**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

LAUREN ADELE OLIVER,
an individual,

      Plaintiff,

v.                                   Case No. 1:20-CV-00237-KK-SCY

MEOW WOLF, INC., a Delaware
corporation; VINCE KADLUBEK,
an individual and officer; and
DOES 1-50,

      Defendants.

**DECLARATION OF JESSE A. BOYD IN SUPPORT OF PLAINTIFF'S MOTION TO
COMPEL DISCOVERY FROM DEFENDANT
MEOW WOLF, INC.**

I, Jesse A. Boyd, declare:

1.     I am an attorney duly licensed to practice law before the United States District Court for the District of New Mexico. I am an attorney of record for Plaintiff Lauren Adele Oliver in the above-captioned matter. I have personal knowledge of the facts contained herein and could testify competently if called upon to do so.

2.     Attached hereto as Exhibit A is a true and correct copy of a profile page for Vince Kadlubek that was available for public view and download as of February 16, 2021 at https://linkedin.com/in/vince-kadlubek-97947649, and which I downloaded on February 16, 2021.

3.     Attached hereto as Exhibit B is a true and correct copy of portions of Plaintiff's Objections and Responses to Defendant Vince Kadlubek's First Set of Interrogatories to Plaintiff Lauren Oliver, and associated verification, which were timely served on defendants in this matter, and which have been highlighted to identify Plaintiff's responses pertinent to the instant motion.

4.      Attached hereto as Exhibit C is a true and correct copy of Brendan L. Smith, Interactive Art Center Meow Wolf Is Forging a New Business Model for Artists, HYPERALLERGIC, July 25, 2017, which was downloaded from the Hyperallergic website by Plaintiff or her counsel on August 20, 2020. As of February 18, 2021, the article remained available for public viewing at https://hyperallergic.com/392154/interactive-art-center-meow-wolf-is-forging-a-new-business-model-for-artists/.

5.      Attached hereto as Exhibit D is a true and correct copy of United States Securities and Exchange Commission, Form D, Notice of Exempt Offering of Securities by Meow Wolf, Inc., signed by Vince Kadlubek, dated May 8, 2019, available at https://sec.report/Document/0001694455-19-000001/primary_doc.html, which I downloaded on February 16, 2021.

6.      Attached hereto as Exhibit E is a true and correct copy "Meow Wolf – Austin" filing with the S.E.C., available at https://sec.report/Document/0001670254-17-000178/document_17.pdf, which I downloaded on February 18, 2021.

7.      Attached hereto as Exhibit F is a true and correct copy of "2019 Artist Bonus Payment Program Agreement," which Plaintiff received from Meow Wolf on or around July 11, 2019.

8.      Attached hereto as Exhibit G is a true and correct copy of a letter from my office to Defendants' counsel, transmitted on or about January 12, 2021.

9.      Attached hereto as Exhibit H is a true and correct copy of a letter from Defendants' counsel's office received by my office in response to the January 12, 2021 letter noted above.

10.     Attached hereto as Exhibit I is a true and correct copy of an email exchange between my office and Defendants' counsel's office in this matter.

11.     Attached hereto as Exhibit J is a true and correct copy of an email exchange between my office and Defendants' counsel's office in this matter.

12.     I have directed that pertinent portions of the Deposition of Kate Lesta, Oct. 8, 2020, shall be lodged with the court for in-camera review pursuant to Paragraph 11, sub. (b) of the

protective order entered in this action (D.E. 56).  Along with their lodging with the court, those portions of said deposition shall be served upon counsel for Defendants, but will not be filed.

I declare, under penalty of perjury, that the forgoing is true and correct.  Executed on February 22, 2021.

By: ___/s/ *Jesse A. Boyd*_____
JESSE A. BOYD

# EXHIBIT A

## Contact

www.linkedin.com/in/vince-kadlubek-97947649 (LinkedIn)

## Top Skills

Leadership
Management
Strategic Planning

# Vince Kadlubek

Founder and Director at Meow Wolf
Santa Fe

## Summary

I've always loved creating cool spaces and I've always believed in artists. What started years ago as a bunch of kids messing around in living rooms has transformed into an indescribable 20,000 sq ft. immersive art experience. I am a Co-founder and a Director of Meow Wolf, an art collective that has become a remarkable experiential arts company. I created the business plan for Meow Wolf's House of Eternal Return in Santa Fe New Mexico, which has seen unprecedented success. I raised a Series A that pushed Meow Wolf towards our newest experiences, Meow Wolf Vegas and Meow Wolf Denver.

This year I launched my own consulting agency, Spatial Activations, with many amazing programmers and producers and creatives across industries.

I like turtles.

———

## Experience

**Meow Wolf**
13 years

Founder and Director
November 2020 - Present (4 months)
Santa Fe, New Mexico, United States

Executive Advisor
November 2019 - November 2020 (1 year 1 month)
Santa Fe, New Mexico Area

Currently developing Meow Wolf's 5-year vision and advising our Officer group. Member of Meow Wolf's BOD.

Interested in location-based experience movement, art, mixed reality, and nu-brands!

Cofounder and CEO
2008 - November 2019 (11 years)
Santa Fe, New Mexico

Meow Wolf
New Mexico

———

## Education

Dropout
Failure, Life · (2000 - 2026)

# EXHIBIT B

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW MEXICO

LAUREN ADELE OLIVER,
an individual,

   Plaintiff,

vs.             Case No. 1:20-CV-00237-KK-SCY

MEOW WOLF, INC., a Delaware
corporation; VINCE KADLUBEK,
an individual and officer; and
DOES 1-50,

   Defendants.

### OBJECTIONS AND RESPONSES TO DEFENDANT VINCE KADLUBEK'S
### FIRST SET OF INTERROGATORIES TO PLAINTIFF LAUREN OLIVER

   Defendant Vince Kadlubek, pursuant to Federal Rules of Civil Procedure 26 and 33, hereby

requests that Plaintiff Lauren Oliver answer the following interrogatories, separately and fully in

writing, under oath, and based on the facts and information available to Plaintiff, her attorneys, or

her agents, within thirty (30) days of receipt.

### DEFINITIONS AND INSTRUCTIONS

Unless otherwise indicated, the following instructions and definitions shall be applicable to these

Interrogatories:

   A.  The words "You" and "Your" refer to Lauren Adele Oliver, the Plaintiff in this

action, and her agents, attorneys, and representatives.

   B.  "Meow Wolf" means Meow Wolf, Inc., a Defendant in this action, both before and

after incorporation, including without limitation other entities that have done business as Meow

1

**INTERROGATORY NO. 3:** Describe in detail any promise or offer Meow Wolf or Vince Kadlubek made to you that you allege in this lawsuit relating to profit sharing, revenue share, equity, ownership interest, or other financial interest or contingent compensation, including without limitation:

    a.  who made the promise or offer,

    b.  the date,

    c.  the medium in which it was communicated,

    d.  every term of the promise or offer;

    e.  every witness to the promise or offer, and

    f.  identify each and every document reflecting the promise or offer.

**ANSWER:**

Plaintiff objects to this interrogatory as vague, overbroad, and compound. Plaintiff further objects that this is an interrogatory more appropriately propounded, at least jointly, by Defendant Meow Wolf. Without waiving these objections, and subject thereto, and to the extent Plaintiff understands the interrogatory, Plaintiff responds as follows:

In late 2014, Plaintiff was approached by Caity Kennedy and encouraged to submit a proposal for a new Meow Wolf venture, which would eventually become HoER. Plaintiff had participated in prior Meow Wolf projects, as far back as 2008, and understood Meow Wolf to be a collective. At the time Kennedy sought the proposal from Plaintiff, she never indicated Meow Wolf's status as a collective had changed, or that HoER would be anything other than a venture of that Meow Wolf collective.

After submitting a proposal for the installation of Plaintiff's flagship art project, Ice Station Quellette ("ISQ"), at Kennedy's urging, Plaintiff received what appeared to be a form

email, with a significant typo, from Kadlubek on April 2, 2015 stating that Plaintiff would retain ownership of the intellectual property associated with her installation and receive an artist revenue share stipend. That email also indicated that a contract would be forthcoming, and Kadlubek was "excited to work with [Plaintiff]." Plaintiff replied by email, showing her own excitement to work with Meow Wolf, and at the prospect of reviewing a "contract." After not receiving a contract for two weeks, Plaintiff sent an email to Kadlubek requesting that one be forwarded to her. No response to that email was received, and Plaintiff was not presented with a written contract covering her relationship with Meow Wolf or her participation in HoER prior to HoER's opening in March of 2016.

At the time of her exchange with Kadlubek in April of 2015, Plaintiff expected HoER to be similar to the Meow Wolf collective's other projects, such as their Halloween Show in 2008, in which she participated, and the later Omega Mart and Due Return projects. The initial timeline supported this understanding, as Plaintiff was informed HoER had a completion deadline of September 1, 2015. However, Plaintiff's understanding of the scope of the project changed after she began regularly attending Meow Wolf meetings during the late Spring of 2015 through the beginning of installation in January of 2016. At those meetings, it became clear that HoER would be a far more significant undertaking than prior Meow Wolf projects for all involved. Unsurprisingly, the completion deadline was pushed back considerably. By Summer of 2015, it was clear to Plaintiff her exchange with Kadlubek in April was a preliminary foray, which had been replaced by a new compensation model being outlined at by Kadlubek's at the meetings. This conclusion was confirmed by Kadlubek's representations, and the fact that Plaintiff's request for a contract was never acted upon, or even mentioned. It was clear HoER

was ballooning into a more complex project than apparently any of the parties had initially anticipated, and most certainly, than Plaintiff had anticipated.

The mood at the meetings was that of a collective – all-for-one-and-one-for-all. Kadlubek regularly mentioned an Artists Revenue Share as a mechanism by which Artists would participate in Meow Wolf's success, should it materialize.  At no time did he revisit the subject of the "contract" he mentioned in April to Plaintiff.  Defendants' promises of a big potential upside of a "revenue share" made sense to Plaintiff at the time, given the large amount of labor, money, and artwork she was being asked to invest in the project.  During this period, Plaintiff was also moving house, and she expressed to Caity Kennedy how daunting that process was to do that while planning and working on a "permanent" ISQ at HoER.  Ms. Kennedy, told Plaintiff to "just ask for help," because "you're part of a collective now."

At the meetings, Kadlubek began delivering an increasingly polished pitch to the participating artists, including Plaintiff, which he repeated to the press.  He portrayed Meow Wolf as a collective, and HoER as a legacy arts complex serving the city of Santa Fe with a grand exhibit generating ticket sales along the lines of Santa Fe's Children's Museum.  The space would also provide support to Santa Fe's art community with studios and a maker's space, and arts programs benefiting local children and families.  At no meeting Plaintiff attended did Kadlubek reveal any ambitions to turn the Meow Wolf Collective into a profit-driven corporation benefitting just a few insiders.  Again, Kadlubek represented that, by investing their labor, money, and artwork in HoER, participating artists were now part of the Meow Wolf Collective and would all share in all the benefits of our collective efforts to make HoER a success – financially and beyond.

The artist compensation Kadlubek introduced at meetings was entirely different from the terms of his April 2, 2015 email. Expressed to the entire group at these meetings, this new compensation structure clearly superseded any prior expressions on the part of Kadlubek or Meow Wolf.  As stated during the meetings, participating artists/members of the Collective would be paid an "Artist Revenue Share" in lieu of upfront payment for their artwork and installation labor.  The return on that investment would be based on an annual calculation, proportional to how much income HoER generated each year, like a residual or royalty.  Plaintiff was familiar with this type of 'sweat equity' program as being common in profit-share models and the entertainment industry.  In order to recruit professional talent to put in the extraordinary effort necessary to get off the ground, ventures regularly offer shares or some other back-end equity mechanism in lieu of cash up front.  Likewise, entertainment creatives regularly forgo full up-front compensation in exchange for royalties or other residuals.  Given the success of Omega Mart and the Due Return, Plaintiff took Kadlubek's words as credible.  Kadlubek also did not hide the fact that participating artists were taking a risk when investing all of their labor and art – – if they built it, would people come?  If not, Plaintiff understood she would not receive compensation, as there would be no money to distribute.

Plaintiff had no reason not to trust this group of artists, whom she had known for many years. In the absence of any contradictory specifics or additional conditions, and given Plaintiff's background in tech and entertainment, the terms as presented made sense. Plaintiff accepted Kadlubek's assurances about Meow Wolf celebrating and safeguarding artists, and his explicit guarantee of an artist revenue share and collective membership in exchange for Plaintiff's investment.

Plaintiff went to work on her end of the bargain, bringing her already-successful climate change art platform to HoER.  Plaintiff invested a great deal of labor (and sweat), money, and of course artwork, in the Meow Wolf venture. Building off of years of prior work on ISQ and its elements, Plaintiff designed her HoER installation during summer and fall 2015 and worked on-site from January 2 to the March 16 opening in 2016.  Plaintiff did this without compensation up front, as a member in the Collective and in reliance on Defendants' promise of an Artist Revenue Share. She also understood herself to be one of the core members of Meow Wolf, based on her participation in Meow Wolf projects from its early days, her long-standing relationship with several members, and ISQ having been given an entire room – sandwiched between the rooms of Benji Geary and Emily Montoya and Caity Kennedy.  To bring the installation of ISQ to the professional standards to which Plaintiff holds herself, she put everything she had into the work, using her own money and resources to complete the project, and turning down lucrative work to meet Defendants' deadline to finish.

Throughout the leadup to and through installation, Meow Wolf avoided discussing, much less presenting, Plaintiff with a written agreement.  At the time, Plaintiff attributed Defendants' failure to reduce what she believed to be the parties' agreement to writing to the pressures everyone was under leading up to, and during the overwhelming build.

Given the scope of the project as it developed and was realized, Plaintiff understood Defendants' representations to be an offer – Plaintiff could not be assured of any payment if the venture was not a success, but if it were, she would proportionally share in that success through a share of revenue and membership in the collective.  At no time prior to the opening of HoER in March of 2016 did Defendants indicate to Plaintiff that the promised revenue share would be capped at an amount certain, or that her share of the success of Meow Wolf would be anything

11

but proportional.  While she was concerned about how her relationship with Meow Wolf would be formalized, she had been friends with other Meow Wolf members for many years.  She understood they were working hard at getting HoER finished – everyone was.  Plaintiff had participated in and kept up with Meow Wolf's projects from the collective's earliest days, and considered herself to be friends with other core members.  She trusted Defendants would make good on their promises, and proceeded to invest everything she had into the installation of her flagship ISQ, and its iconic Space Owl, at HoER.

Witnesses to Defendants' representations include the dozens and dozens of people who attended Meow Wolf meetings with Plaintiff during the Summer of 2015 through the opening of HoER in March 2016.  Plaintiff does not recall all of the persons who were present at any particular one of the given meetings when Defendants made representations regarding artist revenue share or collective membership.  At this time Plaintiff believes the following people may have information related to the representations outlined above:

Plaintiff
Kate Lesta
Vince Kadlubek
Caity Kennedy
Benji Geary
Emily Montoya
Sean Di Ianni
Corvus Brinkerhoff
Matt King
Geoff Banzhof
Patrick Barrow
Brandon Behning
Karen Billard
Sarah Bradley
Cris Brodsky
Peter Chapman
Chris Clavio
Mat Crimmins
David Cudney
Sarah Dallas

**INTERROGATORY NO. 5:** Describe in detail each interaction you had with anyone related to Meow Wolf before it was incorporated, stating without limitation the dates, location or medium of communication, all person(s) involved or who witnessed the interaction, the substance of each interaction, any promises or offers made and all related terms conditions, and your response to each such interaction.

