## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**LAUREN ADELE OLIVER,**
**an individual,**

      **Plaintiff,**

**vs.**                              **Case No. 1:20-CV-00237-KK-SCY**

**MEOW WOLF, INC., a Delaware**
**corporation; VINCE KADLUBEK,**
**an individual and officer; and**
**DOES 1-50,**

                                      **JURY TRIAL DEMANDED**

      **Defendants.**

### AMENDED COMPLAINT FOR VIOLATION AND THREATENED VIOLATION OF THE VISUAL ARTISTS RIGHTS ACT, COPYRIGHT INFRINGEMENT, BREACH OF CONTRACT, BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING, PROMISSORY ESTOPPEL, UNJUST ENRICHMENT, CONVERSION, MISREPRESENTATION, AND CONSTRUCTIVE TRUST

### JURISDICTION AND VENUE

1.      This is an action for copyright infringement arising under the Copyright Act of 1976, Title 17 U.S.C. §§ 101 *et seq*., violation and threatened violation of the Visual Artists Rights Act ("VARA"), 17 U.S.C. § 106A, and state law claims arising from the same general set of facts.

2.      This Court has jurisdiction of this action under 28 U.S.C. §§ 1331, 1367, 1338(a) and (b).

3.      Venue is proper in this judicial district under 28 U.S.C. §§ 1391 and 1400(a).

### THE PARTIES

4.      Plaintiff LAUREN ADELE OLIVER (hereinafter "Oliver") is an individual and resident of the State of New Mexico.

5.      Upon information and belief, defendant Meow Wolf, Inc. (hereinafter "MWI") is a Delaware corporation with a principal place of business in Santa Fe, New Mexico, and conducts business in the State of New Mexico.

6.      MWI is at times herein referred to as "Meow Wolf."

7.      Defendant Vince Kadlubek (hereinafter "Kadlubek") is an individual, and upon information and belief, was a director and/or officer of MWI during relevant times.  Upon information and belief, Kadlubek is a resident of Santa Fe, New Mexico.

8.      Defendants Does 1 through 50, inclusive, are other parties not yet identified who, upon information and belief, have infringed Oliver's copyright(s) and/or VARA rights, have contributed to the infringement of Oliver's copyright(s) and/or VARA rights, and/or have engaged in one or more of the wrongful practices alleged herein.  The true names, whether corporate, individual or otherwise, of defendants Does 1 through 50, inclusive, are presently unknown to Oliver, who therefore sues said defendants by such fictitious names, and will seek leave to amend this Complaint to show their true names and capacities when their true names have been ascertained.

9.      Upon information and belief, at all times relevant hereto each of the defendants was the agent, affiliate, officer, director, manager, principal, alter-ego, and/or employee of the remaining defendants and was at all times acting with the scope of such agency, affiliation, alter-ego relationship and/or employment; and actively participated in or subsequently ratified and adopted, or both, each and all of the acts or conduct alleged, with knowledge of all the facts and circumstances, including, but not limited to, knowledge of each and every violation of Oliver's rights and the damages to Oliver proximately caused thereby. MWI, Kadlubek, and Does 1 through 50 shall sometimes be referred to herein collectively as "Defendants."

## GENERAL ALLEGATIONS

10.     In or around 2006, Oliver created original sketches of an owl-like alien in a space suit with horns and a face visor (the "Space Owl"). A true and correct copy of one of these sketches is attached as Exhibit A.

11.     In February 2010, Oliver began working on a narrative around the Space Owl and created a variety of digital versions of the Space Owl.

12.     In November 2012, Oliver created a seven-foot painted version of the Space Owl for a group art show at a Santa Fe gallery. A local arts magazine featured an image of that version of the Space Owl in a review of the show. A true and correct copy of this image is attached as Exhibit B.  Upon information and belief, Meow Wolf representatives saw this version of the Space Owl at this venue, or in the magazine review.

13.     In 2014, Oliver began envisioning the Space Owl as a central element in a climate change-themed art project with a science fiction-style narrative, titled "Ice Station Quellette" ("ISQ").

14.     During the fall of 2014, Oliver discussed her art project with Meow Wolf representatives at an art opening. Those representatives mentioned Meow Wolf was seeking to obtain a large art space and would need art and artists to participate and expressed interest in Oliver participating.  Oliver had known other members of Meow Wolf since the collective was formed, and participated in early Meow Wolf projects, including the Halloween Show in Santa Fe in 2008.

15.     That winter of 2014/2015, Oliver was focused on developing content for her first ISQ show at a Santa Fe gallery.  At the same time, Meow Wolf began actively soliciting proposals for their "House of Eternal Return" ("HoER"), the permanent flagship project of

Meow Wolf. At the time, and on occasion through the present, Meow Wolf held itself out as an artists' collective. Vince Kadlubek portrayed HoER as a legacy arts complex with a permanent exhibit that would serve the community of Santa Fe, especially its underserved young people. George RR Martin, author and local philanthropist had bought an old bowling alley in town, which he leased to Meow Wolf for a nominal sum.

