**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

LAUREN ADELE OLIVER,
an individual,

      Plaintiff,

v.                                                                                         Case No. 1:20-CV-00237-KK-SCY

MEOW WOLF, INC., a Delaware
corporation; VINCE KADLUBEK,
an individual and officer; and
DOES 1-50,

      Defendants.

**PLAINTIFF'S RESPONSE TO DEFENDANTS MEOW WOLF, INC. AND VINCE
KADLUBEK'S MOTION FOR SANCTIONS**

## I.        INTRODUCTION

As reviewed in depth below, Defendants' motion for sanctions (D.E. 132) ("Motion") is

based on false accusations and fiction presented as fact.  Defendants cannot establish the most

fundamental element of their motion: that Plaintiff had any thought of litigation in June 2018,

much less that litigation was "imminent."  They also skirt the fact that Defendants received no

less than eight (8) auto-responses in 2015 with the subject line, "I'm suspending this email," and

a body stating, "Hello! Please remove this email address from your contact list. Thanks to

hackers, I am no longer using it…"

That Defendants' attempt to make an innocent deletion of emails from a defunct account

sanctionable is itself sanctionable as an attempt to distract the Court from Defendants' own

wrongful conduct and concealment of key evidence.  In addition, the relief requested is wholly

improper, and with regard Defendants attempt to compel forensic work, unjustified and time-barred.  Defendants' motion lacks any legal or factual support and should be denied.

## II.   LEGAL ANALYSIS

### A.  Defendants Cannot Establish a Foundational Requirement Their Motion Ignores: Imminence.

Defendants cite *Browder v. City of Albuquerque* for the proposition that "[p]utative litigants are under an 'obligation to preserve evidence . . . when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation.'" 187 F.Supp.3d 1288, 1294 (D.N.M. 2016).  However, Defendants omit the next sentence from the *Browder* decision, in which the Court further explained: "The Tenth Circuit specifies that this duty to preserve evidence arises at the time litigation is 'imminent.'" *Id., quoting U.S. ex rel. Baker v. Cmty. Health Sys., Inc.,* No. CIV. 05-279 WJ/ACT, 2012 U.S. Dist. LEXIS 146865, 2012 WL 12294413, at *2 (D.N.M. Aug. 31, 2012) (emphasis added).  The applicable standard is thus stated, "**Spoliation sanctions are proper when '(1) a party has a duty to preserve evidence because it knew, or should have known, that litigation was imminent, and (2) the adverse party was prejudiced by the destruction of the evidence.'**" *Turner v. Pub. Serv. Co*., 563 F.3d 1136, 1149 (10th Cir. 2009), *quoting Burlington N. & Santa Fe Ry. Co. v. Grant*, 505 F.3d 1013, 1032 (10th Cir. 2007).  The duty to preserve relevant evidence must be viewed from the perspective of the party with control of the evidence.  *E.g. Paisley Park Enters., Inc. v. Boxill*, 330 F.R.D. 226, 232 (D. Minn. 2019), *quoting Alabama Aircraft Indus., Inc. v. Boeing Co.*, 319 F.R.D. 730, 740 (N.D. Ala. 2017).

Putting aside that she deleted the emails for completely innocent reasons, *see* Section II.C., *infra*, the evidence is clear that Plaintiff had no idea litigation might someday be necessary, much less "imminent" at the time she made the deletion.[1]

First, Plaintiff had never been involved in a lawsuit – based on copyright infringement or otherwise.  *See* Declaration of Lauren Oliver ("Oliver Dec.") at ¶1, attached hereto as Exhibit 1A.  Neither had she consulted an attorney about possible legal action against Defendants as they incorrectly assert.  *See* Oliver Dec. at ¶2.  Thus, she had no idea applying for a copyright registration was a prerequisite for litigation, as Defendants imply.  *See* Oliver Dec. at ¶3.

In addition, Defendants point to a statement by one of their own representatives to establish Plaintiff was "consulting lawyers."  *See* section IV.B., infra.  Again, Oliver was <u>not</u> consulting lawyers at the time, but merely indicating she would need to have an attorney review the contracts that had been presented to her by Defendants.  When those densely-worded contracts are examined, it becomes clear why Ms. Oliver might need the assistance of an attorney.  *See* Space Owl Licensing Agreement, attached hereto as Exhibit C; Artwork Licensing Agreement, attached hereto as Exhibit D.

Further, Oliver's personal life at the time and contemporaneous communication make any inference that she was contemplating litigation against Defendants absurd.  In June 2018, Plaintiff's mother, for whom Plaintiff was the primary source of emotional support and coordination of care, was suffering from late-stage Parkinson's disease, and in the final few months of her life.  Oliver Dec. at ¶4.  At the same time, Plaintiff was in the process of obtaining financing and purchasing a house in Santa Fe, and had just spent considerable time preparing for and participating in a panel discussion sponsored by Santa Fe Institute. Oliver Dec. at ¶5;

---

[1] To the extent they appear without citation here, the facts relayed in this section will be examined and supported in Sections III and IV below.

Interplanetary Festival 2018, Schedule, attached hereto as Exhibit A.  Even when she discovered Defendants had used her work in a Meow Wolf documentary and its associated trailer without her permission, her communications with them were friendly and non-confrontational.  *See* email exchange between Lauren Oliver and Megan Roniger Brinkerhoff and Talia Kosh, Dec. 23, 2018, attached hereto as Exhibit B. Indeed, she was consistently expressing her desire to "to participate and collaborate in interesting and fun events and publications."  *See* e.g. Email exchange between Oliver and Drew Tulchin, May 10, 2018, Motion Exhibit O (D.E. 132-15) at p. 4 (bottom).  That is, in June 2018, Oliver considered Caity (Kennedy), Emily (Montoya), Matt (King), and the other core Meow Wolfers to be her dear friends and partners in what remained an exciting project in her eyes.  Again, the idea she would be considering suing them, or anyone else for that matter, during such a challenging time in her life is absurd.

Finally, even if litigation might have been foreseeable, it was in no way "imminent." During negotiations with Defendants regarding what Oliver believed would be a usage agreement, her mother passed away.  She informed Defendants of the development, and they told her to "take your time."  *See* Email Exchange between Oliver and Megan Roniger Brinkerhoff, Sep. 26, 2018, attached hereto as Exhibit E. Then, less than three months later, while she was still dealing with her mother's estate, the only remaining member of Plaintiff's nuclear family – her brother Bill – passed away tragically and unexpectedly.  Oliver Dec. at ¶6.  By April, 2019, when her mother and brother's estates had been somewhat stabilized, Oliver reached out to Defendants to continue their negotiations.  Defendants delayed meeting with her until June 3, 2019.  That meeting was the first time Oliver was informed that Defendants were going to attempt to sever ties with her without fulfilling the promises they had made that had induced her to invest her labor, money, and art in the House of Eternal Return.

