IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

**LAUREN ADELE OLIVER,**

    **Plaintiff,**

vs.   Civ. No. 20-237 KK/SCY

**MEOW WOLF, INC., a Delaware Corporation; VINCE KADLUBEK, an individual and officer; and DOES 1-50,**

    **Defendants.**

## ORDER DENYING MOTION FOR SANCTIONS

Defendants allege that Plaintiff, once she anticipated suing Defendants, systematically deleted a trove of emails. They further argue Plaintiff deleted these emails in bad faith with the purpose of preventing Defendants from discovering them; therefore, the Court should sanction Plaintiff. Although the timing of Plaintiff's deletion of these emails is suspicious, the circumstantial evidence related to Plaintiff's deletion of these emails is insufficient for the Court to conclude that Plaintiff deleted these emails with the intent to deprive Defendants from discovering them. As a result, the Court denies Defendants' Motion For Sanctions Due To Plaintiff Lauren Oliver's Spoliation Of Evidence. Doc. 132. Finally, the Court concludes that, although sanctions are not appropriate, relevant emails could exist among the emails Plaintiff deleted. Therefore, although not as a sanction, the Court finds Defendants' request to have a forensic expert determine if the deleted emails can be recovered has merit. Accordingly, if Defendants are willing to bear the cost of a forensic expert, the Court will permit Defendants to pursue such discovery and Plaintiff will be required to make her devices available for a digital forensic inspection.

**BACKGROUND**

Although the implications of these facts are hotly contested, except where noted, the parties appear to agree on the following facts.[1]

Prior to March 27, 2015, Plaintiff used the email account lauren.oliver@gmail.com. Oliver Decl. (Doc. 167) ¶¶ 8-9; Doc. 193 at 7.[2] On February 4, 2015, Plaintiff's health insurer at the time, Anthem Blue Cross Blue Shield, disclosed that its servers had been compromised and hackers potentially stole over 37 million records that contain personally identifiable information. Doc. 166-7. Plaintiff became aware that her lauren.oliver@gmail.com account had been affected by the Anthem breach "sometime prior to March 27, 2015." Oliver Decl. ¶ 8. Oliver asserts, "[b]etween March 27, 2015 and June 2018, I ceased checking the lauren.oliver@gmail.com account and did not send emails from that account or use it to communicate." *Id.* She set up an auto-response with the subject line, "I'm suspending this email," stating in the body of the response:

> Hello! Please remove this email address from your contact list. Thanks to hackers, I am no longer using it. If you receive an email from this address, do not open it! Please contact me through other means to get my new email contact. Thank you.

Doc. 166-9 (email auto-response dated April 2, 2015).

At that point, Plaintiff alleges she conducted all email communications related to Meow Wolf through Plaintiff's quellette@gmail.com account, or later through her current

---

[1] Plaintiff, for the first time in her surreply, requests a hearing "to review the evidence and law, and allow testimony as the Court deems appropriate." Doc. 199 at 6. The Court does not need additional testimony and thus denies Plaintiff's request for a hearing.

[2] There is evidence in the record Plaintiff was already using another email address (quellete@gmail.com) because she thought it was "better," Doc. 132-8 at 1 (email dated January 28, 2015), before she ceased using lauren.oliver@gmail.com in March of 2015.

2

quellettestudio@gmail.com account. Oliver Decl. ¶ 10. Defendants, who would have been involved in those communications, have provided no evidence to the contrary.

Plaintiff's counsel represents, and Defendants do not dispute, that between March 27, 2015 and May 24, 2015, lauren.oliver@gmail.com generated at least eight of these auto-responses to Meow Wolf personnel. Doc. 166-14; *see, e.g.*, Doc. 166-9, Doc. 166-13. According to Plaintiff's counsel, the auto-response was sent to Vince Kadlubek at least five times. Doc. 166-14. On one instance, Mr. Kadlubek sent an email to lauren.oliver@gmail.com on April 2, 2015, received the auto-response, and promptly sent the same email to quellette@gmail.com. *See* Doc. 166-8; Doc. 166-9; Doc. 166-10. The parties exchanged more emails through quellette@gmail.com on April 22, 2015. Doc. 166-14; Doc. 166-11. On April 27, 2015, Mr. Kadlubek sent another email regarding a "contracts" meeting to lauren.oliver@gmail.com, and did not follow-up by resending it to quellette@gmail.com. Doc. 166-14; Doc. 166-12. Meanwhile, the parties exchanged hundreds of communications via quellette@gmail.com and Slack from early 2015 through June 2018. Doc. 166 at 13; Doc. 166-14.

