## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

LAUREN ADELE OLIVER,

      Plaintiff,

v.                                                                 Case No. 1:20-CV-00237-KK-SCY

MEOW WOLF, INC., a Delaware
Corporation; VINCE KADLUBEK,
An individual and officer; and
DOES 1-50,

      Defendants.

## PLAINTIFF'S RESPONSE TO DEFENDANTS'
## MOTION FOR PARTIAL SUMMARY JUDGMENT

### I.      INTRODUCTION

In April 2015, Meow Wolf, Inc. (at times referred to as "MWI") did not exist.  At the
time, there were at least four (4) entities operating under the banner "Meow Wolf" with whom
Plaintiff Lauren Oliver ("Oliver" or "Plaintiff") could have entered a contract:  the Meow Wolf
Collective (with whom Oliver believed she was dealing), Meow Wolf, LLC (through whom
Defendant Kadlubek was contracting as "Meow Wolf" with business partners and the City of
Santa Fe), VCMSE Art City, LLC (which Oliver did not know existed), and potentially,
Defendant Vince Kadlubek ("Kadlubek") himself.  "Defendants" bring this motion jointly with a
general reference to "Meow Wolf" without identifying which entity obtained the alleged implied
license, much less how either of the "Defendants" came to hold that license.  Indeed, Defendants
have not produced, and likely cannot produce, any evidence from which Oliver or the Court can
infer that either of them holds the implied license they claim.  The instant motion rests entirely
on that assumption.  Of course, "summary judgment must not be premised on assumptions." *See*

1

*Xtomic, LLC v. Active Release Techniques, LLC*, 340 F. Supp.3d 1092, 1103 (D. Colo. 2018). Defendants' motion must therefore be denied.

In addition, the "Meow Terms" email upon which Defendants base their motion is not a contract, and even if it were, it was founded upon a fraud.  Any implied license created in Oliver's dealings with Defendants or their predecessor entities would have only covered the "particular" use Oliver intended – that is, display of her work in the Meow Wolf Collective's House of Eternal Return with the promise that she would receive an ongoing share of the revenue the venture generated.  Genuine issues of material fact abound with regard to the parties' intent, representations, reliance, and knowledge.

Finally, Defendants' statements of undisputed fact range from misleading to demonstrably false, their reliance on 17 U.S.C. §109(C) is misplaced, and the cases they cite in support of their motion are distinguishable.  As outlined herein, Defendants have failed to meet their burden on summary judgment and the motion should be denied.

## II.    FACTS

### A.  At the Time of the Alleged Contract, Multiple Entities Were Known to Be or Operating as "Meow Wolf."

"Meow Wolf" started as an artist collective in 2008 (the "Meow Wolf Collective"). While a non-profit bearing its name was created in on February 12, 2008 with Megan Burns, Vince Kadlubek, and Matt Smith as directors, the group did not make necessary filings and a Certificate of Revocation was filed on June 6, 2008.  *See* Search Information for "Meow Wolf" entities available at https://portal.sos.state.nm.us/.  From that point until September 16, 2011, when the entity Meow Wolf, LLC was created, the Meow Wolf Collective did not operate under the auspices of a formal business entity.  *Id.*; Rule 30(b)(6) Deposition of Meow Wolf, Inc., Nov. 22, 2021 ("MWI Dep.") at 103:12-15, 24-25, attached hereto as Exhibit 1.

The Meow Wolf Collective operated under the auspices of Meow Wolf, LLC at least

through November 13, 2015 when Defendant Kadlubek apparently signed a contract with the

City of Santa Fe on its behalf.  *See* City of Santa Fe Professional Services Agreement with Meow

Wolf LLC, Item 15-1141, attached hereto as Exhibit 2.  Meow Wolf LLC was not dissolved until

January 5, 2017.  Certificate of Dissolution of Meow Wolf LLC, attached hereto as Exhibit 3.

VCMSE Art City, LLC was formed on October 17, 2014.  *See* Search Information for

"VCMSE," available at https://portal.sos.state.nm.us/.  Meow Wolf, Inc. was formed as a

Delaware corporation and merged VCMSE Art City, LLC out of existence on December 29,

2016.  *See* Certificate of Merger, attached hereto as Exhibit 4.

Oliver has requested, and Defendants have refused to produce, documents indicating that

MWI either merged with or acquired the assets of Meow Wolf LLC.  This request is the subject

of a pending motions to compel.  *See* Motions to Compel (D.E. 243, D.E. 288).

Thus, at the time of the April 2, 2015 "Meow Terms" email upon which Defendants rely,

there were at least four (4) entities operating under the banner "Meow Wolf" with whom Oliver

could have entered a contract:  the Meow Wolf Collective (with whom Oliver believed she was

dealing), Meow Wolf, LLC (through whom Defendant Kadlubek was contracting as "Meow

Wolf" with business partners and the City of Santa Fe), VCMSE Art City, LLC (which Oliver

did not know existed), and potentially, Defendant Kadlubek himself.[1]  As outlined below, no

valid implied license was created due to the failure of Defendants' asserted contract, their fraud,

and their failure to provide Oliver any consideration for her work.  However, even if the

existence of an implied license is assumed, Meow Wolf, Inc. was not in existence at the time it

was created.  Defendants have not produced any evidence showing Oliver entered a contract with

---

[1] Plaintiff is assessing evidence from which it may be inferred Kadlubek was working for his own benefit in his use of Meow Wolf, LLC and as "Meow Wolf's" "CEO."

VCMSE Art City, LLC specifically or that MWI acquired the alleged license from some other entity that may have held it.

