IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

LAUREN ADELE OLIVER,

    Plaintiff,

v.                                                       Civ. No. 20-237 KK/SCY

MEOW WOLF, INC. *et al.,*

    Defendants.

**MEMORANDUM OPINION AND ORDER**

THIS MATTER is before the Court on: (1) Defendant Meow Wolf, Inc.'s Motion to Recognize its Amended Answer and Counterclaim for Declaratory Judgment as an Amendment as of Right, or in the Alternative for Leave to Amend Answer to Assert Counterclaim for Declaratory Judgment (Doc. 182) ("Motion to Amend"), filed July 6, 2021; and, (2) Plaintiff's Motion to Dismiss Defendant's Counterclaim for Lack of Standing and for Failure to State a Claim (Doc. 203) ("Motion to Dismiss"), filed August 10, 2021. Having reviewed the parties' submissions, the record, and the relevant law, and being otherwise sufficiently advised, the Court FINDS that: (1) Defendant's Motion to Amend is well taken and should be GRANTED; and, (2) Plaintiff's Motion to Dismiss is not well taken and should be DENIED.

**I. Factual Background and Procedural History**

In her original complaint, Plaintiff Lauren Adele Oliver alleged the following. From 2006 through at least 2015, Plaintiff created, developed, and exhibited various versions of "the Space Owl," an original "owl-like alien … with horns and a face visor," placing this character at the center of a project entitled "Ice Station Quellette" ("ISQ"). (Doc. 1 at 3-4.) Plaintiff holds registered copyrights for the Space Owl and ISQ. (*Id.* at 11.)

Defendant Meow Wolf, Inc. ("MWI") is a Delaware corporation with a principal place of business in New Mexico.[1] (*Id.* at 2.) Defendant Vince Kadlubek was at relevant times a director and/or officer of Defendant MWI. (*Id.*) Before Defendant MWI's incorporation, "Meow Wolf" was an "artists' collective" that acted through Defendant Kadlubek and other representatives. (*See id.* at 3-6.)

In early 2015, Meow Wolf representatives asked Plaintiff to install ISQ at a permanent exhibition in Santa Fe, New Mexico, called the "House of Eternal Return" ("HoER"). (*Id.* at 4.) "In exchange for [Plaintiff's] timely installation of ISQ at [the] HoER without initial compensation," these representatives, including Defendant Kadlubek, "offered [Plaintiff] membership in the Meow Wolf artists' collective and a right to receive a share of Meow Wolf's revenue." (*Id.* at 5, 17.) Plaintiff accepted this offer and spent months and "considerable personal resources" designing and installing versions of ISQ and the Space Owl at the HoER. (*Id.* at 6.)

The HoER opened in March 2016. (*Id.* at 12.) It was "a monumental success," and as a result Defendant MWI grew into "an artistic enterprise ... valued at hundreds of millions of dollars," with "huge profit margins" and "hundreds of employees." (*Id.* at 6, 11.) The Space Owl became a "fan favorite" and an "iconic element" of the HoER, appearing in numerous social media posts and press articles. (*Id.* at 12.)

In 2017 or 2018, Defendants began to call artists' compensation a "[b]onus [p]rogram" rather than a revenue share. (*Id.* at 6.) Also, in 2018, Plaintiff discovered that Defendants were "making money from the ISQ without compensating or crediting [her]," *e.g.*, by including images of her work in books sold in the HoER gift shop. (*Id.* at 7, 12-13.) Around April 2018, Plaintiff

---

[1] The Court has previously taken judicial notice of a government webpage indicating that Defendant MWI was incorporated in November 2016. (Doc. 59 at 2 & n.2.)

"decided the parties needed to formalize their agreement and relationship." (*Id.* at 7.) When negotiations failed to produce a formal agreement by June 2018, Plaintiff asked Defendant MWI to "stop using the Space Owl until their relationship had been formalized." (*Id.*) Nevertheless, in December 2018, Plaintiff learned that Defendant MWI had used the Space Owl in a documentary. (*Id.* at 8.)

At a meeting in June 2019, Defendant Kadlubek offered Plaintiff a "cruel ultimatum," *i.e.*, either "sell [Defendant MWI] all rights to the Space Owl for a nominal sum and end the relationship or remove ISQ from [the] HoER without additional compensation and end the relationship." (*Id.* at 8-9, 14.) After this meeting, Plaintiff continued to try to "negotiate a fair resolution" to the parties' disputes. (*Id.* at 9.) Meanwhile, Defendant MWI "repeatedly threatened [Plaintiff] with the removal of ISQ without her permission." (*Id.* at 10.) "Because of the way it is constructed, removal of the installation would require its destruction." (*Id.*)

A "significant portion" of Defendant MWI's success and value is due to ISQ and the Space Owl. (*Id.* at 15.) However, to date, Plaintiff has received only $2,000 from Defendants for her work at the HoER, which does "not even cover the personal funds she … expended for the installation." (*Id.* at 8, 15.)

