## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

LAUREN ADELE OLIVER,
an individual,

      Plaintiff,

v.                                  Case No. 1:20-CV-00237-KK-SCY

MEOW WOLF, INC., a Delaware
corporation; VINCE KADLUBEK,
an individual and officer; and
DOES 1-50,

      Defendants.

## MOTION FOR SUMMARY JUDGMENT
## <u>DISMISSING CLAIMS AGAINST DEFENDANT VINCE KADLUBEK</u>

      Defendant Vince Kadlubek respectfully moves for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, dismissing claims Plaintiff Lauren Oliver has asserted against him individually. Plaintiff opposes this motion.

## INTRODUCTION

      Ms. Oliver has asserted all her claims in this case not only against Meow Wolf Inc. (MWI) but also against its former CEO, Vince Kadlubek. Plaintiff made no particularized allegations of wrongful conduct by Mr. Kadlubek, instead asserting generally that he "was a director and/or officer of MWI during relevant times." Amended Complaint, Doc. 148, at 2. On this basis she alleges "defendants" are liable for breach of contract, breach of the covenant of good faith and fair dealing, promissory estoppel, unjust enrichment, conversion, constructive trust, fraudulent and negligent misrepresentation, copyright infringement, and violation of the Visual Artist's Rights Act (VARA). *See generally* Doc. 148.

While Plaintiff has never alleged that her contract was with Mr. Kadlubek, or that the other business dealings giving rise to her claims were with Mr. Kadlubek as an individual, the individual claims survived a motion to dismiss due in part to allegations that the events underlying the claims began in 2015, before the 2016 formation of MWI, and an officer can be personally liable for a pre-incorporation contracts. Memorandum Opinion and Order, Doc. 59, at 35–36.

With the benefit of the facts, however, it is undisputed that MWI's predecessor VCMSE Art City, LLC d.b.a. Meow Wolf (Art City) was formed in 2014 for the purpose of creating the House of Eternal Return (HoER), and merged into MWI in 2016. Mr. Kadlubek was CEO of both Art City and its successor MWI, and Ms. Oliver has never alleged he acted on his own account. There is no longer a question of a pre-incorporation contract, because Ms. Oliver alleges the promises on which she bases her HoER contract and quasi-contract claims were made in 2015, after Art City was formed. Doc. 148, at 15–24. Ms. Oliver's copyright infringement and VARA claims arise from display after HoER opened, and an alleged threat to remove her work, Ice Station Quellette, from HoER. *Id.* at 17–18. The Amended Complaint repeatedly refers to Mr. Kadlubek as a "Meow Wolf representative[]" (*see, e.g.*, *id.* at 5) and nowhere claims Mr. Kadlubek acted other than as an officer of Meow Wolf.

It is fundamental that corporate officers and owners are not liable for the obligations of the company. *Farmers All. Mut. Ins. Co. v. Naylor*, 452 F. Supp. 2d 1167, 1177 (D.N.M. 2006) ("As a general rule of corporate law 'shareholders, directors and officers are not personally liable for the acts and obligations of the corporation.") (citing *Stinson v. Berry*, 1997-NMCA-076, 123 N.M. 482); *see also* N.M. Stat. Ann. § 53-19-13 (1993). Ms. Oliver's contract and quasi-contract claims are all based on an alleged promise of an unknown amount of MWI's revenue—not of Mr. Kadlubek's revenue. Doc. 148, at 5, 15, 19–22.

2

The claims for misrepresentation and conversion fail because Ms. Oliver has provided no evidence of misrepresentation. Ms. Oliver bases these claims on Mr. Kadlubek allegedly misrepresenting an uncapped share of Meow Wolf's revenue to artists for their work on HoER, thus inducing her to install her artwork in the exhibit. Doc. 148, at 22–23. But this allegation was not supported by Ms. Oliver in her sworn testimony. She testified that the representations on which she bases her claims were made at HoER artist group meetings, also called All Shrimps meetings. Her testimony under oath was that Mr. Kadlubek never said during meetings that the artist revenue sharing was either capped or uncapped. Ms. Oliver has also conceded that Mr. Kadlubek never promised any specific amount of revenue sharing in these meetings, or any specific percentage of revenue sharing, or any method of calculating an amount or percentage of revenue sharing.

While Ms. Oliver has no evidence on these points, it is undisputed that Meow Wolf communicated to her in writing a limited monetary amount for her revenue share stipend of $10,000. It is undisputed that she never objected to this amount or counteroffered. Because Ms. Oliver's testimony confirms Mr. Kadlubek *did not* promise that artist revenue sharing was uncapped or was in any particular amount, he did not misrepresent what was provided. Ms. Oliver has further confirmed under oath that she was never promised equity, stock, or stock options. Ms. Oliver's claim for conversion, which is based on the same alleged misrepresentations, must necessarily fail in the absence of misrepresentation. *See* Memorandum Opinion and Order, Doc. 135, at 15 (explaining the bases of Ms. Oliver's conversion claim).

