**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

LAUREN ADELE OLIVER,
an individual,

      Plaintiff,

v.                                                                          Case No. 1:20-CV-00237-KK-SCY

MEOW WOLF, INC., a Delaware
corporation; VINCE KADLUBEK,
an individual and officer;

Defendants.

**DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT ON CONTRACT AND RELATED CLAIMS**

     Defendants Meow Wolf, Inc. (Meow Wolf) and Vince Kadlubek, pursuant to Fed. R. Civ.

P. 56, respectfully move the Court for partial summary judgment (1) declaring the terms of the

parties' contract, (2) limiting plaintiff's damages for breach of contract, and (3) dismissing claims

for breach of covenant of good faith and fair dealing, promissory estoppel, unjust enrichment,

intentional and negligent misrepresentation, and conversion. Plaintiff opposes this motion.

## INTRODUCTION

    Plaintiff Lauren Oliver alleges she contracted with Meow Wolf to install her work Ice

Station Quellette (ISQ) in Meow Wolf's House of Eternal Return (HoER) in exchange for what

her Amended Complaint refers to as an "Artist Revenue Share." Am. Compl. ¶ 23, Doc. 148.

Meow Wolf did establish an Artist Revenue Share program as the centerpiece of its uniform

contracts with the 112 artists who installed art in HoER, of whom Ms. Oliver is one.

    HoER was the first permanent exhibition in Meow Wolf's history. Meow Wolf had begun

as an informal art collective in 2008, formed a limited liability company in 2011 and created more

than twenty immersive art exhibits around the country, but had operated on a model of raising

funds with the hope only of covering out of pockets costs for shows. In 2014, Meow Wolf

developed a vision to build a permanent immersive exhibition in Santa Fe, which would charge admission, compensate artists for their installations for the first time, and provide jobs for artists after the exhibition opened. A meeting was held at Santa Fe's Center for Contemporary Arts to present the plan to artists in the Meow Wolf community. Artists were told about the enormous projected cost of the project, the need to raise investment capital, and that a new company had been formed to do so. Liberty Yablon Dep., Feb. 28, 2022, attached as **Exhibit A**, at 55:4–58:3; 58:11–15; 69:4–8; Tuscany Wenger Dep., Mar. 28, 2022, attached as **Exhibit B**, at 28:8–15. The new company was VCMSE Art City, LLC d.b.a. Meow Wolf (Art City), which built HoER and contracted with the 112 artists who installed art there.[1]

Art City provided a specific monetary revenue sharing amount, or cap, for each of the 112 artists, to be paid from future revenues. In each year that HoER revenues exceeded $1.2 million, 11% of the revenues above that floor poured into an artist revenue sharing pool which was divided among all the artists in the pool that year. For example, HoER opened in March 2016, and revenues for that first partial year did exceed the $1.2 million floor. The first payments under the program were made on schedule in 2017 and each artist received $2000. When an artist reached his or her cap, that artist was dropped from the program, and the remaining money in the pool was divided among the remaining artists in the program until all were paid their cap. The sum of all 112 artists' caps was just over $1 million. Meow Wolf projected it would take seven years to pay all 112 artists, but it took only three years. None of the other 112 artists has sued Meow Wolf claiming the artist revenue sharing program—or Artist Bonus Program, as it was formally named—promised

---

[1] Now that her contract terms are clear, plaintiff has decided it is more lucrative if she does not have a contract with Art City and can instead claim her own installation of ISQ was copyright infringement. Consequently she has begun arguing against the contract her Amended Complaint still alleges, suggesting that the lack of a municipal business license voids her contract. No law conditions the ability to contract on having a municipal business license.

unlimited artist revenue sharing, as plaintiff claims.

Ms. Oliver received an email from Meow Wolf's CEO on April 2, 2015, with the subject line "Meow Terms" (the Meow Terms email), offering her a $10,000 artist revenue share amount, together with other compensation and contract terms. Mr. Kadlubek wrote, "I hope this amount works for you." Ms. Oliver replied "Awesome," and never said the amount was unacceptable or made a counteroffer. Many other HoER artists received similar Meow Terms emails at the same time with amounts specific to them. Twenty-four such Meow Terms emails still exist, each with the recipient's specific Artist Revenue Share amount. See emails from Vince Kadlubek to various artists, attached as **Exhibit C**. The Meow Terms emails said a formal contract was coming, and later in April 2015 Mr. Kadlubek invited Ms. Oliver and many other HoER artists to a meeting "to hand everyone their contract and get things clarified." Plaintiff does not recall going to this meeting.

Nonetheless, Meow Wolf worked diligently to get all artists to sign formal contracts, a fact Meow Wolf's art director, Caity Kennedy, has attested to previously. Caity Kennedy Decl. ¶ 6, May 21, 2021, Doc. 132-12 ("I worked very hard to deliver the remaining contracts to artists who had not been at the meetings. It was important to me that each artist have their contract. . . . I carried contracts in my backpack so that when I saw an artist at HoER, I gave them their contract."). This diligence reached a point where artists would be flagged down when entering HoER if they had not yet signed their contract. *See* **Ex. B**, at 154:2–11 ("I just remember during install watching artists signing their artists agreement contracts and returning them to Caity."). Some artists, like Liberty Yablon, signed their agreement as early as April 28, 2015. Liberty Yablon Revenue-Based Bonus Payment Agreement, attached as **Exhibit D**. These 2015 agreements define the terms of the Artist Bonus Program (called "Revenue-based bonus payments"), complete with a description of

the annual pool described above, examples of how calculations would be made, and clear statements that no individual could receive more than her individual cap. *Id*. Seventeen of these 2015 Revenue-Based Bonus Payment agreements still exist.

In her deposition Ms. Oliver dismissed her Meow Terms email "as a junior effort" that she disregarded, contending the promises constituting the terms of her contract were made in later artist group meetings called All Shrimps meetings. Ms. Oliver described All Shrimps meetings as "like rallies." Another of her witnesses said they were "pep talks," "kind of like being in a mix of a cult and a football team." Drew Lenihan Dep., Jan. 26, 2022, attached as **Exhibit E**, at 59:8–11.

Discovery is now complete. The discovery period was extended to seventeen months, Ms. Oliver took 17 depositions (out of 15 allowed), and received tens of thousands of pages of documents. On the four critical points of what compensation Ms. Oliver was promised, the facts are undisputed.

*First*, as in Ms. Oliver's original complaint, after nearly two years of discovery she cannot identify any definite compensation terms she was promised: she can point to no amount or percentage of revenue she was promised, and no formula agreed upon to calculate her revenue share. *Second*, Ms. Oliver conceded under oath that she was promised no stock, no stock options, no equity, and no ownership units in a limited liability company by Meow Wolf. *Third*, while her amended complaint claims the Artist Revenue Share was uncapped or unlimited, she has testified that at the meetings on which she relies for oral contract promises, the issue of whether the Artist Revenue Sharing program was uncapped or capped *was never addressed*. *Finally*, Ms. Oliver has no facts to support her claim of a promise of "proportional" revenue sharing—although certainly the individual amounts promised to each of the 112 artists were, like any compensation, meant to fairly and proportionally compensate each artist for his or her contribution.

It is undisputed that Ms. Oliver was offered her own specific amount of $10,000 of revenue share stipend. Other artists were offered their own specific amounts depending on the work they were installing. Contemporaneous spreadsheets show all 112 artists' revenue sharing amounts and the annual payments made to pay each artist's cap.

