Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

LAUREN ADELE OLIVER,
an individual,

    Plaintiff,

VS.              Case No. 1:20-CV-00237-KK-SCY

MEOW WOLF, INC., a
Delaware corporation;
VINCE KADLUBEK, an individual
and officer; and DOES 1-50,

    Defendants.

*****************************************
DEPOSITION OF LIBERTY YABLON
February 28, 2022
9:03 a.m.
500 Fourth St. NW, Suite 125
Albuquerque, New Mexico 87102
*****************************************

PURSUANT TO THE FEDERAL RULES OF CIVIL
PROCEDURE, this deposition was:

TAKEN BY:   Mr. Ben Allison
             ATTORNEY FOR DEFENDANTS

REPORTED BY:Annette G. Aragon, NM CR #197
            Paul Baca Professional Court Reporters
            500 Fourth Street NW, Suite 105
            Albuquerque, New Mexico  87102

**EXHIBIT A**

Page 34

1  Q. Okay.
2  A. Did I forget anyone? I feel like that's it.
3  And Benji Geary, to some extent; although, he was not
4  officially technically a core member. He was kind of
5  part of that leadership group, though.
6  Q. Right. Was Lauren Oliver a member of Meow
7  Wolf in those early years that you were from 2011 to '14?
8  A. I don't believe so.
9  Q. Was she a core member?
10 A. No.
11 Q. No. Was Lauren Oliver at any of the
12 meetings that you remember from 2011 to 2014?
13 A. I do not believe so, but it's hard for me to
14 say completely affirmatively. In my mind Lauren relates
15 to people like Erika Wanenmacher and Tuscany Wenger, who
16 were around kind of here and there. So my knee-jerk
17 reaction is no, she was not. But I couldn't say
18 definitively.
19 Q. Did Lauren Oliver work on any Meow Wolf show
20 that you know of in those years?
21 A. I do not believe so.
22 Q. Other than what you've described, did Lauren
23 Oliver have anything to do with Meow Wolf, to your
24 knowledge, in 2011?
25 A. No.

Page 35

1  Q. In 2012?
2  A. No.
3  Q. In 2013?
4  A. Was 2013 when we were beginning The House of
5  Eternal Return?
6  Q. I think that was 2015.
7  A. Okay. Then no, I don't believe that I
8  encountered Lauren as an artist until The House of
9  Eternal Return.
10 Q. Okay. So do you have any memories of Lauren
11 Oliver being around Meow Wolf in 2014?
12 A. Same answer; I don't believe so.
13 Q. Okay. Let me come back to this question of
14 how Meow Wolf used money in these years of 2011 to '14.
15 You said that the idea of the money that Meow Wolf had
16 was that Meow Wolf would use it to buy materials for the
17 next show. Is that fair to say?
18 A. Yeah, that's fair to say.
19 Q. Okay. And so do you remember the amount of
20 money received from donations at the door after the
21 closing of The Due Return?
22 A. I don't remember a specific amount, but I
23 remember it was substantial and it was shared with the
24 group from --
25 Q. What that amount was. Is that right?

Page 36

1  A. I would say more than $10,000. But I
2  wouldn't testify to that exact amount. I just remember
3  it being substantial in my mind.
4  Q. Okay. So I just want to be clear on what
5  you understood about how the money was used. In other
6  words, there was no rule or expectation that you were
7  aware of that the members of the collective had a right
8  to divvy up the money among themselves. Is that true?
9      MR. BOYD: Form.
10 A. I believe there was talk about artist
11 payments and salary, but at that time they had not gone
12 into effect. At that time the only money given to
13 artists was for materials.
14 Q. (BY MR. ALLISON) So are you saying there
15 was the hope or the talk about sometime we'd like artists
16 to be paid, but we can't do it yet?
17 A. That's fair.
18 Q. Okay.
19     MR. BOYD: Form.
20 Q. (BY MR. ALLISON) So --
21     THE WITNESS: Jesse, did you have an
22 objection?
23     MR. BOYD: Yeah. I just said "form," which
24 is -- when I say "form," that means I'm objecting to the
25 form of the question.

