Case 1:20-cv-00237-KK-SCY   Document 363-7   Filed 04/19/22   Page 1 of 13

Page 29 (Pages 110-113)

1:20-CV-00237- KK-SCY  
Lauren Adele Oliver v. Meow Wolf, Inc., et al.

Lauren Adele Oliver  
March 26, 2021

Page 110

1  Q. And it was a huge space, with a lot of
2  construction going on.
3  A. That is correct.
4  Q. I mean there were hundreds of people
5  involved. Isn't that right? I've heard the
6  number "400."
7  A. I'm sorry, what was your last statement?
8  Q. Well, I was just trying to get a sense of
9  how many people were involved in this project,
10 if you know.
11 A. Well, there were artists and there were
12 volunteers, plus there were electricians and
13 construction people, and fire safety engineers
14 and things like that.
15 Q. And this is about a 30,000 foot space.
16 Is that right?
17 A. I'm remembering that it might have been a
18 35,000 foot space, but that's just what I
19 remember.
20 Q. Okay. In other words, this is a major
21 proposition; right?
22    MR. BOYD: Form.
23       Go ahead.
24    THE WITNESS: I would agree.
25 Q. BY MR. ALLISON: This kind of construction

Page 111

1  and this kind of project does not get done
2  without a million-dollar kind of mechanism.
3     MR. BOYD: Form.
4        Go ahead.
5  Q. BY MR. ALLISON: Is that right?
6  A. Yes. It costs money.
7     (Deposition Exhibit Number 5A was
8  marked for identification.)
9  Q. BY MR. ALLISON: I am showing you what's
10 been marked as Exhibit 5A. Would you open that
11 and tell me what it is?
12 A. (Witness complies.)
13    It's an e-mail to me, cc Sarah
14 Bradley: "Subject: Ice Station Materials."
15 Q. Okay. Do you remember this e-mail?
16 A. Well, I got a lot of e-mails, but in
17 general, yes. I remember the spreadsheet, and I
18 plugged in all my materials and my expected
19 costs, and I knew that absolutely minimal
20 possible spending was key.
21    Okay. We could go through it word
22 for word, but that's not --
23    Excuse me. Can I go fill up my
24 water?
25    MR. ALLISON: Yeah, shall we take a --

Page 112

1  well, just go ahead and fill up your water.
2     THE WITNESS: Okeydoke.
3     Okay. What's your question? Sorry.
4  Thank you.
5  Q. BY MR. ALLISON: No, that's fine. I just
6  wanted to continue to get a sense of what you
7  experienced in 2015 as this project was getting
8  planned and built.
9     You said you filled out your budget
10 for this; right? Was Meow Wolf going to pay for
11 the cost that you budgeted?
12    MR. BOYD: Form.
13       Go ahead.
14    THE WITNESS: Excuse me, I'm sorry.
15    Jesse, did you say, "Form"?
16    MR. BOYD: I just said, "Form." Just go
17 ahead.
18    THE WITNESS: So the question is was Meow
19 Wolf asking me to produce a material list --
20 Q. BY MR. ALLISON: Well, okay.
21 A. -- and then estimate the cost? Is
22 that -- that's what I was -- yeah.
23 Q. And you did that; right?
24 A. I believe I did.
25 Q. Okay. And Meow Wolf bought the costs, or

Page 113

1  was buying the materials for ISQ; right?
2  A. Yes.
3  Q. And they talk in here -- this is from
4  Caity Kennedy; right?
5     Can you hear me?
6  A. I can.
7  Q. Okay. Can you see that this e-mail is
8  from Caity Kennedy?
9  A. Yes.
10 Q. Okay. She talks about tech budgets and
11 labor budgets, and vendors and manufacturers.
12    Was Caity working with a lot of
13 moving parts?
14 A. Was Caity moving with a lot of moving
15 parts?
16 Q. Was she working with a lot of moving
17 parts?
18    MR. BOYD: Form.
19       Go ahead.
20    THE WITNESS: Was she working with a lot
21 of moving parts? It was my observation that
22 yes, she was indeed working with a lot of moving
23 parts.
24 Q. BY MR. ALLISON: This must have been a
25 pretty large-scale project to organize. That's

Case 1:20-cv-00237-KK-SCY   Document 363-7   Filed 04/19/22   Page 2 of 13

Page 37 (Pages 142-145)

1:20-CV-00237- KK-SCY                                    Lauren Adele Oliver
Lauren Adele Oliver v. Meow Wolf, Inc., et al.           March 26, 2021

Page 142

1  Q. Correct.
2  A. With my correct e-mail.
3     "Hi, Lauren. Hope you're well!
4     "We now have a gift shop consignment
5     contract. Here's a copy of your
6     contract. Please let me know if you
7     have any questions!"
8     Okay.
9  Q. Great.
10    You can see on the attachment line,
11 there is a PDF attachment; right?
12 A. Okay. So I'm going to assume that is
13 this (indicating).
14 Q. Right.
15 A. Okay.
16 Q. You didn't actually sign this; right?
17 A. I don't recall signing it and sending it
18 back, but I don't recall not signing it and
19 sending it back.
20 Q. Do you have a signed copy of this?
21 A. Not that I'm aware of.
22 Q. Okay.
23 A. I would have to print it out, sign it,
24 scan it, send it back, and I'm getting the
25 thought that I didn't sign it, because as I said,

Page 143

1  I didn't have that capability in Menlo Park, I
2  can guarantee you, so I probably did not.
3     I was at the hospital every day; my
4  mom was having some problems.
5  Q. In 2016 was your mom in Palo Alto?
6  A. She was in Palo Alto.
7     Oh, March 16? No, no, sorry. She
8  was in Palo Alto -- I'm getting my dates wrong.
9     This is March 16th, 2016? Then I'm
10 still in Santa Fe.
11    MR. BOYD: No, this is -- well...
12    THE WITNESS: Well, am I wrong to be
13 confused?
14    Hold on; let's look again.
15    Oh, no. Her e-mail is in July of
16 2016, so then I'm in San Francisco.
17 Q. BY MR. ALLISON: Okay.
18 A. Okay.
19 Q. Okay. We're going to break for lunch
20 here in a sec, but let me just ask you, did you
21 read this contract?
22 A. I don't know.
23 Q. Okay.
24 A. Yes, I probably read it.
25 Q. But you didn't sign it to your knowledge.

