**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

LAUREN ADELE OLIVER,
an individual,

      Plaintiff,

v.                                                                    Case No. 1:20-CV-00237-KK-SCY

MEOW WOLF, INC., a Delaware
corporation; VINCE KADLUBEK,
an individual and officer; and
DOES 1-50,

      Defendants.

**DEFENDANTS' MOTION TO EXCLUDE THE
EXPERT OPINION TESTIMONY OF MARIANNE L. DEMARIO**

      Defendants Meow Wolf, Inc. (Meow Wolf) and Vince Kadlubek respectfully request that

the Court exclude the expert opinion of Marianne L. DeMario pursuant to Federal Rules of

Evidence 104, 702 and 403. This motion is opposed.

**INTRODUCTION**

      Ms. DeMario was engaged to opine on plaintiff Lauren Oliver's damages from the claimed

breach of her compensation contract to install Ice Station Quellette (ISQ) at Meow Wolf's House

of Eternal Return (HoER). Although Ms. Oliver claims an oral contract, Ms. DeMario was not

given, and never read, Ms. Oliver's deposition, and as a result has rendered opinions that are

directly falsified by the plaintiff's own sworn testimony.

      In order to calculate damages from an alleged breach of the parties' contract, Ms. DeMario

must know the compensation terms of that contract. Ms. Oliver claims she was promised a

"proportional revenue share" and "membership in the Meow Wolf Collective" in exchange for

installing ISQ. Am. Compl. ¶¶ 23–25, Doc. 148. But a collective is not an entity, and as a result

has no equity and cannot own property. And Ms. Oliver has acknowledged to the Court that she

was not promised any actual amount or percentage of Meow Wolf's revenue (apart from the $10,000 in revenue share she was offered in the April 2, 2015 "Meow Terms" email). Doc. 297, at 9 ("While no particular percentages or shares were mentioned . . . ."); Email from Vince Kadlubek to Lauren Oliver, April 2, 2015, Doc. 278-1 (containing the subject line "Meow Terms.)"

Ms. DeMario conceded that, after nearly two years of discovery, Ms. Oliver is in the same place the Court described in ruling on the motion to dismiss plaintiff's original complaint. In that Complaint, Ms. Oliver had alleged no agreement for any amount or percentage of revenue. Memorandum Opinion and Order, Doc. 59, at 14 n.9. With discovery over, plaintiff still cannot identify an agreement for any amount or percentage of Meow Wolf revenue, or any method to calculate such an amount.

In order to supply the missing compensation term, Ms. DeMario adopted the opinion of another expert whose report she had not seen or read when she used its conclusion. *See* Marianne DeMario Preliminary Expert Report, Mar. 5, 2021, attached as **Exhibit A**, at ¶ 21; Marianne DeMario Supplemental Expert Report, Jan. 14, 2022, attached as **Exhibit B**, at ¶ 6. The other expert is James Daichendt, who opined that ███████████████████████. Ms. DeMario interpreted this as an opinion of economic value, and specifically as percentages of future cash flow. But she used Mr. Daichendt's report without reading it, and as a result did not know that Mr. Daichendt is a professor of art history who has no training or experience in rendering opinions on economic value. Mr. Daichendt testified ██████████████████████████████████ ██████████████████████████████. The law allows an expert to rely on another's opinion only if she knows the methodology and reliability of the other's opinion—but Ms. DeMario had no idea how Mr. Daichendt arrived at his opinion. Ms. DeMario could have rendered the percentage opinion, but she was not asked to do so; if she had been asked,

she would have used objective measures of ISQ's relative value. Mr. Daichendt used no objective measures and rendered a purely subjective opinion.

Ms. DeMario's entire opinion is founded on this unreliable basis. To deal with the fact that plaintiff can identify no contractual revenue sharing system or structure, Ms. DeMario invented a structure, borrowing elements from the actual Artist Bonus Program (ABP) that plaintiff rejects, but arbitrarily ignoring other elements of the ABP that plaintiff would prefer to rewrite or omit.

