**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

LAUREN ADELE OLIVER,
an individual,

      Plaintiff,

v.                                                    Case No. 1:20-CV-00237-KK-SCY

MEOW WOLF, INC., a Delaware
corporation; VINCE KADLUBEK,
an individual and officer; and
DOES 1-50,

      Defendants.

**DEFENDANTS' MOTION FOR PARTIAL
SUMMARY JUDGMENT DISMISSING PLAINTIFF'S
CLAIM OF VIOLATION OF THE VISUAL ARTIST RIGHTS ACT**

      Defendants Meow Wolf, Inc. and Vince Kadlubek (collectively Meow Wolf) move the

Court pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment

dismissing plaintiff's claims for violation of the Visual Artists Rights Act.

**INTRODUCTION**

      Plaintiff has attempted to use the Visual Artists Rights Act (VARA) to create a catch-22,

alleging Meow Wolf violated VARA by seeking to remove her work Ice Station Quellette (ISQ)

from its House of Eternal Return (HoER)—while at the same time claiming ISQ's presence in

HoER was copyright infringement. She now seeks over $60 million for the supposed copyright

infringement, even though she herself put ISQ into HoER to display it. At the same time she seeks

an injunction from this Court barring Meow Wolf from solving that problem by removing ISQ.

She has hired an art expert to opine that ISQ is so important and integrated into HoER that if it

were removed and installed somewhere else, it would not be the same work of art; it would be

destroyed. Throughout the entire course of this litigation plaintiff has never explained how it can be wrong both to remove ISQ and to leave it in HoER.

VARA was created by Congress to give artists in certain circumstances a right against intentional mutilation or destruction of their work, often referred to as the right of integrity, and a right to have their original works attributed to them, referred to as the right of attribution. However VARA specifically allows for works to be relocated by excluding liability for "the modification of a work of visual art which is the result of conservation, or of the public presentation, including …placement, of the work," 17 U.S.C. §106A(c)(2), unless the modification is the result of gross negligence.

Even more, when a work is so integrated into its location that removing the work would render it a different work and destroy the original work, such a work is considered site-specific. Plaintiff and her experts have opined that ISQ is so integrated into its setting at HoER that if removed and installed in a different venue, it would cease to be the same work of art. Plaintiff claims removal of ISQ would be an intentional destruction of it, suggesting Meow Wolf must display it at HoER forever. While such a requirement under any circumstances raises the specter of an unconstitutional taking,[1] Meow Wolf rents the space where ISQ is housed under a fixed-term lease. The Court of Appeals for the First Circuit has held that forcibly encumbering land with a work of art that must always be displayed is not what VARA requires. The First Circuit held VARA does not apply at all to site-specific works. That holding alone requires dismissal of plaintiff's claims under VARA.

---

[1] Thomas A. Shelburne, "When Art Might Constitute a Taking: A Takings Clause Inquiry Under the Visual Artists Rights Act," 23 *Vanderbilt Journal of Entertainment and Technology Law* 919 (2021).

If plaintiff's three specific claims must be addressed, they also fail independently. *First*, plaintiff seeks an injunction ordering Meow Wolf not to remove ISQ because doing so will allegedly destroy the work. But VARA expressly allows for works to be moved, and provides that only harm caused by gross negligence in moving a work is actionable. Plaintiff has conceded the work is removable: she testified she expected HoER to last for ten years, and that she clearly intended ISQ to have continued life at other venues. Even if a work is part of a building, it can be removed—even if damage is caused—so long as such damage is not prejudicial to the honor or reputation of the artist. Meow Wolf has proffered two experts in the relevant field of installing and deinstalling artworks (one of whom designed the structure of ISQ and built it) who have testified that ISQ can be safely removed. Plaintiff has no expert in moving art installations. Although she and her art historian expert opine that ISQ would be destroyed if moved, they have no relevant expertise on which to base such opinions. Her art expert has never looked at ISQ and has no idea how it was put together.

*Second*, plaintiff claims she was not credited as the author of ISQ in website and other settings, in violation of VARA's right of attribution. But VARA applies only to fine art originals, and by statute does not apply to any of the website images or reproductions about which plaintiff complains. Plaintiff concedes that her original ISQ is properly credited in the room at HoER where it is installed.

*Third*, plaintiff appears to seek damages for claimed future hypothetical harm from removal of ISQ. But no removal of ISQ has occurred, no harm to ISQ has occurred, and this claim of imaginary future harm should be dismissed.

## UNDISPUTED MATERIAL FACTS

1.      The size and layout of the HoER, and of the space occupied by ISQ, were conceived by Meow Wolf without Ms. Oliver's participation. Sean Di Ianni Dep., April 14, 2021, attached as **Exhibit A**, at 103:8–104:16.

