# EXHIBIT 4

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO


                              CASE NO:  1:20-CV-00237-KK-SCY

     LAUREN ADELE OLIVER

                    Plaintiff,
      -vs-

     MEOW WOLF, INC., A DELAWARE
     CORPORATION; VINCE KADLUBEK,
     AN INDIVIDUAL AND OFFICER
     AND DOES 1-50


                    Defendants.


     DEPOSITION OF VINCE KADLUBEK AND CARL CHRISTIANSEN

                 November 22, 2021
                    9:00 a.m.
               Via Zoom Video Conference


          PURSUANT TO THE NEW MEXICO RULES OF CIVIL
     PROCEDURE, this Deposition was:


     TAKEN BY:  JESSE BOYD
                ATTORNEY FOR PLAINTIFF

     REPORTED BY:  CHRISTINE J. ROYBAL, CCR, RPR,
                   CCR No. 50
                   Paul Baca Court Reporters
                   500 Fourth Street NW, Suite 105
                   Albuquerque, New Mexico 87102
                   (505) 841-9241

1          MR. ALLISON:  Form, foundation.

2     A.    I'm not sure how Quinn would feel about it.

3     Q.     (BY MR. BOYD) And so -- but at any rate this is

4  stated as will, this member will provide cash, this member

5  will contribute to sound equipment.  Was it made clear to

6  the people who were voting to establish this LLC at the

7  meeting of Meow Wolf, was it explained to them that this

8  contribution actually wasn't going to be made in the future,

9  it had already been made?

10          MR. ALLISON:  Object to the form.

11     A.    Yeah.  I think that was explained, you know, like

12  we had a lot of these assets on hand and so like the sound

13  equipment or the building materials or the equipment, we had

14  a lot of stuff on hand already, and so it was like now those

15  were basically being given to the entity that was Meow Wolf,

16  LLC.

17     Q.    Okay.  Then Meow Wolf, LLC at this point once it

18  was created, it opened a bank account, right?

19     A.    Yes.

20     Q.    Did the money that had been generated from Due

21  Return, was it deposited in the bank account?

22     A.    Yes.

23     Q.    So did any of that money go back to CCA?

24     A.    We owed CCA a very small percentage of the revenue

25  that we made from the Due Return.  And I don't know if we

1                MR. ALLISON:  Okay.

2        **Q.    If you had received the unanimous approval of all**

3    **members you didn't have to dissolve this company, you could**

4    **have simply amended it to put it in a form that would be**

5    **acceptable, am I right about that?**

6                MR. ALLISON:  Form and foundation, go ahead.

7        A.    That could have been a path that we could have

8    taken, but I believe our conversation at the time was that

9    that was going to be a messier process and that the direct

10   path was towards forming a new company and leaving the

11   failed experiment of Meow Wolf LLC behind us.

12       **Q.    So at any rate, so the intent was to dissolve Meow**

13   **Wolf LLC and then start a new company VCMSE Art City, LLC,**

14   **right?**

15       A.    The intent was to get approval for the dissolution

16   of Meow Wolf LLC, so that we could -- so that we could

17   begin, you know forming VCMSE, knowing that the past

18   formation, the past agreement had been approved to be

19   dissolved.

20       **Q.    Had been approved to be dissolved?**

21       A.    Yeah.

22       **Q.    But Meow Wolf LLC at the time was Meow Wolf,**

23   **right?  I mean it was the entity.**

24                MR. ALLISON:  Form.

25       **Q.    Right?  That's why you had to dissolve it, right?**

1        A.    It was the entity and the entities, but the name

2    just to be clear, the name Meow Wolf was not owned by the

3    entities, the name was owned by David Lockridge.

4        Q.    I understand that, actually that does lead to a

5    question.  Was there ever a license back to the entity by

6    David Lockridge --

7              MR. ALLISON:  Objection to form.

8        Q.    (BY MR. BOYD) -- trademark of Meow Wolf?

9        A.    To what entity?

10             MR. ALLISON:  Objection, form.

11       Q.    (BY MR. BOYD) To Meow Wolf, LLC?

12             MR. ALLISON:  Same objection, go ahead.

13       A.    There was, I don't believe there was a license

14   back to the LLC.

