# EXHIBIT 12

**In the Matter Of:**

**LAUREN ADELE OLIVER vs MEOW WOLF**

1:20-cv-00237-KK-SCY

**KATE LESTA**

*October 08, 2020*



800.211.DEPO (3376)
*EsquireSolutions.com*

1      Q.   Do you know whether this one-million-dollar
2  cap was expressed to any of the artists outside of the
3  ownership group, that they were informed, "Hey, your
4  revenue share total is going to be capped out"?
5      A.   It is possible that this language was
6  included in the original revenue share agreement that I
7  received, which I believe I turned over, but that would
8  have been the first time that it was explicitly stated
9  to me as someone also receiving the revenue share
10 payments.
11     Q.   I'll stop you there.  What I want to get at
12 is prior to the completion of HOER in March of 2016, do
13 you know whether anybody at Meow Wolf let the artists
14 know that the revenue share that they've been mentioning
15 during the course of the lead-up to the installation had
16 a cap to it?
17     A.   I don't think so.
18     Q.   I'm going to go to the next document,
19 hopefully.  Okay.  Do you have that now?  What we're
20 going to mark as Exhibit 4, this next document.
21          (Exhibit 4 identified.)
22     A.   Okay.
23     Q.   (BY MR. BOYD) And do you have that?
24     A.   I'm opening it.
25     Q.   All right.  Have you ever seen that document



1  points that they would bring up verbally.  There was not
2  notetaking and there were not agendas.
3          It wasn't -- we didn't have notetaking and
4  agendas in these types of meetings until that split
5  happened that I just described where there were
6  building-specific management meetings and that were
7  really only related to operating in the Santa Fe
8  facility.
9       Q.   All right.  And those meetings that you
10 attended between April of 2015 and May of 2016, was
11 putting things in writing ever discouraged?
12      A.   It was not -- it was not procedure to put
13 things in writing and I was discouraged from putting
14 agreements with artists into contracts before the
15 building was opened.
16      Q.   Okay.  Did you reach a point at some point
17 during that period where you felt like it was
18 appropriate to start memorializing contracts in writing
19 with artists?
20      A.   Yes.
21      Q.   And did you take that thought to the
22 management committee meetings?
23      A.   I did.
24      Q.   And what were you told?
25      A.   I was told that the terms were going to



1   change, that it was too uncertain, that we just didn't
2   know what was going to happen, and that we should not
3   put anything in writing because the terms were going to
4   change.
5       Q.  On the other side, whether it was before or
6   after this change in May of 2016, were you ever directed
7   to prepare or present a contract to any participating
8   artist?
9       A.  No.
10      Q.  Do you remember any participating artist that
11  you were specifically told "Do not do a contract with
12  that person"?  That is, when you brought to them the
13  idea that you should start contracting, did they
14  specifically tell you as to a particular artist, "No, we
15  do not want you to contract with that person"?
16          MR. ALLISON:  Objection to form.
17      Q.  Do you understand my question?
18      A.  I do understand your question, and it was a
19  general -- it was a general statement that I was not to
20  draft any contracts with any artists.
21      Q.  Do you know who Christian Ristow is?
22      A.  I do.
23      Q.  Do you have any knowledge that Mr. Ristow
24  negotiated a contract with Meow Wolf?
25      A.  Christian's agreements were very separate



1  going to overtake his position or his leadership, which
2  he also expressed concern to me about early on in my
3  employment.
4      Q.   Okay.  In general, if you could explain to
5  me, over the course of your employment, do you feel like
6  the goal of Meow Wolf, vis-a-vis the participating
7  artists, changed during the course of your employment?
8  Do you understand my question?
9      A.   Yeah.  I think that it depends on who you may
10 be speaking of in the ownership group.  I think if you
11 were talking about Caity Kennedy, that her goal would be
12 different than the goal of Vince Kadlubek as far as the
13 involvement of the artists in the company.
14     Q.   What do you think the goal of Vince Kadlubek
15 would be, vis-a-vis the artists?
16          MR. ALLISON:  Object.
17     A.   To monetize their work for the sake of the
18 company.
19          MR. BOYD:  Did you get that, Christine?
20          THE COURT REPORTER:  Yes.
21          MR. BOYD:  Did you get her answer?
22          THE COURT REPORTER:  Yes.  "To monetize
23 their work for the sake of the company."
24     Q.   (BY MR. BOYD) And would you say that
25 monetization of their work for the sake of the company



```
 1   included paying the artists as little as he possibly
 2   could?
 3              MR. ALLISON:  Objection.  Objection to form.
 4       A.   I think people were paid as little as they
 5   could possibly pay them.
 6       Q.   And I'm correct, that's completely contrary
 7   to the representations that were made by Vince and the
 8   other members of the ownership group, quote/unquote, to
 9   the participating artists during the meetings leading up
10   to the installation of HOER; am I right about that?
11              MR. ALLISON:  Objection to form again,
12   continuing to lead.
13       A.   I think that what was represented to the
14   artists was that they would be compensated as much as
15   the company could possibly pay them, that that was what
16   they were told, and that they were going to be a part of
17   something great, and their work was -- they would
18   personally be represented.
19       Q.   And share in the success of the company?
20       A.   Yeah.
21              MR. ALLISON:  Objection to form.
22              MR. BOYD:  All right.  I'll look over my
23   notes.  I think I'm done, absent something after
24   Mr. Allison's examination.  But it's probably a good
25   time for a break.  Does that make sense for you guys?
```



1   Q.   Okay.
2   A.   I really don't -- I don't know.
3   Q.   Okay.
4   A.   So I don't remember -- I don't remember.  I
5   can't speak to this meeting.  I'm sorry.
6   Q.   No, I understand.  Would it surprise you if
7   34 artists signed agreements, contracts at that meeting,
8   or after it?
9   A.   I suppose that's possible.  I don't know.
10  Q.   Would you have been given the artist
11  contracts after they were signed as the person who's
12  going to administer them?
13  A.   I don't know.  There were some things that I
14  took over.  There were things I took over after -- from
15  Caity Kennedy, so it's likely at this period that she
16  received those contracts, not me.
17  Q.   Did you do anything to get Lauren Oliver
18  under contract?
19  A.   Can you say the question again, please?
20  Q.   Yeah.  Did you do anything to get Lauren
21  Oliver's arrangement under a formal contract?
22  A.   No.
23  Q.   Was artist contracts part of your role?
24  A.   It was a part of my role for a portion of the
25  period of time that I worked there, not the entire time.



1       Q.    What was the portion of the time when that
2  was your role?
3       A.    Probably maybe like November 2015 through
4  March 2016, something along those lines.
5       Q.    What did you do to get artists under contract
6  during that time?
7       A.    Well, I was discouraged from administrating
8  contracts, which I mentioned earlier.  The artists who
9  did not have contracts, I was told to not draft
10 contracts because the terms would change and things were
11 changing and they would have to make new contracts
12 because the terms would change.  So I wasn't allowed to
13 make contracts at the time when I asked to.
14      Q.    Let me ask you about something.  This is
15 about the artist revenue share or the artist bonus
16 program.  Are those two terms interchangeable for you or
17 two successive names for the same program?
18      A.    During my period of employment, I only knew
19 it as an artist revenue share program.
20      Q.    Okay.  So I think you testified that
21 Ms. Oliver's original amount was 10,000, and then after
22 the House was built and all the work was installed, then
23 it was 7,000, do you remember talking about that?
24      A.    That's what it appears to be in the
25 documents.

