**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

LAUREN ADELE OLIVER,
an individual,

       Plaintiff,

v.                                                                      Case No. 1:20-CV-00237-KK-SCY

MEOW WOLF, INC., a Delaware
corporation; VINCE KADLUBEK,
an individual and officer; and
DOES 1-50,

       Defendants.

**DEFENDANTS' MOTION TO EXCLUDE
EXPERT OPINION TESTIMONY OF G. JAMES DAICHENDT**

Defendants Meow Wolf, Inc. and Vince Kadlubek (collectively Meow Wolf), pursuant to

Rules 104, 403, and 702 of the Federal Rules of Evidence and Rules 26(a)(2)(B) and 37(c)(1)(A)

of the Federal Rules of Civil Procedure, respectfully request that the Court exclude the opinions

of G. James Daichendt, an art history professor with no financial or valuation training, whom

plaintiff retained to provide an expert opinion on the economic value of Ice Station Quellette (ISQ).

Plaintiff also improperly supplemented Mr. Daichendt's opinions on two occasions, violating the

Court's order on allowable scope of supplementation. Doc. 204, at 2–3. Plaintiff opposes this

motion.

**INTRODUCTION**

This lawsuit centers on the terms of Meow Wolf's contract with plaintiff for installation of

her work, ISQ, in Meow Wolf's House of Eternal Return in Santa Fe (HoER). Ms. Oliver claims

she was promised a "proportional revenue share" and "membership in the Meow Wolf Collective"

in exchange for installing ISQ. Am. Compl. ¶¶ 23–25, Doc. 148. She claims Meow Wolf made

these promises to her during group meetings that were "like rallies" preceding the opening of

HoER. *See* Deposition of Lauren Oliver, attached as **Exhibit A**, 606:3–6. Ms. Oliver has never alleged specific compensation terms promised to her, such as what amount or proportion of revenue sharing she was promised. Meow Wolf has moved for summary judgment declaring that the terms of her contract were that Meow Wolf would buy her materials for the installation, pay her a $1,000 initial stipend, and pay her $10,000 in revenue sharing. See Doc. 362.

As set forth in Doc. 362, after an extended 17 months of discovery, Ms. Oliver has not identified any specific compensation terms that Meow Wolf orally offered her. Plaintiff has admitted under oath that she was never promised a specific percentage or amount of equity in Meow Wolf, that she was never promised a specific percentage or amount of stock options in Meow Wolf, and that she was never promised specific shares of stock in Meow Wolf. *See* Deposition of Lauren Adele Oliver, Doc. 277, Ex. E, 45:7–15 ("Q. Ms. Oliver, did anyone ever promise you a specific percentage or amount of stock options in Meow Wolf? … [A]. No."); *id.* at 46:22–25 ("Q. … Did anyone ever promise you a specific percentage or amount of equity in Meow Wolf? A. No."); *id.* at 48:12–14 ("Q. … Did anyone promise you shares of stock in Meow Wolf? A. No specific shares of stock."). Nor was she promised any amount or percentage of revenue sharing. Doc. 297, at 9 ("While no particular percentages or shares were mentioned . . . .").

Because plaintiff can identify no compensation terms, her damages expert, Marianne DeMario, had no way of calculating what amount of revenue sharing plaintiff is owed. Ms. DeMario testified that she could have estimated what percentage ISQ represents out of the whole of HoER, using objective measures—but she was not asked to do so. Instead plaintiff engaged Mr. Daichendt, an art critic and professor of art history, to supply the missing compensation term by estimating what percentage ISQ represents in HoER.

2

This missing compensation term is the crux of plaintiff's case. The Court suggested what kind of compensation terms can be judicially implied when a contract lacks a compensation term (Doc. 59, at 14), but plaintiff ignored that guidance, instead seeking an opinion not on what Ms. Oliver was promised when she accepted her contract, but on what percentage of HoER revenue is attributable to ISQ years after the parties' contract was formed.

Mr. Daichendt opined that "███████████████████████████████ ██████████████████ *See* March 5, 2021 Report, G. James Daichendt, attached as **Exhibit B**, at 1. Mr. Daichendt's "opinion of the percentage or the estimate of ISQ, of the exhibit . . . is of the House between 2021 and 2022," even though Ms. Oliver claims her contract was made in 2015 or 2016. *See* Deposition of G. James Daichendt, attached as **Exhibit C**, 51:22–52:1.

Ms. DeMario took this opinion to be ████████████████████████ and confirmed under oath that she understood Mr. Daichendt's opinion to be one of economic value. *See* Preliminary Expert Report of Marianne L. DeMario, Doc. 366, Ex. A, at ¶ 21; Deposition of Marianne DeMario, Doc. 366, Ex. C, at 34:23-25 █████████████████████████ ██████████████████████████████████████████████████████ Ms. DeMario interpreted Mr. Daichendt's 5-8% as his opinion of ████████████ *Id*. at 204:2–6. Specifically, she assumed Mr. Daichendt's 5-8% opinion represented the ███████████ of HoER attributable to ISQ. *Id*. at 213:25–214:12 █████████████████ ████████████████████████████████

What Ms. DeMario did not know[1] is that Mr. Daichendt is an art history professor with no qualifications or training to render economic opinions, and that his opinion was of the artistic and

---

[1] Ms. DeMario did not read Mr. Daichendt's opinion and had never seen Mr. Daichendt's CV before being shown it in her deposition.

experiential value of ISQ. In fact, while Ms. DeMario interpreted his opinion as ISQ's percentage of HoER cash flows, Mr. Daichendt testified that was *not* his opinion. Ex. C, at 119:22–120:1 ("Q. So you stated that you've given an opinion of value. I want to know what this 5 to 8 percent value is. Is this 5 to 8 percent of revenue from House admissions? A. No.").

Mr. Daichendt's opinions violate five separate requirements for admissibility under Fed. R. Evid. 403 and 702. *First*, Mr. Daichendt is not qualified to give an opinion on the economic value of ISQ—he is an art historian, not an appraiser or economic expert. *Second*, Rule 702 requires an expert to provide a sufficient factual basis for each opinion, but Mr. Daichendt's opinions are unsupported. *Third*, Rule 702 requires an expert to provide a reliable methodology that he reliably applies to the facts, but Mr. Daichendt did not use any methodology recognized in the fields of appraisal or valuation. In fact, he used no methodology at all. *Fourth*, although the Court suggested what kind of expert analysis could be helpful in this case,[2] Mr. Daichendt did not follow this guidance. *Fifth*, Rule 403 bars testimony that would mislead a jury or confuse the issues. Mr. Daichendt estimates a percentage of the overall experience he believes ISQ plays in HoER, and Ms. DeMario relies on that as an opinion of economic value to calculate the amount of revenue from HoER that plaintiff should receive. Plaintiff intends to use Mr. Daichendt's opinion to mislead the jury to believe she is entitled to receive this amount of revenue even though Ms. Oliver has testified Meow Wolf did not promise her any specific portion of revenue from HoER.

