**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

LAUREN ADELE OLIVER,
an individual,

      Plaintiff,

v.                                Case No. 1:20-CV-00237-KK-SCY

MEOW WOLF, INC., a Delaware
corporation; VINCE KADLUBEK,
an individual and officer; and
DOES 1-50,

      Defendants.

**DEFENDANTS MOTION FOR PARTIAL SUMMARY JUDGMENT LIMITING
REMEDIES AVAILABLE FOR PLAINTIFF'S COPYRIGHT INFRINGEMENT CLAIM**

      Defendants Meow Wolf, Inc. and Vince Kadlubek (Meow Wolf) move the Court pursuant to Fed. R. Civ. P. 56 for summary judgment to limit the remedies available to Plaintiff Lauren Oliver under her claim of copyright infringement. Plaintiff opposes this motion.

**INTRODUCTION**

      Plaintiff Lauren Oliver has made numerous allegations of copyright infringement against Meow Wolf—from the House of Eternal Return (HoER) coloring book, which included one page depicting her Space Owl, to displaying ISQ to the HoER exhibition catalog, which obviously included a photograph of ISQ. All of these alleged infringements have one thing in common— they all began before plaintiff registered her copyright in 2018. As a result, none of the alleged infringements are eligible for statutory damages and attorneys' fees. This motion first seeks summary judgment eliminating the remedies of statutory damages and attorneys' fees, which are only available under 17 U.S.C. § 412 if registration occurred before the alleged infringement began.

Second, there is a complete absence of evidence of actual damages flowing from any of the claimed infringements. Actual damages are defined as the extent to which the market value of a copyrighted work has been injured or destroyed by infringement, and involve determination of a work's market value at the time of the infringement and the diminution in that market value after infringement. Direct evidence of actual damages can include lost sales as a result of infringement, such as when a publisher will not publish a book because an infringer has already put the book on the market. Ms. Oliver had exhibited Space Owl and offered it for sale before HoER, but it did not sell and she dismantled it and recycled the parts. There is no evidence plaintiff lost any sale as a result of alleged infringement, and plaintiff's expert on this issue has no opinion on actual damages. Oliver has offered no evidence of loss of market value to ISQ due to the alleged infringing uses by Meow Wolf. As a result, Ms. Oliver's claim of actual damages fails due to lack of evidence, and summary judgment should be granted eliminating actual damages from alleged copyright infringement.

The final remedy a copyright infringement plaintiff may seek—and the sole remedy plaintiff seeks—is profits of the defendant that are attributable to infringement. But courts have uniformly held that a plaintiff may only recover profits of the infringer that are reasonably related to the infringement, not unrelated profits. A plaintiff must show non-speculative evidence establishing a causal nexus between profits and the alleged infringement. Plaintiff's expert has opined that every cent of revenue at HoER from its opening day in March 2016 goes to Ms. Oliver—every admission ticket, every Meow Wolf hoodie sold in the gift shop, every concert ticket even though many of the shows are in the evening when the exhibit is closed, and every sandwich sold in the cafe. All the revenue from HoER from opening day is ████████████, and plaintiff has not remotely shown a causal nexus between ISQ and all the merchandise, event,

food and beverage, and admission sales. Meow Wolf's expert has identified the profits reasonably related to the alleged infringement, and no other expert has controverted that analysis. Although Meow Wolf strongly believes that display of ISQ was not infringing, as set out in its summary judgment motion on that issue (Doc. 278), summary judgment should independently be granted limiting recovery of profits to ███████, as set out in Mr. Torres' expert report.

Plaintiff has identified thirteen claimed infringements, although she claims damages from only four. All thirteen are listed here because plaintiff does claim statutory damages, and in order to show that statutory damages are barred by the statute, Meow Wolf shows that *all* of the claimed infringements began before copyright registration. The claimed infringements are:

1. "[C]harging visitors an admission fee to view Plaintiff's artwork at HoER represents a copyright violation." *See* **Exhibit 1**, at 28.

2. "Any Space Owl-titled drinks sold in the coffee/bar."[1] *See* **Exhibit 1**, at 28

3. "Virtual reality piece for SXSW [South by Southwest], which did not include a credit or copyright information.". *See* **Exhibit 1**, at 28

4. "The image of the Space Owl in a Red Bull-branded embedded video frame on the Meow Wolf website launching a Red Bull-produced video for their 'Screenland' series, also available on their TV channel." *See* **Exhibit 1**, at 29.

5. "The Exhibit Catalog, sold in the Gift Shop and online." *See* **Exhibit 1**, at 29

6. "The Meow Wolf Coloring Book, sold in the Gift Shop and online." *See* **Exhibit 1**, at 29.

7. "The use of the Space Owl on the soundtrack CD cover/YouTube." *See* **Exhibit 1**, at 29.

8. "The deal with the Rooster Teeth marketing company in Texas to allow them to use the Space Owl character for online content, which progressed far enough for them to have developed a character voice." *See* **Exhibit 1**, at 29.

---

[1] Oliver does not allege that Meow Wolf used any pictures of the Space Owl or ISQ on the menu or anywhere else in conjunction with selling themed drinks. Copyright cannot protect names such as Space Owl, and at no point does Oliver explain how this "use" infringed any right under the Copyright Act.

9.   "The unauthorized footage of the Space Owl in the trailer for the film, 'Meow Wolf: Origin Story,' in all showings online, streamed, and in theatres." *See* **Exhibit 1**, at 29.

