**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

LAUREN ADELE OLIVER,
an individual,

      Plaintiff,

v.                                   Case No. 1:20-CV-00237-KK-SCY

MEOW WOLF, INC., a Delaware
corporation; VINCE KADLUBEK,
an individual and officer; and
DOES 1-50,

      Defendants.

**DEFENDANTS' MOTION TO EXCLUDE THE
<u>EXPERT OPINIONS OF RUSSELL W. MANGUM III</u>**

Defendants Meow Wolf, Inc. (Meow Wolf) and Vince Kadlubek respectfully request that the Court exclude the expert opinions of Russell W. Mangum III pursuant to Federal Rules of Evidence 104, 702 and 403. This motion is opposed.

## INTRODUCTION

Plaintiff engaged Dr. Mangum to opine on the remedies available to her under the Copyright Act. Plaintiff did so when she was granted permission to disclose a copyright infringement damages expert late, after failing to do so by the initial deadline. Ms. Oliver argued for an extension because she wanted to disclose an expert to give an opinion on a reasonable royalty or the value of defendants' use of her work, Ice Station Quellette (ISQ) in pitch decks. Doc. 126, at ¶ d. The Court extended the deadline to disclose an expert "regarding pitch decks or claims added in the amended complaint or proposed counterclaim." Doc. 204, at 3. But Dr. Mangum said he could not provide any opinion regarding pitch decks. Expert Report of Russell W. Mangum III, Ph.D., Jan. 14, 2022, Doc. 384-16, at ¶ 33. He developed no opinion on reasonable royalty. Russell Mangum Dep., Mar. 23, 2022, attached as **Exhibit A**, at 39:10–16 ("Q. So you

have no opinion about a reasonable license fee or royalty for the display of Ice Station Quellette at the House of Eternal Return, correct? MR BOYD: Form. A. I don't have any royalty rate or lump sum royalty that I have opined on in my report, correct."). Dr. Mangum has no opinion on damages related to allegations that defendants infringed Ms. Oliver's copyright in connection with a Meow Wolf documentary and a Red Bull television episode, Doc. 148, ¶¶ 63, 65, or most of the other discrete allegations of copyright infringement Ms. Oliver made throughout this case.

Nor does Dr. Mangum have any opinion on whether Ms. Oliver has suffered any actual damages—that she lost anything because of the infringement. His only opinion, starkly stated in his report, is that Ms. Oliver is entitled to every penny of revenue earned at the House of Eternal Return (HoER) from the day it opened—every admission ticket, every merchandise sale, every concert ticket, every drink sold in its café. All HoER revenue—which Dr. Mangum says goes to Ms. Oliver—is ███████ . This revenue from HoER is owed to Ms. Oliver, according to Dr. Mangum, based on his assertion that HoER "benefited from" ISQ. Doc. 384-16, at ¶ 22.

This opinion of "benefit" is demonstrated with no facts or analysis. Yet Dr. Mangum adds together all five revenue streams from HoER: ticket sales to enter the exhibit; ticket sales to concerts and other events (which frequently occur in the evening when the exhibit is closed); merchandise sales at the gift shop and online store; HoER's on-site café and bar; and all other revenue, such as third-party system fees and COVID-19 relief money. Russell W. Mangum III, PH.D. Supplemental Exhibits, March 22, 2022, Doc. 384-19.[1]  Everything HoER has ever earned should go to Ms. Oliver, according to Dr. Mangum.

---

[1] Plaintiff provided this supplement to defendants the afternoon before Dr. Mangum's deposition, in contravention of Fed. R. Civ. P. 26. The report materially changed what Dr. Mangum viewed as appropriate cost deductions from revenue, and caused defendants to incur additional attorney's fees in order to properly prepare for the deposition.

Three major issues infect Dr. Mangum's opinion. First, he provides no facts or data to support his opinion that the profits he says belong to Ms. Oliver are correlated with the infringement she alleges. Second, a major blunder undermines his opinion—Ms. Oliver made her own non-infringing ISQ merchandise and asked Meow Wolf to sell it in the gift shop under an agreement where she received 70% of the revenue and Meow Wolf received 30%. Dr. Mangum somehow opines that these were infringing sales, and that Ms. Oliver should now take Meow Wolf's profit from sales of merchandise that for years *she manufactured, asked Meow Wolf to sell, and was already paid for*. Third, Dr. Mangum misunderstands remedies under the Copyright Act, does no expert analysis, and merely reformats data provided by Meow Wolf. Despite this lack of analysis, plaintiff would have Dr. Mangum tell a jury that she entitled to all of HoER's profits, undermining the role of the Court as gatekeeper to expert testimony.