**ANSWER:**

Plaintiff objects to this interrogatory as vague, overbroad, and compound.  Plaintiff further objects that this is an interrogatory more appropriately propounded, at least jointly, by Defendant Meow Wolf.  Without waiving these objections, and subject thereto, and to the extent Plaintiff understands the interrogatory, Plaintiff responds as follows:

It is Plaintiff's understanding that Meow Wolf was "incorporated" sometime in 2017. Plaintiff's interactions with Meow Wolf and individuals related to Meow Wolf dates back to 2008 when she participated in group art shows in Trinidad, Colorado, with fellow Santa Fe artists, and met Matt King and Quinn Tincher. They became friends. Plaintiff met with Mr. King, Mr. Tincher and other Meow Wolf members in their first art space on Second Street in Santa Fe, and participated in Meow Wolf's first large exhibit on Halloween that year (Plaintiff painted a large furry creature with antlers, surrounded by scary faces, on a wall — a photograph of which has been produced), at the collective's larger space across Second Avenue.  Plaintiff met and became friendly with Emily Montoya, Benji Geary, and many more of the people in the Meow Wolf circle.

At the invitation of Mr. Tincher Plaintiff attended meetings and later created some posters for Meow Wolf music shows. Plaintiff developed respect for the group on an artistic

level.  Plaintiff also bought some of Mr. Tincher's art and attended many of their events.  The number of times and situations Plaintiff interacted with persons "related" to Meow Wolf is impossible to catalogue entirely.  Suffice it to say, Plaintiff regularly interacted with people related to Meow Wolf between 2008 and 2014 at shows and social gatherings.  These interactions were varied and numerous.  Plaintiff believes she attended most or all of Meow Wolf's art shows in Santa Fe during this period, including, of course Due Return and Omega Mart, and interacting with numerous people related to Meow Wolf, including Caity Kennedy, Benji Geary, Emily Montoya, Brandon Behning, and Quinn Tincher.  Plaintiff also regularly saw persons related to Meow Wolf at other art events and parties, and simply living in and around Santa Fe, which interactions are too numerous to catalogue.

Plaintiff believes in the Fall of 2014, at an opening at Offroad Gallery in Santa Fe, Caity Kennedy and Matt King told her about the possibility of obtaining a huge art space, which would become HoER. Kennedy and King told Plaintiff they were looking for artists to participate.

Plaintiff did not initially submit a proposal for the HoER.  At the time, she was busy developing work for her first Ice Station show at Philspace, which was opening in June.  At the same time, Plaintiff was also regularly travelling to Minnesota to care for her mother who was suffering from Parkinson's disease.  In early 2015, Caity Kennedy reached out and asked Plaintiff to submit a proposal, which Plaintiff ultimately did.

After Plaintiff's proposal was accepted, her interactions with persons related to Meow Wolf are, again too numerous and varied to relay in the context of an interrogatory response. Interactions included meetings, social gatherings, emails, and eventually, Slack exchanges.  For a review of interactions, please see Plaintiff's answer to Interrogatory No. 3, above.

Plaintiff does not recall meeting Vince Kadlubek before 2015.  However, when he made the promises outlined in Plaintiff's answers to Interrogatories No. 3 and No. 4, Plaintiff had no reason to doubt him, or doubt Meow Wolf's intentions, because of her long-standing relationship with the Meow Wolf members as explained above, and what Plaintiff believed to be her and her friends' shared values surrounding art and art-making.  At the time, Plaintiff was unaware of Kadlubek's criminal record.

In the Summer and Fall of 2015, Plaintiff had a lot of stuff to move at her house.  She expressed to Caity Kennedy how daunting that work was.  Ms. Kennedy, told Plaintiff to "just ask for help," because "you're part of a collective now."  This conversation added significantly to Plaintiff's understanding that she was a full member of the collective, and its core team. Further, by offering Plaintiff her own room off "Bermuda Portals," sandwiched between Benji Geary and Emily Montoya's room and Ms. Kennedy's room, which represented a key location in the exhibit, Plaintiff reasonably understood, not only that Meow Wolf respected her work, but also that she was now one of Meow Wolf's core members.  That respect and position within the collective were foundational to Plaintiff's decision to invest her labor, money, and artwork in HoER, especially given the exceptional audience and critical acclaim the Ice Station project was receiving for its appearances at Philspace and Santa Fe Institute.

Prior to Meow Wolf's "incorporation," nothing in Plaintiff's interactions with persons related to Meow Wolf prepared her for the exchange she had on June 3, 2019, when she finally and fully apprehended that the fun, industrious art collective she had joined, and in which she had invested so much, had become a vehicle for a handful of privileged insiders to make millions.  Defendants were not just reneging on their promises to Plaintiff, they were

unceremoniously attempting to terminate the relationship – and this only after they had extracted all the value they could from ISQ and Plaintiff's iconic Space Owl.

**INTERROGATORY NO. 6:** Describe in detail the "Meow Wolf artists' collective," referred to in paragraph 49 of your Complaint, listing each person in the collective, describing its formation, all terms and conditions of the collective, and each person's financial relationship to the collective and when and where the terms of such financial relationship were determined and agreed upon.

**ANSWER:**

Plaintiff objects to this interrogatory as vague, overbroad, and compound. Plaintiff further objects that this is an interrogatory more appropriately propounded, at least jointly, by Defendant Meow Wolf. Without waiving these objections, and subject thereto, and to the extent Plaintiff understands the interrogatory, Plaintiff responds as follows:

Plaintiff's understanding of the Meow Wolf collective is based on interactions with members dating back to 2008 when she participated in group art shows in Trinidad, Colorado, with fellow Santa Fe artists, and met Matt King and Quinn Tincher. They became friends. Plaintiff met with Mr. King, Mr. Tincher and other Meow Wolf members in their first art space on Second Street in Santa Fe, and participated in Meow Wolf's first large exhibit on Halloween that year (Plaintiff painted a large furry creature with antlers, surrounded by scary faces, on a wall — a photograph of which has been produced), at the collective's larger space across Second Avenue. Plaintiff met and became friendly with Emily Montoya, Benji Geary, and many more of the people in the Meow Wolf circle.

At the invitation of Mr. Tincher Plaintiff attended meetings and created some posters for Meow Wolf music shows. Plaintiff developed respect for the group on an artistic level. Plaintiff also bought some of Mr. Tincher's art and attended many of their events. The number of times and situations Plaintiff interacted with persons "related" to Meow Wolf is impossible to catalogue entirely. Suffice it to say, Plaintiff regularly interacted with people related to Meow Wolf regularly between 2009 and 2014 at shows and social gatherings. Plaintiff's interactions with the Meow Wolf collective from late 2014 through June 3, 2019 are outlined in her responses to Interrogatory Nos. 3-6 above.

Plaintiff's understanding is that the membership in the collective changed over time. Members would participate in some projects, but not others. Up through installation and opening of HoER in March 2016, Plaintiff was told she was a member of the collective and she was entitled to a revenue share proportional with the success of the venture. In addition, the prominence of her contribution to HoER showed that she was a member of Meow Wolf's core team. Plaintiff was unaware of any underlying legal entity associated with Meow Wolf – Defendants certainly never discussed LLCs or corporations in Plaintiff's presence – but regardless of what entities may have laid claim to the collective, Plaintiff became an owner of some reasonable share of the collective once the installation of ISQ at HoER was complete, just as any other investor.

**INTERROGATORY NO. 7:** Describe in detail every attempt at commercialization, reproduction, licensing, or merchandising you have made relating to the Space Owl or the Ice Station Quellette outside of Meow Wolf, including for each effort any other persons or entities involved, any written or oral agreements, and all payments received or due from such efforts.

24

**INTERROGATORY NO. 12:** Identify every person who provided information or assisted in answering these interrogatories, and state the relationship of each such person to you.

**ANSWER:**

Lauren Oliver, self.

Jesse A. Boyd; Andrew Chan; and Vince Ward, counsel.

**INTERROGATORY NO. 13:** If any document responsive to Defendants' requests for production or interrogatories no longer exists or is no longer in your possession, custody, or control, for whatever reason, describe the document, including the date, title, author's name and position, intended and actual recipients, how and from whom you obtained the document, and the subject matter of the document, and describe the circumstances surrounding the reason the document no longer exists and the approximate date on which the document was destroyed, discarded, or otherwise ceased to exist or pass out of your possession, custody, or control.

**ANSWER:**

Plaintiff is unaware of any responsive documents.


Dated: November 20, 2020                    ERICKSEN ARBUTHNOT

                                  By:*/s/ Jesse A. Boyd*
                                       JESSE A. BOYD
                                       2300 Clayton Road, Suite 350
                                       Concord, CA 94520
                                       (510) 832-7770
                                       (510) 832-0102 facsimile
                                       jboyd@ericksenarbuthnot
                                       *Attorneys for Plaintiff Lauren Adele Oliver*

34

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

LAUREN ADELE OLIVER,
an individual,

      Plaintiff,

vs.                                    Case No. 1:20-CV-00237-KK-SCY

MEOW WOLF, INC., a Delaware
corporation; VINCE KADLUBEK,
an individual and officer; and
DOES 1-50,

      Defendants.

**PLAINTIFF'S VERIFICATION OF OBJECTIONS AND RESPONSES TO DEFENDANT VINCE KADLUBEK'S FIRST SET OF INTERROGATORIES TO PLAINTIFF LAUREN OLIVER**

PLAINTIFF'S VERIFICATION OF OBJECTIONS AND RESPONSES TO DEFENDANT VINCE
KADLUBEK'S FIRST SET OF INTERROGATORIES TO PLAINTIFF LAUREN OLIVER

Oliver v. Meow Wolf, Inc., et al.

Page 1 of 2

## **VERIFICATION**

STATE OF NEW MEXICO                    )
                                       )
COUNTY OF BERNALILLO                   )

I, LAUREN ADELE OLIVER, verify under penalty of perjury that I have reviewed,

know, and understand the contents of the foregoing OBJECTIONS AND RESPONSES TO

DEFENDANT VINCE KADLUBEK'S FIRST SET OF INTERROGATORIES TO PLAINTIFF

LAUREN OLIVER, and that the statements therein are true to the best of my knowledge.

_____

LAUREN ADELE OLIVER

EXHIBIT C

# HYPERALLERGIC

ARTICLES

# Interactive Art Center Meow Wolf Is Forging a New Business Model for Artists

Meow Wolf has evolved from a ragtag group staging low-budget shows into a multimillion-dollar operation that employs more than 150 people.

Brendan L. Smith    July 25, 2017



*House of Eternal Return*, installation view (photo by Kate Russell, all images courtesy Meow Wolf)

For many private arts venues, fundraising is a hardscrabble ordeal, an unceasing quest to scrape together enough grants and donations to keep the lights on — which makes Meow Wolf's recent fundraising success all the more remarkable.

Meow Wolf, a Santa Fe–based artist collective that opened a very popular permanent art installation in a former bowling alley in 2016, raised more than $1 million in just two days on Wefunder, faster than any other company using the crowdfunding website. More than 725 investors paid at least $1,000 each to help fund the building of a new manufacturing facility in Santa Fe and the hiring of a full-time team to build new installations as Meow Wolf plans to expand to future locations, most likely in Austin, Denver, Houston, or Las Vegas.

Meow Wolf co-founder and CEO Vince Kadlubek told Hyperallergic that he was surprised by the quick response, especially since there is no way for investors to sell their shares in a privately held company and no guarantee of any profits in the future. "We know we have fans, and we have a good profile," he said. "It's a fairly



Meow Wolf (photo by Kate Russell)



*House of Eternal Return*, installation view
(photo by Lindsey Kennedy)

risky

proposition for investors, so the fact that so many people were willing to jump in without a promise of a return really spoke volumes. We're so grateful for the support we have."

Meow Wolf, which got its name from random words drawn from a hat by collective members, also raised more than $7 million earlier this year through more conventional investment rounds. It has become an employee-owned company with a revenue-sharing plan for the more than 135 artists who created the vast 20,000-square-foot permanent installation called *House of Eternal Return*, in the process forging a path for a new business model to support artists: a hybrid blend of art and entertainment that sells immersive experiences rather than artwork. The installation has become a major tourist attraction in Santa Fe, seeing more than 400,000 visitors and raking in $7 million in revenue in its first year. The installation has broad appeal, attracting families and tourists who might never step foot in a gallery or art museum. That success has stirred some controversy in art circles about whether Meow Wolf is creating art or just entertainment — as if there's some reason visual art shouldn't be just as entertaining and profitable as film, music, or theater.



*House of Eternal Return*, installation view
(photo by Lindsey Kennedy)



*House of Eternal Return*, installation view
(photo by Lindsey Kennedy)

While

Hollywood has protected the rights of creatives through royalties, emerging visual artists are often expected to work for free in exchange for "exposure," and they



*House of Eternal Return*, installation view
(photo by Lindsey Kennedy)

don't get royalties when their work is resold in the future at higher values. "We're building a model that is more like the entertainment model, so artists are able to participate in the success that their creativity brings forth," Kadlubek said. "We feel like we've cracked an egg, and I'm hoping that other artists take advantage of this model."

I drove to the *House of Eternal Return* in early July, at the tail end of a dusty 700-mile road trip from the scorched earth of Las Vegas to the stunning mountainous landscape of Santa Fe, which was a homecoming of sorts. I lived in "The City Different" for seven years before moving to Washington, D.C., in 2005, and I started making mixed-media artwork there, collecting rusted bedsprings, auto parts, and metal scraps that had been tossed decades earlier into rock-bottomed arroyos in the piñon-studded hills around the city. I used to bowl and sing drunken karaoke in the bar at Silva Lanes before Meow Wolf transformed it into something entirely different and unexpected.



*House of Eternal Return*, installation view
(photo by Lindsey Kennedy)



*House of Eternal Return*, installation view
(photo by Lindsey Kennedy)

At the *House of Eternal Return*, I saw the ticket line



*House of Eternal Return*, installation view
(photo by Lindsey Kennedy)

stretching out the door toward the giant metal sculptures of a wolf and a robot smelling a flower in the parking lot. Inside, the installation opens in a *Scooby Doo*–ish Victorian house, where a vaguely described mystery involving a missing family has unlocked supernatural portals into other worlds. The theme is a very loose construct that ultimately fails to contain the chaos within the wondrous maze of rooms filled with

Case 1:20-cv-00237-KK-SCY   Document 78   Filed 02/24/21   Page 27 of 91

a bizarre bounty of surprises. A 20-foot-tall furry, horned creature stares down with hollow glowing eyes, a video projection of a falling man can only be glimpsed inside a toilet, and a path winds through a forest of neon glowing trees. I walked into a mastodon skeleton's eerie green rib cage and played its bones like a xylophone. Try doing *that* at MoMA.