16.     Though there was a buzz about HoER in the Santa Fe art community, Oliver did not actively pursue HoER as an outlet for her artwork. However, in early 2015, Meow Wolf representatives approached Oliver, and asked her to install ISQ in the HoER. Upon that invitation, Oliver submitted a proposal and began attending HoER development meetings.

17.     At the same time, Oliver was continuing to develop ISQ. The first ISQ show opened at a gallery in Santa Fe in June 2015; the centerpiece was ten-foot-tall, "life-sized" sculptural version of the Space Owl.

18.     The ISQ gallery show was well-received by visitors and the press.

19.     Based on the success of the gallery show, a private science institution in Santa Fe asked to show ISQ at their campus, and Oliver installed ISQ at that location in September 2015. It had become clear, at that point, that ISQ was likely to be the most important project of Oliver's career.

20.     Meanwhile during the HoER development meetings, Oliver learned ISQ was to be featured prominently in the exhibit space, in its own room, alongside rooms of Meow Wolf original members. Artists, including Oliver, were told their work had to be designed to withstand public viewing at least for the duration of the 10-year lease Meow Wolf had secured at the location.

21.     As plans for HoER progressed, Meow Wolf representatives, including Kadlubek, repeatedly described participating artists, including Oliver, as part of the "collective."

22.     Examples of representatives describing Meow Wolf as a collective abound in local and national publications. To this day, Meow Wolf's website touts its status as a "collective," and announces that Meow Wolf "firmly believes that accomplished artists must be compensated on an equal level with other skilled, in-demand professionals…"

23.     Meow Wolf did not offer upfront payment to Oliver. Instead, Meow Wolf representatives, including Kadlubek, offered membership in the "collective" and an "artist revenue share" as the key components of compensation for participation.  Such promises were necessary to entice the original artists to invest the astonishing amount of work required to transform an empty building into a jam-packed art playland. Kadlubek in particular repeatedly promised an Artist Revenue Share.

24.     Several early Meow Wolf members were old friends of Oliver, and she trusted them. Given her long-time association with Meow Wolf and its other members, the prominent location of her work within HoER, and representations of other early Meow Wolf members, Oliver reasonably understood that she was part of Meow Wolf's core team.

25.     Meow Wolf's representations constituted an offer: If Oliver agreed to invest the time and resources necessary to become an original participating artist in Meow Wolf's flagship project, Oliver might not be paid if the venture failed, but would proportionally share in Meow Wolf's success should it take off.

26.     After considering the risks and potential benefits, Oliver accepted Meow Wolf's offer, and expended months of her time and considerable personal resources designing and installing a version of ISQ, including a robust version of the Space Owl, at the HoER.

27.     The installation was a filthy, full-time job, involving months of late nights, grueling, dangerous work, and the expenditure of significant amounts of Oliver's own money. Oliver put every ounce of love and energy she had into the installation of ISQ at HoER, with the result being an angelic, 13-foot-tall Space Owl, which observers often describe as alive, sentient, and *real*.

28.     It soon became clear the House of Eternal Return was going to be a success. There were lines out the door night and day. Oliver's towering, blinking character was a huge hit with visitors, and Oliver felt the incredible enthusiasm in the press and on social media – the Space Owl put a friendly face on this new, weird, sometimes intimidating art experiment.  Oliver trusted Meow Wolf would make good on their promises and work with her to formalize a mechanism by which she could share in Meow Wolf's extraordinary success.

29.     However, over the course of 2017 and 2018, the language Meow Wolf used to describe itself and its relationship with its member artists began to shift.  At some point the "Artist Revenue Share" began to be called a "Bonus Program," amounting to Kadlubek making personal, arbitrary decisions about who got what.  Because of her relationship with Meow Wolf's original members, and the prominence of ISQ at HoER, Oliver continued to believe Meow Wolf and Kadlubek would make good on their promises to her.  Unbeknownst to Oliver, Kadlubek at the time was bragging in the press about the huge profit margins Meow Wolf was enjoying while making millions of dollars in revenue.

30.     Meanwhile, over the course of 2018, Oliver began finding ways Meow Wolf was making money from the ISQ without compensating or crediting Oliver – there was a coloring book and a coffee table book in the gift shop, and they were even selling Space Owl shots in the bar.

31.     In approximately April 2018, Oliver decided the parties needed to formalize their agreement and relationship going forward.  After considerable runaround from various representatives, Oliver finally connected with Meow Wolf.  Meow Wolf proposed a new agreement to license Oliver's Space Owl character, royalty-free, and without any of the up-side compensation they had promised in order to convince Oliver to install ISQ at HoER.

32.     Of course, Oliver declined, making it clear she did not want to sell Meow Wolf the Space Owl. Meow Wolf eventually presented a usage agreement, but it offered offensively little compensation in exchange for blanket immunity on copyright infringement, even as Oliver was continuing to discover new, unauthorized uses of her work.