Thus, June 3, 2019 was the first time Oliver might be considered a "putative litigant." But even then, litigation was not "imminent."  Discussion between Oliver and defendants continued through the summer, and Oliver was diagnosed with ovarian cancer in August 2019. Throughout the remainder of 2019, while she was undergoing surgery and receiving chemotherapy, Oliver continued her attempts to obtain some semblance of a fair resolution of this matter from Defendants.  It was only after those considerable efforts failed that she filed the instant lawsuit in March of 2020 – a full twenty-one (21) months after she innocently block-deleted what she thought was a bunch of spam, phishing, and stale emails from a defunct account.

Oliver was not a "putative litigant" in June of 2018, as she neither knew, nor should have known the emails she was deleting might be relevant to some future litigation she had no inkling might be necessary.  Neither was litigation "imminent."  She had not contemplated suing Defendants in 2018, did not want to sue them in 2019, and wishes she had not had to sue them to this day.  Defendants cannot establish a foundational requirement of their motion, and it should be denied on that basis alone.

**B.  There Was No Bad Faith on Oliver's Part**

Defendants further ignore the burden of proof when parties request adverse inferences, as Defendants have here on multiple fronts.  As the Tenth Circuit explained in another case that Defendants cite: "If the aggrieved party seeks an adverse inference to remedy the spoliation, <u>it must also prove bad faith</u>." *Turner v. Pub. Serv. Co. of Colo.*, 563 F.3d 1136, 1149 (emphasis added).  As explained above, and in detail below, there simply is no such proof.

Defendants cite *EEOC v. JetStream Ground Srvs.*, but omit the Court's discussion of a comment to the Advisory Committee to the Federal Rules of Civil Procedure, which provided the Court with "strong support" for its bad faith requirement:

> Adverse-inference instructions were developed on the premise that a party's intentional loss or destruction of evidence to prevent its use in litigation gives rise to a reasonable inference that the evidence was unfavorable to the party responsible for loss or destruction of the evidence. **Negligent or even grossly negligent behavior does not logically support that inference**. Information lost through negligence may have been favorable to either party, including the party that lost it, and inferring that it was unfavorable to that party may tip the balance at trial in ways the lost information never would have.

878 F.3d 960, 966 (10th Cir. 2017) (emphasis added).

Here, there is no evidence that Ms. Oliver was *negligent*, much less grossly negligent. At the time of the deletion, the account had not been used for more than three (3) years. She had set up an "auto-response" with the subject line, "**I'm suspending this email**," and worded as follows:

> **Hello! Please remove this email address from your contact list. Thanks to hackers, I am no longer using it. If you receive an email from this address, do not open it! Please contact me through other means to get my new email contact. Thank you.**

Defendants received no less than eight (8) of these auto-responses (including five (5) by Mr. Kadlubek). Additionally, in June 2018, she was exchanging a multitude of communications with Defendants through her main quellette@gmail.com account. She did not associate the lauren.oliver@gmail.com account with Defendants in any way.

Defendants also repeatedly cite cases in which the Courts have found no evidence of bad faith. For example, in *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1401 (10th Cir. 1997), the plaintiff brought a Title VII discrimination claim challenging his firing. The employer contended that he

was fired for excessive absenteeism. *See id.* at 1402. Portions of the plaintiff's attendance record, however, had been lost, and the plaintiff sought an adverse-inference instruction that the missing records would have been unfavorable to the company's contention. *See id.* at 1407.  The Tenth Circuit held that the plaintiff was not entitled to an instruction because the evidence showed that the loss of the documents was inadvertent. As the Court concluded:  "The adverse inference must be predicated on the bad faith of the party destroying the records. Mere negligence in losing or destroying records is not enough because it does not support an inference of consciousness of a weak case." *Id.* (citations omitted); *accord JetStream,* 878 F.3d 960 (adverse inference instruction properly denied).

The act of deleting emails from a defunct account that Defendants knew was defunct, with no basis to expect that any of the emails would be relevant to future litigation, while communicating with Defendants through another account, cannot conceivably rise to the level of "bad faith."  Indeed, the only bad faith is on the part of Defendants, as will be explained below.

### C.  The Deletion was Innocent and There is no Prejudice

Defendants also fail to address the first of the two most important elements that Courts consider when deciding whether to impose sanctions: "When deciding whether to sanction a party for the spoliation of evidence, courts have considered a variety of factors, two of which generally carry the most weight: (1) the degree of culpability of the party who lost or destroyed the evidence; and (2) the degree of actual prejudice to the other party."  *Browder, supra,* 187 F.Supp.3d at 1295.

"Culpability is the degree of fault to be assigned to the offending party." *Browder, supra,* 187 F.Supp.3d at 1297.  "[T]he 'destruction of potentially relevant evidence obviously occurs along a continuum of fault—ranging from innocence through the degrees of negligence to intentionality.'"

First, there is no "culpability" here.  Ms. Oliver was an artist with no familiarity with litigation, had not used the account in question for more than three (3) years due to a data breach, had set an auto-response informing everyone she was no longer using the account, and had no reason to think the defunct account would be relevant to some future litigation with people she considered her friends.  The deletion was innocent in every sense of the word.

Second, there is no "actual prejudice" to Defendants. In fact, Defendants already have the documents they sent to Ms. Oliver, and that after having received at least eight (8) auto-responses informing them the account was defunct.  The best Defendants can do is speculate that the account "could" have emails from "third parties."  Thus, both factors weigh heavily against the imposition of sanctions here, even if "spoliation" occurred in the first place.

### D.  Oliver is Not a Large Sophisticated Corporate Entity

It should also be noted the Defendants generally cite cases in which large sophisticated corporations or entities were obligated to preserve evidence.  *See e.g. United Med. Supply Co. v. United States,* 77 Fed. Cl. 257, 259 (2007) (sanctions imposed on defendant government where it violated duty to preserve evidence "... not once or twice - but repeatedly, over many years, and in sundry ways, leading to the destruction of many admittedly relevant documents. Most disturbingly, some of these documents were destroyed even after the court conducted its first spoliation hearing."); *Browder v. City of Albuquerque*, 187 F.Supp.3d 1288 (D.N.M. 2016) (sanctions imposed on defendant city).  Again, when Oliver performed the bulk deletion, she was doing so as a private individual on a private account.

At the time Oliver made the deletion in question, she had never been involved in a lawsuit, the email account had not been used for more than three years, she had set a clear auto-response letting senders know she could no longer be reached through the account, and Defendants had

received at least eight (8) of those responses.  She was buying a house, caring for an ailing parent, and had no intent to sue her friends or inkling such an action might be necessary.  She also was suffering from a painful abdominal ailment, that ultimately proved to be cancer.

Defendants cannot show litigation was contemplated, much less that it was "imminent." They cannot show negligence, much less bad faith.  Oliver's deletion from her private email account was innocent, and it has not prejudiced Defendants.  Their Motion should be denied in its entirety.