These various communications provide a timeline to Plaintiff's deteriorating relationship with Meow Wolf. The Court begins its timeline on February 12, 2018, because at this point the relationship does not appear to be strained. On that day, Brian Solomon reached out to Plaintiff via Facebook to ask about using Space Owl in a virtual reality (VR) project Meow Wolf was developing. He wrote, "Hey I have space owl in the vr piece, I snuck in some characters we didn't have the money to animate as static characters . . . Emily told me the rights are still all yours for space owl . . . Lemme know if it's ok." Doc. 132-15 at 2. That same day, Plaintiff "had a brief communication" with her current attorney (Jesse Boyd) "regarding granting permission

3

for the use of her work as part of a virtual reality piece." Doc. 199 at 3.[3] The next day, February 13, Plaintiff responded to Mr. Solomon, "Hey Brian, from your description, it sounds like the space owl is just part of the backdrop and I'm happy to contribute. Obviously, I'll want to be more involved when/if MW plans to use ISQ elements in a more substantive way (especially if it might conflict with the ISO narrative). But this VR piece sounds great, and you have my OK to proceed." *Id*. at 3.

A couple of months later, on April 12, 2018 Plaintiff learned that her proposal to place another version of Space Owl in another Meow Wolf exhibition had been declined because Meow Wolf did not want to repeat anything from the House of Eternal Return. Doc. 193-1. Not long after that, on May 1, 2018, Meow Wolf asked Plaintiff for permission to use Space Owl in connection with an "escape room/scavenger hunt style web series." Doc. 193-2. Plaintiff responded the next day that it was "problematic" for anyone but her to use Space Owl, requested to talk to "whoever is handling the legal/IP stuff" for Meow Wolf, and stated "[a]ny proposals are dead in the water until we can hammer out an agreement." Doc. 193-2. Plaintiff followed up her request to speak with someone handling legal issues with a May 10, 2018 email to Meow Wolf's Drew Tulchin: "Hi Drew! Hope everything's good. I'm getting a lot of requests about using the space owl from MW folks. Who have you hired to work with artists on legal issues, and can you put me in touch? Thank you." Doc. 132-15 at 5. In response to Mr. Tulchin's request to provide information about "a specific situation" Plaintiff cited the VR piece as one example: "Brian Solomon let me know in early March that he put the space owl in his VR -- as

---

[3] Mr. Boyd indicates, however, that he has known Plaintiff for more than thirty years and the February 12, 2018 conversation he had with her was consistent with his occasionally providing her *pro bono* legal advice on various topics over the years. Doc. 199. Mr. Boyd represents that he did not formally accept Plaintiff as a client for this case until September 25, 2019 and did not execute a fee agreement with Plaintiff until July 7, 2020. Doc. 199 at 4.

part of the background -- without realizing I own it. I gave him the go-ahead thinking it was already done, and of course, he's a friend and a badass. I'm still waiting to see it -- it sounds like he's still working on it -- I'd like to review the use to get the right copyright/permission credit line on it." *Id*. at 4.

Likely as a result of these May email communications, confusion developed over whether Plaintiff was withdrawing permission to use Space Owl in the VR piece. On May 24, 2018, Plaintiff followed up with Mr. Luchin: "Hey there. Wondering if you had any progress. Yesterday Brian Solomon told me someone said that I wanted him to remove the owl from his VR piece -- which is weird 'cause I did not say that to anyone. Any insights?" *Id*.

Also at some point in May, Meow Wolf proposed a contract to Plaintiff that Plaintiff discussed with her current attorney, Mr. Boyd. Doc. 199 at 4 (noting Mr. Boyd had "a few communications [with Plaintiff] in late-May 2018 related to a contract Ms. Oliver had been forwarded by Meow Wolf Inc.'s attorney."). On May 29, Plaintiff rejected the contract, stating she did not want to sell Space Owl to Meow Wolf, and added: "I'm also now curious to review where and how my work has already been used and credited in Meow Wolf promotional materials, publications and any other projects I'm not aware of." Doc. 193-4. On June 24, 2018, Plaintiff filed her application to register her copyright in ISQ.[4] Doc. 132 at 2; Doc. 166 at 18. On June 26, Plaintiff wrote to Meow Wolf (including its lawyer Talia Kosh) asking how many copies of a coloring book containing an image of Space Owl had been printed and sold. Doc. 193-6.