**B.  Defendants Secured Oliver's Installation of Her Work through Fraud**

Prior to House of Eternal Return, The Due Return was the Meow Wolf Collective's most financially successful and well-known project.  The Due Return was an art installation in the form of a life-sized "interdimentional ship" installed at Santa Fe's Center for Contemporary Arts in May 2011.  *See* Meow Wolf project page, The Due Return, available at https://meowwolf.com/projects/the-due-return, last visited Feb. 11, 2022.  It brought in some $100,000 in cash donations to the Meow Wolf Collective. MWI Dep., Exhibit 1, 108:12-18. More than 100 people worked on the Due Return, including "multiples of dozens" of artists. *Id*. 121:12-22.

After the closing of Due Return, the donated money ignited heated arguments about what to do with it and the direction of the Collective.  Attendance at meetings diminished.  *See* Vince Kadlubek, From Food Delivery, To Meow Wolf Denver, Medium, Sep. 8, 2021 (authenticated at deposition), attached hereto as Exhibit 5.  Ultimately, a decision was made to form Meow Wolf, LLC at a meeting attended by "maybe" 20 people. Deposition of Vince Kadlubek, Apr. 16, 2021 ("Kadlubek Dep."), 147:20-25-148:1-4, 149:10-14, attached hereto as Exhibit 6. Despite repeated discovery requests and a pending motions to compel, Defendants have refused to produce any documents related to Meow Wolf LLC, aside from an unsigned Operating Agreement and Operations Manual.  *See* Motions to Compel (D.E. 243, D.E. 288).

The Meow Wolf LLC Operating Agreement and Operations Manual outline ██████████ ██████████████████████████████████████████████████████████████████ ██████████████████████████.  *See* Operating Agreement and Meow Wolf Operating Manual, jointly attached hereto as Exhibit 7.  Regardless, and despite a new ████████ structure, the

4

group and the company continued to present "Meow Wolf" as a "grass roots artist collective" to artists, donors, volunteers, local government, and the community at large up through ███████ ████████████████ House of Eternal Return. *See* Deposition of Brian Solomon, January 28, 2022 (Draft), 63:11-25-64:1-15, attached hereto as Exhibit 8; Deposition of Caity Kennedy, Nov. 18, 2021 ("Kennedy Dep."), 51:3-8, attached hereto as Exhibit 9; City of Santa Fe Resolution No. 2015-104, attached hereto as Exhibit 10.  It is also important to note ████████████ ████████████████████████████████████████████████████ ████████████████████████. MWI Dep., Exhibit 1, 117:17-22.

At some point prior to August of 2014, a subset of the group's members decided to pursue a permanent exhibit for Meow Wolf in Santa Fe.  In August 2014 Defendant Kadlubek approached George R.R. Martin to support their effort to create a permanent installation in Santa Fe.  Meow Wolf, Saint George: How "Game of Thrones" Author George R.R. Martin Befriended Meow Wolf, MEOW WOLF WEBSITE, Nov. 14, 2016, available at https://meowwolf.com/articles/ game-of-thrones-george-martin-meow-wolf, last visited Feb. 11, 2022.  That overture ultimately led to the author and philanthropist purchasing the bowling alley that eventually would contain the House of Eternal Return.  *Id*.

As plans for what would become HoER became more concrete, Defendants purportedly sought and received approvals to dissolve Meow Wolf, LLC.  Kadlubek Dep., Exhibit 6, 167:2-19. No documents related to that process have been produced pending motions to compel. Later that year, Defendant Vince Kadlubek, Caity Kennedy, Matt King, Sean Di Ianni, and Emily Montoya formed, and used their initials to name, VCMSE Art City, LLC.  *See* Search Information for "VCMSE," available at https://portal.sos.state.nm.us/.

VCMSE Art City, LLC was purely and simply ████████████████████████ ████████████████████████ Defendants claim ████████████████████████.

MWI Dep., Exhibit 1, 157:1-13.  Unlike Meow Wolf LLC, VCMSE's governing documents contained ███████████████████████████████████████████████████████ ████████████████.  *See generally* VCMSE Art City, LLC Operating Agreement, attached hereto as Exhibit 11.[2] Indeed, the only mention of "Meow Wolf" in VCMSE's Operating Agreement is in the title as a "d.b.a."  *Id.*  Defendants have refused to produce any documents that might show a transfer of assets or interests from Meow Wolf, LLC to VCMSE Art City, LLC, which is the subject of a pending motion to compel.  *See* D.E. 243.

Aside from Defendant Kadlubek, it appears the other members of VCMSE Art City, LLC believed that the dissolution of Meow Wolf LLC was complete.  *See e.g.* Deposition of Matt King, Nov. 12, 2021 ("King Dep."), 49:21-23, 65:15-18, attached hereto as Exhibit 12. However, recently discovered evidence establishes that far from being dissolved, Meow Wolf LLC continued to operate throughout 2015 and enter contracts on behalf of "Meow Wolf." Astonishingly, one of those contracts was with the City of Santa Fe, to whom Meow Wolf, LLC was presented as a "grass-roots artist collective." *See* Exhibits 2 and 10 hereto. Contrary to Defendant Kadlubek's testimony on the issue, the November 2015 contract recently obtained by Plaintiff through an Inspection of Public Records Act request was signed by him on behalf of Meow Wolf, LLC.  *Id.*

In addition, Meow Wolf, LLC acting as "Meow Wolf" was heavily involved in a company called "MeowSkratch," ████████████████████████████████ ████████████████.  *See* Facebook exchange between Nicholson and Kadlubek, Apr. 8, 2015 (Kadlubek stating, "Meow Wolf llc and your llc as co-owners of a new business. Sharing in everything."), attached hereto as Exhibit 13;  MeowSkratch, Operating Agreement (████████

---

[2] In producing the operating agreement, Defendants indicated they could not find the original operating agreement and produced several amended versions including the attached dated January 26, 2015, which included Corvas Brinkerhoff and David Kantor as members.



showing the agreement to be between "Meow Wolf LLC" and Jared Nicholson and showing Meow Wolf, LLC as an owner), relevant portions attached hereto as Exhibit 14; Email from Kadlubek to Nicholson, Aug. 29, 2015 attaching MeowSkratchLLCOperatingAgreement.pdf ), attached hereto as Exhibit 15; Skratch Business Overview ( indicating "Meow Wolf has become the operating entity for Skratch), attached hereto as Exhibit 16.  Mr. Nicholson was

. Deposition of Jared Nicholson, Feb. 7, 2022, 139:14-140-11, attached hereto as Exhibit 17.  He was led to believe

. *Id.*  Tellingly,

. *Id.* at 138:5-139:13.