Plaintiff filed her original complaint against Defendants MWI and Kadlubek and fifty Doe Defendants on March 16, 2020. (*Id.* at 1-2.) In this complaint, Plaintiff asserted claims for copyright infringement, violation of the Visual Artists Rights Act ("VARA"), breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, conversion, intentional misrepresentation, negligent misrepresentation, and constructive trust. (*Id.* at 15-21.) Based on these claims, she sought injunctive relief, compensatory, punitive, and statutory damages, equitable relief including disgorgement of unjust enrichment and conveyance of an

ownership interest in "the Meow Wolf artists' collective," and attorney's fees and costs. (*Id.* at 22-24.)

On August 3, 2020, Defendants filed an answer to Plaintiff's original complaint. (Doc. 30.) They also filed a motion to dismiss the complaint in part, (Doc. 32), which the Court granted in part and denied in part on November 25, 2020. (Doc. 59.) Specifically, the Court dismissed Plaintiff's conversion claims without prejudice and denied the motion in all other respects. (*Id.* at 41.)

Plaintiff filed a motion for leave to amend her complaint on February 22, 2021. (Doc. 77.) In it, Plaintiff sought leave to: (1) add promissory estoppel claims against all Defendants; (2) assert revised conversion claims against all Defendants; and, (3) add supporting factual allegations. (*Id.* at 1.) On May 24, 2021, the Court denied Plaintiff leave to assert her proposed revised conversion claims but otherwise granted her motion. (Doc. 135 at 20.) Plaintiff duly filed her amended complaint on June 1, 2021. (Doc. 148.)

In response to Plaintiff's amended complaint, Defendants filed an amended answer on June 15, 2021. (Doc. 164.) Notably, in response to Plaintiff's breach of contract claims, Defendants admitted "there was a contract which [Plaintiff] accepted and whereby [Plaintiff] installed ISQ and Space Owl" but denied "that the terms of the contract are as she alleges." (*Id.* at 13.) Twenty-one days later, on July 6, 2021, Defendant MWI filed its Motion to Amend. (Doc. 182.) Simultaneously, Defendants filed Defendants Meow Wolf, Inc. and Vince Kadlubek's Amended Answer to Plaintiff's First Amended Complaint (Doc. 183) ("Second Amended Answer"), which adds a counterclaim by Defendant MWI for declaratory judgment. (*Id.* at 18-27.)

In its counterclaim, Defendant MWI alleges the following. "Meow Wolf began in 2008 as a group of artists working together to build art shows, host music shows, and be a social group."

4

(*Id.* at 18.) Plaintiff participated in the group in 2008 but did not participate between 2009 and 2015. (*Id.*) After a financially successful show in 2011, "the first Meow Wolf company was formed." (*Id.* at 18-19.) In 2014, "Meow Wolf" began making plans to open the HoER as a permanent exhibition in Santa Fe. (*Id.* at 19.)

"Meow Wolf" purchased the materials for artists' installations at the HoER and in some cases provided "small up-front stipends." (*Id.*) It also "created a deferred compensation program initially informally referred to as the artist revenue sharing program, and formally named [the] Artist Bonus Program (ABP), which would compensate artists from Meow Wolf's profits if [the] HoER was successful." (*Id.*)

> The ABP earmarked $1 million in future profits to pay to the artists who created installations and art in [the] HoER. The 113 artists in the program were each given an individual cap on their share of the ABP based on the scope and amount of work they were to build. In each year that [the] HoER rev[e]nue passed a set cost number, 11% of profits would flow into the ABP to pay artists.… Once an artist's cap was reached, that artist would drop out of the ABP pool and the remaining artists would be paid until each artist had received her set share stipend.

(*Id.* at 19-20.) "Meow Wolf told artists that … after [the] HoER was built … an artist's cap would be adjusted if he or she underperformed or overperformed." (*Id.* at 20.)