Ms. Oliver's misrepresentation claims fail for additional independent reasons. Both fraudulent and negligent misrepresentation require that the plaintiff justifiably relied on the misrepresentation. *See Jones v. Augé*, 2015-NMCA-016, ¶ 32, 344 P.3d 989; *Garcia v. Rodey, Dickason, Sloan, Akin & Robb, P.A.*, 1988-NMSC-014, ¶ 16, 106 N.M. 757. Ms. Oliver has never

been able to explain that there were any particulars to the promise she alleges was misrepresented, and as a result it would be unreasonable for her to have relied on the alleged promises, especially absent any effort to clarify them or engage in discussion regarding them. Further, specific to Ms. Oliver's claim for negligent misrepresentation, she must show that Mr. Kadlubek owed her a duty of care. Mr. Kadlubek owed Ms. Oliver no duty when negotiating an arms-length transaction on behalf of Art City. Further, liability for negligent misrepresentation only attaches for misrepresentations of present facts, not future promises.

The copyright infringement claim and VARA claim fail for the simple reason that no evidence has been adduced to suggest that Mr. Kadlubek took any action causing infringement. While Ms. Oliver's claims against Mr. Kadlubek survived the pleading stage, they are untenable now that no facts have been brought forward to support them. Accordingly, there is no need for a jury trial on Ms. Oliver's claims against Mr. Kadlubek.

## UNDISPUTED MATERIAL FACTS

1. On October 21, 2014, Art City was formed as a New Mexico limited liability company doing business as "Meow Wolf." Doc. 212-4, at 3 (Art City's certificate of organization was filed on October 21, 2014); Doc. 298-11, at 2 (Art City operating agreement providing "d.b.a. Meow Wolf"). "The purposes for which the Company is formed are (a) to open and operate arts centers in Santa Fe, New Mexico and possibly other locations . . . ." Doc. 298-11, at 2.

2. Mr. Kadlubek was CEO of Art City and had authority to and did contract with Ms. Oliver on behalf of Art City. Doc. 298-11, at 5 ( designating Mr. Kadlubek CEO of Art City).

3. Art City asked Ms. Oliver to submit an art proposal for HoER, which she did. Oliver Interrogatory Answers, Doc. 278-4, at 21 ("In early 2015, Caity Kennedy reached out and asked

Plaintiff to submit a proposal, which Plaintiff ultimately did); Doc. 297, at 11 (acknowledging Caity Kennedy was acting on behalf of Art City).

4.      On behalf of Art City, Mr. Kadlubek sent Ms. Oliver an email "about the contractual terms for your involvement in *the Meow Wolf project*," offering to buy her materials, pay her a $1000 initial stipend, and a $10,000 revenue share stipend in exchange for her installing her work in HoER. Doc. 278-1 (emphasis added); Doc. 297, at 8, 15 (acknowledging the offer was for $10,000). *See* Doc. 278-5, at 251:25-252:9, 212:21-25, 192:5-10; Doc. 330-6, at 584:2–19.

5.      The performance requested of Ms. Oliver was that she install her artwork in time for HoER's opening, which she did. Doc. 278-4, at 19 ("Upon completion of installation of ISQ at HoER, Plaintiff had fulfilled her obligations under the parties' contract.").

6.      Ms. Oliver attended large group meetings with other artists working on HoER, called "All Shrimps" meetings, where Mr. Kadlubek discussed how artists like Ms. Oliver would be paid their revenue share if HoER was profitable. Doc. 278-4, at 11 ("Plaintiff could not be assured of any payment if the venture was not a success, but if it were, she would proportionally share in that success through a share of revenue and membership in the collective"); Doc. 278-5, 234:6–10 (A. "[T]he promise or offer that I heard was in the late summer and fall [of 2015], and this was conveyed verbally at meetings with everybody."). Lauren Oliver Deposition, attached as ***Exhibit A***, at 524:20–25 (Q. "So did you go to All Shrimps meetings in 2015?" A. "The All Shrimps were the meetings I went to.").

7.      There was no representation in those meetings about whether the artist revenue share would be capped or uncapped. Ex. A, at 609:1–20. And there was no specific promise regarding a percentage of revenue, ownership, equity, stock, or shares of ownership in a limited liability company. Doc. 297, at 9; Doc. 278-5, at 45:7-15 ("Q. Ms. Oliver, did anyone ever promise

you a specific percentage or amount of stock options in Meow Wolf? … [A]. No."); Doc. 278-5, at 46:22-25 ("Q. … Did anyone ever promise you a specific percentage or amount of equity in Meow Wolf? A. No."); Doc. 278-5, at 48:12-14 ("Q. … Did anyone promise you shares of stock in Meow Wolf? A. No specific shares of stock."); Doc. 278-5, at 48:15–20 ("Q. Did anyone promise you shares of ownership in an L.L.C. in Meow Wolf?" "A. No.").