The Artist Revenue Share program had a review and adjustment phase, as a result of the reality that individual artist caps were provided before work was done. After HoER opened, each artist's work was reviewed and artists who over-delivered had their caps raised and artists who under-delivered had their caps reduced. In February 2017, Meow Wolf notified Lauren Oliver that her revenue sharing amount had been reduced to $7,000. Email from Vince Kadlubek to Lauren Oliver, Mar. 17, 2017, attached as **Exhibit F**. Ms. Oliver had been unable to construct ISQ and its Space Owl, and had brought in another artist, Cary Cluett, as a volunteer. Mr. Cluett solved the unique problems in designing the structure of Space Owl, built it, and helped in other areas of HoER as well. Meow Wolf included Mr. Cluett in the Artist Bonus Program although he had not been promised anything before his work on HoER, and reduced Ms. Oliver's cap. *See* Lauren Oliver Dep., Mar. 26, 2021, and April 08, 2021, attached as **Exhibit G**, at 191:12–193:5. While this adjustment was disclosed, Ms. Oliver disputes that it was disclosed to her as a contract term that she agreed to before installing ISQ. Given that dispute and the amount at issue in the adjustment, Meow Wolf does not seek enforcement of the adjustment for purposes of this Motion. Meow Wolf seeks a ruling declaring that Meow Wolf's maximum liability for breach of contract is $3,000: the $10,000 originally promised, less $2,000 Meow Wolf paid and Ms. Oliver accepted and $5,000 Meow Wolf tendered and Ms. Oliver refused.

Under *Anderson v. Liberty Lobby*, a factual dispute is only genuine if a rational factfinder could find for the non-movant. 477 U.S. 242, 252 (1986). Here Ms. Oliver attempts dispute that

she accepted the terms set out in her Meow Terms email, but in addition to having no evidence of different compensation terms, her proposed alternative does not meet the *Anderson* standard. Her claim is that 112 artists were contractually promised an unlimited revenue share with no way to apportion the unknown amount of money between them. While Ms. Oliver has brought experts to try to do this, the other 111 artists could also bring experts, each of whom would value their artist more highly than the others. No rational factfinder could conclude this 112-way deadlock was the parties' contract. Defendants are entitled to summary judgment limiting damages under breach of contract and dismissing her related claims, all of which are based on the same factual allegations, and all of which lack evidentiary support.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

**The House of Eternal Return**

1.     In late 2014, leaders of Meow Wolf developed a vision to build a permanent immersive exhibition in Santa Fe which would charge admission, compensate artists for the first time in Meow Wolf's history, and provide jobs for artists after the exhibition opened. A meeting was held at Santa Fe's Center for Contemporary Arts to present the plan to the Meow Wolf community. Artists were told about the projected cost of the project, the need to raise investment capital, and that a new company had been formed to do so. **Ex. A**, at 55:4–58:3; 58:11–15; 69:4–8; **Ex. B**, at 28:8–15; Doc. 330-3, at 3.

2.     Art City was formed in 2014, built the 20,000 square-foot permanent exhibition HoER, and contracted with approximately 112 artists to install immersive installations. *See* Marianne DeMario Preliminary Expert Report, ¶ 9, Mar. 5, 2021, attached as **Exhibit H** ("In 2014, Meow Wolf was incorporated formally; VCMSE Art City LLC dba Meow Wolf LLC . . . was formed for the purpose of creating HoER."). Some of these artists worked solely on their own art

project(s), and others worked full time or part time on the whole exhibition. HoER opened to the public in March 2016.

3.      Meow Wolf asked Ms. Oliver to submit an art proposal for HoER, which she did. *See* Lauren Oliver Answer to Interrog. No. 3, Nov. 20, 2020, Doc. 278-4; Lauren Oliver Answer to Interrog. No. 5, Nov. 20, 2020, Doc. 278-4 ("In early 2015, Caity Kennedy reached out and asked Plaintiff to submit a proposal, which Plaintiff ultimately did."). Art City accepted plaintiff's art proposal.

4.      Art City's contracts with the 112 HoER artists all followed a similar structure: Art City (1) bought the artist's materials for their installation, (2) provided a revenue share stipend, and (3) in some cases provided a small initial stipend paid during installation. These terms were communicated in emails, many with the subject line "Meow Terms" which contained specific amounts offered to each artist. *See* **Ex. C**. Each email was substantially the same other than individual amounts to be paid to the artist. *Id.*

5.      Ms. Oliver received her Meow Terms email on April 2, 2015. Email from Vince Kadlubek to Lauren Oliver, April 2, 2015, Doc. 278-1. It was from Mr. Kadlubek, Art City's CEO, who wrote: "Writing to you today to talk about the contractual terms for your involvement in the Meow Wolf project. Your project(s) are to be completed by September 1st. We have allocated $1,000 for your personal stipend to complete the project(s). . . . In addition, we want to offer you $10,00 [sic] of revenue share stipend, which we can go over in more depth when we meet. We will also be purchasing all materials agreed upon for your project. I hope this amount works for you." The "$10,00" was a typo and meant $10,000. Doc. 297, at 8, 15 (conceding the offer was for $10,000). Lauren Oliver Dep. 251:25–252:5, Doc. 248-5 (Question: "And the offer wasn't, of course, just the $10,000, or the typo number, it was also, 'We'll buy your materials, and we'll give

you a bit of cash, and you'll keep the IP'; right?" Answer: "Looking at this now, the terms are for a personal stipend and artist revenue stipend, an undecipherable amount, and purchasing materials . . . .").

6.     Ms. Oliver responded "Awesome. Good luck tonight." Doc. 178-1. She did not respond that this amount was unacceptable, and never made a counteroffer or expressed a desire to negotiate any aspect of the parties' agreement. She never emailed Defendants indicating confusion about the terms offered to her. *See, e.g.*, Doc. 278-5, at 247:9-17 (Q. "But you didn't respond to this e-mail with a concern or question; right?" A. "No."); Doc. 278-5, at 244:21–245:3 (discussing Meow Terms email: "Q. In the paragraph before, it says: 'Please let me know if you have any questions or concerns before I send over the contract.' Did you write back with any questions or concerns to Vince? A. No . . . .").

7.     Apart from the "Meow Terms" email, plaintiff has no writing setting forth any other terms for her engagement to install ISQ and space owl. Doc. 278-4, at 236:8–236:25.

8.     On April 27, 2015, Mr. Kadlubek sent an email to plaintiff and other HoER artists with the subject line "Meow Wolf Meeting (Contracts, Please Attend)" inviting them to a meeting where contracts would be handed out to artists and explained. The artists were urged to attend, and the email said the meeting was "pretty close to mandatory." Email from Vince Kadlubek to Lauren Oliver et al., April 27, 2015, Doc. 132-11. Ms. Oliver does not remember going to the meeting. **Ex. G,** at 279:6–8.

9.     At that meeting, printed contracts were handed out to artists who were present. They were form contracts with blanks where individual artists' names and compensation numbers were filled in by hand. *See, e.g.*, **Ex. D** (containing hand-written compensation numbers); Drew Lenihan Independent Contractor Agreement, attached as **Exhibit I** (same).