Page 37

1  Q. (BY MR. ALLISON) So if there's -- if there
2  was a hundred dollars in the Meow Wolf bank account and
3  there were -- and there were ten members of Meow Wolf,
4  there was not an understanding that every -- that each of
5  those ten members got ten dollars out of that bank
6  account. Is that right?
7      MR. BOYD: Form.
8  A. It was more that if a member had an idea
9  that required $30 and another member only needed $5, it
10 could be disbursed as needed. It wasn't necessarily
11 equally divided.
12 Q. (BY MR. ALLISON) And there was -- and that
13 $30 or the $5 was for materials. It wasn't for
14 compensation. Correct?
15 A. Yes.
16 Q. So is it fair to say that in all your -- in
17 those years of Meow Wolf in 2011 to 2014, there was no
18 understanding in the collective that money of Meow Wolf
19 was -- was used for artist compensation. Is that true?
20 A. There was an expectation of fairness, I
21 would say, and that if money was needed for gas to get
22 somewhere, that could be considered if it was available,
23 or for materials. And I don't believe that anyone was
24 receiving compensation.
25 Q. Okay. Gas would be an out-of-pocket cost.

Page 46

```
1   how we referred to ourselves, not Meow Wolf company.
2       Q.  (BY MR. ALLISON)  And, in other words, Meow
3   Wolf was an art collective and it was a company and the
4   two coexisted.  Is that right?
5           MR. BOYD:  Form.
6       A.  That sounds right.
7       Q.  (BY MR. ALLISON)  So, in your view, it was
8   perfectly appropriate to describe Meow Wolf, you said, as
9   a collective in this fundraising context, even though it
10  was also a company.  Is that fair?
11          MR. BOYD:  Form.
12          MS. SAKURA:  Join.
13      A.  Yes.
14      Q.  (BY MR. ALLISON)  Loretta could have asked
15  you if it was a company.  Do you recall if she ever did?
16      A.  I don't recall.
17      Q.  But she must have responded positively to
18  your pitch for the fundraiser because you said you had it
19  in their space.  Is that right?
20      A.  That's right.
21      Q.  Do you remember how much you raised?
22      A.  I don't, unfortunately.  I would estimate.
23  A lot of work sold.  So I would estimate we raised more
24  than $2,000.
25      Q.  Okay.  That's pretty successful.
```

Page 47

```
1           MR. BOYD:  Form.
2       A.  I could be way off on that.  I really don't
3   remember.  I'm thinking of looking around this space and
4   feeling like that one sold, that one sold.  You know, let
5   me correct that.  I would say I believe we raised around
6   a thousand dollars.
7       Q.  (BY MR. ALLISON)  Okay.  Do you remember
8   just -- and this isn't a -- you know, whatever you
9   remember.  But from all your fundraising activities for
10  Meow Wolf in the pre-House of Eternal Return days, what
11  was the most you remember raising for funds?
12      A.  I don't remember.
13      Q.  Do you remember any fundraiser bigger than
14  this one?
15      A.  Fundraising for The House of Eternal Return
16  or for other shows?
17      Q.  No.  For shows before The House of Eternal
18  Return, not including the House.
19      A.  Most of the fundraising we did was for the
20  House.  So, no, I don't recall other specific fundraising
21  events.
22      Q.  Okay.  So you don't remember any fundraiser
23  for Glitteropolis, Flex Factory, any show prior to The
24  House of Eternal Return where you raised more than a
25  thousand dollars?
```

Page 48

```
1       A.  I don't remember.
2       Q.  Okay.  I dropped into the chat box
3   Exhibit 3.  Would you open that and tell me what it is.
4               (Exhibit No. 3 marked.)
5       A.  Sure.  Hold on.  It's loading.  Okay.  Here
6   we are.  Yes.  This appears to be an e-mail from Vince to
7   me.
8       Q.  (BY MR. ALLISON)  On February 4, 2015.  Is
9   that right?
10      A.  Correct.
11      Q.  Okay.  And what is Vince telling you in this
12  e-mail?
13          MR. BOYD:  Form.
14      A.  As I recall, this e-mail was the invitation
15  to become involved in HoER.
16      Q.  (BY MR. ALLISON)  Do you remember getting
17  this e-mail?
18      A.  I remember the first meeting about that
19  show.  I don't remember this e-mail.
20      Q.  Okay.  Tell me about the first meeting.
21  Where was it, if you remember?
22      A.  It was at the CCA.
23      Q.  Okay.
24      A.  There were quite a lot of people present; I
25  would say more than 50 people.  There was a projection,
```