Page 144

1  A. No, I didn't really have a mechanism for
2  signing it, so I probably didn't.
3     Why; is there something bad in there?
4  Q. No, there is no tricks.
5  A. There is nothing bad I should have known
6  about?
7  Q. But you went right on selling things at
8  the gift shop; right?
9  A. Oh, my goodness gracious.
10    Sorry, I'm just distracted by phone
11 calls coming in that I silenced, and I'm just
12 going to make my phone go away afterwards.
13    Your question was I didn't sign it
14 and did I -- well, I wasn't aware that they --
15 they never asked for it again, so nobody ever
16 followed up on it. I didn't, I guess, think it
17 was that important.
18    I mean if they had asked me to sign
19 it, and to review it and send it back, I
20 certainly would have.
21 Q. Well, that's exactly what Emily asked.
22    You didn't let her know if you had
23 any questions about it to your knowledge, did
24 you?
25 A. Well, actually she just said, "We have a

Page 145

1  contract; here it is. Let me know if you have
2  any questions."
3     She didn't press me to sign it,
4  so...
5  Q. Is your testimony really that Emily was
6  not asking you to sign this, by sending it to
7  you and asking you if you have any questions?
8  A. She sent it to me, and as I said, I
9  didn't have the mechanism to sign it, and so she
10 didn't follow up on it and I didn't sign it.
11    I don't think there's anything
12 nefarious going on here, Ben.
13 Q. I'm not suggesting there is.
14    My question is you kept on selling
15 in the gift shop; right?
16 A. Yeah.
17 Q. Is that a yes?
18 A. Because there wasn't really a problem, so
19 I don't know why this is relevant, but yes.
20 Q. Okay.
21 A. I sold in the gift shop. There didn't
22 seem to be any problems with the gift shop
23 consignment situation.
24 Q. Okay.
25    MR. ALLISON: Let's break for lunch.

Case 1:20-cv-00237-KK-SCY   Document 363-7   Filed 04/19/22   Page 3 of 13

Page 41 (Pages 158-161)

1:20-CV-00237- KK-SCY
Lauren Adele Oliver v. Meow Wolf, Inc., et al.

Lauren Adele Oliver
March 26, 2021

Page 158

1 seemed to be there to observe.
2   Q. And you had asked about the coloring
3 book; right?
4   A. Perhaps; I'm not sure.
5   Q. Yeah, and I think you asked about sales
6 numbers.
7     Do you remember if they gave you
8 sales numbers in that meeting?
9   A. I don't think they did.
10  Q. Maybe that meeting was where you asked
11 about them.
12  A. Possibly.
13  Q. Okay. Would you open Exhibit 13B?
14  A. (Witness complies.)
15    13B; that's from Ivan.
16  Q. It looks like it's from you to Ivan;
17 right?
18  A. Oh, yeah, it's from me to Ivan.
19  Q. An e-mail.
20  A. Okay. Yeah, May 17, 2018.
21  Q. Right.
22    You're saying you're going to bring
23 more product and that you owe them a tax form;
24 right?
25  A. Correct.

Page 159

1   Q. That's in your gift shop relationship, or
2 business relationship; right?
3   A. Yeah, that's related to that, and there's
4 A, and I'll open up C or B. These don't seem to
5 be in order.
6   Q. They are A, C, and B, my bad.
7     Would you open up 13C and tell us
8 what that is.
9   A. (Witness complies.)
10    Okay. Well, that is a suggestion
11 from Luciano Mor, again, who was working in the
12 Merchandising Department. He says:
13    "Hi. How about some Space Owl
14    Slippers!"
15    There is then a little drawing of
16 faux fur slippers.
17  Q. And you weren't into these; right?
18  A. Well --
19    MR. BOYD: Form.
20    Go ahead.
21    THE WITNESS: -- given that my -- well,
22 first of all, it's worth pointing out that
23 December 7th, it was about four days later I
24 found out my brother was dead, so I may not have
25 promptly answered his e-mail to know.

Page 160

1     At the time I felt it was probably
2 inappropriate for my project, because my project
3 is about climate change.
4     Slippers, first of all, getting
5 beyond the idea of taking an iconic character
6 like the Space Owl, and turning them into bedroom
7 slippers, it felt that maybe Luciano hadn't
8 fully considered the project, which was sort of
9 amplified by the fact that it's a climate change
10 project.
11    I can't think of slippers as being
12 sort of a forever item. Slippers kind of end up
13 in landfill pretty quickly, so no, I wasn't
14 interested.
15  Q. BY MR. ALLISON: No judgment on your
16 decision; it was your decision. Meow Wolf
17 listened to you, and those slippers didn't ever
18 go anywhere; right?
19  A. Well, I never -- I'm not sure I answered,
20 and if I did, I said, "Hey, no thanks."
21    So yeah, unlike the coloring book,
22 they did not spontaneously, without my approval
23 or authorization, manufacture these slippers.
24    (Deposition Exhibit Number 15 was
25 marked for identification.)

Page 161

1   Q. BY MR. ALLISON: Okay. I have shown you
2 what's been marked as Exhibit 15. Would you
3 open that up and tell us what that is?
4   A. Sure. What happened to 14?
5   Q. Skipped it. I think that's where you
6 said "No thanks," and you just told us that, and
7 I want to move along.
8   A. (Witness complies.)
9     Okay. Here we go.
10  Q. Like I said, if this was a real
11 deposition, like in person, we wouldn't have
12 this numbering thing, but we're all going to
13 have to live with not perfect sequencing.
14  A. Okeydoke.
15    Okay.
16  Q. Tell us what Exhibit 15 is.
17  A. Exhibit 15 is an e-mail from Ivan Gamboa
18 on October 11th, 2019, to me, and it's a gift
19 shop Consignment Agreement and Vendor Guidelines
20 that says starting November 1st, the split goes
21 from, you know, 70/30 to 60/40.
22  Q. Okay. And it has attached, as you said,
23 an Artist Consignment Agreement; right?
24  A. Yes.
25  Q. Okay. And some guidelines and policies;

Case 1:20-cv-00237-KK-SCY   Document 363-7   Filed 04/19/22   Page 4 of 13

Page 42 (Pages 162-165)

1:20-CV-00237- KK-SCY
Lauren Adele Oliver v. Meow Wolf, Inc., et al.

Lauren Adele Oliver
March 26, 2021

Page 162

1  right?
2     A.  Right.
3     Q.  Did you sign this agreement?
4     A.  No, Ben.
5     Q.  Okay. And is it any different than the
6  2016 Consignment Agreement they sent you, other
7  than the price term or the split?
8     A.  If you give me an hour to sort them out,
9  I might be able to do a better job here at
10 saying yes or no.
11    Q.  Okay. But you don't know sitting here
12 right now.
13    A.  Sitting here right now I can't do a
14 comparison side-by-side, no.
15    Q.  Why didn't you sign the 2019 agreement?
16    A.  Because Vince had fired me from Meow Wolf
17 on June 3rd, 2019.
18    Q.  Did you --
19    A.  Vince had terminated the relationship, so
20 we no longer had a relationship as far as Meow
21 Wolf was concerned. This is what was conveyed
22 to me, so I ignored this.
23    Q.  You weren't an employee; right?
24    A.  No, I was not an employee.
25    Q.  What relationship did he "fire" you from?