While the Court, in its first ruling in this case, identified expert analyses that could be helpful in a contract with a missing compensation term, Ms. DeMario ignored these suggestions. The Court wrote that plaintiff could potentially be compensated with "the appraised value of ISQ," or provide "a range of alternatives, which would support an award in accordance with the alternative that will result in the smallest recovery.'" *Id.* at 14–15 (citing *Padilla v. RRS, Inc.*, 1997-NMCA-104, ¶ 6, 124 N.M. 111) (internal quotation marks and brackets omitted). Ms. DeMario provided none of these analyses, and did not recall reviewing the Court's order. *See* Marianne DeMario Dep., Mar. 16, 2022, attached as **Exhibit C**, at 105:10–14 (█████████ ████████████████████████████████████████████████████ ██████████████████████████).

Because Ms. DeMario failed to inform herself of Ms. Oliver's deposition testimony, she was unaware Ms. Oliver testified she was never promised "shares of stock in Meow Wolf," "units of ownership in an L.L.C. in Meow Wolf," or "a specific percentage or amount of equity in Meow Wolf." Lauren Oliver Dep., Doc. 278-5, at 46:22–48:20. As a result, Ms. DeMario opined, in direct contradiction of her own party's sworn testimony, that Ms. Oliver was promised equity and should be awarded ██████ in the lost value of that equity. *See* **Ex. A**, at ¶ 29.

3

Nor was Ms. DeMario informed of undisputed testimony that all Meow Wolf artists were given the opportunity to buy equity during the building of HoER, and Ms. Oliver declined to do so. Ms. DeMario contradicted these facts by opining that plaintiff should have been given the opportunity to buy equity in 2015, had she been given that opportunity she would have taken it, and she was damaged in the amount ████████ by being "denied" this opportunity. Ms. DeMario's opinions will not be helpful to the jury because they are not grounded in the facts. In addition, after her report and supplemental report were served, Ms. DeMario changed her position and opined for the first time in her deposition that her equity and lost revenue share opinions are alternative damages theories—plaintiff should not get both.

Finally, Ms. DeMario's opines that Ms. Oliver is entitled to ██████ for unreimbursed expenses related to ISQ being installed at HoER. **Ex. A**, at ¶ 17. Ms. DeMario cites nothing to show Meow Wolf agreed to reimburse Ms. Oliver for her expenses, and while Ms. Oliver has said she expected Meow Wolf to buy her *materials*, the only basis for such an agreement is the Meow Terms contract offer email that Ms. DeMario explicitly rejects. Ms. DeMario also includes in her list of expenses items like rent that Ms. Oliver testified she was never promised reimbursement for.

Ms. DeMario either did not ask for or was not given sufficient facts in this case to render reliable and helpful opinions. Her opinions are falsified by undisputed facts and should be excluded.

## ARGUMENT

Ms. DeMario agrees that calculating contract damages requires identifying the terms of Ms. Oliver's bargain. **Ex. C**, at 58:18–22 (Q. ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████); *see also* **Ex. A**, at ¶ 15.

As such, an opinion on contract damages must be based on sufficient facts in this case in order to be admissible. *See City of Hobbs v. Hartford Fire Ins. Co.*, 162 F.3d 576, 587 (10th Cir. 1998) (an expert who "possesses knowledge as to a general field" but "lacks specific knowledge does not necessarily assist the jury").

Before permitting any expert to testify, the Court must determine whether "(1) the expert is qualified and the testimony would be helpful to the trier of fact, (2) the testimony is based on sufficient facts or data, (3) it is further based on reliable principles and methods, and (4) the expert has reliably applied the principles and methods to the facts and data." *Rodgers v. Beechcraft Corp.*, 759 F. App'x 646, 657 (10th Cir. 2018). This gatekeeping function applies regardless of whether the proffered expert is giving scientific testimony. *Kumho Tire Co. v. Carmicheal*, 526 U.S. 137, 149 (1999). The reliability inquiry is context-specific, and the question before the Court is "not the reasonableness [of the expert's methodology] in general," but rather "the reasonableness of using such an approach . . . to draw a conclusion regarding the particular matter to which the expert testimony was directly relevant." *Id.* at 154 (emphasis in original).

The proponent of expert testimony must show that the proffered opinion is grounded in accepted methods and is based on actual knowledge rather than subjective belief or speculation. *Mitchell v. Gencorp Inc.*, 165 F.3d 778, 780 (10th Cir. 1999); *Walker v. Spina*, 359 F. Supp. 3d 1054, 1067 (D.N.M. 2019) ("The proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the pertinent admissibility requirements are met.") (citing *Bourjaily v. United States*, 483 U.S. 171, 175 (1987)).