2.      Meow Wolf likewise determined where Ms. Oliver's work would be installed within HoER. (*Id*. 112:8–22.)

3.      Cary Cluett is a sculptor and art preparator who assisted Ms. Oliver in building and installation of the ISQ exhibit at the HoER. Cary Cluett CV, attached as **Exhibit B**; Lauren Oliver Dep., April 8, 2021, attached as **Exhibit C**, at 539:22–540:9 ("Q. Okay. You say: 'Hey! Re: The station, Cary does deserve a design credit -- he did more than just build my designs. He designed the underlying structures.' Tell me about Cary's contribution to the Ice Station. A. Well, he came on as a volunteer, as my assistant. I did about a million drawings, you know, before seeing the building, and then once I got into the room, then I had to change the entire design. Cary helped me build, you know, the design.")

4.      Mr. Cluett planned and shaped the curves in the walls, and planned, shaped, and constructed the soffits encircling the space. Oliver Dep. Ex. C, at 540:12–15.

5.      Mr. Cluett helped plan and build the base supporting the Space Owl which houses structural, lighting, and electrical elements. Oliver Dep., Ex. C, at 540:16–541:4 ("A.… Then I had the idea about the -- well, somebody dropped off that grate that the Space Owl sits on, and so that, in my mind, I adapted. I wanted a vent in it, and so Cary built the structure, the wooden structure around the vent, and we went salvaging together to go get the base that the Space Owl sits in, which is metal. He did the -- I think it was him who bolted it into the cement, and then with a full -- you know, it was a fairly simple, obvious design that involved a four-by-four going up the

center, and then just something that could hold the lathe that went around.") *See also* Cary Cluett Dep., March 7, 2022, attached as **Exhibit D**, at 106:14–110:1, 173:11–175:9.

6.      The Space Owl's base was built to help the piece withstand heavy traffic at HoER. Cluett Dep., Ex. D, at 175:10–24 ("Q. So was the -- was the designing and construction of the base, was that driven in any way by the needs of HoER, and the kind of traffic, and interactivity that -- that it would face in that room? A. Absolutely, because what we had to do was create the lag bolts and the turnbuckles to anchor the 4-by-4 down into the collar it was sitting in, and the piece of plumbing pipe, that attaches it to the curved wall, was another leg to give it further support. So what happened was the basis [sic] is more of a skirt to hide the pieces that keep it from falling over.")

7.      Mr. Cluett planned and built the curved acrylic barrier that protects the lower portion of the Space Owl. Oliver Dep., Ex. C, at 541:5–15, ("A….Cary did a lot of the heavy lifting, but, you know, I put -- the key thing that Cary did was he went in and bent the acrylic, because at first I was going to do acrylic flat. So I ordered the acrylic, and then I got that grate, so... Q. Yeah. A. He went in and he did the bending of the acrylic, and the fasteners that were put around it, so I wanted to make sure that he had credit for that."); Cluett Dep. Ex. D, at 117:13–23, ("Q. You performed the bending on the Plexiglas surrounding the Space Owl, right? A. Yes, technically it's acrylic, and I built the kiln out at the community college, and I built the forms to make the radius. I hand forged the steel that's holding that up from the bottom and attached it to the base before the scratch was put on, and I hand forged -- and you may not notice, but those pieces up at the top have a slight curve to them, to match the curve the acrylic, and I installed those, as well.")

8.      Sean Di Ianni is a co-founder and former chief operating officer of Meow Wolf, and oversaw the construction of HoER. He is a graduate of the Rhode Island School of Design, and worked professionally as a designer, model maker, and preparator. Sean Di Ianni Resume, attached as **Exhibit E**.

9.      Mr. Di Ianni described a plan for de-installing ISQ. Sean Di Ianni Expert Dep., March 18, 2022, attached as **Exhibit F**, at 95:9–101:20. It includes removing and packing the horns, body, and components of the base of the Space Owl and removing the sculpted elements and portholes of ISQ. *Id*. Some elements of Mr. Di Ianni's plan are as follows:

- I would pack the Space Owl. I would use probably either large cell bubble wrap or memory foam or a combination of the two. I would wrap that carefully around the Space Owl to protect it and I would probably go so far as to also wrap around that some cardboard, some corrugated cardboard so the Space Owl was well protected and the monitor was well protected. In that process I would note where in the packing the ribs were inside the Space Owl so that we knew where there was solid points to handle the sculpture. That would be like sort of stage one. Then I would deconstruct the base. *Id.*, 96:11–23

- I would look for a way to – and for a way to very carefully peel back some of the fabric sitting at the bottom there. My understanding is that the fabric is not glued but that it's all sewn. So I think you could lift that carefully above the grate. I think you could then use strong clamps to clamp onto the underlying armature, which is that four-by-four, and that would provide pick points for us to then manipulate the sculpture. So with those in place, I would then put a rigging system in place probably using scaffolding. *Id.*, 97:24–98:10