15       Q.    (BY MR. BOYD) Okay.  And so, but the

16   trademark -- putting the trademark in David Lockridge's name

17   was a decision of the Meow Wolf Group, right, as part of the

18   process of setting up the LLC, there was also a decision

19   made to get a trademark and put that name -- put that in the

20   name of David Lockridge, am I right about that?

21             MR. ALLISON:  Form.

22       A.    Yes.

23       Q.    Okay.  That was not simply David going out and

24   getting it himself, that was the decision that was made by

25   the group, right?

Page 153

1          MR. ALLISON:  Same objection.

2     A.   It was communicated at meetings often, like it was

3  a pretty common known thing.

4     **Q.   (BY MR. BOYD) You said the word VCMSE Art City**

5  **at meetings?**

6     A.   Yeah, we would and we had like a term Very Cool

7  Mega Strength Eagles and people even knew that term Very

8  Cool Mega Strength Eagles.

9     **Q.   When was that?**

10    A.   From 2014 until 2017 it was.

11    **Q.   Okay, who -- again I'm just talking about the**

12 **documents.**

13    A.   Documents.

14    **Q.   Were any writing aside from the contract that**

15 **we've been discussing, the paper contract, that contains**

16 **VCMSE Art City LLC as an entity that would be contracting**

17 **with Lauren Oliver prior to opening?**

18    A.   I think the only -- I think the only contract that

19 Lauren would have seen that would have shown that VCMSE was

20 contracting with her would have been the contract that we

21 presented to her.

22    **Q.   What about any other document that contained the**

23 **words VCMSE Art City, LLC in the contract?**

24         MR. ALLISON:  Object to the form.  Foundation.

25    A.   I don't see why we would show her any other

Page 154

1    contracts other than the contract that we showed her.

2         Q.    I'm not talking about just contracts.  I'm talking

3    about documents, a writing where it was made clear that the

4    entity that was doing business as Meow Wolf was actually

5    VCMSE Art City LLC owned by six people and whoever they

6    decided to transfer equity to?

7              MR. ALLISON:  Form.

8         A.    We provided a contract that stated this.  That

9    seems sufficient and I'm not sure why we would show any

10   additional like business documentation other than that, so

11   no, I don't think that there was any other documents, but

12   the contract was pretty clear.

13        Q.    Well, the contract mentions VCMSE Art City LLC,

14   putting aside the differences of understanding and memories

15   about whether or not Ms. Oliver actually got a copy of that

16   contract, but putting that aside, that contract doesn't

17   explain the ownership structure of VCMSE Art City, does it?

18        A.    It does not, but I don't think it is obligated to.

19   This is also assuming that -- I mean this is assuming that

20   Lauren had any understanding of Meow Wolf LLC or its

21   operating manual or its operating agreement.  Nobody even

22   knew who Lauren Oliver was.  She was a total stranger to the

23   vast majority of people who were part of the project and she

24   hadn't been part of Due Return, wasn't in any of those

25   meetings to form Meow Wolf LLC, had not participated in Meow

1    Q.    The members of VCMSE Art City LLC owned the

2    company entirely, they did not share ownership with any

3    other entity, the members of the LLC were the owners of the

4    LLC to the extent that they sold their share of the LLC they

5    would recover whatever amount they sold those shares for, or

6    those, those -- that equity for, right?

7        A.    Yes, I would agree with you that the owners of the

8    company carry the equity value of the company.

9        Q.    Okay.

10       A.    The owners of the company carried the equity value

11   of the company, yes.

12       Q.    Fine.   It was a for profit company, right?

13       A.    Yes.

14       Q.    In building House of Eternal Return, the company

15   utilized volunteers, if I understand that correctly, is that

16   correct?

17       A.    We utilized volunteers, that's correct.

18       Q.    Did you keep any records of the amount of time

19   volunteers put into working on the House of Eternal Return?

20       A.    We kept some records of that, and who those

21   volunteers were and had waivers for them and agreements

22   around it.

23       Q.    But still, regardless of the paperwork that may

24   have been signed before they began, they were suffered or

25   permitted to work at House of Eternal Return, right?