---

[2] The Court suggested the following kinds of testimony would be helpful to determining plaintiff's missing contract terms. First, plaintiff could "argue[] for a 'reasonable' fee" and "suggest[ a] method of computing such a fee." Doc. 59, at 14 (quoting *Padilla*, 1997-NMCA-104, ¶ 11). For example, "Plaintiff could seek compensation for her labor at a reasonable hourly rate and for the cost of her materials at a fair market price; or, she could seek compensation at the appraised value of ISQ." *Id*. Alternatively, the Court instructed Plaintiff that she "could demonstrate that, though the parties never agreed on an exact amount or method of compensation, they did agree on a range of alternatives, which would support an award 'in accordance with the alternative that will result in the smallest recovery.'" *Id*. at 14–15 (quoting *Padilla*, 1997-NMCA-104, ¶ 12).

Mr. Daichendt's opinions also violate the scope of the Court's Omnibus Order on Discovery Motions allowing a limited supplemental expert. Plaintiff's original expert disclosure deadline was March 5, 2021. After defense counsel pointed out that the deadline for plaintiff to disclose a copyright damages expert had passed, plaintiff asked the Court for permission to engage an expert to "determine the value to Defendants that the unauthorized use of Oliver's work represents to their brand and venture as a whole, as well as a reasonable royalty and/or value associated with the use itself." Doc. 126, at 2. Plaintiff added that she needed an expert to opine "about how the use of a particular work affects brand and company value." *Id*. The Court granted the motion in part, permitting plaintiff to disclose an expert specifically "regarding the pitch decks or claims added in the amended complaint or the proposed counterclaim . . . ." Doc. 204, at 3.

Plaintiff disclosed Russell Mangum as an expert on the issues above, and along with Mr. Mangum's disclosure issued a new report from Mr. Daichendt with a variety of new opinions. *See* January 14, 2022 Preliminary Report – Art Expert Opinion, G. James Daichendt, Doc. 372, Ex. I. None of the new opinions addressed pitch decks or claims added in the Amended Complaint. The new opinions are substantial: (1) concluding that removing ISQ from HoER would damage the structure and the unique installation elements used for its creation; (2) explaining the "fundamental difference between an artist and a craftsperson;" and (3) addressing how art collectives operate and the "reasonable expectations" any participating artist has when joining one. *See* Doc. 372, Ex. I, at 4–6. The Court did not grant plaintiff leave to inject new opinions on these topics.

To make matters worse, on the afternoon before Mr. Daichendt's deposition, plaintiff's counsel disclosed that plaintiff had just provided Mr. Daichendt with 176 pages of new material. Mr. Daichendt used these materials to render yet more new opinions during his deposition. He added an opinion that the walls of the room ISQ sits in are part of Ms. Oliver's work, that the

pedestal underneath ISQ was also part of the work, and that Cary Cluett's role was merely that of an assistant. These opinions were not included in either of Mr. Daichendt's reports, and their mid-deposition disclosure was barred by Rule 26.

Fed. R. Civ. P. 26(a)(2)(B) requires that a party disclose their experts in the manner and sequence required by the Court through its orders. Rule 26 also requires that an experts report contain a complete statement of their opinions, including the bases and reasons for each opinion; the facts considered by the expert in forming those opinions, any exhibits they will use to support the opinions, and, among other things, a statement of their compensation. *See* Fed. R. Civ. P. 26(a)(2)(B)(i)–(iii), (vi). Mr. Daichendt's disclosure violated all of these requirements. Fed. R. Civ. P. 37 "forbid[s] the use at trial of any information required to be disclosed by Rule 26(a) that is not properly disclosed." *Olson v. Mont. Rail Link, Inc.*, 227 F.R.D. 550, 552 (D. Mont. 2005) (quoting *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001)).

Plaintiff's flouting of the Court's orders and of Rule 26 prejudiced defendants by forcing them to pay their expert Mary Peck to create a 21-page supplemental rebuttal report. Doc. 314. Additionally, Mr. Daichendt's mid-deposition amendments deprived defendants of the time and ability to adequately depose him on those topics.  Under Fed. R. Civ. P. 26 and 37, the Court should exclude Mr. Daichendt's opinions after March 5, 2021, and order plaintiff to pay defendants costs and attorneys' fees associated with reviewing Mr. Daichendt's amended report, for Ms. Peck's supplemental rebuttal report, and for preparing and filing this motion.

## ARGUMENT

Before a witness may come "before the jury cloaked with the mantle of an expert, . . . care must be taken to assure" that the witness' "testimony meets the requirements of Rule 702." *Jinro Am. Inc. v. Secure Inv., Inc.*, 266 F.3d 993, 1004 (9th Cir. 2001). "Expert evidence can be both

powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, at 595 (1993) (citation omitted). Mr. Daichendt is an expert in art history and criticism, but rendered an opinion of value that plaintiff is using as an opinion of economic value. His opinions and qualifications do not meet the requirements of Fed. R. Evid. 702, and would confuse the issues and mislead the jury under Fed. R. Evid. 403. Mr. Daichendt's late disclosures and amended opinions are sanctionable under Fed. R. Civ. P. 37.

## I
## MR. DAICHENDT GIVES OPINIONS HE IS NOT QUALIFIED TO MAKE AND WHICH DO NOT MEET THE OTHER REQUIREMENTS OF RULE 702

"The objective of [Fed. R. Evid. 702] is to ensure the reliability and relevancy of expert testimony. It is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 152 (1999). The court's gatekeeping function applies to all expert testimony. *See Kumho Tire*, 526 U.S. at 141 ("*Daubert*'s general holding—setting forth the trial judge's 'gatekeeping' obligation—applies not only to testimony based on 'scientific knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge." (citing Fed. R. Evid. 702)). The proponent of expert testimony has the burden of establishing admissibility. *See Daubert*, 509 U.S. 579, 592 n.10 (1993) (quoting Fed. R. Evid. 104(a)) (other citation omitted).