10.  "The unauthorized footage of the Space [Owl] in the film, 'Meow Wolf: Origin Story,' in all showings online, streamed, and in theatres." *See* **Exhibit 1**, at 29.

11.  "Use of Plaintiff's work by Meow Wolf on the internet and social media, sponsored posts or otherwise, tweets and retweets, which are too numerous to catalogue here. Examples include Defendants' use of the Space Owl in their Instagram 'Todos 7' campaign, and multiple other Instagram posts (sponsored and otherwise) by Meow Wolf." *See* **Exhibit 1**, at 29.

12.  "Any image of, or showing of, Plaintiff's work shown to investors, press, as part of business development, or to other third-parties for the benefit of Defendants, including in-person visits." *See* **Exhibit 1**, at 29 .

13.  "Use of Space Owl to represent Meow Wolf itself." **Exhibit 1**, at 29.[2]

Plaintiff's Answer to Interrog. No. 8, Nov. 20, 2020, attached as **Exihibit 1.**

Plaintiff only claims monetary damages from the following:

1.  Disgorgement of HoER's gross revenue based on "[s]howing Plaintiff's work without license March 16, 2016 to present. **Ex. 2**, at 2.

2.  Gross revenues generated by Coloring Book sales based on "[u]nauthorized use of a reproduction of Plaintiff's work in Coloring Book. **Ex. 2**, at 2-3.

3.  Gross revenues generated by Exhibition Catalog sales based on [u]nauthorized use of a reproduction of Plaintiff's work in HoER Exhibition Catalog. **Ex. 2**, at 3.

4.  Reasonable royalty or licensing fee for the [u]nauthorized use of reproductions of Plaintiff's work without a license in pitch decks and materials provided to third parties for solicitation of investment and/or to promote Meow Wolf. **Ex. 2**, at 3.

5.  Statutory damages and attorneys' fees in an amount to be proved at trial.

See Pl's Answer to Interrog. No. 14, Dec. 21, 2021, attached as **Exihibit 2**.

Ms. Oliver has evidence of a causal link to profits only for her claims of displaying ISQ at

HoER, the coloring book, and HoER exhibition catalog. No causal connection to profits can be

---

[2] Oliver does not explain what she means in this regard, nor does she provide any instances of infringing use that fit within this answer to Meow Wolf's interrogatory.

established for the remaining alleged infringements. Ms. Oliver's claimed entitlement to the entirety of HoER's six years of revenue, despite ISQ being a tiny fraction of the whole, should be dismissed.

## UNDISPUTED MATERIAL FACTS

1.      Ms. Oliver's earliest copyright registration for ISQ is dated June 24, 2018. *See* TXu Certificate of Registration attached as **Exhibit 3**.

2.      ISQ was first published March 16, 2016. *See* Application dated September 19, 2019 attached as **Exhibit 4**.

3.      Ms. Oliver did not register her copyright for more than two years after her own alleged date of publication.

4.      All of the following uses commenced before June 24, 2018:

a.      Public display of ISQ began March 16, 2016, when HoER opened to the public. *See* **Exhibit 1**, at 11 ("Plaintiff designed her HoER installation during summer and fall 2015 and worked on-site from January 2 to the March 16 opening in 2016.").

b.      Café and bar drinks with the name "Space Owl Jelly" began at least as early as January 5, 2017. *See* January 5, 2017, Café Menu, attached as **Exhibit 5**.

c.      The virtual reality piece for SXSW launched March 13, 2018. *See* Draft Press Release, attached as **Exhibit 6** ("Tuesday March 13 – Thursday March 15, [2018] … Meow Wolf's first VR Experience, *The Atrium*, premieres at SXSW as an official selection of SXSW Virtual Cinema Program.").

d.      The complained-of episode of the Red Bull documentary series "Screenland" launched April 24, 2017. *See* Image dated April 19, 2017 attached as **Exhibit 7** ("Meow

Wolf being featured in a new Red Bull documentary series called Screenland that debuts April 24th.").

e.   Meow Wolf began selling the Exhibition Catalog in stores and online in May 2018. *See* "HOER Exhibit Catalog" Sales Chart attached as **Exhibit 8**.

f.   Meow Wolf began selling the Coloring Book in November 2017. *See* "HOER Coloring Book" Sales Chart attached as **Exhibit 8**.

g.   Meow Wolf began using the CD Cover in 2017. *See* August 22, 2017, email thread between Lauren Oliver and Geet Jacobs, attached as **Exhibit 9** (Lauren Oliver: "So we're just talking about the cover of the YouTube video, right?" Geet Jacobs: "I think it's the actual cover of the CD they want to sell.");

h.   The Rooster Teeth team never filmed ISQ or Space Owl so the series aired without including Space Owl. *See* May 2, 2018 Email from Isabel Zermani to Lauren Oliver, Subject Line: Space Owl in web series request, attached as **Exhibit 10**.

i.   "Meow Wolf: Origin Story" and the associated trailer, which includes two brief glimpses of Space Owl, premiered March 10, 2018. *See* **Exhibit 6** ("Meow Wolf: Origin Story Documentary World Premiere").

j.   Social Media posts advertising HoER that included ISQ began before registration. *See* Instagram April 6, 2016 post, attached as **Exhibit 11.**

k.   Meow Wolf included Space Owl in pitch materials in the third quarter of 2017, possibly earlier. *See* Q3 2017 Pitch Deck, page 2 attached as **Exhibit 12**.