Under the Copyright Act, a plaintiff may recover an infringer's profits once the plaintiff has met her burden of establishing what profits "are attributable to the infringement." 17 U.S.C. § 504(b). Plaintiff must establish a causal nexus between the alleged infringement and the claimed profits. *On Davis v. The Gap, Inc.*, 246 F.3d 152, 160 (2d Cir. 2001) (an award of profits is limited to "gross revenue reasonably related to the infringement, not unrelated revenues.); *Mackie v. Reiser*, 296 F.3d 909, 915 (9th Cir. 2002) ("When an infringer's profits are only remotely and speculatively attributable to the infringement, courts will deny recovery to the copyright owner.") (quoting *Nimmer on Copyright* § 14.03[A], at 14–29(2001)). Dr. Mangum—an experienced economist who could easily mislead a jury—has no facts or data supporting his opinion. He rests entirely on the statement that HoER "benefits from" ISQ to justify his profits opinion.

As is clear from the report, Dr. Mangum's opinion that Ms. Oliver is entitled to ███████ is based on the assumption that display of ISQ at HoER is copyright infringement. *See* Doc. 384-

16, at ¶ 20. This claim of infringement is the subject of a motion for partial summary judgment which reflects undisputed facts that Ms. Oliver not only permitted but intended ISQ to be displayed at HoER. Doc. 278.

## ARGUMENT

Among other requirements, under Rule 702, the Court must only admit expert testimony which is helpful to the jury and based on sufficient facts and data. Fed. R. Evid. 702; *Rodgers v. Beechcraft Corp.*, 759 F. App'x 646, 657 (10th Cir. 2018). Rule 702's requirements apply regardless of whether the proffered expert is giving scientific testimony. *Kumho Tire Co. v. Carmicheal*, 526 U.S. 137, 149 (1999).

The proponent of expert testimony has the burden to show that it is grounded in accepted methods and procedures based on actual knowledge rather than subjective belief or speculation. *Mitchell v. Gencorp Inc.*, 165 F.3d 778, 780 (10th Cir. 1999); *Walker v. Spina*, 359 F. Supp. 3d 1054, 1067 (D.N.M. 2019) ("The proponent of expert testimony has the burden of establishing by a preponderance of the evidence that the pertinent admissibility requirements are met.") (citing *Bourjaily v. United States*, 483 U.S. 171, 175 (1987)).

In addition to Rule 702, Fed. R. Evid. 403 limits admissible expert testimony. Testimony is not admissible if it is not sufficiently probative of any fact at issue and risks confusing the issues and misleading the jury. Fed. R. Evid. 403. These limitations apply strongly to proposed expert testimony because of its inherent risk of being misleading. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, at 595 (1993) ("Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses.") (quoting Weinstein, *Rule 702 of the Federal Rules of Evidence is Sound; It Should Not Be Amended*, 138 F.R.D. 631, 632 (1991)).

**I**
**DR. MANGUM'S OPINION HAS NO DATA OR**
**ANALYSIS CORRELATING PROFITS TO INFRINGEMENT**

Because the Copyright Act ties an award of defendants' profits to specific acts of infringement, Dr. Mangum's opinion necessarily depends on which claims he assumes Ms. Oliver will succeed on. The only specific allegations of copyright infringement mentioned in his opinion are display of ISQ at HoER and use of ISQ in the coloring book and exhibition catalog, which the report defines as "collectively, the 'accused infringing sales.'" Doc. 384-16, at ¶ 20. In other words, it is these activities to which Dr. Mangum attributes all the profits of HoER. *See* Doc. 384-16, at ¶¶ 24, 25 (discussing profits from HoER, as well as profits from book sales narrowly). The grand total ████████ is tied to display, while Dr. Mangum separately identifies profits from the two books. *Id.* The crucial element missing is any facts or data showing *how* that total is attributable to display of ISQ in HoER. When an expert fails to base their opinions on sufficient facts or data, like in the case here, the opinion is inherently unreliable. *See In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529 (6th Cir. 2008) ("Rule 702 guides the trial court by providing general standards to assess reliability: whether the testimony is based upon 'sufficient facts or data,' . . . ."). "[T]he requirement that an expert's testimony be reliable means that it must be "supported by appropriate validation—i.e., 'good grounds,' based on what is known." *Id.* (quoting *Daubert*, 509 U.S. at 593).