*House of Eternal Return*, installation view
(photo by Lindsey Kennedy)

As an arts writer, I initially started analyzing the experience, but I quickly realized that was a mistake. It's more refreshing to just roll with the weirdness and see what opening the next door brings. *House of Eternal Return* is a creative free-for-all, like falling into a dream or sliding down a rabbit hole. It's a psychedelic trip that winds through narrow openings and up twisting spiral staircases. My two sons, who are five and seven, loved it, unlike some of our art museum forays where they kept yanking me toward the exit. They didn't care if this wild ride was art or entertainment or both — and pretty soon I didn't, either.

Over the past decade, Santa Fe's art scene has sharpened its edges considerably, moving beyond a regional focus on Southwestern art, Pueblo pottery, and the bland abstract paintings that the calcified galleries on Canyon Road sell to rich tourists. Nine contemporary art galleries now fill the new Railyard Arts District next to the contemporary art museum SITE Santa Fe. The first museum in the nation dedicated to encaustic art opened this year with an exhibition focused on climate change. And Meow Wolf has evolved from a ragtag group of artists staging low-budget shows in rundown buildings into a multimillion-dollar operation that employs more than 150 people, helping artists thrive in a state hammered by the nation's highest unemployment rate. It remains to be seen whether their radically different art-as-entertainment model will succeed outside the Land of Enchantment, but hundreds of investors are betting on it.

Interactive Art Center Meow Wolf Is Forging a New Business Model for Artists



*House of Eternal Return*, installation view
(photo by Lindsey Kennedy)



Christian Ristrow's Robot at Meow Wolf
(photo by Kate Russell)



*House of Eternal Return*, installation view
(photo by Lindsey Kennedy)

MORE FROM HYPERALLERGIC

# EXHIBIT D

The Securities and Exchange Commission has not necessarily reviewed the information in this filing and has not determined if it is accurate and complete.
The reader should not assume that the information is accurate and complete.

# UNITED STATES SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549
## FORM D

| OMB APPROVAL | |
|---|---|
| OMB Number: | 3235-0076 |
| Estimated average burden | |
| hours per response: | 4.00 |

## Notice of Exempt Offering of Securities

### 1. Issuer's Identity

CIK (Filer ID Number)

<u>0001694455</u>

Name of Issuer

Meow Wolf, Inc.

Jurisdiction of Incorporation/Organization

DELAWARE

Year of Incorporation/Organization

☐ Over Five Years Ago
☒ Within Last Five Years (Specify Year) 2016
☐ Yet to Be Formed

Previous Names

☒ None

Entity Type

☒ Corporation
☐ Limited Partnership
☐ Limited Liability Company
☐ General Partnership
☐ Business Trust
☐ Other (Specify)

### 2. Principal Place of Business and Contact Information

Name of Issuer

Meow Wolf, Inc.

Street Address 1

1352 RUFINA CIRCLE

Street Address 2

City

SANTA FE

State/Province/Country

NEW MEXICO

ZIP/PostalCode

87507

Phone Number of Issuer

(505) 395-6369

### 3. Related Persons

| Last Name | First Name | Middle Name |
|---|---|---|

SEC FORM D

Kadlubek

Vince

**Street Address 1**
c/o Meow Wolf, Inc.

**Street Address 2**
1352 Rufina Circle

**City**
Santa Fe

**State/Province/Country**
NEW MEXICO

**ZIP/PostalCode**
87507

**Relationship:** ☒ Executive Officer ☒ Director ☐ Promoter

**Clarification of Response (if Necessary):**

---

**Last Name**
Di Ianni

**First Name**
Sean

**Middle Name**

**Street Address 1**
c/o Meow Wolf, Inc.

**Street Address 2**
1352 Rufina Circle

**City**
Santa Fe

**State/Province/Country**
NEW MEXICO

**ZIP/PostalCode**
87507

**Relationship:** ☒ Executive Officer ☒ Director ☐ Promoter

**Clarification of Response (if Necessary):**

---

**Last Name**
Christensen

**First Name**
Carl

**Middle Name**

**Street Address 1**
c/o Meow Wolf, Inc.

**Street Address 2**
1352 Rufina Circle

**City**
Santa Fe

**State/Province/Country**
NEW MEXICO

**ZIP/PostalCode**
87507

**Relationship:** ☒ Executive Officer ☐ Director ☐ Promoter

**Clarification of Response (if Necessary):**

---

**Last Name**
Ward

**First Name**
Jim

**Middle Name**

**Street Address 1**
c/o Meow Wolf, Inc.

**Street Address 2**
1352 Rufina Circle

**City**
Santa Fe

**State/Province/Country**
NEW MEXICO

**ZIP/PostalCode**
87507

**Relationship:** ☒ Executive Officer ☐ Director ☐ Promoter

**Clarification of Response (if Necessary):**

Last Name
Fisher

First Name
Winston

Middle Name

Street Address 1
c/o Meow Wolf, Inc.

Street Address 2
1352 Rufina Circle

City
Santa Fe

State/Province/Country
NEW MEXICO

ZIP/PostalCode
87507

Relationship: [ ] Executive Officer [X] Director [ ] Promoter

Clarification of Response (if Necessary):

---

Last Name
Sobecki

First Name
Christopher

Middle Name

Street Address 1
c/o Meow Wolf, Inc.

Street Address 2
1352 Rufina Circle

City
Santa Fe

State/Province/Country
NEW MEXICO

ZIP/PostalCode
87507

Relationship: [ ] Executive Officer [X] Director [ ] Promoter

Clarification of Response (if Necessary):

---

Last Name
Barstein

First Name
Justin

Middle Name

Street Address 1
c/o Meow Wolf, Inc.

Street Address 2
1352 Rufina Circle

City
Santa Fe

State/Province/Country
NEW MEXICO

ZIP/PostalCode
87507

Relationship: [ ] Executive Officer [X] Director [ ] Promoter

Clarification of Response (if Necessary):

---

Last Name
Zandan

First Name
Peter

Middle Name

Street Address 1
c/o Meow Wolf, Inc.

Street Address 2
1352 Rufina Circle

City
Santa Fe

State/Province/Country
NEW MEXICO

ZIP/PostalCode
87507

Relationship: [ ] Executive Officer [X] Director [ ] Promoter

2/16/2021

SEC FORM D

Clarification of Response (if Necessary):

| Last Name | First Name | Middle Name |
|---|---|---|
| Alsop | Stewart | |

| Street Address 1 | Street Address 2 | |
|---|---|---|
| c/o Meow Wolf, Inc. | 1352 Rufina Circle | |

| City | State/Province/Country | ZIP/PostalCode |
|---|---|---|
| Santa Fe | NEW MEXICO | 87507 |

Relationship: ☐ Executive Officer ☒ Director ☐ Promoter

Clarification of Response (if Necessary):

## 4. Industry Group

☐ Agriculture

Banking & Financial Services
☐ Commercial Banking
☐ Insurance
☐ Investing
☐ Investment Banking
☐ Pooled Investment Fund

Is the issuer registered as an investment company under the Investment Company Act of 1940?
☐ Yes      ☐ No

☐ Other Banking & Financial Services
☐ Business Services

Energy
☐ Coal Mining
☐ Electric Utilities
☐ Energy Conservation
☐ Environmental Services

☐ Health Care
☐ Biotechnology
☐ Health Insurance
☐ Hospitals & Physicians
☐ Pharmaceuticals
☐ Other Health Care

☐ Manufacturing

Real Estate
☐ Commercial
☐ Construction
☐ REITS & Finance
☐ Residential
☐ Other Real Estate

☐ Retailing
☐ Restaurants

Technology
☐ Computers
☐ Telecommunications
☐ Other Technology

Travel
☐ Airlines & Airports
☐ Lodging & Conventions
☐ Tourism & Travel Services
☐ Other Travel

☒ Other

☐ Oil & Gas
☐ Other Energy

## 5. Issuer Size

| Revenue Range | OR | Aggregate Net Asset Value Range |
|---|---|---|
| ☐ No Revenues | | ☐ No Aggregate Net Asset Value |
| ☐ $1 - $1,000,000 | | ☐ $1 - $5,000,000 |
| ☐ $1,000,001 - $5,000,000 | | ☐ $5,000,001 - $25,000,000 |
| ☐ $5,000,001 - $25,000,000 | | ☐ $25,000,001 - $50,000,000 |
| ☐ $25,000,001 - $100,000,000 | | ☐ $50,000,001 - $100,000,000 |
| ☐ Over $100,000,000 | | ☐ Over $100,000,000 |
| ☒ Decline to Disclose | | ☐ Decline to Disclose |
| ☐ Not Applicable | | ☐ Not Applicable |

## 6. Federal Exemption(s) and Exclusion(s) Claimed (select all that apply)

☐ Investment Company Act Section 3(c)

☐ Rule 504(b)(1) (not (i), (ii) or (iii))       ☐ Section 3(c)(1)       ☐ Section 3(c)(9)

☐ Rule 504 (b)(1)(i)       ☐ Section 3(c)(2)       ☐ Section 3(c)(10)

☐ Rule 504 (b)(1)(ii)       ☐ Section 3(c)(3)       ☐ Section 3(c)(11)

☐ Rule 504 (b)(1)(iii)       ☐ Section 3(c)(4)       ☐ Section 3(c)(12)

☒ Rule 506(b)       ☐ Section 3(c)(5)       ☐ Section 3(c)(13)

☐ Rule 506(c)       ☐ Section 3(c)(6)       ☐ Section 3(c)(14)

☐ Securities Act Section 4(a)(5)       ☐ Section 3(c)(7)

## 7. Type of Filing

☒ New Notice   Date of First Sale 2019-04-23   ☐ First Sale Yet to Occur

☐ Amendment

## 8. Duration of Offering

Does the Issuer intend this offering to last more than one year?  ☐ Yes ☒ No

## 9. Type(s) of Securities Offered (select all that apply)

☒ Equity
☐ Debt
☐ Option, Warrant or Other Right to Acquire Another Security
☐ Security to be Acquired Upon Exercise of Option, Warrant or Other Right to Acquire Security

☐ Pooled Investment Fund Interests
☐ Tenant-in-Common Securities
☐ Mineral Property Securities
☐ Other (describe)

## 10. Business Combination Transaction

Is this offering being made in connection with a business combination transaction, such as a merger, acquisition or exchange offer?          ☐ Yes ☒ No

Clarification of Response (if Necessary):

## 11. Minimum Investment

Minimum investment accepted from any outside investor $0 USD

## 12. Sales Compensation

Recipient                                        Recipient CRD Number ☐ None

LionTree Advisors LLC                            164399

(Associated) Broker or Dealer ☒ None             (Associated) Broker or Dealer CRD Number ☒ None

None

Street Address 1                                 Street Address 2
ONE MARKET PLAZA, SPEAR TOWER                    40TH FLOOR

City                                             State/Province/Country              ZIP/Postal Code
San Francisco                                    CALIFORNIA                          94105

State(s) of Solicitation (select all that apply) ☒ All States    ☐ Foreign/non-US
Check "All States" or check individual States

## 13. Offering and Sales Amounts

Total Offering Amount   $158,613,855 USD   or ☐ Indefinite

Total Amount Sold       $158,613,855 USD

Total Remaining to be Sold      $0 USD  or ☐ Indefinite

Clarification of Response (if Necessary):

## 14. Investors

☐ Select if securities in the offering have been or may be sold to persons who do not qualify as accredited investors, and enter the number of such non-accredited investors who already have invested in the offering.

Regardless of whether securities in the offering have been or may be sold to persons who do not qualify as accredited investors, enter the total number of investors who already have invested in the offering: ☐ 87

Clarification of Response (if Necessary):

## 15. Sales Commissions & Finder's Fees Expenses

Provide separately the amounts of sales commissions and finders fees expenses, if any. If the amount of an expenditure is not known, provide an estimate and check the box next to the amount.

Sales Commissions $4,160,000 USD  ☒ Estimate

Finders' Fees      $0 USD  ☐ Estimate

Clarification of Response (if Necessary):

## 16. Use of Proceeds

Provide the amount of the gross proceeds of the offering that has been or is proposed to be used for payments to any of the persons required to be named as executive officers, directors or promoters in response to Item 3 above. If the amount is unknown, provide an estimate and check the box next to the amount.

$0 USD  ☒ Estimate

Clarification of Response (if Necessary):

## Signature and Submission

Please verify the information you have entered and review the Terms of Submission below before signing and clicking SUBMIT below to file this notice.

## Terms of Submission

In submitting this notice, each issuer named above is:

- Notifying the SEC and/or each State in which this notice is filed of the offering of securities described and undertaking to furnish them, upon written request, in the accordance with applicable law, the information furnished to offerees.*

- Irrevocably appointing each of the Secretary of the SEC and, the Securities Administrator or other legally designated officer of the State in which the i maintains its principal place of business and any State in which this notice is filed, as its agents for service of process, and agreeing that these persor accept service on its behalf, of any notice, process or pleading, and further agreeing that such service may be made by registered or certified mail, in Federal or state action, administrative proceeding, or arbitration brought against the issuer in any place subject to the jurisdiction of the United States, action, proceeding or arbitration (a) arises out of any activity in connection with the offering of securities that is the subject of this notice, and (b) is founded,

SEC FORM D

directly or indirectly, upon the provisions of: (i) the Securities Act of 1933, the Trust Indenture Act of 1939, the Investment Company Act of 1940, or the Investment Advisers Act of 1940, or any rule or regulation under any of these statutes, or (ii) the laws of the State in which the issuer maintains its principal place of business or any State in which this notice is filed.

- Certifying that, if the issuer is claiming a Regulation D exemption for the offering, the issuer is not disqualified from relying on Rule 504 or Rule 506 for one of the reasons stated in Rule 504(b)(3) or Rule 506(d).

Each Issuer identified above has read this notice, knows the contents to be true, and has duly caused this notice to be signed on its behalf by the undersigned duly authorized person.

For signature, type in the signer's name or other letters or characters adopted or authorized as the signer's signature.

| Issuer | Signature | Name of Signer | Title | Date |
|---|---|---|---|---|
| Meow Wolf, Inc. | /s/ Vince Kadlubek | Vince Kadlubek | Chief Executive Officer | 2019-05-08 |

*Persons who respond to the collection of information contained in this form are not required to respond unless the form displays a currently valid OMB number.*

* This undertaking does not affect any limits Section 102(a) of the National Securities Markets Improvement Act of 1996 ("NSMIA") [Pub. L. No. 104-290, 110 Stat. 3416 (Oct. 11, 1996)] imposes on the ability of States to require information. As a result, if the securities that are the subject of this Form D are "covered securities" for purposes of NSMIA, whether in all instances or due to the nature of the offering that is the subject of this Form D, States cannot routinely require offering materials under this undertaking or otherwise and can require offering materials only to the extent NSMIA permits them to do so under NSMIA's preservation of their anti-fraud authority.