33.     Thus, in June of 2018, Oliver asked Meow Wolf to stop using the Space Owl until their relationship had been formalized.

34.     At the same time, Oliver had other pressing responsibilities. She and her brother were losing her mother to Parkinson's disease, and Oliver was the primary coordinator of her mother's care. A persistent stomach ailment was plaguing Oliver, which she attributed to chronic stress related to her mother's condition and Meow Wolf's inability or unwillingness to formalize their relationship, properly credit her work, and allow Oliver to capitalize on the contribution ISQ had made to Meow Wolf's extraordinary success.

35.     Oliver's mother passed away in September of 2018; Oliver's brother followed her three months later, in December. The week her brother died, Oliver found out Meow Wolf had used the Space Owl in the trailer for their self-made puff-piece documentary, which was ultimately distributed to millions of viewers online and in theatres. This was despite Oliver's specific direction several months earlier to stop using her work without her permission.  It

seemed to Oliver she was powerless to stop Meow Wolf and the other defendants from illegally

using her art.

36.     After stabilizing the estates of her mother and brother, Oliver returned to Santa Fe

in the spring of 2019.  She again asked for a meeting with Meow Wolf to finally formalize the

parties' relationship, and again got the runaround. According to news reports, Meow Wolf

received an infusion of $158 million dollars in venture capital.

37.     Oliver finally secured a meeting with Kadlubek on June 3, 2019.  During that

meeting he issued Oliver a surprise ultimatum: sell Meow Wolf all rights to the Space Owl for a

nominal sum and end the relationship or remove ISQ from HoER without additional

compensation and end the relationship.  In other words, Kadlubek was saying, "You're fired!"

The membership in the collective was being stolen.  There would be no Artist Revenue Share.

There would be no compensation for all the work and money Oliver had invested in Meow Wolf,

much less the enormous amount of good will and millions of dollars the Space Owl helped bring

Meow Wolf.

38.     At the time of the June 3, 2019 meeting, Oliver had received from Meow Wolf a

grand total of $2000 in Artist Revenue Share, which did not even cover the personal funds she

had expended for the installation of ISQ at HoER.

39.     After the June 3, 2019 meeting, Oliver spent weeks reviewing all of her

communications with Meow Wolf as well as a multitude of articles about the "collective" and its

transition to a "startup."  Meow Wolf had been sued for discrimination and was forcing a stock

buyback from a set of early investors, who had been convinced by Kadlubek they were getting in

on the ground floor of the next Disney. Worse, from Oliver's perspective, Meow Wolf was now

emailing paperwork declaring the only way for all of the original artists to get their artist revenue

share check was to sign all their IP rights over to the company. What had begun to appear as a fraud and theft, was beginning to feel like extortion.

40.    It had become clear that Meow Wolf had brazenly conned dozens of artists into installing their work for free, on the promise of collective shared success, only to renege, paying pennies on the dollar for the participating artists' investment of time, resources, declined competing opportunities, artwork, and valuable intellectual property.  Upon information and belief, when Defendants were making their promises to Oliver of membership in the collective, and an Artist Revenue Share, they had no intent to fulfill those promises.  Any license to show Oliver's work at HoER, implied or otherwise, was contingent on Defendants' good faith and fulfillment of their promises.

41.    Meanwhile, Oliver's mysterious stomach ailment turned out to be a diagnosis of ovarian cancer, stage IV.  Accelerated spread of ovarian cancer is associated with chronic stress.

42.    In the months since her meeting with Mr. Kadlubek on June 3, 2019, Oliver tried to negotiate a fair resolution. Meow Wolf's members were Oliver's friends. She just wanted to be treated fairly and receive appropriate compensation for the use of her art and her ownership interest in Meow Wolf, given the promises that were made to convince her to install ISQ at HoER, and the contribution the Space Owl has made to Meow Wolf's success.  Unfortunately, Meow Wolf's response has been to double-down on the cruel ultimatum Kadlubek made at the June 3, 2019 meeting.  All this while being fully aware of Oliver's diagnosis and that the stress and delay tactics would threaten her ability to battle her illness.

43.    Ironically, the funds used by Meow Wolf to battle against Oliver's claims come, in no small part, from the money Oliver's work made for them.

44.     Meow Wolf has repeatedly threatened Oliver with the removal of ISQ without her permission.  Because of the way it is constructed, removal of the installation would require its destruction, including the destruction of the Space Owl.

45.     Another disturbing moment for Oliver came at the beginning of 2020, when she was recovering from cancer surgery.  A family member told Oliver she had seen the Space Owl on Apple News. Oliver obtained a link to a piece on Artnet: "The 100 Defining Works of the Decade." Number 25 was Meow Wolf, along with a picture of the Space Owl. Beyoncé (#24) and Banksy (#23) got to see their name on that list – but not Oliver.  Instead, her work was attributed to the Meow Wolf artists' "collective."  A copy of pertinent portions of the fourth instalment of the Artnet piece containing Meow Wolf as #25 is attached hereto as Exhibit C.  A copy of the Artnet introductory page for the 4-part series, incorporating the Space Owl as one of only 7 images included from the piece, is attached hereto as Exhibit D.