## IN-DEPTH REVIEW OF FACTS

### III.   THE TRUTH OF THE MATTER

Defendants' motion presents a dizzying array of unsupported assertions, misstatements, and outright fabrications.  In fact, the bulk deletion in question was simply a person innocently clearing out emails from an account she believed had been compromised, had not used for years, and which she did not associate with Defendants in any way.  Defendants have known this since early 2015, as they received no less than eight (8) auto-responses explaining it (including five (5) to Mr. Kadlubek),[2] and proceeded to regularly communicate with Plaintiff during the relevant timeframe through other accounts (as did all of Plaintiff's other friends and associates).  Yet it is only Mr. Kadlubek who appears to have ignored (or conveniently avoided using) Plaintiff's correct address when sending what Defendants now assert are "key" emails.

### A.  Oliver Ceased Using lauren.oliver@gmail.com Account Due to Anthem Breach

On or around February 4, 2015, Plaintiff's health insurer at the time, Anthem, disclosed that criminal hackers had broken into its servers and had potentially stolen over 37 million

---

[2] Defendants' motion references nine (9) auto-responses to Meow Wolf representatives, but Plaintiff is only aware of eight (8), all of which are discussed herein.  Regardless, Defendants have only produced one auto-response during discovery.

records that contain personally identifiable information from its servers. This total eventually

increased to 78.8 million people. *See* California Department of Insurance, Press

Releases/Anthem Data Breach, https://www.insurance.ca.gov/0400-news/0100-press-

releases/anthemcyberattack.cfm, copy attached hereto as Exhibit F; *see also* Anthem, Statement

regarding cyber attack against Anthem, Feb. 5, 2015,

https://www.anthem.com/press/wisconsin/statement-regarding-cyber-attack-against-anthem/,

attached hereto as Exhibit G.

Plaintiff became aware that her lauren.oliver@gmail.com account had been affected by

the Anthem breach sometime before March 27, 2015. *See* Oliver Dec. at ¶8. Thereafter,

Plaintiff ceased using that email address for communications, and set an "auto-response" with

the subject line, "**I'm suspending this email**," and worded as follows:

> **Hello! Please remove this email address from your contact list. Thanks to hackers, I am no longer using it. If you receive an email from this address, do not open it! Please contact me through other means to get my new email contact. Thank you.**

*See e.g.* I'm suspending this email. Re: Meow Terms auto response from

lauren.oliver@gmail.com to meta4vdk@gmail.com, Apr. 2, 2015, attached hereto as Exhibit I.

(emphasis added). At that point, Plaintiff considered the account compromised by hackers and

defunct, and ceased checking or sending emails on it. *See* Oliver Dec. at ¶9. Thereafter, all

email communications related to Meow Wolf, were conducted through Plaintiff's

quellette@gmail.com account, or later through her current quellettestudio@gmail.com account.

Oliver Dec. at ¶10.

### B.  Defendants, Particularly Mr. Kadlubek, Were Well Aware That Plaintiff Was No Longer Using the lauren.oliver@gmail.com Account.

Between March 27, 2015 and May 24, 2015, Defendants received at least eight (8) of the above-quoted auto-response from lauren.oliver@gmail.com.  The auto-response was sent to Vince Kadlubek no less than five (5) times.

At 1:04 p.m. on April 2, 2015, Vince Kadlubek sent from his meta4vdk@gmail.com email account to lauren.oliver@gmail.com, and copying Caity Kennedy, what Defendants have at times referred to as a "key" email in this case.  *See* First April 2, 2015 Email, attached hereto as Exhibit H.  The auto-response was immediately sent from lauren.oliver@gmail.com.  *See* April 2, 2015 Auto-Response to meta4vdk@gmail.com, attached hereto as Exhibit I.

Then, at 8:01 p.m. on the same day, Mr. Kadlubek sent the same email to Plaintiff's correct quellette@gmail.com address (this time not copying Ms. Kennedy), to which Plaintiff responded.  *See* Exhibit J hereto.  Thus, on April 2, 2015, Defendant Vince Kadlubek was aware that lauren.oliver@gmail.com was no longer a functioning address, and succeeded in reaching Oliver through her correct email, quellette@gmail.com.

On April 22, 2015, Oliver sent Kadlubek an email from quellette@gmail.com seeking a copy of the "contract" referenced in his April 2, 2015 email.  Kadlubek responded without addressing the request for a contract.  *See* April 22, 2015 email exchange attached hereto as Exhibit K.  This important exchange was through Oliver's correct email account, quellette@gmail.com.

Only 5 days after communicating via Oliver's correct quellette@gmail.com account, at 11:26 p.m. on April 27, 2015, Kadlubek sent what Defendants' claim was another critical email regarding a "contracts" meeting to lauren.oliver@gmail.com, an account he already knew was no longer in use.  *See* Exhibit L hereto.  The auto-response was sent back immediately to Mr.

Kadlubek's email account, but "critically" on this occasion, <u>Mr. Kadlubek did not follow up by resending the email to quellette@gmail.com</u>.  *See* Exhibit M hereto.  From this, one can infer Mr. Kadlubek was either incredibly negligent in ensuring Oliver received a written contract, or actively attempting to keep her from getting one.  Plaintiff believes the latter to be the case, as it would be consistent with the testimony of witness Kate Lesta on the issue.  *See* Deposition of Kate Lesta, Oct. 8, 2020 at 74:9-75:10, 162:23-163:13, lodged with Court pursuant to protective order.

Despite requests for all documents related to Plaintiff, and their importance given Defendants' positions, Defendants have not produced the April 2, 2015 or April 27, 2015 auto-responses during discovery.  In fact, of the eight (8) auto-responses from lauren.oliver@gmail.com Defendants received, they have only produced one.  A summary of these instances is attached hereto as Exhibit N.

### C.  Defendants Speculation that there "Could" be Relevant Emails is Baseless, Especially Since They Communicated Regularly with Oliver between Early 2015 through June 2018 Via Her Correct Email Address and "Slack."

Defendants' motion rests largely on what emails the lauren.oliver@gmail.com account "could" have included.  *See e.g.* Motion at p. 2-3.  However, aside from the March 17, 2017 Kadlubek email of which Defendants make so much (which Oliver did not receive, and which, in fact, is damning evidence rather than exculpatory as will be explained below), Defendants cannot point to any communication from Meow Wolf representatives or third parties that went to the lauren.oliver@gmail.com account that "could" have been deleted, much less that they might have been read by Plaintiff.  Of course, this is because <u>Oliver had stopped using the address</u>, and had let everyone know it.

Meanwhile, the parties had exchanged hundreds of communications between Oliver and her Meow Wolf colleagues via quellette@gmail.com and Slack from early 2015 through June 2018.  These communications are far too voluminous to attach here, but include all of the email communications between Oliver and Meow Wolf, Inc.'s legal counsel regarding licensing and usage, as well as communications about how easy it was to reach Oliver.  *See e.g.* Email exchange between Gamboa and Skye, March 28, 2017, attached as Exhibit O.

### D. Plaintiff's Deletion of Emails from lauren.oliver@gmail.com, More Than Three Years After She Had Ceased Using the Account, Was Entirely Innocent.