---

[4] In 2014, Oliver began envisioning the Space Owl as a central element in a climate change-themed art project with a science fiction-style narrative, titled "Ice Station Quellette" ("ISQ"). Doc. 148 ¶ 13.

On, or shortly before June 27, 2018, Plaintiff accessed her lauren.oliver@gmail.com account and deleted five years of emails, from the date of the deletion back to April 8, 2013. Doc. 132-7 at 1. According to Plaintiff, she did so "in an attempt to clear the account of emails [she] believed were largely spam, phishing, and otherwise malicious." Oliver Decl. ¶ 9. A little more than a year later, on July 25, 2019, Plaintiff's present counsel wrote Meow Wolf a letter threatening litigation. Doc. 193 at 6. Plaintiff then filed this lawsuit on March 16, 2020. Doc. 1.

## DISCUSSION

Based on the June 2018 mass email deletion, Defendants move for sanctions. Doc. 132. Defendants argue that the deleted emails included "one of the most important documents in this case: Meow Wolf CEO Vince Kadlubek's March 17, 2017 email to her with her Artist Bonus Program contract." Doc. 132 at 2. Defendants argue they do not have copies of the relevant emails either, because "Meow Wolf personnel were often independent contractors using non-Meow Wolf email addresses to communicate with artists during the relevant period, so not all significant communications are contained on Meow Wolf email servers." *Id.* at 3. As sanctions, Defendants request a Court-appointed digital forensics expert to examine Plaintiff's devices which maintained her old gmail account, and with respect to the emails that cannot be recovered:

- an order precluding Ms. Oliver from putting on evidence (including testimony) that she did not receive a paper contract from Meow Wolf in May 2015, and an adverse inference that Ms. Oliver did in fact receive a paper contract from Meow Wolf in May 2015;

- an order precluding Ms. Oliver from putting on evidence (including testimony) that she did not receive or read Vince Kadlubek's March 17, 2017 email to her and its attached written contract, and an adverse inference that Ms. Oliver did in fact receive and read the email and attached written contract;

- an order precluding Ms. Oliver from putting on evidence (including testimony) that she was a core member of Meow Wolf, and an adverse inference that Ms. Oliver was not a core member of Meow Wolf;

- an adverse inference that Ms. Oliver granted a permission for Meow Wolf to use images of her artwork in HoER for promotion of HoER and Meow Wolf;

- an adverse inference instruction or presumption that the spoliated evidence would have been unfavorable to Ms. Oliver with respect to all of Ms. Oliver's claims;

. . . [I]f the majority of the deleted emails cannot be recovered, . . . dismissal of plaintiff's claims for copyright infringement, breach of contract, intentional and negligent misrepresentation, and unjust enrichment.

Doc. 132 at 21-22.

Plaintiff acknowledges she mass-deleted emails but avers that she believed them to be "largely spam, phishing, and otherwise malicious." Doc. 167 (Oliver Decl.) ¶ 12. Thus, resolution of the present motion does not turn on whether Plaintiff mass-deleted emails; instead, it turns on the potential relevance of these emails and the reason Plaintiff deleted those emails.

1. **Timing of Deleted Emails**

Defendants infer from the timing of Plaintiff's email deletions that a desire to destroy communications that could harm her litigation position prompted Plaintiff's deletions. Plaintiff, on the other hand, asserts the Anthem data breach served as the catalyst for her deletions. In comparing each side's asserted catalyst, Defendants' aligns much more neatly with the undisputed timeline.