This evidence stands in stark contrast to Defendant Kadlubek's testimony about Meow Wolf, LLC while acting as Defendant Meow Wolf, Inc.'s representative during its Rule 30(b)(6) deposition.  There, Defendant Kadlubek stated that in 2015 Meow Wolf, LLC "was dormant and all activity was happening through VCMSE Art City." MWI Dep., Exhibit 1, 136:24-25, 137:2-4.

In 2014 and early 2015, Oliver did not know anything about the legal entities associated with Meow Wolf.  Declaration of Lauren Oliver in Support of Response, attached hereto as Exhibit 18 at ¶2.  To her, Meow Wolf was an art collective she had been part of in its early days, and which she had appreciated and supported since.  *Id.* at ¶2.  She knew personally several of its most active members, including Matt King, Caity Kennedy, Emily Montoya, and Benji Geary, and considered them friends.  *Id.* at ¶4. Sometime in the fall of 2014 King and Kennedy let

Oliver know that Meow Wolf was on a path to getting a large art space and would need artists to fill it. *Id*. at ¶5. During this time, Oliver was focused on developing her climate change platform "Ice Station Quellette" ("ISQ") and its central "Space Owl" figure for her first solo show that would be opening in late June 2015 at Phil Space gallery in Santa Fe. *Id*. at ¶6.

When Kennedy reached out to Oliver in early 2015, she was excited at the prospect of getting back involved with the collective.  When she received the "Meow Terms" email two months later, it seemed an unprofessional but well-meaning attempt at formality – consistent with her perception of the Meow Wolf Collective. *Id*. at ¶10.  It contained an obvious typo and ambiguous terms such as "stipend" (which term she did not hear from Defendants again until this litigation). *See* "Meow Terms" Email exchange between Oliver and Kadlubek, Apr. 2, 2015, attached hereto as Exhibit 19. Oliver did not take the email as anything more than a preliminary contact that would eventually lead to formal paperwork.  Indeed, it stated that Kadlubek would "send over the contract."  In response to Kadlubek's salutation of "Thanks! Excited to work with you!" Oliver responded "Hey. Awesome."  "Awesome" is not Oliver's signature, and she has never used it to accept a contract, including in this instance.  Oliver Dec. at ¶11.  There was no mention of VCMSE Art City, LLC or that "Meow Wolf" was anything other than the collective Oliver understood it to be. *See* Exhibit 19.

After several weeks of having not received the referenced contract, Oliver reached out to Defendant Kadlubek seeking it.  Oliver Dec. at ¶12.  She did not receive the contract in response or at any time prior to the opening of House of Eternal Return. *Id*.

At the time of her initial exchange with Kadlubek through Fall of 2015, Oliver was putting all of her time and energy into preparing her show at Phil Space and later at Santa Fe Institute ("SFI").  The Phil Space show was attended by representatives of Defendants.  Kennedy made an Instagram post of the Space Owl at the show with the notation, "Lauren Oliver's Space

Owl! Rumor has it he will appear again at House of Eternal Return." Meow Wolf Instagram Post, June 26, 2015, attached hereto as Exhibit 20.

By the time she turned her attention to it, HoER meetings were large. Oliver and the other artists were told they <u>were</u> the Meow Wolf collective. *See e.g.* Deposition of Blake Cahill, Feb. 4, 2022 ("Cahill Dep.), 66:15-22, 127:17-20, attached hereto as Exhibit 21; Oliver Response to Kadlubek's Interrogatory No. 15, attached hereto as Exhibit 22. She and the other artists were promised they would participate in the success of the venture through their membership in the Meow Wolf Collective, ███████████████ and a "revenue share" or and that would go up with the success of the venture. *See e.g.* Cahill Dep., Exhibit 21, 77:14-23; Exhibit 22. Based on Kadlubek's description of the share of revenue and that membership in the Meow Wolf Collective conveyed substantive rights and status, Lauren turned down a $50,000 writing job and went to work. See Exhibit 22. Based on the prominent location allocated to her installation, Oliver understood that she was being welcomed into the core of the collective, and had greater responsibility to deliver a standout installation – which she did. Oliver Dec., Exhibit 18 at ¶13.

During the install, Defendants pushed the artists to put everything they had into their work. They repeated the promise of a revenue share and the group's identity as a collective to obtain an extraordinary investment of labor, money and art from the army of artists and volunteers who put in long hours for little or no pay to make House of Eternal Return a reality. *See e.g.* Exhibit 22. While no particular percentages or shares were mentioned, it was clear – everyone, including Oliver, would realize success, including financial success that would increase with the success of the venture. *Id*. Cahill. Oliver understood Defendants' representations to be a promise of fair back-end financial benefit commensurate with her investment, and the success of the venture. Others felt the same, and documents obtained during discovery, as well as statements by representatives of Defendants in the press, show her belief

was reasonable. *See e.g.* VCMSE Art City, LLC D.B.A. Meow Wolf Business Line of Credit

Application ████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████), attached hereto as Exhibit 23.