After soliciting and accepting Plaintiff's proposal to install ISQ in the HoER, "Meow Wolf, through its CEO [Defendant] Kadlubek," sent Plaintiff an e-mail in April 2015 entitled "Meow Terms." (*Id.* at 21; Doc. 183-1 at 1.) In the e-mail, "Meow Wolf" offered to purchase the materials Plaintiff needed to construct ISQ and proposed to pay Plaintiff $1,000 as an up-front stipend in $250 bi-weekly increments. (Doc. 183 at 21*;* Doc. 183-1 at 1.) Defendant MWI asserts that "Meow Wolf" additionally proposed in the e-mail to pay Plaintiff $10,000 as a revenue share stipend for her installation of ISQ.[2] (Doc. 183 at 21; *cf.* Doc. 183-1 at 1.) Finally, "Meow Wolf" proposed that

---

[2] The e-mail stated, "we want to offer you $10,00 of revenue share stipend, which we can go over in more depth when we meet." (Doc. 183-1 at 1.)

it would own ISQ as tangible property while Plaintiff would retain the intellectual property rights in her artwork. (Doc. 183 at 21; Doc. 183-1 at 1.) In her responsive e-mail, Plaintiff wrote, "Hey. Awesome. Good luck tonight." (Doc. 183 at 21; Doc. 183-1 at 1.) During the year Plaintiff spent installing ISQ in the HoER, she never objected to the terms of this e-mail or asked to change them. (Doc. 183 at 21-22.) "Up to that point [Plaintiff] had not sold any work of art for more than $1000." (*Id.* at 22.)

Another artist, Cary Cluett, helped Plaintiff to install ISQ without charge. (*Id.*) *Inter alia*, Mr. Cluett "designed, fabricated, and constructed the physical structures needed for ISQ." (*Id.*) Consequently, Plaintiff directed that her $1,000 personal stipend be paid to Mr. Cluett; and, "Meow Wolf gave him a $10,000 participation stipend in [the] ABP and adjusted [Plaintiff's] participation stipend down to $7,000." (*Id.* at 22-23.)

In March 2017, "Meow Wolf" paid Plaintiff $2,000 under the ABP. (*Id.* at 23.) Plaintiff accepted and cashed this check. (*Id.*) Between 2016 and 2019, she also "cashed more than $20,000" in checks from "Meow Wolf" for the sale of consigned products in the HoER's gift shop. (*Id.*) "Each check Meow Wolf issued to [Plaintiff] was issued from Meow Wolf's corporate bank account." (*Id.*)

In 2018, Defendant MWI tried to pay Plaintiff an additional $2,750 under the ABP but Plaintiff was non-responsive and eventually "asked for space" to deal with family issues. (*Id.* at 24.) In 2019, "Meow Wolf" tried to pay Plaintiff "her entire remaining balance of $5,000." (*Id.*) It told her that to receive this check she would have to sign an intellectual property ("IP") assignment; however, she knew "Meow Wolf" was not trying to buy her IP rights in ISQ for $5,000 because a month earlier "Meow Wolf" had met with her and her lawyer and proposed to buy these rights for

$35,000. (*Id.*) Plaintiff "could have told Meow Wolf to remove the IP assignment since her agreement was to keep her IP, and reissue the ABP check. She did not do so." (*Id.*)

In light of the parties' conflicting allegations regarding the terms of the parties' contract, as well as Plaintiff's position "that Meow Wolf should not try to defend itself against [her] contract claim by proving the actual terms of the contract between the parties[,] … a dispute has arisen about the [parties'] contract rights and obligations." (*Id.* at 25.) Thus, in its counterclaim, Defendant MWI asks the Court to declare that Defendant "MWI and Plaintiff entered into a contract whereby Plaintiff was entitled to a specified amount of money—$10,000[,]" rather than "an unlimited share in [Defendant] MWI's revenue based on the success of her own project" and/or "an ownership interest in [Defendant] MWI." (*Id.* at 26-27.)

As noted above, Defendant MWI filed its Motion to Amend on the same date Defendants filed their Second Amended Answer. (Docs. 182, 183.) In its Motion to Amend, Defendant MWI asks the Court to recognize that Defendants were entitled to file their Second Amended Answer as of right under Federal Rule of Civil Procedure 15(a)(1). (Doc. 182 at 4-5.) Alternatively, Defendant MWI asks the Court to grant Defendants leave to file their Second Amended Answer under Rule 15(a)(2). (*Id.* at 5-9.) Plaintiff filed a response in opposition to Defendant's Motion to Amend on August 4, 2021, and Defendant filed a reply in support of it on August 18, 2021. (Docs. 198, 206.)

In addition, Plaintiff filed her Motion to Dismiss on August 10, 2021, asking the Court to dismiss Defendant MWI's counterclaim for lack of standing and failure to state a claim. (Doc. 203.) Defendant filed a response in opposition to Plaintiff's Motion to Dismiss on August 27, 2021, and Plaintiff filed a reply in support of it on September 10, 2021. (Docs. 212, 214.)