8.       Art City contracted with artists who, like Ms. Oliver, worked on constructing exhibits within HoER. *See, e.g.*, Liberty Yablon Revenue-Based Bonus Payment Agreement, attached as ***Exhibit B***.

9.       Ms. Oliver accepted payment of her $1,000 stipend, budgeted her materials which Art City bought, and Ms. Oliver accepted payment of $2,000 toward her $10,000 revenue share balance. *See* Doc. 278, at 8 and Doc. 297, at 16 (acknowledging receipt of $1,000 and not disputing that she directed the money to Cary Cluett); Doc. 330-6, at 584:2–19 (acknowledging payment of materials); Doc. 330-7, at 1 (acknowledging of $2,000 payment toward revenue share).

10.      Art City merged into MWI on December 30, 2016. Doc. 212-4, at 3.

11.      Mr. Kadlubek has not been CEO of MWI during the duration of this lawsuit. 30(b)(6) Deposition of MWI, attached as ***Exhibit C***, at 179:23–25 (Q. "[w]hen did you stepdown as CEO of Meow Wolf?" A. "November 2019.").

12.      ISQ inside of HoER is appropriately attributed to Ms. Oliver. Ex. A, at 538:21–539:6 (Q. "I believe in the Ice Station room you have a little badge with your website on it, right? A. "Yes, I do." Q. "Did you design that and install it?" A. "I designed it, yeah" Q. "Okay, so that's the way you wanted it in the ISQ room I assume; right?" A. "Yeah, that seems to be the most that it would be, you know, the – yes, that was fine with me.")

# ARGUMENT

Summary judgment is proper when there is no genuine issue over any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is "material" if it may reasonably affect the outcome of a claim. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Relatedly, a dispute is not "genuine" unless there is evidence sufficient to cause a reasonable jury to find in the nonmovant's favor. *Id.* at 252. "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Id.* at 249.

On a motion for summary judgment, it is the Court's role to determine whether Ms. Oliver has presented evidence on which a reasonable jury could find in her favor. *Id.* at 252. "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Id.* Although the court cannot weigh evidence, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id.* at 247–48 (emphasis in original). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Further, the court must be mindful of the ultimate standard of proof the plaintiff faces. *Anderson*, 550 U.S. at 252. If there is an absence of evidence, and the plaintiff produces no evidence for a point, there is no material question of fact about it. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) ("[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case.").

**I**

**MR. KADLUBEK CANNOT BE PERSONALLY LIABLE**
**FOR CONTRACTS AND PROMISES MADE BY ART CITY**

It is hornbook law that "shareholders, directors and officers are not personally liable for the acts and obligations of the corporation." *Farmers All. Mut. Ins. Co.*, 452 F. Supp. 2d at 1177 (D.N.M. 2006). The principle extends to members of limited liability companies as well. N.M. Stat. Ann. § 53-19-13 ("[T]he debts, obligations and liabilities of a limited liability company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the limited liability company."). This law alone resolves Ms. Oliver's contract and quasi-contract-based claims against Mr. Kadlubek.

**A.    Plaintiff Concedes She Contracted with Art City**

Before merging into MWI, Art City, doing business as Meow Wolf, contracted with artists to work on HoER. Doc. 298-11, at 2; Ex. B. Ms. Oliver alleges a 2015 contract with MWI, which could only have been formed with its predecessor, Art City. The contract Ms. Oliver alleges was for a share of Meow Wolf's revenue. *See* Doc. 148, at 19–20 ("Oliver's future compensation would be proportionate with any increased value of *Meow Wolf's* brand and enterprise and any increased revenue realized by *Meow Wolf*, i.e. a share of *Meow Wolf's* success.") (emphasis added). She has never claimed her contract was with Mr. Kadlubek personally. *See* Doc. 297, at 3, n.1.[1]

As a non-party to the contract, Mr. Kadlubek cannot be liable for breach of the contract, or breach of the duty of good faith and fair dealing implied in that contract. N.M. Stat. Ann. § 53-19-13; *see also Roberts v. Generation Next, LLC*, 853 F. App'x 235, 241 (10th Cir. 2021) (affirming dismissal of breach of contract and breach of implied covenant claims against members of a limited

---

[1] To the extent Ms. Oliver has argued that Mr. Kadlubek was acting on behalf of another entity, *see* Doc. 297, at 6–7, 11–12, she has still presented no evidence that Mr. Kadlubek was acting on his own behalf when interacting with her. *See* Doc. 297, at 7, 10.

liability company based on New Mexico law). Accordingly, Ms. Oliver's contract-based claims against Mr. Kadlubek must be dismissed.