10.     A "Revenue-based Bonus Payment" sheet described the artist revenue sharing component of artist payments. Artist revenue sharing payments were to be made annually, contingent on Meow Wolf's financial success. **Exs. D** and **I** ("If Meow Wolf exceeds \$1.2M annually, Meow Wolf will set aside 11% of the revenues in excess of \$1.2M. These revenues will be distributed equally amongst all RBP participants."); *see also* **Ex. G**, at 521:5–522:4. Each artist was given a cap, *see* **Ex. C**, which was the aggregate maximum that such artist could receive under the program. "Once an RBP participant reaches his/her cap, they will be removed from the RBP program and distributions will be made equally amongst the remaining RBP participants." **Exs. D** and **I**

11.     Potential investors were told about this artist revenue sharing program in investor disclosure documents. The combined amount set aside for this artist revenue sharing program was \$1,046,500. Loan Participation Units Disclosure Document, Jun. 6, 2015, attached as **Exhibit J.**

12.     Plaintiff contends she entered into a contract with Art City for installation of ISQ in HoER in exchange for money. *See* Doc. 278-5, at 130:9–21 (Q. "Let's make it concrete: In this case you claim there was a contract created by Meow Wolf making you an offer, and you accepting that offer by installing ISQ. Isn't that correct?" A. "Yes, in this instance, this is what we claim, and this is exactly – I mean clearly this is what happened. I was operating on these promises that were made verbally in front of many others, and so I installed the work, yes."); Doc. 148, at ¶ 104 ("Oliver accepted Defendants' offer, and installed ISQ at HoER according to its terms, thereby creating a contract.").

13.     Ms. Oliver attended regular artist meetings with other artists working on HoER, called "All Shrimps" meetings, where Mr. Kadlubek discussed how artists like Ms. Oliver would be paid their revenue share if HoER was profitable. Doc. 278-4, at 11 ("Plaintiff could not be

assured of any payment if the venture was not a success, but if it were, she would proportionally share in that success through a share of revenue and membership in the collective"); Doc. 278-5, at 234:6–10 (A. "[T]he promise or offer that I heard was in the late summer and fall [of 2015], and this was conveyed verbally at meetings with everybody."). **Ex. G**, at 524:20–25 (Q. "So did you go to All Shrimps meetings in 2015?" A. "The All Shrimps were the meetings I went to.").

14.     Ms. Oliver asserts that Meow Wolf verbally offered the same contract to all HoER artists. *See* Doc. 278-5, at 526:2–7 ("Q. Okay. So the offer he was making was one that was not made specifically to you, Lauren Oliver, it was made to the whole group of artists. Is that right? A. It was made to the whole group of artists, and again, I expected paperwork."); *see also* Doc. 278, at 234:6–10 ("[A. T]he promise or offer that I heard was in the late summer and fall, and this was conveyed verbally at meetings with everybody. And no, I did not receive any paperwork that said or reflected that.").

15.     The All Shrimps meetings were "like rallies." **Ex. G**, at 606:1–6. Another witness for Ms. Oliver described them as being "pep talks," and when asked what was said about the Artist Revenue Share responded: "I mean, I think—you know, going back to like a pep talk mentality, yeah. It's like, we're all working so hard and here's how we'll be compensated some day." **Ex. E**, at 68:4–8. When asked if he thought Mr. Kadlubek's statements at All Shrimps meetings formed a compensation contract with him, Mr. Lenihan replied, "I did not take Vince's pep talks as a legal document, if that answers the question." **Ex. E**, at 70:1–7.

16.     In the meetings, there was no promise that the Artist Revenue Share would be uncapped or unlimited:

> Q. Okay. And just so I understand, did you hear the words -- well, what I understand your testimony is that you never heard the word 'cap' in those meetings. Is that right?
> A. I never heard it.

Q. Okay. And so you didn't hear the words 'There is no cap.' It wasn't that they affirmatively said, 'There is no cap,' it's that they never brought up the word 'cap.' Is that right?

A. They never said the work 'cap,' only 'share.'

Q. So they never said, 'There is no cap' in those meetings; true?

A. I can't say if they used that exact language. I can tell you I never heard the word 'cap,' so technically I did not hear those words. "There is a cap; there is no cap." I didn't ever remember hearing the word cap.

**Ex. G**, at 609:1–20. Other of Ms. Oliver's witnesses testified similarly:

Q. In any of these meetings during the build of the House of Eternal Return, were you and the other artists ever promised an unlimited share of Meow Wolf's revenue?

MR. BOYD: Form.

A.      An unlimited share?

Q.      (Mr. Allison) Right.

A.      No, I was never promised an unlimited share.

**Ex. E**, at 68:22–69:3.

17.     There was no specific promise to Ms. Oliver regarding a percentage of revenue, ownership, equity, stock, or shares of ownership in a limited liability company. Doc. 297, at 9; Doc. 278-5, at 45:7–15 ("Q. Ms. Oliver, did anyone ever promise you a specific percentage or amount of stock options in Meow Wolf? . . . [A]. No."); Doc. 278-5, at 46:22–25 ("Q. . . . Did anyone ever promise you a specific percentage or amount of equity in Meow Wolf? A. No."); Doc. 278-5, at 48:12–14 ("Q. . . . Did anyone promise you shares of stock in Meow Wolf? A. No specific shares of stock."); Doc. 278-5, at 48:15–20 ("Q. Did anyone promise you shares of ownership in an L.L.C. in Meow Wolf?" "A. No.").

**Plaintiff's Accepts by Words and by Performance**

18.     After responding "Awesome" to the Meow Terms email, Ms. Oliver went on to design and install ISQ. She did not express disagreement or concern about the terms in the Meow Terms email, or make a counteroffer. *See* Doc. 278-5, 244:21–245:5, 246:18–246:25, 247:13–17.

19.     Meow Wolf asked to adjust the timing of portions of its agreement with Ms. Oliver, who agreed that her $1,000 payment would be paid in a lump sum rather than a bi-weekly installment, and to a shift in HoER's opening schedule. *Compare* Doc. 278-1 *with* Doc. 278-5, at 181:17-22 ("Q. Well, let's go up to the next e-mail where you respond. A. I say: Megan, don't worry about me re pay schedules. I'll go with whatever works best for Meow Wolf." (internal marks omitted)); *see* Doc. 287-5, 602:4-22 ("[A.] From memory, the April 2 e-mail outlined a timeline that was different . . . the timeline changed."); Doc. 287-5, 603:23-604:1 ("[Q.] I hear you saying that the time schedule, as it turned out, was different, because it was extended. A. Yes, sir.").

20.     Ms. Oliver delivered ISQ to Meow Wolf in time for HoER's opening, as contemplated by the parties' agreement. *See* Doc. 148, at ¶ 103 ("In exchange for Oliver's timely installation of ISQ at HoER ...."); Doc. 278-5, 209:4-7 (Q. "My question was just that you installed ISQ from January to March 2016 at the House of Eternal Return." A. "Oh, okay. I'm so sorry. Yes, sorry."); Doc. 278-4, at 11 ("[Plaintiff] put everything she had into the work . . . to meet Defendant's deadline to finish."); Doc. 278-4, at 19 ("Upon completion of installation of ISQ at HoER, Plaintiff had fulfilled her obligations under the parties' contract.").

**Meow Wolf Performs its end of the Bargain**

21.     Meow Wolf bought the material plaintiff budgeted for her installation. **Ex. G**, at 111:9–113:2 ("Q. BY MR. ALLISON: I am showing you what' been marked as Exhibit 5A. Would you open that and tell me what it is? A. . . . It's an email to me . . . Subject: Ice Station Materials . . . I remember the spreadsheet, and I plugged in all my materials and my expected costs. . . . Q. Okay. And Meow Wolf bought the costs, or was buying the materials for ISQ; right? A. Yes.). Meow Wolf also reimbursed Ms. Oliver for additional materials needed to install ISQ.

*See* Doc. 278-5, 209:18–210:5 (Q. "Kate Lesta offered to send you to Home Depot with a card if you needed to; right? … Is that right?" A. "Oh, yes, if I needed to.").