Page 49

```
1   which it looks like you have the pitch deck here, and I
2   think that this was screened.
3       Q.  Okay.  And you're referring to the
4   attachment to -- that is attached to Vince's e-mail in
5   Exhibit 3?
6       A.  Scrolling down to pages 7, 8, 9, 10 --
7   gracious, how long is this? -- 11, 12, 13, 14, 15.  Yeah.
8   And that it was a very positive meeting that, you know,
9   "We're so glad you're here.  We're going to do this great
10  show.  We hope you'll be involved."
11      Q.  How did you hear about the meeting, if you
12  remember?
13      A.  I don't remember if I heard about it
14  socially or just through this e-mail.
15      Q.  Okay.  Well, is it possible -- I'm going to
16  ask you about the timing of that meeting.  Do you
17  remember what time of year it was?
18      A.  I believe I remember jackets at that
19  meeting.  So I would assume it was during the colder
20  months of fall or winter.
21      Q.  Is it possible it was in the fall of 2014
22  that you all met at CCA for this meeting about --
23      A.  Well, wouldn't that seem odd since the
24  e-mail is from February of 2015?
25      Q.  Well, is it possible that the e-mail, this
```

13 (Pages 46 to 49)

Page 54

1  inviting artists to join.
2      Q.  Okay.  And how do you know that?
3      A.  Because if we were already planning the
4  gala, we would have been past the finding artists for the
5  beginning phase of the project.
6      Q.  Got it.  So does this -- what's your
7  estimate of when the CCA meeting was now that you've read
8  this e-mail?
9      A.  The CCA meeting of artists being called to
10 join in the Meow Wolf Art Center?
11     Q.  Correct.
12     A.  I still don't remember.  Let's think.  So
13 when did work begin on the HoER?  Can you tell me that?
14     Q.  You know, if you mean construction and
15 renovation, as opposed to artists installation, I -- I
16 don't have that exact date.  And I'm not trying to, you
17 know, quiz your memory, Ms. Yablon.
18         I just, it's -- I think you are just fine
19 that you understood what you said is that the call to
20 artists and the CCA, which was the CCA meeting, was well
21 before this e-mail.
22     A.  Yes.  It would have been because I'd say
23 that was about a year before the construction beginning
24 on the bowling ally.
25     Q.  Okay.  So leading up.  Let me take you back

Page 55

1  to that CCA meeting which was the introduction to The
2  House of Eternal Return vision.  Is that right?
3      A.  That sounds right.
4      Q.  Okay.  Where this slide deck in Exhibit 3
5  was screened.  And putting yourself at that meeting, let
6  me ask you this:  Going earlier before that meeting, were
7  there regular Meow Wolf meetings in the year or so
8  leading up to this?  Or had there been a lull?
9          And the CCA meeting with The House of
10 Eternal Return pitch, was that kind of the, I don't know,
11 the first big thing in quite a while?
12     A.  I think that's correct.  I think there was a
13 bit of a lull and then this was the call to action to get
14 things rolling again.
15     Q.  Okay.  So tell me, just tell me what you
16 remember from that meeting, the CCA artists call meeting.
17 Is that a fair name for it?
18     A.  Sure.
19     Q.  Okay.
20     A.  Just a very kind of casual social meeting
21 with a lot of people saying hello, good to see you.
22 Giving hugs, exciting to get to do this new project.  And
23 then with kind of a more formalized portion of slides
24 being shown and kind of a vision board.
25     Q.  Who spoke at the meeting, if you remember?

Page 56

1      A.  I remember Sean Di Ianni speaking.  I'm sure
2  other people spoke as well, but I remember him speaking a
3  lot.
4      Q.  Okay.  Do you remember anyone else speaking?
5  Do you remember who showed the slide deck, talked through
6  the slide deck?
7      A.  I believe Vince.
8      Q.  Okay.
9      A.  One more addition to prior testimony.  I'm
10 so sorry.  When you asked who the core members are I
11 think I forgot to mention Sean Di Ianni who has been a
12 core member the whole time as well.
13     Q.  Okay.  Thank you for that.  Tell me what you
14 remember from that meeting about what the vision was for
15 House of Eternal Return.
16     A.  It was to be -- we didn't have the concept
17 of the show worked out yet, but it was just the -- the
18 emphasis was that it was going to be very big and that it
19 would be different rooms and that lots of us would
20 collaborate and work together on it.
21     Q.  And was the idea that it would be a
22 permanent exhibition?
23     A.  Yes.  That was one of the main points.
24     Q.  And would it be the first permanent
25 exhibition?