Page 163

1        MR. BOYD: Form.
2           Go ahead.
3        THE WITNESS: Well, if I remember the
4  gist of his conversation, it was, "You can either
5  give us all rights to the Space Owl, or rip out
6  the exhibit, your choice. Either way you are
7  not involved in Meow Wolf any longer."
8     Q.  BY MR. ALLISON: Well, neither of those
9  things happened; right? You didn't give the
10 rights to Space Owl to Meow Wolf, and it didn't
11 get ripped out. Is that right?
12    A.  I didn't rip it out, no.
13    Q.  And you didn't give the rights to Meow
14 Wolf.
15    A.  They didn't rip it out, and I didn't give
16 the rights to Meow Wolf.
17    Q.  So what did you get "fired" from?
18    A.  Mr. Kadlubek was very clear. He said,
19 "If you sell us the rights to the Space Owl, you
20 will not be involved in any way. If you do not
21 sell us the rights to the Space Owl, then it
22 will be removed."
23        I believe he told me that he was
24 going to remove it, and then I would cease to be
25 involved in Meow Wolf in any way. I took that

Page 164

1  as, "You're fired."
2        In answer to your original question,
3  it pretty much seemed that signing an Artist
4  Consignment Agreement would be a waste of
5  everyone's time.
6     Q.  And this was a June 3rd meeting, is that
7  what you said, with Vince?
8     A.  June 3rd, 2019.
9     Q.  Okay. Were you and Meow Wolf trying to
10 figure out a deal with Space Owl and ISQ at that
11 time?
12       MR. BOYD: Form.
13          Go ahead.
14    Q.  BY MR. ALLISON: Were you trying to come
15 to terms on ISQ, as I think you may have put it
16 in your Complaint and elsewhere?
17    A.  I was trying to formalize the
18 relationship. I had been, throughout 2018,
19 until my mom's passing.
20    Q.  Okay. And so --
21    A.  I had been trying to negotiate with them.
22 My mom died, and then my brother died, and I did
23 what I could, you know? I organized memorial
24 services, basic financial forensics, and then I
25 came back to Santa Fe to try to deal with the

Page 165

1  other things that were going on, which were Meow
2  Wolf. I e-mailed Talia Kosh, and she didn't get
3  back to me, and then I ran into her at a party.
4     Q.  Okay.
5     A.  Okay. Go ahead. I'm sorry.
6     Q.  Yeah, just because I am not asking about
7  everything --
8     A.  Okay.
9     Q.  -- that led up to that meeting. I'm just
10 asking about your attempt to formalize your
11 relationship with Meow Wolf.
12       You said Vince said in that meeting,
13 "Either assign the rights to Meow Wolf, or take
14 it out," and you didn't accept that proposal,
15 did you.
16    A.  No, that didn't seem like -- I didn't
17 really seem to have any options there, but...
18    Q.  Well, you had the option to say no;
19 right?
20    A.  I said, "No, no." I said "No," and "No."
21    Q.  You did have that power at that time;
22 right?
23       MR. BOYD: Form.
24          Go ahead.
25       THE WITNESS: What power do you speak of?

Case 1:20-cv-00237-KK-SCY   Document 363-7   Filed 04/19/22   Page 5 of 13

Page 49 (Pages 190-193)

1:20-CV-00237- KK-SCY
Lauren Adele Oliver v. Meow Wolf, Inc., et al.

Lauren Adele Oliver
March 26, 2021

Page 190

1  Terms"; right?
2     A. Yes.
3     Q. And on the top of that e-mail, the first
4  e-mail in the string is from Vince to you, and
5  he says:
6        "Hello!  Writing to you today to talk
7        about the contractual terms for your
8        involvement in the Meow Wolf
9        project"; right?
10    A. Yes.
11    Q. Okay.  And then he says:
12       "Your project(s) are to be completed
13       by September 1st.  We have $1,000
14       allocated for your personal stipend
15       to complete the project(s)."
16       Do you see that?
17    A. Yes.
18    Q. So that's the $1,000 that Kate Lesta
19 talked to you about, and in the Slack we just
20 looked at; right?
21       MR. BOYD:  Form.
22       Go ahead.
23       THE WITNESS:  Well, Ben, I'd have to
24 disagree, because Kate Lesta called it a "labor
25 budget," not a "personal stipend."

Page 191

1    Q. BY MR. ALLISON:  Okay.
2    A. If it was a personal stipend, I might not
3 have given it to Carey.  But it was presented to
4 me as a labor budget, and it was clear that I was
5 going to need lots of help to pull together that
6 ISQ.
7    Q. Let me ask you --
8    A. There was a lot of heavy lifting there,
9 and that's what I -- when I heard "labor budget,"
10 that's what I believed that was for, for the
11 labor.
12    Q. Okay.  Let's talk about Carey and the
13 labor for a minute.
14       How much would you say Carey worked
15 in terms of weeks or months on ISQ?
16    A. Well, we may have had -- I think we had
17 some meetings prior to January, when the building
18 first opened, and then I really couldn't say
19 because I didn't keep track of hours.
20    Q. You don't have any idea how many weeks or
21 months he worked on ISQ?
22    A. Well, if we're talking the entire time,
23 we can measure January to opening.
24    Q. Okay.
25    A. So that's two and a half months that he

Page 192

1 was involved.
2    Q. Plus meetings, you said, before January to
3 some degree.
4    A. He had like one or two meetings maybe.
5    Q. Okay.  Did you pay Carey anything for all
6 that work -- two and a half months, maybe plus a
7 little -- other than the $1,000 that you directed
8 Kate Lesta to give him?
9    A. No.  I took him to lunch and dinner a
10 couple of times, or a few times.
11   Q. Okay.  He did all that.  You didn't give
12 him anything, but you did give him the $1,000.
13 That was up to you, according to Kate, to direct
14 whether it went to you or to him, and you gave
15 it to him; right?
16   A. No, I didn't really see that as going to
17 me.
18   Q. I understand.
19   A. I didn't feel -- I didn't feel -- I'm
20 sorry to interrupt you, but I want to make it
21 clear that I did not associate this as my money
22 in the same way as if I didn't spend the
23 materials budget.  I didn't get to keep that
24 money.
25   Q. Okay.  So my question to you is Vince

Page 193

1 promised you $1,000 in the April 2 e-mail called
2 "Meow Terms"; right?
3       MR. BOYD:  Form.
4       Go ahead.
5       THE WITNESS:  Yes.
6    Q. BY MR. ALLISON:  And Kate Lesta, who was
7 the Project Manager, you said, in the Slack
8 messages said, "That is up to you" when you told
9 her who to direct it to.  Is that right?
10      MR. BOYD:  Form again.
11      Go ahead.
12      THE WITNESS:  Well, again, I was running
13 the Ice Station Quellette installation, so to
14 use your word, "director," the artist behind the
15 Ice Station Quellette, I directed how we spent
16 the budget for materials and how we spent the
17 budget for labor.
18   Q. BY MR. ALLISON:  Okay.  And this was not
19 your money, that was Meow Wolf's money; right?
20      MR. BOYD:  Form.
21      Go ahead.
22      THE WITNESS:  It came from and it was
23 Meow Wolf's labor budget, so yes, what I
24 contributed to Carey personally was:
25      "Here, I'm buying lunch.