Rule 403 of the Federal Rules of Evidence likewise provides limits to the admissibility of evidence. Grounds for such limitations include confusing the issues and misleading the jury. Fed. R. Evid. 403. These limitations apply strongly to proposed expert testimony. *See Daubert v.*

*Merrell Dow Pharms., Inc.*, 509 U.S. 579, 595 (1993) ("Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses.") (quoting Weinstein, *Rule 702 of the Federal Rules of Evidence is Sound; It Should Not Be Amended*, 138 F.R.D. 631, 632 (1991)). Indeed, the Court should be mindful that "expert testimony that is more likely 'to mislead [the trier of fact] than to enlighten should be excluded' under Rule 403." *Casey v. Geek Squad*, 341 F. Supp. 2d 334 (D. Md. 2011) (quoting *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999)).

# I
## DEMARIO'S OPINION ON LOST REVENUE SHARE
## IS NOT GROUNDED IN ANY PARTY'S EXPECTATIONS

Ms. DeMario opines that Ms. Oliver's contract entitled her to a share of revenue share anywhere from ▮▮▮▮ to nearly forty times that amount, ▮▮▮▮▮—a range so broad as to betray the fact that Ms. DeMario does not know what the actual contract terms are. **Ex. B**. at ¶ 6[1] In order to calculate contract damages, Ms. DeMario needed to know the compensation terms of the parties' contract. **Ex. C**, at 58:18–22. Yet Ms. Oliver was not promised any compensation terms in the artist meetings she relies on, as her counsel has formally acknowledged to the Court: "While no particular percentages or shares were mentioned . . . ." Doc. 297, at 9. Ms. DeMario admitted ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ **Ex. C**, at 108:16–21.

---

[1] Ms. DeMario's supplemental report merely updates the upper limit of lost revenue share damages by lengthening the period of time assessed. The underlying method for calculating those damages is unchanged from her original report. *See* **Ex. A**, at ¶¶ 18–21.

A.     **Ms. DeMario Made Up Contract Terms**

Faced with this devastating reality, Ms. DeMario invented contract terms—ending in a complicated web of contradictions:

▪       Ms. DeMario started by borrowing terms from Meow Wolf's actual Artist Bonus Program (ABP)—which the entire point of plaintiff's lawsuit is to reject. From the ABP, Ms. DeMario took the structure of an annual pool consisting of 11% of revenues in excess of $1.2 million. *Compare* **Ex. A**, at ¶ 18 ████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████ ) *with* Liberty Yablon Revenue-Based Bonus Payment Agreement, Apr. 24, 2015, Doc. 362-4 ("If Meow Wolf exceeds $1.2M annually, Meow Wolf will set aside 11% of the revenues in excess of $1.2M."); *see also* Loan Participation Units Disclosure Document, Jan. 5, 2016, Doc. 362-10, at 5, 6 (describing the ABP to potential investors).

▪       Ms. DeMario took these terms from a document describing the ABP, but Ms. Oliver testified there is no document that reflects the terms she was promised. *See* **Ex. A**, at ¶ 18; Oliver Dep., Mar. 26, 2021, attached as **Exhibit D**, at 236:6–24 (Q. "Is there any other document where Meow Wolf promised you in writing a Revenue Share and to buy your materials? . . . A. . . . . There is nothing in writing that reflected my understanding of the agreement that made me proceed to install the ISQ."). Therefore, terms from this document *cannot* reflect plaintiff's alleged contract. Ms. DeMario did not know this because she did not review Ms. Oliver's deposition. **Ex. C**, at 48:7–12 (████████████████████████████████████████████

been given a transcript of Ms. Oliver's deposition? A. I don't believe so."); **Ex. C**, at 125:3–10 (██
███████████████████████████████████████████████████████).

■      While borrowing some ABP terms, Ms. DeMario arbitrarily rejected others set out
in the same document as the 11% and $1.2 million threshold, such as the $1,046,500 cap on the
revenue pool. *See* **Ex. A**, at ¶ 18. Ms. DeMario justified this by saying plaintiff was not informed
of the $1,046,500 cap—but neither was plaintiff informed of the 11% and $1.2 million terms that
Ms. DeMario took. *See* **Ex. A**, at ¶ 20 ███████████████████████████
█████████); **Ex. C**, at 123:16–20 ████████████████████████████████
███████████████████████████████████████████████████████
████████).