- We would slowly lower the sculpture down away from the base. *Id.*, 98:24–25

- At that point I would probably rest it on those points that we had marked where those ribs were, and it would be safe if the ribs could take the pressure. There would be no deformation to the sculpture itself. *Id.*, 99:1–5

- And then we would simply carry the sculpture out. *Id.*, 99:17–18

- Then I would address the sculptures on the wall. *Id.*, 100:13–14

- If we were doing this in a really formal way we would start the whole process by conditioning the work, so in a preparator context we would actually create some documentation of the condition of work. We would note any existing scratches or damages or anomalies so we could make note of any possible scratches or anomalies that might occur in the shipping, which I wouldn't anticipate. I have shipped lots of work like this,

more delicate work including ceramics and glass and strange materials that are fragile, plaster and things like that. And while things sometimes do break in shipping, I don't see any issue with any of these materials breaking. *Id.*, 100:23–101:11

- The general idea is we would be able to pack the Space Owl before handling it so that it would be well protected and then we could remove it pretty easily. *Id.*, 101:17–20

10.    If necessary, the walls of the room containing ISQ could be de-installed without substantial harm. Di Ianni Dep. Ex. F, at 105:6–107:23:

Q: Now, really quickly, just give me your plan. If the walls and the base are included as part of the work, what would your plan be to de-install the walls and the space without the construction modification? A: So I think this would be a much more cumbersome process, but I think you would start by locating all of the screws that are attaching the sheetrock to the studs behind. So the studs are probably on 16-inch centers. You would use a tool to locate those, a non-invasive tool to locate those screws and then you would have to drill out the surface of the plaster, remove each one of those screws while stabilizing the panel, remove the sheetrock panel -- sorry, I missed a step. You would have to cut the seam between the sheetrock panel. So each one of those pieces of sheetrock has a tapered edge that then has some taper tape and joint compound, so you would locate those locations as well and with a straight edge that was protecting the surface of the walls you would just cut there. So you cut each one of those seams. And then there's a curved area of the room which is built out of an independent unit that is attached to the facility but it's not the facility itself. I would recommend that you go in from the back side, so behind the wall, and you locate the screws that are attaching that curved framing on the back corner of the wall and probably with just a sawzall or a hacksaw you would cut those screws. If you could remove them mechanically you could do that as well, but you detach that sort of curved framing with that curved panel attached. So I think that curved panel is made from a quarter-inch piece of sheetrock that's just bent into the form, so that whole assembly would be removed. So what you would be left with is a number of sheetrock panels cut into sections that you could then pack. You might put them on some plywood or substrates so that they had a little more support for them for shipping. You could pack those kind of however you wanted just to protect it. You put them in trays basically and carry them out of the space. Again, I think that's a pretty cumbersome process. What you would be left with is a bunch of panels. They would have some small seams where you made those cuts. Those would have to then be -- depending on how Lauren would want to re-exhibit that work, again, I think it's a little bit unreasonable, but however that would want to be done. You could then put the panels back together and re-seam them with joint compound and match color or you could display them separately as independent works. For that matter, you could also cut any section out of the sheetrock in the same way if you wanted to remove pieces of the sheetrock rather than the entire wall.

11.     ISQ's base is also removable, if necessary, without substantial harm. Di Ianni Dep., Ex. F, at 107:24–108:19:

> Q. What about the base? A. Sorry, the base? I understand the base 1 just to be like a two-by-four framed structure with lathe and plaster on top of it. I'm not 100 percent certain how that's attached to the floor so you would have to determine how it was attached to the floor. You basically would just cut underneath the two-by-fours and you could take the whole base out. You would also have to cut the pipe that attaches to the wall that serves as a conduit for some of the cabling that goes into the base. And then you could replace the trim, the bottom sort of metal trim pieces. Those just screw on and off and of course you would have the hardware on top of the base that the plexiglass went into. You would have to do some patching and repairing to the base probably. That's very easy to do and happens all the time on both wooden pedestals and also in this case it's like a plaster lathe scenario, so anybody who is familiar with mud and plaster could patch the base.

12.     Mr. Cluett also testified that the Space Owl could be deinstalled. Cluett Dep. Ex. D, at 137:6–140:6, 171:6–172:10.

13.     Mr. Cluett likewise testified that the component sculptural pieces of ISQ could be deinstalled. Cluett Dep. Ex. D, at 169:18–170:7, 170:12–171:5.

14.     ISQ inside of HoER is attributed to Ms. Oliver. Oliver Dep., Ex. C, at 538:21–539:6 ("Q. I believe in the Ice Station room you have a little badge with your website on it, right? A. Yes, I do. Q. Did you design that and install it? A. I designed it, yeah. Q. Okay, so that's the way you wanted it in the ISQ room I assume; right? A. Yeah, that seems to be the most that it would be, you know, the – yes, that was fine with me.")