### A.    Mr. Daichendt is Not Qualified to Opine on ISQ's Value, or to Determine the Proportion of HoER Revenue Attributable to ISQ

The first step under Fed. R. Evid. 702 is to determine whether the expert is qualified to testify. *Bitler v. A.O. Smith Corp.*, 400 F.3d 1227, 1232–33 (10th Cir. 2005). An expert must

possess "such skill, experience or knowledge in that particular field as to make it appear that his opinion would rest on a substantial foundation and would tend to aid the trier of fact in his search for truth." *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 928 (10th Cir. 2004) (citation omitted). Proposed expert testimony must therefore "fall within the reasonable confines of [the witness's] expertise." *Conroy v. Vilsack*, 707 F.3d 1163, 1169 (10th Cir. 2013) (quotations omitted). The proponent of expert testimony is burdened with showing the expert is qualified and that the proposed testimony falls within the expert's qualifications. *Ralston v. Smith & Nephew Richards, Inc.*, 275 F.3d 965, 970 n.4 (10th Cir. 2001).

Mr. Daichendt concluded that ISQ is "5 to 8% of the overall value of the experience." Ex. C, 112:4–5. Plaintiff has taken this as an opinion of economic value, specifically of HoER's ███ ███ DeMario Dep. at 213:25–214:12 ███████████████████ ███████████████████████████████████████████. Plaintiff directly relies on Mr. Daichendt's opinion as an economic assessment of a percentage of revenue to which Ms. Oliver claims entitlement. *Id*. at 142:12 ███████████████████ ██████████████████████████.[3] Yet Mr. Daichendt testified he did not intend his opinion as ISQ's percentage of HoER revenue. Daichendt Dep., Ex. C, at 119:22–120:1 ("Q. So you stated that you've given an opinion of value. I want to know what this 5 to 8 percent value is. Is this 5 to 8 percent of revenue from House admissions? A. No.").

Mr. Daichendt is not remotely qualified to give the economic value plaintiff has interpreted his opinion as. His CV indicates he is a professor of art history and has degrees in fine arts and

---

[3] *See also* ███████████████████ ██████████████████████; Ex. C, 114:15–19 ("Q. So do you see that Ms. DeMario is using your 5 to 8 percent estimate to assess the value attributable to ISQ at the House? Mr. Boyd: Form and foundation. A. As far as I understand the document, yes.").

education.  There is no financial, valuation, or economic training or experience in his background. *Id*. Mr. Daichendt admitted in his deposition he is unqualified to give economic opinions. *See* Ex. C, 229:17–22 ("Q. Mr. Daichendt, I'm asking if you have any experience developing opinions on the economic value of art besides any appraisal experience which you told me you do not have. A. Yeah, I don't. I do not have experience in that area."); *id*. at 272:10–11 ("I am not an economic expert."); *id*. at 126:21–22 ("I'm not an art appraiser, so I don't have experience doing this."). The opinion that ISQ is 5 to 8% of HoER therefore is outside Mr. Daichendt's expertise. The Court should exercise its gatekeeping function to exclude Mr. Daichendt's opinion that ISQ is 5 to 8% of the exhibit, because the only use of the opinion in this case is as an opinion of economic value.

### B.   Mr. Daichendt's Opinions Are Not Based on Sufficient Facts, Are Not the Product of Any Methodology, and Are Unreliable

A witness who is qualified as an expert may testify in the form of an opinion or otherwise if four distinct requirements are satisfied:

> (a) the expert's . . . specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702; *accord*, *Walker v. Spina*, 359 F. Supp. 3d 1054, 1067 (D.N.M. 2019) (quoting the same). "'*[A]ny* step that renders the analysis unreliable . . . renders the expert's testimony inadmissible. *This is true whether the step completely changes a reliable methodology or merely misapplies that methodology*.'" Fed. R. Evid. 702 advisory committee's note to 2000 Amendment (citation omitted); *accord Mitchell v. Gencorp Inc.*, 165 F.3d 778, 781 (10th Cir. 1999) (citing *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir. 1994)).

For each of the opinions discussed below, Mr. Daichendt's analysis is incomplete. He failed to review facts specific to this case—even where deposition transcripts and other evidence

existed. He admitted he relied on no methodology in reaching any opinion. He has not disclosed a basis for his opinions or the reasons connecting his conclusions with a source of information or knowledge. Mr. Daichendt's opinions are entirely subjective, and they are therefore unreliable. Where, as here, "an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, Daubert and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos v. Nat'l Railroad Passenger Corp.*, 303 F.3d 256, 266–67 (2d Cir. 2002).

### 1.    The Proffered Testimony Is Not Grounded on Sufficient Facts or Data

An expert who "possesses knowledge as to a general field" but "lacks specific knowledge does not necessarily assist the jury." *City of Hobbs v. Hartford Fire Ins. Co.*, 162 F.3d 576, 587 (10th Cir. 1998). "A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *Id.*; *accord Armeanu v. Bridgestone/Firestone N. Am. Tire, LLC*, No. CIV 05–0619 JB/DJS, 2006 WL 4060665, at *11 (D.N.M. Sept. 26, 2006) (Browning, J.) ("'[A]n expert's conclusions are not immune from scrutiny . . . [and the] court may conclude that there is simply too great an analytical gap between the data and the opinion proffered.'") (alterations omitted; citations omitted); *Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 881, 886 (10th Cir. 2005) (affirming district court's exclusion of purported expert because the expert's conclusion did not follow from the data, and there was an impermissible analytical gap between the premises and conclusion).

### a.    Mr. Daichendt Lacks Information to Opine that ISQ is 5 to 8% of HoER

Mr. Daichendt concluded that ISQ is "5 to 8% of the overall value of the experience," Ex. C, 112:4–5, but had difficulty identifying what kind of "value" he meant. *See* Ex. C, 119:22–123:1. He testified his 5-8% opinion was not of revenue of HoER, square footage of HoER, or social

media mentions. Ex. C, at 119:22–120:15. These objective measures were not facts Mr. Daichendt

considered. On subjective measures, he hedged:

> Q. Is this 5 to 8 percent of the artistic significance of the exhibit?"
> A. "That's—that's closer. It's part of the artistic significance.
> Q. Is this 5 to 8 percent of the viewer experience?
> A. That's definitely part of it.

Ex. C, at 120:5–12.

A percentage expresses a relationship of one thing to another, in this case ISQ relative to

HoER. Knowledge of the whole is necessary to assess the relative value of the part. *See* Ex. C,

115:4–9 ("So you're asking if the percentage of 5 to 8 is the percentage of the whole of the exhibit.