5.   Oliver admitted under oath that she has never received past payments to license her artwork, and no one has ever paid her to buy or license a copyright. Lauren Oliver Deposition, attached as **Exhibit 13**, 323:5-19.

6.      An artist rendering of Space Owl appears on one page of a 27-page coloring book sold by Meow Wolf. See Coloring Book attached as **Exhibit 14** at MW_037744**.**

7.      A photograph of Space Owl appears on one page of the 65-page exhibition catalog sold by Meow Wolf. *See* Exhibit Catalog attached as **Exhibit 15** at MW_37773**.**

## STANDARD ON SUMMARY JUDGMENT

Summary judgment is proper when there are no genuine issues of any material fact, and as a result the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is "material" if it may reasonably affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is not "genuine" unless there is evidence sufficient to cause a reasonable jury to find in the nonmovant's favor. *Id.* at 252. Although the district court does not weigh the evidence, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Id*. at 247-48 (emphasis in original). The court must, at any rate, be mindful of the ultimate standard of proof that the plaintiff faces. *Id*. at 252.

On the one hand, "[i]f the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Id.* at 249. Likewise, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Id.* And on the other hand, if the plaintiff produces no evidence for a point, there is no material question of fact about it. *Master Mortg. Inv. Fund, Inc. v. Chicago Title Ins. Co.*, 34 F.3d 1076 (10th Cir. 1993) ("Given this void, we agree with the district court that there is no material fact question regarding the existence of an agreement …."). Indeed, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record[] so that no reasonable jury could believe it, a court should not

adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## ARGUMENT

### I
### SECTION 412 OF THE ACT BARS
### OLIVER FROM RECOVERING THE EXTRAORDINARY
### <u>REMEDIES OF STATUTORY DAMAGES AND ATTORNEY'S FEES</u>

The Copyright Act provides enhanced remedies of statutory damages and attorneys fees if, and only if, a work was registered before the infringement began or within three months of first publication. Statutory damages allow the Court to award up to $30,000 per work infringed as well as costs and attorney fees. 17 U.S.C. §§ 504(a) & 505. However, as a matter of statutory mandate, these remedies are only available if a copyright owner registered her copyright either 1) prior to the infringement or 2) after the infringement but within a three-month grace period after the first publication of the work:

> [N]o award of statutory damages or of attorney's fees, as provided by sections 504 and 505, shall be made for—(1) any infringement of copyright in an unpublished work commenced before the effective date of its registration; or (2) any infringement of copyright commenced after first publication of the work and before the effective date of its registration, unless such registration is made within three months after the first publication of the work.

17 U.S.C. § 412.  The limitation found in § 412 is designed to provide an incentive for copyright owners to register early and for potential infringers to check the federal register. *Johnson v. Jones*, 149 F. 3d 494, 505 (6th Cir. 1998).

According to her Amended Complaint, Oliver published ISQ and Space Owl at a Phil Space show in June 2015, and obviously they were published in March 2016 when HoER opened. *See* Doc. 148, Para. 17. Oliver did not register a copyright in ISQ until June 24, 2018. See **Ex. 3**. Even assuming the later publication date, Ms. Oliver did not register her copyright within three months after publication.

When an infringing act begins prior to registration and continues after registration, courts including the District of New Mexico have consistently held that such infringement began before registration, based on the express language "commenced" in § 412. *Wilson v. Brennan*, 666 F. Supp. 2d 1241, 1264 (D.N.M. 2009) (holding "every court that has considered the issue has reached the same conclusion: that 'infringement commences for the purposes of § 412 when the first act in a series of acts constituting continuing infringement occurs") (*quoting Johnson v. Jones*, 149 F. 3d 494, 506 (6th Cir. 1998)). In fact, the leading treatise on copyright references this Court in the section entitled "Defining 'Commencement.'" *See* 2 *Nimmer* § 7.16[C][1][a][i] ("To illustrate the methodology of determining commencement, consider a case arising out of the bible for annual bicycle races held in the New Mexico desert.") (discussing *Wilson*, 666 F. Supp. 2d at 1264).

In attempting to collect statutory damages, Wilson argued that acts of infringement after his registration were distinct acts for purposes of § 412. The Court explained that organizers had distributed his text without license in conjunction with a race prior to his copyright registration, marking the "commencement" of the use of the infringing materials in the annual race. *Id*. As this Court explained, "Because the Defendants' infringement commenced after first publication of Wilson's works and before the effective date of registration, Wilson may not recover statutory damages unless the registration occurred within three months of first publication." *Id*. (citation omitted). But, like our case, "Wilson did not register his works until nearly three years after first publication." *Id*. "Thus, Wilson may not recover statutory damages." *Id*.

Oliver cannot recover statutory damages, costs or attorneys' fees under the Copyright Act because every act of infringement she alleges commenced before she registered her copyright.