A.     **The Copyright Act Requires a Causal Link Between Profits and Infringement**

The Copyright Act provides that in "establishing the infringer's profits, the copyright owner is required to present proof only of the infringer's gross revenue, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work." 17 U.S.C. § 504(b). But courts do not construe the statute to mean that a copyright owner need merely point to the gross revenue of the infringer in order to

recover profits. Instead, the phrase "gross revenue" refers to revenue reasonably related to the infringement. *Wood v. Houghton Mifflin Harcourt Publ'g Co.*, 589 F. Supp. 2d 1230, 1245 (D. Colo. 2008) ("Rather, 'gross revenue' refers only to revenue reasonably related to the infringement. The copyright owner thus has the burden of demonstrating some causal link between the infringement and the particular profit stream before the burden-shifting provisions of § 504(b) apply") (quoting *Bonner v. Dawson*, 404 F.3d 290, 294 (4th Cir. 2005)). The circuits are consistent across the country on this issue. *On Davis*, 246 F.3d at 160 ("Nonetheless we think the term 'gross revenue' under the statute means gross revenue reasonably related to the infringement, not unrelated revenues."); *Andreas v. Volkswagon of Am., Inc.,* 336 F. 3d 789, 796 (8th Cir. 2003) ("The nexus requirement exists in both direct and indirect profits cases.") (citing *Taylor v. Meirick*, 712 F. 2d 1112, 1122 (7th Cir. 1983)); *Polar Bear Prods. v. Timex Corp.*, 384 F.3d 700, 708 (9th Cir. 2004) ("From the statutory language, it is apparent that a causal link between the infringement and the monetary remedy sought is a predicate to recovery of both actual damages and profits."); *Univ. of Colo. Found. v. Am. Cyanamid Co.*, 196 F. 3d 1366, 1375 (Fed. Cir. 1999) (finding the copyright owner failed to meet the burden to show a connection between copyright infringement and the gross profits for the product created and sold).

When analyzing what evidence is required before the burden shifts to defendants, courts have distinguished between "'direct profits'—those that are generated by selling an infringing product—and 'indirect profits'—revenue that has a more attenuated nexus to the infringement." *Mackie*, 296 F.3d, at 914. However, "[e]ven in a direct profits claim, the plaintiff bears the 'burden of demonstrating some causal link between the infringement and the particular profits stream before the burden-shifting provisions of § 504(b) apply.'" *Predator int'l, Inc. v. Gamo Outdoor U.S.*, No. 09-cv-00970-PAB-KMT, 2013 WL 1129404, at *15 (D. Colo. Mar. 18, 2013) (quoting

*Wood*, 589 F. Supp. 2d at 1245 (D. Colo. 2008)). Evidence that a product has independent value such that consumers would have purchased it regardless of the infringement, or that the profits are not the natural and probable consequences of infringement, shows the absence of that causal link. *Yield Dynamics, Inc. v. Tea Sys. Corp.*, No. C 06-0331 VRW, 2007 U.S. Dist. LEXIS 113955, at *9 (N.D. Cal. Aug. 15, 2007) (quoting *Data General v. Grumman Sys.*, 36 F.3d 1147, 1175 (1st Cir. 1994)).

Courts deny recovery of defendants' profits when a plaintiff fails to link them to any infringement. In *Mackie*, the court denied recovery of Seattle Symphony concert subscriptions when an infringing photo was used in a newsletter about it. 296 F.3d at 917. In *On Davis*, the court denied recovery of all revenue of The Gap when it published an infringing advertisement. 246 F. 3d at 160. In *Dash v. Mayweather* the court denied recovery of all revenue of a boxing match where an infringing song was played. 731 F.3d 303, 331–32 (4th Cir. 2013). Innumerable other cases exist denying plaintiffs' attempts to obtain windfall profits by pointing to revenue without any evidence of causation.

### B.     Dr. Mangum Has No Facts or Data Showing a Causal Link

It was paramount, then, that Dr. Mangum have sufficient facts and data to causally link ISQ's display at HoER to the ███████ he opines Ms. Oliver is entitled to. Ms. Oliver had exhibited elements of ISQ before HoER and offered Space Owl for sale before HoER without success. Mary Peck Fair Market Value Appraisal Report, Apr. 16, 2021, Doc. 372-12, at 13; Lauren Oliver Dep., Apr. 8, 2021, attached as **Exhibit B**, at 320:7–9 ("Q. Did you ever sell the Space Owl that was in the Phil Space show? A. No, I did not."); **Ex. B**, at 321:1–11 ("Q. So what did you do after the Phil Space show with that work? A. Well, I gave the mannequin to Lizzie Hart, Jamie Hart's (phonetic) daughter. Q. Did -- A. Then I took the horns and I initially put them

in for position on the Meow Wolf space, and then I replaced them with horns that I made by hand. The fur from the Phil Space show was salvaged and reused for Meow Wolf."). The undisputed appraised value of ISQ at the time of its installation at HoER was $5,000. Doc. 372-12, at 20.