# EXHIBIT E



AUSTIN

*Isn't it time for the next big thing to
emerge on Austin's cultural landscape?*

## 1970
**Armadillo World Headquarters** opens its doors

## 1976
**Austin City Limits** debuts on PBS







## 1972
**Willie Nelson** moves to town

## 1987
**SXSW** debuts on 6th street

**2** CONFIDENTIAL



**1991**
**Richard Linklater** puts Austin on the filmmaking map

**2002**
**Austin City Limits Festival** debuts in Zilker Park

**1997**
**Alamo Drafthouse** opens its doors on Colorado St.

**????**
**What's next?**





## WHAT IS MEOW WOLF?

*Meow Wolf is the most exciting new company in the rapidly growing themed entertainment industry.*

Meow Wolf began as an art collective and has grown into a B-corporation ready to take on the world — creating unforgettable, imaginative experiences that surprise and delight audiences of all ages.

- Meow Wolf creates **Immersive Storytelling Experiences** told through interactive, explorable spaces that are imagined, designed, and constructed by artists.

- **Engaging for audiences of (literally) all ages.** Kids experience an imaginative playground, adults experience sophisticated art, architecture, and narrative experience.

- **Premium viral imagery** and video, shared millions of times online.

- **Positive, magical, wonderful and playful vibes.**

- Meow Wolf received the prestigious **THEA Award** for Best Customer Immersion from the Themed Entertainment Association in 2017 alongside industry behemoths like Disney and Universal.

- Meow Wolf is a **leader in the industry** and has a dual bottom line for profit and positive social impact.

# EXECUTIVE SUMMARY

## MEOW WOLF AUSTIN OPPORTUNITY: 12-MONTH PROJECTIONS

| | SANTA FE | AUSTIN |
|---|---|---|
| Annual city visitors | 1.5 million | 24 million |
| Meow Wolf attendance | 400k actual | 1.25 million projected |
| Revenue | $6.8 million actual | $36 million projected |
| Spent per visit | $17 actual | $29 projected |
| EBITDA | $1.7 million actual | $13 million projected |

## BRAND STRENGTH & ECONOMIC IMPACT

- 3 million engagements, 160 million impressions in 12 months
- 187,000 Facebook likes
- 53,000 Instagram followers the most Instagrammed place in NM
- Over 3,400,000 website views in 12 months
- Over 90% 5-star organic user reviews
- $358 million in economic impact from direct and indirect visitor spending in 10 years (estimated by the New Mexico Economic Development Department)

## FINANCIAL ASSUMPTIONS

Santa Fe EBITDA: $2 million / year before debt service
Company valuation as of May 2017: $40 million
Company annual revenue in 2025: $260 million

A udiences from all walks of life are craving immersive, colorful, magical, and unique out-of-home experiences. Escape rooms, immersive theater, amusement parks, virtual reality, day-glo bowling, and music festivals all point to a growing experience economy.

After opening 2016's *House of Eternal Return* in Santa Fe, Meow Wolf emerged as the coolest, most unique brand of immersive experience in the world. Meow Wolf welcomed 400,000 visitors in its first year in Santa Fe, grossing $6.8 million in revenue, receiving overwhelmingly positive reviews and ratings across all online review sites and social media.

Meow Wolf will open its follow-up immersive experience by Q4 of 2019 in a major U.S. city, welcoming 1.25M annual visitors and grossing $36M in annual revenue. Three additional major-market exhibitions will open by 2026.

To begin development and production on the next major market experience, Meow Wolf has opened a fully-functioning manufacturing facility headquartered in Santa Fe, NM.  This team and facility, called Meow Wolf Creative Studios, will generate new exhibition experiences at *House of Eternal Return* in Santa Fe and temporary art experiences for music festivals and touring exhibitions.

## INVESTMENT OPPORTUNITY

Meow Wolf will be the #1 out-of-home entertainment attraction in Austin, appealing to an all-ages demographic. The Austin market is 14x the size of Santa Fe. Meow Wolf is raising a total of $35 million for Austin from:

**25%** Equity    **25%** Junior Debt    **50%** Senior Debt

## ABOUT MEOW WOLF

### MEOW WOLF OFFICERS

Vince Kadlubek, Chief Executive Officer
Sean Di Ianni, Chief Operations Officer
Corvas Brinkerhoff, Chief Technology Officer
Drew Tulchin, Chief Financial Officer
Damian Taggart, Chief Business Development Officer
Caity Kennedy, Chief Artistic Officer
Matt King, Chief Installation Officer
Emily Montoya, Chief Design Officer
Michael Feferman, MW Austin

### MEOW WOLF BOARD OF DIRECTORS

Vince Kadlubek, Meow Wolf
Sean Di Ianni, Meow Wolf
Stewart Alsop, Alsop Louie Partners
Peter Zandan Ph.D, Hill+Knowlton Strategies

### NOTABLE PARTNERS

George RR Martin, Creator, Game of Thrones
Stewart Alsop, Partner, Alsop Louie Partners
Jared Tarbell, Founder, Etsy



Founders and Managing Members of Meow Wolf.

**M**eow Wolf's core team of officers delivers a balance of artistic credibility, company culture, operational detail, business development focus, ambitious vision, and fiscal responsibility. 6 of Meow Wolf's 8 officers are also founding members of Meow Wolf, carrying strong leadership of the company's aesthetic and unique forms of process.

Additional business and financial strength was added to the core team in 2016 through CFO Drew Tulchin, (MBA from University of Washington, Founder of UpSpring) and CBDO Damian Taggart (Founder of Mindshare Labs).

**CONFIDENTIAL   7**

## HOUSE OF ETERNAL RETURN - SANTA FE, NM



**160 Million** total Impressions in 12 months
**65 Million** impressions on Social Media
**5 Million** engagements on Social Media



**53,000** Instagram followers
**45,000** organic image shares on Instagram

**187,000** Facebook followers

**3,400,000** website visits in 12 months
**250,000** website visits per month



*"An immersive Twilight Zone."*

-LA TIMES

*"The House that Art, Fantasy,
and Mystery Built"*

-NY TIMES



8   CONFIDENTIAL

**HOUSE OF ETERNAL RETURN - SANTA FE, NM**



*"What would happen if, say, Fantasia and Alice in Wonderland came to life"*

-VICE

The New York Times

COLOSSAL   engadget

ars TECHNICA   CONDÉ NAST

theguardian   TRAVEL+LEISURE

Los Angeles Times



## FINANCIALS

### SANTA FE REVENUE: FIRST YEAR



**ADMISSIONS BREAKDOWN**
(ROUNDED TO NEAREST 1,000)

**Total: $5,250,000**

NM Adult $2,800,000

NM Child 12 & under $605,000

NM Senior $350,000

Out-of-State Adult $1,200,000

Out-of-State Child 12 & under $170,000

Out-of-State Senior $125,000



**REVENUE BREAKDOWN**
(ROUNDED TO NEAREST 1,000)

**Total: $6,800,000**

Special Events $650,000

Passes $275,000

Gift Shop Sales $625,000

Admissions $5,250,000

| **OPERATIONAL COSTS:** | **$5.1M** |
|---|---|
| **EBITDA:** | **$1.7M** |

## SANTA FE VS. AUSTIN COMPARISONS

## SANTA FE

Population: 75K
Metro Population: 110K
City Visitors/Year: 1.5M
3-hour Drive Population: 1.1M
Median Age: 47

### SANTA FE EXHIBITION NUMBERS

Year 1 MW attendees: 400K (actual)
Year 1 Revenue: $6.8M (actual)
Spend per Customer: $17 (actual)
Op. Costs / Year 1: $5.1M (actual)
Year 1 EBITDA: $1.7M (actual)

## AUSTIN

Population: 940K
Metro Population: 2M
City Visitors/Year: 24M
3-hour Drive Population: 16M
Median Age: 31

### AUSTIN EXHIBITION NUMBERS

Year 1 MW attendees: 1.25M (projected)
Year 1 Revenue: $36M (projected)
Spend per Customer: $29 (projected)
Op. Costs / Year 1: $23M (projected)
Year 1 EBITDA: $13M (projected)

## WHY AUSTIN MAKES SO MUCH SENSE

### KEY MARKET COMPARABLES

| ATTRACTION | ANNUAL VISITORS | ADULT SINGLE-DAY TICKET PRICE |
|---|---|---|
| Seaworld San Antonio | 2.3 million | $69 |
| San Antonio Zoo | 1.1 million | $19 |
| Schlitterbahn | 1.0 million | $51 |
| The Thinkery | 500,000 | $10 |
| ACL Festival | 450,000 | $85 |

### KEY MARKET STATISTICS

- Austin is the #2 major U.S. city in the number of community celebrations, festivals, fairs, and parades per capita

- Austin's creative sector generates a total economic impact of over $4.3 billion per year

### COLLABORATION & CONTRIBUTION

Meow Wolf is **excited about collaborating with Austin's deep and diverse creative community**. We love the city's reputation as a leader in cultural trends, a place that thinks for itself, and a population that engages eagerly in live music and entertainment experiences.

We have already begun to connect with kindred spirits from Austin creative organizations in all corners of the community -- art groups like **Big Medium** and **Blue Genie**, event collaboratives like the **Burning Flipside** crew and **Maker Faire**, theater groups like **Fusebox** and the **Rude Mechs**, and maker hubs like the **Austin Tinkering School**, **TechShop** and so many more. We love the talent, energy, and sense of community in Austin.

Meow Wolf is also **excited about our ability to be an impactful part of the solution to many of Austin's urgent creative community needs**, as detailed in important policy papers like Mayor Adler's 2016 Omnibus Resolution and the 2009 CreateAustin Cultural Master Plan.

#### MEOW WOLF'S IMPACT FOR AUSTIN CREATIVES:

- Living-wage jobs for local artists and makers
- Affordable creative space and creative hub space
- A sustainable business model for the local creative ecosystem
- Stronger connections between different sectors of the creative community
- Increased access to cultural learning and creative education programs

## AUSTIN, THE PROPERTY AND THE PLAN

### WHAT TYPE OF PROPERTY ARE WE LOOKING FOR?

Meow Wolf currently operates out of a 30,000 square foot space in the small market of Santa Fe. In order to accommodate demand in a city the size of Austin, Meow Wolf will create a larger 100,000 square foot experience to allow for an enjoyable experience for customers and sufficient throughput for the business.

An ideal home for Meow Wolf Austin is an adaptive reuse or a build-to-suit structure that achieves a ceiling height of at least 30ft with easy access for Austin residents, at least 500 parking spaces, and minimal impact on existing residential neighborhoods located within a target development zone of the City of Austin.

Meow Wolf is seeking a tenant-landlord relationship with a property developer in Austin, capable of committing to a long-term, market-rate lease. With 1.25M visitors projected annually, the property will become an attractive anchor for a burgeoning destination with additional creative retail, F&B, nightlife and other experience-economy activities.

In addition to Meow Wolf's world-class immersive exhibition, Meow Wolf Austin will benefit from an on-site makerspace, a creative learning center, an events space, creative food and retail options, a full bar, and collaborative office spaces.



**TIMELINE**

**Q3 2017**
- Secure civic partnerships
- Secure location

**Q4 2017**
- Design Phase begins
- Begin hiring Austin artistic team

**Q1 2018**
- Permitting
- Exhibition Prefabrication

**Q3 2018**
- Preview events

**Q4 2018**
- Build Phase begins

**Q4 2019**
- Doors open to the public

CONFIDENTIAL 13

# PROJECTED REVENUE

| SANTA FE | 2017 | 2018 | 2019 | 2020 | 2021 & BEYOND | TOTAL |
|---|---|---|---|---|---|---|
| Visits | 400,000 | 410,000 | 420,000 | 430,000 | 440,000 | 2,100,000 |
| Revenue | $7,200,000 | $7,400,000 | $7,600,000 | $7,800,000 | $8,000,000 | $38,000,000 |
| Expenses | $5,000,000 | $5,100,000 | $5,200,000 | $5,300,000 | $5,400,000 | $26,000,000 |
| EBITDA | $2,200,000 | $2,300,000 | $2,400,000 | $2,500,000 | $2,600,000 | $12,000,000 |
| Financing Repayment | $750,000 | $750,000 | $750,000 | $750,000 | $0 | $3,000,000 |
| Average Revenue/Visit | $18 | | | | | |

| AUSTIN | YEAR 1 | YEAR 2 | YEAR 3 | YEAR 4 | YEAR 5 | 5-YEAR TOTAL |
|---|---|---|---|---|---|---|
| Visits | 1,250,000 | 1,300,000 | 1,400,000 | 1,540,000 | 1,700,000 | 7,190,000 |
| Revenue | $36,000,000 | $39,000,000 | $43,400,000 | $50,204,000 | $57,800,000 | $226,404,000 |
| Expenses | $23,400,000 | $24,180,000 | $26,040,000 | $27,612,200 | $30,056,000 | $131,288,200 |
| EBITDA | $12,600,000 | $14,820,000 | $17,360,000 | $22,591,800 | $27,744,000 | $95,115,800 |
| Financing Repayment | $8,000,000 | $8,000,000 | $8,000,000 | $8,000,000 | $0 | $32,000,000 |
| Profit Margin | 35% | 38% | 40% | 45% | 48% | |

## MEOW WOLF ANNUAL REVENUE



KEY MILESTONES

Santa Fe   Austin   Denver   Las Vegas   Los Angeles

## KEY ASSUMPTIONS

- First year projected 1.25 million MW attendees, increasing 5% a year thereafter

- Revenues rise with increase in attendance and average revenue per visitor increases from value added experiences, more auxiliary services, and (later) ticket price increases

- Profit margin in Austin is higher than Santa Fe due to larger size and greater economy of scale; rises with improved operational efficiencies

- Expenses increase accounting for cost of living and adding cool new stuff each year

- Expenses here EXCLUDE depreciation, taxes and interest payments

- Debt is projected at $25 million. A mix of junior, senior and leasehold improvements drawn down during construction 2017-2019. Principal and interest repaid in 4 years from opening

*"We have an extraordinary opportunity right now to help our arts community thrive - and to bring something special to our City. Let's make sure that Meow Wolf's next immersive installation is in Austin, TX."*

**- MAYOR STEVE ADLER**

*"Meow Wolf is the future of the future. This most extraordinary innovative space is about how when you and I come together, anything is possible and everything is engaging."*

**- LOUIS BLACK (CO-FOUNDER, SXSW AND AUSTIN CHRONICLE)**

*"Meow Wolf is the perfect example of an economic development project for Austin.  If I were still working with the City,  this is the type of project that I would recommend to Council -  it provides jobs, affords an opportunity for collaboration with the creative community and brings a unique experience for both children and adults to explore.  I can't wait to see Meow Wolf in Austin. "*

**SUE EDWARDS (FORMER ASSISTANT CITY MANAGER, CITY OF AUSTIN)**

*"Meow Wolf would be a wonderfully creative addition to Austin's emerging art scene."*

**- MARGO SAWYER (PROFESSOR OF STUDIO ART: SCULPTURE + EXTENDED MEDIA, UNIVERSITY OF TEXAS)**

*"We have businesses in both Santa Fe and Austin, and I spend a lot of time in both places.  Meow Wolf has truly transformed the already robust arts and culture landscape in Santa Fe, and it is PERFECT for Austin."*

**- BILL BANOWSKY (OWNER, VIOLET CROWN CINEMAS)**

*"Like Austin City Limits, Meow Wolf has the potential to be a uniquely galvanizing force in the Austin community."*

**- BILL STOTESBERY (CEO, KLRU-TV)**

*"After 40 years in technology, the last 20 as a professional investor, I have learned to look for a certain combination of factors to forecast success. Meow Wolf has all of those factors: early success, great leadership, and a vision for the future."*

**- STEWART ALSOP (PARTNER, ALSOP LOUIE PARTNERS AND DIRECTOR, MEOW WOLF INC.)**

*"Meow Wolf has the opportunity to be one of the world's most exciting and creative companies.  And I put my money where my mouth is and invested."*

**- PETER ZANDAN, PH.D (GLOBAL VICE CHAIR, HILL+KNOWLTON STRATEGIES)**

*"Art has now become an experience, and people crave experiences."*

**- LAURIE FRICK (DATA ARTIST & ENGINEER)**



Contact our executive team for more information: invest@meowwolf.com

EXHIBIT F

## 2019 Artist Bonus Payment Program Agreement

This document serves as a record of compensation associated with Meow Wolf's Artist Bonus Payment Program and an Agreement to the terms of this program. This Agreement is made by and between Meow Wolf Inc. (d/b/a Meow Wolf - hereafter "Meow Wolf") and «Full_Name» ("Program Participant" or "Artist").