46.     Had Defendants been truthful at the outset that their actual plan was to morph Meow Wolf into a massive entertainment conglomerate, potentially worth hundreds of millions of dollars, none of which Oliver would share in, Oliver would have never put her flagship art project, which spent many years developing, into HoER.

47.     Because of Defendants' misrepresentations and actions, Oliver's ability to realize the potential of ISQ and the Space Owl has been thwarted, while at the same time her work has been exploited to enrich a handful of lucky new millionaires. Had Oliver any clue Defendants would leverage her trust, based on false promises, to obtain her participation, then exploit her Space Owl character to build their brand empire – all without compensation, credit, or consent – and even after she asked them to stop using it, she most definitely would have said, "No thanks."

Oliver's life until now has been focused on creating art, but because of her experience with

Defendants, her interest in making art has been largely destroyed.

## SPECIFIC ALLEGATIONS

48.     The ISQ installation at HoER, including the Space Owl, encompass multiple

elements of Ice Station Quellette and Ice Station Quellette – The Last Ice On Earth, works

registered with the U.S. Copyright Office, Registration Numbers TXu 2-144-749 and VA 2-170-

075.

49.     Oliver is the sole author of Ice Station Quellette, Ice Station Quellette – The Last

Ice On Earth, and the Space Owl.

50.     Upon installation of the ISQ at HoER, Oliver held an ownership interest in the

Meow Wolf artists' collective.

51.     Oliver has not signed any written document purporting to transfer any interest in

the copyright of ISQ or the Space Owl to Meow Wolf.

52.     The Space Owl and other elements of ISQ installed at HoER are works of visual

art as defined in 17 U.S.C. § 101 and as the term is used in 17 U.S.C. § 106A.

53.     The Space Owl and other elements of ISQ installed at HoER are works of

recognized stature as the term is used in 17 U.S.C. § 106A(a)(3)(B).

54.     The HoER has been a monumental success, generating tens-of-millions in

revenue in its first four years. That success has propelled Meow Wolf to an artistic enterprise

with hundreds of employees, valued at hundreds of millions of dollars.

55.     In mid-2019, Meow Wolf announced the infusion of $158 million in venture

funding from 87 investors.  Upon information and belief, both as part of this round of funding,

and earlier rounds, Defendants alienated, encumbered, or diluted Oliver's ownership interest in the Meow Wolf artists' collective.

56.     After HoER's opening, ISQ, and in particular the Space Owl, became an instant fan favorite.  The Space Owl was and is a highly recognizable, iconic element of the exhibit appearing in countless social media posts from HoER visitors. Numerous local, national, and international press articles on Meow Wolf's success have featured images and descriptions of the Space Owl.

57.     Since the HoER opening in March 2016, Defendants have consistently exploited the fan appeal of ISQ and the Space Owl across multiple platforms to Defendants' benefit in promoting their brand and building their enterprise, without attribution and often without Oliver's knowledge or permission.

58.     Examples of such usage include using the Space Owl image in advertising, social media posts, and to represent Meow Wolf at the Themed Entertainment Association ("THEA") Awards.  A copy of Meow Wolf's THEA Awards web page is attached hereto as Exhibit E.

59.     Upon information and belief, Meow Wolf has presented ISQ and the Space Owl to investors and other third parties as Meow Wolf's intellectual property.

60.     The "art collective Meow Wolf's" HoER was recently lauded as #25 in an influential publication's list of "The 100 Works of Art That Defined the Decade."  The image used to represent HoER in the publication was of the Space Owl.

61.     Defendants knew or should have known that Oliver held copyrights covering the ISQ at HoER, including the Space Owl, at all relevant times.

62.     Defendants knew or should have known that Oliver held rights of attribution and integrity covering ISQ at HoER, including the Space Owl, at all relevant times pursuant to VARA, 17 U.S.C. § 106A.

63.     Examples of Defendants use and copying of Oliver's work, without attribution without Oliver's knowledge or permission, and in violation of Oliver's copyrights and VARA rights  include commissioning a Meow Wolf employee to draw an ISQ scene featuring an image substantially similar to the Space Owl for their Coloring Book, captioning an image of the Space Owl in a Coffee Table Book with HoER narrative text, and utilizing images of the Space Owl in cross-branding promotions with multi-national corporations.  Both the Coloring Book and the Coffee Table Book have been sold in the HoER gift shop and online.  A copy of the relevant coloring book pages is attached hereto as Exhibit F.  A copy of a Red Bull promotional web page incorporating the Space Owl is attached hereto as Exhibit G.