#### 1. By June of 2018, Plaintiff did not connect lauren.oliver@gmail.com with Meow Wolf in any way.

In June 2018, Oliver had not used the lauren.oliver@gmail.com account for more than 3 years.  During this period she had conducted countless communications with her colleagues at Meow Wolf through quellette@gmail.com, Slack, in-person, and by phone.  She had set an auto-response clearly stating her old account was not being used, and had no reason to believe she was receiving any substantive communications from Meow Wolfers through it.  Given the amount of communication she was having with Meow Wolf colleagues and Meow Wolf legal counsel via other means, Oliver did not associate her lauren.oliver@gmail.com account with Meow Wolf in any way, much less think that clearing it of what she though was a mass of spam and phishing emails might result in the deletion of anything relevant to a future litigation she had no inkling would become necessary.

#### 2. In June 2018, Oliver considered her Meow Wolf colleagues to be dear friends, and had zero plan, anticipation, expectation, or thought that she might one day be in litigation with them.

Aside from this action, Oliver has never been a party to a lawsuit.  In June 2018, she had no idea what a lawsuit would entail, much less what prerequisites (such as copyright registration)

might be necessary to bring one.  She was not consulting an attorney or claiming copyright infringement.  Rather, she had merely indicated to Megan Roniger, Talia Kosh, and apparently Brian Solomon, that the agreements Ms. Kosh had presented would require review by an attorney, which was entirely appropriate, given the language contained in the agreements Defendants were hoping she would sign.

In addition, Oliver would not have contemplated risking the relationships she cherished within her social community in Santa Fe – a city she considered at the time, and continues to consider, her home.  On this point, in June 2018, Oliver was in the process of purchasing a house in Santa Fe, which she owns to this day.

3.   <u>In June 2018, Oliver was dealing with extraordinarily difficult family circumstances, and the possibility of suing anyone, much less her friends and colleagues, did not, and could not have occurred to her.</u>

Oliver's mother was diagnosed with Parkinson's Disease in approximately 2010. Starting in Fall 2013, Oliver's responsibilities as her mother's primary source of emotional support and coordination of care increased substantially, when her mother became confined to a wheelchair.  In June 2018, Oliver's mother was nearing the end of her life, and these responsibilities became all-consuming.  For example, between January 1, 2018 and her mother's death on September 13, 2018, Oliver made at least seven (7) trips to Minnesota to be with her, including trips from May 28 – June 3, 2018, and July 2-8, 2018.  Oliver Dec. at ¶11.

Her mother's condition was also extraordinarily hard on her only sibling, Bill, for whom Oliver also had familial responsibilities.  Tragically, and crushingly for Oliver, on December 11, 2018, only three months after her mother's passing, Bill too passed away.

It should be noted that Defendants were aware of her mother's condition and passing. Indeed, when Oliver informed Megan Roniger Brinkerhoff that her mother had passed, Ms. Brinkerhoff responded, "take your time."  *See* Email attached as Exhibit E.

### 4.   Oliver's Bulk-Deletion of Emails was Innocent.

As best she can recall, Oliver bulk-deleted hundreds of emails from lauren.oliver@gmail.com in an attempt to clear the account of emails she believed were largely spam, phishing, and otherwise malicious.  She had not used the account for more than three (3) years, and had no idea there could be emails relevant to some future litigation about which she had not even formed a thought.

The first email in the lauren.oliver@gmail.com inbox after April 7, 2013 is dated June 27, 2018.  The process Oliver used to make the deletion between those dates entailed "selecting all" of 50-100 emails at a time, then clicking "delete."  For any of these emails, this process would not have included an individualized inspection of every email on a page being deleted. Oliver simply "selected all" emails on a page with one click, then clicked "delete."  At that point, a new page of emails appeared, and she repeated the process until she had deleted all the emails from June 26, 2018, back to April 8, 2013, which she judged to be sufficient to conservatively encompass any malicious emails attributable to the Anthem data breach.  See Oliver Dec. at ¶12. This was simply an administrative effort related to a personal email account, which effort she happened to have had time to take amidst otherwise all-consuming familial responsibilities.

### 5.   Oliver made every effort to avoid litigation even after it became apparent litigation might be necessary.

Oliver had no idea she might be forced to initiate litigation prior to her meeting with Defendants on June 3, 2019, when they presented the ultimatum outlined in her Complaint.  Prior to that date, it was inconceivable that her Meow Wolf friends and colleagues would renege on

their promises or treat her unfairly.  After June 3, 2019 through mid-March 2020, despite

undergoing surgery and two rounds of chemotherapy for stage-IV ovarian cancer, Oliver worked

hard to avoid litigation, and then only filed the instant lawsuit after coming to the disheartening

realization that Defendants were not going enter a good-faith resolution of the matter without

court intervention.  Oliver had zero thought of litigation in 2018, *see e.g.* Exhibit B hereto,

worked hard to avoid litigation in 2019, did not want to sue Defendants in 2020, and is baffled

today that she has had to endure this litigation at all.

### E.  Defendants' Motion is Based on Outright Falsehoods, and is Improper

Given the facts outlined above, Defendants' assertions, speculation, and innuendo are

revealed as absurd.  Most, if not all of these facts were known to Defendants prior to their filing

the instant motion.  To the extent they were not, Plaintiff stood ready to explain why the deletion

was entirely innocent (and direct Defendants to the evidence supporting that conclusion).  In this

context, and given Defendants' false and salacious accusations that Oliver committed intentional

and wrongful spoliation, Defendants' motion is not only baseless and improper, it is cruel.

## IV.   RESPONSE TO KEY MISSTATEMENTS, LACK OF CONTEXT, AND FABRICATIONS IN DEFENDANTS' MOTION

Defendants' motion is a flood of misstatements, snippets of language taken out of

context, unsupported assumptions, and outright fabrications.  As categorizing and organizing

them would be an almost insurmountable challenge, Plaintiff will address as many as she can in

the order they appear.

### A.  Motion Page 1

Defendants note lauren.oliver@gmail.com was "one of three email accounts she had used

to communicate with Meow Wolf during the time period relevant to this case," and without

citation to evidence state the email deletion "…required intention and commitment to carry out."

This implies Oliver intentionally deleted emails related to Meow Wolf, which she did not.  It also implies that the deletion process was something more than a rote administrative task, which it was not.  *See* Section D.4., above.  Finally, apart from the emails from Caity Kennedy in January 2015 suggesting Oliver submit a proposal for HoER, Oliver did not "communicate with Meow Wolf" via lauren.oliver@gmail.com regarding HoER or the interactions she had with Defendants in relation to the venture.

### B.  Motion Page 2

Defendants state Oliver "informed Meow Wolf that she was consulting lawyers…"  This is a misstatement and egregiously misleading.  Defendants do not cite to any evidence that Oliver "was consulting" an attorney, and the statement is made in conjunction with another unsupported assertion that Oliver had "asserted claims that Meow Wolf was infringing her copyrights."  In fact, Oliver did not assert claims regarding copyright infringement until filing this lawsuit and was not "consulting lawyers."