Plaintiff's email deletions occurred amid growing tension over Defendants' use of Space Owl and payment for that use. On May 1, 2018, in response to a Meow Wolf inquiry about obtaining filming rights and permissions for the Space Owl, Plaintiff responded that she needed to "hammer out an agreement" with Meow Wolf about the Space Owl/Ice Station and asked to be put in touch with "whoever is handling the legal/IP stuff on your side . . ." Doc. 193-2. Plaintiff followed up her request to speak with someone handling legal issues with a May 10, 2018 email asking, "Who have you hired to work with artists on legal issues, and can you put me

7

in touch?" Doc. 132-15 at 5. On May 29, 2018, Plaintiff wrote an email "Re: Space Owl Licensing" to a Meow Wolf representative stating,

> This contract came as a surprise—my request to talk to your legal department isn't about selling the Space Owl to Meow Wolf, but to set some guidelines on the use of the likeness and appropriately credit the work, given the flurry of requests to use it this spring.
>
> . . . . I prefer to retain ownership and total creative control over the Space Owl/Ice Station.
>
> . . . .
>
> I'm also now curious to review where and how my work has already been used and credited in Meow Wolf promotional materials, publications and any other projects I'm not aware of."

Doc. 193-4. Likewise, Plaintiff communicated with her current counsel in late May 2018 to discuss a contract forwarded by a Meow Wolf attorney. Doc. 199 at 4. Plaintiff acknowledges that she understood at this point that litigation with Defendants was theoretically possible, but asserts that she considered the possibility to be remote. Doc. 199 at 3-4.

In late June (close in time to the June 2018 email deletions), Plaintiff reached out to Meow Wolf to ask how many coloring books, which included a picture of the Space Owl, Meow Wolf sold. Doc. 133-3.[5] On June 24, 2018, Plaintiff filed an application to copyright her artwork. Doc. 132 at 2; Doc. 166 at 18. Beginning sometime before June 13, 2018 through at least June 27, 2018, Plaintiff was also negotiating with Meow Wolf over the use of her Space Owl in a Meow Wolf virtual reality piece and was considering a contract Meow Wolf had provided in connection with the virtual reality piece. Doc. 166 at 18; Doc. 132-2. On June 26, Plaintiff wrote

---

[5] Defendants assert Plaintiff asked about the coloring books on June 24, 2018. Doc. 132 at 2. The document Defendants cite, however, is a June 26, 2018 email between Meow Wolf employees that references an undated earlier communication with Plaintiff. Thus, rather than attributing a specific date to Plaintiff's question about the coloring books, the Court infers that Plaintiff's inquiry came sometime in late June, near the time Plaintiff deleted her emails.

to Meow Wolf (including its lawyer Talia Kosh) asking how many copies of a coloring book containing an image of Space Owl had been printed and sold. Doc. 193-6. Around this same time, on or shortly before June 27, 2018, Plaintiff deleted emails from her account going back to April 8, 2013. Doc. 132-7 at 1. Thus, Plaintiff's mass deletion of her email account occurred in the midst of a rising dispute over Defendants' use of Plaintiff's Space Owl. Compare this with the timing of the Anthem breach.

Plaintiff learned of the Anthem breach sometime between February 4, 2015 and March 27, 2015. Doc. 166-7 (Anthem's announcement of the breach); Doc. 167 ¶ 8 (Plaintiff's affidavit stating she learned of the breach "sometime prior to March 27"). Yet, she did not delete emails from her lauren.oliver@gmail.com account until three years later, on or shortly before June 27, 2018. In that three-year period, Plaintiff asserts she was not using her lauren.oliver@gmail.com account. And, she alleges no specific event related to the hack (such as a notification that a password or other account data connected to her lauren.oliver@gmail.com account had been compromised) that would serve as a more temporally connected catalyst to her deletion. Thus, although the timing of the Anthem data breach does generally coincide with Plaintiff's decision to cease using her lauren.oliver@gmail.com account, Plaintiff's deletion of emails in that account does not.[6]

### 2. Significance of Deleted Emails

The Court, however, must look at more than just the suspicious timing of Plaintiff's email deletions. More important than timing is the likely significance of what was deleted. And,

---

[6] It appears Plaintiff had already begun to shift to a "better" email account even before she learned of the Anthem data breach. *Compare* Doc. 132-8 (1/28/2015 email to Meow Wolf employee Caity Kennedy stating, "here's my better email quellette@gmail.com"), *with* Doc. 167 at 2 ¶ 8 (Oliver affidavit indicating that she "came to understand" in March 2015 that her lauren.oliver@gmail.com account was part of the Anthem breach).