Pitched as a 'community arts complex' with affordable art studios and a makers' space,

Santa Fe stepped up with enthusiastic support for House of Eternal Return. As the 'Meow Wolf

Artist Collective,' Defendants were able to get everything they needed to launch House of

Eternal Return for pennies on the dollar for their for-profit — including the works of 100-plus

artists and hundreds of volunteer construction workers needed for the grueling build.[3]

Defendants' "collective" brand story resonated with the community, as intended, especially their

claims of a revolutionary business model: a joint venture, by artists, for artists, who would share

in the success of their creations.

We now know it was a fraud. Defendants had no intention of sharing the success House

of Eternal Return would quicky realize, despite it having been built by hundreds of artists and

others who were working for a fraction of minimum wage, or being paid nothing at all. The

artists made that investment of their art, and the extraordinary time and effort it took to install it,

because they were led to believe they were building equity in something that was <u>theirs</u>: the

Meow Wolf Collective. It defies logic that Defendants would have been able to marshal such an

extraordinary investment from the artists and community if they had been transparent about

VCMSE Art City, LLC holding all the equity and power, their plan to renege on the promised

---

[3] The extraordinary value Defendants realized from the labor of hundreds of volunteers is especially eyebrow-raising given that they are highlighting in this litigation their status as a for-profit company during the build. *See generally e.g. Rhea Lana, Inc. v. United States Dep't of Labor*, 271 F.Supp.3d 284 (D.D.C. 2017) (noting the Department's interpretation of FLSA as "prohibiting private, for-profit companies from using unpaid volunteers," and granting summary judgment to the Department with regard to its determination that "consignor/volunteers" who performed labor at a consignment business for no pay while their items were on consignment were "employees" subject to FLSA.).

revenue share, and that after installation they would tell the artists who had put their heart and

soul into HoER that they were not entitled to a penny of the tens-of-millions of dollars their work

would ultimately generate.

## C.  THE FACTS PRESENTED BY DEFENDANTS ARE DISPUTED

Defendants' purportedly undisputed facts are far from.  Oliver will address them in order,

and with the support of the above facts except as independently cited.

> 1.  *Meow Wolf asked Ms. Oliver to submit an art proposal for installation in Meow Wolf's House of Eternal Return, which she did.*

This statement lacks context and is misleading as written.  When Caity Kennedy asked

Oliver to submit an art proposal in February 2015, she failed to disclose she was soliciting

Lauren's art on behalf of VCMSE Art City LLC, not the Meow Wolf Collective as Plaintiff and

many others understood 'Meow Wolf' to be.  Had Plaintiff known this she would have declined

to participate.

> 2.  *Meow Wolf accepted Ms. Oliver's art proposal, and the parties entered into a contract for her to install ISQ in HoER.*

The "parties" did not enter a contract as outlined by Defendants.  The cited testimony

relates to an oral contract Oliver believed at the time she had entered with the Meow Wolf

Collective, not the "Meow Terms" email, paper contract, or ABP "agreements" Defendants

assert somehow formed a contract between Oliver and VCMSE Art City, LLC.  Oliver did not

even know VCMSE Art City, LLC existed prior to her installation of ISQ at HoER.

Additionally, and most critically, evidence recently obtained by Oliver shows that if any

business entity was contracting with her in April 2015 when she received the "Meow Terms"

email, it would have been Meow Wolf, LLC.  Defendant Kadlubek was using Meow Wolf, LLC

in situations where the use of VCMSE Art City, LLC might lead to difficult questions regarding

Meow Wolf's status as a "collective."  He shepherded a resolution through the Santa Fe City

Council and signed a contract with the City under Meow Wolf, LLC.  See Exhibits 2 and 10.

Meanwhile he was using Meow Wolf, LLC in business dealings with Jared Nicholson while

representing that VCMSE Art City, LLC "just covers the invoices every once in a while."

Defendant Meow Wolf, Inc. was formed as a Delaware corporation in December 2016 –

more than 8 months after HoER opened.  It merged VCMSE Art City, LLC out of existence

shortly thereafter.  Oliver has requested agreements between Meow Wolf, LLC and VCMSE Art

City, LLC or Meow Wolf, Inc. precisely to determine if Meow Wolf, Inc. merged with, or

obtained the assets of, Meow Wolf, LLC, which documents Defendants have refused to produce.

That request is subject to a motion to pending motion to compel.  To the extent Oliver had a

contract with any "Meow Wolf" entity that existed in 2015, she completed her performance upon

her installation of ISQ and HoER's opening on March 17, 2016.  In addition, assuming *arguendo*

an implied license was created when Oliver installed her work, it was not on behalf of Meow

Wolf, Inc.  That corporation did not exist at the time, and Defendants cannot show the specific

legal entity from which it obtained the purported implied license.

### 3. *Ms. Oliver installed ISQ in HoER.*

Oliver brought an iteration of her flagship climate change education platform Ice Station

Quellette to HoER. ISQ incorporates science, history, story, text, and characters in a multi-media

setting, and draws on Oliver's experience as an artist, journalist, and creative working for high

profile magazines and companies.  Oliver's Ice Station Quellette project had already been

exhibited twice in 2015 at Phil Space and SFI.

### 4. *Ms. Oliver installed ISQ understanding and intending Meow Wolf to display ISQ in HoER alongside the works of other artists—like Meow Wolf's previous projects.*

Oliver intended her work to be displayed by the Meow Wolf Collective, not VCMSE Art

City, LLC or Meow Wolf, Inc.  Her intent was formed in reliance on Defendants'

misrepresentations about HoER belonging to the Meow Wolf Collective and a share of revenue

for the artists.  Given the number of entities falling under the "Meow Wolf" name in 2015, this

statement of fact is unsupportable.

Additionally, HoER is fundamentally different from 'Meow Wolf's' previous projects.

The Meow Wolf Collective's final project prior to the formation of Meow Wolf, LLC was The

Due Return in 2011 – that project was truly and completely the collective's.  By contrast,

Defendants (incorrectly) claim HoER was created for, and the exclusive property of, a for-profit

startup. Defendants somehow believed they could get away with grafting The Due Return's

donation-and-volunteer army model onto HoER, with no accountability. Again, had Plaintiff

been aware of this, she would have declined to participate.