## II. <u>Analysis</u>

**A.     Legal Standards**

Federal Rule of Civil Procedure 15 provides that a party may amend its pleading "once as a matter of course within … 21 days after serving it, or … if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier." Fed. R. Civ. P. 15(a)(1). "In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). The decision whether to grant leave to amend is within the trial court's discretion. *Bradley v. Val-Mejias*, 379 F.3d 892, 900-01 (10th Cir. 2004) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)). "The court should freely give leave when justice so requires," and should be mindful that Rule 15 is intended to provide litigants with "the maximum opportunity for each claim to be decided on its merits rather than on procedural niceties." Fed. R. Civ. P. 15(a)(2); *Minter v. Prime Equip. Co.*, 451 F.3d 1196, 1204 (10th Cir. 2006). Nevertheless, courts may deny leave to amend on "a showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, failure to cure deficiencies by amendments previously allowed, or futility of amendment." *Duncan v. Manager, Dep't of Safety, City & Cty. of Denver,* 397 F.3d 1300, 1315 (10th Cir. 2005).

Federal Rule of Civil Procedure 12(b)(1) provides that a party may assert the defense of "lack of subject-matter jurisdiction" by motion. Fed. R. Civ. P. 12(b)(1). "Motions to dismiss for lack of standing are properly brought pursuant to [R]ule 12(b)(1), because standing is a jurisdictional matter." *Hernandez v. Grisham*, 499 F. Supp. 3d 1013, 1047 (D.N.M. 2020) (quotation marks omitted). "Rule 12(b)(1) motions generally take one of two forms: (1) a facial attack on the sufficiency of the complaint's allegations as to subject matter jurisdiction; or (2) a

8

challenge to the actual facts upon which subject matter jurisdiction is based." *Ruiz v. McDonnell*, 299 F.3d 1173, 1180 (10th Cir. 2002). "On a facial attack, the Court must consider the complaint's allegations to be true. By contrast, on a factual attack, the Court may refer to evidence outside the pleadings." *Hernandez*, 499 F. Supp. 3d at 1018 (citations and quotation marks omitted).

Under Federal Rule of Civil Procedure 12(b)(6), a party may also assert the defense of "failure to state a claim" by motion. Fed. R. Civ. P. 12(b)(6). To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotation marks omitted); *Walker v. Mohiuddin*, 947 F.3d 1244, 1248-49 (10th Cir. 2020). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678; *Walker*, 947 F.3d at 1249. "The complaint does not need detailed factual allegations, but the factual allegations must be enough to raise a right to relief above the speculative level." *Barnett v. Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C.*, 956 F.3d 1228, 1234 (10th Cir. 2020).

In determining whether a complaint states a plausible claim to relief, courts "accept as true all well-pleaded factual allegations in [the] complaint and view these allegations in the light most favorable to the plaintiff." *Schrock v. Wyeth, Inc.*, 727 F.3d 1273, 1280 (10th Cir. 2013) (quotation marks omitted). However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not count as well-pleaded facts." *Warnick v. Cooley*, 895 F.3d 746, 751 (10th Cir. 2018) (quotation marks omitted).

"In evaluating a motion to dismiss," courts may consider not only the factual allegations in the complaint, "but also the attached exhibits and documents incorporated into the complaint by reference." *Commonwealth Prop. Advocates, LLC v. Mortg. Elec. Registration Sys., Inc.*, 680 F.3d

9

1194, 1201 (10th Cir. 2011). Courts may also consider documents not attached to or specifically incorporated into the complaint if the complaint refers to the document, the document is central to the plaintiff's claim, and the defendant submits an indisputably authentic copy. *Prager v. LaFaver*, 180 F.3d 1185, 1189 (10th Cir. 1999); *Hill v. Vanderbilt Capital Advisors, LLC*, 834 F. Supp. 2d 1228, 1247 (D.N.M. 2011). Finally, on a Rule 12(b)(6) motion, courts may take judicial notice of appropriate facts and records. *Tal v. Hogan*, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006); *Hill*, 834 F. Supp. 2d at 1247.

**B.      The Court will grant Defendants leave to file their Second Amended Answer.**

As noted above, Rule 15(a)(1) permits a party to amend its pleading "once as a matter of course within … 21 days after serving it." Fed. R. Civ. P. 15(a)(1)(A). Defendant MWI contends that this provision authorized Defendants to file their Second Amended Answer as of right. (Doc. 182 at 4-5.) Specifically, Defendant MWI reasons that Defendants filed their initial answer to Plaintiff's amended complaint on June 15, 2021, and their Second Amended Answer 21 days later; and, they have never amended their answer pursuant to Rule 15(a)(1) before. (*Id.*; *see* Docs. 164, 183.)