> **B.      Quasi-Contract Claims Against Mr. Kadlubek**
> **Also Fail Because He was Acting on Behalf of Art City**

Section 53-19-13 does not narrowly apply to specific claims, but rather states that "debts, obligations and liabilities of a limited liability company, whether arising in contract, tort *or otherwise*, shall be solely the debts, obligations and liabilities of the limited liability company." Ms. Oliver's promissory estoppel and unjust enrichment claims are based on the same promises she alleges were made under her contract with MWI. *Compare* Doc. 148, at 19 (alleging a "right to receive a share of Meow Wolf's revenue" and collective ownership) *with* Doc. 148, at 16, (alleging a promise to Meow Wolf's revenue and collective membership); Doc. 135, at 12 (discussing the allegations of promissory estoppel); Doc. 148, at 22 (alleging unjust enrichment based on the "increase in revenue Meow Wolf has enjoyed as a result of ISQ's installation at HoER, and the increase in value of Meow Wolf's brand and enterprise attributable to ISQ's installation at HoER."). Thus, both Ms. Oliver's unjust enrichment and promissory estoppel claims, like her contract claims, are based on promises made by Art City, not Mr. Kadlubek. The alleged promise, whether enforced through contract, promissory estoppel, or unjust enrichment, is an obligation of Art City for which Mr. Kadlubek is not personally liable. N.M. Stat. Ann. § 53-19-13.

Although New Mexico courts have not yet interpreted this statute in the context of quasi-contract claims, courts in jurisdictions with similar statutes have. *See, e.g.*, *Horlick v. Capital Women's Care, LLC*, 896 F. Supp. 2d 378, 395, 397 (D. Md. 2011) (dismissing promissory estoppel and contract claims against individual members of an LLC because under Maryland law a member of an LLC is not "personally liable for the obligations of the limited liability company,

whether arising in contract, tort or otherwise . . . ."); *Shevin-Sandy v. Athletic Specialties, LLC*, No. 20 C 1181, 2020 WL 4748152, at *5–8 (N.D. Ill. Aug 17, 2020) (dismissing promissory estoppel and unjust enrichment claims against individual members of an LLC based on Illinois's and Texas's limited liability company act).

In *Shevin-Sandy v. Athletic Specialties, LLC*, the plaintiff sued both the company and the company's owner for unjust enrichment resulting from expenses that the defendants did not reimburse and for promissory estoppel. 2020 WL 4748152, at *2. The individual defendant was the sole member of his company. *Id.* at *8. Even though the plaintiff argued that the owner must have benefitted from his company retaining the unreimbursed funds, the court dismissed the plaintiff's claim, explaining that "the logical conclusion of [plaintiff's argument] is that the owner of a limited liability company would be personally liable for the unjust enrichment of that company," contrary to limited liability statutes. *Id.*; *accord* NMSA 1978 § 53-19-13. Other courts have dismissed unjust enrichment claims in similar circumstances. *See, e.g.*, *In Re* Wolf, 556 B.R. 676, 698–690 (Bankr. E.D. Pa. 2016) *aff'd Jordan v. Wolf*, 573 B.R. 179 (E.D. Pa. 2017) (dismissing unjust enrichment claim against individual, stating, "[i]t is not unconscionable for a corporate principal to be free of liability for corporate debts based on the general benefits obtained by his or her status as officer, director or shareholder. That is the whole point of the corporate veil.").

Here, Ms. Oliver has claimed promises made by Mr. Kadlubek on behalf of Art City, as its representative, and unjust enrichment of the company, not Mr. Kadlubek personally. As in *Shevin-Sandy*, Mr. Kadlubek was a member of a company limiting his personal liability. His position is even stronger than that of the defendant in *Shevin-Sandy* because Mr. Kadlubek was not the sole member of Art City. *See* Doc. 298-11, at 10 (listing the other members of Art City). Based on New

Mexico's limited liability company statute and cases applying similar statutes, Ms. Oliver's quasi-contract claims cannot succeed.

### C.  Constructive Trust is a Remedy Rather than a Claim, and Should be Dismissed Without Liability for Unjust Enrichment

Because there is no basis for recovery on Ms. Oliver's unjust enrichment claim, she is likewise not entitled to the equitable relief it entails. Although Ms. Oliver pleads constructive trust as a separate claim, it is an equitable remedy for unjust enrichment. Doc. 59, at 31 (citing *In re Estate of Duran*, 2003-NMSC-008, ¶ 35, 133 N.M. 553). "A constructive trust is a remedy rather than an independent cause of action." *Id.* (citing *Willis v. Smith*, No. 16 CV 167 JAP/LF, 2017 WL 2963873, at *9 (D.N.M. Feb. 13, 2017)). Without the underlying claim to support it, the remedy is obviously unavailable and Ms. Oliver's claim for a constructive trust should be dismissed along with her unjust enrichment claim.