22.      Meow Wolf tendered $1,000 to Ms. Oliver during installation of ISQ, which she directed to Cary Cluett. *See* Doc. 278-5, at 212:21–25 (Q. "[Y]ou got to direct the $1,000 in Kate Lesta's Slack messages; right?" A. "As the director/artist of Ice Station Quellette, the installation, yes, I directed where that labor budget went to."); Doc. 278-5, at 192:5–10 (Q. "Okay. Did you pay Carey anything for all that work—two and a half months, maybe plus a little—other than the $1,000 that you directed Kate Lesta to give him?" A. "No. I took him to lunch and dinner a couple of times, or a few times."); **Ex. G**, at 192:25-193:17 ("Q. So my question to you is Vince promised you $1000 in the April 2 email called "Meow Terms"; right? A. Yes. Q. And Kate Lesta . . . said, "That is up to you" when you told her who to direct it to. Is that right? A. Well, again, I was running [the installation] . . . I directed how we spent the budget for materials and how we spent the budget for labor.)

23.      Meow Wolf gave Ms. Oliver the opportunity to sell merchandise in its gift shop, which she did. Lauren Oliver Dep., Doc. 330-7, at 133:16–22, 166:16-167:2. Meow Wolf twice presented her with consignment contracts for her signature, but Ms. Oliver refused to sign either one. **Ex. G**, at 142:1–19, 161:17–162:4**.** Nonetheless, Meow Wolf paid Ms. Oliver thousands of dollars through these sales. *See* Gift Shop Statements for Lauren Oliver, Dec. 7, 2016, through May 31, 2018, collectively attached as **Exhibit K** (totaling $14,315.35). The total obtained from Ms. Oliver's gift shop statements is missing more than a year's worth of sales Ms. Oliver made at Meow Wolf's gift shop. *See* Doc. 330-7, at 166:16–167:2 (acknowledging gift shop sales continued through 2019).

24.     Meow Wolf made its first Artist Revenue Sharing Program payments in 2017. Ms. Oliver and other artists each received $2,000. Bonus Payment Spreadsheet, Doc. 278-6.

25.     The Artist Revenue Share and Artist Bonus Program were two names for the same thing. **Ex. A**, at 189:22–190:14; *see also* Emails between Lauren Oliver and Shana Pedroncelli, Mar. 4, 2019, attached as **Exhibit L** ("Is this the check with the $2000 artist bonus?").

26.      Meow Wolf followed up several times with Ms. Oliver to make sure she received her $2,000 payment and understood that it was for her share of the Artist Bonus Program. Ms. Oliver eventually understood it was for the Artist Bonus Program. See Doc. 330-7, at 1 ("Okay, so this is the just [sic] the artist revenue thing -- thank you!"); **Ex. L** (Oliver: "Is this the check with the $2000 artist bonus?" Pedroncelli: "It is that one.").

27.     Ms. Oliver asked for this check to be reissued and cashed it. Doc 278-4, at 5 ("Plaintiff was sent one check for $2000."); **Ex. L** ("I'm about ten days from New Mexico could you reissue? A million thanks."); Doc. 278-5, at 501:8-21 (Q. "In Exhibit 76B you see the $2,000 amount, and then $165 and $336, and the total check amount is $2502.60. Is that the $500 in consignment money that was lumped in with it?" A. "That's exactly right." Q. "And then Exhibit 76C is the check itself. Do you see that?" A. "Yes, I do." Q. "Is that your signature on the back?" A. "I assume it is, yes." Q. "Okay. So that's the check that you cashed; right?" A. "That is the check that I cashed for $2500.").

28.     Meow Wolf attempted to make another payment in 2018, to which Ms. Oliver did not respond until 2019. *See* Emails between Stephanie Deutsch and Lauren Oliver, Aug 9, 2018, attached as **Exhibit M**; Emails between Lauren Oliver and Megan Brinkerhoff, Mar. 5, 2019, attached as **Exhibit N**.

29.     Meow Wolf tendered $5,000 of Ms. Oliver's Artist Bonus Program amount to Ms. Oliver, which she refused. Email from Meow Wolf to Lauren Oliver, August 5, 2019, attached as **Exhibit O** ("Our records indicate that you have an outstanding balance for the Artist Bonus Payment of $5,000. Please sign and complete the attached document and we can prepare a check for you."); Doc. 278-5, 455:24–456:3 ("Q. . . . . I thought you had said it would be inappropriate for you to sign this 2019, $5,000 Bonus Program Agreement. A. It would be."). While the form agreement Oliver was asked to sign to get this $5,000 included a copyright assignment, Ms. Oliver knew she would not have to assign her copyright to get the $5,000 because she was in discussions to assign her copyright to Meow Wolf for much more. In fact, at that time, she had a pending written offer from Meow Wolf of $35,000 for her copyright in ISQ. Email from Talia Kosh to Lauren Oliver, June 11, 2019, attached as **Exhibit P** (attaching proposed contract for assignment of copyright in exchange for $35,000).

30.     ISQ was worth $5,000 at the time of its installation in 2016. Mary Peck Fair Market Value Appraisal Report, at 20, Apr. 16, 2016, attached as **Exhibit Q**. No other appraisal of ISQ been done.

## ARGUMENT

Summary judgment is proper when there are no genuine issues of any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is "material" if it may reasonably affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is not "genuine" unless there is evidence sufficient to cause a reasonable jury to find in the nonmovant's favor. *Id.* at 252.

On a motion for summary judgment, it is the Court's role to determine whether Ms. Oliver has presented evidence on which a reasonable jury could find in her favor. *Id.* at 252. "The mere

existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Id.* Although the court cannot weigh evidence, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id.* at 247–48 (emphasis in original). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

Further, the court must be mindful of the ultimate standard of proof the plaintiff faces. *Anderson*, 550 U.S. at 252. If there is an absence of evidence, and the plaintiff produces no evidence for a point, there is no material question of fact about it. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986) ("[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case.").

**I**
**UNDISPUTED FACTS ESTABLISH THE PARTIES'**
**CONTRACT WAS FOR A SPECIFIC $10,000 REVENUE SHARE AMOUNT**

As the Court has noted, the parties agree they have a contract, and the outcome of this case hinges on identifying its compensation terms: "The contract alleged in both Plaintiff's amended complaint and Defendant's counterclaim is the contract pursuant to which Plaintiff agreed to install ISQ in the HoER and Defendant agreed to compensate her. The parties simply dispute the nature and amount of the compensation to which the parties agreed." Doc. 325 at 17 (citations omitted).

With discovery complete, the material facts about these terms are not genuinely disputed. After seventeen months of discovery, plaintiff can point to no specific compensation terms that she was promised. Although her Amended Complaint alleges a "proportional" revenue share,

plaintiff has no evidence that anyone said "proportional," much less what that specifically meant. By itself, it means no more than "fair," which is not a compensation term. Even with discovery having been extended by eleven months and after seventeen depositions, plaintiff still has no more compensation terms than her original complaint alleged, which is to say none.

Plaintiff's contract damages expert, Marianne DeMario, acknowledged this. In her deposition Ms. DeMario was shown the Court's November 25, 2020, Memorandum Opinion and Order where the Court states that in her original complaint Ms. Oliver alleged neither an amount or value of her compensation, a method for her compensation to be calculated, or any terms governing an ownership interest or revenue share she was to receive. Doc. 59 at 13. Ms. DeMario testified this is still the case, two years later and with all discovery complete. Marianne DeMario Dep., Mar. 16, 2022, attached as **Exhibit R**, at 105:1–106:2 (stating, after reviewing Court's ruling, that she had no knowledge of any "specific amount or percentage of artist revenue share that Lauren Oliver claims there was an agreement about for her."); *see* **Ex. H**, at ¶ 19 (assuming percentage amounts of artist revenue share).