Page 57

1      A.  Yes.
2      Q.  Was there talk about paying artists
3  compensation to install work at this time?
4      A.  Yes.
5          MR. BOYD:  Form.
6      Q.  (BY MR. ALLISON)  Was that a new thing in
7  Meow Wolf's history?
8      A.  Yes.
9      Q.  Were you excited about it?
10     A.  Very.
11     Q.  Why?  For obvious reasons?
12     A.  For obvious reasons.
13     Q.  Okay.  Was there talk about after this
14 permanent exhibition opened, the opportunity of employing
15 artists?
16         MR. BOYD:  Form.  You're talking about at
17 that meeting was that raised?
18         MR. ALLISON:  I'm talking about at the
19 meeting.
20     A.  I don't remember specifically.
21     Q.  (BY MR. ALLISON)  Okay.  Anything else you
22 remember about what was said and the vision that was
23 presented at the meeting?
24     A.  No.  Just that it was very upbeat and very
25 inspired.  There was a lot of thanking of everyone for

15 (Pages 54 to 57)

Page 58

1  coming and praising what a wonderful talented group of
2  people we've brought together and yay. This is going to
3  be great.
4         MR. ALLISON: Okay. Let's take a break.
5  Let's take our ten-minute break. We've been going over
6  an hour.
7         (Break taken from 10:15 a.m. to 10:22 a.m.)
8         Q. (BY MR. ALLISON) Ms. Yablon, did I say that
9  better?
10        A. Yes.
11        Q. Okay. Good. We were looking at this pitch
12 deck which was screened at the CCA artist call meeting
13 we'll call it, a few months before the February e-mail
14 from Vince to you. Right?
15        A. Yes.
16        Q. Okay. And scroll -- open that. This is
17 Exhibit 3.
18        A. Okay. Yes.
19        Q. Scroll through it, if you didn't take a
20 moment to, to just refresh yourself on the document.
21        A. Yep. I'm refreshed.
22        Q. Okay. So it presents the first permanent
23 Meow Wolf experience. I'm looking at page 4. It's
24 got -- if you're on page 4, it says, "Santa Fe Market
25 Opportunity," looking at the market for The House of

Page 59

1  Eternal Return. Has four revenue streams; admission,
2  gift sales, rentals and special events, and artists
3  studio rental. And financial outlook. Do you see that?
4         A. I do.
5         Q. Okay. Operating cost of $855,000.
6  Projected first year revenue, 1.5 million. Fundraising
7  goal $1 million. And funds raised as of December '14,
8  $125,000. Do you see all of that?
9         A. Yes, I do.
10        Q. Do you -- and do you remember seeing these
11 things in that meeting?
12        A. I don't remember looking at this document,
13 but I remember that information.
14        Q. Okay. And if you scroll farther down, I
15 think it's page 7, there's a picture of The Due Return.
16        A. Uh-huh.
17        Q. This might have been during construction
18 before you arrived, but does that convey a little of the
19 sense that you talked about being attracted to?
20        A. Well, one part. That conveys the sense of
21 community and communication that I was attracted to. But
22 it doesn't convey the sense of aesthetic that I was
23 attracted to because, as you mentioned, it's in
24 construction. The show wasn't complete yet.
25        Q. Got it. And then if you scroll to the end,

Page 60

1  it's page 13, there's a page called Financial
2  Projections. Tell me when you get there.
3         A. 3, 2, 1, there.
4         Q. Got it?
5         A. Uh-huh. Yes.
6         Q. Okay. Good. My audio may have been a
7  little inconsistent. So there are annual expenses and
8  exhibition installing costs sections. Do you see those?
9         A. Yes, I do.
10        Q. And there -- the exhibition installation
11 costs had $40,000 in rent, $368,000 in labor, $10,000 in
12 insurance, $200,000 in materials and equipment. Do you
13 see those numbers?
14        A. Yes, I do.
15        Q. And in total it was $850,000. And do you
16 see that?
17        A. Yes, I do.
18        Q. All right. And then the annual expenses,
19 this is projected, for The House of Eternal Return were
20 over a million in the column above that. Right?
21        A. Yes.
22        Q. What was -- were these kind of -- was this
23 kind of financial scope beyond anything you had ever seen
24 with Meow Wolf up to this point?
25        A. Yes. Far beyond.

Page 61

1         Q. Far beyond. There was no installation that
2  cost close to any of this, to these amounts in terms of
3  installation or what it cost to take -- to maintain it?
4         MR. BOYD: Form and foundation.
5         A. That is correct. As far as I know.
6         Q. (BY MR. ALLISON) And this -- this -- then
7  there's projected income, first year, in the other
8  column. Do you see that?
9         A. I do.
10        Q. And the fundraising says Meow Wolf was
11 seeking to raise a million in upfront capital, $125,000
12 has already raised as of December 29, 2014. So this page
13 was probably updated by the time it came to you from
14 Vince in that February 4th e-mail compared to what you
15 saw at the CCA meeting. Is that true?
16        MR. BOYD: Form and foundation.
17        A. Well, the glaring discrepancy that I'm
18 seeing is the annual expenses projected for rent.
19 Because as we know, George R.R. Martin stepped up and
20 essentially bought the building for Meow Wolf.
21        And I know that we were not paying $156,000
22 in rent to him. I believe he was paid a very small
23 nominal fee, but essentially gave the space.
24        Q. (BY MR. ALLISON) Where does your knowledge
25 come from on that?