Case 1:20-cv-00237-KK-SCY   Document 363-7   Filed 04/19/22   Page 6 of 13

Page 59 (Pages 230-233)

1:20-CV-00237- KK-SCY  
Lauren Adele Oliver v. Meow Wolf, Inc., et al.

Lauren Adele Oliver  
March 26, 2021

Page 230

1 process.
2    Q.  BY MR. ALLISON:  But you understand the
3 process of owning a company, and that equity is
4 always shared whether that's good times or bad.
5        MR. BOYD:  Form.
6           Go ahead.
7        THE WITNESS:  Yes.
8    Q.  BY MR. ALLISON:  Okay.  And you were not
9 promised a share of the bills if things went
10 south; right?  You were only promised a share of
11 revenue if things went up; true?
12       MR. BOYD:  Form.
13          Go ahead.
14       THE WITNESS:  Again, my understanding is
15 the offer was, "If we make a lot of money, so
16 will you.  If we don't make any money, hey, that
17 was a good time."
18   Q.  BY MR. ALLISON:  Right.  Well, were you
19 aware that the founders of Meow Wolf personally
20 guaranteed a lot of loans to build that beehive
21 of activity in 2015?
22   A.  I can see from the paperwork that yes,
23 some of them did.
24   Q.  Like over a million dollars in loans;
25 does that sound right?

Page 231

1   A.  I am not an accountant and I did not --
2 because of the nature of the -- the private
3 nature of those numbers, Ben, I have not deeply
4 analyzed them or, you know, internalized them in
5 any significant way.
6       MR. ALLISON:  Just a second.
7         (The deposition recessed from 3:39
8 p.m. to 3:39 p.m.)
9       MR. ALLISON:  Sorry about that.
10   Q.  You said you did understand or you do
11 understand, from looking at documents that you've
12 seen, that the founders had to personally
13 guarantee a lot of loans.  I'm just wanting to be
14 clear that they never asked you, Ms. Oliver, to
15 guarantee those loans, did they?
16   A.  No.
17   Q.  Okay.  So what you were promised, you
18 said, is a Revenue Share.
19   A.  A share of the revenue, yes.
20   Q.  Your Complaint says "a Revenue Share."
21 Do you disagree with that?
22   A.  Okay.  Let's go with "Revenue Share"
23 then.
24   Q.  Okay.  You were promised a Revenue Share,
25 your materials, $1,000, whatever you want to

Page 232

1 label it.
2   A.  I was not promised $1,000, I'm really
3 sorry.  I cannot accept that.
4   Q.  Okay.
5   A.  Just please eliminate that, because I'm
6 going to have to stop you every time you say it.
7 It's just not true.
8   Q.  Okay.  Well, it's for you to answer the
9 questions however you answer them under oath,
10 and for me to ask them.
11   A.  Okay.
12   Q.  I hear your answer.
13       Is there any place where those things
14 were put together in any writing that you know
15 of --
16   A.  Well, Ben --
17   Q.  I'm not done with the question.
18       -- other than the April 2 e-mail,
19 Exhibit 20?
20       MR. BOYD:  Form.
21          Go ahead.
22       THE WITNESS:  Okay.  Number one, there
23 was no --
24   Q.  BY MR. ALLISON:  It's a yes or no
25 question.

Page 233

1   A.  Okay.  What I'm claiming -- what I'm
2 claiming, or what you referred to in the claim
3 is what I'm claiming in the -- in the -- in the
4 document.  You're referring directly to that or
5 no?
6   Q.  Here's my question:
7       You've said you were promised a
8 Revenue Share, and you were promised that Meow
9 Wolf would buy your materials, and you said you
10 weren't promised $1,000; right?
11   A.  Correct.
12   Q.  And you installed ISQ in acceptance of
13 that offer; right?
14       MR. BOYD:  Form.
15          Go ahead.
16       THE WITNESS:  In acceptance of a larger
17 offer, but go ahead.
18   Q.  BY MR. ALLISON:  Well, okay.
19   A.  Okay.
20   Q.  It was the Revenue Share and, "We'll buy
21 your materials"; right?
22   A.  A share of the success in our creations,
23 that I was a member of the collective, and the
24 entire package.  The Revenue Share, it was my
25 understanding, would be, as you say, contingent

Case 1:20-cv-00237-KK-SCY   Document 363-7   Filed 04/19/22   Page 7 of 13

Page 64 (Pages 250-253)

1:20-CV-00237- KK-SCY                                                Lauren Adele Oliver
Lauren Adele Oliver v. Meow Wolf, Inc., et al.                       March 26, 2021

Page 250

1  A. That's right. I remembered it long enough
2  for two weeks to ask for a contract, and then I
3  never heard back with the contract.
4  Q. Well, your response was six days later,
5  from April 2 to April 8. You took your time to
6  think about it and write back; right?
7  A. I think taking my time to think about it
8  would mischaracterize my reaction. I saw it
9  probably, realized I had to say something, said,
10 "Oh, okay," and then after I thought about it, I
11 asked for a contract.
12 Q. Okay. Did you talk to anyone about this
13 e-mail?
14 A. I did not.
15 Q. It says: "Good luck tonight." What did
16 that refer to?
17 A. Whatever he was saying; I don't know.
18 There must have been some event that night that
19 I knew about on April 8th. I had no idea,
20 because it's not answering anything specifically
21 in the e-mail. There must have been some event
22 on April 8th. Vince could take a look at his
23 calendar and let us know.
24 Q. Okay. You don't remember it.
25 A. I do not.