■      Ms. DeMario testified she was looking for contemporaneous documents to reflect
the parties' expectations (again not knowing the plaintiff's own testimony), and admitted that the
one document reflecting contract terms between the parties—with plaintiff's manifestation of
assent—is the Meow Terms email. Yet she ignored this document at Ms. Oliver's instruction. **Ex.
C**, at 200:5–8 (██████████████████████████████████████████████
████████████████████); **Ex. C**, at 150:21–25 (████████████████
███████████████████████████████████████████████████
████████); **Ex. C**, at 135:17–22 (████████████████████████
███████████████████████████████████████████████████
██████████████████████████████████████████████████);
140:5–6 ██████████████████████████████); *see also* Doc. 278-1.

Ms. DeMario invented a new *post hoc* contract, taking piecemeal ABP terms that are
beneficial to the plaintiff and conveniently rejecting other terms. The resulting "contract" is

8

untethered from Meow Wolf's expectations as expressed in the ABP, but more importantly is unsupported by Ms. Oliver's own testimony.

**B.    Ms. DeMario Relied on Another Expert for a Key Element of Her Analysis, but never Read that Expert's Report and was Unaware he had no Relevant Qualifications**

Ms. DeMario can make financial calculations with HoER's cash flow, but she does not know what amount or percentage of those cash flows Ms. Oliver should get under the parties' contract. Having rejected the only compensation terms, written or oral, that exist in this case (the April 2, 2015 Meow Terms email to which plaintiff replied "Awesome," Doc. 278-1) Ms. DeMario has no answer the question what amount or percentage of HoER revenue plaintiff contracted for.

For this missing term—the crux of plaintiff's entire case—Ms. DeMario turned to another of plaintiff's experts, James Daichendt. Her report says it is her "███████████████ ████████████████████████████████████████████████ ████████████████████" **Ex. A**, at ¶ 21; **Ex. C**, at 142:13–14 (████████████ ████████████████████████████████████████████ ).

Ms. DeMario testified that she interpreted Mr. Daichendt's percentages as an opinion of "economic value" (**Ex. C**, at 204:2–6) and assumed his opinion represented the "future cash flow" of HoER attributable to ISQ. *See* **Ex. C**, at 213:25–214:12 ████████████████████ █████████████████████████████████████ ). She also testified that when she used the term "value," she meant economic value. **Ex. C**, at 34:23-25 ("█ ████████████████████████████████████████████████ ███████████████████ ).

The problem is that Mr. Daichendt is a professor of art history and has absolutely no economic or financial education, training, or experience. He admitted he is not qualified to give

an opinion on the economic value of ISQ. James Daichendt Dep., Mar. 10, 2022, attached as **Exhibit E**, at 272:10–11 ████████████████████████████████████████);

*see* **Ex. E**, at 229:17–22 ██████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████); 126:15–127:13, 225:7–9. Mr. Daichendt testified the kind of "value" he was opining on was "artistic and experiential" value. *See* **Ex. E**, at 272:12–18. He was clear he was not opining on an appraisal value of ISQ. **Ex. E**, at 130:16–17 ████████████████████████).

Ms. DeMario was oblivious to the fact that Mr. Daichendt could not provide an opinion of economic value; she did not read his report and had never seen his CV until shown it at her deposition. *See* **Ex. C**, at 109:18-19 ████████████████████).

"One expert may not rely on another expert's opinion if the first expert is unfamiliar with the methods and reasons supporting the second, . . . an expert cannot merely recite another expert's opinion, and . . . an expert cannot directly testify as to the conclusions of another expert." *Assessment Techs. Inst., LLC v. Parkes*, Case No. 19-2514-JAR-KGG, 2021 WL 2530977, at *13 (D. Kan. June 21, 2021) (quoting *U.S. Bank Nat'l Ass'n v. PHK Variable Life Ins. Co.*, 122 F. Supp. 3d 122 131 (S.D.N.Y. 2015 (collecting cases)).