15.     Todos 7 is part of the fictional narrative of HoER. *See* Emails from Lauren Oliver to Vincent Kadlubek and Peter Chapman, Feb. 26, 2016, attached as **Exhibit G**.

## STANDARD ON SUMMARY JUDGMENT

Summary judgment is proper when there are no genuine issues of any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is "material" if it may reasonably affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 248 (1986). A dispute is not "genuine" unless there is evidence sufficient to cause a reasonable jury to find in the nonmovant's favor. *Id.* at 252. If no reasonable jury could return a verdict for the nonmoving party, then summary judgment is proper. *See Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1313 (10th Cir. 1999).

## ARGUMENT

VARA rights[2] extend only to a "work of visual art," defined as "a painting, drawing, or sculpture existing in a single copy. . ." and specifically excludes art created in other media such as motion pictures, audio visual works, electronic publications, books, and items used in merchandising, promotion, and advertising. *See* 17 U.S.C. §101.

VARA's public presentation provision, 17 U.S.C. Section 106A(c)(2), provides:

> The modification of a work of visual art which is the result of conservation, or of the public presentation, including lighting and placement, of the work is not a destruction, distortion, mutilation, or other modification described in subsection (a)(3) unless the modification is caused by gross negligence.

*Id*.

# I
## PLAINTIFF'S EXPERT HAS OPINED ISQ WOULD NOT BE THE SAME WORK IF REMOVED FROM HOER, RENDERING ISQ SITE-SPECIFC AND VARA INAPPLICABLE

The First Circuit, the only appellate court to address the issue, has defined site-specificity as where "the location of the work is an integral element of the work. Because the location of the work contributes to its meaning, site specific art is destroyed if it is moved from its original site."

---

[2] VARA creates two rights: attribution, which allows artists to receive credit for a work of visual art, 17 U.S.C. §106A(a)(1)(A), and to prevent wrongful attribution of works they did not create, 17 U.S.C. §106A(a)(1)(B), and integrity, 17 U.S.C. §106A(a)(3)(A)-(B). The right of integrity prohibits intentional distortion, mutilation, or other modification which is prejudicial to the artist's reputation, and intentional or grossly negligent destruction of works of recognized stature. *Id*.

*Phillips v. Pembroke Real Estate, Inc.*, 459 F.3d 128, 134 (1st Cir. 2006). The U.S. Copyright Office has defined site specific works as "works that are fundamentally integrated with their setting and are considered incomplete when perceived in isolation." Register of Copyrights, *Authors, Attribution, and Integrity: Examining Moral Rights in the United States* 71 (April 2019).

Plaintiff's art expert, James Daichendt, described ISQ in this way. He testified that if ISQ were installed in another location, it would no longer be the same work:

> Q. And if Ice Station Quellette were deinstalled and reinstalled in some different location, would it be the same work of art?
> A. So once it would be deinstalled it would be modified. One theoretically could set it up in another location, but it would be a new work of art.
> Q. . . . what happened to the original work of art?
> A. . . . The original work of art would cease to exist at that point.
> Q. Would it have been destroyed?
> A. It would have been destroyed.

Deposition of James Daichendt, March 10, 2022, attached as **Exhibit H**, at 263:10–264:7. He stated in his expert report, ███████████████████████████████████ ██████████████████████████████████████████████████████ ███████████████████████████████████ Daichendt Prelim. Report, Art Expert Opinion, January 14, 2022, attached as **Exhibit I**, at 4.

Mr. Daichendt's undisputed opinion that ISQ, if moved to a different location, would become an entirely new work of art means that ISQ's placement in HoER contributes to the meaning of ISQ in such a way that its removal would result in the destruction of ISQ. If the relocation of ISQ will result in the creation of a new work when placed in a different location, then ISQ is a site-specific work.

This conclusion is confirmed by the definition of site-specific works provided by Mr. Daichendt. "[S]ite specific artwork is artwork created for a particular location that typically takes into account a site that's unique and incorporates the artwork in some way" Daichendt Dep., Ex.

H, at 260:1–4. Mr. Daichendt testified that ISQ was created specifically for HoER. *Id.*, at 45:15–18. The necessary conclusion of Mr. Daichendt's opinions is that ISQ is a site-specific work, and under the First Circuit's holding in *Phillips*, is not protected by VARA. 459 F.3d 128 at 143.