Yes."). Yet Mr. Daichendt did not analyze HoER, does not know how many works of art comprise

the exhibition, and thus cannot compare ISQ to the whole. *See* Ex. C 117:6–25. ("Q. Did you

quantify all of the exhibits at the House? A. It's not possible to do that. Q. So you didn't? A. It's

not possible."). In fact it is possible to know how many installations are at HoER. *See House of

Eternal Return Credits*, accessed April 27, 2022,  https://credits.meowwolf.com/house-of-eternal-

return (crediting 124 separate projects at HoER). Without knowledge of the number of exhibits at

HoER, Mr. Daichendt cannot opine on ISQ's percentage of the exhibition. Although it is entirely

unclear how Mr. Daichendt arrived at his 5 to 8% estimation, he did not have the information he

needed to form this opinion. When asked whether his opinions are "helpful to someone trying to

understand the economic value of ISQ," he flatly stated that "I don't have enough information for

that." Ex. C, 163:17–22.

Nor does Mr. Daichendt have any data on the value of ISQ to an HoER visitor. *See* Ex. C,

122:5–15 ("Q. Do you know how many patrons went to see ISQ while you were there visiting? A.

No. Q. Do you have knowledge that everyone who goes through the House sees ISQ? . . . A. Do I

have  knowledge  that  everybody  who  goes  to  the  House  sees  ISQ.  No,  I  do  not  have  that

knowledge."). He also does not have any data showing foot traffic through the exhibition. *See* Ex. C, 121:18–20 ("Q. Is it 5 to 8 percent of the foot traffic through the house? A. I don't have that data."). He therefore cannot testify that ISQ formed any specific portion of a viewer's experience.

      b.    <u>Mr. Daichendt Lacks the Information to Opine on Art Collectives</u>

Mr. Daichendt opines that members of art collectives are entitled to its funds, and that art collectives are distinct from hierarchical businesses. *See* Doc. 372, Ex. I, at 5–6. Yet Mr. Daichendt did not gather any facts to back up this opinion. He did not speak to any members of the Meow Wolf art collective. He did not even speak to Ms. Oliver. *See* Ex. C, 79:4–9 ("Q. Did you ever speak to Liberty Yablon, one of Ms. Oliver's witnesses in this case? A. No. Q. You never asked her specifically about how the Meow Wolf collective operated? A. No."); 77:15–17 ("Q. Did you ask Ms. Oliver how the Meow Wolf collective operated? A. No."); 78:12–14 ("Q. Did you interview anyone at all in the Meow Wolf collective about how it operated? A. No.").

Undisputed facts contradict Mr. Daichendt's opinion. Meow Wolf, as a collective, used its money only for costs, and never to compensate artists. Liberty Yablon Dep., Feb. 28, 2022, attached as **Exhibit D**, 36:4–17, 267:9–14. Undisputed testimony about another Santa Fe art collective, the Squirrels, is that money the collective earned from its art projects went toward funding future projects or reimbursing members, but not paying members. *See* Tuscany Wenger Dep., Mar. 28, 2022, attached as **Exhibit E**, 17:5–12, 20:13–21:21.

Not only is his opinion factually untrue as to 100% of the evidence about art collectives in this case, but Mr. Daichendt also did not research *any* art collectives in creating the description in his report. *See* Ex. C, 70:2–5 ("Q. Okay. You didn't go back and look at any art collectives in forming this description, did you? A. No."). He did not speak with any individual who is part of any art collective. *See* Ex. C, 70:6–9 ("Q. And you don't have a name of a particular individual

who's part of an art collective that you spoke with? A. No. It's based on common knowledge."). If it is truly common knowledge, then expert testimony is not needed. But the fact that his unresearched opinions about art collectives do not match the facts suggests that Mr. Daichendt's opinions are not common knowledge. He could provide no example of any art collective that operated in the way he described. *See* Ex. C, 73:10–22 ("Q. So you've not looked up any art collectives in forming this opinion? Mr. Boyd: Form. A. I did not provide a list of art collectives for this opinion. I just provided the common knowledge.").

Mr. Daichendt also testified that ███████████████████████████████ Doc. 372, Ex. I, at 5, and denied that a collective could form a company and still be a collective. *See* Ex. C, at 192:20–193:6. This uninformed opinion is contradicted by undisputed testimony that not one but two Santa Fe collectives, the Squirrels and Meow Wolf, formed companies while continuing to identify themselves as collectives. Ms. Oliver's friend and witness, Liberty Yablon, testified that Meow Wolf was both a collective and a company, and she appropriately called Meow Wolf a collective while knowing it was also a company. Ex. D, at 46:2–13. Mr. Daichendt had no answer for examples of other collectives forming companies while continuing to identify as collectives. Ex. C, at 191:9–193:19 ("Q. Right. And Guerrilla Girls and Assemble and teamLab all say that they're collectives and also a company? A. You could call yourself whatever you want to. But once you a establish a business, you're a business or a museum or a gallery."). Perhaps the key to Mr. Daichendt's confusion is that he does not know what an entity is under the law, so he is unaware that a collective, not being a legal entity, has no externally-imposed structure. *See* Ex. C, 96:10–15 ("Q. Do you know how an entity is defined in the law? A. I would – no. Q. Okay. Do you know whether a collective is an entity under the law? A. No."). Mr. Daichendt's opinions in this area are not based on sufficient facts to be reliable.

      c.     Mr. Daichendt Lacks the Information to Opine that
           <u>the Walls Around ISQ and the Base Underneath it Are Part of ISQ</u>

Mr. Daichendt opined during his deposition that the walls around ISQ and pedestal underneath it are part of the artwork. He explained that, to him, the most important fact to consider in determining whether the walls around ISQ are part of the artwork is whether the artist—Ms. Oliver—intended the walls to be part of ISQ at the time she created the work. *See* Ex. C, 285:2–7 ("Q. I'm just asking, if she disagreed with you that the walls are part of the exhibit, would she be right or would you be right? A. It's entirely at the discretion of the artist. If it wasn't part of it, then the artist could choose that."). Mr. Daichendt admitted that he never spoke with Ms. Oliver about whether she intended the walls around ISQ to be part of the artwork. *See* Ex. C, 282:1–4 ("Q. Yeah. Okay. And you acknowledge that you did not know what Ms. Oliver's plans were for ISQ at that time. Correct? A. Correct."). Mr. Daichendt does not rely on any facts to opine that the pedestal underneath ISQ or the walls around it are part of the work.

      d.     Mr. Daichendt Lacks the Information to Opine that
           <u>ISQ Cannot Be Moved without Damaging or Destroying It</u>

Mr. Daichendt opined that ISQ cannot be moved without damaging or destroying the work. But he did not examine the base and how it was constructed. *See* Ex. C, 145:7–15 ("Q. So you don't know how the base was constructed? A. I saw a report just recently about the base. Q. Did you examine how the base was constructed? A. Did I examine how the base was constructed? I could only observe what one could see on the outside. Q. So is that a no? A. That's a no."); 210:4–8 ("Q. Mr. Daichendt, did you or did you not analyze the structure and the materials of the Space Owl's base? A. I did not analyze the structure of the base when I visited."). All that Mr. Daichendt did to form his opinion was review "some documents yesterday from a previous deposition that

talked about the logistics that went into the base. Whether I'd characterize that as an in-depth analysis, I would not. But I looked at it." Ex. C, 210:9–14.