### A. The Plain Language of § 412 Bars Oliver From Recovering Statutory Damages Because Each Alleged Infringement Commenced Prior To Registration

As outlined above, Oliver identified twelve distinct uses that she believes infringed her copyright in ISQ. Meow Wolf maintains that none of these uses infringed Oliver's copyright in ISQ, but even if they were infringing, eleven commenced before plaintiff's June 24, 2018 registration, precluding recovery of statutory damages and attorneys' fees. The remaining one, the Rooster Teeth series, did not include ISQ because Ms. Oliver asked that ISQ be excluded. The commencement dates for each use are as follows:

(a) Displaying ISQ and Space Owl in the HoER began March 2016;

(b) Selling Space Owl-themed drinks in the café and bar at HoER began at least as early as January 5, 2017;

(c) marketing the HoER through a virtual reality piece for SXSW launched in March 2018;

(d) marketing HoER through an episode of a Red Bull documentary series which launched in 2017;

(e) selling and distributing the Exhibit Catalog began in May 2018;

(f) selling and distributing the Coloring Book began in November 2017;

(g) using Space Owl on a CD cover for a Meow Wolf Soundtrack began 2017;

(i) marketing the HoER through the Documentary began March 2018;

(j) marketing the HoER through social media posts began at least as early as April 2016;

(k) investor pitch materials and slide decks that included an image of Space Owl began at least as early as the third quarter of 2017;

(l) using the Space Owl to represent Meow Wolf began in March 2016.

Because each of Meow Wolf's allegedly infringing uses commenced before Oliver registered her copyright on June 24, 2018, § 412 bars statutory damages, costs and attorney fees under §§ 504(a)(2) and 505. Summary judgment is appropriate because these facts are uncontroverted.

**II**
**OLIVER HAS NO EVIDENCE OF LOSS**
**OF MARKET VALUE DUE TO ALLEGED**
**INFRINGEMENTS AS REQUIRED FOR ACTUAL DAMAGES**

Oliver cannot be awarded actual damages pursuant to § 504(b) because she has presented no evidence to show that any of Meow Wolf's allegedly infringing uses or ISQ or Space Owl diminished the market value of the work.

When a Plaintiff has failed to register their copyright prior to infringement, Section 504(b) of the Act provides two remaining means to obtain monetary remedies: actual damages and profits of the infringer:

> The copyright owner is entitled to recover the actual damages suffered by him or her as a result of the infringement, and any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages. In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work.

17 U.S.C. § 504(b). The Ninth Circuit has defined actual damages as "the extent to which the market value of a copyrighted work has been injured or destroyed by an infringement." *Frank Music Corp. v. MGM, Inc.,* 772 F.2d at 512 (quoting Nimmer on Copyright § 14.02, at 14–6 (1985)). In *Mackie v. Rieser*, 296 F.3d 909, 917 (9th Cir. 2002), the Court of Appeals affirmed the methodology in *Frank Music Corp.* to determine a work's market value at the time of the infringement as "what a willing buyer would have been reasonably required to pay to a willing seller for [the owner's] work." *Id.* (quoting *Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.,* 562 F.2d 1157, 1174 (9th Cir. 1977)). A direct way to establish damage to the market value of a copyrighted work is lost sales or profits such as evidence that the infringement caused the Plaintiff to lose another interested buyer, as seen in *Cream Records, Inc. v. Jos. Schlitz Brewing Co.*, 754 F .2d 826, 827–28 (9th Cir. 1985). There, the plaintiff provided evidence that an

advertiser had approached them to license a song but withdrew their interest when another commercial used the song first, without Cream's permission. *Id*. at 827. ("There was testimony that use of a well-known popular song in a commercial destroys its value to other advertisers for that purpose.").

*Frank Music Corp.* is a particularly telling example of a case where a plaintiff offered a precise measurement of damages that the court rejected as too speculative to support damages under § 504(b). *Frank Music Corp.* at 513. There, the plaintiff introduced detailed testimony both that a full production of their play could have been licensed in Las Vegas for $7,500 per week and that the infringing use of a single song from the play by the defendants had destroyed the entire Las Vegas market for the play. The Ninth Circuit Court of Appeals affirmed the trial court's rejection of this evidence as too uncertain and speculative to support a measure of actual damages because the infringement was just six minutes of music from the play and didn't tell any of the story, so it was not implausible for the fact finder to conclude that the infringement "would not significantly impair the prospects for presenting a full production of that play." *Id.*

Ms. Oliver has offered no evidence, speculative or otherwise, to support a claim for actual damages under the Act. Plaintiff's original expert disclosure deadline was March 5, 2021. After defense counsel pointed out that copyright damages were unavailable because plaintiff had disclosed no copyright damages expert by the expert disclosure deadline, plaintiff asked the Court for permission to engage an expert to "determine the value to Defendants that the unauthorized use of Oliver's work represents to their brand and venture as a whole, as well as a reasonable royalty and/or value associated with the use itself." Doc. 126, at 2. The Court granted the motion in part, permitting plaintiff to disclose an expert specifically "regarding the pitch decks or claims added in the amended complaint or the proposed counterclaim . . . ." Doc. 204, at 3. Plaintiff has

provided some expert opinion testimony from Russel W. Mangum III, Ph.D opining on gross revenues attributable to Meow Wolf's alleged infringements. But his report offers no opinions on pitch decks and no opinions on any actual damages. See Expert Report of Russell W. Mangum III, Ph.D attached as **Exhibit 16.** In his deposition, Mr. Mangum confirmed that he had no opinions on a reasonable license fee or royalty, sales by Oliver prior to HoER, or appraisal value of ISQ or Space Owl. Russell Mangum Dep., March 23, 2022, 38:13–41:5 attached as **Exhibit 17**. Ms. Oliver testified that no one had previously offered to buy a copyright in any of her artworks (**Ex. 13**, 323:5–10) and that she had never received money for licensing her art. **Ex. 13**, 323:11–19.