Dr. Mangum does not address this evidence, and does not address evidence that individual installations in the exhibit are removed and changed without any evidence of change in HoER's revenue. Mary Peck Rebuttal Expert Report, Feb. 25, 2022, attached as Doc. 372-13, at 14 (detailing the changing nature of the artwork inside HoER); *see* Doc. 384-19, at 3 (showing HoER revenue since 2016). Nor does Dr. Mangum address the voluminous national media coverage of HoER as a whole. *See, e.g.*, Rachel Monroe, *Can an Art Collective Become the Disney of the Experience Economy?* N.Y. Times Mag. (May 1, 2019), https://www.nytimes.com /interactive/2019/05/01/magazine/meow-wolf-art-experience-economy.html ("Even when components occasionally go on the fritz — the laser harp that refuses to sing, the interactive elements that don't interact — the House still skates by on its hand-built charm."). Dr. Mangum agreed in his deposition that the public has a multitude of reasons for going to HoER other than ISQ, and he has no way of knowing which caused any specific profits. **Ex. A**, at 146:6–148:20 (agreeing that people may go to HoER because they heard of Meow Wolf, liked the company's aesthetic, liked other artworks, and that "[c]onsumers have lots of things they care about and are influenced by").

Dr. Mangum points to nothing about how ISQ contributed to admission sales, and acknowledged he did no such analysis. **Ex. A**, at 146:6–20. He provides nothing on how ISQ contributed to concert sales. He provides nothing on how ISQ contributed to merchandise sales or café sales. And he provides nothing on how ISQ contributed to other revenue, like COVID-19 relief. *See generally* Doc. 384-16. By defining "accused infringing sales" as admission revenue

and sales of the coloring book and exhibit catalog, Dr. Mangum impliedly concedes that those are the revenues attributable to the alleged infringement. Doc. 384-16, at ¶ 20. But then Dr. Mangum with a vague wave of the hand throws in all the rest of HoER gross revenue:

> I have calculated damages as disgorgement of Meow Wolf's profit from the sale of admission to HoER and other revenue generated by HoER attributable to the infringement. I understand that all revenue generated by HoER is related to the promotion of admission to the exhibit space. More specifically, HoER primarily earns revenue from admissions, with additional sales from an on-site café and bar open to HER admission ticket holders, gift shop sales, and admissions to its event venue. *Therefore, since HoER benefits from the ISQ installation, all revenue generated by the operation of HoER is attributable to the alleged infringement.*"

Doc. 384-16, at ¶ 22 (emphasis added).

Dr. Mangum assumes but does not show that HoER "benefits from the ISQ." He omits any effort to determine whether ISQ is part of the reason anyone goes to HoER, and if so, to what extent that ties to HoER's profits. He provides no market data concerning any individual work's impact on HoER's profits, no survey on consumer interest in the exhibition, and no other analysis to link profits to alleged infringement. Dr. Mangum did no analysis of any kind on the issue.

By failing to provide *any* facts or data causally linking the alleged infringement to all the revenue of HoER, Dr. Mangum's opinion misses the mark set by the Copyright Act and should be excluded under Rule 702 for lack of sufficient facts or data to support the conclusion that Ms. Oliver is entitled to every dollar earned since the day HoER opened, or ███████. Given that lack of grounding, Dr. Mangum's opinion has no probative value on the key issue in an award of Meow Wolf's profits—the causal nexus—and would mislead the jury about what Ms. Oliver is entitled to receive under the Copyright Act.