### RECITALS

**Wherefore** the Artist specified below has been selected to receive an Artist Bonus Payment from Meow Wolf.

**Wherefore**, in fulfillment of the requirements of the Artist Bonus Payment Program ("Program"), Meow Wolf and Artist must enter into an Artist Bonus Payment Agreement. This Agreement provides project data and specifies the goals of Meow Wolf in dispersing Program Payments.

NOW THEREFORE in consideration of the above-recited facts, Artist agrees as follows:

Artist acknowledges and understands that any Bonus Payment made to the Artist is made at the absolute discretion of Meow Wolf, and Artist is not entitled to any such payment pursuant to the Program. Bonus Payments are made through electronic transfer or manual check.

Payment is made subject to the terms and conditions of the document "Meow Wolf Artist Bonus Program Description", a copy of which is attached for your reference.

Artist has read, understands and agrees to all terms and conditions of "Annex II – INTELLECTUAL PROPERTY RELEASE AND ASSIGNMENT AGREEMENT ". A copy of which is attached hereunder.

\*\*\*ARTIST NAME: \_\_\_\_«Full_Name»_____

\*\*\*FINAL BONUS PAYMENT AMOUNT: **$«Remaining_Balance_»**

Written: «Written_Balance»

***How would you like to receive your payment?***
Have check sent by mail ☐      Pick up check at Finance office ☐

***Artist Contact Information:***
Street Address: _____

City: _____ State: _____ Zip: _____

***Received By:***

Artist Name (Signed): _____ Date: _____

Artist Name (Printed): _____

***Presented on behalf of Meow Wolf by:***

Name (Signed): _____ Date: _____

Name(Printed): _____ Title: _____



### ANNEX II
#### INTELLECTUAL PROPERTY RELEASE AND ASSIGNMENT AGREEMENT

This **INTELLECTUAL PROPERTY RELEASE AND ASSIGNMENT AGREEMENT** (this "Agreement"), dated as of _____, 2019 (the "Effective Date"), is made by and between «Full_Name» ("Assignor"), and Meow Wolf, Inc., a Delaware Public Benefit Corporation ("Company").

**WHEREAS**, Assignor has provided services to Company either as an employee, consultant, or volunteer and, in connection with such services, developed certain projects and works being used in connection with the Company's business (the "Engagement"); and

**WHEREAS**, in consideration of the Engagement and the Company's Artist Bonus Payment Program Agreement held by Assignor in connection with the execution hereof, the parties desire to confirm that the results of the Engagement are and will be owned by Company.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which is acknowledged, the parties agree, notwithstanding anything in any other agreement between the Company and Assignor to the contrary, as follows:

1. **Definitions**. As used in this Agreement, the term "Intellectual Property Rights" means all trade secrets, copyrights, trademarks, mask work rights, patents and other intellectual property rights recognized by the laws of any jurisdiction or country; the term "Copyright" means the exclusive legal right to reproduce, perform, display, distribute and make derivative works of a work of authorship (as a literary, musical, or artistic work) recognized by the laws of any jurisdiction or country; and the term "Moral Rights" means all paternity, integrity, disclosure, withdrawal, special and any other similar rights recognized by the laws of any jurisdiction or country.

2. **Assignment of Inventions**. Unless Assignor has identified an Invention (as defined below) as a "pre-existing work" on Exhibit A of an employment agreement with Company (if applicable), Assignor irrevocably assigns and transfers to Company, all right, title and interest worldwide in and to all trade secrets, inventions, mask works, ideas, processes, formulas, software in source or object code, data, programs, other works of authorship, know-how, improvements, discoveries, exhibits, developments, designs and techniques and any other proprietary technology and all Intellectual Property Rights made, conceived, reduced to practice, or learned by Assignor, either alone or with others, either (i) during the period of the Engagement (including prior to the date of this agreement hereof) or (ii) prior to or outside the scope of the Engagement, in each case only to the extent such Intellectual Property is used or incorporated in any aspect of the Company's exhibitions and/or business in connection with Assignor's Engagement with the Company (collectively, "Inventions").

To the extent required by applicable copyright laws, Assignor (with respect to any copyrightable Inventions that are fixed in a tangible medium of expression as of the Effective Date), hereby assigns, and agrees to assign in the future (when any copyrightable Inventions are first fixed in a tangible medium of expression) to Company, Assignor's copyright rights in and to such Inventions.

Any assignment of Inventions (and all Intellectual Property Rights with respect thereto) hereunder includes an assignment of all Moral Rights. To the extent such Moral Rights cannot be assigned to Company and to the extent the following is allowed by the laws in any country where Moral Rights exist, Assignor hereby unconditionally and irrevocably waives the enforcement of such Moral

Rights, and all claims and causes of action of any kind against Company or related to Company's business, with respect to such rights. Assignor further acknowledges and agrees that neither Assignor's successors-in-interest nor legal heirs retain any Moral Rights in any Inventions (and any Intellectual Property Rights with respect thereto).

3. **Ownership of Work Product**. Unless Assignor has identified an Invention (as defined below) as a "pre-existing work" on Exhibit A of an employment agreement with Company (if applicable), Assignor agrees that Company will exclusively own all work product that is made by Assignor (solely or jointly with others) within the scope of the Engagement (including prior to the date hereof), and Assignor hereby irrevocably and unconditionally assigns to Company all right, title and interest worldwide in and to such work product. Assignor acknowledges that all original works of authorship which are made by Assignor (solely or jointly with others) within the scope of the Engagement (including prior to the date hereof) and which are protectable by Copyright are "works made for hire," pursuant to United States Copyright Act (17 U.S.C., Section 101). If the original works of authorship are found not to be "works made for hire," then Assignor hereby irrevocably and unconditionally assigns to Company all right, title and interest worldwide in and to such works of authorship.

4. **Assistance**. Assignor will assist Company in every proper way to obtain, and from time to time enforce, United States and foreign Intellectual Property Rights and Moral Rights relating to Inventions in any and all countries. To that end Assignor will execute, verify and deliver such documents and perform such other acts (including appearances as a witness) as Company may reasonably request for use in applying for, obtaining, perfecting, evidencing, sustaining and enforcing such Intellectual Property Rights and the assignment thereof. In addition, Assignor will execute, verify and deliver assignments of such Intellectual Property Rights to Company or its designee, including the United States or any third party designated by Company. Assignor's obligation to assist Company with respect to Intellectual Property Rights relating to such Inventions in any and all countries will continue beyond the termination of the Engagement, but Company will compensate Assignor at a reasonable rate after Assignor's termination for the time actually spent by Assignor at Company's request on such assistance. In the event Company is unable for any reason, after reasonable effort, to secure Assignor's signature on any document needed in connection with the actions specified in the preceding paragraph, Assignor hereby irrevocably designates and appoints Company and its duly authorized officers and agents as Assignor's agent and attorney in fact, which appointment is coupled with an interest, to act for and on Assignor's behalf to execute, verify and file any such documents and to do all other lawfully permitted acts to further the purposes of the preceding paragraph with the same legal force and effect as if executed by Assignor. Assignor hereby waives and quitclaims to Company any and all claims, of any nature whatsoever, which Assignor now or may hereafter have for infringement of any Intellectual Property Rights assigned under this Agreement to Company.

5. **Pre-existing IP**. Assignor has not used or incorporated into any Inventions any of Assignor's Intellectual Property Rights not assigned to Company pursuant to this Agreement nor has Assignor used or incorporated into any Inventions any intellectual property developed or own by any third party.

6. **Representations and Warranties**. Assignor represents and warrants that: (a) Inventions are original works of Assignor, (b) Assignor has the right and unrestricted ability to assign the ownership of Inventions to Company as set forth in Section 2, and (c) neither the Inventions nor any element thereof will infringe upon or misappropriate any copyright, patent, trademark, trade secret, right of publicity or privacy, or any other proprietary right of any third party, whether contractual, statutory or common law.

7.      **General Provisions**. This Agreement (together with any agreement(s) between Assignor and the Company in connection with the Engagement (such agreement(s), the "Original Agreement")) constitutes the entire agreement between the parties with respect to the subject matter hereof and merges all prior and contemporaneous communications. Except as set forth in this Agreement, all of the terms and conditions of the Original Agreement (if applicable) shall continue in full force and effect. To the extent there is any conflict between this Agreement and the Original Agreement (if applicable), this Agreement shall govern. Notwithstanding the foregoing or anything in this Agreement to the contrary, the Company and the Assignor agree that the treatment of Inventions as a "pre-existing work" on Exhibit A of an employment agreement between Assignor and the Company (if any) will continue to be governed by such employment agreement. This Agreement shall not be modified except by a written agreement dated subsequent to the date of this Agreement and signed on behalf of the parties by their respective duly authorized representatives. This Agreement shall be governed under the laws of the State of New Mexico without regard to the conflict of laws provisions thereof. If any term of this Agreement is held invalid or unenforceable for any reason, the remainder of the provisions shall continue in full force and effect, and the parties shall substitute a valid provision with the same intent and economic effect. Assignor may not assign any rights or obligations hereunder without the prior express written consent of Company. Company may assign this Agreement or any rights granted hereunder without Assignor's consent. Subject to the above restrictions on assignment, this Agreement shall inure to the benefit of and bind the successors and assigns of the parties. This Agreement may be executed in one or more counterparts, each of which will be deemed an original, but which collectively will constitute one and the same instrument.

*[Signature Page Follows]*



**IN WITNESS WHEREOF**, the parties have executed this Intellectual Property Release and Assignment Agreement as of the Effective Date.

**COMPANY:**

**MEOW WOLF, INC.**

By:_____

   Name: _____

   Title: _____

Address:

**ASSIGNOR:**

_____«Full_Name»_____
Name of Assignor (Please Print)


_____
Signature


_____
Title (if applicable)

Address:

# EXHIBIT G



**ERICKSEN**
70 YEARS
**ARBUTHNOT**
*Attorneys at Law*

2300 Clayton Road

Suite 350

Concord, California 94520

T: 510.832.7770

F: 510.832.0102

ericksenarbuthnot.com

CALIFORNIA

OFFICES:

Los Angeles

San Jose

Concord

Sacramento

Fresno

Bakersfield

Walnut Creek

January 12, 2021

**Via Electronic Communication**
Benjamin Allison
Breanna Contreras
Bardacke Allison LLP
141 E. Palace Avenue, 2nd Floor
Santa Fe, New Mexico 98501
ben@bardackeallison.com
breanna@bardackeallison.com

Re:     **Oliver v. Meow Wolf, MW's Discovery Responses**

Dear Mr. Allison and Ms. Contreras,

This letter serves as our meet-and-confer regarding Defendant Meow Wolf, Inc.'s ("MW") responses (collectively, "Discovery Responses") to Plaintiff's Laura Oliver's ("Oliver") first set of requests for production and first set of interrogatories (collectively, "Discovery Requests").

On July 9, 2020, Oliver propounded the Discovery Requests to MW. [D.E. 20, 21, 63, 64]. MW served the Discovery Responses on November 20, 2020. [D.E. 58, 63, 64].

The Court extended the deadline for the parties' motion(s) to compel until February 10, 2021. [D.E. 66].

MW's discovery responses identified below fail to provide any substantive responses and rely on improper general objections and legal objections.

Accordingly, by <u>close of business on January 22, 2021</u> (i.e. 5 p.m. PST), **please advise** of your position regarding the deficiencies identified below and/or provided amended responses.

### MW's Discovery Responses:

Discovery serves an important purpose in our adversarial system: advancing the quest for truth. *President & Fellows of Harvard Coll. v. Elmore*, 2016 U.S. Dist. LEXIS 49717, *2 (D.N.M. April 13, 2016) (J. Khalsa) (discussing the work product privilege).

Pursuant to Federal Rule of Civil Procedure 33, a party may serve on any other party interrogatories relating to any matter that may be inquired into under Rule 26(b). *Ortega v. N.M. Legal Aid, Inc.*, 2019 U.S. Dist. LEXIS 197593, *2 (D.N.M. Nov. 14, 2019) (J. Khalsa); Fed. R. Civ. P. 33(a)(2).

Similarly, a party may request that any other party produce designated documents or electronically stored information ("ESI") in the other party's possession, custody, or control that concern any matter within the scope

Benjamin Allison
Breanna Contreras
Re: Oliver v. Meow Wolf, MW's Discovery Responses
January 12, 2021
Page 2

of Rule 26(b).  *Ortega*, 2019 U.S. Dist. LEXIS 197593 at *2; Fed. R. Civ. P. 34(a).

Rule 26(b), in turn, permits a party to obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case.  *Ortega*, 2019 U.S. Dist. LEXIS 197593 at *2; Fed. R. Civ. P. 26(b)(1); *Employbridge, LLC v. Riven Rock Staffing, LLC*, 2017 U.S. Dist. LEXIS 11605, *5 (D.N.M. Jan. 26, 2017) (J. Khalsa).

Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action. While relevancy in discovery is broader than that required for admissibility at trial, the object of inquiry must have some evidentiary value to be discoverable.  *Driscoll v. Castellanos*, 2020 U.S. Dist. LEXIS 243615, *3-4 (D.N.M. Dec. 29, 2020) (J. Khalsa); Fed. R. Evid. 401.

Information within this scope of discovery need not be admissible in evidence to be discoverable.  *Ortega*, 2019 U.S. Dist. LEXIS 197593 at *2.

Factors the Court should consider in determining whether discovery is proportional to the needs of the case include: the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.  *Ortega*, 2019 U.S. Dist. LEXIS 197593 at *2-3; *Employbridge, LLC*, 2017 U.S. Dist. LEXIS 11605 at *5.

The court's responsibility, using all the information provided by the parties, is to consider these factors in reaching a case-specific determination of the appropriate scope of discovery.  *Ortega*, 2019 U.S. Dist. LEXIS 197593 at *3; *Employbridge, LLC*, 2017 U.S. Dist. LEXIS 11605 at *5; Fed. R. Civ. P. 26(b)(1), 2015 Amendment, Advisory Committee Notes.