64.     In June 2018, Oliver directed Meow Wolf to refrain from using the Space Owl until a usage agreement had been negotiated.  To the extent any implied license for promotional purposes existed prior to this communication, which is disputed by Oliver, this communication ended any such implied license.  In addition, Oliver specifically directed Meow Wolf not to use her name as the author of any portion of the "Todos 7" collection of visual art.  Despite this direction, Meow Wolf repeatedly used Oliver name and ISQ with the "Todos 7" collection of visual art, including Meow Wolf's "credits" web page indicating ISQ as being part of "Todos 7."

65.     Notwithstanding Oliver's direction, in late 2018 Meow Wolf included the Space Owl, without attribution to Oliver, to represent Meow Wolf in their "Origin Story" documentary and associated trailer, which has been now been seen extensively by the public, in theaters and online.  A screenshot of the trailer is attached hereto as Exhibit H.

66.     Up until June 3, 2019, Oliver was an enthusiastic supporter of Meow Wolf and attempted at various times after the opening of the HoER to become more involved in the collective.

67.     Leading up to June 3, 2019, Oliver's relationship with Defendants, and her interactions with them had been pleasant.  Oliver trusted that Defendants would at some point negotiate a reasonable method of compensation in keeping with her contribution and status as a member of the Meow Wolf artists' collective and core team.

68.     However, as previously described, on June 3, 2019, Oliver was given an ultimatum by Defendants:  sell them all rights to the Space Owl, along with a license for the exhibition of the remaining ISQ elements at HoER, for an unreasonably low one-time payment; or remove ISQ from HoER with no additional compensation.

69.     These communications were the first time Oliver realized Defendants had been acting in bad faith and did not intend to share Meow Wolf's "collective" success with Oliver as promised.

70.     Defendants have threatened to remove ISQ from HoER without Oliver's permission if she did not accede to Defendants demands.  ISQ cannot be removed from HoER without being distorted, mutilated, modified, or destroyed.

71.     Defendants' wrongful acts and omissions have caused Oliver to incur significant actual damages, including, but not limited to, those damages stemming from lack of attribution in multiple Meow Wolf publications of Oliver's work, loss of opportunities to realize value from ISQ and the Space Owl, association of Oliver's work with corporations anathema to ISQ's climate-change theme and Meow Wolf itself, loss of the value of Meow Wolf's agreement to

share its success with Oliver, and loss of the value of her ownership interest in the Meow Wolf

artists' collective.  An example of the damage to Oliver's honor and reputation related to her

association with Meow Wolf can be seen in the article entitled, "How Do You Solve a Problem

Like Meow Wolf," by Christina Rees and Neil Fauerso, Oct. 1, 2018, Glasstire, which used an

image of the Space Owl under the headline, and which is attached hereto as Exhibit I.

72.     In an amount to be proved at trial, some significant portion of Meow Wolf's

success and current valuation is attributable to the ISQ, and its iconic Space Owl.

73.     To date, Oliver has received, at most, $2,000 from Meow Wolf for her installation

of ISQ at HoER.

### ADDITIONAL AND SUMMARIZING ALLEGATIONS REGARDING DEFENDANTS' PROMISES AND REPRESENTATIONS

74.     Repeatedly during meetings from late-spring through the remainder of 2015,

Defendants promised that, in lieu of upfront payment for installing her art in the HoER, Oliver

would be compensated as a member of the Collective and through a back-end payment of an

"Artist Revenue Share."

75.     The meetings where Defendants made the promises to Oliver and other

participating artists were held at facilities located on Rufina Circle and Rufina Street in Santa Fe,

New Mexico.  The meetings were generally collaborative.  As the layout and design of the

project was solidified, later meetings often involved Kadlubek delivering an increasingly

polished pitch promising the revenue share as an incentive not only to participate, but to devote

everything Oliver and the other Collective members had to the project.

76.     As represented by Defendants, in particular Kadlubek, Oliver's share of revenue

would be calculated and distributed on an annual basis, based on how much revenue the venture

generated each year.  Prior to Oliver's installation of ISQ at HoER, Defendants never represented

to Oliver that there was a cap on the share of revenue she would receive; rather, Defendants representations led Oliver to reasonably believe the return on her investment would be proportional to Meow Wolf's success.

77.     In Oliver's experience growing up in Silicon Valley, involvement in tech ventures, and career in the entertainment industry in New York, London, and Los Angeles, and consistent with her understanding at the time, start-ups on a limited budget often attract talent by providing a mechanism for that talent to share in the ultimate success of the venture.  Based on Defendants' representations, Oliver reasonably believed that type of back-end compensation model was what Defendants were promising.  In addition, if Meow Wolf were to incorporate and/or be purchased, her membership in the Collective and/or share in future revenue would convert to equity or payout proportionate with her investment. Upon information and belief Defendants knew of Oliver's background and knew or should have known that their representations would lead to this understanding on the part of Oliver.