Defendants claim "Oliver rejected Meow Wolf's attempts to reach an agreement for a license to use her works…" They leave out, however, that the language of the agreement presented to Oliver gave Defendants

> A worldwide, irrevocable, exclusive, perpetual, sub-licensable, royalty-free license to Licensee, to copy, graphically depict, film and otherwise display, create derivative works of, distribute and otherwise exploit the Works, in any manner and medium, including but not limited to use and commercial exploitation in the form of motion pictures, animation, marketing, and promotional uses. The terms of this Section shall survive the closing of title or termination of this Agreement, for any reason.

Plaintiff did not "reject" Defendants' "attempts" to reach a licensing agreement, she politely declined Defendants initial unsolicited attempt to take complete control over a project Oliver had put years of her life into creating, and which she planned to continue pursuing and developing

for years to come.  *See* Email Oliver to Brinkerhoff, May 29, 2018, attached hereto as Exhibit P.

As Oliver explained, she had sought out Meow Wolf, Inc.'s legal department simply "to set some

guidelines on the use of the likeness and appropriately credit [her] work… [she] would love to

consider interesting events and publications once we get credits, guidelines and approval

channels established." *Id*.  Ms. Brinkerhoff's response was likewise very cordial and

accommodating.  *See* Exhibit Q hereto.  Again, until the meeting on June 3, 2019, Oliver

understood that she was engaging in good-faith negotiations that would result in a mutually-

beneficial relationship in which all of the parties' rights and obligations were understood and

protected.

   Defendants then rely on hearsay to support an assertion that Oliver stated "she was

engaging in a 'legal process'…"  Putting aside its inadmissibility, Defendants' paraphrase of

Brian Solomon's email is inaccurate and misleading.  The communication only notes that Oliver

had been "presented with a long legal contract and has to consult lawyers to make sure it's ok,

etc. … she said she was fine with how we used the character [in a VR piece] and that the only

hold up would be legal process and review of the contract at large."  Motion Exhibit B (D.E.

132-2).  Using this communication to imply Oliver was consulting attorneys with regard to

copyright infringement is misleading in the extreme and emblematic of Defendants' entire

Motion.[3]

   On June 24, 2018, Oliver filed an application she hoped would cover all aspects of her

Ice Station Quellette project, including story lines and associated visual elements.  A cursory

review of the filing, and her exchanges with the copyright office (which have been produced to

Defendants), make clear Ms. Oliver did not obtain the assistance of counsel in creating or filing

---

[3] It should also be noted that Mr. Solomon has been disclosed by Oliver as a corroborating witness regarding the promises, representations, and actions of Defendants.

the application.  Oliver filed the application with plans to develop a children's/young adult story, not with any thought of suing Defendants for copyright infringement.

Contrary to Defendants' fabrication, Oliver was not claiming the coloring book infringed her copyright, and Defendants present zero evidence that she was.  After learning that a Space Owl page appeared in the book, Oliver only asked how many had been sold to determine how big a deal the situation presented.

Additionally, as outlined in Section III above, during this time, Oliver had a short break from her familial responsibilities to address matters at Meow Wolf _and_ to perform some personal administrative tasks – including clearing out some emails from an old, defunct account.  Despite voluminous evidence disproving their theory, Defendants cobble together assumptions, snippets of hearsay, and mere coincidences to present a motion based on nothing more than innuendo.

It is also important to note that the _only_ relevant document not available from other sources that Defendants can colorably argue was included in the bulk deletion was a March 17, 2017 email from Kadlubek to lauren.oliver@gmail.com.  Again, at the time the email was sent, Kadlubek had received no less than five (5) auto-responses informing him the account was no longer in use.  Yet he sent what Defendants claim to be "one of the most important documents in this case" to an email address he either knew, or should have known, was no longer valid.  Furthermore, when he did not get a response from Oliver, he did nothing – no follow up email, no call, no Slack message – nothing.  If any adverse inference can be drawn from this situation, it is that Defendants did not want Oliver to see the 2017 "agreement."  This conclusion is bolstered by documents only recently produced by Defendants on June 4, 2021, showing pitch decks from 2017 that not only pictured Oliver's full-size Space Owl with the name "Meow Wolf" on top of it, but also her then-recently produced Space Owl plush toy, which Defendants used to announce

their new "Meow Wolf-Branded Merchandise" and "Merchandising Division."  *See* Exhibits R and S hereto. All of this without informing Plaintiff, much less getting her consent.  The pattern of concealment in this case is on the part of Defendants, not Plaintiff.

Additionally, aside from being evidence of Defendants' violation of the covenant of good-faith and fair dealing, the March 17, 2017 email has little relevance to the contractual issues presented in this case, as it came more than a year after Oliver had performed her side of the bargain.  Beyond that, speculation that vague categories of documents might have been deleted from a defunct email account that had not been used for more than three (3) years is not a proper basis upon which to seek sanctions.

### C.  Motion Page 3

Defendants state, "Key points of Oliver's deposition testimony rested directly on the absence of the emails she destroyed."  In fact, none of her testimony did.  The only potentially-relevant email either party knows of within the bulk deletion is the March 17, 2017 email from Kadlubek.  Given the ordeal the deletion has put her through, Oliver certainly wishes she had not deleted any emails from that long-defunct, personal account.  If she had not, and assuming the email Mr. Kadlubek apparently sent actually arrived, it would be sitting in her inbox unopened to this day, because Oliver has not opened, sent, or received emails in the account since sometime before March 27, 2015.  Putting aside that the 2017 Artist Bonus Program Agreement is not a contract at all, *see* Section IV.G.2., below, Oliver's testimony that she "did not receive" it would stay the same, because it is the truth.  A document attached to an unopened email in the inbox of a defunct email account has not been "received" by anyone.  But more fundamentally, the relevance of the question of whether Ms. Oliver "received" the 2017 email is dwarfed by the fact that she has not signed it, and would not have signed it had she received it.  If Defendants wanted

Oliver to sign the 2017 "agreement," they should have made sure a copy was presented to her. They could have sent it to her correct quellette@gmail.com address (where they were regularly communicating with her), sent it via Slack, or set up an in-person meeting, none of which they did, or even attempted.  This despite a March 28, 2017 email exchange between project manager Wylla Skye to gift shop manager Ivan Gamboa about the coloring book, that noted how easy it was to reach Oliver:

> Ms. Skye: "I was wondering what the policy is regarding replicating artist's work for Meow Wolf purposes, particularly relating to some of the more monumental sculptures like Christian's Robot, Christina's spider, and the space owl.  This was one element I totally overlooked when assigning coloring book pages.
>
> Mr. Gamboa responding: "the Robot and Space Owl definitely need permission in order to use the image.  I have heard Christian is difficult to get a hold of.  Lauren Oliver is on Slack, you can ask her about using the Space Owl… [Meow Wolf, Inc. principal] Emily [Montoya] has a pretty good idea on those agre[e]ments. Might be worth it to touch base with her."