Defendants overstate the significance of the lauren.oliver@gmail.com account from which Plaintiff deleted her emails. Defendants assert:

> The emails Ms. Oliver destroyed included one of the most important documents in this case: Meow Wolf CEO Vince Kadlubek's March 17, 2017 email to her with her Artist Bonus Program contract. See Kadlubek to Oliver, Ex. D. Ms. Oliver has repeatedly complained in this action that Mr. Kadlubek failed to offer her a contract for the Artist Revenue Share/Bonus Program. . . The destroyed email trove could well include communications of Ms. Oliver relating to the terms of her relationship with Meow Wolf and what she understood about it, permissions to use her artwork, and the labor of others in co-creating the Space Owl sculpture and ISQ.

Doc. 132 at 2-3. Asserting that Plaintiff destroyed one of the most important documents in this case implies that Plaintiff possessed the one and only copy of that document. But, as Plaintiff points out, any contract that Defendants sent to Plaintiff would be in Defendants' possession as well as Plaintiff's. Similarly, Defendants would also be in possession of any response Plaintiff provided to them.[7]

Further, Defendants' argument fails to recognize that, on January 28, 2015, after the Meow Wolf employee in charge of getting Plaintiff her contract (Doc. 132-12) sent Plaintiff an email at her lauren.oliver@gmail.com account, Plaintiff informed her, "here's my better email quellette@gmail.com" (Doc. 132-8). Thereafter, Plaintiff included an auto-response to her lauren.oliver@gmail.com account that informed the sender that she was no longer using that account because it had been hacked and that the sender should no longer use this account. Doc. 166 at 1. Defendants do not dispute Plaintiff's contention that at least eight of these auto-responses were sent to Meow Wolf representatives, including five of which were sent to Mr. Kadlubek *before* Mr. Kadlubek sent to lauren.oliver@gmail.com the March 17, 2017 email that

---

[7] Of course, depending on the parties' respective email settings, Defendants' possession of an email and contract attachment they sent Plaintiff would not tell Defendants whether Plaintiff opened the email or the contract attached to the email.

10

Defendants characterize as one of the most important documents in this case. Further, Defendants do not dispute Plaintiff's contention that they themselves have only produced one of the eight auto-responses. Doc. 166 at 9 n.2.

Instead, Defendants assert, "Nor is it true that all relevant emails plaintiff deleted would be found because Meow Wolf sent the emails. Meow Wolf personnel were often independent contractors using non-Meow Wolf email addresses to communicate with artists during the relevant period, so not all significant communications are contained on Meow Wolf email servers." Doc. 132 at 3.[8] Defendants' argument that their emails are justifiably irretrievable because some Meow Wolf employees were using their personal email addresses fails to recognize that Plaintiff also was using her personal email address. True, Plaintiff as the filer of this lawsuit likely would have been able to foresee litigation earlier than Defendants. But even accepting Defendants' arguments, Plaintiff's duty to preserve emails going back to 2013 arose in 2018. Compare this with Defendants' duty to preserve, which would have arisen no later than July 25, 2019, when Plaintiff's present counsel wrote Meow Wolf a letter threatening litigation. Doc. 193 at 6.[9] If, as of 2018, Plaintiff should have been able to retrieve emails going back to 2013 from her personal email account, it seems reasonable to expect Defendants, as of 2019, to retrieve emails going back to 2014 from their personal email accounts.

It also seems reasonable to expect a business to retain emails relating to contract negotiations in which it was involved, even when litigation is not anticipated. But, if a trove of

---

[8] For example, Defendant Kadlubek was at one point using the email meta4vkd@gmail.com to communicate with Plaintiff. *E.g.*, Doc. 166-11.

[9] Although Plaintiff disputes that she reasonably anticipated litigation in 2018, she acknowledges that she realized during a June 3, 2019 meeting that "her relationship with Defendants had deteriorated" and "shortly after June 3, 2019 she reasonably anticipated litigation might be necessary to protect her rights." Doc. 199 at 3.

email exchanges with Oliver on the lauren.oliver@gmail.com account existed, Defendants are missing nearly the entire trove. Other than a few emails *Defendants sent* to Plaintiff's lauren.oliver@gmail.com account after Plaintiff advised them that she was no longer using that account and so neither should they, Defendants have produced no examples of the trove. Had Oliver sent a trove of emails to Defendants from this account, surely Defendants would be able to produce one or two examples. That they cannot belies their argument of a missing trove.