> 5. *Defendants never received a communication from Ms. Oliver expressing any limitations on Meow Wolf's display of ISQ in HoER at the time she installed it. Ms. Oliver expressed no desire to negotiate any aspect of the parties' agreement, and she never emailed Defendants indicating confusion about the terms offered to her.*

This statement of fact is patently false.  "Meow Terms" is not an "agreement."  Plaintiff

repeatedly expressed limitations on the display of her work during installation, and after — to no

avail. After a Todos 7 sign was placed outside the door to her space during installation, Plaintiff

immediately issued an email expressing precise boundaries. Defendant Kadlubek agreed to

Plaintiff's limitations and assured her of his "respect" for her IP.  Had Plaintiff been aware of

Kadlubek's dishonesty on this critical issue, she would have withdrawn ISQ from the project

immediately.

Plaintiff was understandably confused by the language in "Meow Terms." However,

Defendant Kadlubek indicated a contract was coming.  Oliver sought it but did not receive it.

Such unprofessional communication was to be expected from a "grass-roots artist collective," so

Oliver turned her attention back to preparing her ISQ show at Phil Space.  Months later, during

the frenzy of installation, she was left to rely on the misrepresentations of Defendants that she

was part of the Meow Wolf Collective and would receive a share of HoER's revenue

proportional to its success.

>    6.   *Ms. Oliver understood that Meow Wolf wanted her to build her exhibit to last at*
>         *least 10 years.*

What Defendants fail to point out is that this direction made their misrepresentations

about a revenue share all the more believable. Additionally, Defendants gave no indication to

Plaintiff that they might unilaterally decide to remove, and thereby destroy the work.  It also

gave her comfort that her relationship with "Meow Wolf" was "permanent," which made the

Defendants unilateral severance of the relationship three years after opening that much more of a

shock. Had Plaintiff been aware of any of these possibilities, she would have declined to

participate.

>    7.   *At the time Ms. Oliver installed ISQ and the Space Owl in HoER, she was not*
>         *engaged in any ongoing or permanent relationship with Meow Wolf.*

Virtually everything Defendants told Plaintiff and other artists before installation

conveyed an ongoing and permanent relationship.  They all <u>were</u> Meow Wolf, and HoER was

going to be ███████████████████████.  Their work was to be built for permanence.  In

the months leading up to opening, Defendants promised Plaintiff and other artists a share of

revenue as an incentive to install their artwork in HoER — by definition, an ongoing and

potentially permanent relationship with 'Meow Wolf.' It was a shared investment: if HoER were

a success, then Oliver's investment of labor and art would continue to grow with that success and

pay off for years to come, and would grow as *Meow Wolf* (which they were all part of) grew.

This recruiting promise is typical in the entertainment business and tech industry with use of

back-end payments and payments in stock to attract talent ventures cannot afford during startup.

Defendants also represented to Oliver and many other artists that membership in the "Meow

Wolf Collective" conveyed substantive status, and shared accountability, which, although fraudulent as to their own accountability, constituted an ongoing and permanent relationship with 'Meow Wolf' at the time of installation. Had Defendants had been truthful about the fact that they might sever the relationship at "their absolute discretion," Oliver would have certainly declined to participate.

8. *Meow Wolf paid Ms. Oliver $2,000 toward the $7,000 adjusted revenue sharing amount.*

Defendants statement No. 8 is absurd for multiple reasons.  First, the "Meow Terms" email puts the "revenue share stipend" at $10,000 without any indication that it would be reduced. Indeed, "stipend" connotes a payment to tide over the artist until he or she starts receiving greater income.  If "Meow Terms" were a contract (which it is not), this was a clear breach.

Second, Defendants fail to point out that the $2,000 was combined in a single check with a gift-shop payment and thus totaled $2,502.60.  Defendants also leave out that the check was issued on April 11, 2019 – more than 3 years after opening, and less than 2 months before they attempted to terminate the relationship.  There was no information accompanying the check that indicated it was payment on a purported contract, and the "Meow Terms" email of course makes no reference to $2,000.

Finally, and most importantly, the $2,000 Defendants make so much of was purportedly a payment on the 2017 Artist Bonus Program set up by Defendants.  To participate in that program, artists were asked to sign an "agreement" that provided they understood the payment to be a "bonus" and acknowledge they were "not entitled to any such payment."  *See* 2017 Artist Bonus Program Agreement, attached hereto as Exhibit 24.  *Oliver did not see that agreement until her deposition in this case in 2021.*  More importantly to the instant motion, the Artist

Bonus Program Description incorporated into the "agreement" states in no uncertain terms, "All **[Program Payments] are considered a bonus payment** for compensation definitions made electively by Meow Wolf to Artists.  They **are not considered part of Artists compensation package through employment or other contract with Meow Wolf.**"  Meow Wolf Artist Bonus Program Description, Feb. 16, 2017, attached hereto as Exhibit 25.

To date, Oliver has not received any compensation for her installation of ISQ at HoER.

> 9.  *Meow Wolf also bought Ms. Oliver's materials and tendered to Ms. Oliver the $1,000 personal stipend for installation, which she directed to Cary Cluett.*

Pleading poverty during installation, Defendants cut the materials budget in half, leaving HoER artists to "*get creative*."  Artists scavenged materials and purchased the rest needed to complete their installation — as did Oliver. Oliver bore the bulk of the cost of bringing her art to HoER.

Defendants did not tender to Oliver the "$1000 personal stipend." Oliver did not hear or see the word "stipend" from Defendants after the "Meow Terms" email.  Nine months after that email, Oliver was presented with her project's "Labor Budget." Defendants gave her no reason to infer she was entitled to keep what she did not spend in her "Labor Budget," any more than she believed she could keep whatever she saved in her "Materials Budget."