Plaintiff disagrees. (Doc. 198 at 2-3.) In support of her position, she argues that Rule 15(a)(1) "does not apply," apparently because Defendants filed their initial *and* amended answers to her amended complaint many months after they filed their original answer to her original complaint. (*Id.*) And, according to Plaintiff, Defendants were not entitled to amend their original answer in response to her amended complaint without consent or the Court's leave, because the amended complaint did not change the theory or scope of the case. (*Id.*)

Plaintiff's argument raises the question of when a defendant may amend its answer as of right in response to an amended complaint. In answering this question, courts have taken at least

four distinct approaches, *i.e.*: (1) the "permissive approach," pursuant to which courts permit such amendments regardless of the changes in the amended complaint; (2) the "narrow approach," pursuant to which courts permit such amendments only if they directly relate to the changes in the amended complaint; (3) the "moderate approach," pursuant to which courts permit such amendments if the amended complaint changes the theory or scope of the case; and, (4) the "*Bern Unlimited* approach,"³ pursuant to which courts require leave to amend under Rule 15(a)(2) whenever such an amendment does not satisfy Rule 15(a)(1)'s requirements. *See, e.g., Digital Ally, Inc. v. DragonEye Tech., LLC*, No. 13-CV-2290 CM/TJJ, 2014 WL 2865592, at *3–4 (D. Kan. June 24, 2014) (describing moderate and *Bern Unlimited* approaches); *Hydro Eng'g, Inc. v. Petter Invs., Inc.*, No. 2:11-CV-00139-RJS, 2013 WL 1194732, at *2–4 (D. Utah Mar. 22, 2013) (describing permissive, narrow, and moderate approaches).

In this case, neither side has discussed which approach the Court should apply; rather, they simply address whether Defendants have satisfied the moderate approach's requirements. (*See* Doc. 198 at 2-3; Doc. 206 at 8-9.) In a footnote, Defendant MWI does acknowledge that there is "far from a consensus among courts" on this point. (Doc. 206 at 9 n. 2.) However, Defendant does not offer a description of the various approaches or a reasoned analysis regarding which one the Court should follow. (*Id.*) The Court is disinclined to venture into the legal thicket of which approach to apply without the benefit of briefing. Moreover, there is no need for the Court to do so, because even if Defendants were not entitled to file their Second Amended Answer as of right under Rule 15(a)(1), the Court finds that they should be granted leave to do so under Rule 15(a)(2).

As previously noted, courts should "freely" grant parties leave to amend pleadings "when justice so requires." Fed. R. Civ. P. 15(a)(2). Plaintiff proffers three reasons why the Court should

---

³ *See Bern Unlimited, Inc. v. Burton Corp.*, 25 F. Supp. 3d 170, 179 (D. Mass. 2014).

11

nevertheless deny Defendants leave to file their Second Amended Answer. (Doc. 198 at 4-5.) First, Plaintiff asserts that Defendants "unduly delayed" and "failed to amend despite the opportunity to do so." (*Id.* at 4.) In support, Plaintiff notes that she asserted breach of contract claims in her original complaint and argues that if Defendants "believed a different contract applied, they should have asserted it" in their original answer. (*Id.*)

> Defendant MWI explains its delay in filing its counterclaim as follows:
>
> Because the position and issues set forth in Meow Wolf's counterclaim have always been known to Plaintiff and central to the contract claim in the litigation, there was no apparent need throughout most of this litigation to assert the counterclaim for declaratory relief…. However, as the first discovery period was concluding, Plaintiff began to assert in discussions between counsel that Meow Wolf should not be allowed to defend [against Plaintiff's] claims by showing that the terms were different than she alleged, or, in his words, proving "a different contract." Doc. 198, at 4. As a result, and in an abundance of caution, Meow Wolf seeks leave to amend to make clear that it intends to prove that while the parties did indeed have a contract, the terms were different than Plaintiff alleges.

(Doc. 206 at 5-6.)

Additionally, Defendant notes that its counterclaim is "a direct response" to Plaintiff's promissory estoppel claims, which Plaintiff asserted for the first time in her amended complaint. (*Id.* at 8; *compare* Doc. 1 *with* Doc. 148.) As the Tenth Circuit has observed, the doctrine of promissory estoppel is "inapplicable" where there is a contract between the parties. *Tiberi v. Cigna Corp.*, 89 F.3d 1423, 1432 (10th Cir. 1996) (applying New Mexico and Minnesota law). The Court therefore agrees that, to defend against Plaintiff's new promissory estoppel claims, Defendant MWI should be allowed to assert a counterclaim based on the existence of a contract between the parties. Furthermore, Defendant sought to add its counterclaim only 35 days after Plaintiff filed her amended complaint. (Docs. 148, 182.) In these circumstances, the Court finds that Defendant did not unduly delay in filing its Motion to Amend.

Plaintiff next argues that she will be unduly prejudiced if Defendants are allowed to file their Second Amended Answer, "especially if the amendment is permitted without allowing additional discovery." (Doc. 198 at 4-5.)

> Courts typically find prejudice only when the amendment unfairly affects the [opposing party] in terms of preparing [its] defense to the amendment. Most often, this occurs when the amended [pleading] arise[s] out of a subject matter different from what was set forth in the [original pleading] and raise[s] significant new factual issues.