## II
## UNDISPUTED FACTS SHOW NO MISREPRESENTATIONS WERE MADE TO MS. OLIVER

For the two-year duration of this lawsuit, Ms. Oliver has been making the serious charge that Mr. Kadlubek committed fraud by lying to artists at HoER about how they would be compensated. After sixteen months of discovery, Ms. Oliver has come up with no facts—including from her own testimony—to support the charge. Her misrepresentation and conversion claims are based on Mr. Kadlubek allegedly promising an uncapped revenue share (with no known amount or method of calculating an amount) to Ms. Oliver and the 111 other HoER artists, then delivering revenue sharing payments capped at amounts specific to each artist. Doc. 148, at 23; Doc. 135, at

15 (summarizing Ms. Oliver's conversion claim). Ms. Oliver's claims fail by her own sworn testimony.

A. **The Undisputed Facts Show That Mr. Kadlubek Made No Misrepresentations**

Both intentional and negligent misrepresentation claims require proof of a false representation. *Bull v. BGK Holdings,* LLC, 859 F. Supp. 2d 1238 (D.N.M. 2012) (intentional misrepresentation); *Smith v. Liberty Mut. Fire ins. Co.*, 495 F. Supp. 3d 1019, 1028 (D.N.M. 2020) (citing *Robey v. Parnell*, 2017-NMCA-038, 398); *W. States Mech. Contractors, Inc. v. Sandia Corp.*, 1990-NMCA-094, ¶ 12, 110 N.M. 676. ("A negligent misrepresentation is one where the speaker has *no reasonable ground* for believing the statement made was true.") (emphasis in original). To succeed on her conversion claim, Ms. Oliver would also need to show a misrepresentation. *See* Doc. 135, at 15 (citing *Ortiz v. N.M. Dep't of Cultural Affs.*, No. CV 16-1396 JB/JHR, 1028 WL 318461, at *4 (D.N.M. Jan 5, 2018)).

Like her contract and quasi-contract claims, Ms. Oliver alleges that the statements giving rise to her misrepresentation and conversion claims were made not only to her but to all HoER artists during "All Shrimps" meetings with artists. *See* Doc. 148, at 10–11, 13–14, 16–17, 22–24; Ex. A, at 524:20–25 (Q. "So did you go to All Shrimps meetings in 2015?" A. "The All Shrimps were the meetings I went to."); Doc. 278-5, at 526:2-7 ("Q. Okay. So the offer he was making was the one that was not made specifically to you, Lauren Oliver, it was made to the whole group of artists. Is that right?" A. "It was made to the whole group of artists, and again, I expected paperwork."); *see also* Doc. 278-5, at 234:6-10 ("[A. T]he promise or offer that I heard was in the late summer and fall, and this was conveyed verbally at meetings with everybody. And no, I did not receive any paperwork that said or reflected that."); Doc. 278-5, at 236:22-24 ("[A.] There is

12

nothing in writing that reflected my understanding of the agreement that made me proceed to install the ISQ.")

Meow Wolf held a mandatory meeting with artists early in 2015 to explain the artist revenue sharing program and hand out each artist's formal contract containing their specific compensation. Doc. 132-11; Ex. B. Ms. Oliver was urged to go to that meeting to get her contract and have it explained, but does not recall going, and no one else has a memory of having seen her there. Oliver Dep., at 279:6–8 (Q. "Did you go to the meeting?" A. "I don't remember going to the meeting."). Although there is evidence Ms. Oliver was given her formal written contract, Declaration of Caity Kennedy, Doc. 132-12, at 2, Ms. Oliver disputes it.

This leaves All Shrimps meetings as the sole source of the claimed misrepresentations. The two critical points of alleged false representation are (1) whether the artist revenue sharing program would be capped or uncapped, and (2) whether there was any amount or percentage Ms. Oliver was promised different than what she was told in her April 2, 2015, Meow Terms email.

As to the first issue whether artist revenue sharing would be capped or uncapped, Ms. Oliver testified that in meetings there was no representation either way:

> Q. "Okay. And just so I understand, did you hear the words -- well, what I understand your testimony is that you never heard the word 'cap' in those meetings. Is that right?"
> A. "I never heard it."
> Q. "Okay. And so you didn't hear the words 'There is no cap.' It wasn't that they affirmatively said, 'There is no cap,' it's that they never brought up the word 'cap.' Is that right?"
> A. "They never said the work 'cap,' only 'share.'"
> Q. "So they never said, 'There is no cap' in those meetings; true?"
> A. "I can't say if they used that exact language. I can tell you I never heard the word 'cap,' so technically I did not hear those words. "There is a cap; there is no cap." I didn't ever remember hearing the word cap."

Ex. A, at 609:1–20.

As to the second issue, Ms. Oliver has never been able to say that any specific amount or percentage was promised to her. After repeated questions about what promises were made to her at All Shrimps meetings, her testimony was as follows:

> The mechanism by which we were incentivized to install our work, and in my case, spend months and months and months designing and installing my work, was for a Revenue Share Program. All I heard was "share," "share," "share," and I knew that it was calculated on an annual basis, based on the revenues of the House of Eternal Return, and that would emerge in – it could emerge in any form. The typical one was stock. That was the one that I thought, "Well, that's the easiest thing is assign artists stock," you know, residuals, royalties, things like that.