The only evidence of the parties' contract terms is in the Meow Terms email from Meow Wolf's CEO to Ms. Oliver. Doc. 278-1. Three clear compensation elements are offered: a $1,000 initial stipend, the purchase of her materials, and a $10,000 revenue sharing stipend. *Id*. Ms. Oliver in fact concedes the existence of these terms. First, she alleges a revenue share agreement in her amended complaint: "Defendants promised that, in lieu of upfront payment for installing her art in the HoER, Oliver would be compensated as a member of the Collective and through a back-end payment of an 'Artist Revenue Share.'" Doc. 148, at ¶ 74. Second, Ms. Oliver testified that Meow Wolf promised to buy her materials. **UMF 21.** The only source in this case for an agreement by Meow Wolf to buy Ms. Oliver's materials is the Meow Terms email. Third, Ms. Oliver testified

that Meow Wolf provided her a $1,000 payment, which she described as a labor budget. **UMF 22**. Again, the *only source* in this case where Meow Wolf promised Ms. Oliver $1000 during installation is in the Meow Terms email.

Ms. Oliver thus confirms the validity of the terms set out in the Meow Terms email. While she claims (after this litigation began) that she "completely forgot about" the email and "dismissed it as a junior effort," her response at the time was objective assent: "Awesome." Lauren Oliver Dep. 606:18–19, Doc. 348-1; Doc. 278-1.

By contrast, Ms. DeMario invented compensation terms since plaintiff could point to none. She began by rejecting the Meow Terms email even though she testified she wanted to find contemporaneous documents that reflected the parties' understanding. **Ex. R**, at 200:5–8 (Q. "[Y]ou wanted to find documents contemporaneous with when [Oliver] reached her understanding, right?" A. "Correct."); 150:21–25 (Q. "The April 2, Meow Terms document was a contemporaneous document under the terms you gave me, agreed?" A. "That was a contemporaneous document."); 135:17–22 (Q. "And you said you considered this document. How did you consider it?" A. "I reviewed it. I believe I spoke with Ms. Oliver about it and she told me that this did not reflect her understanding of the terms that she was agreeing to.").

Despite rejecting the Artist Bonus Program—and in what could only be called chutzpah— Ms. DeMario took terms from Meow Wolf's actual Artist Bonus Program, like the annual pool made up of 11% of revenues over a $1.2 million threshold, **Exs. D** and **I,** while arbitrarily ignoring other terms in the same document. *See* **Ex. H**, at ¶¶ 19–21. She ignored the $1,046,500 aggregate cap on the pool, even though that cap was described in the same document from which she took the 11% and $1.2 million. *See id.* She ignored the $10,000 cap promised to plaintiff, and ignored Meow Wolf's spreadsheet showing not only plaintiff's but all 112 artists' assigned caps making

up that $1,046,500 aggregate pool. *See id.* This kind of shameless alteration of contract terms through the lens of seller's regret—years after the bargain was struck—is not countenanced by the law. *Smith v. Price's Creameries, Inc.*, 98 N.M. 541, 545 (1982) ("The courts cannot change or modify the language of a contract, otherwise legal, for the benefit of one party and to the detriment of another."); *Mitchell v. Intermountain Cas. Co.*, 1961-NMSC-138, ¶ 6, 69 N.M. 150 ("Contractual damages recoverable for breach of the contract are those damages contemplated by the parties at the time of the making of the contract.").

### A.      Ms. Oliver Accepted the Terms Set out in the Meow Terms Email

An enforceable contract consists of offer, acceptance, and consideration evidencing mutual assent. *Garcia v. Middle Rio Grande Conservancy Dist.*, 1996-NMSC-029, ¶ 9, 121 N.M. 728; *see Pope v. Gap, Inc.*, 1998-NMCA-103, ¶ 11, 125 N.M. 376 ("For an offer and acceptance to create a binding contract, there must be an objective manifestation of mutual assent by the parties to the material terms of the contract."). The Meow Terms email made a complete offer, including what each party was to deliver, the schedule, compensation, ownership of rights, and ownership of the tangible copy of the work. *See Naranjo v. Paull*, 1990-NMCA-11, ¶ 14, 111 N.M. 165 ("In the law of contracts an offer is a proposal setting forth the essential terms of the prospective transaction") (citing Restatement (Second) of Contracts §§ 24, 33); *Padilla v. RRA, Inc.*, 1997-NMCA-104, ¶ 8. 124 N.M. 111.

When Meow Wolf needed to modify terms that were set out in the Meow Terms email, it asked Ms. Oliver and she agreed. This occurred twice: the scheduled payment for Lauren Oliver's $1,000 labor stipend was changed from a bi-weekly installment to a lump sum payment, which Meow Wolf asked for and she agreed to. **UMF 19.** And when Meow Wolf needed to shift its

opening schedule to a later date, Ms. Oliver agreed. *Id.* The Meow Terms email requested installation by HoER's opening date, and Ms. Oliver met that requirement. Doc. 278-1; **UMF 20.**

Ms. Oliver claims her reply to the Meow Terms email ("Hey. Awesome. Good luck tonight.") was not acceptance but was "mirroring Defendant Kadlubek's stated excitement in his closing salutation." Doc. 344, ¶ 15. While she disputes the legal conclusion, she cannot dispute this was an objective manifestation of assent. *See Pope*, 1998-NMCA-103, ¶ 13 ("Mutual assent is based on objective evidence, not the private, undisclosed thoughts of the parties. In other words, what is operative is the objective manifestations of mutual assent by the parties, not their secret intentions.").

Plaintiff's conduct also demonstrates her acceptance. *See* Restatement (Second) of Contracts § 22 ("manifestation of assent may be made wholly or partly by written or spoken words or by other acts"). There is no dispute Ms. Oliver performed what the offer requested: she installed ISQ in the HoER exhibit. **UMF 20.** Ms. Oliver's performance was as contemplated by the Meow Terms offer, for which no different compensation had ever been negotiated.[2] *See Trujillo v. Chavez*, 1966-NMSC-175, ¶ 7, 76 N.M. 703 ("We believe it to be elementary law that when parties by conduct manifest an intention that one is to perform a certain thing and the other is to compensate him therefor, a contract is implied in fact."); *Long v. Allen*, 1995-NMCA-119, 120 N.M. 763 (finding that an offeree accepted a counteroffer when he paid the requested amount of

---

[2] Ms. Oliver notified Meow Wolf several days after the exchange that she had not seen a formal contract. Lauren Oliver Decl. ¶ 12, Feb. 11, 2022, Doc. 298-18. As promised in the Meow Terms email, though, on April 27, 2015, Meow Wolf followed up by announcing a mandatory meeting where the formalized contracts would be signed. **UMF 8.** Lauren Oliver does not remember attending the meeting. *Id.* But there is evidence that Ms. Oliver was given her formal written contract anyway. Doc. 132-12, at ¶ 6.

money specified by the counteroffer); Restatement (Second) of Contracts § 72 cmt. a, (stating the "general rule that exchange of performance for promise is an enforceable bargain"); Restatement (Second) of Contracts § 32 (in case of doubt, offeree may accept by promise or performance).

**B.      No Reasonable Factfinder Could Believe
        Ms. Oliver's Version of the Contract Terms**

As set forth above, plaintiff has identified no contract terms outside of the Meow Terms email after deposing seventeen witnesses in a seventeen-month discovery period. This absence of evidence alone is enough for the grant of summary judgment. In addition, plaintiff's two alleged contract promises fail as a matter of law. First, she alleges Meow Wolf promised her membership in a collective; second, she alleges Meow Wolf promised her a revenue share proportionate with Meow Wolf's success. Doc. 148 ¶¶ 103. These promises are without meaningful content, unenforceably vague, and would result in an impossibility.