Page 66

1     MR. ALLISON: Sure.
2     MR. BOYD: Sure.
3     MR. ALLISON: And Jesse, I'll go along with
4  this, but this is --
5     MR. BOYD: In fairness here.
6     MR. ALLISON: You'll -- that's not fair to
7  interject in my deposition. I don't mind this time but
8  it's not -- you'll have your chance to ask questions.
9     Q. (BY MR. ALLISON) I'm glad that Jesse
10 pointed this out. Would you go there if you are on
11 page 10 and read that Proven Product paragraph.
12    A. Sure. (Reading) A Proven Product. The Due
13 Return, Meow Wolf's groundbreaking 2011 exhibition in
14 Santa Fe attracted $25,000 in visitors in three months
15 and grossed over $125,000 in suggested donations.
16 Nimbus, Meow Wolf's 2013 show in San Antonio, Texas
17 enjoyed 10,000 visits in just five hours. The audience
18 of both shows was truly intergenerational and diverse and
19 included regular art-goers, out of town tourists, and
20 families with young children."
21        What stands out to me about this is the
22 number generated by The Due Return, $125,000. Because as
23 I said, I'm not completely clear on the, you know,
24 finances and the numbers all of this. That was never
25 really my focus.

Page 67

1  So I estimated earlier more than $10,000.
2  Obviously I was way off and it generated way more than
3  $10,000. So there's that.
4        And one more correction to my testimony.
5  The show in San Antonio, Texas, Nimbus, I do remember
6  that show taking place and I did not work on that show.
7     Q. Okay. Thanks for that clarification.
8  Sometimes Meow Wolf charged admission. Whether it's a --
9  whether it's a charge or a suggested donation before The
10 House of Eternal Return and sometimes it didn't. Is that
11 true?
12    A. I'd say that's true.
13    Q. Okay. And the donation being talked about
14 in the paragraph you read are at-the-door donations for
15 admission. Correct?
16    MR. BOYD: Form.
17    A. Of course, that is correct. But I mean,
18 people were welcome to give an additional donation if
19 they liked what they saw.
20    Q. (BY MR. ALLISON) Absolutely and I'm sure
21 they did. And it's not that it's -- moving back to the
22 CCA meeting that you're telling me about. It's obviously
23 not that Meow Wolf would turn down anybody's donation.
24 Right?
25    A. Yes.

Page 68

1     Q. Yeah. Thank you. My only -- my only
2  question to you is this whole deck is pitching a
3  for-profit project seeking to get people to invest in it
4  as a business prospect. Would that be fair to say?
5     MR. BOYD: Form. Foundation.
6     A. Yes.
7     Q. (BY MR. ALLISON) Okay. Go to page -- let's
8  see. Go to Meow Wolf company profile.
9     A. On what page, please.
10    Q. I'm sorry, I'm getting there. It's page 6.
11    A. Okay. And I'm there.
12    Q. Okay. It says -- first of all, this calls
13 Meow Wolf a company, right? The heading and the whole
14 page is company profile and it starts, "Meow Wolf is an
15 arts and entertainment production company." Is that
16 right?
17    A. That is what it says.
18    Q. Okay. And then in the back story paragraph
19 to the right it says, "Originally organized as an
20 informal art collective in 2008 by a small group of
21 dedicated Santa Fe artists." And then it goes on about
22 all the shows, 22 shows, eight different cities. And you
23 were involved in some of those. Right?
24    A. That's correct.
25    Q. Which cities did you go to by the way, other

Page 69

1  cities?
2     A. Chicago, New York, Las Cruces. I think
3  that's it.
4     Q. Okay. And then it says, "In preparation for
5  the first permanent exhibition, Meow Wolf organized as an
6  LLC in 2014 with six equity partners:" Vince, Sean, Matt
7  the people you had told me before. Is that right?
8     A. That's right.
9     Q. Okay. Do you remember -- what did this
10 sentence mean to you, in preparation for the first
11 permanent exhibition Meow Wolf organized --
12    MR. BOYD: Form and foundation.
13    MS. SAKURA: Join.
14    MR. BOYD: Sorry. Form and foundation.
15    A. I'm sorry. I'm looking for where you're
16 saying that. "In preparation for this" I don't see that
17 sentence.
18    Q. (BY MR. ALLISON) It's in the back story
19 paragraph, page 6. After the cities, San Antonio,
20 Chicago, Miami, New Orleans --
21    A. Got it. Got it. Okay. You're asking me
22 what that last sentence means in preparation --
23    Q. Yes.
24    MR. BOYD: And just to be clear, were you
25 asking about what her impression was at the time or now?