Page 251

1  Q. Your response actually was:
2      "Hey, awesome."
3      What was that in response to?
4  A. "Thanks. Excited to work with you. Hey,
5  awesome."
6  Q. Had you ever been offered $10,000 before
7  this point for Ice Station Quellette?
8  A. Not for Ice Station Quellette.
9  Q. For any work of art of yours?
10 A. Not for any work of art, but I did a lot
11 of creative work in my time, and I was paid
12 pretty well for it, Ben, so...
13 Q. But this was the biggest offer for art up
14 to this point in your career. Is that right?
15    MR. BOYD: Form.
16       Go ahead.
17    THE WITNESS: Okay. Again, I don't see a
18 number for $10,000 here, so that's academic.
19 This is an academic discussion; I don't remember
20 this e-mail. I don't read that as $10,000 now.
21 I forget what I thought at the time, other than,
22 "I better get a contract and see what we're
23 talking about," which was a contract that never
24 came.
25 Q. BY MR. ALLISON: And the offer wasn't, of

Page 252

1  course, just the $10,000, or the typo number, it
2  was also, "We'll buy your materials, and we'll
3  give you a bit of cash, and you'll keep the IP";
4  right?
5  A. Looking at this now, the terms are for a
6  personal stipend and artist revenue stipend, an
7  undecipherable amount, and purchasing materials.
8  I keep the IP. They are essentially buying the
9  piece --
10 Q. And your response was --
11 A. -- on lay away it sounds like.
12 Q. And this e-mail does not offer you an
13 open-ended or an unlimited Revenue Share, does
14 it?
15 A. It does not.
16 Q. And this e-mail does not offer you equity
17 ownership in Meow Wolf, does it?
18 A. It does not.
19    MR. BOYD: Okay for a break?
20    MR. ALLISON: Yeah, we can take a break.
21    MR. BOYD: Okay.
22    THE WITNESS: Okay. Thank you.
23    THE CERTIFIED REPORTER: Off the record.
24    MR. BOYD: Yeah, off the record.
25    (The deposition recessed from 4:04

Page 253

1  p.m. to 4:21 p.m.)
2     MR. ALLISON: David, back on the record.
3     (Deposition Exhibit Number 21 was
4  marked for identification.)
5  Q. BY MR. ALLISON: I am going to load -- if
6  I can find my mouse -- a document that's been
7  marked as Exhibit 21.
8     MR. BOYD: You know, Ben, I want to put
9  this on the record now, so that way I don't have
10 to remember and don't have to put it on the end.
11    THE WITNESS: I'll be right back.
12    MR. BOYD: Okay. For the record, we've
13 had a discussion off the record. It looks like
14 the plan is that we'll do another half hour or
15 45 minutes of questioning today, and then we'll
16 adjourn the deposition.
17    It is Plaintiff's position that in
18 coming back for the next session of Ms. Oliver's
19 deposition, that because we're continuing today,
20 and just in general, that questioning will be
21 devoted to new areas and will not be rehashing
22 anything that was already discussed today at a
23 future session. That's just our position, and
24 I'm stating it for the record.
25    Go ahead, Ben, if you have anything

Case 1:20-cv-00237-KK-SCY  Document 363-7  Filed 04/19/22  Page 8 of 13

Page 71 (Pages 278-281)

1:20-CV-00237- KK-SCY
Lauren Adele Oliver v. Meow Wolf, Inc., et al.

Lauren Adele Oliver
March 26, 2021

Page 278

1 MR. BOYD: Form.
2 Go ahead.
3 THE WITNESS: That's true. Instead I
4 decided to take the polite route and ask for a
5 contract, because there was more on that. Again,
6 as I have testified, there was more on that
7 e-mail that begged a lot of questions, and I
8 decided the easiest thing was to politely ask
9 for a contract.
10 Q. BY MR. ALLISON: Okay.
11 A. Okay.
12 Q. And the next paragraph says where the
13 meeting is and when, and then the following
14 paragraph says:
15     "This meeting is pretty close to
16     mandatory, as I want to go over some
17     logistical things with everyone, hand
18     everyone their contract, and get
19     things clarified. We are moving
20     closer and closer to install time!
21     "So please try to make it. If you
22     cannot make it (of course out-of-
23     towners), let's get everything
24     clarified and signed over e-mail."
25     Did you respond to that e-mail do

Page 279

1 you remember?
2 MR. BOYD: Form.
3 Go ahead.
4 THE WITNESS: I don't remember getting
5 this e-mail, so I can't answer that question.
6 Q. BY MR. ALLISON: Okay. Did you go to the
7 meeting?
8 A. I don't remember going to the meeting.
9 Q. So had you been there, according to this
10 e-mail, you would have been handed a contract;
11 right?
12 MR. BOYD: Form.
13 Go ahead.
14 THE WITNESS: If I had been at that
15 meeting, it's possible I could have been handed
16 a contract.
17 Q. BY MR. ALLISON: Were you living in Santa
18 Fe at this time?
19 A. I was.
20 Q. Okay. So you could have gone to the
21 meeting; right? The 16th --
22 A. If I had gotten the e-mail, I could have
23 gone to the meeting, because I was living in
24 Santa Fe at this time.
25     It's important to remember that I

Page 280

1 was going back and forth from Minnesota. This
2 could have happened when I was in Minnesota.
3 Q. Is your mom in Minnesota?
4 A. Yes.
5 Q. What year did she move to Minnesota?
6 A. She moved to Minnesota in 2007.
7 Q. Okay. If you were out of town, Vince
8 said:
9     "Let's get everything clarified and
10     signed over e-mail."
11     You said you don't remember
12 responding to this e-mail; right?
13 A. I don't remember getting this e-mail, and
14 so therefore I don't remember responding to this
15 e-mail.
16     Did I respond to this e-mail?
17 Q. Oh, that's a question I'm asking you.
18 A. I don't have any record of it.
19 Q. Okay. But you have testified that you
20 did go to meetings in the summer of 2015.
21 A. I did go to meetings.
22 Q. And did you go to meetings where the
23 Artist Revenue Share Program was explained?
24 MR. BOYD: Form.
25 Go ahead.