In *Assessment Technologies*, the plaintiff proffered an expert to give an opinion concerning the defendant's profits earned from copyright infringement. *Id.* at *5. The plaintiff's expert based his opinion that the defendant should disgorge all its profits on conversations with an undesignated expert concerning marketing. *Id.* at *6. The plaintiff's expert was not a marketing expert and was unfamiliar with the undesignated expert's methods. *Id.* at *6, 10. The court held the expert's opinion on disgorgement was not reliable because it suffered from all three flaws noted above. *Id.*

at *11. The court reasoned that the expert's reliance on another expert was "problematic" because "it would constitute direct testimony about [the undesignated expert's] conclusions." *Id.* at 14. The plaintiff's expert's "lack of familiarity with the methods and reasons underlying [the other expert's] projections virtually preclude[] any assessment of the validity of the projections through cross-examination . . . ." *Id.* (brackets in original). The expert's opinion was thus excluded. *Id.*

Like the expert opinion in *Assessment Technologies*, Ms. DeMario's opinion suffers from all three flaws. Ms. DeMario interpreted Mr. Daichendt's opinion as one of economic value even though he is unqualified to assess economic value, *see* **Ex. A**, at ¶ 21, and she testified there may be important differences between her methods and Mr. Daichendt's. *See* **Ex. C**, at 215:11–13 █

████████████████████████████████████████████████████████████████████████

████████████████████████████████████ ). More fundamentally, she does not know what methods he used, because she did not read his report.

At the same time, she testified she was qualified to determine the percentages of economic value, but she had not been asked to do so. **Ex. C**, at 193:21–194:17. She testified that she would use objective measures for determining Ms. Oliver's percentages. *Id*. Mr. Daichendt did not use objective measures to arrive at his ████ range; he made qualitative estimates, without looking at ISQ or HoER, based on little more than his own *ipse dixit*.

Ms. DeMario cannot testify to an opinion of Ms. Oliver's lost revenue share without testifying about another expert's opinion—and that expert, Mr. Daichendt, is not an expert in the relevant field of economic valuation of art. Like the expert in *Assessment Technologies*, Ms. DeMario's "lack of familiarity with the methods and reasons underlying [the other expert's] projections virtually preclude[] any assessment of the validity of the projections through cross-examination . . . ." *Assessment Techs.*, at *14 (brackets in original).

Additionally, the ▇▇▇▇ she relies on is not based on Ms. Oliver's expectations at the time her contract was formed. Ms. Oliver claims she was never promised a specific percentage of revenue. It is inappropriate to create that percentage after the fact, especially based on the unexamined opinion of an expert in the wrong field. Ms. DeMario's opinion is unreliable because it is based on an unqualified opinion, is contradicted by Ms. Oliver's sworn testimony and the facts in this case, is not based on Ms. Oliver's expectations, and is therefore unreliable and unhelpful to the jury.

## II
## DEMARIO'S OPINION ON LOST INVESTMENT VALUE
## IS FALSIFIED BY PLAINTIFF'S OWN SWORN TESTIMONY

Ms. Demario opines—altering her written opinion to now claim it is an alternative to her revenue share damages—that Ms. Oliver has been damaged in the amount of ▇▇▇▇▇ ▇▇▇▇ in "lost investment value in Meow Wolf." **Ex A**, at ¶ 29; **Ex. C**, at 63:16–18 ▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇). [2] These numbers are based on the following assumptions: (1) that Ms. Oliver had an agreement with Meow Wolf whereby all the time she spent on ISQ (▇▇▇▇▇▇ would be valued at ▇▇▇▇ and she would be allowed to invest the resulting ▇▇▇ in a purchase of equity in Meow Wolf at approximately ▇▇▇ for each 1% of the company; or (2) that Ms. Oliver should have been allowed to buy equity in Meow Wolf at the same 2015 purchase price as two other artists. That she would have

---

[2] Ms. DeMario alternatively labels these damages "unjust enrichment." **Ex. A**, at ¶ 22. She does not explain how this number reflects the amount by which any party was enriched by. Ms. Oliver never invested in Meow Wolf, so it could not have been enriched by any hypothetical investment by her.

done so if given the opportunity, and that if she had done it would have appreciated to ███████

*Id.* at ¶¶ 24–26.