In *Phillips*, the First Circuit concluded that "VARA does not apply to site-specific art at all." *Phillips*, 459 F.3d 128 at 143. At issue in *Phillips* was removal of an artwork consisting of sculptures integrated into the landscape of a Massachusetts park. The artist, David Phillips, argued that while he had a right of integrity under VARA, because his piece was site-specific, the public presentation exception (*see supra*, Point II) allowing relocation could not apply. The First Circuit rejected this argument and stated, "Once a piece of art is considered site-specific, and protected by VARA, such objects could not be altered by the property owner absent consent of the artist. Such a conclusion could dramatically affect real property interests and laws." *Id.* at 142. The *Phillips* court cited concerns about land restrictions (especially unrecorded ones), the common-law doctrine disapproving the long-term burdening of property, and the judicial practice of construing statutory provisions regarding land restrictions in favor of freedom of alienation. *Id.*[3]

## II
## ISQ CAN BE RELOCATED WITHOUT VIOLATING PLAINTIFF'S RIGHT OF INTEGRITY, SO HER REQUEST FOR INJUNCTIVE RELIEF SHOULD BE DENIED

### A.    VARA's Public Presentation Exception Allows Relocation

VARA specifically allows for works to be moved by excluding liability for "the modification of a work of visual art which is the result of conservation, or of the public

---

[3] *Phillips* is the sole appellate decision on whether site-specific artworks are covered by VARA. The Seventh Circuit in dictum has questioned *Phillips*. *Kelley v. Chi. Park Dist.*, 635 F.3d 290, 306-07 (7th Cir. 2011). *See also* Register of Copyrights, *Authors, Attribution, and Integrity: Examining Moral Rights in the United States* 72-73 (April 2019) (discussing the two cases but disfavoring a statutory amendment to explicitly include site-specific art under VARA) *Id.*

presentation, including …placement, of the work." 17 U.S.C. §106A(c)(2). This provision of VARA provides that "modification of a work" which is the result of "placement . . . is not a destruction, distortion, mutilation, or other modification . . . unless the modification is caused by gross negligence." *Id.* Courts interpreting this section of VARA have made it clear that moving a work of art cannot constitute distortion, mutilation, or modification unless gross negligence occurs in the relocation. *See Tobin v. Rector*, 2017 U.S. Dist. LEXIS 187792, at 14 (S.D.N.Y. Nov. 14, 2017) ("Simply relocating [a work of visual art] does not by itself constitute distortion, mutilation or modification under VARA"); *Phillips*, 459 F.3d 128 at 141 (holding that implicit in VARA is that changes in placement of a work do not violate an artist's right of integrity). Accordingly, courts have interpreted the public presentation provision to mean that modifications to a work that result from deinstallation and relocation do not violate VARA. *See e.g. Kleinman v. City of San Marcos*, No. A-08-CA-058-SS, 2008 U.S. Dist. LEXIS 142123, at *17-18 (W.D. Tex. Aug. 22, 2008), ("Courts considering [the public presentation] exception have uniformly found 'an artist has no right to the placement or public presentation of his sculpture under the exception in § 106A(c)(2).'" (citing *Phillips*)); *see also Board of Managers of SOHO Int'l Arts Condo. v. City of New York*, 2003 U.S. Dist. LEXIS 10221 at *34 (S.D.N.Y. 2003) ("the point [of VARA] is not … to preserve a work of visual art *where* it is, but rather to preserve the work *as* it is.") (emphasis in the original).

Prior to his career at Meow Wolf, Sean Di Ianni was a professional art preparator at SITE Santa Fe, among other places, handling installation and deinstallation of numerous works of art including complex installation art.  In his expert deposition, Mr. Di Ianni described a detailed step-by-step process by which Space Owl could be professionally and safely deinstalled.  *See* Di Ianni Dep., Ex. F, at 95:9–101:20. Mr. Cluett, also an art preparator and the sculptor who designed and

built the structure of Space Owl, also testified that deinstallation can be accomplished safely. *See* Cluett Dep., Ex. D, at 137:23–140:5.

As described above, the plain language of VARA makes clear that an organization displaying visual art is not liable under VARA for damage caused in relocation of a work, so long as the damage did not result from gross negligence. 17 U.S.C. §106A(c)(2). Gross negligence is "a conscious voluntary act or omission in reckless disregard of a legal duty and the consequences to another party." *Tobin*, 2017 U.S. Dist. LEXIS 187792, at 15. Plaintiff obviously cannot show that in a future relocation of ISQ, anyone would commit gross negligence. Meow Wolf's detailed and careful plan for relocating ISQ is undisputed, and no other witness in the case has the expertise to dispute the plan.