He did nothing else to inform himself how ISQ was constructed so that he could offer an informed opinion on deinstalling or moving it. He never asked Ms. Oliver how ISQ was built at HoER. Ex. C, 147:13–15 ("I did not ask her that."). He never asked Ms. Oliver how the base was built, how the walls were built, how Space Owl was built, how the portholes on the walls were built, or how the glass around the base was built. *See* Ex. C, 147:16–148:4. Mr. Daichendt never asked anyone involved in building this exhibit how it was done. Ex. C, 148:7–9. He did not analyze how Space Owl could be detached from the base, or how ISQ could be moved. Ex. C, 148:10–19 ("I do not say that – anything like that in my report. No."). Mr. Daichendt does not know the materials used to build the wall around ISQ. *See* Ex. C, 146:22–25 ("Q. Do you know specifically what material was used for the walls? A. So I don't know the exact materials that were used on the walls."); *see also id*., 130:9–10 ("A. That's a different kind of expert if you're looking for` cost of materials."). Mr. Daichendt cannot opine on whether ISQ can be removed from HoER without damaging the work because he has no understanding of how the work was made—nor does he have expertise as a preparator or art mover to evaluate such knowledge if he had it.

### 2. Mr. Daichendt's Opinions are not Based on Methods Relevant to the Matter He Purports to Analyze

The trial court's gatekeeping function requires more than simply "taking the expert's word for it." Fed. R. Evid. 702 advisory committee's note to 2000 Amendment (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 43 F.3d 1311, 1319 (9th Cir. 1995) ("We've been presented with only the experts' qualifications, their conclusions and their assurances of reliability. Under *Daubert*, that's not enough.")). "The more subjective and controversial the expert's inquiry, the more likely the testimony should be excluded as unreliable." Although "the witness must

explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts," Fed. R. Evid. 702 advisory committee's note to 2000 Amendment, Mr. Daichendt fails to explain how his experience and education lead to any of his conclusions, why his experience was a sufficient basis, or how it is reliably applied to the facts in this case.

Furthermore, Fed. R. Evid. 702 "'requires a valid . . . connection to the pertinent inquiry as a precondition to admissibility.'" *Kumho Tire*, 526 U.S. at 149 (citations omitted)). The question before the Court is "not the reasonableness [of the expert's methodology] *in general*," but rather "the reasonableness of using such an approach . . . to draw a conclusion regarding *the particular matter to which the expert testimony was directly relevant*." *Kumho Tire*, 526 U.S. at 154 (emphasis in original). Mr. Daichendt's subjective approach is not appropriate for analyzing the matters on which he opined. *General Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.") (citation omitted).

Mr. Daichendt's testimony is purportedly relevant to showing ISQ's value in the context of plaintiff's claims for breach of contract and related claims. Plaintiff claims Meow Wolf did not fulfill its promise to compensate her for installing ISQ at HoER. Doc. 148, ¶¶ 103–106, ¶ 117. To this end, plaintiff must prove the compensation she was promised and how to calculate it.  The relevant methods for determining value are those needed to appraise ISQ, compute a reasonable fee, or show plaintiff's compensation at a reasonable hourly rate and for the cost of her materials at a fair market price. Doc. 59, at 14. Mr. Daichendt admits he could not do an appraisal: ███████

████████████████████████████████████████████████

████████████████████████ Ex. C, 167:7–13.

"Appraise" means "to set a value on." Webster's New International Dictionary (2d ed. 1934). The fields of art appraisal and business valuation have highly developed methods for showing the economic value of plaintiff's contribution to HoER—and are the only recognized ways of doing so—but Mr. Daichendt did not use those methods. *See* Ex. C, at 44:24–45:5 ("Q. Are you familiar with the uniform standards of professional appraisal practice? A. No. Q. Okay. Did you consult a uniform standards of professional appraisal practice methodology in this matter? A. No."); *see also* ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

Mr. Daichendt did not apply a formal methodology in this case. *See* Ex. C, at 44:19–23 ("Q. Okay. And that's an example. I guess, by contrast from those formal methodologies, you didn't apply a formal methodology in this case, did you? Mr. Boyd: Form. A. No.").

a.      Mr. Daichendt Does Not Explain How He
        Quantified ISQ's Value from the Information he Reviewed

It is impossible to discern how Mr. Daichendt valued ISQ at an estimated 5 to 8% of HoER:

████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████████████████████

Ex. B, 7–8. In fact, he testified that his 5 to 8% opinion is not the product of any methodology:

██      ████████████████████████████████████
        ████████████████████████████████████
        ████████████████████████████████



Ex. C, 161:10–162:5; *see also* 36:4–9 ("Q. Sure. But did you specifically apply the Feldman methodology in this matter? Mr. Boyd: Form. A. I did not write it down in four categories that the Feldman method [*sic*], but it's engrained in who I am and how I engage things as a philosophy.").

Rather, Mr. Daichendt testified that his opinion is based on "my experience, my education." Ex. C, 58:8; *see also id.*, 162:12–20



. This does not suffice to support the admissibility of Mr. Daichendt's opinions. *See O'Conner v. Commonwealth Edison Co.,* 13 F.3d 1090 (7th Cir. 1994) (expert testimony based on a completely subjective methodology held properly excluded); *see also*, *e.g.*, *Watkins v. Telsmith, Inc.,* 121 F.3d 984, 991 (5th Cir. 1997) ("[I]t seems exactly backwards that experts who purport to rely on general engineering principles and practical experience might escape screening by the district court simply by stating that their conclusions were not reached by any particular method or technique.").

      b.     Mr. Daichendt Does Not Explain How He Concluded that
           the Walls Around ISQ Cannot be Moved without Destroying ISQ

The only argument Mr. Daichendt makes to support his opinion that ISQ would be damaged or destroyed if it was removed from HoER is the opinion that the walls around ISQ and the pedestal underneath it cannot be moved. *See* Ex. C, 211:18–25 ("Q. How can you opine that it would be damaged if it were moved, then? A. I testified specifically about the walls. Q. Okay. So

your opinion is just with respect to the walls? A. Well, like – Q. Is that a yes? A. Yeah, for sure.").