Further, establishing actual damages requires an objective analysis, and evidence of a copyright owner's displeasure or personal objections about the way their work was portrayed or used cannot establish actual damages. *Mackie* at 917 (holding that 'hurt feelings' over the nature of the infringement has no place in this calculus.). Summary judgment precluding actual damages under § 504(b) of the Act is appropriate here because Oliver has offered no evidence to show that Meow Wolf's allegedly infringing uses of ISQ diminished the market value of her work.

### III
### OLIVER MAY BE AWARDED PROFITS ONLY WHERE SHE HAS PROVIDED EVIDENCE TO ESTABLISH A RATIONAL CONNECTION BETWEEN AN INFRINGING ACT AND A SOURCE OF REVENUE

Section 504(b) also provides a copyright owner the opportunity to claim "any profits of the infringer that are attributable to the infringement and are not taken into account in computing the actual damages. In establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work." 17 U.S.C. § 504(b).

However, courts do not construe the statutory language referencing gross revenue literally to mean to a copyright owner need merely point to revenue of the infringer in order to recover profits. Instead, the phrase "gross revenue" refers to revenue reasonably related to the infringement. *Wood v. Houghton Mifflin Harcourt Publ'g Co.*, 589 F. Supp. 2d 1230, 1245 (D. Colo. 2008) ("Rather, 'gross revenue' refers only to revenue reasonably related to the infringement. The copyright owner thus has the burden of demonstrating some causal link between the infringement and the particular profit stream before the burden-shifting provisions of § 504(b) apply") (quoting *Bonner v. Dawson*, 404 F.3d 290, 294 (4th Cir. 2005)). The Plaintiff's burden of demonstrating some causal nexus between the infringement and a particular profit stream is recognized consistently across circuits. *Davis v. The Gap, Inc.*, at 160 ("Nonetheless we think the term 'gross revenue' under the statute means gross revenue reasonably related to the infringement, not unrelated revenues."); *Dash v Mayweather*, 731 F. 3d 303, 331 (4th Cir 2013) ("In summation, whether at the summary judgment stage or at trial, a plaintiff seeking profit damages has an affirmative duty to prove the defendant's gross revenue reasonably related to the infringement."); *Andreas v. Volkswagon of Am., Inc.,* 336 F. 3d 789, 796 (8th Cir. 2003) ("The nexus requirement exists in both direct and indirect profits cases.") (citing to *Taylor v. Meirick*, 712 F. 2d 1112, 1122 (7th Cir. 1983)); *Polar Bear Prods. v. Timex Corp.*, 384 F.3d 700, 708 (9th Cir. 2004) ("From the statutory language, it is apparent that a causal link between the infringement and the monetary remedy sought is a predicate to recovery of both actual damages and profits."); *Univ. of Colo. Found. v. Am. Cyanamid Co.*, 196 F. 3d 1366, 1375 (Fed. Cir. 1999) (finding the copyright owner failed to meet the burden to show a connection between copyright infringement in a patent application and the gross profits for the product created and sold based on that patent). The copyright owner not only has to show some rational connection between the particular source of

revenue and the act of infringement but must also offer something more than speculative evidence to support that connection. *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F. 3d 514, 522–23 (4th Cir. 2003) ("In sum, we conclude that the Defendants could be awarded summary judgment with respect to any given revenue stream if either (1) there exists no conceivable connection between the infringement and those revenues; or (2) despite the existence of a conceivable connection, Bouchat offered only speculation as to the existence of a causal link between the infringement and the revenues.").

Only after the plaintiff has met both these aspects of her burden to establish a causal connection between an infringing act and a particular revenue stream, does the burden shift to the defendants to prove apportionment—what portion of the profits are attributable to factors other than the copyright owner's work. *Bonner v. Dawson*, 404 F.3d 290, 294-295 (4th Cir. 2005). If infringing and non-infringing components are commingled, the defendant must also prove offsetting costs and reasonable methods for apportioning the relative worth. Andreas, 336 F.3d at 796–97. It is important not to confuse the plaintiff's burden to establish a causal nexus to a particular revenue stream with their rebuttal to the defendant's burden of apportionment within a revenue stream because each requires a slightly different evidentiary offer at summary judgement. *Dash*, 731 F. 3d at 331 ("In order to demonstrate a causal link, the plaintiff must show that the infringement could reasonably be viewed as one of the causes of the claimed revenues. In order to rebut a defendant's evidence that the claimed revenues are not attributable to the infringement, the plaintiff must show that at least some portion of the revenues was actually generated by the infringement, rather than by other factors.").

In *Dash v. Mayweather*, the Fourth Circuit translated the copyright owner's two-part burden to establish causation along with the alleged infringer's burden of apportionment described

above into three distinct ways a defendant may successfully challenge the relationship between claimed revenues and an alleged infringement at the summary judgment stage:

> "First, the defendant can argue that the plaintiff cannot state a conceivable connection between the infringement and the claimed revenues. The plaintiff must respond to this challenge by arguing that some such connection exists. A defendant will be granted summary judgment on this basis only if it is not even "hypothetically possible" that the infringement could have affected the revenues, such as when the revenues were determined prior to the infringement. The second method by which a defendant can challenge the connection between the infringement and the claimed revenues on summary judgment is to argue that, although there may be a conceivable connection, the plaintiff has not presented sufficient evidence of a causal link between the infringement and the claimed revenues. If a defendant makes this argument, the plaintiff must respond by providing some non-speculative evidence that would . . . suggest a link between the infringement and the supposedly enhanced revenues… As a third option, a defendant can seek summary judgment on the basis that all of the claimed revenues are attributable to factors other than the infringement. Although the defendant bears the statutory burden of proof on this issue, it can still raise a proper motion for summary judgment if it submits evidence that no reasonable jury could find that any portion of the claimed revenues is attributable to the infringement."