**II**
**DR. MANGUM'S OPINION IS FURTHER UNDERMINED BY**
**<u>IGNORING THAT PLAINTIFF'S MERCHANDISE WAS NONINFRINGING</u>**

All ISQ-themed merchandise sold in Meow Wolf's gift shop was non-infringing merchandise made by Ms. Oliver and sold on consignment. **Ex. B**, at 134:2–20. Meow Wolf gave Ms. Oliver the opportunity to sell her merchandise in the HoER gift shop and she enthusiastically accepted, manufacturing the merchandise herself, delivering it to the gift shop, and replenishing as needed. **Ex. B**, at 134:2–20; *see also* Slack messages between Lauren Oliver and Ivan Gamboa, Mar. 24, 2017, attached as **Exhibit C**; Emails between Lauren Oliver and Megan Davis, Oct. 29, 2018, attached as **Exhibit D**; Emails between Lauren Oliver and Megan Davis, May 23, 2019, attached as **Exhibit E**. Her arrangement was that she received 80% of the sales revenue and Meow Wolf 20%, which later changed to 70%/30%. **Ex. B**, at 134:2–20. She received statements from the gift shop showing sales, with checks for her portion. *Id*. An incomplete accounting of the money Ms. Oliver made on HoER merchandise sales amounted to more than $14,000. Doc. 362, at 13.

These merchandise sales were by definition noninfringing—because they were done at the behest and with the full agreement of the copyright owner. **Ex. B**, at 138:8–13 ("You were agreeing for them to sell it, and you were resupplying it when they ran out; right? A. That is correct."); 17 U.S.C. § 501(a) (defining copyright infringement); 17 U.S.C. § 106 (providing the rights of copyright owner include the right to "reproduce the copyrighted work in copies" and "prepare derivative works based upon the copyrighted work").

Yet Dr. Mangum says Ms. Oliver, who was already paid 70% to 80% of these sales in her consignment arrangement, should now get Meow Wolf's share as well. He renders this opinion despite the fact that plaintiff specifically agreed—through years of consignment statements and

checks—that Meow Wolf properly earned its share of the non-infringing sales. The fundamental requirement for recovery of profits is that such profits must be attributable to *infringement*, and Dr. Mangum's blindness to the basic difference between infringement and noninfringement renders his opinion unreliable.

In his deposition, Dr. Mangum admitted that the inclusion of profits from sales of merchandise Ms. Oliver made and consigned to HoER is included in the profit number he opines is attributable to infringement. **Ex. A**, at 110:23–111:9. This blunder infects his opinion on the total amount of profits he opines Ms. Oliver is entitled to; he did not do any calculation to exclude these non-infringing sales, and does not have the data to do it. *Id.*; *see* Doc. 384-19, at 1.

Dr. Mangum's written opinion on this point reinforces its unreliability. His report acknowledges that "HoER's merchandise sales include sales of Meow Wolf branded products and products based on other artist designs that are sold on consignment." Doc. 384-16, at ¶ 25. From this, Dr. Mangum provides an opinion on profits from "merchandise specific to items subject to the alleged violation as an alternative to all HoER merchandise sales," specifically the coloring book and exhibit catalog. *Id.* In doing so, Dr. Mangum implicitly acknowledges that most merchandise sales are not causally linked to ISQ, or even to sales of ISQ-related merchandise. Nonetheless, Dr. Mangum stands by his opinion that Ms. Oliver is entitled to all of HoER's profits.

### III
### MANGUM OPINION REPACKAGES
### EXISTING EVIDENCE WITH NO ANLYSIS

The need for expert testimony is grounded in a demand for analysis of evidence and data which the trier of fact may not be able to understand. Fed. R. Evid. 702 advisory committee's note to 1972 proposed rule ("An intelligent evaluation of facts is often difficult or impossible without the application of some scientific, technical, or other specialized knowledge. The most common

source of this knowledge is the expert witness."). "[T]he 'touchstone' of admissibility is helpfulness to the trier of fact." *Werth v. Makita Elec. Works, Ltd.*, 950 F.2d 643, 648 (10th Cir. 1991). If "expert testimony is offered on an issue that a jury is capable of assessing for itself, it is plainly within the trial court's discretion to rule that testimony inadmissible because it would not even marginally assist the trier of fact" and must be "viewed as needless presentation" of testimony. *Thompson v. State Farm Fire & Cas. Co.*, 34 F.3d 932, 941 (10th Cir. 1994).

The length of this brief is indicative of the lack of analysis in Dr. Mangum's expert opinion. In his report, Dr. Mangum claims to have "calculated profits directly attributable to the infringement." Doc. 384-16, at ¶ 27. But Dr. Mangum simply took Meow Wolf's statement of its revenue, said Ms. Oliver gets it all, and blamed it on the law:

> I have evaluated Meow Wolf's profit from the alleged misconduct by identifying the revenue earned by Meow Wolf related to operating its HoER exhibit. I understand that Meow Wolf's profits may be an appropriate remedy for Oliver's claims in this matter, and that in assessing profits, Oliver (as the plaintiff) is required to prove Meow Wolf's sales or revenues only.