### Deficiencies in MW's Discovery Responses

As an initial matter, MW's general objections are improper and should be deleted.

As a rule, a general objection to a request for production which does not identify the documents to be withheld but states, for example, merely that the responding party objects to the production of privileged documents is entirely inadequate.  A response to requests for production must clearly set forth the specifics of the objection and how that objection relates to the documents being demanded.  The burden is on the party resisting discovery to clarify and explain precisely why its objections are proper.  *Ortega*, 2019 U.S. Dist. LEXIS 197593 at *6-7 (striking general objections).

In addition, please note the following specific deficiencies contained in MW's Discovery Responses:

Benjamin Allison
Breanna Contreras
Re: Oliver v. Meow Wolf, MW's Discovery Responses
January 12, 2021
Page 3

| Oliver's Interrogatory No.: | MW's Discovery Responses and Deficiency(ies): |
|---|---|
| 1:<br><br>IDENTIFY all PERSONS that have held any ownership interest in MEOW WOLF from January 1, 2008 to the present. | MW's Response:<br><br>Meow Wolf objects to this interrogatory because the identities, home addresses and telephone numbers of every person who has held an ownership interest in Meow Wolf since 2008 has no relevance to any claim or defense in this action. Meow Wolf further objects on the grounds that the interrogatory is overbroad, unduly burdensome and intrusive into personal information without any corresponding benefit, and not likely to lead to admissible evidence.<br><br>Deficiency(ies):<br><br>MW fails to provide any substantive response. The requested information is relevant and proportional to the needs of the case as Oliver's Complaint [D.E. 1] seeks (among other relief) conveyance to Oliver of her ownership interest in the Meow Wolf artists' collective, to the extent title to that interest still rests with Defendants.   The identity of individuals with an ownership interest in MW is relevant to this claim. |
| 2:<br><br>Describe the ownership interest in MEOW WOLF held by each PERSON identified in the immediately preceding Interrogatory No. 1, including how each interest was acquired, the investment made for each such interest, and the amount of money received by each such PERSON upon alienation of any portion of their interest. | MW's Response:<br><br>Meow Wolf objects to this interrogatory on the grounds that the purchase and any sale price of each owner's interest has no relevance to any claim or defense in this action. Meow Wolf further objects on the grounds that the interrogatory seeks highly confidential and intrusive information about persons not parties to this action or concerned in it, which confidential information is not relevant to any claim or defense in the action and certainly not proportional to the needs of the case.  Meow Wolf further objects on the grounds that the interrogatory is overbroad and not likely to lead to admissible evidence.<br><br>Deficiency(ies):<br><br>MW fails to provide any substantive response. |

Benjamin Allison
Breanna Contreras
Re: Oliver v. Meow Wolf, MW's Discovery Responses
January 12, 2021
Page 4

|  | The requested information is relevant and proportional to the needs of the case as Oliver's Complaint [D.E. 1] seeks (among other relief) conveyance to Oliver of her ownership interest in the Meow Wolf artists' collective, to the extent title to that interest still rests with Defendants.  Information regarding how individual acquired their interest in MW, the investment made to acquire each such interest, and the amount of money received by each such individual upon alienation of any portion of their interest are relevant to this claim.<br><br>In addition, the Court entered a Protective Order [D.E. 56] related to any claimed confidential information or records. |
|---|---|
| 3:<br><br>IDENTIFY all PERSON(S) who developed any aspect of, and/or updated, MEOW WOLF's website since January 1, 2014. | MW's Response:<br><br>Meow Wolf objects that this interrogatory is overbroad because the names and home addresses and telephone numbers of every person who has worked on the Meow Wolf website over more than six years are not relevant to any claim or defense in this action and not likely to lead to admissible evidence. Meow Wolf further objects that identifying them all would be unduly burdensome and not proportional to the needs of the case.<br><br>Deficiency(ies):<br><br>MW fails to provide any substantive response. The requested information is relevant and proportional to the needs of the case as Oliver's Complaint [D.E. 1] alleges MW's website touts its status as a "collective," and announces that Meow Wolf "firmly believes that accomplished artists must be compensated on an equal level with other skilled, in-demand professionals…"  Oliver's Complaint further states causes of action for violation and threatened violation of the Vistual Artists Rights Act ("VARA"), Copyright Infringement, and Unjust Enrichment (among other causes of action).  The identity of individuals involved with MW's website is |

Benjamin Allison
Breanna Contreras
Re: Oliver v. Meow Wolf, MW's Discovery Responses
January 12, 2021
Page 5

|  |  |
|---|---|
|  | relevant to these claims.<br><br>In addition, the Court entered a Protective Order [D.E. 56] related to any claimed confidential information or records. |
| 6:<br><br>IDENTIFY all PERSONS who attended MEOW WOLF promotional or investor events, including but not limited to any MEOW WOLF "investor weekend," and the grand-opening "Gala" that occurred on or around March 16, 2016. | MW's Response:<br><br>Meow Wolf objects to this interrogatory because the identity, home addresses and telephone numbers of every person who attended any Meow Wolf "promotional" even or investor event over a twelve-year period has no relevance to any claim or defense in this action. Meow Wolf further objects to this interrogatory on the grounds that identifying all persons who attended Meow Wolf promotional or investor events would be unduly burdensome, overly intrusive into the lives of people with no connection to any issue in this case, and the burden and expense of the proposed discovery outweighs its likely benefit. Meow Wolf further objects that the phrase "promotional or investor events" is vague and ambiguous.<br><br>Deficiency(ies):<br><br>MW fails to provide any substantive response. The requested information is relevant and proportional to the needs of the case as Oliver's Complaint [D.E. 1] seeks (among other relief) conveyance to Oliver of her ownership interest in the Meow Wolf artists' collective, to the extent title to that interest still rests with Defendants. Attendees to promotional or investor events, including but not limited to any MEOW WOLF "investor weekend," and the grand-opening "Gala" that occurred on or around March 16, 2016, are witnesses to MW representations and/or offers to investors, and their identities are relevant to Oliver's claims.<br><br>In addition, the Court entered a Protective Order [D.E. 56] related to any claimed confidential information or records. |
| 7: | MW's Response: |

Benjamin Allison
Breanna Contreras
Re: Oliver v. Meow Wolf, MW's Discovery Responses
January 12, 2021
Page 6

| IDENTIFY all PARTICIPATING ARTISTS. | Meow Wolf objects that this interrogatory is overbroad because the names and home addresses and telephone numbers of every artist who has contributed to the extensive House of Eternal Return are not relevant to any claim or defense in this action and not likely to lead to admissible evidence. Meow Wolf further objects that identifying them all would be unduly burdensome and not proportional to the needs of the case.

Meow Wolf objects that this interrogatory is overbroad because many potentially responsive names would be entirely irrelevant to this lawsuit and not likely to lead to admissible evidence. Meow Wolf further objects to this interrogatory on the grounds that identifying all participating artists (as that term is defined in plaintiff's interrogatories) would be unduly burdensome and the burden and expense of the proposed discovery outweighs its likely benefit.

Deficiency(ies):

MW fails to provide any substantive response. The requested information is relevant and proportional to the needs of the case as Oliver's Complaint [D.E. 1] seeks (among other relief) conveyance to Oliver of her ownership interest in the Meow Wolf artists' collective, to the extent title to that interest still rests with Defendants. "PARTICIPATING ARTIST(s)" is defined in Oliver's Discovery Requests as "any PERSON that contributed copyrightable works of art to the HoER as more fully described in the COMPLAINT, including but not limited to paragraphs 14, 21, 23, 25, 40, and 47." The identity of these artists is relevant to Oliver's copyright claims (among others).

In addition, the Court entered a Protective Order [D.E. 56] related to any claimed confidential information or records. |

Benjamin Allison
Breanna Contreras
Re: Oliver v. Meow Wolf, MW's Discovery Responses
January 12, 2021
Page 7

| Oliver's Request for Production No.: | MW's Discovery Responses and Deficiency(ies): |
|---|---|
| 5: <br><br> All DOCUMENTS CONCERNING national and international impacts, impressions, and viewings of the DOCUMENTARY and/or any trailer for the DOCUMENTARY. | MW's Response: <br><br> Meow Wolf objects to this request on the grounds that documents concerning persons who have viewed the documentary or trailer for it seeks information not relevant to any claim or defense. Meow Wolf further objects that the request is overbroad and unduly burdensome and the burden and expense of producing the requested documents would vastly outweigh the likely benefit. Meow Wolf further objects to this request on the grounds that "national and international impacts" and "impressions" is vague and ambiguous, leaving unclear what type of documents plaintiff actually seeks. <br><br> Deficiency(ies): <br><br> MW fails to provide any substantive response. The requested information is relevant and proportional to the needs of the case. The number of persons who have viewed the documentary or trailer for it is relevant to Oliver's copyright violation claims as Oliver's work was depicted in both. |
| 6: <br><br> All DOCUMENTS transmitted by MEOW WOLF to any prospective investor, including, but not limited to, advertisements, information packets, brochures, informational e-mails, websites, prospectuses, financial disclosures, asset lists, online funding pages/solicitations, including, but not limited to, https://www.wefunder.com. | MW's Response: <br><br> Meow Wolf objects to this request on the grounds that by calling for the production of all documents transmitted to prospective investors without limiting the request to documents referred or relating to Plaintiff's work, the request seeks information not relevant to any claim or defense. Meow Wolf further objects that the request is overbroad and unduly burdensome and calls for documents that have no relationship or relevance to this action, and the burden and expense of producing the requested documents would vastly outweigh the likely benefit. <br><br> Deficiency(ies): |

Benjamin Allison
Breanna Contreras
Re: Oliver v. Meow Wolf, MW's Discovery Responses
January 12, 2021
Page 8

| | MW fails to provide any substantive response. The requested information is relevant and proportional to the needs of the case as Oliver's Complaint [D.E. 1] seeks (among other relief) conveyance to Oliver of her ownership interest in the Meow Wolf artists' collective, to the extent title to that interest still rests with Defendants and documents transmitted to prospective investors are relevant to this claim. |
|---|---|
| 7:<br><br>All COMMUNICATIONS between MEOW WOLF and TEA. | MW's Response:<br><br>Meow Wolf objects to this request on the grounds that by calling for the production of all communications between Meow Wolf and Themed Entertainment Association without limiting the request to communications concerning Plaintiff or her work, the request seeks information not relevant to any claim or defense. Meow Wolf further objects that the request is overbroad and unduly burdensome and calls for documents that have no relationship or relevance to this action.<br><br>Deficiency(ies):<br><br>MW fails to provide any substantive response. The requested information is relevant and proportional to the needs of the case. Oliver's Complaint [D.E. 1] defines TEA as "the Themed Entertainment Association and its Themed Entertainment Awards as more fully described in the COMPLAINT, including but not limited to paragraph 56." Paragraph 56 of Oliver's Complaint [D.E. 1] states "Examples of such usage include using the Space Owl image in advertising, social media posts, and to represent Meow Wolf at the Themed Entertainment Association ("THEA") Awards. A copy of Meow Wolf's THEA Awards web page is attached hereto as Exhibit E." MW's communications with TEA are relevant to MW's use of Oliver's work and the value of same. |
| 11:<br><br>All DOCUMENTS CONCERNING any contract | MW's Response:<br><br>Meow Wolf objects to this request on the |

Benjamin Allison
Breanna Contreras
Re: Oliver v. Meow Wolf, MW's Discovery Responses
January 12, 2021
Page 9

| | |
|---|---|
| and/or agreement between MEOW WOLF and any PARTICIPATING ARTIST between January 1, 2014 and June 3, 2019, including, but not limited to the contracts or agreements themselves, drafts, and COMMUNICATIONS CONCERNING any contract and/or agreement. | grounds that by requesting all documents related to other artists' communications and agreements with Meow Wolf that are not related to plaintiff or her work over a more than five year period are unduly burdensome and encompass information irrelevant to the claims or defenses in this action. Meow Wolf further objections to the request on the grounds that the burden and expense responding to the request likely outweighs the benefit of any such production. Meow Wolf further objects to the request on the grounds that it seeks extensive personal or confidential information about persons not parties to this litigation that Ms. Oliver does not need in order to prosecute her lawsuit. |
| | Deficiency(ies): |
| | MW fails to provide any substantive response. The requested information is relevant and proportional to the needs of the case as Oliver's Complaint [D.E. 1] seeks (among other relief) conveyance to Oliver of her ownership interest in the Meow Wolf artists' collective, to the extent title to that interest still rests with Defendants and contracts and/or agreements with other PARTICIPATING ARTISTS are relevant to this claim. |
| | In addition, the Court entered a Protective Order [D.E. 56] related to any claimed confidential information or records. |
| 12: <br><br> DOCUMENTS sufficient to verify the gross revenue MEOW WOLF realized from HoER, from March 16, 2016 to the present, including, without limitation, revenue from ticket sales, events, bar/café sales, gift shop sales, online sales, content sales, and licensing proceeds. | MW's Response: <br><br> Meow Wolf objects to this request on the grounds that it is overbroad, unduly burdensome, and seeks information far beyond what is relevant to the claims or defenses in this action. Meow Wolf further objects that the request for documents concerning all proceeds derived by Meow Wolf over a period of more than 4 years including revenue wholly unrelated to plaintiff's work would impose a burden that outweighs any likely benefit, is not proportional to the needs of the case, and is intrusive and harassing. |

Benjamin Allison
Breanna Contreras
Re: Oliver v. Meow Wolf, MW's Discovery Responses
January 12, 2021
Page 10

| | |
|---|---|
| | Deficiency(ies): |
| | MW fails to provide any substantive response. The requested information is relevant and proportional to the needs of the case as Oliver's Complaint [D.E. 1] seeks (among other relief) conveyance to Oliver of her ownership interest in the Meow Wolf artists' collective, to the extent title to that interest still rests with Defendants and MW's gross revenue from HoER after Oliver's involvement and installation of her work is relevant to this claim. |
| | In addition, the Court entered a Protective Order [D.E. 56] related to any claimed confidential information or records. |
| 14: <br><br> DOCUMENTS sufficient to identify all PERSONS who held any interest in MEOW WOLF from January 1, 2008 to the present. | MW's Response: <br><br> Meow Wolf objects to this request on the grounds that documents concerning all persons who held any interest in Meow Wolf over nearly a thirteen-year period have no relevance to any claim or defense in this action. Meow Wolf further objects to this request on the grounds that producing all documents that identify all persons who held any interest in Meow Wolf over this extensive time period would be unduly burdensome, overly intrusive into the lives of people with no connection to any issue in this case, and harassing. Meow Wolf further objects to the request on the grounds that the burden and expense of the proposed discovery outweighs its likely benefit. <br><br> Deficiency(ies): <br><br> MW fails to provide any substantive response. The requested information is relevant and proportional to the needs of the case as Oliver's Complaint [D.E. 1] seeks (among other relief) conveyance to Oliver of her ownership interest in the Meow Wolf artists' collective, to the extent title to that interest still rests with Defendants.  Documents sufficient |