78.     In reasonable reliance on Defendants' promises, Oliver invested all her available time and resources into the project, believing the installation of her flagship Ice Station Quellette, and its central Space Owl figure, at HoER would pay off proportionately with Meow Wolf's success. She leveraged years of development effort she had put into ISQ, and spent months in design and materials research before completing the grueling two-and-a-half-month build. Oliver delivered, on time and to professional standards.

79.     Prior to Oliver's completion of her work at ISQ, Defendants never communicated to Oliver that the value of her membership in the Collective and the promised revenue share was limited by anything other than Meow Wolf's success.

## FIRST CLAIM FOR RELIEF
### (Copyright Infringement against All Defendants)

80.     Oliver repeats and realleges the averments contained in all other paragraphs of this complaint as though fully set forth, except to the extent they are contrary to this claim for relief.

81.     Oliver is the sole author and owner of a valid copyright covering elements of the ISQ at HoER, including the Space Owl.

82.     Oliver did not transfer any right to create derivative works of the ISQ or Space Owl to Defendants.

83.     Defendants' production, reproduction, and preparation of copies or substantially similar derivative works based on protected elements of the ISQ, including, without limitation, the Coloring Book and the Coffee Table Book, without Oliver's consent, represent infringements of Oliver's exclusive rights under the Copyright Act.

84.     Defendants did not have an express license, in writing, signed by Oliver to publicly display ISQ or the Space Owl at HoER.

85.     To the extent Defendants disclaim any promises to Oliver as outlined herein, or the existence of a corresponding enforceable agreement with Oliver, there was no implied license to publicly display ISQ and the Space Owl at HoER, and Defendants' public display of ISQ and the Space Owl to paying patrons and potential investors, without any license, infringed Oliver's exclusive rights under the Copyright Act.

86.     Defendants' conduct was willful and malicious.

87.     As a result of the above-described conduct by Defendants, Oliver has been damaged in an amount to be proved at trial.

88.     By reason of their copyright infringement, Oliver is entitled to recover her actual damages or Defendants' profits.

89.     In the alternative, at the election of Oliver, Oliver is entitled to recover from Defendants statutory damages for Defendants' willful copyright infringement.

90.     Oliver neither knew, nor should have known, of Defendants' infringement of her copyrights until sometime in 2018.

## SECOND CLAIM FOR RELIEF
### (Violation and Threatened Violation of VARA against All Defendants)

91.     Oliver repeats and realleges the averments contained in all other paragraphs of this complaint as though fully set forth, except to the extent they are contrary to this claim for relief.

92.     Elements of ISQ installed at HoER, including, without limitation, the Space Owl, are each a "work of visual art" within the meaning of 17 U.S.C. § 101.

93.     As alleged above, Oliver specifically directed Meow Wolf not to use her name as the author of any portion of the "Todos 7" collection of visual art.  Despite this direction, Meow Wolf repeatedly used Oliver name and ISQ with the "Todos 7" collection of visual art, including Meow Wolf's "credits" web page indicating ISQ as being part of "Todos 7."  Defendants use of Oliver as the author for "Todos 7" constitutes violations of Oliver's rights of attribution under VARA.

94.     ISQ elements, including the Space Owl, are works of recognized stature pursuant to 17 U.S.C. § 106A(a)(3)(B), having received wide public acclaim and approval, and having been recognized as definitive and important in publications by influential members of the artistic community.

95.     Defendants used ISQ elements, including the Space Owl, such that the works were distorted, mutilated, or modified in a way prejudicial to Oliver's honor and reputation.

96.     Defendants used ISQ elements, including the Space Owl, without Oliver's knowledge or permission, and without attribution.

97.     ISQ, including the Space Owl, have been incorporated in and made part of HoER such that removing the works of visual art, or any part thereof, from HoER would cause their destruction, distortion, mutilation, or modification.

98.     Oliver has never waived her VARA rights.

99.     Defendants' prior acts violative of Oliver's VARA rights have caused Oliver actual damages in an amount to be proved at trial.

100.    Oliver neither knew nor should have known of Defendants' acts in violation of VARA until sometime after June 3, 2019.

101.    Oliver does not have an adequate remedy at law to address Defendants ongoing use of ISQ and the Space Owl without attribution and threatened removal of ISQ from HoER.

**THIRD CLAIM FOR RELIEF**
**(Breach of Contract against All Defendants)**

102.    Oliver repeats and realleges the averments contained in all other paragraphs of this complaint as though fully set forth, except to the extent they are contrary to this claim for relief.

103.    In exchange for Oliver's timely installation of ISQ at HoER without initial compensation, Defendants offered Oliver membership in the Meow Wolf artists' collective and a right to receive a share of Meow Wolf's revenue.  Under Defendants' offer, Oliver's future compensation would be proportionate with any increased value of Meow Wolf's brand and

enterprise and any increased revenue realized by Meow Wolf, i.e. a share of Meow Wolf's success.