*See* Exhibit O hereto.

Defendants go on to speculate that emails from "independent contractors using non-Meow Wolf email addresses" might have been sent to Plaintiff's unused lauren.oliver@gmail.com account.  They point to documents produced via subpoena from third-party Kate Russell to support this argument.  First, it is notable that none of the communications Ms. Russell produced were via lauren.oliver@gmail.com.  Second, any third-party would have received an auto-response, just as Defendants did on multiple occasions.  In addition, there was nothing stopping Defendants from subpoenaing any potential witness in this case that might have relevant information, and should discovery be extended, Defendants are free to do so going forward.  Regardless, even if we assume *arguendo* any emails from third parties were sent, Plaintiff would still be able to truthfully testify she did not see them, as she was not opening, sending, or receiving email from the account after March 27, 2015 at the latest.

It is also imperative to clarify that in none of the Kate Russell emails was Oliver "granting Meow Wolf permission to use images of Space Owl for various purposes." Oliver only ever granted <u>Ms. Russell</u> permission to take photos of the Space Owl. Oliver had no knowledge Ms. Russell was selling to, or being paid by, Meow Wolf for the resulting images, and certainly was not granting Meow Wolf any permissions in her exchanges with Ms. Russell. Plaintiff notes that Defendants only cite the subpoena of Ms. Russell, and an email containing inadmissible hearsay to support their assertion of permission.

### D. Motion Pages 4-5 – Plaintiff was not "Cornered," Nor Did She "Conceal" Anything.

Plaintiff was not "cornered," and has not "concealed" anything in this case. On the contrary, she has been an open book. Prior to her deposition, Oliver had not searched the lauren.oliver@gmail.com account because she knew it to be defunct, and in her mind, dead – it had been part of a well-documented data breach, unused for five (5) years when she filed her complaint, and from her earliest involvement in HoER, all of her email communications with friends, associates, and colleagues regarding Meow Wolf, or anything else for that matter, had been through quellette@gmail.com or quellettestudio@gmail.com. She did not search lauren.oliver@gmail.com because she did not associate it with Meow Wolf in any way. That it went unsearched until her deposition was at most an oversight, not anything nefarious.

When it was raised at her deposition, she answered Defendants' counsels' questions honestly, and relayed the information she had and recalled as best she could. She worked diligently with her counsel and their e-discovery vendor to provide a complete production from the account. It was not until she began that process that she recalled having made a bulk deletion back in 2018. It is important to note Oliver undertook this process immediately, and without requiring a formal discovery request or motion to compel.

Additionally, Oliver did not delay in providing information regarding the lauren.oliver@gmail.com account until the end of discovery – she simply did not realize the account was one she might need to search.  As Defendants point out, they are in possession of emails they claim are critical to the case that were sent to and from lauren.oliver@gmail.com.  At any time Defendants could have served a request for production to Oliver specifically mentioning the account, to which Oliver would have responded and revealed all the same information Defendants obtained informally between her deposition sessions.  It should also be noted that Defendants did not produce the March 17, 2017 email until March 23, 2021, a mere three days before the first session of Ms. Oliver's deposition.

### E.  Motion Pages 5-6 – Sent Emails Were Incorporated in Deleted "Conversations," Not Actively Deleted by Plaintiff

In providing Defendants information about the lauren.oliver@gmail.com account, Plaintiff and her counsel have done their best to present what information they have as quickly and accurately as they can.  It is not clear what Defendants are referring to when they state Plaintiff's counsel "represented that Ms. Oliver's deletion did not include sent items." However, prior to their filing the instant motion, Counsel for Plaintiff sent an email explaining that the deletion likely <u>did</u> include sent items.  *See* Boyd to Allison Email, May 21, 2021, attached hereto as Exhibit Y.  As explained in that email exchange, Ms. Oliver utilizes "conversation" mode when using Gmail.  When a Gmail conversation is deleted, it deletes the entire email string, including sent items.  *See e.g.* Georgia Southern University, My Apps Learning Center, available at https://sites.google.com/a/georgiasouthern.edu/google-apps-fac-staff/learn-more/gmail/gmail-basics?overridemobile=true#TOC-Conversations, attached hereto as Exhibit Z.  Thus, when Oliver deleted the emails in her inbox she also deleted the sent items within conversations as well, including those contained in her conversations with Caity Kennedy in 2013 and January of

2015 referenced by Defendants.  Oliver did not individually include or exclude sent items to be deleted; those that were part of conversations were simply deleted along with all of the other messages in the string.

Finally, and importantly for purposes of this motion, Oliver had nothing to gain by deleting the emails from this account in 2018.  Any substantive emails would be in the possession of the other party to the communication.  It therefore defies logic that Oliver would delete emails with any intent to destroy evidence, as such would likely be an exercise in futility. In addition, if Oliver illogically *had* intended to destroy evidence by deleting emails from the lauren.oliver@gmail.com account, why would she not delete emails from her other accounts containing the vast majority of her communications related to her involvement in HoER?  Once again, the assumptions and conclusions underlying Defendants' motion are absurd.

### F.  Motion Pages 6-8 – Plaintiff Has Stated the Truth, Not an "Excuse"

Oliver has not made any "excuse," she has simply explained what happened.  Defendants, however, present a raft of unsupported conclusions to argue her entirely reasonable explanation does not "hold water."  It is clear Defendants decided to file the instant motion as soon as they learned about the deletion, no matter how far their theory ultimately departed from the truth.

Defendants cannot deny there was a data breach involving the personal information of tens-of-millions of Anthem members announced in February 2015.  Neither can they deny Oliver was an Anthem member at the time.  Sometime prior to March 27, 2015 she learned of the breach, stopped using the account, and set up a clear auto-reply asking people to delete the address from their contacts and connect with her by other means.  Defendants admit Kadlubek received five (5) of those auto-responses, yet he continued to send "important" emails to the account.  Defendants go on from there to fault Plaintiff for deleting emails from a personal

account, while completely excusing Kadlubek's transmission of "critical" documents as part of his role as "CEO" to an account from which he had received five (5) auto-replies telling him not to use it.

Further, without any personal knowledge Defendants state Oliver "had no trouble accessing the account."  If they had asked her, they would have learned it took her hours to find the password, which was in hand-written form buried in old paperwork.  Neither did she "laboriously" delete "every single message" in her inbox between April 8, 2013 and June 27, 2018 by "clicking and deleting" them – she merely selected "all" on 50-100 emails at a time and clicked "delete."  That process did not involve an individualized assessment of each email in a given block.  See Oliver Dec. at ¶12.  Again, this was a mundane administrative task on a defunct personal email account to which Plaintiff did not attach any significance.

Despite this fact, Defendants go on to reiterate their outright fabrications that Oliver was contemplating litigation in consultation with a lawyer, and claiming Defendants were infringing her copyright.  None of this is true, and the complexity of this response is an example of how difficult it is to litigate against parties and counsel who are willing to say anything, despite all evidence to the contrary.