Further, there are additional reasons the Court disagrees with Defendants' assertion that Plaintiff's lauren.oliver@gmail.com account is likely to contain a trove of emails. Defendants argue, "The destroyed email trove could well include communications of Ms. Oliver relating to the terms of her relationship with Meow Wolf and what she understood about it, permissions to use her artwork, and the labor of others in co-creating the Space Owl sculpture and ISQ." Doc. 132 at 3. The Court will address each of these assertions in turn.

First, as noted, Defendants should have their own copies of email exchanges they had with Plaintiff about the terms of their relationship, and permissions to use her artwork. This greatly mitigates any prejudice Defendants have suffered from the destruction of emails in the lauren.oliver@gmail.com account. Second, that Plaintiff owns the copyright and intellectual property rights to the Space Owl and ISQ is not in dispute. Whether Plaintiff contracted with someone else to help create these works is therefore likely to have little relevance to this case. And, to the extent Defendants directly contracted with or paid someone to help install the Space Owl sculpture on their property, they should have possession of those records.

Third, Plaintiff's submission of Space Owl for use in Defendants' project did not occur until *after* she began shifting away from her lauren.oliver@gmail.com account. Plaintiff's First Amended Complaint alleges that she created digital versions of the Space Owl in 2010 and

created a seven-foot painting of the Space Owl for a Santa Fe art gallery in 2012. Doc. 148 at ¶ 12. On November 13, 2013, Meow Wolf employee Caity Kennedy sent out (using a meowwolf.com domain) what appears to be a mass email soliciting funding for Meow Wolf. Doc. 132-9. The email exchange she then had with Plaintiff makes clear that Plaintiff was not part of Meow Wolf's core group at this time. *Id*. Indeed, Plaintiff does not allege that she even discussed her art project with Meow Wolf until the fall of 2014. Doc. 148 at ¶ 14. On January 27, 2015, Caity Kennedy sent Plaintiff another email. Here, Ms. Kennedy wrote, "You know, we were thinking about it, and we weren't sure if anyone ever invited you to submit a proposal to this colossal project we're working on (if you're even interested). If you are interested, let me know, I'll tell you all the things!" Doc. 132-8. This email indicates that, although Plaintiff was not yet associated with Meow Wolf, she was being invited to submit a proposal. And, although Plaintiff alleges that she did then submit a proposal, as of June 2015, Plaintiff's first ISQ show opened somewhere else—at an art gallery in Santa Fe. Doc. 148 at ¶ 17.

      Because Plaintiff's relationship with Meow Wolf did not begin until mid-2015 at the earliest, her allegation that she was part of "the Meow Wolf artists' collective and core team" (Doc. 148 ¶ 67), if true, must have arisen from her association with Meow Wolf from mid-2015 forward. And, to the extent Plaintiff and Meow Wolf engaged in contract negotiations, those negotiations would not have occurred until after Plaintiff submitted her proposal in response to Ms. Kennedy's January 27, 2015 email. Based on Plaintiff's January 28, 2015 reply to Ms. Kennedy, we know that as of January 28, 2015, Plaintiff was asking her correspondents to use quellete@gmail.com because it was "better" than lauren.oliver@gmail.com account. We also know from the automatic reply she associated with this account that, by April 2, 2015, she had informed anyone who tried to send her an email at this account that she was no longer using it.

13

Thus, for almost all of the time Plaintiff was using her lauren.oliver@gmail.com account, she was not involved with Meow Wolf. And, for almost all of the time she was involved in Meow Wolf, she was not actively using her lauren.oliver@gmail.com account (as evidenced by the automatic reply Meow Wolf and all others received when they tried to send an email to this account beginning no later than April 2, 2015). Thus, it is unlikely this account ever had the trove of emails Defendants envision. Moreover, to the extent the account did contain relevant emails, Defendants or Defendants' employees likely independently possessed those same emails.