> 10. *Ms. Oliver agrees that the terms expressed by Meow Wolf included their owning the tangible objects she would install at HoER.*

This statement is in no way supported by the deposition testimony presented.  Reading a portion of a 2015 email Oliver disputes to be a contract, the presenting her opinion in 2021 about the meaning of the words contained in the document is in no way an acknowledgement that a purported contract included Defendants' ownership of "the tangible objects she would in stall at HoER."

> *11. Meow Wolf also reimbursed Ms. Oliver for the cost of materials needed to install ISQ.*

The cited evidence does not support the statement.  Offering to send someone to Home Depot "with a card" is not evidence of reimbursement.  Additionally, as mentioned above, Plaintiff shouldered the bulk of the cost of bringing her art to HoER and was not reimbursed for the cost of all materials needed to install her work.

> *12. Ms. Oliver delivered ISQ to Meow Wolf in time for HoER's opening, as contemplated by the parties' agreement.*

Oliver installed ISQ to HoER based on her perceived obligations to the Meow Wolf Collective and in reliance on Defendants' misrepresentations.  To the extent that installation was pursuant to an agreement it was the agreement Oliver alleges in this action, not the fatally flawed "Meow Terms" theory Defendants advance with their motion.

> *13. Ms. Oliver was one of 112 artists in the artist bonus program.*

According to its own terms, to be in the Artist Bonus Program, "Meow Wolf and Artist must enter into an Artist Bonus Payment Agreement."  This Oliver did not do.  Her discussion in deposition about the misrepresentations Defendants made about membership in the Meow Wolf Collective and a share in the revenue generated by HoER is not evidence to the contrary.

Genuine disputes of material fact abound in this case.

## III.   ARGUMENT

### A.   Standard of Review on Summary Judgment

"Summary judgment should only be granted where, taking the facts in the light most favorable to the non-moving party, there is no genuine issue of material fact, and the moving party is entitled to a judgment as a matter of law." *Pignanelli v. Pueblo Sch. Dist. No. 60*, 540 F.3d 1213, 1216 (10th Cir. 2008); *See* F.R.C.P. § 56(c).

17

Whether there is a genuine dispute as to a material fact depends upon whether the evidence presents a sufficient disagreement to require submission to a jury or is so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Stone v. Autoliv ASP, Inc.*, 210 F.3d 1132, 1136 (10th Cir. 2000); *Carey v. United States Postal Serv.*, 812 F.2d 621, 623 (10th Cir. 1987). Once the moving party meets its initial burden of demonstrating an absence of a genuine dispute of material fact, the burden then shifts to the nonmoving party to demonstrate the existence of a genuine dispute of material fact to be resolved at trial. *See 1-800 Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1242 (10th Cir. 2013).

"Pleadings and documentary evidence must be liberally construed in favor of the party opposing the motion." *Ackee Music, Inc. v. Williams*, 650 F. Supp. 653, 654-655 (D. Kansas 1986), citing *Thomas v. United States Department of Energy*, 719 F.2d 342, 344 (10th Cir. 1983).

Here, it is clear that genuine issues of material fact exist, and when viewed in a light most favorable to Plaintiff, Defendant's Motion for Summary Judgment should be denied.

**B.  Defendants Have Not, and Cannot Show "They" Hold an Implied License**

In analyzing whether an implied copyright license has been established, courts in this Circuit have followed the 9th Circuit's *Effects* test, which contains three (3) prongs: "(1) a person (the licensee) requests the creation of a work, (2) the creator (the licensor) makes the particular work and delivers it to the licensee who requested it, and (3) the licensor intends that the licensee-requestor copy and distribute his work." *Xtomic, LLC v. Active Release Techniques, LLC*, 340 F. Supp.3d 1092, 1100 (D. Colo. 2018), *citing Effects Assoc. v. Cohen,* 908 F.2d 555, 558 (9th Cir. 1990).

Courts place particular emphasis on the third factor: intent. "The relevant intent is the licensor's objective intent at the time of the creation and delivery of the [product] as manifested by the parties' **conduct**." *Asset Mktg. Sys., Inc. v. Gagnon*, 542 F.3d 748, 756 (9th Cir. 2008) (emphasis included), *citing Xtomic*, 340 F. Supp. 3d at 1100.  As noted by Defendants, A non-exclusive implied license exists when the circumstances "demonstrate that the parties intended that the work be used for a *specific* purpose," or "in a *particular* way."  Motion (D.E. 278) at p. 11, *citing* William F. Patry, 2 Patry on Copyright § 5:131 (2021), *Wilson v. Brennan,* 637 F.Supp.2d 959, 976-77 (D.N.M. 2009) (emphasis added). Importantly, "because the existence of an implied license is an affirmative defense to infringement, the alleged infringers have the burden of establishing an implied license." *Asset Mktg. Sys. Inc.*, 542 F.3d at 756.

### 1.      Plaintiff Did Not Grant a Non-Exclusive Implied License to Defendants

At the outset, it should be highlighted that Defendants refer to the generic term "Meow Wolf" throughout their Motion. Importantly, ***Defendant Meow Wolf, Inc., did not exist at the time Plaintiff allegedly granted an implied license***. While the "Meow Terms" email exchange occurred in April 2015 and plaintiff installed ISQ in HoER in January – March 2016, MWI was not formed until December 29, 2016. Aside from Defendant Kadlubek, the entities that existed at the relevant time were the Meow Wolf Collective, Meow Wolf LLC and VCMSE Art City, LLC. Based on these facts and those set forth herein, defendants have failed to meet the high burden of establishing that Plaintiff granted an implied license to any of them, much less which one.