*Minter*, 451 F.3d at 1208 (quotation marks and citation omitted).

Here, Defendant MWI's counterclaim clearly arises out of the same subject matter as Defendants' prior answer, in which Defendants admitted the existence of a contract but denied that the contract's terms are as Plaintiff alleges. (Doc. 164 at 13.) Likewise, though it certainly includes more detailed factual *allegations*, the counterclaim does not raise any significant new factual *issues*. (*Id.*) Moreover, Plaintiff completely fails to explain why the counterclaim would unduly prejudice her and even concedes that it should not require "an inordinate amount" of additional discovery. (Doc. 198 at 4-5.) In contrast, Defendant supplies specific details indicating that the parties have already taken extensive discovery regarding the counterclaim's allegations. (Doc. 182 at 7; Doc. 206 at 7.) The Court therefore finds that the proposed amendment will not unduly prejudice Plaintiff.

Finally, Plaintiff argues that the Court should deny Defendants leave to amend because the proposed amendment would be futile. (Doc. 198 at 4.) A pleading is futile if, "as amended, [it] would be subject to dismissal." *In re Thornburg Mortg., Inc. Sec. Litig.*, 265 F.R.D. 571, 580 (D.N.M. 2010) (citing *Bradley*, 379 F.3d at 901). "The futility question is functionally equivalent to the question whether a complaint may be dismissed for failure to state a claim." *Gohier v. Enright*, 186 F.3d 1216, 1218 (10th Cir. 1999); *see also Childs v. Unified Life Ins. Co.*, 781 F. Supp. 2d 1240, 1251 (N.D. Okla. 2011) ("In order to determine whether a proposed amendment is

13

futile, the court must analyze the proposed amendment as if it were before the court on a motion to dismiss pursuant to Rule 12(b)(6).") (brackets omitted). "The burden of showing futility rests with the [party] who assert[s] this ground in opposing … leave to amend." *Martin Marietta Materials, Inc. v. Kansas Dep't of Transp.*, 953 F. Supp. 2d 1176, 1181 (D. Kan. 2013), *aff'd*, 810 F.3d 1161 (10th Cir. 2016).

In support of her futility argument, Plaintiff asserts that "Defendants have yet to describe in detail":  (1) "the contract they assert exists between the parties"; and, (2) "how MWI is entitled to assert it." (Doc. 198 at 4.) Plaintiff is plainly mistaken on the first point. As described in Section I, *supra*, Defendant MWI's counterclaim includes detailed allegations regarding the terms of the parties' contract. In this regard, the proposed counterclaim easily includes sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Iqbal*, 556 U.S. at 678.

However, the second point, *i.e.*, the sufficiency of Defendants' allegations regarding Defendant MWI's entitlement to sue on the contract, requires a more in-depth analysis. Plaintiff fleshes out her argument on this issue in her Motion to Dismiss, asserting that Defendant's counterclaim should be dismissed because it lacks standing to sue on the contract forming the basis of the claim. (*See generally* Doc. 203.) Specifically, Plaintiff claims that Defendant lacks standing because "it did not exist at the time of the alleged formation of the contract" and therefore cannot show that it has suffered an "injury in fact." (*Id.* at 3.)

Article III of the United States Constitution limits the federal courts to the adjudication of "Cases" and "Controversies." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 90 (2013). "That limitation requires those who invoke the power of a federal court to demonstrate standing." *Id.*; *see also Am. Petroleum Inst. v. U.S. Dep't of Interior*, 823 F. App'x 583, 586 (10th Cir. 2020) ("One element of the case-or-controversy requirement is that plaintiffs must establish that they have standing to

sue."). To demonstrate standing, a claimant must establish "(1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision." *Philadelphia Indem. Ins. Co. v. Lexington Ins. Co.*, 845 F.3d 1330, 1335 (10th Cir. 2017). "To establish injury in fact," in turn, a claimant "must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Am. Petroleum Inst.*, 823 F. App'x at 586 (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016)).

"[C]ontingent liability may present an injury in fact." *Protocols, LLC v. Leavitt*, 549 F.3d 1294, 1299 (10th Cir. 2008); *see also Chamber of Com. of U.S. v. Edmondson*, 594 F.3d 742, 758 (10th Cir. 2010) ("It is hardly controversial that exposure to liability constitutes injury-in-fact."). As long ago as 1937, the Supreme Court found that Article III's requirements were satisfied where an insurance company sued for a declaratory judgment that it did not owe its insured benefits pursuant to his claim of disability. *Aetna Life Ins. Co. of Hartford, Conn. v. Haworth*, 300 U.S. 227, 240–41, 244 (1937). "By holding that [the insurance company's] contingent liability presented a 'controversy' under Article III," the *Aetna* Court "necessarily held that standing can be predicated on such liability." *Protocols, LLC*, 549 F.3d at 1300.