Ex. A at 509:23–510:10; *see also* Doc. 278-5, at 234:6–10. Plaintiff's counsel confirmed this formally to the Court: "*While no particular percentages or shares were mentioned*, it was clear – everyone, including Oliver, would realize success, including financial success that would increase with the success of the venture." Doc. 297, at 9 (emphasis added).

Ms. Oliver has also admitted she was never promised equity, stock options, or stock. Doc. 278-5, at 45:7-15 ("Q. Ms. Oliver, did anyone ever promise you a specific percentage or amount of stock options in Meow Wolf? … [A]. No."); Doc. 278-5, at 46:22-25 ("Q. … Did anyone ever promise you a specific percentage or amount of equity in Meow Wolf? A. No."); Doc. 278-5, at 48:12-14 ("Q. … Did anyone promise you shares of stock in Meow Wolf? A. No specific shares of stock."). Ms. Oliver's witnesses who also attended these meetings agreed that no one was promised stock, unlimited revenue share, equity, or stock options during meetings. Deposition of Drew Lenihan, Doc. 330-8, at 68:22–70:7; Deposition of Blake Cahill, Doc. 330-9, at 192:12–193:6; Deposition of Galen Hutchinson, Doc. 330-10, at 52:16–53:8, 82:1–83:23, 93:23–94:4.

The undisputed facts are thus as follows:

- At meetings the artist revenue share was not represented as either capped or uncapped. Ex. A, at 609:1–20.
- Ms. Oliver did receive in writing a revenue share stipend in a specific amount ($10,000). Doc. 278-1.

14

- At meetings Ms. Oliver was not promised any specific amount or percentage of revenue, equity, or stock. Doc. 297, at 9.
- At meetings the revenue share was represented as contingent on success. Ex. A, at 509:23–510:10.

Ms. Oliver's testimony regarding All Shrimps meetings reflects the revenue share program at a high level. It is understandable that All Shrimps meetings would involve only a high-level discussion of the artist revenue sharing program, because different artists had different revenue sharing amounts ranging from $1,250 to $35,000, Doc. 278-6, and "these meetings were like rallies." Ex. A, at 606:5. There is no dispute among the parties that the artist revenue sharing program promised to pay artists from the profits of HoER only if HoER was successful, and thus if HoER was successful, artists would "share in that success." *See* Doc. 278-1; Doc. 278-4, at 11. The question is whether they would share in it up to their individual revenue share amount, or in an uncapped, unspecified, and incalculable way. Because neither an uncapped share nor a specific amount was promised in the meetings, it is now clear that Mr. Kadlubek did not make misrepresentations at the artist meetings.

### B. There is no Evidence Mr. Kadlubek Had Intent to Deceive, that He Owed Ms. Oliver a Duty, or that it was Reasonable for Plaintiff To Rely on an Alleged Promised of an Unspecified Share of Success

Ms. Oliver's claims for misrepresentation fail for a number of other independent reasons. First, both her intentional and negligent misrepresentation claims are premised on Mr. Kadlubek promising something at meetings that he intended not to fulfill. Doc. 148, at 21–22; Doc. 59, at 26. To be actionable, a fraudulent promise must be made by someone who has a present intent, when making the promise, to not keep it. *Telman v. Galles*, 1936-NMSC-073, ¶¶ 16–17, 41 N.M. 56. Such intent is based on the circumstances. *Id.* Here Ms. Oliver has presented no evidence Mr. Kadlubek did not intend to honor the $10,000 revenue sharing offer made to her, or the nonspecific representations of revenue sharing contingent on HoER's success made during the All Shrimps

meetings. Ms. Oliver does not dispute that she was tendered $1,000 or that her materials were paid for, as outlined in the Meow Wolf email. *See* Doc. 278, at 8; Doc. 297, at 16; Doc. 330-6, at 584:2–19. Ms. Oliver does not dispute that Art City and MWI paid Ms. Oliver $2,000 and repeatedly tried to pay her the remainder of her promised revenue sharing amount. *See* Doc. 330, at 9–10; Doc. 330-7, at 1.

Negligent misrepresentation is not actionable for misrepresentations of promises of future conduct. Whlie New Mexico courts have not yet spoken to this point, the nature of the claim demands this conclusion, as courts in other jurisdictions have held. *See* 200 N. *Gilmor, LLC v. Capital One, Nat'l Ass'n*, 863 F. Supp. 2d 480, 493 ("[A] promise made with the present intention not to perform is "perforce, an intentional misrepresentation, not a negligent one, and thus cannot sustain an action for negligent misrepresentation."); *Smith*, 495 F. Supp. 3d at 1028 (providing the elements of a negligent misrepresentation claim); *Bowman v. Honeywell Int'l, Inc.*, 438 F. App'x 613 (9th Cir. 2011) ("[A] negligent misrepresentation claim cannot be based upon a promise of future conduct.").