Neither alleged promise is definite enough to be enforceable. In New Mexico, a contract "requires more than just the parties' intent to be bound" to be enforceable *Padilla*, 1997-NMCA-104, ¶ 8 ("Even though a manifestation of intention is intended to be understood as an offer, it cannot be accepted so as to form a contract unless the terms of the contract are reasonably certain.") (citing Restatement (Second) § 33(1)). To be sufficiently definite, the terms of the contract must be capable of "provid[ing] a basis for determining the existence of a breach and for giving an appropriate remedy." *Id.* Here, it is not possible to determine an appropriate remedy based on Ms. Oliver's alleged promises.

As to the promise of membership in a collective, a collective is not an entity. Consequently it has no equity mechanism, cannot contract, and cannot own property. Nothing is owned by being a member of a collective, and Ms. Oliver has never cited authority to the contrary. Although plaintiff claims that belonging to an art collective implies entitlement to funds the collective has,

undisputed facts about art collectives contradict this. Meow Wolf as a collective used its money only for costs and never for compensation for artists. **Ex. A**, at 36:4–17; 267:9–14. Undisputed testimony about another Santa Fe art collective, the Squirrels, is that money the collective earned from its art projects went toward funding future art projects or reimbursing members, rather than paying members. *See* **Ex. B**, at 17:5–12, 20:13–21:21. Because a collective is not an entity, many art collectives form companies, as both the Squirrels and Meow Wolf did. Ms. Oliver's friend and witness Liberty Yablon, who unlike Ms. Oliver was a member of Meow Wolf years before Art City was formed, testified that Meow Wolf was both a collective and a company, and there was no contradiction between the two coexisting. **Ex. A**, at 46:2–13.

A promise of "membership in a collective" is meaningless in New Mexico under *Padilla v. RRA, Inc.*, because those words neither define breach nor establish a remedy. 1997-NMCA-104, ¶ 8 ("[T]he terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy (quoting Restatement (Second) of Contracts § 32(2))). Indeed, it would be impossible, based on Ms. Oliver's alleged promise, to determine what she should be entitled to should she be successful on the merits of her claim.

As to Ms. Oliver's claim that Meow Wolf offered her a revenue share "proportionate to Meow Wolf's success," this likewise fails the *Padilla* standard. Ms. Oliver claims her promise was delivered to all artists in All Shrimps meetings, where the Revenue Share Program was described as "share, share, share." **Ex. G**, at 509:5–510:13 ("The mechanism by which we were incentivized to install our work, and in my case, spend months and months and months designing and installing my work, was for a Revenue Share Program. All I heard was 'share,' 'share,' 'share,' and I knew that it was calculated on an annual basis, based on the revenues of the House of Eternal Return,

and that would emerge in--it could emerge in any form . . . ."). Beyond this, Ms. Oliver is unable to point to any specific promises to her, and has in fact conceded the point. **UMF 17**.

The contract terms Ms. Oliver proposes would result in an impossibility. She testified that all HoER artists were promised what she was promised: an unknown share of HoER's revenue for an unknown time, with no formula for calculating anyone's share other than "proportional." *See id.*; **UMF 14**. Ms. Oliver's solution to this problem is to hire expert witnesses to opine that ISQ is worth 5–8% of HoER. The other hundred-plus artists obviously could hire their own experts to opine on the value of their work. Inevitably these 112 different expert teams would disagree, each touting the value of their own artist. More disagreement would occur because there is no agreed time at which value was to be assessed (or re-assessed as time went on) and the value and popularity of various works can rise and fall over time. No rational fact-finder could believe this 112-way deadlock, extending for unknown periods of time, was the compensation term the parties agreed to.

Moreover, plaintiff's proposed terms would contradict the formal written contracts many HoER artists have—because Ms. Oliver claims her contract terms also apply to all HoER artists. Two of Ms. Oliver's own witnesses have formal 2015 artist contracts with clear Revenue-based Bonus Payments of $10,000 and $7,500 respectively. *See, e.g.*, **UMF 9**. Plaintiff has never offered an explanation for how such artists could have another—and conflicting—contract covering the same installation.

This is a bridge too far. No rational jury could find for the non-movant on the terms of contract at issue. Under *Anderson v. Liberty Lobby*, trial is unnecessary because this contract dispute is not genuine, and summary judgment should be entered.

### C.   <u>Meow Wolf Fulfilled its Contract Obligations</u>

It is undisputed that Meow Wolf both made payments and tendered others according to terms set out in the Meow Terms email. Meow Wolf paid the $1,000 installation stipend, which Ms. Oliver directed to her assistant, Cary Cluett. **UMF 22.** It both bought and reimbursed Ms. Oliver for materials. **UMF 21.** Meow Wolf issued a check in 2017 for $2,000 as Ms. Oliver's first annual installment toward her revenue sharing stipend—which Ms. Oliver cashed. **UMF 25**.

A series of emails from late 2018 through early 2019 shows the efforts Meow Wolf made to follow up with Ms. Oliver and pay her annual Artist Bonus Program payments up to her $7,000 adjusted cap. *See* **UMF 26; UMF 27; UMF 28.** The emails further show Ms. Oliver was aware that the $2000 payment was payment under the Artist Bonus Program:

- On August 9, 2018, Stephanie Deutsch sent Ms. Oliver an email stating, "It's that time of year again! Round 2 of the Artist Revenue Checks are going to be dispersed soon. Attached you will find the Bonus Program Description, a W9, and the Bonus Agreement to sign." After receiving no response from Ms. Oliver, Ms. Deutsch wrote again on August 22, 2018, to inquire. Ms. Oliver wrote back the same day, "away from civilization, back in September." **Ex. M**; **UMF 28**.

- In a separate thread Ms. Oliver wrote to Megan Brinkerhoff, previously Megan Roniger, on March 5, 2019, "I received an email from Shana Pedroncelli about a check I received. I didn't cash it because I mistook it for the artist share program and it was different that [sic] the amount on the paperwork you sent but Shana said it was unrelated. I'm wondering what that was now, and what I have to do to get the artist share check (and whether I've ever received an artist share check???)" On March 6, 2019, in the same thread, she wrote, "I thought for sure you had sent me paperwork for the annual artist bonus whatever check for $2750 or something?" **Ex. N**; **UMF 28**.

- Having realized the 2018 ABP email hadn't been from Ms. Brinkerhoff, (*See* Exhibit 73, March 8, 2019 email "I found the email – not you – sorry to bother") she resumed the email chain with Ms. Deutsch, also on March 8, and stated, "I'm returning to Santa Fe shortly and will be able to sign and return. I'm not sure whether I've received any of the previous artist revenue checks. I wonder if you could have a look at that." *See* **Ex. M**.

- In yet another email thread, begun by Ms. Pedroncelli, who'd written to inquire about an uncashed check, Ms. Oliver responded on March 4, 2019, "Is this the check with the $2000 artist bonus? I didn't cash it because I was sent a note that I would be receiving 2750, by Megan. So I put it away . . ." Ms. Pedroncelli responded later that "The $2750

is Separate from the $2165.90. So, please try and cash this check and let me know if it works or doesn't. I will gladly re-issue if it does not. The $2750 will be issued when proper paperwork is filled out." **Ex. L**; **UMF 25**; **UMF 26**; **UMF 27**.

- Later, in April of 2019, Ms. Pedroncelli again wrote to inquire about uncashed checks. In that thread, Ms. Oliver wrote, "I don't even understand what it's supposed to be and how it's different form the artist profit sharing thing that I don't actually think I've ever received." Ms. Pedroncelli responded, "The $2000.00 is from 2017, and the $2750.00 will be paid out when you submit the paper work to Stephanie Deutsch. So, it is the same thing, just different years." Ms. Oliver responded, "Okay, so this is the [sic] just the artist revenue thing – thank you!" Ms. Pedroncelli concluded, "Yes, so many titles for the same thing!" **Doc. 330-7**; **UMF 26**.