Page 186

1  stock exchange where you have prices to look at every
2  day.  Does that make sense to you?
3         A.  Well, in a way.  But it seems that there
4  were values attached to them.  Because when they did the
5  liquidation events that they would buy them back for I
6  believe it was double the value.
7             So, you know, that they did have a value.
8  There was some value to them.  It was just frustrating to
9  get what that number was.
10        Q.  Yeah.  I hear you.  And sometimes you have
11 data points like that and values at certain times.  But
12 in between those times, you kind of got to make
13 assumptions.
14            But I hear you that you didn't get an answer
15 to the question what was the current book value of the
16 shares.
17            Going up to your e-mail to Chris on July 2,
18 2019.  Do you see the one where you say, "Hi Chris, I'm
19 just checking in to be sure you received my Exercise
20 docs and checks from my attorney Bob Strumor."  Do you
21 see that?
22        A.  I see this, yes.
23        Q.  And then your next sentence says, "Also, I
24 was expecting a final communication, or deposit, for my
25 revenue share balance and I have not received either.  Do

Page 187

1  you know the status of that?"  Do you see that e-mail?
2         A.  I do.
3         Q.  Were you referring to your artist bonus
4  program payment?
5             MR. BOYD:  Form.
6             MS. SAKURA:  Join.
7         A.  Probably, yes.
8         Q.  (BY MR. ALLISON)  And then, in response,
9  Chris writes -- and this is the e-mail at the top -- "I
10 have not received your exercise docs, checking around,"
11 et cetera.  And then he says, "I just forwarded you the
12 info I sent on your revenue share balance.  We are
13 finalizing the document and hope to send it out to all
14 participants next week."  Do you see that?
15        A.  Yes, I do.
16        Q.  So was Chris responding to your question
17 about revenue share balance there?
18        A.  It looks like he was.
19        Q.  And do you know what the finalizing the
20 document and sending it out referred to?
21        A.  No, not specifically.
22        Q.  I'll refer you back to Exhibit 18.
23        A.  Uh-huh.  Got it.  Oh, okay.  Yes, I see it.
24        Q.  And this was -- this was something you
25 signed on July 11th; so nine days later.  Right?

Page 188

1         A.  Yes.
2         Q.  So he says, "We're finalizing the document
3  and hope to send it out to all participants next week."
4  And so if next week was seven days later, you know, you
5  signed it nine days later.
6             Does Exhibit 18 look like the final -- the
7  document that he was talking about there?
8             MR. BOYD:  Form and foundation.
9         A.  Probably.
10        Q.  (BY MR. ALLISON)  Like you said, I mean, you
11 generally sign things within a few days from what we've
12 seen.  Right?
13        A.  Yeah.  I try to be prompt.
14        Q.  Yeah.  Yeah.  So let me -- let me ask you
15 about terminology.
16            MS. SAKURA:  Hey, Ben.  Could I just
17 interrupt you quickly before we go to terminology.  Could
18 you get it in your mind that we've been going for about
19 an hour and try and get us to a reasonable breaking point
20 fairly soon?
21            MR. ALLISON:  That's -- I -- it's on my mind
22 too.  I think it will be very soon.  Give me a couple of
23 minutes.  And I hear you.
24        Q.  (BY MR. ALLISON)  On just this terminology,
25 there's really one question.  Are you using artist

Page 189

1  revenue share in your e-mails with Chris in Exhibit 16 to
2  refer to your artist bonus program $10,000 payment?
3             MR. BOYD:  Form.  Foundation.
4         A.  Revenue share was how we had talked about it
5  early on and for a pretty long time and that's how it
6  imprinted in my memory.  So I believe, yes.  When I was
7  saying revenue share, it was what had come to be artist
8  bonus payment program.
9         Q.  (BY MR. ALLISON)  Okay.
10        A.  In my mind it was still, you know, the
11 concept was the revenue share.
12        Q.  And that's consistent with the 2017
13 agreement saying revenue share amount, $10,000?  Do you
14 remember that agreement?
15        A.  Yes, I remember that agreement.
16        Q.  And then do you remember Vince's e-mail to
17 you saying, "Good news, we're paying out the entire
18 remaining balance of the revenue share payments this
19 year," which was just the month before your e-mails with
20 Chris?
21        A.  Yes.
22        Q.  ==So my question is:  Are these two terms for==
23 ==the same program, artist revenue share and artist bonus==
24 ==program?==
25            MR. BOYD:  Form.  Foundation.