Page 281

1 THE WITNESS: I did go to meetings over
2 the summer where it was mentioned. I don't
3 remember if it was explained in detail, but I
4 know it was discussed over the summer and through
5 the fall.
6 Q. BY MR. ALLISON: Okay.
7 A. And I forget when we stopped having big
8 meetings and just started working.
9 Q. Okay. So what was explained about the
10 Artist Revenue Share Program in meetings in
11 2015?
12 A. Here's what I remember:
13     The Artist Revenue Share was couched
14 in a larger pitch that Vince was making. It
15 felt, to us, as a way of incentivizing artists
16 to give their all in this upcoming installation
17 in lieu of up-front payment, and that I just
18 remember hearing the word "share," "share,"
19 "share," "sharing in the success of our
20 creations." This was part of the pitch that
21 seemed to be going out about Meow Wolf, not just
22 to artists, but to everyone.
23     And so I remember the aspect that it
24 would be calculated on an annual basis, based on
25 whether HoER not so much turned a profit, but

Case 1:20-cv-00237-KK-SCY   Document 363-7   Filed 04/19/22   Page 9 of 13

Page 72 (Pages 282-285)

1:20-CV-00237- KK-SCY                                         Lauren Adele Oliver
Lauren Adele Oliver v. Meow Wolf, Inc., et al.                 March 26, 2021

Page 282

1  the word "revenue" is what came up, because it
2  sounded like a profit share, but they used the
3  word "revenue," and it was part of, again, a
4  larger pitch. "As members of the collective, you
5  will share in success."
6      Q. Okay.
7      A. If this thing happens, you will share in
8  the success.
9      Q. Okay. Now have you ever been an investor?
10     A. Not in any significant way.
11     Q. Yeah, me neither, but I've seen enough
12 and heard enough.
13         If one was pitching to an investor,
14 you would have to say, "Look, here's why we think
15 this is going to be successful. But it might not
16 be successful, and you might lose your money";
17 right?
18     A. That's right, if you were a responsible
19 person.
20     Q. If you were responsible.
21        In all those meetings -- because if
22 you buy ownership, then you're there for the
23 good times, but if nothing ever sells and all
24 you've got is debts, then that's what you've
25 bought; right? If you invest in ownership.

Page 283

1      A. Again, I don't usually think investors
2  are on the hook for the debts of a company -- I
3  feel that I know that much -- because typically
4  companies shield investors and executives from
5  company debts. It's why, I think, they were in
6  L.L.C.s, which limits liability.
7      Q. Yes, you make a very good point, and
8  you're a better lawyer than you gave yourself
9  credit for.
10        When you're an L.L.C., or a company
11 with no track record -- and maybe this isn't a
12 position you've ever been in -- nobody will give
13 you anything just based on the L.L.C. They need
14 a personal guarantee, so that there is somebody
15 to go after if things go south.
16        That concept, is that familiar to
17 you from your startup, you know, Silicon Valley
18 background?
19     A. Well, that makes sense --
20     MR. BOYD: Form.
21        Go ahead.
22     THE WITNESS: -- from an understanding of
23 how banks work.
24     Q. BY MR. ALLISON: Okay. Yeah, banks.
25     A. Collateral, that I do understand.

Page 284

1      Q. Yeah. So in all the meetings in 2015,
2  was it ever said that you needed to sign personal
3  guarantees for this to work, and "If it goes up,
4  you'll go up with us, but if it goes down,
5  you'll have to help pay the bills"?
6      MR. BOYD: Form.
7         Go ahead.
8      THE WITNESS: No, my contribution, or what
9  I was investing in was the House of Eternal
10 Return. What I was bringing to Meow Wolf was my
11 Ice Station Quellette art piece. That is what
12 they asked for, and that is what I delivered.
13 If they made no money, then again, it would have
14 been a good time. If the whole thing had just
15 been a terrible, you know, shame, at least, you
16 know, everyone would have gone down together.
17        But the force of Vince's incentive
18 with the Artist Revenue Share was that there was
19 the promise of an open-ended reward that would
20 be a share. I never heard the word "capped." I
21 never heard the word "bonus," it was a share.
22     Q. BY MR. ALLISON: And in Vince's e-mail
23 that we just looked at, Exhibit 22, the April 27
24 e-mail, what he says is in the first line and the
25 second line is:

Page 285

1        "I have sent out preliminary numbers
2  to most people..."
3        He doesn't say anywhere in this
4  e-mail "Revenue Share is unlimited," does he?
5      MR. BOYD: Form.
6        Go ahead.
7      THE WITNESS: Well, and by "unlimited,"
8  excuse me, I meant as in contrast to the idea
9  that it was capped, or that it was a capped
10 bonus, if you understand.
11        I think if we start talking about
12 infinity, I don't think Vince was saying to us
13 that we would be sharing in the success until
14 the end of time. I don't know what the terms
15 were, because again, a share is generally like
16 we talked about earlier, stock. That's a share.
17 That's equity. We agreed that stock was an
18 equity mechanism, and the stock either goes up
19 or it goes down until you sell it.
20     Q. BY MR. ALLISON: In any of the meetings
21 in 2015, did Vince Kadlubek change the terms that
22 he offered to you or that he wrote to you in his
23 April 2 e-mail?
24     MR. BOYD: Form.
25        Go ahead.

Page 509

1  There was a sense of the collective, and that,
2  you know, as Dave McPherson said last week that
3  my interests were represented in Meow Wolf as
4  part of the collective.
5      Q.  You mentioned a minute ago equity and
6  stock.  I think from our earlier conversation a
7  couple weeks ago, what you said was that you
8  believe you were promised ownership in the
9  collective, and that ownership is what should
10 result in equity or stock.  Is that a statement
11 of your position?
12     MR. BOYD:  Form.
13     Go ahead.
14     THE WITNESS:  I don't think that quite
15 articulates what my beliefs were at the time, or
16 what they -- you know, what time has been.  I
17 know that I was -- the pitch was pretty, pretty
18 clear; "You are joining this collective and we
19 have a revolutionary new business model.  It is
20 that artists are one.  We'll get to share in the
21 success of their creations; and two, get paid as
22 professionals, as any in-demand professional."
23     The mechanism by which we were
24 incentivized to install our work, and in my case,
25 spend months and months and months designing and

Page 510

1  installing my work, was for a Revenue Share
2  Program.  All I heard was "share," "share,"
3  "share," and I knew that it was calculated on an
4  annual basis, based on the revenues of the House
5  of Eternal Return, and that would emerge in --
6  it could emerge in any form.  The typical one
7  was stock.  That was the one that I thought,
8  "Well, that's the easiest thing is assign
9  artists stock," you know, residuals, royalties,
10 things like that.
11     I never heard the word "capped," or
12 "bonus," or anything like that.  That was my
13 understanding.
14     Q.  BY MR. ALLISON:  Okay.  We'll come back
15 to that.
16     In Exhibit 66, it says, and this is
17 a document you provided us, that this Screenland
18 documentary series debuts April 24, 2017.
19     A.  Sure.
20     Q.  So when was this shot?
21     A.  Well, I wouldn't know.  It was shot when
22 I wasn't there clearly.
23     Q.  I would think it would have been
24 shot -- yeah, I don't know either, but if it was
25 released in April of 2017, it must have been shot