### A.  <u>Ms. Oliver Testified Under Oath She Was Never Promised Equity</u>

Once again Ms. DeMario's opinion is not based on the facts of the case. Ms. DeMario's first calculation is "based on the implied value of [Ms. Oliver's] sweat equity." **Ex. A**, at ¶ 24. The assumption is of an agreement as set forth above, which does not exist. In fact, Ms. Oliver was never promised an ownership interest. In her testimony, she was clear that she was not promised "shares of stock in Meow Wolf," or "shares of ownership in an L.L.C. in Meow Wolf," or any "specific percentage or amount of equity in Meow Wolf."  Lauren Oliver Dep., Doc. 278-5, at 46:22–48:20. Although Ms. DeMario asserted that her ██████████████████████████████ ████████████████████████████████████ **Ex. C**, at 94:22–95:1, Ms. DeMario computes an equity interest in Meow Wolf for Ms. Oliver, and does so in direct contravention of Ms. Oliver's own testimony. **Ex. A**, at ¶¶ 24–25.

When confronted with Ms. Oliver's testimony, Ms. DeMario asserted that her opinion concerning Ms. Oliver's "lost investment value" was still valid because Ms. Oliver was merely saying she was not offered any *specific* equity. **Ex. C**, at 86:1–16. This assertion misstates Ms. Oliver's testimony, which broadly and categorically denied that she was promised equity in Meow Wolf. Ms. DeMario only saw portions of the plaintiff's testimony for the first time at Ms. DeMario's deposition, and reached all the opinions in her written report without any knowledge of the plaintiff's deposition. *See* **Ex. C**, at 48:7–12.

Because Ms. Oliver admits she was not promised equity in Meow Wolf, Ms. DeMario's opinion assuming she was promised equity is unreliable, not based on sufficient facts, and would be confusing and unhelpful to the jury.

**B.**     **Ms. DeMario's Alternative Calculation Is Based on the**
           **False Premise that Ms. Oliver Was Not Offered to Buy Stock in Meow Wolf**

Ms. DeMario's second calculation of Ms. Oliver's "lost investment value" is based on two other HoER artists' equity purchases. These artists each bought a 3.86% equity stake in Meow Wolf in 2015. **Ex. A**, at ¶ 26. Had Oliver been given the same opportunity, Ms. DeMario opines, she would have taken it. *Id.* ███████████████████████████████████████████

███████████████████████████████████████████); **Ex. C**, at 245:21–246:1 (███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████). The second basis for this opinion fails for the same reasons as the first, that Ms. Oliver was never promised equity in Meow Wolf.

Additionally, Ms. Oliver *was* given the opportunity to purchase stock in Meow Wolf along with all HoER artists, as plaintiff's witness Drew Lenihan acknowledged under oath. Drew Lenihan Dep. Jan. 26, 2022, attached as **Exhibit F**, at 61:2–9 (Q. "Do you remember Vince telling artists that investing in Meow Wolf was at that point open to artists?" A. "[Y]es, that was a talking point at some point."). Other HoER artists corroborated this and the point is undisputed. *See* **Ex. F**, at 62:11–19 (Q. "Do you know any artists who did buy stock?" A. "I'm going to say yes." Q. "Who were those?" A. "I want to say like Leo Brown bought stock.").

Ms. DeMario did not know that Ms. Oliver had the opportunity to buy stock in Meow Wolf because she did not read any depositions and apparently did not ask to read them. *See*  By doing so, she rendered opinions that were not based on the facts and are on this point directly contrary to the facts. Not only did plaintiff have the opportunity to buy Meow Wolf stock along with other artists, but plaintiff did not take advantage of the opportunity, contrary to Ms. DeMario's assumption. Ms. Oliver was never promised equity in Meow Wolf, but when she was given the

chance to purchase equity, she declined the offer. The opinion is patently false, unhelpful to the jury, and would mislead the jury into believing Ms. Oliver was entitled to equity when she admitted she was not.

### III
### MS. DEMARIO'S OPINION ON UNREIMBURSED EXPENSES IS AGAIN FALSIFIED BY THE PLAINTIFF'S OWN TESTIMONY

Ms. DeMario finally opines that Ms. Oliver has been damaged in the amount of ███ for unreimbursed expenses. **Ex. A**, at ¶ 17. To arrive at this number, Ms. DeMario assumes Ms. Oliver is ███████████████████████████████ *Id.* Ms. DeMario's opinion on this issue is falsified by undisputed facts in three areas. *First*, Ms. DeMario states Ms. Oliver ███████████████████ *id.* at ¶ 13, which contradicts plaintiff's sworn testimony. *Second*, Ms. DeMario includes expenses that were not for the HoER exhibition, as acknowledged under oath by plaintiff. *Third*, Ms. DeMario has no factual basis for an agreement for Meow Wolf to buy plaintiff's materials, let alone expenses. The only basis for an agreement to purchase materials is the Meow Terms email that she rejects. *See* Doc. 278-1 ("We will also be purchasing all the materials agreed upon for your project.").