1.   *Plaintiff Has Acknowledged that ISQ Can Be Removed from HoER*

Before bringing this lawsuit, Ms. Oliver took a practical approach to ISQ. When Meow Wolf told her ISQ needed maintenance because "one of your knobs for the miniature displays is missing and we'd like to order more; where could we get these from?" she responded, "I got the portholes on Amazon. Any knobby things should work—just replace all of them."[4] Emails between Julian Gingell and Lauren Oliver, July 16, 2018, attached as **Exhibit J**. During planning and design before HoER was built, when Meow Wolf was planning with artists about fitting installations through doors and hallways, she quipped, "The owl can be carried on a stretcher." Emails between Caity Kennedy and Lauren Oliver, July 23, 2015, attached as **Exhibit K**.

Plaintiff expected her work to be in HoER for ten years. Oliver Dep., Ex. C, at 472:9–13; 560:22–561:3. She instructed her experts accordingly, and her damages expert Marianne DeMario

---

[4] This email also clearly confirms Ms. Oliver's permission, two years after she installed the work, for display of ISQ at HoER.

based her opinion on the fact that HoER was scheduled to remain open for ten years and come to an end in 2026. Supplemental Expert Report of Marianne L. DeMario, Jan. 14, 2022, Doc. 366-2, at ¶ 2 n.1. Plaintiff therefore expected ISQ would be disassembled at that end point. She testified that she "was very clear" from the start that she intended ISQ to have a continued life at other venues after HoER and Meow Wolf. Oliver Dep., Ex. C, at 561:4-10 ("Q. Let me ask you this: Did you have an intention for ISQ to have a continued life of its own, beyond Meow Wolf, as a project of yours that you're interested in pursuing in other venues and other connections? A. Absolutely. I was very clear about that from the start.").

Meow Wolf has another powerful piece of evidence demonstrating removability which is the subject of Defendants' Motion for *In Camera* Review, to ensure that Rule 408 does not bar use of the evidence.[5]

> 2. *Space Owl's Base or Pedestal, and the Walls of*
> *The Room Holding ISQ, are Not Part of the Work of Art*

ISQ is unusual among HoER exhibits in that it is not interactive; it is static sculptural elements in a room, like a traditional work of art displayed in a gallery. Preliminary Rebuttal Report of Mary Peck, April 16, 2021, attached as **Exhibit L**, at 8. The exhibit is designed so visitors cannot touch Space Owl; it is placed on a high pedestal with a clear acrylic barrier around it to keep hands off of the Space Owl. Oliver Dep., Ex. C, at 560:22–561:3; Cluett Dep., Ex. D, at 174:10–175:24. Visitors can view it, look at the portholes in the wall which have color prints behind glass, and see sea slugs and an octopus out of reach high up on the wall of the room. Space Owl's pedestal was dictated by the needs of HoER, particularly the interactivity of HoER and heavy traffic, including children. *Id.*

---

[5] *See* Defendants' Motion for *In Camera* Review, filed April 27, 2022.

Since the litigation began, however, Ms. Oliver has taken the position that ISQ cannot be moved without destroying it. The testimony is undisputed that the easiest way to remove Space Owl is by deconstructing the base to detach Space Owl from the floor. *See* Undisputed Material Fact (UMF) 9. Plaintiff has taken the position, after commencement of this litigation, that the base is part of the work of art.

But plaintiff has conceded that a base or pedestal is not part of the Space Owl work of art by installing Space Owl in another gallery with no pedestal. Supplemental Rebuttal Report of Mary Peck, Feb. 25, 2022, attached as **Exhibit M**, at 11 (including images). Displaying Space Owl in HoER, however, required a base to cover the significant structural elements needed to make Space Owl durable and stable in a high-traffic interactive environment. Cluett Dep., Ex. D, at 173:25–175:24; Oliver Dep., Ex. C, at 560:22–561:3.

Plaintiff has also taken the position, after this litigation began, that the walls of the room in which ISQ is located are part of ISQ because she prepared them with joint compound and a color wash. Di Ianni Dep., Ex. F, at 73:24–74:11. Mr. Di Ianni, a professional art preparator at Site Santa Fe before his career at Meow Wolf, testified, "It's common in museum preparation to paint a wall and to texturize the wall to the artist's specifications. We're talking about the facility, which is the gallery, which are the walls of that space, and then we're talking about a preparation of those walls with joint compound and color treatment. That's something that I've done many, many times in galleries and not removed from the gallery, nor has it been explicitly considered part of the art. It's part of the conditions of the installation of the art." *Id.*, at 76:8-24. He further opined:

> A. Okay. So I stand by my opinion that the walls are not part of the art. I want to say that I think it would be an unreasonable approach to claim that the walls are part of the art. I would be surprised if Lauren were to have made that claim prior to this litigation. If she had had that opinion prior to this litigation I would have expected that she might have put some effort towards designing them in such a way that they could be removed with all the other elements easily. I don't think

she did that. So I want to say that, that I stand by my opinion about it. However, if I were to be in a situation where someone were to dictate to me as a preparator that those walls would need to be removed, I could offer an approach, a technical approach to removing the walls. I don't think that's a reasonable approach, a reasonable thing to do, but I think there could be an approach to removing the walls technically, and if you would like I could describe what that approach would be.