He does not otherwise explain how the work would be damaged. *See* Ex. C, 208:9–11 ("Q. You

don't describe how the work would be damaged, though. Right? A. No, I do not.").

Mr. Daichendt goes on in his deposition to claim that "[w]alls would be a difficult thing to

move. . . . I liken them to murals in that it's very difficult to move a mural without damaging it. In

fact, I haven't seen it done. You tend to always get a portion of it moved, not the entire thing. So

I can easily make that assumption in looking at it." Ex. C, 208:12–20. This "explanation" did not

show that it could not be done, it simply assumed it. When pressed to explain in depth how the

base and the wall were constructed and whether they could be removed, he could not do so:

> Q.      You don't in fact know whether the wall could be removed from the House
>          and placed somewhere else with the Space Owl and its base, do you?
> Mr. Boyd:      Form.
> A.      I would question. I would say that I have a pretty good idea on how to
>          remove a wall or how and what goes into it.
> Q.      Okay. But you don't know how this specific wall is constructed. Right?
> Mr. Boyd:      Form.
> A.      I have not seen the inside of this wall.
> Q.      Okay. You don't know whether or not Meow Wolf has the ability to remove
>          the wall without destroying it given that you do not know how the wall is
>          constructed, do you?
> Mr. Boyd:      Form.
> A.      I don't know of any wall that can be removed without damaging it.

Ex. C, 213:25–214:17. Mr. Daichendt simply states that it is not possible to move or remove the

wall around the Space Owl without damaging it, because he knows of no wall that can be removed

without damaging it. This is not a reliable explanation for his opinion.

### C.      Mr. Daichendt's Testimony Is Unhelpful to Answering Any Disputed Question

Even if Mr. Daichendt's opinions were reliable or based on sufficient facts, they are still

inadmissible under Fed. R. Evid. 702 because they do not help resolve any disputed question in

this case. Expert testimony must be helpful to resolve an issue in the case before it may be admitted,

and trial courts have "the responsibility to make certain that proffered experts will assist the jury

19

in understanding the evidence and in determining the factual issues it must decide." *United States v. Gutierrez-Castro*, 805 F. Supp. 2d 1218, 1224 (D.N.M. 2011).

During his deposition, Mr. Daichendt admitted he provided none of the opinions the Court specifically suggested could be helpful in this case. *See* Ex. C, 132:8–13 ("[Q.] Did you . . . provide any of the opinions that Judge Khalsa asks for on those two pages? . . . I don't provide the list of things in these two paragraphs in my opinion piece, in my paper."). Instead, Mr. Daichendt provides three opinions that are not helpful to resolving any key question in this case.

First, plaintiff relies on Mr. Daichendt to invent a contract term plaintiff was not promised, namely, that ISQ represents 5 to 8% of HoER, so plaintiff should receive 5-8% of a revenue sharing pool. Mr. Daichendt's opinion on this does not resolve any question in this case because plaintiff has already conceded she was not promised any specific share of HoER revenue. Doc. 297, at 9 ("While no particular percentages or shares were mentioned . . . ."). Plaintiff nonetheless relies on Mr. Daichendt's opinion that ISQ was 5 to 8% of HoER to claim a specific share of HoER's revenue. *See supra*, pp. 3–4. Second, Mr. Daichendt's opinion on collectives cannot form a basis for how the Meow Wolf art collective operated and what Meow Wolf promised plaintiff—the relevant inquiry. In addition to being based on no facts or research, it is unrelated to how Meow Wolf operated at any point in time. Third, Mr. Daichendt's expert opinion on the differences between artists and craftspersons does not relate to any aspect of any of plaintiff's claims, nor has he provided any basis for it. *See* Doc. 372, Ex. I. These opinions therefore are not helpful to answering any disputed question under Fed. R. Civ. P. 702(a), and the Court should exclude them.

**D.      Mr. Daichendt's Opinions Have Little Probative Value, Would Confuse the Issues, and Would Mislead the Jury**

Fed. R. Evid. 403 also limits the admissibility of expert testimony where, as here, that testimony would confuse the issues or mislead the jury. Indeed, these limitations apply strongly to

proposed expert testimony. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, at 595 (1993) ("Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses.") (citation omitted). "[E]xpert testimony that is more likely 'to mislead [the trier of fact] than to enlighten should be excluded' under Rule 403." *Casey v. Geek Squad*, 341 F. Supp. 2d 334 (D. Md. 2011) (quoting *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 261 (4th Cir. 1999)).

Here, Mr. Daichendt's opinion about ISQ's value could mislead jurors to believe Ms. Oliver is entitled to anywhere between 5 and 8% of a revenue sharing pool even though she never claimed such a promise. Mr. Daichendt's testimony could also mislead jurors to believe that moving a work of art is commensurate with damaging the artist's reputation under VARA. These two opinions confuse key legal questions underlying Ms. Oliver's claims, and the Court should exclude them under Fed. R. Evid. 403.

## II
## MR. DAICHENDT DISCLOSED NEW OPINIONS OUTSIDE THE SCOPE ALLOWED BY THE COURT, AND HIS REPORTS DO NOT CONTAIN A COMPLETE STATEMENT OF HIS OPINIONS AND THEIR BASES

Fed. R. Civ. P. 26 "commands that the disclosure of testifying experts 'be accompanied by a written report—prepared and signed by the witness' which must contain 'a complete statement of all opinions a witness will express and the basis and reasons for them . . . .'" *Perea v. City of Albuquerque*, No. CIV 13-263 RB/RHS, 2014 U.S. Dist. LEXIS 194484, at *3 (D.N.M. Nov. 14, 2014) (quoting Fed. R. Civ. P. 26(a)(2)(B)); *accord*, *Ciomber v. Coop. Plus, Inc.* 527 F.3d 635, 641 (7th Cir. 2008). "A party must make these disclosures at the times and in the sequence that the court orders." Fed. R. Civ. P. 26(a)(2)(D). The deadline for plaintiff's expert disclosure was March 5, 2021. Doc. 53, at 2. Plaintiff obtained an extension for a limited supplement to that disclosure

"for the purpose of disclosing Frederick Kuhns as an expert, or any further expert regarding the pitch decks or claims added in the amended complaint or the proposed counterclaim . . . " by October 1, 2021. Doc. 204, at 3. That deadline was extended by agreement through April 14, 2022. Doc. 240.