*Id.* Ms. Oliver's alleged infringements, listed in the statement of undisputed material facts above, will be addressed under this three-part framework.

### A.  Oliver can Offer no Conceivable Connection to Support Profits where the Alleged Infringing Activity Resulted in no Profits

Outside of the Coloring Book and Exhibition Catalog, Oliver has only offered evidence of all of Meow Wolf's gross profits without even attempting to explain how some of the infringing activities she alleges are rationally related to the variety of revenue streams she includes in her figures for monetary damages. In her answers to Interrogatory No. 14, Oliver limits her claims to Meow Wolf profits to the display of her work in HoER, the Coloring Book, and the Exhibition Catalog. *See* **Ex. 2.** Logically, Oliver also cannot provide a conceivable connection to any revenue stream when the alleged infringing activity resulted in no profits. Specifically, the following

alleged infringements from Oliver's answers to Meow Wolf's Interrogatory No. 8 resulted in no profits:

     c.   Marketing the HoER through a virtual reality piece for SXSW;

     d.   Inclusion of Meow Wolf in one episode of the Red Bull documentary series, "Screenland;"

     h.   The Rooster Teeth series which aired without Space Owl;

     i.   The "Meow Wolf: Origin Story" documentary which lost ████████; See financial statements attached as **Exhibit 18.**

     j.   Social media posts;

     k.   Investor pitch materials.

The investor pitch materials included pictures of the HoER as illustration of past accomplishments. **Ex. 12**, at MW_18133. Oliver's claim for Meow Wolf profits based on capital investments made in response to investor pitch materials fails as a matter of law because investments of capital are not "profits." Investor pitch materials are not sold and do not generate revenue or profits. Investor pitch materials are not used to advertise anything for sale. As a matter of law, the copyright remedy offered by § 504(b) is defined as profits. The Act does not provide a definition for the word profit, but Black's Law Dictionary (10th ed. 2014) defines "profits" as "[t]he excess of revenues over expenditures in a business transaction." Id. at 1404. Investment, on the other hand, is defined as "[a]n expenditure to acquire property or assets to produce revenue; a capital outlay." Id. at 954. Any capital investments made in response to the alleged infringing investor materials produced revenue for the investor, not Meow Wolf, and does not fit within the constraints in § 504(b) of gross revenues minus expenditures.

Oliver's claim for Meow Wolf profits based on inclusion of a picture of Space Owl in investor pitch decks also fails as a matter of law because she has not presented evidence of any conceivable connection between investor decisions and an image of Space Owl. Like the *Bouchat* court's observation regarding the likelihood that a consumer would purchase NFL trading cards or a video game to catch a glimpse of the Flying B logo on a player's helmet, it defies reason that an investor would base their decision to risk capital based on a picture of ISQ rather than on the portions of the pitch deck conveying Meow Wolf's financial records, business plans, and leadership. Plaintiff has made no argument that any investor took a risk on Meow Wolf because of one decorative image of a single artist's work (among dozens of HoER exhibits by hundreds of artists) because such an argument would be rank speculation.

Oliver has not and cannot meet her burden to establish a causal nexus between an alleged act of infringement and a particular revenue stream with respect to the acts that resulted in no profits—including marketing HoER through a virtual reality piece for SXSW; inclusion of Meow Wolf in an episode of the Red Bull documentary series "Screenland;" the Rooster Teeth series which did not include Space Owl; the "Meow Wolf: Origin Story" documentary; social media posts; and investor pitch materials.

**B.      Oliver has not Provided Sufficient Evidence of a Causal Link to Profits From Alleged Infringing use of ISQ in Promotional Materials or Pitch Decks**

Rulings related to recovery of profits under §504(b) of the Act can be divided into those where the plaintiffs claim profits from the direct sale of a product containing infringing content versus those where the act of infringement is found in advertisements, promotional materials, and other activities that don't directly generate revenue. *Compare Wood v. Houghton,* 589 F. Supp. 2d 1230, 1248 to *Polar Bear Prods. v. Timex Corp.*, 384 F. 3d 700, 712 (9th Cir. 2004). However, "[o]n its face, § 504(b) does not differentiate between 'direct profits' – those that are generated by