Doc. 384-16, at ¶ 23 (citing 27 U.S.C. § 504(b)).

As discussed above, this does not adequately reflect the judicial interpretation of plaintiff's burden under the Copyright Act. As a result, it makes for an opinion merely copying Meow Wolf's existing revenue data and handing it to the jury with the imprimatur of a Ph.D. economist instructing the jury that the law gives all the revenue to plaintiff. *Compare* Income Statements, Jan. 1, 2017, to Sep. 30, 2021, attached as **Exhibit F**, *with* Doc. 384-19. As an example of how little he did, Dr. Mangum provides that Meow Wolf's admissions revenue in 2017 was ███████ in 2017 in Exhibit 3 to his supplemental exhibits. Doc. 384-19, at 3. He also opines there is no direct cost of goods sold for admissions. *Id.* He does not calculate these numbers, but rather copies them from Meow Wolf's income summaries. *See* **Ex. F,** at 1. He does the same for each year and

category of revenue. *See generally* Doc. 384-19. He also does the same with revenue from 2016, although he copies the numbers from a different document Meow Wolf produced. *Compare* Meow Wolf Revenue Table, Mar. 16, 2016, to Dec. 31, 2016, attached as **Exhibit G** (stating total revenue as ███████ and direct COGS as ███████), with Doc. 384-19, at 2 (stating total revenue as ███████ and direct COGS as ██████).

Although Dr. Mangum breaks down "incremental indirect" cost of goods—which are simply credit card fees—into percentages attributable to each category of revenue and each year, this step is superfluous, as he merely deducts the total from Meow Wolf's revenue. *See* Doc. 384-19, at 3 n.3; Doc. 384-19, at 8 (listing credit card fees since 2017); **Ex. F** (listing credit card fees since 2017). He makes the same unnecessary calculation for Meow Wolf's revenue in 2016. *See* Doc. 384-19, at 2. In the end, the most Dr. Mangum does is add up the revenue for each category and each year and subtract credit card fees for each year, all of which already exists in Meow Wolf's income statements. *See* Doc. 384-19, at 2.[2]

A jury is capable of performing the basic arithmetic Dr. Mangum performs, and routinely does so when calculating damages. His calculations do not even present Meow Wolf's revenue in a way that makes them easier to understand, as he repeatedly breaks down numbers by percent without any need to do so. What would have been helpful to a jury is an expert analysis on *which* profits are related to the alleged infringement, but as discussed above, Dr. Mangum does not do this. To say Dr. Mangum "calculated" Meow Wolf's profits is an overstatement. He does not

---

[2] Dr. Mangum's total credit card fee deduction is off by $21,033. *Compare* Doc. 384-19, at 1, *with* Doc. 384-19, at 8. This happened because of Dr. Mangum annualizing the credit card fees and spreading them across each category of revenue, then inexplicably not deducting them from COVID-19 relief money. **Ex. A**, at 311:15–23.

provide any meaningful analysis or remarks concerning Meow Wolf's profits, and thus his opinion

merely creates "needless presentation" of facts the jury is perfectly capable of understanding.

## **CONCLUSION**

Based on the foregoing, Defendants respectfully request that the Court exclude the opinion

of Russell W. Mangum III pursuant to Rules 104, 702, and 403 of the Federal Rules of Evidence.

Dated: April 29, 2022

Respectfully submitted,

BARDACKE ALLISON LLP

By: */s/ Michael Woods*
   Benjamin Allison
   Maureen Dolan
   Rose Bryan
   Cole Wilson
   Michael Woods
   P.O. Box 1808
   141 East Palace Avenue
   Santa Fe, New Mexico 87504-1808
   (505) 995-8000
   ben@bardackeallison.com
   maureen@bardackeallison.com
   rose@bardackeallison.com
   cole@bardackeallison.com
   michael@bardackeallison.com

*Counsel for Defendants Meow Wolf, Inc.*
*and Vince Kadlubek*

## CERTIFICATE OF SERVICE

I hereby certify that I caused a true and correct copy of the foregoing to be filed through the Court's CM/ECF system which caused all parties and counsel entitled to receive notice to be served electronically as more fully described on the Notice of Electronic Filing.

BARDACKE ALLISON LLP

By:    */s/ Michael Woods*
       Michael Woods