Benjamin Allison
Breanna Contreras
Re: Oliver v. Meow Wolf, MW's Discovery Responses
January 12, 2021
Page 11

|  | to identify those with an interest in MW are relevant to this claim.<br><br>In addition, the Court entered a Protective Order [D.E. 56] related to any claimed confidential information or records. |
|---|---|
| 15:<br><br>DOCUMENTS sufficient to establish how each PERSON identified in the immediately preceding Request No. 14 acquired their interest, the investment made to acquire each such interest, and the amount of money received by each such PERSON upon alienation of any portion of their interest. | MW's Response:<br><br>Meow Wolf objects to this request on the grounds that documents establishing the identity of each person held any interest in Meow Wolf over a nearly thirteen-year period are unduly burdensome and are not relevant to any claim or defense in this action. Meow Wolf objects to this request on the grounds that documents identifying how all persons who held any interest in Meow Wolf over this extensive time period acquired their interest, for what amount of money, and how much money they received upon selling such interest would be unduly burdensome, exceedingly intrusive into the lives of people with no connection to any issue in this case, and not proportional to the needs of the case. Meow Wolf further objects to the request on the grounds that the burden and expense of the proposed discovery outweighs its likely benefit.<br><br>Deficiency(ies):<br><br>MW fails to provide any substantive response. The requested information is relevant and proportional to the needs of the case as Oliver's Complaint [D.E. 1] seeks (among other relief) conveyance to Oliver of her ownership interest in the Meow Wolf artists' collective, to the extent title to that interest still rests with Defendants. Documents regarding how individual acquired their interest in MW, the investment made to acquire each such interest, and the amount of money received by each such individual upon alienation of any portion of their interest are relevant to this claim.<br><br>In addition, the Court entered a Protective |

Benjamin Allison
Breanna Contreras
Re: Oliver v. Meow Wolf, MW's Discovery Responses
January 12, 2021
Page 12

| | Order [D.E. 56] related to any claimed confidential information or records. |
|---|---|
| 16:<br><br>All DOCUMENTS CONCERNING the removal of any copyrightable work from HoER. | MW's Response:<br><br>Meow Wolf objects to this request on the grounds that by calling for the production of all documents concerning removal of any copyrightable work from the entire House of Eternal Return without limiting the request to Plaintiff's work, the request seeks information not relevant to any claim or defense. Meow Wolf further objects that the request is overbroad and unduly burdensome and calls for documents that have no relationship or relevance to this action.<br><br>Deficiency(ies):<br><br>MW fails to provide any substantive response. The requested information is relevant and proportional to the needs of the case.  Oliver's Complaint [D.E. 1] states causes of action for violation and threatened violation of VARA, Copyright Infringement, breach of the covenant of good faith and fair dealing, and misrepresentation (among other causes of action). |

Please provide your position regarding the deficiencies identified herein by <u>close of business on January 22, 2021.</u>

If needed, we intend to move to compel regarding these deficiencies by the Court's anticipated February 10, 2021 deadline.  [D.E. 66].

Let us know if you wish to discuss.

Very truly yours,

ERICKSEN ARBUTHNOT

ANDREW J. CHAN
JAB/AJC/ajc

# EXHIBIT H

# ALLISON

January 22, 2021

*Via email to:*

Andrew Chan
Ericksen Arbuthnot
2300 Clayton Road, Suite 350
Concord, CA 94520
achan@ericksenarbuthnot.com

*Meow Wolf's Discovery Responses*

Dear Mr. Chan,

We received your letter of January 12, 2021 and write to address each of your concerns about Meow Wolf's discovery responses.

**Interrogatories 1, 2, and 6, and Requests for**
**Production 6, 11, 14, and 15 Are Not Relevant In Light of**
**the Court's November 25, 2020 Memorandum Opinion and Order**

You argue that Interrogatories 1, 2, and 6 and Requests for Production 6, 11, 14, and 15 is relevant because Ms. Oliver seeks "conveyance of her ownership interest in the Meow Wolf artists' collective." Since discovery was served, Ms. Oliver's claims in this matter have been narrowed. The Court's order of November 25, 2020 eliminated the remedy from the case. *See* Doc. 59 at 14 ("[T]he Court does not mean to suggest that Plaintiff could recover the value of the ownership interest and revenue share she claims she was promised . . . ."). You have made no effort to show relevance of these requests given the new reality that Ms. Oliver's claim for an ownership share has been held as a matter of law cannot be recovered.

Even if the requests were relevant, they are still overly broad and the burden of producing the requested information and documents are not proportional to the needs of the case. *See, e.g.,* Interrogatories 1 and 2, and Requests 14 and 15 (requesting information and documents about all persons who have at various times held an ownership interest in Meow Wolf over a more than 12-year period); Interrogatory 6 and Request 6 (seeking information concerning persons who attended investor meetings and all documents received by prospective investors, whether or not those persons invested in Meow Wolf, and with no time limitation).

BARDACKE ALLISON LLP   PO BOX 1808 SANTA FE NM 87504   505 995 8000
141 E PALACE AVENUE SANTA FE NM 87501   BARDACKEALLISON.COM

BARDACKE

Andrew Chan
January 22, 2021
Page 2

If you feel any of these requests interface with a surviving issue in the case, we are interested to hear why and see how you would narrow the requests to only the relevant issues.

**Interrogatories 3 and 7 and Request for
Production 7 are Overly Broad As Written**

You do not dispute that Interrogatories 3 and 7 and Request for Production 7 are overly broad as written—instead you claim the requests are "proportional to the needs of the case" without explaining why or how. Simply stating that the information is relevant does not make it so.

In Interrogatory 3, you seek information concerning *all* persons who developed or updated Meow Wolf's website, and justify the request because a very small portion of the website allegedly provides that Meow Wolf is a "collective" that "firmly believes that accomplished artists must be compensated on an equal level with other skilled, in-demand professionals . . ." The identity of every person who worked on Meow Wolf's website, whether or not they participated in creating the copy for those words on the site and explaining how their identities are relevant to Ms. Oliver's claim reflects how overly broad and burdensome the requests are, and have no conceivable bearing on any claim or defense in this matter.

You claim in Interrogatory No. 7 that the identities of more than 200 artists who participated in creating HoER is relevant for two reasons: first, because it is allegedly relevant to Ms. Oliver's "ownership interest" in Meow Wolf, and second that it is allegedly relevant to Ms. Oliver's copyright claims. As provided in the Court's November 25, 2020 Memorandum Opinion and Order, Ms. Oliver no longer has a claim for an ownership interest in Meow Wolf, and as such her requests aimed at this information are not relevant. *See* Doc. 59 at 14. You also provide no basis for your bare assertion that the information is relevant to Ms. Oliver's copyright claim— neither expressing why or how the information would further Ms. Oliver's copyright claim.

In Request No. 7, you seek all communications between Meow Wolf and Themed Entertainment Association. This request is also overly broad because they are not tied to communications concerning Ms. Oliver or her work.

If you would like to narrow these requests to make clear what specific information you seek that is relevant to any surviving claim or defense in the case, we are glad to consider them and supplement our responses as appropriate.

A
B

Andrew Chan
January 22, 2021
Page 3

**Request for Production 5, 12, and 16 Are Not Relevant,**
**Overly Broad, and Disproportional to the Needs of the Case**

You state that your Request for Production 5 seeking all documents about national and international impacts, impressions, and viewings of a documentary is relevant to Ms. Oliver's claim for copyright infringement without stating why or how such information is relevant. A request for "all documents" concerning a broad subject, here a documentary, where Ms. Oliver's work was not featured prominently, is irrelevant, disproportional to the needs of the case and would require production of potentially vast amounts of information, most of which would not relate to Ms. Oliver's work.

In Request for Production 12 Ms. Oliver seeks documents to verify all of Meow Wolf's gross revenue from the House of Eternal Return. Ms. Oliver's operative claims are not prefaced on Meow Wolf's sales of admission tickets, and the Court has eliminated the remedy of an ownership interest or revenue share from the case. Thus, a general request for Meow Wolf's total earnings relating to HoER is irrelevant and overly broad.

Request for Production 16 seeking all documents concerning the removal of any copyrightable work from HoER is also overly broad—the language "removal of any copyrightable work" would cover everything from disposal of damaged materials to throwing away old promotional posters. It may be that the information you actually seek is narrower than the request you made, but you have not provided a limiting principle tied to any issue in the case.

If you would like to narrow these requests to make clear what specific information you seek that is relevant to any surviving claim or defense in the case, we are glad to consider them and supplement our responses as appropriate.

We also disagree that Meow Wolf's general objections are improper. Use of general objection is ubiquitous practice in New Mexico civil litigation and not forbidden by any rule or law. Our general objections were limited to those matters that apply to each request. If there is any specific application of a general objection to a request that you contend does not fit, we will be happy to discuss.

As you are aware, Meow Wolf has engaged in a rolling production since early September and has served more than 11,000 pages of documents. Meow Wolf intends to supplement its production on or before the first week of February to serve additional responsive documents.

Andrew Chan
January 22, 2021
Page 4


We look forward to speaking with you on Monday to determine whether we can come
to an agreement on the appropriate scope of Ms. Oliver's discovery requests.

Very truly yours,

Breanna Contreras

Breanna Contreras

# EXHIBIT I

| | |
|---|---|
| **From:** | Breanna Contreras |
| **To:** | Jesse Boyd; Ben Allison |
| **Cc:** | Andrew Chan; Vince Ward; David Harrigan; Penny Peterson |
| **Subject:** | RE: Oliver v. Meow Wolf; Discovery Meet-and-Confer |
| **Date:** | Wednesday, February 3, 2021 3:41:06 PM |
| **Attachments:** | image002.png |
| | image003.png |

Dear Jesse,

Thank you for your email summary below.

With respect to Interrogatory No. 3 concerning "all persons who develop[ed any aspect of, and/or updated Meow Wolf's website since January 1, 2014," during our call we discussed narrowing the request to some reasonable parameter other than every person who had anything to do with Meow Wolf's website over the course of 6 years whether or not their involvement with the website has anything to do with this matter, which appears to us to be facially overbroad. I've spoken with my client and we can provide the name or names of persons who had primary responsibility for developing and updating Meow Wolf's website, but it would likely be very difficult to track down each person (some of whom may have been contractors) who may have assisted in developing Meow Wolf's website over such a long period of time. Please let us know if you would accept our offer to identify the persons with primary responsibility for developing and updating Meow Wolf's website during that period.

With respect to Interrogatory No. 7 concerning the identity of "all Participating Artists," which is defined as "any person that contributed copyrightable works of art to the [House of Eternal Return]," we told you that it would be very difficult for us to identify who we believed may have contributed copyrightable works, but that we would agree to supplement our answer to point you to Meow Wolf's website which provides a credits page detailing more than 400 persons who had a role in creating HoER, and to refer to one or more documents in Ms. Lesta's production in response to your subpoena which contains the names of artists who contributed to HoER. We do not believe Meow Wolf's agreements with all other artists who contributed copyrightable works of art to the House of Eternal Return (RFP No. 11) are relevant to any claim or defense in this matter.

My client is in the process of searching for and gathering what information it can regarding sales and distribution data related to the Meow Wolf Origin Story documentary (RFP. No. 5), and its communications with Themed Entertainment Association prior to receiving and related to the THEA Award for Outstanding Achievement which was given to MW in 2017 (RFP No. 7). We will let you know whether communications with TEA is unreasonably voluminous so as to create an undue burden to produce.

We look forward to receiving your list of instances of removal of works from HoER related to your RFP No. 16, and the basis for those works' removal being relevant to Ms. Oliver's claims. Once we receive that list and your explanation for how they are relevant to the claims or defenses in this matter, we will consider supplementing our response to RFP No. 16.

Thank you,

Breanna

**B**
**V**

Breanna Contreras
Bardacke Allison LLP
bardackeallison.com
+1 505 995 8000

CONFIDENTIALITY NOTICE: This e-mail and any attachments may be confidential and protected by privilege. If you are a client, do not forward this email. If you are not the intended recipient, please notify us by reply and then delete this e-mail with any attachments from your system; you are not authorized to read, copy, forward or use the contents of this e-mail or any attachments in any manner. Thank you.

**From:** Jesse Boyd <jboyd@ericksenarbuthnot.com>
**Sent:** Thursday, January 28, 2021 10:51 AM
**To:** Ben Allison <ben@bardackeallison.com>; Breanna Contreras <breanna@bardackeallison.com>
**Cc:** Andrew Chan <achan@ericksenarbuthnot.com>; Vince Ward <vjw@fbdlaw.com>; David Harrigan <djh@fbdlaw.com>; Penny Peterson <ppeterson@ericksenarbuthnot.com>
**Subject:** Oliver v. Meow Wolf; Discovery Meet-and-Confer

Good day Ben and Breanna,

Thank you for taking the time to talk on Monday regarding Meow Wolf's responses to Oliver's first interrogatories and requests for production.  I will do my best to summarize our discussion with this email.

During the discussion I took the position that a response to Special Interrogatories 1 and 2, and Request for Production 14 and 15 related to the identification of Meow Wolf's owners over time were calculated to lead to the discovery of admissible evidence regarding Oliver's claims in that she reasonably understood Meow Wolf to be a collective beginning in 2008, which status was reiterated by Defendants up through installation at HoER and beyond, and that information related to how the Meow Wolf Collective was converted to a private, for-profit venture purportedly owned by particular individuals goes directly to Oliver's claims for breach of contract, bad faith, misrepresentation, and unjust enrichment.  You responded that Meow Wolf believes the information sought was not relevant to any claim given the court's ruling on Meow Wolf's motion to dismiss.  We are at an impasse as to these discovery requests.

As to Interrogatory 6 and RFP 6 related to the identity of investors and documents provided to investors, I argued that the information sought was reasonably calculated to lead to the discovery of admissible evidence for multiple claims, including misrepresentation and unjust enrichment in that, upon information and belief, Defendants presented HoER as their own, including Oliver's work, which in turn was used to increase the value of Meow Wolf to their benefit under circumstances where the retention of that benefit would be unjust.  The witnesses and documents sought in the requests should have information directly relevant to that (and other) issues in the case in that they will likely have information confirming (or refuting) Oliver's understanding of the basic facts

underlying this case.  You stated the requests were overbroad and would require disclosure of investments and ownership interests up through today and again asserted relevance as a basis for non-response.  We are at an impasse as to these discovery requests.

Interrogatory 3 concerns persons responsible for developing and updating Meow Wolf's website.  Such persons may have information related to the posting and use of images of Oliver's work over time, and archived versions of Meow Wolf's web page, which may contain admissions by Meow Wolf relevant to the instant lawsuit (e.g. touting itself as a collective, statements regarding sharing Meow Wolf's success with members of the collective/artists, etc.).  Meow Wolf believes the request is overbroad and has refused to answer.  Oliver believes it is a reasonable request for the identification of potential witnesses and a good-faith response is appropriate.  We will proceed on the assumption we are at an impasse as to Interrogatory #3 unless you inform us otherwise.