104.    Oliver accepted Defendants' offer, and installed ISQ at HoER according to its terms, thereby creating a contract.

105.    Oliver has performed all duties required of her under the contract.

106.    The acts and omissions of the Defendants outlined herein constitute breaches of the contract.

107.    Defendants' breaches have caused damage to Oliver in an amount to be proved at trial.

## FOURTH CLAIM FOR RELIEF
### (Breach of Covenant of Good Faith and Fair Dealing against All Defendants)

108.    Oliver repeats and realleges the averments contained in all other paragraphs of this complaint as though fully set forth, except to the extent they are contrary to this claim for relief.

109.    Defendants failed to implement the terms of Oliver's contract with Meow Wolf in good faith.

110.    Defendants wrongfully and intentionally acted and failed to act contrary to Oliver's rights under the contract, and were consciously aware of, and proceeded with deliberate disregard for, the potential harm to Oliver from their acts and failures to act.

111.    Oliver suffered damages, including general damages, as a result of Defendants' bad faith in an amount to be proved at trial.

112.    Defendants' actions justify an award of punitive damages.

**FIFTH CLAIM FOR RELIEF**
**(Promissory Estoppel against All Defendants)**

113.     Oliver repeats and realleges the averments contained in all other paragraphs of this complaint as though fully set forth, except to the extent they are contrary to this claim for relief.

114.     Defendants' reasonably foresaw, or should have foreseen, and intended that, their promises to Oliver of membership in the Collective and a revenue share, representing a proportionate share in the success of Meow Wolf, would induce Oliver to invest her labor, money, and artwork at HoER as outlined herein.

115.     Oliver invested her labor, money, and artwork at HoER in reasonable reliance on Defendants' promises in an amount to be proved at trial.

116.     Oliver's investment of labor, money, and artwork in reasonable reliance on Defendants' promises amounted to a substantial change in position.

117.     Oliver suffered damages in an amount to be proved at trial as a result of Defendants' failure to fulfill their promises, and enforcement of Defendants' promises to Oliver is required to prevent injustice.

**SIXTH CLAIM FOR RELIEF**
**(Unjust Enrichment against All Defendants)**

118.     Oliver repeats and realleges the averments contained in all other paragraphs of this complaint as though fully set forth, except to the extent they are contrary to this claim for relief.

119.     Defendants knowingly benefitted at Oliver's expense.  If the HoER had been either unsuccessful or only moderately successful, Defendants would have proceeded within the

collective structure they presented by sharing with the artists, including Oliver, on an equitable basis. HoER's enormous success changed Defendants' minds, however, and caused them to convert the assets of the collective to their benefit alone, and at the expense of Oliver and others.

120.     These benefits so converted and retained at Oliver's expense include, but are not limited to, the increase in revenue Meow Wolf enjoyed as a result of ISQ's installation at HoER, and the increase in value of Meow Wolf's brand and enterprise attributable to ISQ's installation at HoER.

121.     Defendants' retention of the benefits they obtained at Oliver's expense would be unjust.

## SEVENTH CLAIM FOR RELIEF
### (Conversion against All Defendants)

122.     Oliver repeats and realleges the averments contained in all other paragraphs of this complaint as though fully set forth, except to the extent they are contrary to this claim for relief.

123.     To the extent it is determined that Oliver held and holds title to her work at HoER, Defendants have wrongfully possessed and exercised dominion and control over ISQ and the Space Owl.

124.     Oliver neither new nor should have known of Defendants' conversion of her property until after June 3, 2019.

125.     Oliver was damaged by Defendants' conversion in an amount to be proved at trial.

126.     This claim is not asserting conversion of Oliver's copyrights.

## EIGHTH CLAIM FOR RELIEF
### (Intentional Misrepresentation against All Defendants)

127.    Oliver repeats and realleges the averments contained in all other paragraphs of this complaint as though fully set forth, except to the extent they are contrary to this claim for relief.

128.    Defendants knowingly and intentionally made representations to Oliver that she would be compensated proportionally with the ISQ's contribution to Meow Wolf's brand, enterprise, and revenue.  These representations included statements that Oliver was part of the Meow Wolf "collective," and her compensation would include an "artist revenue share."

129.    Defendants representations were material.

130.    Defendants representations were false, and Defendants knew them to be false at the time they were made.

131.    Defendants intended Oliver to rely upon their representations.

132.    Oliver justifiably relied upon Defendants' representations to her detriment and suffered general and special damages in an amount to be proved at trial.

## NINTH CLAIM FOR RELIEF
### (Negligent Misrepresentation against All Defendants)

133.    Oliver repeats and realleges the averments contained in all other paragraphs of this complaint as though fully set forth, except to the extent they are contrary to this claim for relief.

134.    Defendants made representations to Oliver that she would be compensated proportionally with the ISQ's contribution to Meow Wolf's brand, enterprise, and revenue. These representations included statements that Oliver was part of the Meow Wolf "collective," and her compensation would include an "artist revenue share."