### G.  Motion Pages 8-9 – The Only Pattern of Concealment Is On the Part of Defendants

Given recent revelations, that Defendants would accuse Oliver of a "pattern of concealing evidence" is pure projection and the apex of hypocrisy.  In reviewing the parties' actions, the instant motion is appropriately seen as an attempt to distract the Court from *Defendants'* abuses of the discovery process with cries of "but her emails!"

1.  <u>Plaintiff has assiduously complied with her discovery obligations.</u>

Plaintiff is a lay person who has fulfilled all of her discovery obligations with the utmost good faith.  She has spent dozens of hours compiling and providing all of the documents and information in her possession as requested by Defendants.  When any inadvertent gaps in her searches have been identified, she has addressed and rectified them quickly and completely.

Her actions with regard to the lauren.oliver@gmail.com account at issue here are a clear example of this.  Until her deposition, Oliver did not realize the long-defunct account might become relevant in this case.  Once it was raised by Defendants' counsel, she immediately set about making a production from the account as requested.  She did not attempt to hide the deletion Defendants make so much of, because it had been done completely innocently.  This was exhaustively explained to Defendants, which is why the instant motion is so baffling to her and her counsel.

As to the paper files in storage in New Mexico, Plaintiff explained to Defendants that 1) her chemotherapy treatment for ovarian cancer had left her immune compromised, 2) searching them would entail travel to New Mexico during a global pandemic, 3) that the vast majority, if not all, of the information contained in the dozens of boxes in storage was encompassed by electronic files that had already been produced, and 4) that the "contract" referred to by Defendants almost certainly was not there.  This latter point was supported by the fact that the email announcing the meeting went to a defunct email address, Oliver had no recollection of attending the meeting or receiving a written contract prior to installation, and that she was likely preparing for a May 9, 2015 trip to see her mother in Minnesota when the meeting occurred.

Despite all of this, as soon as she could after receiving her CoVid-19 vaccine Plaintiff drove to New Mexico from California and completed an exhaustive search of her documents and

items stored there (in 100+ degree heat).  That search was conducted over nine (9) days and took approximately 50 hours, concluding on the morning of June 14, 2021.  As expected, <u>no contract was found.</u>  *See* Oliver Dec. at ¶18.  Plaintiff did find some responsive documents, including receipts and several design drawings from her work at HoER, as well as some artwork she purchased from Meow Wolf friends which she will produce.  *Id*.

For the purposes of this discussion, it is crucial to note that Defendants have not filed a single motion to compel.  This is not because Defendants would not have jumped at the opportunity to do so, but because Plaintiff's good-faith cooperation in the discovery process would make any such motion unjustified.

Plaintiff has been an open book.  As outlined below, Defendants have not.

2. <u>The only "pattern of concealing evidence" is that of Defendants</u>

a. *Defendants concealed damning pitch decks.*

With her initial round of discovery in this case almost a year ago, Oliver sought two fundamental and quintessentially relevant categories of documents:  those related to "Lauren Oliver," and those related to her "Space Owl" work.  Attached hereto as Exhibits R and S are two examples of multiple "pitch decks" Defendants sent to prospective investors that include Oliver's Space Owl, as well as her trademarked Mimizuku Samurai Space Owl plush toy.  Not only did Defendants place the Meow Wolf name directly on top of Oliver's copyrighted work, they referred to Oliver's plush toy as "Meow Wolf branded merchandise," and used it to tout the creation of Meow Wolf, Inc.'s merchandizing division.  It is unfathomable that Defendants did not know of the existence of these pitch decks, yet they were only produced on June 4, 2021 after Plaintiff filed a motion to compel.

> *b. Defendants have yet to describe or produce the "express" contract to which they claim Oliver is bound.*

Oliver's Interrogatory #13 asks Meow Wolf, Inc. to "Please state YOUR basis for claiming ownership of the ISQ work, including the SPACE OWL." Defendants' "response" was as follows:

> Subject to and without waiving the foregoing general objections, the basis for Meow Wolf's ownership of the ISQ work including the Space Owl is the terms of Meow Wolf's offer made to plaintiff Lauren Oliver and her acceptance of the offer by words and by performance including installing the work in the House of Eternal Return, as further reflected in the parties' actions and in Ms. Oliver's communications with Meow Wolf representatives, and her testimony.

*See* Defendant Meow Wolf, Inc.'s Response to Plaintiff's Interrogatory #13, attached hereto as Exhibit T. As the Court can see, this is no response at all.

Defendants began this litigation by arguing there was no "meeting of the minds" with regard to the parties' contractual relationship. That position has shifted over time to focus on Kadlubek's April 2, 2015 email referencing a "revenue share stipend," to the 2017 "Artist Bonus Program Agreement," and now to an as-yet unidentified "paper" contract Caity Kennedy declares she recalls "looking at" with Oliver.

It is no surprise that Plaintiff requested that Meow Wolf, Inc. produce "All documents supporting any claim by MEOW WOLF to ownership of the ISQ work at HoER," and "All documents supporting any claim by MEOW WOLF that a particular contract existed between MEOW WOLF and Lauren Oliver." To both of these requests, Meow Wolf, Inc. responded:

> Meow Wolf believes all responsive, non-privileged, relevant materials have already been produced, and nothing can be added that is not purely cumulative. Subject to and without waiving the foregoing objections, any further responsive, non-privileged documents that are found during discovery will be produced.

Meow Wolf, Inc.'s Responses to Plaintiff's Requests for Production Nos. 24 and 25, attached hereto as Exhibit U.

Defendants base the instant motion on a March 17, 2017 Kadlubek email they claim is "critical" to their contract theories.  Despite possessing the email throughout the litigation, Defendants failed to produce it until March 23, 2021 – three days before they confronted Oliver with it for the first time at her deposition.  Meanwhile, they have not described the contract to which they claim the email is relevant, or identified any of the documents they contend support the contract's existence.  If this were a case that had not been so intensely litigated, Defendants' discovery responses outlined above would be laughable.  Given how hard Plaintiff has had to fight for the incomplete discovery Defendants have chosen to produce to date, the responses are offensive.

> c.  *That Defendants have avoided identifying the contract they claim exists is not surprising when the available documents are analyzed.*

As best Plaintiff can tell, Defendants' constantly shifting contract theory begins with Kadlubek's April 2, 2015 "Meow Terms" email to Oliver.  For brevity, Plaintiff will focus on Defendants' bad faith surrounding the ownership of intellectual property.

After stating some vaguely-worded "terms," and indicting a "contract" would follow, the April 2, 2015 email states clearly, "It is important to note that you will retain all intellectual property rights for your pieces…"  Exhibit H hereto.  However, in depositions, Defendants represented that the "paper" contract referenced by Ms. Kennedy, and allegedly distributed at a May 6, 2015 meeting, was the same as a document attached to the deposition of a third-party witness that contains a "work-for-hire" provision.  That work-for-hire provision is in direct conflict with the intellectual property assurances contained in the April 2, 2015 email, and is clear evidence of Defendants' bad faith.