Defendants also argue that the most natural explanation for the timing of Plaintiff's email deletion is that Plaintiff had something to hide. Doc. 134 at 13-4; Doc. 193 at 7-9. Plaintiff, however, requested Defendants, as well as all others, to use a different email address at the inception of her relationship with Meow Wolf (long before even Defendants allege litigation was foreseeable to Plaintiff). Yet, she did not try to delete emails from the accounts most likely to contain emails related to this case (the quellette@gmail.com and quellettestudio@gmail.com accounts she and Meow Wolf most often used to communicate with each other). And, to the extent Defendants disregarded her instructions and sent emails to her old email address, it would have been illogical for Plaintiff to assume that deleting emails from her old account would prevent Defendants from having access to emails already in their possession. Thus, although the timing of Plaintiff's deletion is suspicious, the Court cannot consider that timing in isolation. Considering all the relevant factors, the Court cannot complete the inferential leap Defendants ask it to take.

### 3. Duty to Preserve Evidence and Bad Faith

The Court notes that the parties engage in substantial debate over whether litigation was "imminent" at the time of the mass deletion. The majority of courts and authorities hold that a

duty to preserve evidence arises when litigation is "reasonably foreseeable" or "reasonably anticipated." *United States ex rel. Baker v. Cmty. Health Sys., Inc.*, No. 05cv279 WJ/ACT, 2012 WL 12294413, at *2-3 (D.N.M. Aug. 31, 2012), *recommendation adopted*, 2012 WL 5387069 (D.N.M. Oct. 3, 2012). The Tenth Circuit, on the other hand, has stated: "A spoliation sanction is proper where (1) a party has a duty to preserve evidence because it knew, or should have known, that litigation was imminent, and (2) the adverse party was prejudiced by the destruction of the evidence." *Burlington N. & Santa Fe Ry. Co. v. Grant*, 505 F.3d 1013, 1032 (10th Cir. 2007) (citing *103 Investors I, L.P. v. Square D Co.*, 470 F.3d 985, 989 (10th Cir. 2006)).

Other courts to discuss the "imminence" standard have concluded that the Tenth Circuit offered this as one example of when spoliation sanctions are appropriate, rather than the only circumstance under which a court may award spoliation sanctions. *United States ex rel. Baker*, 2012 WL 12294413, at *3 n.2. "For this definition, *Burlington Northern* cited to *103 Investors I, L.P. v. Square D Co.*, 470 F.3d 985 (10th Cir. 2006). In *103 Investors*, litigation was imminent when the product was destroyed and the Court believes the Tenth Circuit's choice of the word 'imminent' reflected that fact, rather than stating a different standard from the virtually universal standard of 'reasonably foreseeable.'" *Id.*; *see also Micron Tech., Inc. v. Rambus Inc.*, 645 F.3d 1311, 1320 (Fed. Cir. 2011) ("*Burlington* merely noted that imminent litigation was sufficient, not that it was necessary for spoliation . . . ."). The Court tends to agree with this: a plaintiff cannot make a decision to sue, delete adverse relevant evidence, wait some period of time, file suit, and then successfully avoid liability for spoliation by claiming that, although foreseeable, the lawsuit was not "imminent" at the time of the deletion. Counting the number of months or number of years in between the deletion and the filing of the lawsuit is not always the best litmus test to determine reasonable foreseeability.

15

Here, however, the Court does not need to decide whether foreseeable, but not imminent, litigation gives rise to a duty to preserve. This is because the suspicious timing of Plaintiff's email deletions is not enough to find intentional spoliation, even assuming litigation was foreseeable and imminent at the time of the deletions. Intent is required for an award of sanctions under Rule 37(e)(2) and, for the reasons set forth above, the Court does not find intent to spoliate.[10]

Next, the Court addresses Defendants' argument that intentional conduct or "bad faith" is not necessary for spoliation sanctions outside the context of Rule 37(e). Doc. 193 at 11. In a published decision, the Tenth Circuit has held that bad faith is a necessary finding to issue an adverse inference to remedy the spoliation. *Turner v. Pub. Serv. Co. of Colo.*, 563 F.3d 1136, 1149 (10th Cir. 2009); *see also In re: Gold King Mine Release in San Juan County, Co. on August 25, 2015*, No. 18-md-2824 WJ, 2021 WL 3472440, at *6 (D.N.M. Aug. 6, 2021) (requesting more information to determine whether a party acted in bad faith, and thus, whether an adverse inference instruction is appropriate). As a contrast to that case, Defendants cite another Tenth Circuit case upholding a district court decision striking a party's testimony concerning what the destroyed evidence would have shown. *103 Investors I, L.P. v. Square D Co.*, 470 F.3d 985, 988-89 (10th Cir. 2006). But this was not an adverse-inference remedy; instead, it was a finding that neither party could present evidence on the topic, with the result that