### i.      Analysis of the *Xmotic* Case Confirms that Summary Judgment Should be Denied

*Xtomic* is analogous. The plaintiff in *Xtomic,* a software company, claimed copyright infringement against defendants, three different entities that provided healthcare services directly to patients. *See Xtomic,* 340 F. Supp. 3d at 1098.  Plaintiff provided software and other services

to Defendants for a number of years. *Id*. The copyright infringement dispute centered on certain software developed by plaintiff: the Admin and EPN Programs, and the EHR Service Application and PMS Program. In response to plaintiff's copyright infringement allegations, defendants filed summary judgment based on an implied non-exclusive license to use the programs. *Id*.

Plaintiff invoiced one defendant (Active Release Techniques, LLC) for the Admin Program and one defendant (ART Corporate Solutions, Inc.) for the EPN program. Plaintiff was paid between $1.7 – 2 million for this work. *Id*.

In their motion for summary judgment, defendants referred to themselves collectively without making a distinction between the entities. The Court refused to grant summary judgment because defendants did not differentiate between the defendant entities. *Id*. at 1103. The court refused to assume that each corporate entity requested each program, received delivery of that program, and that plaintiff's conduct was directed at, and the same, with respect to each of the three separate legal entities. *Id*.

The Court reasoned that, though defendants presented evidence regarding which programs were provided to defendants and that defendants paid $2 million to plaintiff, defendants did not allege – and the court could not decipher – which of the three entity defendants plaintiff allegedly granted the implied license. *Id*. The Court concluded that "defendants are separate legal entities, despite defendants' argument that they are commonly owned by the same individual." *Id*. As stated by the court, "Apart from identifying the specific legal entity that requested the Admin Program and EPN Program, all that has been presented is general evidence that the programs were 'provided to Defendants.'" *Id*. at?

Here, Defendants Vince Kadlubek and Meow Wolf, Inc. not only conflate themselves as "Meow Wolf," they fail even to identify the "legal entity that requested" Oliver's work. *See id*. This fact is fatal to defendants' motion.

First, defendant Meow Wolf, Inc. was formed on December 29, 2016 – well after any alleged implied license would have been granted. Accordingly, it is impossible for defendant Meow Wolf, Inc. to have obtained an implied copyright license from plaintiff directly.

Second, Defendants cannot even supply as much evidence about which entity received the alleged implied license as the unsuccessful defendants in *Xtomic*. Was it the Meow Wolf Collective, as Oliver believed?  Was it Meow Wolf LLC, which Kadlubek was operating to contract with business partners and the City of Santa Fe? Was it VCMSE Art City, LLC, which Oliver did not even know existed at the time? Was it Vince Kadlubek himself?  By this failure to show which entity was contracting with Oliver in April of 2015, defendants have "failed to present competent evidence to establish a complete defense to the claims of copyright infringement." *Xtomic,* 340 F. Supp. 3d at 1103.

Third, to the extent that that any entity other than VCMSE Art City, LLC received Oliver's implied license, Defendants cannot show how the license was transferred from that entity to Meow Wolf, Inc. As set forth above, Meow Wolf, LLC was in existence and entering contracts with the City of Santa Fe in 2015.   Though Oliver has requested such evidence via the discovery process in this matter, Defendants have refused to produce any documents that might show a transfer of assets or interests from Meow Wolf, LLC to VCMSE Art City, LLC, much less that the alleged implied license was transferred from whoever had it to Meow Wolf, Inc.

Fourth, Defendants cannot argue Kadlubek's interest in all entities involved somehow results in those entities receiving the benefits of the alleged implied license (which they do not), as the court in *Xtomic* rejected that argument.  "[D]efendants are separate legal entities, despite

21

defendants' argument that they are commonly owned by the same individual." *Xtomic,* 340 F. Supp. 3d at 1103.

Lastly, even if Defendants were able to specify which entity received and then transferred the alleged implied license to Meow Wolf, Inc. (which they cannot), such a transfer in ownership of an implied license, or a sublicense to a completely separate entity, changes the scope of the grant of that non-exclusive implied license and thus precludes a finding of summary judgment. *See Crispin v. Christian Audigier, Inc.*, 839 F. Supp. 2d 1086, 1096 (C.D. Cal. 2011) (Allowing an entity other than original licensee "would allow [the transferee entity] to use the intellectual property for a purpose wholly different from, and independent of, the purpose for which the licensee was granted its license. Were a licensee vested with such authority by implication, that would usurp the property holder's retained right to control its intellectual property."). The *Crispin* court held that this issue was a triable issue of fact. Indeed, the same can be said here: holding that defendants possess an implied license would usurp plaintiff's retained right to control her intellectual property.

At their core, Defendants' arguments assume that one of several entities is the "Meow Wolf" that allegedly contracted Oliver *and* that that entity legally transferred the license to either Kadlubek or MWI.  As expressed by the Court in *Xtomic*, "summary judgment must not be premised on assumptions." *See Xtomic,* 340 F. Supp.3d at 1103 (D. Colo. 2018).

### ii.    Analysis of the *Effects* Tests Results in the Lack of an Implied License

The *Effects* test contains three (3) prongs to establish an implied license: "(1) a person (the licensee) requests the creation of a work, (2) the creator (the licensor) makes the particular work and delivers it to the licensee who requested it, and (3) the licensor intends that the licensee-requestor copy and distribute his work." *Xtomic,* 340 F. Supp. 3d at 1100, citing *Effects,* 908 F.2d at 558.

### a.      Defendants Did Not Request that Plaintiff Install the ISQ

Defendants allege that "Oliver admits Meow Wolf asked her to submit an art proposal for

HoER, and she did so." Motion at 12. In fact, defendants' support of that allegation shows that

claim to be false. Plaintiff only admitted that Caity Kennedy approached her to submit a proposal

for a "new Meow Wolf venture, which would eventually become HoER." *Id*. Defendants'

reference here is to a February 2015 email – long before Meow Wolf, Inc. existed. Further,

plaintiff understood this proposal to mean that she would be involved in the Meow Wolf

Collective. There was no mention of any other entity in the email.