As noted above, Plaintiff argues that Defendant MWI lacks standing to assert its counterclaim because it cannot show an "injury in fact." (Doc. 203 at 3.) More particularly, Plaintiff relies on the general rule that "only a party to a contract has standing to enforce a contract and sue for breach of that contract." (Doc. 203 at 3 (emphasis omitted) (quoting *Ocimum Biosolutions (India) Ltd. v. LG Corp*, No. CV 19-2227 (MN), 2021 WL 931094, at *4 (D. Del. Mar. 11, 2021)); *see also Fleet Mortg. Corp. v. Schuster*, 1991-NMSC-046, ¶ 4, 112 N.M. 48, 49, 811 P.2d 81, 82 ("It is a general rule of law that one who is not a party to a contract cannot maintain

15

suit upon it."). Observing that Defendant MWI "did not exist at the time of the alleged formation of the contract," Plaintiff contends that Defendant MWI cannot be a party to it and therefore lacks standing to sue on it. (Doc. 203 at 3; *see also* Doc. 59 at 2 & n.2 (Defendant MWI was incorporated in November 2016); Doc. 183 at 21, 26 (alleged contract was formed in April 2015).)

Plaintiff's argument fails for two reasons. First, Plaintiff asserts a breach of contract claim against Defendant MWI in her amended complaint, and in doing so takes a position that directly refutes her argument here. (Doc. 148 at 19-20.) Specifically, Plaintiff alleges that "Defendants," including Defendant MWI, offered her "membership in the Meow Wolf artists' collective and a right to receive a share of Meow Wolf's revenue," and that she "accepted Defendants' offer, and installed ISQ at [the] HoER according to its terms, thereby creating a contract." (*Id.* at 2, 19-20.) And, all of this would necessarily have occurred before March 2016, when Plaintiff alleges the HoER opened. (*Id.* at 12.) In short, in her amended complaint, Plaintiff takes the position that Defendant MWI *was* able to and *did* in fact enter into a contract with her before November 2016.

Helpfully, in analyzing Article III requirements in the declaratory judgment context, the Tenth Circuit has observed that

> [b]ecause it is the nature of the controversy, not the method of its presentation or the particular party who presents it, that is determinative, we can confirm the point by asking, counterfactually, whether we would have Article III jurisdiction if faced with a straightforward … suit by [the declaratory judgment defendant] against [the declaratory judgment plaintiff], rather than a declaratory judgment action in which the parties are reversed.

*Surefoot LC v. Sure Foot Corp.*, 531 F.3d 1236, 1245 (10th Cir. 2008) (quotation marks, brackets, and citation omitted). By taking the position that the Court has Article III jurisdiction over her breach of contract claim against Defendant MWI, Plaintiff effectively concedes that the Court also has Article III jurisdiction over Defendant's declaratory judgment counterclaim based on the same contract.

Relatedly, the Court rejects Plaintiff's suggestion that the contract she alleges and the contract Defendant MWI alleges are two separate contracts. (*See* Doc. 198 at 4 ("[I]f [Defendants] believed a different contract applied, they should have asserted it in response to Plaintiff's initial complaint.").) The contract alleged in both Plaintiff's amended complaint and Defendant's counterclaim is the contract pursuant to which Plaintiff agreed to install ISQ in the HoER and Defendant agreed to compensate her. (Doc. 148 at 19-20; Doc. 183 at 21, 26.) The parties simply dispute the nature and amount of the compensation to which the parties agreed. As such, it is patently untenable for Plaintiff to bring a breach of contract claim against Defendant MWI and simultaneously contend that Defendant MWI lacks standing to sue on the contract.

Plaintiff's standing argument also fails in light of the evidence Defendant MWI presents in response to Plaintiff's Motion to Dismiss, which the Court may consider under Rule 12(b)(1) in light of Plaintiff's challenge to the truth of the allegations in the counterclaim. *Hernandez*, 499 F. Supp. 3d at 1018-19. This evidence shows that: (1) VCMSE Art City LLC d/b/a Meow Wolf ("Art City") was formed in October 2014; (2) Art City is the entity that entered into the contract with Plaintiff; (3) Art City merged with Defendant MWI in December 2016; and, (4) Defendant MWI is the surviving entity of this merger. (*See* Docs. 212-1, 212-2, 212-3, 212-4.) Plaintiff has not contested this evidence or otherwise challenged the merger's validity. (*See generally* Doc. 214.)