Second, Ms. Oliver could not justifiably rely on vague alleged misrepresentations of an unlimited "proportional" revenue share and "ownership" of a collective. Both negligent and intentional misrepresentation claims in New Mexico require justifiable reliance on the representation being made. *See Jones* 2014-NMCA-016, ¶ 32(discussing justifiable reliance in the fraudulent misrepresentation context); *Garcia*, 1988-NMSC-014, ¶ 16 (listing justifiable reliance as an element of negligent misrepresentation). Two factors to consider when determining whether reliance is reasonable are (1) how sophisticated the party is, and (2) how definite the statement is. *See e.g.*, *Garwood Packaging, Inc. v. Allen & Co.*, 378 F.3d 698, 705 (7th Cir. 2004) (holding that reasonable reliance depends on knowledge of promisee and sophisticated party's reliance on

optimistic assurances were unreasonable as a matter of law); *Johnson v. Univ. Health Servs., Inc.*, 161 F.3d 1334, 1340 (11th Cir. 1998) (it "usually is unreasonable to rely on a substantial promise that has not been reduced to writing.").

Ms. Oliver has emphasized her experience in Silicon Valley and her career in the technology and entertainment industry, *see* Doc. 278-4, at 18 and Doc. 278-5, at 47:7–20, while arguing Mr. Kadlubek was unsophisticated. Doc. 298-18, at 3 (describing the Meow Terms email as "unprofessional but well meaning . . . ."); Ex. A, at 606:18–19 ("I just dismissed that entirely as a junior effort."). Someone sophisticated in business could not possibly have relied on promises of sharing in success at meetings that were "like rallies" with no specific amount, percentage, or way of calculating an amount of revenue. As the Court noted in its order denying Defendants' motion to dismiss, the promise Ms. Oliver seeks to enforce is not specific enough to do so, because it would require the Court to imply terms which are "considerably more complex than the simple monetary compensation New Mexico law allows courts to imply [in contract cases]." Doc. 59, at 14. Given Ms. Oliver's background and the lack of specificity of statements on which she claims to have relied on, she has not presented sufficient evidence that her reliance on such a promise was justifiable.

Third, a fault unique to Ms. Oliver's negligent misrepresentation claim is that, to succeed, Mr. Kadlubek must have owed her a duty of care. *Bar J Sand & Gravel, Inc. v. Fisher Sand & Gravel Co.*, No. CV 15-228 SCY/KK, 2018 WL 3128991, at *5 (D.N.M. June 26, 2018). Parties in an arms-length transaction typically do not owe such a duty to one another. *See Saylor v. Valles*, 2003-NMCA-037, ¶ 18 133 N.M. 432; *Smith v. Woodwind Homes, Inc.*, 605 N.W.2d 418, 424–25 (Minn. App. 2000) (declining to recognize a duty of care by parties on opposite sides of an arm's length transaction); *Fry v. Mount*, 554 N.W.2d 263, 266 (Iowa 1996) (finding no duty of care in

setting where parties were negotiating a commercial transaction). However, some factors are used to determine whether such a duty exists, and the Court denied Defendants' motion to dismiss principally on the basis that they allegedly "affirmatively misrepresented and failed to disclose facts basic to the transaction, despite knowing that Plaintiff was about to enter into it under a mistake as to those facts and that she would reasonably expect a truthful and accurate disclosure of those facts in light of the objective circumstances." Doc. 59, at 30 (citing *Azar Prudential Ins. Co. of Am.*, 2003-NMCA-062, ¶ 61, 133 N.M. 669).

At the close of discovery, Ms. Oliver has presented no evidence indicating that (1) Mr. Kadlubek failed to disclose basic facts of the transaction, or (2) Mr. Kadlubek knew Ms. Oliver was under a mistake of fact. On the contrary, undisputed evidence shows that Mr. Kadlubek repeatedly disclosed facts about the transaction. He did so during All Shrimps meetings, he did so in his email to Ms. Oliver detailing the terms of Art City's offer, and he did so at a mandatory meeting where paper contracts were handed out, which Ms. Oliver was urged to attend. Doc. 230, at 10. Ms. Oliver never expressed any confusion or dissatisfaction of these terms to Mr. Kadlubek. *See* Doc. 278-4, at 18 ("Plaintiff had no reason not to trust this group of artists . . . [and] went to work on her end of the bargain.").

Based on the myriad reasons detailed above, Ms. Oliver's negligent misrepresentation, intentional misrepresentation, and conversion claims cannot succeed and should be dismissed.