Ms. Oliver thus received and accepted payment under the Artist Bonus Program, and acknowledged that the Program (the explicit subject of the original August 2018 message from Ms. Deutsch) and the Artist Revenue Share program were the same. Further, Ms. Oliver specifically requested these artist revenue checks. When faced in her deposition with contemporaneous emails showing she knew the $2,000 check was her Artist Bonus check, Ms. Oliver evaded by suggesting she did not get the check or cash it. Doc. 278-5, 496:4-16 (Q. "What check were you asking her to reissue? A. 24101. Q. Is that a check number. A. Yeah, that's a check number. Q. Okay. That's the check with the $2,000 Artist Bonus in it; right? [A]: Is this the check with the $2,000 Artist Bonus? So I asked for it. Now the interesting thing is did I ever cash that check? Did I ever get it?"). But Ms. Oliver did receive the check and she did cash it. Doc. 278-5, 500:12 ("A. I did cash it.").

Ms. Oliver testified she rejected the remaining $5,000 Meow Wolf offered her. **UMF 29**.

### D. Meow Wolf Intends to Prove the Adjustment Phase was A Term of its Contract at Trial, but at Summary <u>Judgment, Contract Damages Should Be Limited to $3,000</u>

Damages for breach of contract are based on the benefit the plaintiff obtained through her contract. *See Stewart v. Potter*, 1940-NMSC-052, ¶ 16, 44 N.M. 460. A party rejecting payment made under a contract cannot recover that amount in damages because it was avoidable.

Restatement (Second) of Contracts § 350 ("[D]amages are not recoverable for loss that the injured party could have avoided without undue risk, burden or humiliation."); *Hickey v. Griggs*, 1987-NMSC-050, ¶ 22, 106 N.M. 27 ("The legal rule of mitigation is designed to discourage persons against whom wrongs have been committed from passively suffering economic loss which could be averted by reasonable efforts, or from actively increasing such loss where prudence requires that such activity cease."); N.M. Code R. § 13-1811 (LexisNexis 1991).

As set out above, all artists' revenue share amounts were reviewed and, in some cases, adjusted after contract performance. While Meow Wolf expects at trial to prove this adjustment phase as part of its contract with plaintiff, Meow Wolf does not argue at summary judgment that plaintiff indisputably agreed to the adjustment phase. As a result, Meow Wolf asks the Court to declare that the Meow Terms email reflects the terms of the parties' contract, that Meow Wolf fulfilled $7,000 of the $10,000 revenue share stipend, and that unless and until the $3,000 reduction is proved at trial as part of the contract, plaintiff's damages for breach of contract are limited to $3,000.

## II
## MEOW WOLF FULFILLED ITS CONTRACT IN GOOD FAITH, AND ACTIVELY SOUGHT TO PROVIDE MS. OLIVER THE BENEFIT OF HER BARGAIN

In addition to breach of contract, Ms. Oliver has claimed that Meow Wolf breached the implied covenant of good faith and fair dealing. Doc. 148, at 20. In New Mexico, "every contract imposes a duty of good faith and fair dealing on the parties with respect to the performance and enforcement of the terms of the contract." *Sanders v. FedEx Ground Package Sys.*, 2008-NMSC-040, ¶ 7, 144 N.M. 449. "[T]he covenant prevents a party from acting in bad faith to frustrate the contract's *actual* benefits." *Henning v. Rounds*, 2007-NMCA-139, ¶ 26, 142 NM. 803 (quoting *Guz v. Bechtel Nat'l, Inc.*, 8 P.3d 1089, 1112 n.18.) "[T]he covenant of good faith and

fair dealing requires that neither party do anything that will injure the rights of the other to receive the benefit of their agreement." *Id.* (citation omitted).

Because the actual benefits of the parties' agreement were the terms accepted by plaintiff in the Meow Terms email, undisputed facts show Meow Wolf exercised good faith in delivering those benefits to plaintiff. Meow Wolf not only bought the materials plaintiff budgeted for her installation, but offered to send her to Home Depot with the Meow Wolf credit card to buy more materials. **UMF 21.** When Meow Wolf needed to change even the timing of small payments under its contract, it sought out and received plaintiff's agreement in advance. **UMF 19**. Meow Wolf gave plaintiff lucrative merchandising opportunities in its gift shop for years, even though Meow Wolf twice presented consignment contracts which Ms. Oliver never signed. **UMF 23.**

What is more, Ms. Oliver *did* benefit from her agreement. Meow Wolf honored its covenant by providing Ms. Oliver the technical and financial support necessary for her to realize her artistic vision. *See* **UMF 21.** Meow Wolf went to considerable trouble to repeatedly follow up with her to pay her revenue sharing stipend when she was not asking for it. **UMF 26**; **UMF 27**; **UMF 28**; *supra* 22–23. Meow Wolf even promoted her work until Ms. Oliver complained about it. *see* Doc. 148, at ¶ 28.

Meow Wolf took on an obligation to artists totaling more than one million dollars. Doc. 132, at ¶ 4. The compensation offered to Ms. Oliver and other artists was not only accepted and reasonable; it was many times more than Ms. Oliver had ever made from her art before or since. There had never been money to pay any Meow Wolf artist anything before HoER. Ms. Oliver in her own art career outside of Meow Wolf had sold pictures for $200, given them away, and had never sold any work of art for more than $1,000. **Ex. G,** at 251:6–12. The $10,000 offered by Meow Wolf was far and away the largest art sale she had ever made. No one knew if HoER would

succeed. As Ms. Oliver testified in her deposition, her mindset was, "If we don't make any money, hey, that was a good time." **Ex. G,** at 230:8–17. The terms of the Artist Bonus Program were clear, and Meow Wolf adhered to those terms. Ms. Oliver's claim for breach of the covenant of good faith and fair dealing is thus insupportable on its face and should not survive summary judgment.

### III
### PROMISSORY ESTOPPEL AND UNJUST ENRICHMENT SHOULD
### BE DISMISSED BECAUSE OF THE PARTIES' CONTRACT AND BECAUSE
### THE CLAIMED PROMISES ARE NOT SUFFICIENTLY PROMISSORY OR DEFNITE

It is well established that claims in quasi-contract, such as promissory estoppel and unjust enrichment, do not lie where there is an enforceable contract arising out of the same subject matter. *Elliot Indus. Ltd P'ship v. BP Am. Prod. Co.* 407 F.3d 1091, 117 (10th Cir. 2005) ("quasi-contractual remedies . . . are not to be created when an enforceable express contract regulates the relations of the parties with respect to the disputed issue.") (applying New Mexico law) This Court has ruled, "As the Tenth Circuit has observed, the doctrine of promissory estoppel is 'inapplicable' where there is a contract between the parties." Doc. 325 at 12 (citing *Tiberi v. Cigna Corp*. 89 F.3d 1423, 1432 (10th Cir. 1996)); *see also Arena Resources, Inc. v. OBO, Inc*. , 2010-NMCA-061, ¶¶ 17–21, 148 N.M. 483 (reversing the trial court's judgment entering recovery based on unjust enrichment because a contract governed the parties' conduct)

The existence of the parties' contract, on which both parties agree regardless of its compensation, precludes Ms. Oliver's promissory estoppel and unjust enrichment claims. As a matter of law, Ms. Oliver is not entitled to relief under either quasi-contract theory. *See, e.g.*, *Peace v. Parascript Mgmt.*, 59 F. Supp. 3d 1020, 1029-30 (D. Colo. 2014) ("Promissory estoppel is 'applicable only in the absence of an otherwise enforceable contract.'") (citations omitted); *EBC I, Inc. v. Goldman Sachs & Co.*, 5 N.Y.3d 11, 23, (2005) ("[P]laintiff fails to state a cause of action

for unjust enrichment as the existence of a valid contract governing the subject matter generally precludes recovery in quasi contract for events arising out of the same subject matter.").