Page 190

```
 1        A.  I think so.
 2        Q.  (BY MR. ALLISON)  Did Meow Wolfers other
 3   than you use those two terms interchangeably to mean the
 4   same thing?
 5             MR. BOYD:  Form.  Foundation.
 6        A.  I feel like mostly revenue share was used,
 7   just socially and in conversations.
 8        Q.  (BY MR. ALLISON)  Okay.  But your testimony
 9   is that when you used revenue share in your e-mails with
10   Chris and -- that you were referring to the artist bonus
11   program.  Right?
12             MS. SAKURA:  Form.
13             MR. BOYD:  Same objection.
14        A.  Yes.
15             MR. ALLISON:  Okay.  Let's take a break.
16   Ten minutes.  Let's just come back at 2:45.
17             (Break taken from 2:36 p.m. to 2:47 p.m.)
18        Q.  (BY MR. ALLISON)  Going to drop in
19   Exhibit 35.
20             (Exhibit No. 35 marked.)
21        A.  Okay.
22        Q.  (BY MR. ALLISON)  Getting up there now.
23        A.  I know.  Are we going to have to look at
24   everything in between?
25        Q.  Probably most of it.
```

Page 191

```
 1        A.  Okay.  Do we have an estimate on what time
 2   we'll wrap up today?
 3        Q.  You know, that's a great question.  I really
 4   would hope to be done in about an hour, maybe an hour to
 5   an hour and a half.  And so that's me.
 6             MR. ALLISON:  Jesse, do you expect to spend
 7   any --
 8             MR. BOYD:  I'm going to have some questions,
 9   follow-up, and also just some independent questions.  I
10   don't think I'm going to go nearly as long as you are,
11   but I'll have some questions, probably.
12             MR. ALLISON:  Okay.  Because I actually am
13   trying to plan when this going to end for another meeting
14   and I've been pushing it.  And so can you give me a
15   ballpark?  Do you think you're going to spend a half an
16   hour or an hour?
17             MR. BOYD:  No.  Probably an hour and a half.
18             MR. ALLISON:  Probably an hour or hour and a
19   half?
20        Q.  (BY MR. ALLISON)  Okay.  It looks like we're
21   in for it.  But let's go and we'll see how quickly we can
22   finish.  Dropped in Exhibit 35, Ms. Yablon.  Tell me what
23   that is.
24        A.  This appears to be an e-mail from Vince to a
25   number of people, not everybody -- not as many people as
```

Page 192

```
 1   the last e-mails we've been looking at -- saying,
 2   "Meeting reminder.  There will be a meeting tomorrow,
 3   Wednesday, 6:30 p.m., Big Pink, Rufina.  Please park at
 4   the bowling alley and walk.  This meeting" --
 5             (Court reporter requests clarification.)
 6             THE WITNESS:  Oh, my apologies.  I didn't
 7   know I was reading the whole thing.
 8        A.  The e-mail subject is Meeting Reminder.  The
 9   body is, "We will be meeting tomorrow, Wednesday, at 6:30
10   p.m. "
11        Q.  (BY MR. ALLISON)  Let me jump in there
12   because you don't need to read it all.
13        A.  Okay.
14        Q.  Was this an All Shrimps meeting
15   announcement?
16        A.  Yes.
17        Q.  Okay.  You said it wasn't to as many people.
18   What's the date of this one?
19        A.  This appears to be Tuesday, May 19th --
20        Q.  Okay.
21        A.  -- 2015.
22        Q.  2015.  Right.  So the gang was bigger by
23   2019, the e-mails we were just looking at with the payout
24   of the artist bonus program.  At this point, 2015 in May,
25   it wasn't as many addressees.  Right?
```

Page 193

```
 1        A.  That's how it appears.  It was -- the e-mail
 2   went to fewer people than the subsequent ones.
 3        Q.  Okay.  So tell me about All Shrimps
 4   meetings.  How often were they held?
 5        A.  Oh, I couldn't say.  Maybe about, oh, every
 6   week to every month.  Not necessarily every week.  Kind
 7   of as needed.
 8             I believe that this was the time when we
 9   were more divided into kind of teams and groups that
10   would have specific meetings and All Shrimps just
11   referred to everyone altogether.
12        Q.  So was there a -- a standing date and time
13   for them and frequency, or was it only by announcement?
14        A.  I do not recall.
15        Q.  Okay.  Anyway, sometimes they were weekly,
16   maybe they were less sometimes is your memory?
17        A.  That's my memory.
18        Q.  How often did you go to them?
19        A.  All of them.  Any time I could.
20        Q.  Okay.  Who -- tell me the format.  Where
21   were they held?
22        A.  They were held kind of wherever they could
23   be held.  When we were in the build-out, they would be in
24   Big Pink or in Fastenal, wherever we had space.  And then
25   once we were in the bowling alley, they would be held in
```