Page 511

1  in 2016; right?
2      A.  I have no idea.
3      Q.  Okay.
4      A.  You can put stuff together pretty fast,
5  but I don't know what episode it was.  I have no
6  idea literally.
7      Q.  Did you hear about it in 2016 when you
8  were around Meow Wolf?
9      A.  I did not.
10     (Deposition Exhibit Number 67 was
11 marked for identification.)
12     Q.  BY MR. ALLISON:  Okay.  I'm putting in
13 front of you what's been marked as Exhibit 67.
14     You know, I guess this is going back
15 to your frame of mind in 2016 when the House of
16 Eternal Return opened.
17     A.  Uh-huh.
18     Q.  Exhibit 67 is an e-mail from you in
19 August of 2016.  Do you see that?
20     A.  Okeydoke.
21     Q.  Is this an e-mail between you and Caity
22 in August of 2016?
23     A.  Yes.
24     Q.  And in the long middle e-mail from you to
25 Caity, on August 19, you are proposing possible

Page 512

1  additional projects, or raising the possibility
2  of future projects with Meow Wolf; right?
3      A.  Absolutely.
4      Q.  Climate change museum.  Museum of the
5  Future is one; right?
6      A.  Well, there is a Museum of Climate Change;
7  I wonder what happened to that.  I was wondered
8  about that the other day and whether that's
9  still alive.
10     Q.  And you mentioned a TeamLab show in Menlo
11 Park.
12     A.  Yeah.
13     Q.  And interesting space at Fort Mason in
14 San Francisco.
15     A.  There is a great big space at Fort Mason,
16 yeah.
17     Q.  And then Gray Area in San Francisco.
18     A.  Uh-huh.
19     Q.  You say:  "In any case, I'm all the way
20        up for anything.  Let me know how I
21        can assist"; right?
22     A.  Absolutely.  That absolutely sums up my
23 attitude in August 2016.
24     Q.  Were you jazzed about the success and the
25 possibilities that you saw in 2016 as a result

Case 1:20-cv-00237-KK-SCY   Document 363-7   Filed 04/19/22   Page 11 of 13

Page 57 (Pages 521-524)

1:20-CV-0237 KK-SCY
Lauren Adele Oliver v. Meow Wolf, Inc., et al

Lauren Adele Oliver
April 08, 2021

Page 521

1  fur in the House and so on; right?
2    A. Yes, I'm sorry. I'm not seeing the
3  distinction. I'm not seeing where we're
4  disagreeing somehow.
5    Q. Okay. I think we're on the same page.
6      Let me ask you, you have claimed in
7  this case that you had a contract with Meow
8  Wolf; that you accepted an offer from Meow Wolf
9  and had a contract with them. What was the offer
10 that Meow Wolf made to you that you accepted?
11     MR. BOYD: Form.
12     Go ahead.
13     THE WITNESS: The offer was the one that
14 I discussed actually just a few minutes ago;
15 that I join the collective. That I would share
16 the revenue as part of this entire group.
17     I was joining up with what was an
18 organization that was taking a new view of
19 artists as paid professionals. This was almost
20 like joining a professional union because we
21 would be paid as professionals. In lieu of up
22 front payment for my time and my effort, I would
23 receive a share of the revenue, an Artist Revenue
24 Share that was calculated on an annual basis
25 with a relationship from year to year on how

Page 522

1  much revenue our work generated. If it was
2  nothing, we'd get nothing; it was a roll of the
3  dice. But if we had a really good year, we would
4  get more.
5      To me, as I said, this translated as
6  stock, because of its tying to the value of the
7  company, or the revenues of the company. That
8  equated to me an equity mechanism, or what they
9  call commonly sweat equity, and that would be
10 expressed in an equity mechanism like stock.
11     Q. BY MR. ALLISON: Okay. Were there any
12 other terms to the contract that you believe you
13 accepted?
14     A. Make it bulletproof is what they said,
15 because kids are going to climb up and try to
16 get your Space Owl. You know, there were simple
17 terms, but again, I trusted these people.
18     The thing that you should realize,
19 and you may, by the time you get through these
20 e-mails, is that I had been close to these people
21 for years and years and years. I had been with
22 them at their inception and participated in some
23 of those things, and the cool bonus you're going
24 to find out is that they were hitting me up for
25 rent and I was giving them rent.

Page 523

1      So yes, we can share that laugh here,
2  because as it turns out, I think I may have
3  contributed to their rent when they weren't
4  making it.
5      Ben, I absolutely -- it is worth
6  saying that I absolutely, 100 percent trusted
7  these people. I expected paperwork, and it is
8  inconceivable that we would get to this place
9  right now. I absolutely fully expected that
10 paperwork commensurate with that deal would come
11 that would be on a professional level. I
12 expected it and started asking for it in the
13 fall, and during installation.
14    Q. Okay. My question is just about the
15 terms.
16    A. Okay. I'm sorry.
17    Q. I'm asking for the last time was there
18 anything else in the offer that Meow Wolf made
19 to you other than what you've already described?
20    A. I can't --
21     MR. BOYD: Form.
22     Go ahead.
23     THE WITNESS: I feel like I've said
24 everything I can.
25    Q. BY MR. ALLISON: That's fine.

Page 524

1    A. I don't...
2    Q. Where was this offer made?
3    A. At multiple meetings.
4    Q. And when were those meetings?
5    A. Those meetings started in -- the meetings
6  that started in the spring, Ben, were mostly
7  mechanical meetings about starting to introduce
8  the idea of some of the technology and things
9  that were available.
10     By the summer, these meetings were
11 quite large, and they included introductions,
12 presentations from people, the latest news,
13 things like that.
14     By fall, again, everything was
15 really starting to gel, and the scope of the
16 project was becoming more and more visible, and
17 people were already starting to do work.
18    Q. Is this spring, summer, and fall 2015.
19    A. Correct.
20    Q. Okay. So did you go to All Shrimps
21 meetings in 2015?
22     MR. BOYD: Form.
23     Go ahead.
24     THE WITNESS: The All Shrimps were the
25 meetings I went to.

Case 1:20-cv-00237-KK-SCY   Document 363-7   Filed 04/19/22   Page 12 of 13

Page 78 (Pages 605-608)

1:20-CV-0237 KK-SCY
Lauren Adele Oliver v. Meow Wolf, Inc., et al

Lauren Adele Oliver
April 08, 2021

Page 605

through the meetings in 2015, as you're saying, and that cap had been expressed in the April 2 e-mail in writing by the CEO, and you now thought the cap is going away and there's no cap, wouldn't that be something to check on before accepting the deal? Wouldn't that be something to write to Vince and say, "Hey, there's no cap any more; right?"