### A. Ms. DeMario Rendered Her Opinion Without Knowing Plaintiff Testified that Meow Wolf Bought the Materials She Budgeted

Ms. Oliver plainly stated that Meow Wolf bought the materials she budgeted relating to ISQ. **Ex. D**, at 112:25–113:12 (Q. "And Meow Wolf bought the costs, or was buying the materials for ISQ; right?" A. "Yes."); Lauren Oliver Dep., Doc. 330-6, at 584:2–19 (A. "There was sort of some general materials around, but in general, they paid for, within the budget, a lot of materials."). Ms. DeMario did not know this because Ms. Oliver did not tell her and Ms. DeMario did not inform herself with any of the critical facts from Ms. Oliver's deposition, even in her supplemental report submitted almost a year after Ms. Oliver's deposition. **Ex. C**, at 48:7–12.

Meow Wolf also reimbursed plaintiff for additional materials, and offered to send her to Home Depot with the Meow Wolf credit card**.** Doc. 278-5, at 209:18–210:15. If there were outstanding materials Meow Wolf did not buy for Ms. Oliver, Ms. DeMario did not separate them from materials Meow Wolf did purchase or reimburse. *See* **Ex. A**, at Exhibit C. This makes it impossible for the jury to determine which portions of Ms. DeMario's opinion are valid and which are not. The fact that Ms. DeMario did not know that Meow Wolf bought materials for Ms. Oliver, and reimbursed her for others, reflects again that Ms. DeMario's opinion is not based on rudimentary facts in plaintiff's deposition. That she does not distinguish materials Meow Wolf bought from those plaintiff bought makes it unreliable. *See Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 881, 886 (10th Cir. 2005) (affirming district court's exclusion of purported expert because the expert's conclusion did not follow from the data, and there was an impermissible analytical gap between the premises and conclusion); *Armeanu v. Bridgestone/Firestone N. Am. Tire, LLC*, No. CIV 05-0619 JB/DJS, 2006 WL 4060665, at *11 (D.N.M. Sept. 26, 2006) (Browning, J.) ("'[A]n expert's conclusions are not immune from scrutiny . . . [and the] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.'") (alterations omitted; citations omitted)*.*

## B.    Ms. DeMario Included Expenses Plaintiff Testified Were Not for HoER

Ms. DeMario lists "expenses" that Ms. Oliver has conceded Meow Wolf never promised to reimburse for—such as her rent. **Ex. D**, at 556:21–557:1 (Q. "Did you ever get promised by Meow Wolf to reimburse your housing while you worked on the ISQ project?" A. "No, I did not."); *see* **Ex. A**, at Exhibit C (listing $6,400 as a recoverable expense for a housing rental); **Ex. D**, at 550:5–13 (in discussing the digital camera listed in DeMario's report: Q. "So that would not have

been incorporated in any way in ISQ and the House of Eternal Return, would it?" A. "I didn't glue it into the wall if that's what you mean.").

Ms. DeMario shows many more expenses for Meow Wolf to reimburse that, not having read the plaintiff's testimony, she did not know (and plaintiff chose not to inform her) were expenses for two other shows, one at Phil Space in Santa Fe and the other at the Santa Fe Institute (SFI). **Ex. D**, at 557:8–10 (Q. "Does this time reflect, like your cost list, time you invested in the Phil Space ISQ?" A. "Yes, it does."); **Ex. D**, at 549:16–23 (Q. "And you have a number or a lot of charges at Visions Photo Lab." A. "Uh-huh." Q. "And would those be the printing of the prints for the Phil Space show?" A. "Phil Space and SFI probably. It depends on the date, but it looks probably like I used probably the same frames and things for the SFI.").