*Id.*, at 84:14-85:9.

As in a traditional gallery or museum, Ms. Oliver was provided a pre-determined location within the HoER building. Neither the size and shape of the space, nor its interconnection with neighboring spaces were directed or created by Ms. Oliver.  The top of the room has a circular opening in the ceiling creating what Ms. Oliver and Mr. Cluett called the "oculus." It is undisputed that this was conceived and built by Mr. Cluett, with direction from Mr. Di Ianni to ensure compliance with building codes and ensure proper sprinkler coverage.

### B.    Even if the Walls and Base Are Part of ISQ, 17 U.S.C. §113(d)(2) Applies and ISQ Can Be Moved

VARA specifically provides in 17 U.S.C. § 113(d)(2) for removal of works of art that are "part of" a building but that "can be removed from the building without the destruction, distortion, mutilation, or other modification of the work as described in Section 106A(a)(3)." Section 106A(a)(3) in turn describes "distortion, mutilation, or other modification of the work *which would be prejudicial to [the artist's] honor or reputation*." 17 U.S.C. § 106A(a)(3) (emphasis added). In other words, modification or even partial destruction is not prohibited entirely; only damage that would be prejudicial to the artist's reputation is prohibited.

Undisputed facts support that ISQ is removable with appreciable harm. Mr. Di Ianni described in great detail how the walls of ISQ could be removed if, hypothetically, they were considered part of the work and had to be moved. Undisputed Material Fact ¶ 10. Neither plaintiff nor her experts have disputed this plan, and neither plaintiff nor her experts are qualified to dispute

it. While Mr. Daichendt asserts the walls of ISQ would be damaged if they were removed, (Daichendt Dep., Ex. H, at 214:18–21), he has no technical expertise as a preparator. Defendants do not concede this level of care and preservation is actually required under Section 106A(a)(3), but the fact that such care *can be taken* with ISQ demonstrates that it is removable without harm that would be prejudicial to plaintiff's honor or reputation under Section 113(d)(2). Damage to walls from sheetrock seams and screws that can be repaired would not damage Ms. Oliver's honor or reputation.

According to 17 U.S.C. Section 113(d)(2), if a work of visual art is a part of building and can be removed from the building without its destruction, distortion, mutilation, or other modification as described in section 106A(a)(3), VARA allows a building owner to provide notice to the artist of intended removal. If the artist receives notice, she has 90 days to either remove the work or pay for its removal. If she fails to do so, she can no longer complain about the owner's removal. Meow Wolf provided this notice to plaintiff on March 11, 2021. Letter from Ben Allison to Jesse Boyd re: VARA 17 U.S.C. §113 Notice, attached as **Exhibit N**. The parties disagreed about whether ISQ was removable without prejudicial harm (Joint Stipulation Regarding Visual Artists Rights Act, Doc. 155), but Meow Wolf's art preparator experts have since testified about their detailed process for safe removal, and plaintiff has failed to disclose any expert witness with relevant expertise to dispute removability. Trial is therefore unnecessary on the issue of removability, and Meow Wolf is entitled to summary judgment that ISQ is removable without prejudicial harm to the artist's reputation or honor.

Since defendants have shown that ISQ is removable, the same analysis that applies above, under the public presentation exception, applies here. *See e.g.*, *Tobin*, 2017 U.S. Dist. LEXIS 187792, at 14, citing the Seventh Circuit in *Kelley*: "Addressing site-specific art and the public

presentation exception, the Seventh Circuit stated, '[T]he artist has no cause of action unless through gross negligence the work is modified, distorted, or destroyed in the process of changing its public presentation.'" No material facts about removability are genuinely disputed, and as a matter of law plaintiff is not entitled to injunctive relief under VARA.

### III
### VARA'S RIGHT OF ATTRIBUTION APPLIES ONLY
### TO THE ORIGINAL ISQ AT HOER,
### WHICH PLAINTIFF CONCEDES IS PROPERLY ATTRIBUTED TO HER

VARA only applies to works that fit within the narrow definition of a "work of visual art" under 17 U.S.C. §101. A work of visual art "is" "a painting drawing, print, or sculpture, existing in a single copy . . . or, in the case of a sculpture, in multiple cast, carved, or fabricated sculptures of 200 or fewer that are consecutively numbered by the author and bear the signature or other identifying mark of the author," and "does not include" electronic publications, film or audiovisual works, items used in promotion, advertising, or merchandising, and other copies. *Id*.