Mr. Daichendt's disclosure violated both the scope and the time requirements, causing prejudice by forcing defendants to secure yet another rebuttal report from their own expert, Ms. Peck, and to conduct a lengthy deposition to deal with new materials disclosed the day before Mr. Daichendt's deposition. *See Olson v. Mont. Rail Link, Inc.*, 227 F.R.D. 550, 552 (D. Mont. 2005) (Fed. R. Civ. P. 37(c)(1) "gives teeth to the expert disclosure requirements 'by forbidding the use at trial of any information required to be disclosed by Rule 26(a) that is not properly disclosed'") (quoting *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001)).

### A.    Mr. Daichendt's Amended Report Violates the Court's Order on the Permissible Scope of Any Supplemental Expert Disclosure

Mr. Daichendt's amendments to his Report ignore the Court's express limitation on supplemental expert disclosure. In Doc. 204, at 3, the Court permitted plaintiff to disclose additional expert opinions "regarding the pitch decks or claims added in the amended complaint or the proposed counterclaim . . . ."). Mr. Daichendt opined neither on pitch decks nor on any claim added in plaintiff's Amended Complaint—yet disclosed a new "Preliminary Report" with several new opinions nearly a year after the March 5, 2021 deadline for plaintiff's expert opinions. Mr. Daichendt's new opinions on art collectives, artists vs. craftspersons, removal of ISQ from HoER, and harm to plaintiff's reputation from relocating ISQ all violate the Court's order on the allowable scope of new expert opinions. None of Mr. Daichendt's opinions in his new January 14, 2022 report are permitted by the Court's order as set forth above. Doc 204, at 3.

A party's failure to timely disclose the above, based on "the sequence that the court orders," Fed. R. Civ. P. 26(a)(2)(D)), means that the party has "yet to properly disclose" the expert's new opinions. *Townsend v. City of Fort Wayne*, No. 1:12-CV-371-JD, 2014 U.S. Dist. LEXIS 136764, at *9 (N.D. Ind. Sept. 26, 2014) (quoting Fed. R. Civ. P.  26(a)(2)(C)(ii)).

### B.      **Mr. Daichendt Disclosed Additional Opinions in the Middle of His Deposition**

In *Olson*, *supra*, material was withheld until two days before the expert was scheduled for deposition. 227 F.R.D. at 552. Here, at 3:09 p.m. on the afternoon before Mr. Daichendt's deposition, plaintiff provided counsel with new information she had just given to Mr. Daichendt. *See* March 9, 2022 Email Correspondence, attached as **Exhibit F**; *see also* Ex. C, 11:2–4 ("Q. And those exhibits that you just mentioned, when specifically did you review them before today? A. Yesterday."); 29:18–21 ("Q. Okay. Can you show me where in either report you identify those new exhibits? A. The new exhibits that I reviewed yesterday are not part of these reports."); 30:23 ("Okay. Yeah. It's 176 pages."). This disclosure prevented counsel from fully and adequately preparing to depose Mr. Daichendt because counsel had to review almost 200 pages of material just provided to Mr. Daichendt, and to consider how those materials might affect Mr. Daichendt's opinions. *See id*. (disclosure two days before an expert deposition prejudiced the opposing party by "preventing counsel from fully preparing to depose" the expert).

Mr. Daichendt disclosed 3 new opinions in his deposition based on these materials. First, Mr. Daichendt opined that the walls around ISQ are part of Ms. Oliver's artwork. *See* Ex. C, 31:23–32:3 ("Q. Do you consider the walls to be part of Ms. Oliver's exhibit? A. Yes. Q. That opinion was not in your second report, was it? A. No."). Second, Mr. Daichendt opined at his deposition that the pedestal underneath ISQ was also part of the work of art. *See* Ex. C, 32:4–10 ("Q. Did these exhibits lead you to think of the base of Ice Station Quellette as part of the exhibit? A. Yes,

23

I assumed it was all part of the exhibit. Q. Did you state in your second report that the base was part of Ms. Oliver's exhibit? A. No."). Third, plaintiff's counsel also elicited an additional opinion about Mr. Cluett based on an excerpt from the transcript of Mr. Cluett's deposition that plaintiff provided to Mr. Daichendt on March 9, 2022. *See* Ex. C, 269:22–270:11 (downplaying Mr. Cluett's role as merely that of an assistant).

Although defendants believe Mr. Daichendt may try to add new facts, reasons, or conclusions while on the stand, plaintiff's disclosure has already prejudiced defendants, who "did not receive all of the required and necessary information until after the deadline for rebuttal expert reports, denying [them] the opportunity to effectively rebut [Mr. Daichendt's] conclusions." *Olson*, 227 F.R.D. at 552. Here, as in *Olson*, there is "no substantial justification for [the party's] failure to disclose, . . . [and] sanctions are automatic under Rule 37(c)(1)." *Id.* at 553 (prohibiting expert from relying on data or conclusions not included in his report, and striking any opinion held by the expert that was not disclosed in compliance with Rule 26(a)).

### C.   Both of Mr. Daichendt's Reports Are Inadequate

"[A]n expert report must not be sketchy, vague or preliminary; it must be detailed and complete, including how and why the expert reached a particular result, not merely the expert's conclusory opinions." *Atlas Res. v. Liberty Mut. Ins. Co.*, CIV 09-1113 WJ/KBM, 2012 U.S. Dist. LEXIS 203636, at *5 (D.N.M. Nov. 13, 2012) (citations and internal quotation marks omitted). As the Seventh Circuit Court of Appeals explained in *Ciomber*,

> The purpose of Rule 26(a)(2) is to provide notice to opposing counsel—before taking the deposition—as to what the expert witness will testify and this purpose would be completely undermined if parties were allowed to cure deficient reports with later deposition testimony. Allowing parties to cure a deficient report with later depositions would further undermine a primary goal of Rule 26(a)(2): to shorten or decrease the need for expert depositions.

527 F.3d at 642 (citations omitted). Mr. Daichendt's reports do not express the reasons or basis for all of his opinions, and therefore do not satisfy Fed. R. Civ. P. 26(a)(2).