selling an infringing product – and 'indirect profits – revenue that has a more attenuated nexus to the infringement." Mackie, 269 F. 3d at 914. When claiming gross revenue for alleged infringements found in promotional materials, a plaintiff's burden to establish that the profits sought were caused by the infringement is, arguably, even more important to avoiding absurd results. *See On Davis*, 246 F. 3d at 160. For example, the jury in *Polar Bear* awarded $2.1 million to Polar Bear when Timex continued using Polar Bear's adventure kayaking film in its promotion of a line of watches after their one-year licensing agreement had expired. *Polar Bear* at 712. Specifically, Timex used a ten-minute loop from the film at twelve different trade shows between 1995 and 1998, in a promotional campaign with Mountain Dew, and in videos used to train salespeople at a large national retailer. *Id.* at 704. At trial, Polar Bear's expert estimated that they were entitled to recover between $1.7 and $3.2 million based on his aggregation of profit from three sources: 1) Timex's direct sales at the twelve trade shows; 2) its use of a still image in the Mountain Dew promotion; and 3) the overall enhancement of brand prestige resulting from Timex's association with the sport of extreme kayaking. *Id.* at 712. The Court found that the expert established a causal nexus and a reasonable approximation of the profit related to the infringement when he offered non-speculative estimates of gross revenue at trade shows. *Id.* Polar Bear also demonstrated a causal nexus with the Mountain Dew promotional materials that contained a Timex advertisement with the infringing material and satisfied its burden of establishing Timex's gross revenue attributable to the infringement with a Timex press release stating that the promotion generated $564,000 in sales. *Id.* However, even though the "brand premium analysis" used to calculate the impact of the infringing advertising on the profitability of Timex's products overall was clearly laid out, the court ruled "Polar Bear failed to establish the required causal nexus between the infringement and the profits sought" and vacated the entire indirect profits award. *Id.*

at 713. The court acknowledged that Polar Bear need not put individual customers on the stand to testify that the infringing content was the reason they bought the product but "a copyright plaintiff must present a modicum of proof linking the infringement to the profits sought." *Id.* at 715.

Oliver's copyright damages expert, Mr. Mangum, provides *no* support to tie any alleged infringements, much less the alleged infringements in promotional materials, to a particular revenue stream in his expert report or deposition testimony. **Ex. 16** and **Ex. 17**. In fact, Mr. Mangum expressly asserts that his opinion regarding Oliver's damages is based on a literal reading of Sec. 504(b) and, consequently, an assumption that Oliver merely needs to opine on all of Meow Wolf's gross profits and then the burden shifts to Defendants to apportion costs. See **Ex. 16**, at ¶ 11 and 23. Despite acknowledging that the "HoER was built by 135 artists and features over 70 different rooms across 20,000-square-feet of explorable exhibit space," (**Ex. 16**, at ¶ 17) Mr. Mangum opines that every cent ever made at HoER since opening day in March 2016 should go to Oliver— including the sale of every Meow Wolf mug in the gift shop, every concert ticket, and every coffee in the cafe. Mr. Mangum has not shown a causal connection to the ▉▉▉▉▉▉▉▉ ▉▉▉▉▉ he labels as "Profit Directly attributable to the Infringement." Instead, he simply aggregates every possible Meow Wolf revenue stream, including their COVID-19 Relief Grant. *See* "Supplemental Exhibit 1" attached as **Exhibit 19**. Mr. Mangum makes his disavowal of the necessity of causal nexus explicit in describing his methodology for reaching that conclusion: "Therefore, since HoER benefits from the ISQ installation, all revenue generated by the operation of HoER is attributable to the alleged infringement." **Ex. 16**, at ¶ 22. As described above, simply pointing to all operational revenue without establishing that the alleged infringement caused those revenues has been universally rejected by courts as insufficient to meet a plaintiff's causal nexus burden. The only alleged infringements Mr. Mangum ties to a particular revenue stream are the

Coloring Book and Exhibition Catalog, which will be addressed in the next section. **Ex. 16,** at ¶ 25.

Mr. Mangum admits he cannot "determine the incremental value of Meow Wolf's use of Oliver's intellectual property in its investor pitch-decks." **Ex. 16**, para 33. But he also refuses to tie any of the infringements Oliver alleges to any particular revenue stream by completely ignoring Ms. Oliver's burden when seeking an award of profits under § 504(b) of the Act.

Ms. Oliver has failed to meet her burden to establish causal nexus between any particular revenue stream and the alleged acts of infringement related to promotional activities including marketing HoER through a VR piece for SXSW, the Red Bull Cross-branding campaign, the CD cover, the Rooster Teeth series, the "Meow Wolf: Origins" documentary film, social media posts, and the investor pitch materials because she has offered no evidence, expert or otherwise, to establish the necessary causal nexus to claim any indirect profits. Unlike the Polar Bear case, Oliver has not even attempted to provide evidence, much less non-speculative evidence, establishing that any of these alleged infringements may have influenced the purchasing decisions of those that bought Meow Wolf admission tickets.

**C.     No Rational Jury could Find ISQ Caused all the Revenue from Meow Wolf Admissions, the Coloring Book, and Exhibition Catalog Because ISQ Comprised a Small Fraction of the Alleged Infringements**

As described in detail below, Defendants have offered evidence demonstrating that the overwhelming majority of the revenues from admission ticket sales, the coloring book, and the exhibition catalog are attributable to sources other than the alleged infringement of ISQ and Space Owl in a "Supplemental Expert Rebuttal Report" from Fernando Torres, MSc. attached as **Exhibit 20**. Oliver failed to offer any rebuttal evidence and, instead, simply seeks the entirety of

the revenues from admission ticket, coloring book, and exhibition catalog sales as if ISQ and

Space Owl were the sole work featured in those products.