We have agreed that you will provide an amended response to Interrogatory 7 related to the identity of participating artists.  However, you will not provide any contracts with those artists as requested by RFP 11.  I explained Meow Wolf's contracts with other artists, before, during, and after installation of HoER would be relevant to Oliver's breach of contract and bad faith claims (evidence shows Meow Wolf actively avoided addressing contractual issues with Oliver prior to installation), and may well include information relevant to her misrepresentation and unjust enrichment claims.  In addition, the contracts can be used to identify potential witnesses.  I believe you stated the contracts are not relevant to Oliver's case.  We are at an impasse as to RFP 11.

I believe you have agreed to provide available sale and distribution data in response to RFP 5 related to the Meow Wolf Origin Story documentary and associated trailer.  Please let me know if my notes are incorrect on this.

As to RFP 7, we agreed that Meow Wolf will provide communications with TEA in its possession, custody, or control related to the THEA Award for Outstanding Achievement – Connected Immersion on a Limited Budget which was given to MW in 2017, and MW communications prior to that award, unless it appears prior communications are unreasonably voluminous.

As to RFP 16, we will forward a list of particular instances of removal of work from HoER of which Oliver is aware, which you will assess and respond to.  Parties will continue to meet-and-confer as to RFP 16.

Thank you again for your time and attention to this.  Let me know if any of the above does not conform with your understanding.  I look forward to connecting with you again soon.

Best,
Jesse



**JESSE A. BOYD**
**Partner**
2300 Clayton Road, Suite 350
Concord, CA 94520
Telephone:  (510) 832-7770, ex. 103
Cell: (505) 620-9520
Facsimile: (510) 832-0102
Email: jboyd@ericksenarbuthnot.com
Website: www.ericksenarbuthnot.com

Due to the "shelter in place" policy that is currently in effect for many of the counties serviced by our Firm, I am working from home. We do not know how long the policy will be in effect. While I am working from home, I will have unlimited access to my emails.  You can also reach me by phone at the main number below at extension 103.  Your call will be routed directly to me or my voicemail if I am unavailable.

*This email constitutes an electronic communication protected by state and federal laws.  This communication may contain confidential and privileged material for the sole use of the intended recipient.  If you are not the intended recipient please notify the sender, do not disseminate the email or information therein, and delete all copies of this communication.  Thank you.*

EXHIBIT J

| From: | Jesse Boyd |
|---|---|
| To: | Breanna Contreras; Ben Allison |
| Cc: | Shelby Spoonhoward; Penny Peterson; Andrew Chan; Vince Ward |
| Subject: | RE: Oliver v. Meow Wolf; Meet and confer on Revenue Data; Specific instances of Removal of Art |
| Date: | Friday, February 12, 2021 11:30:00 AM |
| Attachments: | image001.png |
| | image002.png |

Hi Breanna,

Meow Wolf threatened to remove ISQ from HoER if Lauren didn't accept what we believe to be unconscionable terms. This, in part, underlies Oliver's claim for injunctive relief under VARA, and is clearly laid out in the complaint and Lauren's discovery responses. Sarah Bradley's Rabbit and Billy Joe Miller's Chapel were actually removed from HoER, and the circumstances of those removals is directly relevant to this claim, and we believe likely relevant to Oliver's bad faith claim. Unless I hear otherwise, I'll continue to assume we are at an impasse on this issue.

Best,
Jesse



**JESSE A. BOYD**
**Partner**
2300 Clayton Road, Suite 350
Concord, CA 94520
Telephone: (510) 832-7770, ex. 103
Cell: (505) 620-9520
Facsimile: (510) 832-0102
Email: jboyd@ericksenarbuthnot.com
Website: www.ericksenarbuthnot.com

Due to the "shelter in place" policy that is currently in effect for many of the counties serviced by our Firm, I am working from home. We do not know how long the policy will be in effect. While I am working from home, I will have unlimited access to my emails. You can also reach me by phone at the main number below at extension 103. Your call will be routed directly to me or my voicemail if I am unavailable.

*This email constitutes an electronic communication protected by state and federal laws. This communication may contain confidential and privileged material for the sole use of the intended recipient. If you are not the intended recipient please notify the sender, do not disseminate the email or information therein, and delete all copies of this communication. Thank you.*

**From:** Breanna Contreras <breanna@bardackeallison.com>
**Sent:** Thursday, February 11, 2021 4:31 PM
**To:** Jesse Boyd <jboyd@ericksenarbuthnot.com>; Ben Allison <ben@bardackeallison.com>
**Cc:** Shelby Spoonhoward <Shelby@bardackeallison.com>; Penny Peterson

<ppeterson@ericksenarbuthnot.com>; Andrew Chan <achan@ericksenarbuthnot.com>; Vince Ward
<vjw@fbdlaw.com>
**Subject:** RE: Oliver v. Meow Wolf; Meet and confer on Revenue Data; Specific instances of Removal
of Art

Thanks for your quick response, Jesse.

I don't understand how Meow Wolf's removal of another artist's work would have any bearing on
Ms. Oliver's VARA claim, and her work has not been destroyed. I also don't see how removal of other
works would have any bearing on Ms. Oliver's contract or bad faith claims. I think we are at an
impasse unless we are better able to understand how any of this information would support any
claim or defense in this matter.

My best,
Breanna

B

V

Breanna Contreras
Bardacke Allison LLP
bardackeallison.com
+1 505 995 8000

CONFIDENTIALITY NOTICE: This e-mail and any attachments may be confidential and protected by privilege. If you are a client,
do not forward this email. If you are not the intended recipient, please notify us by reply and then delete this e-mail with any
attachments from your system; you are not authorized to read, copy, forward or use the contents of this e-mail or any
attachments in any manner. Thank you.

**From:** Jesse Boyd <jboyd@ericksenarbuthnot.com>
**Sent:** Thursday, February 11, 2021 5:25 PM
**To:** Breanna Contreras <breanna@bardackeallison.com>; Ben Allison <ben@bardackeallison.com>
**Cc:** Shelby Spoonhoward <Shelby@bardackeallison.com>; Penny Peterson
<ppeterson@ericksenarbuthnot.com>; Andrew Chan <achan@ericksenarbuthnot.com>; Vince Ward
<vjw@fbdlaw.com>
**Subject:** RE: Oliver v. Meow Wolf; Meet and confer on Revenue Data; Specific instances of Removal
of Art

Hi Breanna,

For one thing, removal of other work, and the circumstances surrounding that removal, goes to
Oliver's VARA claim and potential destruction of her work.  In addition, it would go to the underlying
contractual relations (or disputes) that Meow Wolf has had at HoER, which would be relevant to
Oliver's contract and bad-faith claims.

Please let me know if we are at an impasse on RFP #16.

Best,
Jesse



**JESSE A. BOYD**
**Partner**
2300 Clayton Road, Suite 350
Concord, CA 94520
Telephone:  (510) 832-7770, ex. 103
Cell: (505) 620-9520
Facsimile: (510) 832-0102
Email: jboyd@ericksenarbuthnot.com
Website: www.ericksenarbuthnot.com

Due to the "shelter in place" policy that is currently in effect for many of the counties serviced by our Firm, I am working from home. We do not know how long the policy will be in effect. While I am working from home, I will have unlimited access to my emails.  You can also reach me by phone at the main number below at extension 103.  Your call will be routed directly to me or my voicemail if I am unavailable.

*This email constitutes an electronic communication protected by state and federal laws.  This communication may contain confidential and privileged material for the sole use of the intended recipient.  If you are not the intended recipient please notify the sender, do not disseminate the email or information therein, and delete all copies of this communication.  Thank you.*

**From:** Breanna Contreras <breanna@bardackeallison.com>
**Sent:** Thursday, February 11, 2021 4:15 PM
**To:** Jesse Boyd <jboyd@ericksenarbuthnot.com>; Ben Allison <ben@bardackeallison.com>
**Cc:** Shelby Spoonhoward <Shelby@bardackeallison.com>; Penny Peterson <ppeterson@ericksenarbuthnot.com>; Andrew Chan <achan@ericksenarbuthnot.com>; Vince Ward <vjw@fbdlaw.com>
**Subject:** RE: Oliver v. Meow Wolf; Meet and confer on Revenue Data; Specific instances of Removal of Art

Hi Jesse—

I'm writing to respond to your Request for Production No. 16 concerning copyrightable works that have been removed from HoER. We have analyzed your request for documents related to removal of The Rabbit Room and Chapel, but those documents do not appear to us to be relevant to any claim or defense in this matter. Can you provide us your position on why this information is relevant, so that we can consider it and let you know if we will supplement our response to this request?

My best,
Breanna



**Breanna Contreras**

Bardacke Allison LLP

bardackeallison.com

+1 505 995 8000

CONFIDENTIALITY NOTICE: This e-mail and any attachments may be confidential and protected by privilege. If you are a client, do not forward this email. If you are not the intended recipient, please notify us by reply and then delete this e-mail with any attachments from your system; you are not authorized to read, copy, forward or use the contents of this e-mail or any attachments in any manner. Thank you.

**From:** Jesse Boyd <jboyd@ericksenarbuthnot.com>
**Sent:** Tuesday, February 09, 2021 2:45 PM
**To:** Breanna Contreras <breanna@bardackeallison.com>; Ben Allison <ben@bardackeallison.com>
**Cc:** Shelby Spoonhoward <Shelby@bardackeallison.com>; Penny Peterson
<ppeterson@ericksenarbuthnot.com>; Andrew Chan <achan@ericksenarbuthnot.com>; Vince Ward
<vjw@fbdlaw.com>
**Subject:** RE: Oliver v. Meow Wolf; Meet and confer on Revenue Data; Specific instances of Removal
of Art

Hi Breanna,

We are ok with a mutual extension of time on motions to compel for 15 days (to February 25). I will have a response to your letter out by the end of the week. We assume you will be preparing and making the filings (I've attached the previous papers here for you to use).

As to revenue data, Lauren alleges (now under oath) that your clients promised a "revenue share" tied to overall revenue, which promise underlies several of Lauren's claims (contract, bad faith, misrepresentation, unjust enrichment), and which our damages expert has requested for their work. Let me know if you have second thoughts on this issue, but absent word to the contrary, we will proceed on the assumption we remain at an impasse.

On another issue, the specific instances of art removal we are seeking information about at this time, which would be responsive to Request for Production #16, are The Rabbit Room by Sarah Bradley, and the Chapel by Billy Joe Miller. Please let us know if you will be producing responsive documents concerning the removal of these installations.

Best,
Jesse



**JESSE A. BOYD**
**Partner**
2300 Clayton Road, Suite 350
Concord, CA 94520
Telephone:  (510) 832-7770, ex. 103
Cell: (505) 620-9520
Facsimile: (510) 832-0102
Email: jboyd@ericksenarbuthnot.com
Website: www.ericksenarbuthnot.com

Due to the "shelter in place" policy that is currently in effect for many of the counties serviced by our Firm, I am working from home. We do not know how long the policy will be in effect. While I am working from home, I will have unlimited access to my emails.  You can also reach me by phone at the main number below at extension 103.  Your call will be routed directly to me or my voicemail if I am unavailable.

*This email constitutes an electronic communication protected by state and federal laws.  This communication may contain confidential and privileged material for the sole use of the intended recipient.  If you are not the intended recipient please notify the sender, do not disseminate the email or information therein, and delete all copies of this communication.  Thank you.*

**From:** Breanna Contreras <breanna@bardackeallison.com>
**Sent:** Tuesday, February 9, 2021 12:05 PM
**To:** Jesse Boyd <jboyd@ericksenarbuthnot.com>; Ben Allison <ben@bardackeallison.com>
**Cc:** Shelby Spoonhoward <Shelby@bardackeallison.com>; Penny Peterson <ppeterson@ericksenarbuthnot.com>; Andrew Chan <achan@ericksenarbuthnot.com>; Vince Ward <vjw@fbdlaw.com>
**Subject:** RE: Oliver v. Meow Wolf; Meet and confer on Revenue Data; Specific instances of Removal of Art

Hi Jesse,

Thank you for your email. I called you a short while ago to discuss this, Ms. Oliver's production, and Ms. Oliver's deposition.

I believe we discussed RFP #12 by phone—as written, it is incredibly overbroad. If there are particular revenue streams that are more reasonably tied to Ms. Oliver's claims (i.e. information concerning income derived from specific instances of alleged infringement), we would be willing to consider supplementing our response. But without reasonable parameters on the request, we do not think the Court will compel us to provide this information.

My client is still in the process of gathering responsive documents and information that we agreed in our email of February 3rd to search for and produce. We also want to know whether Ms. Oliver has withheld any responsive documents on the basis of her objections, to confirm she has produced all

responsive documents in her custody, possession or control, and to obtain the emails she's produced in native file format. Please see our attached letter. I acknowledge that our letter to you is last minute, and apologize for that, but the issues in it are simple and easily resolved.

Given that Meow Wolf is in the process of supplementing its responses and that you will not have had a meaningful opportunity to discuss with Ms. Oliver the issues raised in our letter, we propose one more extension of 15 or 30 days to allow Meow Wolf to supplement its responses and for you to respond concerning Ms. Oliver's document production.

Please let us know if you are amenable to that, and we will prepare a proposed motion and order for your review.

My best,
Breanna

B
V

Breanna Contreras
Bardacke Allison LLP
bardackeallison.com
+1 505 995 8000

CONFIDENTIALITY NOTICE: This e-mail and any attachments may be confidential and protected by privilege. If you are a client, do not forward this email. If you are not the intended recipient, please notify us by reply and then delete this e-mail with any attachments from your system; you are not authorized to read, copy, forward or use the contents of this e-mail or any attachments in any manner. Thank you.

**From:** Jesse Boyd <jboyd@ericksenarbuthnot.com>
**Sent:** Tuesday, February 09, 2021 10:58 AM
**To:** Ben Allison <ben@bardackeallison.com>; Breanna Contreras <breanna@bardackeallison.com>
**Cc:** Shelby Spoonhoward <Shelby@bardackeallison.com>; Penny Peterson <ppeterson@ericksenarbuthnot.com>; Andrew Chan <achan@ericksenarbuthnot.com>; Vince Ward <vjw@fbdlaw.com>
**Subject:** Oliver v. Meow Wolf; Meet and confer on Revenue Data; Specific instances of Removal of Art

Good day Ben and Breanna,

While it was addressed in Andrew's letter, we did not discuss or exchange positions on RFP #12 concerning revenue information in subsequent communications. I am proceeding on the assumption that we are at an impasse on that request, unless you inform me otherwise.

Stay well.

Best,
Jesse



**JESSE A. BOYD**
**Partner**
2300 Clayton Road, Suite 350
Concord, CA 94520
Telephone:  (510) 832-7770, ex. 103
Cell: (505) 620-9520
Facsimile: (510) 832-0102
Email: jboyd@ericsenarbuthnot.com
Website: www.ericksenarbuthnot.com

Due to the "shelter in place" policy that is currently in effect for many of the counties serviced by our Firm, I am working from home. We do not know how long the policy will be in effect. While I am working from home, I will have unlimited access to my emails.  You can also reach me by phone at the main number below at extension 103.  Your call will be routed directly to me or my voicemail if I am unavailable.

*This email constitutes an electronic communication protected by state and federal laws.  This communication may contain confidential and privileged material for the sole use of the intended recipient.  If you are not the intended recipient please notify the sender, do not disseminate the email or information therein, and delete all copies of this communication.  Thank you.*