135.    Defendants representations were material.

136.    Defendants representations were false, and Defendants should have known them to be false at the time they were made.

137.    Defendants intended Oliver to rely upon their representations.

138.    Oliver justifiably relied upon Defendants' representations to her detriment and suffered general and special damages in an amount to be proved at trial.

**TENTH CLAIM FOR RELIEF**
**(Constructive Trust against All Defendants)**

139.    Oliver repeats and realleges the averments contained in all other paragraphs of this complaint as though fully set forth, except to the extent they are contrary to this claim for relief.

140.    Defendants hold title to Oliver's ownership interest in the Meow Wolf artists' collective subject to an equitable duty to convey that interest to Oliver.

141.    Defendants would be unjustly enriched if the they were permitted to retain Oliver's ownership interest.

**PRAYER FOR RELIEF**

WHEREFORE, Oliver prays for non-duplicative relief as follows:

A.  For an Order enjoining Defendants, their officers, agents, employees, and those acting in concert or conspiracy with them, temporarily during the pendency of this action, and permanently thereafter, from: (a) infringing, or contributing to or participating in the infringement by others any element of ISQ, including, without limitation, the Space Owl or acting in concert with, aiding, or abetting others to infringe said copyright in any way; (b) copying, duplicating, selling, licensing, displaying, distributing, or otherwise using

without authorization copies of any element of ISQ, including, without limitation, the Space Owl, or derivative works based thereon;

B.  For an Order enjoining Defendants, their officers, agents, employees, and those acting in concert or conspiracy with them, temporarily during the pendency of this action, and permanently thereafter, from: (a) taking any action to remove, alter, deface, modify, mutilate, or destroy ISQ at HoER, or any element thereof, during Oliver's lifetime; and (b) using ISQ, or any element thereof, including the Space Owl, without the permission of, or attribution to, Oliver;

C.  For an order requiring that Defendants account for and pay over to Oliver the portion of their income reasonably attributable to Oliver's work, whether by copyright infringement or otherwise, and to pay such damages to Oliver as to this Court shall appear just and proper within the provisions of the Copyright Act, or, in the alternative, at Oliver's election, statutory damages for infringement of each separate copyright as set forth in 17 U.S.C. § 504;

D.  Damages sustained by Oliver arising from Defendants use of her works without attribution, and their distortion, mutilation, or other modification of her works in a way prejudicial to her honor and reputation;

E.  Damages sustained by Oliver arising from Defendants' breach of contract in an amount to be proved at trial;

F.   General and special damages sustained by Oliver arising from Defendants' breach of the covenant of good faith and fair dealing implied in all contracts in an amount to be proved at trial;

G.   An order requiring Defendants to disgorge Defendants' unjust enrichment, in the full amount of the direct and indirect benefit that Defendants retained, as a result of their wrongful acts and omissions outlined herein, in an amount to be proved at trial;

H.   Damages sustained by Oliver as a result of Defendants' conversion of Oliver's property in an amount to be proved at trial;

I.   General and special damages sustained by Oliver as a result of Defendants' misrepresentations to Oliver in an amount to be proved at trial;

J.   Exemplary and punitive damages commensurate with Defendants' ability to pay and sufficient to deter future similar conduct;

K.   For an award of costs pursuant to the Copyright Act and VARA, 17 U.S.C. §§ 101, *et seq.*, or as otherwise provided by law;

L.   For an award of attorneys' fees pursuant to the Copyright Act and VARA, 17 U.S.C. §§ 101, *et seq.*, or as otherwise provided by law;

M. For an award of pre-judgment interest and post-judgment interest in the maximum

    amount permitted by law;


N. For such other and further relief as the Court deems just and proper.



Dated: June 1, 2021                Respectfully submitted,


                                FREEDMAN BOYD HOLLANDER
                                GOLDBER URIAS & WARD PA

                                By:  /s/ Vincent J. Ward_____
                                    VINCENT J. WARD
                                    20 First Plaza, Ste. 700
                                    Albuquerque, NM 87102
                                    (505) 842-9960
                                    (505) 842-0761 facsimile
                                    vjw@fbdlaw.com


                                ERICKSEN ARBUTHNOT

                                By:/s/ Jesse A. Boyd_____
                                    JESSE A. BOYD
                                    2300 Clayton Road, Suite 350
                                    Concord, CA 94520
                                    (510) 832-7770
                                    (510) 832-0102 facsimile
                                    jboyd@ericksenarbuthnot.com


                                *Attorneys for Plaintiff Lauren Adele Oliver*

**Certificate of Service**

I hereby certify that on **June 1, 2021** a true and correct copy of the foregoing document, and all referenced exhibits was served via CM/ECF on all interested parties.  I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to the following non-CM/ECF participants: N/A.

*/s/ Jesse A. Boyd*
Jesse A. Boyd