This bad faith was compounded by the post-installation series of "agreements" Defendants sent to participating artists.  Instead of the "revenue share" artists had been promised

as an incentive to invest their labor, money, and art into HoER, participants now had to sign a document Defendants created after installation stating the "Artist acknowledges and understands that any Bonus Payment made to the Artist are (sic) made at the absolute discretion of Meow Wolf and Artist is not entitled to any such payment pursuant to the Program." *See* Meow Wolf Artist Bonus Program Agreement and Description, Feb. 16, 2017, attached hereto as Exhibit V. The incorporated Meow Wolf Artist Bonus Program Description goes on to state that "bonus" payments "are not considered part of Artists' compensation package through employment or contract with Meow Wolf." Thus, this purported "contract," which forms the basis of this motion, was not a contract at all, because it lacked any consideration.[4] The 2018 version is substantively the same. *See* 2018 agreement attached hereto as Exhibit W.

Both the 2017 and 2018 payments artists did receive were relatively modest. Then, in 2019, in order for artists to receive the remainder of their "bonus," Defendants once again radically altered the terms of the "agreement" to condition any payment on the artists signing over all of their intellectual property rights. Thus, by 2019, not only were artists to be paid completely at the whim of Defendants, but in order to get any payment at all, they had to sign over the intellectual property rights they had originally been told they would retain. *See* Exhibit X hereto. Defendants' bad faith is clear, and whether Oliver received any of these "agreements" after installation goes only to Defendants' wrongdoing, not to any contract that might be binding on Plaintiff.

---

[4] In addition, it was a blatant attempt to change the terms of Defendants' contracts with artists after installation, as clearly shown in comments by Meow Wolf, Inc. principal Sean Di Ianni on drafts being developed in 2016. As those comments are currently subject to the protective order in this case, Plaintiff will present them to the Court at a later date.

    d. *Relying on a declaration of Caity Kennedy regarding a paper contract that has not been produced is improper.*

 Suffice it to say, Oliver's recollection of events differs from Ms. Kennedy's.  *See* Oliver Dec. at ¶¶15-17.  Given Defendants have not produced the "paper" contracts to which she refers, and that Oliver has not had an opportunity to take Ms. Kennedy's deposition, responding to Ms. Kennedy's vaguely-worded declaration is difficult.  That said, Oliver does not recall reviewing a written contract with Ms. Kennedy or Ms. Kennedy giving her one prior to installation.  Oliver Dec. at ¶15.  From the summer of 2015 through opening, Ms. Oliver was readily available through her quellette@gmail.com account, by phone, in person, and by Sack, and she regularly communicated with Ms. Kennedy during that time.  *See* Oliver Dec. at 17.  Aside from Ms. Kennedy's declaration that she recalls "looking at" some as-yet unidentified contract with Oliver, Defendants have produced no evidence they provided Ms. Oliver with a written contract prior to opening – no email, no Slack message, nothing.

    e. *Other examples of Defendants concealment of evidence*

 In summer 2019, Oliver noted and secured a screen shot of her work being associated with Red Bull on Meow Wolf, Inc.'s website.  *See e.g.*  Exhibit ZA hereto.  On July 30, 2019, counsel for Oliver sent a letter to Defendants' counsel referencing and highlighting their obligation to preserve evidence, including "internet content referencing, picturing, or otherwise relating to Lauren Oliver, Ice Station Quellette, or the Space Owl…"  To date, Defendants have not produced the content associated with the screen shot Plaintiff acquired in 2019.

 As outlined above, and in Defendants' motion, Defendants received eight or nine auto-responses on emails sent to lauren.oliver@gmail.com.  Only one has been produced.

 Defendants assert that Oliver is bound by a contract they have yet to identify.  Oliver assumes Defendants will take the position the alleged contact was between her and VCMSE Art

City, LLC.  Oliver also understands that Meow Wolf, LLC was formed in 2011 to do business on behalf of the Meow Wolf collective, and subject to a complex operating agreement containing protections for various categories of persons.  It remains unclear how the right to contract on behalf of "Meow Wolf" was transferred or held leading up to installation of HoER, and since. To date, Defendants have not produced the operating agreements for Meow Wolf, LLC or VCMSE Art City, LLC, or any documents showing how those entities' rights and obligations were transferred to Meow Wolf, Inc.  As Oliver does not even recall seeing or hearing the name "VCMSE Art City, LLC" prior to the initiation of discovery in this case, that entity's right to contract with Oliver (or lack thereof), is critical to assessing the claims and defenses in this case, as well as the story of how Meow Wolf went from being a New Mexico art collective to a Delaware corporation.

The supreme irony that Defendants pattern of concealing evidence is the backdrop for this meritless motion for sanctions is that at least some portion of the great wealth it takes to litigate a case in this way was generated by Plaintiff's own work.  As admitted by Mr. Kadlubek in an exchange he had with Meow Wolf, Inc. CFO Carl Cristensen on July 2, 2018, Oliver "owns the rights to her images that we are profiting from…"  *See* Exhibit ZB hereto.

## V.      THE RELIEF REQUESTED BY DEFENDANTS IS IMPROPER

Defendants are in essence seeking summary judgment through a discovery motion.  As outlined above, Defendants requests for sanctions in the form of evidentiary inferences and presumptions are not justified in law or fact.

Defendants request for the appointment of a forensic expert is improper because they have not shown that it would accomplish anything except forcing Oliver to expend large amounts

of money on a search for emails from third parties that "could" exist.  As such it is evidence that this Motion was brought to intimidate and harass.

Regardless, the request for appointment of a forensic expert is procedurally improper and untimely, as it represents relief that is appropriately sought through a motion to compel. Defendants learned of the email deletion on April 8, 2021 and that Oliver's e-discovery vendor had determined the deletion was permanent.  It has been more than two months since, and plaintiffs have not filed a motion to compel, or requested an extension of their 21-day deadline to do so.  *See* L.R. 26.6.

## VI.   CONCLUSION

For the reasons stated above, Plaintiff requests that Defendants' Motion be denied in its entirety, and an order awarding Plaintiff its attorneys' fees and costs expended in responding to the Motion and such other relief the Court deems proper.

Respectfully Submitted,

ERICKSEN ARBUTHNOT

By:____/s/ *Jesse A. Boyd*_____
      JESSE A. BOYD
      ANDREW J. CHAN
      2300 Clayton Road, Suite 350
      Concord, CA 94520
      (510) 832-7770
      (510) 832-0102 facsimile
      jboyd@ericksenarbuthnot.com

      *Attorneys for Plaintiff Lauren Adele Oliver*

**Certificate of Service**

I hereby certify that on **June 15, 2021** a true and correct copy of the foregoing document and all referenced exhibits was served via CM/ECF on all interested parties.  I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to the following non-CM/ECF participants: N/A.

*/s/ Jesse A. Boyd*
Jesse A. Boyd