---

[10] Rule 37(e)(2) permits a Court, "only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation," to presume that the lost information was unfavorable to the party; to instruct the jury that it may or must presume the information was unfavorable to the party; or to dismiss the action.

the party with the burden of proof lost a directed verdict. *Id.* at 988. Thus, the Court denies Defendants' request for adverse inferences to be drawn in the absence of a finding of bad faith.[11]

### 4. Other Requested Sanctions

The Court also declines the request to preclude Plaintiff from presenting any evidence on the relevant topics at trial (that she did not receive a paper contract from Meow Wolf in May 2015; that she did not receive or read Vince Kadlubek's March 17, 2017 email and its attached written contract; and that she was a core member of Meow Wolf). As discussed above, the Court does not find it likely that the deleted emails contained a "trove" of information relevant to these topics, and thus does not find that Defendants have shown they were prejudiced by the mass-deletion. *103 Investors I*, 470 F.3d at 989 (opposing party must show it "was prejudiced by the destruction of the evidence").

In reply, Defendants also argue that Plaintiff's failure to search her possessions for hard copies of her files in Santa Fe until after the filing of the present motion is grounds for attorney's fees. Doc. 193 at 12-13. The Court denies this request because it was raised for the first time on reply. *See Gutierrez v. Cobos*, 841 F.3d 895, 902 (10th Cir. 2016). In addition, the Court finds Plaintiff's explanations for not conducting the search earlier are reasonable. Plaintiff was concerned about her medical treatment and Covid-19 restrictions related to travel. She stated she was willing to travel from California to New Mexico to perform the search as soon as she was vaccinated. Doc. 132-7. And, she has now performed that search. Amendments to the original complaint and counterclaims have necessitated the need for additional discovery. That Plaintiff's disclosure has occurred before the end of the discovery period mitigates any prejudice Plaintiff's

---

[11] The Court takes no view of whether the suspicious timing of the deletions might be a topic for cross-examination at trial such that the jury might draw its own adverse inference. Such questions are reserved for Judge Khalsa.

delayed disclosure has caused Defendants. Further, the description of discoverable documents found indicates that Plaintiff's delayed disclosure did not significantly prejudice Defendants. *See* Doc. 167 ¶ 18.

### 5. Recovering Deleted Emails

The Court does make the more basic finding that, even though emails in the lauren.oliver@gmail.com account are unlikely to contain a trove of emails, that account could contain some relevant emails. In other words, absent deletion of the emails, it would be reasonable under Rule 26(a) to require Plaintiff to use specific terms to search her email account. Defendants ask that the Court appoint a digital forensic expert to attempt to recover the missing emails. Doc. 132 at 21. The Court finds that while this request is appropriate, the cost of such an expert is likely not proportional to any potential benefit from recoverable emails. *See* Fed. R. Civ. P. 26(b)(1). Accordingly, if Defendants are willing to bear the cost of a forensic expert, the Court will permit Defendants to pursue such discovery. In that case, Plaintiff will be required to make her devices available for a digital forensic inspection.

## CONCLUSION

The Court orders as follows:

- In Defendants choose to procced with a digital forensic expert, within 7 days of the entry of this order, the parties shall confer and agree on a digital forensic expert. If they are unable to agree, they may each send an email to Judge Yarbrough's chambers (yarbroughproposedtext@nmd.uscourts.gov) and propose two experts, listing the expert's qualifications and rate;

- Plaintiff shall preserve her devices that might be used to retrieve the deleted emails and shall work with the digital forensic expert to access the devices so that the expert may seek to recover the deleted emails;

- Plaintiff shall execute a release for Google to provide access for the forensic expert to the lauren.oliver@gmail.com account;

- the forensic expert shall complete his/her work to recover the emails within 45 days of this Order;

- Defendants shall bear the expert's costs;

- Defendants may reopen Plaintiff's deposition, limited to 4 hours, related to any documents or information recovered by the digital forensic expert;

- each side shall bear their own costs for bringing and responding to the motion for sanctions.

**IT IS SO ORDERED.**

_____
**STEVEN C. YARBROUGH**
**United States Magistrate Judge**