These are material facts in dispute as to the first prong of the *Effects* test.

### b.      Plaintiff Did Not Physically Deliver the ISQ to Defendants

Second, Oliver did not voluntarily deliver ISQ to Defendants. As set forth above,

Defendants acquired it by fraud, and did not pay plaintiff any consideration.

Thus, under these circumstances, Oliver did not voluntarily deliver ISQ to defendants

with the intent that defendants use the Space Owl in the manner in which they did. Instead, she

was deceived into installing the Space Owl, and her installation of the Space Owl does not

constitute evidence that she intended to grant defendants a non-exclusive, implied license.

### c.      Plaintiff Did Not Intend to Grant an Implied License to Defendants

Plaintiff did not intend to grant an implied license to defendants. Specifically, plaintiff

intended to grant an implied license to the Meow Wolf Collective, not VCMSE Art City, LLC or

Meow Wolf, Inc. (which of course was non-existent at the time). Plaintiff was operating in

reliance on Defendants' misrepresentations that she was installing her work as a member of the

Meow Wolf Collective ███████████████. Again, Oliver was not informed of the

existence, much less the nature of VCMSE Art City, LLC prior to HoER's opening and Meow

Wolf, Inc. was not in existence at the time.  If Oliver had known her implied license would have ended up under the control of such an entity, she would not have participated in the venture from the outset.  As outlined above, her installation of ISQ at HoER was procured by fraud, and any implied license she granted is invalid.

When the facts are viewed in a light most favorable to plaintiff, the Court cannot reasonably conclude that plaintiff intended to grant a license to defendants implied or otherwise.

### 2.     Additional Factors Preclude a Finding that Plaintiff Granted an Implied License to Defendants

First, assuming *arguendo* Defendants held an implied license to display Oliver's work, Oliver expressly revoked it on March 5, 2021. *See* Letter from Jesse Boyd to Ben Allison, March 5, 2021, attached hereto as Exhibit 26.  In addition, and as set forth above, Oliver received no compensation from Defendants.

Next, defendants' reliance on 17 U.S.C. §109(c) is misplaced. Section 109 of the Copyright Act deals exclusively with copies and phonorecords. It is known as the First Sale Doctrine, which gives buyers of sound recordings (CDs, albums, tapes), books, and computer programs the rights to enjoy them and sell them when they are done enjoying them. *See* 17 U.S.C. §109(c).  *See also, New Atlas Dot Com, Inc. v. Pizza Inn I-40 W., Inc.*, CIV-11-149-D, 2012 WL 12863152, at \*4 (W.D. Okla. Nov. 9, 2012).

The critical issue is that Section 109 concerns "copies," not originals. Even if Section 109 applied to visual artworks (it does not), it would only allow the purchaser to transfer the work. That is not the case here, and Section 109 is inapplicable.

### 3.     Defendants' Cases are Distinguishable

The facts and circumstances in the cases cited by defendants are distinguishable.  For instance, in *Effects Assocs. v. Cohen*, the court ultimately found that an implied, non-exclusive

24

license existed for a movie producer where there was an oral contract that did not address copyright issues. *See Effects Assocs. v. Cohen,* 908 F.2d 555, 559 (9th Cir. 1990). There was no need to imply a contractual meeting of the minds because there was already an express agreement. *Id*.  That is not the case here.

Additionally, the court's analysis in *Effects* was based on its prior decision in *Oddo*. *Id*; *Oddo v. Ries*, 743 F.2d 630 (9th Cir. 1984). In both cases, in determining that an implied license existed, the Court found pertinent the fact that the copyright owner's contribution to the final work (or partnership venture, in *Oddo*) would have been of little or no value without the implied license. *See Effects*, supra, at 558 and *Oddo*, supra, at 634.  This stands in stark contrast to the instant case in that the value of ISQ to Oliver has proved of no value to her (indeed it has cost her dearly) precisely *because* she installed it at HoER and Defendants have used it egregiously without Oliver receiving a penny in compensation.

In *Shaver*, the court considered a transaction governed by a fairly elaborate written contract that failed to address the issue of copyright licenses and, on the basis of this elaborate contract and letters written by the would-be licensor, determined that an implied license existed. *I.A.E. v. Shaver*, 74 F.3d 768, 775 (7th Cir. 1996). In the present case, defendants rely on an "Awesome" response by Plaintiff in an email.

In *Graham,* defendant relied on an express grant of a license. *See Graham v. James,* 144 F.3d 229, 236 (2d Cir. 1998). Here, plaintiff certainly did not expressly grant a license to defendants.

In each of the foregoing cases, either the existence of the implied license was not in dispute or the court relied on the district court's finding of facts in making its determination that a non-exclusive, implied license existed. Where, as here, there are genuine issues of material fact

in dispute and whether a non-exclusive, implied license exists depends upon the court's

determination regarding such issues, granting a motion for summary judgment is inappropriate.

## IV.    CONCLUSION

As outlined above, Defendants have failed to meet their burden on summary judgment,

and their motion should be denied.

Respectfully submitted,

ERICKSEN ARBUTHNOT

By:/s/ Jesse A. Boyd
      JESSE A. BOYD
      2300 Clayton Road, Suite 350
      Concord, CA 94520
      (510) 832-7770
      (510) 832-0102 facsimile
      jboyd@ericksenarbuthnot.com

**Certificate of Service**

I hereby certify that on January 25, 2022 a true and correct copy of the foregoing document and all referenced exhibits was served via CM/ECF on all interested parties.  I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to the following non-CM/ECF participants: N/A.

*/s/ Jesse A. Boyd*
Jesse A. Boyd