Accepting Defendant's uncontested evidence as true for purposes of the present motions, "all debts, liabilities and other obligations" of Art City "bec[a]me the obligations" of Defendant MWI; and, "except as prohibited by other law, all the rights, privileges, immunities, powers and purposes" of Art City "bec[a]me vested in" Defendant MWI. N.M. Stat. Ann. § 53-19-62.2(A)(3), (5); *see also* Del. Code Ann. tit. 8, § 259(a) (after merger, surviving corporation possesses "all the rights, privileges, powers and franchises" of the merged entities and is subject to "all debts,

liabilities and duties" of these entities "to the same extent as if said debts, liabilities and duties had been incurred or contracted by it"); Del. Code Ann. tit. 8, § 264(e) (section 259 applies to mergers between corporations and limited liability companies).[4] Thus, Defendant MWI acquired the rights and obligations of the contract Plaintiff and Art City entered into before Plaintiff filed this lawsuit in March 2020 and before Defendants filed their Second Amended Answer in July 2021. It inexorably follows that Defendant MWI has standing to sue based on that contract. *Cf. Bank of New York v. Romero*, 2014-NMSC-007, ¶ 17, 320 P.3d 1, 6, *abrogated on other grounds by Deutsche Bank Nat. Tr. Co. v. Johnston*, 2016-NMSC-013, 369 P.3d 1046 (recognizing that successor in interest at time of filing has standing to sue on contract).

For all of these reasons, the Court finds that Defendant MWI has standing to assert the counterclaim in Defendants' Second Amended Answer. The Court further finds that Defendant MWI has sufficiently alleged its entitlement to bring that counterclaim under Rule 12(b)(6) in light of both sides' allegations that Defendant MWI was a party to the contract for Plaintiff to install ISQ at the HoER. (Doc. 148 at 19-20; Doc. 164 at 13; Doc. 183 at 13, 21, 26); *see Schrock*, 727 F.3d at 1280 (on Rule 12(b)(6) motion, court accepts as true all well-pleaded factual allegations in the complaint). Furthermore, as Defendants have observed, Plaintiff "offers no authority for the notion that [Defendant MWI] must allege in a pleading its entire corporate succession history," (Doc. 212 at 9), and the Court therefore finds that Plaintiff has forfeited this point. *See Phillips v. Hillcrest Med. Ctr.*, 244 F.3d 790, 800 n.10 (10th Cir. 2001) ("A litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting

---

[4] Beyond Plaintiff's bare observation that Defendant "MWI was organized under the laws of Delaware," (Doc. 203 at 4), the parties do not address choice of law in their briefing. (*See generally* Docs. 182, 198, 203, 206, 212, 214.) However, on the current record, Art City was formed under New Mexico law; Defendant MWI was formed under Delaware law; Art City did and Defendant MWI does business in New Mexico; and, the incidents giving rise to the parties' disputes occurred in New Mexico. Thus, the Court has considered New Mexico and Delaware law in assessing the legal effects of Art City's and Defendant MWI's merger.

authority or in the face of contrary authority, forfeits the point. The court will not do his research for him.") (brackets omitted).

In sum, because Defendant MWI has demonstrated that it has standing to bring the counterclaim in Defendants' Second Amended Answer and has also sufficiently alleged its entitlement to bring this claim, the Second Amended Answer is not subject to dismissal and is not futile. *In re Thornburg Mortg., Inc. Sec. Litig.*, 265 F.R.D. at 580. Thus, and because Plaintiff has made no "showing of undue delay, undue prejudice to the opposing party, bad faith or dilatory motive, [or] failure to cure deficiencies by amendments previously allowed," *Duncan,* 397 F.3d at 1315, the Court will grant Defendant MWI's Motion to Amend, allow Defendants to file their Second Amended Answer, and deny Plaintiff's Motion to Dismiss Defendant MWI's counterclaim.[5]

### III. Conclusion

For the reasons set forth above, IT IS HEREBY ORDERED as follows:

1. Defendant Meow Wolf, Inc.'s Motion to Recognize its Amended Answer and Counterclaim for Declaratory Judgment as an Amendment as of Right, or in the Alternative for Leave to Amend Answer to Assert Counterclaim for Declaratory Judgment (Doc. 182) is GRANTED;

2. Plaintiff's Motion to Dismiss Defendant's Counterclaim for Lack of Standing and for Failure to State a Claim (Doc. 203) is DENIED; and,

3. Defendants are granted leave to file Defendants Meow Wolf, Inc. and Vince Kadlubek's Amended Answer to Plaintiff's First Amended Complaint (Doc. 183).

---

[5] The Court will not require Defendants to withdraw and refile their Second Amended Answer even though they filed it *before* the Court granted them leave, because to do so would serve only to further clutter an already lengthy docket.

IT IS SO ORDERED.

_____
KIRTAN KHALSA
UNITED STATES MAGISTRATE JUDGE
Presiding by Consent