## IV
## COPYRIGHT-BASED CLAIMS CANNOT LIE AGAINST MR. KADLUBEK WHEN HE WAS ACTING ON BEHALF OF ART CITY

Ms. Oliver has claimed that Mr. Kadlubek is liable for copyright infringement and violations, or threatened violations, of VARA. Doc. 148, at 17–19. However, Ms. Oliver's copyright-based claims are directed solely at Art City and MWI, not at Mr. Kadlubek. Ms. Oliver has never claimed that Mr. Kadlubek personally infringed Ms. Oliver's copyrights or personally

18

sought to remove her work. The instances of infringement Ms. Oliver alleges are a coloring book and HoER exhibition catalog that include Space Owl and were sold in HoER's giftshop, and the display of ISQ in HoER. *See id.* (alleging infringement based on display of her work at HoER and selling merchandise at its gift shop). No evidence has been adduced that Mr. Kadlubek had any role in creating either the coloring book or exhibition catalog. As for liability for displaying ISQ in HoER, the claim fails because Art City, and then MWI, had an implied license to display the work. *See generally* Doc. 278. Mr. Kadlubek cannot be liable for the lawful display of ISQ.

Ms. Oliver has acknowledged that Mr. Kadlubek is not the target of her copyright infringement claim because none of her experts has given any opinion regarding copyright infringement damages related to Mr. Kadlubek. Ms. Oliver's expert has no opinion on Mr. Kadlubek's profits from any alleged infringement, nor any other opinion related to Mr. Kadlubek. Given this void of evidence, Ms. Oliver's copyright infringement claim against Mr. Kadlubek cannot survive summary judgement.

Ms. Oliver's VARA claim suffers from similar problems, in that her allegations supporting the claim are actions taken by Art City or MWI, not Mr. Kadlubek. Ms. Oliver makes two claims under VARA, first with regard to the attribution right under 17 U.S.C. § 106A(a)(1), which protects an author's right to be appropriately credited, and second with regard to an alleged threat to remove ISQ which was claimed would cause harm that would violate 17 U.S.C. § 106A(a)(3). Doc. 148, at 18–19.

As to attribution, the right applies only to the original physical "work of visual art," defined in the statute to include a "sculpture, existing in a single copy," and does not apply to "any reproduction, depiction, portrayal, or other use of a work in, upon, or in any connection with" the work. 17 U.S.C. § 101; 17 U.S.C. §106A(c)(3). Ms. Oliver has conceded that she is properly

credited at the actual ISQ installation inside HoER. Ex. A, at 539:2–6 (Q. "Okay, so that's the way you wanted it in the ISQ room I assume; right?" A. "Yeah, that seems to be the most that it would be, you know, the – yes, that was fine with me."). Her only specific allegation of an attribution violation related to "Meow Wolf's 'credits' web page indicating ISQ as being part of 'Todos 7.'" Doc. 148, at 18. However, the credits web page is a reproduction of ISQ to which the statute specifically does not apply. Because Ms. Oliver's claim does not go to her original work, it cannot succeed. *See* 17 U.S.C. § 106(A)(c)(3); *Pollara v. Seymour*, 344 F.3d 265 (2d Cir. 2003) (Affirming dismissal on the grounds that "Congress chose to exclude from the scope of VARA all advertising and promotional materials"); *Teter v. Glass Onion, Inc.*, 723 F. Supp. 2d 1138, 1158-1159 (W.D. Mo. 2010) (Granting summary judgment because electronic copies of artwork displayed on a website "fall comfortably within the works that are excluded from liability under VARA"). Accordingly, the claim should be dismissed against Mr. Kadlubek.

As to the second portion of Ms. Oliver's VARA claim, she merely asserts that Defendants have *threatened* to remove her work and removal would cause harm that would be prejudicial to her honor and reputation. *See* Doc. 148, at 19. This claim, which is entirely based on future actions related to ISQ, seeks an injunction to prevent such removal. *Id.* at 24. However, Mr. Kadlubek is no longer the CEO of MWI (Ex. C, at 179:23–25) and thus no longer has the potential to be involved in any removal. The claim for an injunction against him is unsupported by fact, and this portion of Ms. Oliver's VARA claim against Mr. Kadlubek should therefore be dismissed.

## CONCLUSION

For the foregoing reasons, Mr. Kadlubek respectfully requests that the Court enter summary judgment dismissing all claims against him.

Dated: April 6, 2022.

Respectfully submitted,

BARDACKE ALLISON LLP

By: */s/ Benjamin Allison*
    Benjamin Allison
    Maureen Dolan
    Cole Wilson
    Michael Woods
    P.O. Box 1808
    141 E. Palace Avenue
    Santa Fe, NM  87504-1808
    505-995-8000
    ben@bardackeallison.com
    maureen@bardackeallison.com
    cole@bardackeallison.com
    michael@bardackeallison.com

    *Counsel for Defendants Meow Wolf, Inc.*
    *and Vince Kadlubek*

## CERTIFICATE OF SERVICE

I certify that I caused a true and correct copy of the foregoing to be filed through the Court's CM/ECF system which caused all parties and counsel entitled to receive notice to be served electronically as more fully described on the Notice of Electronic Filing.

BARDACKE ALLISON LLP

By:     */s/ Benjamin Allison*
        Benjamin Allison