Because undisputed facts establish the existence, as well as the compensation terms, of the parties' contract, the Court "is bound by a contract as the parties have made it and has no authority to substitute for it another and different agreement . . . ." *Arena Resources, Inc.*, 2010-NMCA-061, ¶ 17. Accordingly, the promissory estoppel and unjust enrichment claims should be dismissed.

### A.     Ms. Oliver Cannot Cure the Indefiniteness of Her Alleged Promises by Seeking to Enforce Them Through Promissory Estoppel

Even in the face of a contract, the Court may alternatively dismiss Ms. Oliver's promissory estoppel claim for the same reason it cannot enforce the contract terms she alleges: they are too indefinite. To succeed on a promissory estoppel claim, the plaintiff must show (1) a promise which induced her to act, (2) her reasonable reliance on that promise, (3) that she substantially changed her position in reliance, (4) such change in position was reasonably foreseeable, and (5) enforcement is required to prevent injustice. *Magnolia Mountain Ltd. v. Ski Rio Partners*, 2006-NMCA-027, ¶ 25, 139 N.M. 288. In this case, the only enforceable promise made to Ms. Oliver is in the Meow Terms email. Nonetheless, earlier in this litigation, the Court permitted Ms. Oliver to go forward with her claim for promissory estoppel because Ms. Oliver's amended complaint included some description of the circumstances of Meow Wolf's promises, and some details of how Ms. Oliver would be compensated:

> For example, Plaintiff describes in more detail when and where Defendants made these promises, and alleges that Defendants promised to calculate and distribute her "share of revenue" annually "based on how much revenue the venture generated each year," without mention of a cap.

Doc. 135 at 13. The Court admonished Defendants for "cit[ing] to no legal authority regarding how specific a promise must be to support a claim for promissory estoppel, as opposed to a breach of contract claim." *Id*.

Defendants address the Court's concerns here. Equivocal or ambiguous statements about future conduct cannot support promissory estoppel because they cannot be reasonably relied upon. *See Magnolia Mountain Ltd.*, 2006-NMCA-027, ¶¶ 26–27; *Soderlun v. Pub. Serv. Co.*, 944 P.2d 616, 619 (Colo. App. 1997); *D'Ulisse-Cupo v. Bd. of Dirs. of Notre Dame High Sch.*, 202 Conn. 206, 214, 520 A.2d 217 (1987) ("We agree with the defendants that these representations do not invoke a cause of action for promissory estoppel because they are neither sufficiently promissory nor sufficiently definite to support contractual liability.").

In *Mongolia Mountain Limited*, the New Mexico Court of Appeals rejected the plaintiff's bid to enforce "promises" by the plaintiff not to foreclose on the defendant's house, which were ambiguous assertions that the defendant could have "plenty of time to cure" late payments. *Id.* The Court of Appeals held that "that any reliance by Defendant on the alleged promise would likely have been unreasonable due to the equivocal and ambiguous nature of most of the statements on which Defendant relies." *Id.* ¶ 27.

Here, Ms. Oliver's claimed promises are equally ambiguous. Ms. Oliver's testimony was that she felt a "vibe" in All Shrimps meetings that Meow Wolf would "share, share, share." **Ex. G**, at 281:9–282:5. But Ms. Oliver admitted that she was never offered anything more specific, like an amount of equity, a mechanism to calculate equity, or concrete compensation terms. *See* **UMF 17.** There is no meaningful difference between a statement that someone will have "plenty of time" to pay a debt and that someone will "share, share, share" in revenue. The promise is thus too indefinite to enforce.

### B.      Meow Wolf Was Not Enriched By Ms. Oliver's Work, Let Alone Unjustly

Yet another basis for dismissing Ms. Oliver's unjust enrichment claim is the fact she has produced no evidence showing how Meow Wolf was enriched by her work on HoER, or in what

amount. Restitution for unjust enrichment is only available when "(1) another has been knowingly benefitted at one's expense (2) in a manner such that allowance of the other to retain the benefit would be unjust." *Ontiveros Insulation Co. v. Sanchez*, 2000-NMCA-51, ¶ 11, 129 N.M. 200. If the plaintiff does not prove the defendant received a benefit, there is no claim for unjust enrichment. *See Toltec Int'l, Inc. v. Vill. Of Ruidoso*, 1980-NMSC-115, ¶¶ 3–4, 95 N.M. 82; *Nunn v. Nunn*, No. 29,132, 2011 N.M. App. Unpub. LEXIS 74, at 8 (Feb. 7, 2011) (overturning a trial court's award for unjust enrichment because it "seemed to simply assume" that the defendant was provided a benefit).

To date, the only evidence of any benefit Meow Wolf received is the value of the work Ms. Oliver installed, ISQ. Undisputed evidence shows that, at the time ISQ was installed in 2016, it was valued at $5,000. **UMF 30**. However, in return, Meow Wolf paid Ms. Oliver $2,000 and tendered an additional $5,000 that she refused. Accordingly, Meow Wolf was not enriched—it paid or tendered payment more than the value of the work Ms. Oliver installed.

**IV**
**THE UNDISPUTED FACTS IN MR. KADLUBEK'S**
**MOTION FOR SUMMARY JUDGMENT WARRANT**
**DISMISSAL OF MISREPRESENTATION AND CONVERSION CLAIMS**

Mr. Kadlubek's Motion for Summary Judgment set forth the undisputed facts concerning Ms. Oliver's intentional and negligent misrepresentation claim and her conversion claim. Doc. 348, at 11–12. Mr. Kadlubek presented arguments to support summary judgment dismissing those claims. Doc. 348, at 12–18. Meow Wolf adopts and incorporates those arguments and the undisputed material facts they rely on. Without tortious conduct by its officer, Meow Wolf cannot be liable for the alleged torts.

**CONCLUSION**

For all the foregoing reasons, defendants ask the Court to grant summary judgment:

1) Declaring that the parties entered into a contract for installation of ISQ in the House of Eternal Return on the terms set forth in Mr. Kadlubek's April 2, 2015, Meow Terms email to Ms. Oliver;

2) Limiting damages for plaintiff's claim for breach of contract to $3,000;

3) Dismissing plaintiff's claims for breach of the covenant of good faith and fair dealing, promissory estoppel, unjust enrichment, intentional misrepresentation, negligent misrepresentation, and conversion; and

4) For such further relief as the Court deems just and proper.

Dated: April 19, 2022.

Respectfully submitted,

BARDACKE ALLISON LLP

By: */s/ Benjamin Allison*
        Benjamin Allison
        Maureen Dolan
        Rose Bryan
        Cole Wilson
        Michael Woods
        P.O. Box 1808
        141 East Palace Avenue
        Santa Fe, New Mexico 87504-1808
        (505) 995-8000
        ben@bardackeallison.com
        maureen@bardackeallison.com
        rose@bardackeallison.com
        cole@bardackeallison.com
        michael@bardackeallison.com

        *Counsel for Defendants Meow Wolf, Inc. and Vince Kadlubek*

**CERTIFICATE OF SERVICE**

I hereby certify that I caused a true and correct copy of the foregoing to be filed through the Court's CM/ECF system which caused all parties and counsel entitled to receive notice to be served electronically as more fully described on the Notice of Electronic Filing.

BARDACKE ALLISON LLP

By:      */s/ Benjamin Allison*