Page 266

1  we'd been talking about these written contracts. And,
2  kind of, the confusion for me in this whole process was
3  that I felt that there were, kind of, agreed-upon norms
4  and terms and responsibilities and duties that were
5  conveyed socially and not necessarily in written form.
6      Q. Is the social contracts that you're talking
7  about, does that relate to the community reality of Meow
8  Wolf to the family element; the doing art together
9  element?
10     A. Yeah. You know, it's so foundational to
11 Meow Wolf is that it's a collective and that it's a
12 collaboration. You know, collaboration is a word we
13 would use when describing it to anyone and everyone,
14 whether trying to get an investor or a donation or just,
15 you know, a homeless kid we were buying a burrito for.
16 You know, here's what we do. We're a collaboration. We
17 work together, you know.
18     And so that social contract went within, you
19 know, everything of, like, it's, kind of, an agreed upon
20 state of making the work that we make and putting in the
21 hours that we make; that I never had an employment
22 contract saying that I would work from such and such
23 time, you know, and make such and such pieces, it was
24 just understood that that's what this is.
25     Q. You did that before there was compensation

Page 267

1  in it for you for years. Right?
2      A. Correct.
3      Q. And what I would take from that is there's a
4  tremendous drive, and -- I might even dare to say -- love
5  that creativity comes from, that was very powerful for
6  you and maybe others in Meow Wolf?
7      A. Absolutely. I think creativity is divinely
8  given.
9      Q. So let me understand the social contracts.
10 Your -- your testimony about Meow Wolf before The House
11 of Eternal Return was that money was not for compensation
12 for artists; it was only used for materials,
13 out-of-pocket costs and the next show. Right?
14     A. That was my understanding.
15     Q. And when you got to The House of Eternal
16 Return at that CCA meeting, you said there was the
17 intention expressed to pay artists for the work, to give
18 compensation.
19     And it was exciting because that was the
20 first time that artists in Meow Wolf were going to be
21 paid for doing art. Do you remember that?
22     MR. BOYD: Form.
23     MS. SAKURA: Form.
24     A. Yes.
25     Q. (BY MR. ALLISON) And then you got a

Page 268

1  contract, and you got a Meow terms e-mail in April 2, you
2  signed a contract on April 28 with your specific
3  compensation terms in it. Do you -- right?
4      MR. BOYD: Form.
5      A. Yes.
6      Q. (BY MR. ALLISON) Okay. So I want to know,
7  for the social contracts that you're talking about
8  involving collaboration, involving a shared sense of
9  purpose, a -- this, what you called divinely sourced or
10 inspired creativity, did that all continue at Meow Wolf
11 during the build of the House?
12     A. Yes. Definitely.
13     Q. Okay. Was the social contracts that you're
14 talking about a shared commitment to values like you
15 described?
16     MR. BOYD: Form.
17     A. I believe so, yeah. I think that there
18 could be a certain amount of -- if this could not be
19 received negatively, but kind of a group think and a, you
20 know, coming together and a sharing of values and a
21 sharing of ideals.
22     I mean, really essentially coming down to we
23 have each other's backs. And, I mean, especially with
24 the paper contracts and my admitted, kind of, sloppiness
25 over them and just signing everything that was put in

Page 269

1  front of me, it was because of that social contract that
2  we all have each other's backs.
3      Q. (BY MR. ALLISON) Well, you -- you did tell
4  me that you were very pleasantly surprised by a $10,000
5  revenue share contract. Right?
6      So it -- at the time that you signed that,
7  you were -- you knew it was $10,000 and you were happy
8  for $10,000 at that time. Fair to say?
9      MR. BOYD: Form.
10     MS. SAKURA: Form.
11     A. Absolutely. I don't consider myself a
12 greedy person, and I'd never received anything close to
13 $10,000 from Meow Wolf before. So that was lovely. I
14 was very grateful to get that.
15     Q. (BY MR. ALLISON) Okay. And the social
16 contracts that you talked about did not have any specific
17 financial elements to them, did they?
18     A. No.
19     MR. BOYD: Form.
20     Q. (BY MR. ALLISON) Okay. I just want to
21 touch on the gift shop. I dropped in the chat box
22 Exhibit 39. Would you pop that open. It's a series of
23 e-mails that I think we can be pretty quick with. But
24 tell me what they are.
25     (Exhibit No. 39 marked.)