 MR. BOYD: Form.
  Go ahead.
 THE WITNESS: (No audible response.)
 Q. BY MR. ALLISON: Did you do that with Vince, to check that the cap was going away?
 MR. BOYD: Form.
  Go ahead.
 THE WITNESS: Okay. Ben, I was expecting paperwork any day. I will also -- I'm going to -- since you're asking a hypothetical, I will give you a picture of what things were like, so that maybe you can understand.
  I was in nonstop hysteria trying to get my first solo show together until June 28th. And then I was very quickly offered the Santa Fe Institute, so that took all the time to September 26th.

Page 606

 Once September 26th was done, then I started turning to this Meow Wolf project, and I would go to meetings. There would be, let's say, you know, some percentage of that 113 artists, and these meetings were like rallies; okay?
 Q. BY MR. ALLISON: Ms. Oliver, my question was just if you thought the cap was going away, wouldn't that be something to check with the CEO about, since you had that cap expressed in writing from him?
 MR. BOYD: Form.
  Go ahead.
 THE WITNESS: Okay. Again, I completely forgot about that first e-mail, because at this point it was so old, I literally forgot about it. I had followed up on it; he gave me nothing. I just dismissed that entirely as a junior effort.
 Q. BY MR. ALLISON: So your testimony today is that you did not consider it something to check with the CEO about; that the cap was going away. Is that correct?
 MR. BOYD: Form.
  Go ahead.

Page 607

 THE WITNESS: My testimony is that I completely dismissed that e-mail because I heard entirely different terms. In fact, Meow Wolf was very well aware, as we can now see, that they were telling us it was a share, when it was really a bonus after installation. They were aware that it was different, but...
 Q. BY MR. ALLISON: I feel like you maybe don't want to answer my question.
 MR. BOYD: No, okay. Wait a second, Ben; okay?
 Q. BY MR. ALLISON: This is the question --
 MR. BOYD: Okay. You've asked it three times, and you've asked -- you asked it again in the previous session. We've been very accommodating. You've asked the same question three times. Lauren's given her best answer. You can ask it one more time, and Lauren can give her best answer based on her recollection.
  Go ahead.
 MR. ALLISON: You can object to form and foundation.
 MR. BOYD: Okay. Or I can shut it down because we're well past the time that we agreed upon.

Page 608

  Go ahead.
 Q. BY MR. ALLISON: Ms. Oliver, my question was is it your testimony that it was not something to check with the CEO about when you believed that the cap expressed in the April 2 e-mail was going away?
 MR. BOYD: Form.
  Go ahead.
 THE WITNESS: A, wrong words. I'd forgotten anything about a cap, because I forgot about that April 2nd e-mail.
  Also, I completely trusted these people 100 percent, even though I did not know Vince. It seemed that the people that I knew, and really did trust -- Matt, Caity, Emily, Benji -- trusted Vince, so I accorded him the same trust that I accorded them.
  It would be inconceivable that if he was telling me that I had a share, and was not mentioning, "You are going to get flat bonuses. I'm going to give you your amounts. We're going to call these bonuses, not shares." He told us it was a share. He presented it as a profit-sharing program, a classic profit-sharing program, and I believed him.

Page 609

1   Q. BY MR. ALLISON: Okay. And just so I
2  understand, did you hear the words -- well, what
3  I understand your testimony is that you never
4  heard the word "cap" in those meetings. Is that
5  right?
6   A. I never heard it.
7   Q. Okay. And so you didn't hear the words,
8  "There is no cap." It wasn't that they
9  affirmatively said, "There is no cap," it's that
10 they never brought up the word "cap." Is that
11 right?
12  A. They never said the word "cap," only
13 "share."
14  Q. So they never said, "There is no cap" in
15 those meetings; true?
16  A. I can't say if they used that exact
17 language. I can tell you I never heard the word
18 "cap," so technically I did not hear those
19 words. "There is a cap; there is no cap." I
20 don't ever remember hearing the word "cap."
21  Q. And you never wrote to Vince, or any other
22 founder, to clarify and to confirm whether there
23 was or wasn't a cap; correct?
24  A. Why would I do that? Why would I do that
25 when they were talking about a share based on

Page 610

1  revenues, or a revenue share on our sweat equity
2  in lieu of up-front payment?
3       If they wanted to give us a cap
4  thing, they should have said, "We're buying your
5  art on layaway," but they presented it as an
6  Artist Revenue Share. "We can't pay for your
7  art now, but you are earning sweat equity."
8   Q. What's the material or medium of the
9  octopus and the snails in ISQ?
10  A. They are floral foam, and I bought the
11 kind of casting stuff that goes on an arm that's
12 broken; I don't know what to call it.
13      I introduced this around, and a lot
14 of other people started using it, and it's
15 something I learned from a train freak, or
16 someone who makes model trains. It was a little
17 technique, and then I put scratch on it, and
18 then I painted them.
19  Q. Had you ever used that medium before ISQ
20 at the House?
21  A. What, the casting material?
22  Q. Right.
23  A. No.
24  Q. And would you just spell that word,
25 "floral foam"? Is that what you said?

Page 611

1   A. I think it's "floral foam."
2   Q. Got it. Got it.
3       What's the medium of the images in
4  the portholes in the walls?
5   A. Those are digital images.
6   Q. That are printed on paper?
7   A. They are printed on paper.
8   Q. Okay.
9       Were those portholes in the Phil
10 Space show?
11  A. They were not.
12     MR. ALLISON: Okay. That's it.
13     MR. BOYD: Thank you, Ben.
14     I do have some questions; I'll be as
15 quick as I can.
16     THE CERTIFIED REPORTER: While being
17 mindful of the Court Reporter, which is to say
18 patience your rhythm.
19     MR. ALLISON: And David, let me just say
20 thank you for all the hard work, because I
21 don't --
22     MR. BOYD: Yeah, absolutely.
23     MR. ALLISON: You didn't give me that
24 lecture, and you bore with it, so thank you.
25     MR. BOYD: All right.

Page 612

1              EXAMINATION
2  BY MR. BOYD:
3   Q. Lauren, are you there?
4   A. I am.
5       (Deposition Exhibit Number 4 was
6  marked for identification.)
7   Q. BY MR. BOYD: All right. So jumping back
8  to your first session, Lauren, I've just
9  uploaded Exhibit 4 to your deposition, if you
10 can open that up.
11  A. (Witness complies.) Okeydoke.
12  Q. All right. Do you remember your
13 conversation with Mr. Allison about this e-mail
14 that's pictured in Exhibit 4?
15  A. I do.
16  Q. All right. What's the date on that
17 e-mail?
18  A. January 25th, 2016.
19  Q. And this e-mail was about a funding push;
20 right?
21  A. Yes.
22  Q. And the way that Meow Wolf was going to
23 generate some additional funding was -- well,
24 how was Meow Wolf going to generate additional
25 funding, according to this e-mail?