Ms. Oliver testified under oath that Ms. DeMario told her to include these Phil Space and SFI expenses. **Ex. D**, at 559:20–25 (Q. "Did your expert ask you to provide expenses for Phil Space and for SFI and time for those? Is that why those are in this sheet?" A. "Yes."). Ms. DeMario testified ███████████████████████████████████████████████████████████████ ██████████████████████████████████████████. **Ex. C**, at 260:15–18 (████████ ████████████████████████████████████████████████████████████████ █████████████████████████████████). Ms. Oliver discussed a number of other such unrelated expenses in her testimony.

Ms. DeMario testified Ms. Oliver did not tell her these expenses were related to other shows. *See* **Ex. C**, at 47:2–6 (████████████████████████████████████████ ███████████████████████████████████████████████████████████). Because Ms. DeMario's opinion includes expenses which are unrelated to HoER, they should be excluded even in Ms. DeMario's view. The entire opinion on expenses is so infected by ignorance and

contradictions that it (and Ms. DeMario's other opinions) lack any basis and should be excluded as unreliable and unhelpful—even by plaintiff's estimation.

      **C.**      **Only Budgeted Materials, not All "Expenses,"**
                  **Were to be Bought by Meow Wolf, and Plaintiff Has**
                  <u>**No Basis for this Except the Meow Terms Emails She Rejects**</u>

Plaintiff testified that Meow Wolf promised to buy the materials for her installation, not reimburse all her expenses. **Ex. D**, at 209:18–22 (Q. "Meow Wolf promised to buy the materials for your installation; right?" A. "Yes."). Ms. DeMario's opinion that Ms. Oliver can recover for expenses is not based on sufficient facts. Reimbursement of expenses is not even alleged in Ms. Oliver's Amended Complaint and is not in issue; as such Ms. DeMario's opinion is unhelpful to the jury and would confuse the facts at issue in this case.

Ms. DeMario assumes Ms. Oliver should be reimbursed for her materials costs, but inexplicably provides a much more general list of *expenses* Ms. Oliver allegedly incurred between January 1, 2015, and March 14, 2016. Ms. DeMario justified this by explaining she understands Ms. Oliver will ████████████████████████████████████████ " but had no basis for this request other than conversations with Ms. Oliver. **Ex. C**, at 253:1–4, 254:12–20 (████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████ ). Ms. Oliver has never alleged or testified that the defendants promised her reimbursement for all expenses, only that they agreed to pay for materials for ISQ.

Ms. DeMario's opinion regarding unreimbursed expenses suffers from myriad deficiencies because she was not provided sufficient facts. As a result her opinions are neither helpful nor reliable in this case. *See In re Brand Name Prescription Drugs Antitrust Litig.*, 186 F.3d 781, 786 (7th Cir. 1999) (holding court has "the responsibility to make certain that proffered experts will assist the jury in understanding the evidence and in determining the factual issues it must decide");

*United States v. Gutierrez-Castro*, 805 F. Supp. 2d 1218, 1224 (D.N.M. 2011). Further, the lack of any factual basis would also confuse the issues at trial; Ms. DeMario included expenses in her reimbursement opinion even though Ms. Oliver has never alleged an agreement to reimburse her expenses, and recovery of expenses is not in issue in this case.

**CONCLUSION**

For all the foregoing reasons, Defendants respectfully request the Court to exclude the opinions of Marianne L. DeMario pursuant to Rules 104, 702 and 403 of the Federal Rules of Evidence.

Dated: April 22, 2022

Respectfully submitted,

BARDACKE ALLISON LLP

By: */s/ Michael Woods*_____
Benjamin Allison
Maureen Dolan
Rose Bryan
Cole Wilson
Michael Woods
P.O. Box 1808
141 East Palace Avenue
Santa Fe, New Mexico 87504-1808
(505) 995-8000
ben@bardackeallison.com
maureen@bardackeallison.com
rose@bardackeallison.com
cole@bardackeallison.com
michael@bardackeallison.com

*Counsel for Defendants Meow Wolf, Inc.*
*and Vince Kadlubek*

**CERTIFICATE OF SERVICE**

I hereby certify that I caused a true and correct copy of the foregoing to be filed through the Court's CM/ECF system which caused all parties and counsel entitled to receive notice to be served electronically as more fully described on the Notice of Electronic Filing.

BARDACKE ALLISON LLP

By:      */s/ Michael Woods*