#### A.  The Right of Attribution Does Not
#### Extend to Images or Reproductions of ISQ

Any image of ISQ on a website, poster, social media, or any copy of ISQ is not covered by VARA because any such image is outside the definition of a "work of visual art." *See Pollara v. Seymour*, 344 F.3d 265 (2d Cir. 2003) (affirming dismissal on the grounds that "Congress chose to exclude from the scope of VARA all advertising and promotional materials"); *Teter v. Glass Onion, Inc.*, 723 F. Supp. 2d 1138, 1158-1159 (W.D. Mo. 2010) (Granting summary judgment because electronic copies of artwork displayed on a website "fall comfortably within the works that are excluded from liability under VARA").

Plaintiff claims Meow Wolf failed to credit Ms. Oliver under VARA in "promoting their brand and building their enterprise" through images of ISQ in advertising, social media posts,

blogs, newspapers, coloring books, coffee table books, web pages, pitch decks, and in Meow Wolf's documentary film. *See* Doc. 148 ¶¶ 57-63. But none of these alleged uses of ISQ is within the definition of a "work of visual art" in VARA, and therefore no attribution right exists under VARA for these items. *See Berrios Nogueras v. Home Depot*, 330 F. Supp. 2d 48 (D.P.R. 2004) (holding that the right of attribution does not extend to non-visual art reproductions, depictions, or portrayals of a work even when the underlying work is protected under VARA, and granting motion to dismiss because VARA's "rights of attribution and integrity do not apply to reproduction, depiction, portrayal, or other uses of the otherwise protected work when used in connection with those works specifically excluded from the definition of 'works of visual art'"); *Martin v. Walt Disney Internet Grp.,* No. 09CV1601-MMA (POR), 2010 U.S. Dist. LEXIS 65036 (S.D. Cal. June 30, 2010) (granting motion to dismiss with prejudice because reproducing a work of visual art in a magazine "does not implicate [plaintiff's] attribution or integrity rights" under VARA).

Plaintiff's claim that Meow Wolf has wrongfully used "Ms. Oliver's name and ISQ with the 'Todos 7' collection of visual art" fails for the same reason under VARA's right to not have a work attributed to an artist that she did not create. Doc. 148, ¶ 64. Todos 7 refers to a fictional world that is part of the narrative of HoER. It is simply not a "work of visual art." UMF 15. Even if it were, plaintiff alleges the incorrect attribution occurred on a website. Doc. 148, ¶ 64. Because VARA's right of non-attribution only applies to works of visual art, it does not extend to websites, electronic publications, or databases, as set forth above. VARA simply has no application to these uses.

**B. Plaintiff Concedes She was Properly**
**   Credited in the Room at HoER Containing ISQ**

VARA applies only to the original ISQ work installed in a room at HoER, and Ms. Oliver has conceded under oath that she was credited there to her satisfaction. Oliver Dep. Ex. C, at 538:21-539:9.

**IV**
**NO CLAIM FOR DAMAGES CAN BE SUSTAINED**
**BECAUSE ISQ HAS NOT BEEN MOVED OR HARMED IN ANY WAY**

Plaintiff's complaint seeks damages for "Defendant's . . . distortion, mutilation, or other modification of her works." Doc. 148, at 25. ISQ is still located within the HoER and on view to the public. Plaintiff has not alleged or offered evidence of physical harm to ISQ. Plaintiff has only alleged the "threat" of removal. *Id*., ¶¶ 70, 101. Because removal is allowed under VARA as set out above, the claim seeking an injunction should be dismissed. *See Tobin,* 2017 U.S. Dist. LEXIS 187792, at 14. And plaintiff's claim for damages should be dismissed because no harm has occurred or been claimed to have occurred. "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300, 118 S. Ct. 1257, 1259 (1998).

**CONCLUSION**

For the foregoing reasons, summary judgment should be granted dismissing with prejudice

the plaintiff's claims under the Visual Artists Rights Act.

Dated: April 27, 2022.

Respectfully submitted,

BARDACKE ALLISON LLP

By: _/s/ Benjamin Allison_
     Benjamin Allison
     Maureen Dolan
     Rose Bryan
     Cole Wilson
     Michael Woods
     P.O. Box 1808
     141 East Palace Avenue
     Santa Fe, New Mexico 87504-1808
     (505) 995-8000
     ben@bardackeallison.com
     maureen@bardackeallison.com
     rose@bardackeallison.com
     cole@bardackeallison.com
     michael@bardackeallison.com

*Counsel for Defendants Meow Wolf, Inc.*
*and Vince Kadlubek*

**CERTIFICATE OF SERVICE**

I hereby certify that I caused a true and correct copy of the foregoing to be filed through the Court's CM/ECF system which caused all parties and counsel entitled to receive notice to be served electronically as more fully described on the Notice of Electronic Filing.

BARDACKE ALLISON LLP

By:   */s/ Benjamin Allison*
      Benjamin Allison