To satisfy the Rule, "the report must provide the substantive rationale in detail with respect to the basis and reasons for the proffered opinions. It must explain factually why and how the witness has reached them." *Hilt v. SFC, Inc.*, 170 F.R.D. 182, 185 (D. Kan. 1997); *see also Brainard v. Am. Skandia Life Assur. Corp.*, 432 F.3d 655, 657 (6th Cir. 2005) ("[A]n expert opinion must 'set forth facts' and, in doing so, outline a line of reasoning arising from a logical foundation."). A report must "'set forth the substance of the direct examination.'" *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 953 (10th Cir. 2002) (quoting Fed. R. Civ. P. 26(a)(2) advisory committee note (1993)). An expert report that fails to identify "specific facts or data considered . . . is useless in preparing for cross-examination." *Siburt*, 2011 U.S. Dist. LEXIS 94531, at *8 (citations and quotation marks omitted). Mr. Daichendt's reports suffer from four defects.

First, regarding those conclusions that Mr. Daichendt included in his March 5, 2021 Report, he provided minimal to no explanation of the bases and reasons that supported them. His amended report merely added new opinions that were similarly unsupported. During his deposition, he admitted that his amended report does not contain the bases for his opinions. *See* Ex. C, 27:14–18 ("No, it would not contain the bases."). Nor does his amended report "contain a complete statement of the reasons for your opinions . . . ." Ex. C, 27:19–24 ("Not – I don't believe it could contain all the reasons."). He fails to explain how he reached his opinions, why he reached them, or to provide a line of reasoning arising from an articulated foundation.

Second, neither report includes a statement of the compensation Mr. Daichendt will receive for his study and testimony. *See* Ex. C, 28:17–20 ("Q. Does your report include a statement of the compensation that you will receive for your study and testimony in this case? A. No."); *but see*

Fed. R. Civ. P. 26(a)(2)(B)(vi) (requiring "a statement of the compensation to be paid for the study and testimony in the case").

Third, Mr. Daichendt's amended report and his deposition testimony included opinions that were not in his March 5, 2021 Report. *See Atkins v. County of Orange*, 372 F. Supp. 2d 377, 395 (S.D.N.Y. 2005) ("A report is deficient if it fails to include any of the underlying conclusions on which the expert's ultimate opinions are based."). Mr. Daichendt's reports therefore are deficient under Rule 26(a).

> **D.    The Court Should Exclude Mr. Daichendt's Improperly Disclosed Opinions, and Order Plaintiff to Pay Defendants' Attorney's Fees and Costs**

It is "a well-accepted notion that expert witnesses cannot testify about facts or data, but fail to disclose the same." *Ravo v. Covidien LP*, 55 F. Supp. 3d 766, 776 (W.D. Pa. Oct. 24, 2014) (citing *Siemens Med. Solutions USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.*, 637 F.3d 1269, 1286 (Fed. Cir. 2011)). "Under Rule 37(c)(1), 'exclusion of non-disclosed evidence is automatic and mandatory . . . unless non-disclosure was justified or harmless.'" *Tribble v. Evangelides*, 670 F.3d 753, 760 (7th Cir. 2012) (citation omitted);[4] *accord Perea*, 2014 U.S. Dist. LEXIS 194484, at \*3. "In addition to or instead of this sanction, the court, on motion and after giving an opportunity to be heard . . . may order payment of the reasonable expenses, including attorneys fees, caused by the failure." Fed. R. Civ. P. 37(c)(1)(A).

Mr. Daichendt's reports are conclusory and lack a sufficient basis. *See*, *e.g.*, *Ohime v. Foresman*, 186 F.R.D. 507, 508–09 (N.D. Ind. 1999) (expert testimony excluded due to insufficient basis for expert's conclusory opinions). A "report must be complete such that opposing counsel is not forced to depose an expert in order to avoid an ambush at trial; and moreover the

---

[4] *See also Lohnes v. Level 3 Communs., Inc.*, 272 F.3d 49, 60 (1st Cir. 2001) ("[T]he required sanction in the ordinary case is mandatory preclusion.") (citation and internal marks omitted).

report must be sufficiently complete so as to shorten or decrease the need for expert depositions and thus to conserve resources." *Salgado v. Gen. Motors Corp.*, 150 F.3d 735, 742 n.6 (7th Cir. 1998) (citation omitted).

Meow Wolf had to depose Mr. Daichendt to learn the bases and reasons for his opinions, and even then got new opinions. This is prejudice enough to sanction Plaintiff. *See*, *e.g.*, *Acadia Ins. Co. v. Cunningham*, 771 F. Supp. 2d 172, 177 (D. Mass. 2011) (granting attorneys' fees associated with reviewing the expert's report and deposing the expert). Plaintiff is not permitted to rely on the deposition to cure the inadequacies in Mr. Daichendt's reports. Rule 26(a)(2) does not allow parties "to cure deficient expert reports by supplementing with later deposition testimony." *Ciomber*, 527 F.3d at 642. Here plaintiff used defendants' deposition of Mr. Daichendt to insert new opinions that the walls around ISQ and the pedestal underneath it are part of the art and cannot be moved without damaging ISQ, and that Mr. Cluett played only a minimal role in ISQ's construction. These opinions should be stricken.

## CONCLUSION

For the foregoing reasons, defendants ask the Court to exclude Mr. Daichendt from testifying under Fed. R. Evid. 403 and 702, and to sanction plaintiff under Fed. R. Civ. P. 37 for violating Fed. R. Civ. P. 26(a)(2).

Dated: April 28, 2022.

Respectfully submitted,

BARDACKE ALLISON LLP

By: */s/ Cole Wilson*
    Benjamin Allison
    Maureen Dolan
    Rose Bryan
    Cole Wilson
    Michael Woods
    P.O. Box 1808

141 E. Palace Avenue
Santa Fe, NM  87504-1808
505-995-8000
ben@bardackeallison.com
maureen@bardackeallison.com
rose@bardackeallison.com
cole@bardackeallison.com
michael@bardackeallison.com

*Counsel for Defendants Meow Wolf, Inc.
and Vince Kadlubek*

**CERTIFICATE OF SERVICE**

I certify that I caused a true and correct copy of the foregoing to be filed through the Court's CM/ECF system which caused all parties and counsel entitled to receive notice to be served electronically as more fully described on the Notice of Electronic Filing.

BARDACKE ALLISON LLP

By:     */s/ Cole Wilson*
        Cole Wilson