### 1.      Revenue From Coloring Book and Exhibition Catalog Sales

An artist rendering of Space Owl is featured on one page of a 27-page coloring book. *See*

**Ex 14**, at MW_37744**.** A photograph of Space Owl is found on one page of the 65-page exhibition

catalog. *See* **Ex 15**, at MW_037773. Nonetheless, Oliver's expert, Mr. Mangum, offers that Oliver

is entitled to all of the profits from the sales of these products resulting in ████ for the Coloring

Book and ████ for the Exhibition Catalog. See **Ex. 19**, page marked "Exhibit 7A."

Defendants offered an expert report from Fernando Torres, MSc. where he apportioned the

profits of the Coloring Book and Exhibition Catalog based on the percentage of pages that included

Space Owl, 3.70% and 1.54% respectively. *See* **Ex. 20**, at 24-25. As a result, Mr. Torres concludes

that the portion of sales attributable to the alleged infringements is ████ for the Coloring Book

and ███ for the Exhibition Catalog. **Ex. 20,** at 25 (Table 9). When asked about the Coloring Book

and Exhibition Catalog in deposition, Mr. Mangum opined on a variety of ways that an expert

could determine the portion of the products attributable to ISQ and Space Owl and rejected Mr.

Torres' methods but did not offer his own opinion on apportionment to rebut Mr. Torres'

methodology. See **Ex. 17**, 123:9–131:17.

### 2.      Revenue From Admission Tickets and Related Sales

Meow Wolf does not sell tickets to see only ISQ; customers buy admission tickets to the

entire HoER. As acknowledged by Oliver's expert Mr. Mangum, "HoER was built by 135 artists

and features over 70 different rooms across 20,000-square-feet of explorable exhibit space." **Ex.**

**16**, at ¶ 17. Therefore, Defendants offered an expert report from Fernando Torres, MSc.

presenting three different methods for allocating the portion of admission ticket sales attributable

to ISQ and Space Owl. *See* **Ex. 20,** at 9–11. The three objective measures of apportionment for admissions revenue used by Mr. Torres were 1) the monetary value given to Oliver's work relative to all artists who participated in the build of HoER, the proportion of the cost to build ISQ compared to the total cost to build HoER, and 3) the physical space ISQ occupies compared to the total exhibit space. *See* **Ex. 20,** at 9–11. Applying these methods, Mr. Torres explained that 1) the $10,000 originally offered to Oliver to install ISQ made up 0.95% of the artist revenue share program funds, 2) ISQ made up 0.47% of labor and material costs, and 3) that ISQ occupies 0.60% of the total exhibit space in HoER, resulting in an upper bound of 0.95% of gross revenue and a lower bound of 0.47% gross revenue. **Ex. 20**, at 10-11. After applying these percentages to admissions, food and beverage sales, and other sources of revenue and then subtracting costs of goods sold, Mr. Torres concluded that the profits Oliver could attribute to the alleged infringement ranges from ██████████████ See **Ex. 20**, at 28 (Table 11) and 29 (Table 12). In making these calculations, Mr. Torres excludes special events revenue because of their lack of any causal link to a particular exhibit in HoER. **Ex 20**, at 12.

No reasonable jury could find that the entirety of the admission ticket sales are attributable to an installation that makes up less than 1% of the institution or that the entirety of the coloring book sales and the exhibition catalog sales are attributable to the single page in each of those publications that includes Space Owl. Since Oliver has provided no evidence or testimony to dispute the expert apportionment provided by the Defendants, there is no genuine dispute of material fact as to what portion of Defendant's profits from the Coloring Book and Exhibition Catalog derived from factors other than alleged infringement.

## CONCLUSION

WHEREFORE Defendants respectfully request that the Court

1.  Grant summary judgment dismissing plaintiff's claims for statutory damages, costs, and attorney's fees under §§ 504(a) and 505 of the Copyright Act;

2.  Grant summary judgment dismissing plaintiff's claims for actual damages pursuant to § 504(b) of the Copyright Act;

3.  Grant summary judgment dismissing plaintiff's claims for Meow Wolf's profits related to the following seven alleged acts of infringement: marketing HoER through a VR piece for SXSW, the Red Bull Cross-branding campaign, the CD cover, the Rooster Teeth series, the "Meow Wolf: Origins" documentary film, social media posts, and the investor pitch materials;

4.  Grant summary judgment limiting plaintiff's potential recovery for her claims of infringement based on the Coloring Book to █████;

5.  Grant summary judgment limiting plaintiff's potential recovery for her claims of infringement based on the Exhibition Catalog to ████;

6.  Grant summary judgment limiting plaintiff's potential recovery for her claims of infringement based on admission ticket sales to HoER to a maximum of ██████.

Dated: April 29, 2022.

Respectfully submitted,

BARDACKE ALLISON LLP

*/s/Rose Bryan*
Benjamin Allison
Maureen Dolan
Rose Bryan
Cole Wilson
Michael Woods

P.O. Box 1808
141 East Palace Avenue
Santa Fe, New Mexico 87504-1808
(505) 995-8000
ben@bardackeallison.com
maureen@bardackeallison.com
rose@bardackeallison.com
cole@bardackeallison.com
michael@bardackeallison.com

*Attorneys for Defendants Meow Wolf, Inc.
and Vince Kadlubeck*

## CERTIFICATE OF SERVICE

I certify that I caused a true and correct copy of the foregoing filing to be filed through the Court's CM/ECF system, which caused all parties and counsel entitled to receive notice to be served electronically as more fully described on the Notice of Electronic Filing.

*/s/Rose Bryan*