**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

LAUREN ADELE OLIVER,
an individual,

   Plaintiff,

v.              Case No. 1:20-CV-00237-KK-SCY

MEOW WOLF, INC., a Delaware
corporation; VINCE KADLUBEK,
an individual and officer; and
DOES 1-50,

   Defendants.

**DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT
DISMISSING PLAINTIFF'S CLAIM OF COPYRIGHT INFRINGEMENT
FOR USES OF ICE STATION QUELLETTE FOR MARKETING AND PROMOTION**

   Defendants Meow Wolf, Inc. (Meow Wolf) and Vince Kadlubek move the Court pursuant to Fed. R. Civ. P. 56 for summary judgment dismissing plaintiff's claim of copyright infringement based on using images of Ice Station Quellette (ISQ) for marketing and promotion. Undisputed facts show that by installing her work in the House of Eternal Return (HoER), Ms. Oliver granted an implied license for marketing and promotion, which she explicitly confirmed. Her claim of copyright infringement premised on such use should therefore be dismissed with prejudice. Plaintiff opposes this motion.

**INTRODUCTION**

   Plaintiff alleges that all of Meow Wolf's uses of ISQ to market and promote were instances of copyright infringement: "Since the HoER opening in March 2016, Defendants have consistently exploited the fan appeal of ISQ and the Space Owl across multiple platforms to Defendants' benefit in promoting their brand and building their enterprise, without attribution and often without Oliver's knowledge or permission." Am. Compl. (Doc. 148), ¶ 57. "Examples of such usage

include using the Space Owl image in advertising, social media posts, and to represent Meow Wolf at the Themed Entertainment Association ("THEA") Awards." *Id*. ¶ 58.

When an artist puts her work in a gallery, museum, or exhibition, it is the role of the gallery, museum, or exhibition to market the exhibition so that people come. This is in fact the purpose of an exhibition. By putting work in an exhibition an artist requests such marketing. The law recognizes this by holding that when an artist puts her work in a show, she grants an implied license to market the show. This includes highlighting and previewing the experience to the public through photos and videos on traditional and social media. Meow Wolf fulfilled its role, promoting HoER with photographs from the exhibit, including ISQ, in public social media posts.

The implied license to do this is so obvious that Ms. Oliver acknowledged it in her complaint. Doc 148, ¶ 64 ("To the extent any implied license for promotional purposes existed prior to this communication, which is disputed by Oliver, this communication ended any such implied license."). Ms. Oliver also acknowledged the benefit to her of this promotion. When the amended complaint describes Space Owl's appearances "in the press and on social media," plaintiff does not complain about the attention her work received—she says she "felt the incredible enthusiasm" for the project. Doc 148, ¶ 28. The creation of that implied license is further laid out in defendants' *Motion for Partial Summary Judgment Dismissing Plaintiff's Claim of Copyright Infringement for Displaying Ice Station Quellette at the House of Eternal Return*, Doc. 278. Defendants adopt and incorporate those arguments and the undisputed material facts they rely on.

Ms. Oliver also affirmatively approved the marketing Meow Wolf did. On the Facebook page Meow Wolf created for Space Owl, Ms. Oliver "liked" multiple comments and wrote in response to one comment: "Love to you from Mimizuku Space Owl." And in an email before HoER opened, Ms. Oliver offered to use her marketing skills to assist Meow Wolf. In fact, to this

day Ms. Oliver displays a screenshot of one of Meow Wolf's marketing posts on her own website: *ISQ at Meow Wolf's House of Eternal Return*, quellette-studio.com, https://www.quellette-studio.com/exhibits/2016/7/17/meow-wolfs-house-of-eternal-return, attached as **Exhibit A**. Her website also displays a New York Times piece on Meow Wolf, and plaintiff has taken a screenshot from the video associated with the article that shows Space Owl. *See id*. Not until years after HoER opened—and after plaintiff benefited from this publicity—did first she complain about Meow Wolf's promotional uses of ISQ.

After plaintiff began talking with Mr. Boyd on February 12, 2018, she also began objecting to Meow Wolf's promotional and marketing uses of ISQ. *See* Doc. 199, at 2–3 ("Ms. Oliver had a brief communication with counsel on February 12, 2018, regarding granting permission for the use of her work as part of a virtual reality piece; a few communications in late-May 2018 related to a contract Ms. Oliver had been forwarded by Meow Wolf Inc.'s attorney . . . ."); *see also* Doc. 188, Ex. 3, Deposition of Lauren Adele Oliver, 393:11–394:12 (stating that, in April 2018, Ms. Oliver "had engaged Jesse [Boyd] to discuss the VR with him at the time. . . . I had been talking to other IP lawyers. I was fishing for lawyers in other places at the time, but I had just quickly run that one thing by Jesse."). On May 2, 2018, Ms. Oliver told Meow Wolf that "[a]ny proposals [to use Space Owl] are dead in the water until we can hammer out an agreement." Doc. 188, Ex. 2.

Plaintiff's position that she revoked the license she granted Meow Wolf is contradicted by the circumstances surrounding the creation of that license. As set out in defendants' Motion for Partial Summary Judgment on plaintiff's copyright display claim, when consideration is given for an implied license, that license is irrevocable. Doc 278, at 18–19. Here, Meow Wolf contracted with Ms. Oliver to install ISQ, and the resulting implied license to market cannot be revoked at plaintiff's whim. *See also Reply in Further Support of Motion for Partial Summary Judgment*

*Relating to Display of Ice Station Quellette at the House of Eternal Return*, Doc. 330. The scope of this license necessarily included using the artwork to market and promote the exhibit in which it resides. Ms. Oliver cannot succeed in now claiming this was copyright infringement.

## UNDISPUTED MATERIAL FACTS

1.      Meow Wolf asked Ms. Oliver to submit an art proposal for installation in Meow Wolf's House of Eternal Return, which she did. *See* Doc. 278, Ex. D, Ans. to No. 3 ("Plaintiff was approached by Caity Kennedy and encouraged to submit a proposal for a new Meow Wolf venture, which would eventually become HoER."); Doc. 278, Ex. D, Ans. to No. 5 ("In early 2015, Caity Kennedy reached out and asked Plaintiff to submit a proposal, which Plaintiff ultimately did."); *see also* Doc. 278, Ex. E, at 557:11–24 ("I submitted – when they came to me for the proposal, I had already proposed. I had done a proposal for Phil Space, and then I adapted that proposal in early 2015 for the House of Eternal Return.").

2.      Meow Wolf accepted Ms. Oliver's art proposal, and the parties entered a contract for her to install ISQ in HoER. *See* Doc. 278, Ex. E, at 130:9–21 (Question: "Let's make it concrete: In this case you claim there was a contract created by Meow Wolf making you an offer, and you accepting that offer by installing ISQ. Isn't that correct?" Answer: "Yes, in this instance, this is what we claim, and this is exactly – I mean clearly this is what happened. I was operating on these promises that were made verbally in front of many others, and so I installed the work, yes."); *see also* Doc. 148, ¶ 104 ("Oliver accepted Defendants' offer, and installed ISQ at HoER according to its terms, thereby creating a contract.").

3.      Ms. Oliver installed ISQ in HoER. *See* Doc. 278, Ex. D, Ans. to No. 3 ("Plaintiff went to work on her end of the bargain . . . [and] invested a great deal of labor (and sweat), money, and of course artwork, in the Meow Wolf venture. . . . Plaintiff designed her HoER installation

4

during summer and fall 2015 and worked on-site from January 2 to the March 16 opening in 2016. . . . She trusted Defendants would make good on their promises, and proceeded to invest everything she had into the installation of her flagship ISQ, and its iconic Space Owl, at HoER."); Doc. 278, Ex D, Ans. to No. 4 ("Upon competition of installation of ISQ at HoER, Plaintiff had fulfilled her obligations under the parties' contract.").

4.      Ms. Oliver installed ISQ intending Meow Wolf to display ISQ in HoER, understanding HoER would be like Meow Wolf's past projects. *See* Doc. 278, Ex. D, Ans. to No. 3 ("Plaintiff expected HoER to be similar to . . . Meow Wolf['s] . . . other projects, such as their Halloween Show in 2008 in which she participated, and later Omega Mart and Due Return projects. . . . [Mr. Kadlubek] portrayed . . . HoER as a legacy arts complex serving the city of Santa Fe with a grand exhibit generating ticket sales . . . ."); Doc. 278, Ex. D, Ans. to No. 5 ("Plaintiff . . . participated in Meow Wolf's first large exhibit on Halloween[.] . . . Plaintiff believes she attended most or all of Meow Wolf's art shows in Santa Fe during this period, including, of course Due Return and Omega Mart[.]"); Doc. 148, ¶ 20 ("Artists, including Oliver, were told their work had to be designed to withstand public viewing at least for the duration of the 10-year lease Meow Wolf had secured at the location."); Doc. 278, Ex. E, at 577:15–578:2 (For the Halloween show, Ms. Oliver "[m]ade crazy art on the walls, and then glued stuff together, and created very dangerous structures that were probably fire traps. . . . And had shows  . . . .").

5.      Defendants never received a communication from Ms. Oliver expressing any limitations on Meow Wolf's display of ISQ in HoER at the time she installed it, and Ms. Oliver expressed no desire to negotiate any aspect of the parties' arrangement. *See*, Doc. 278, Ex. E, at 247:9–17 (Question: "But you didn't respond to this e-mail with a concern or question; right?" Answer: "No."); 244:21–245:3 (discussing April 2 email: "Q. . . . In the paragraph before, it says:

'Please let me know if you have any questions or concerns before I send over the contract.' Did you write back with any questions or concerns to Vince? A. No . . . .").

6.     Ms. Oliver understood that Meow Wolf wanted her to build her exhibit to last at least 10 years. *See* Doc. 278, Ex. E, 470:21–471:20 ("[W]hen we were instructed to design our exhibits in 2015, we were told two things. The two major parameters were, 'It's going to be up for 10 years, because we have a 10-year lease on the building.' They also said 'Build it for permanence[.]' . . . . So that is what I was told with regard to how to structure the Ice Station installation with regard to a timeline."); Doc. 278, Ex. D, Ans. to No. 3 ("Plaintiff was also moving house, and she expressed to Caity Kennedy how daunting that process was to do while planning and working on a 'permanent' ISQ at HoER."); Doc. 148, ¶ 15 ("[The HoER was] the permanent flagship project of Meow Wolf."), ¶ 20 ("Artists, including Oliver, were told their work had to be designed to withstand public viewing at least for the duration of the 10-year lease Meow Wolf had secured at the location.").

7.     At the time Ms. Oliver installed ISQ in HoER, she was not engaged in any ongoing or permanent relationship with Meow Wolf. *See* Doc. 278, Ex. E, 69:21–70:3 (Question: "Okay. Well, did you ever have a conversation with Caity about wanting a job at Meow Wolf?" Answer: "I have no specific recollection of this, but I did reach out via e-mail to Caity." Question: "About wanting a job?" Answer: "About wanting to be involved in all future plans, and it included jobs and everything else."); 63:17–20 (Question: "I asked you, I believe, already, and you said you never became an employee of Meow Wolf; right?" Answer: "That is correct.").

8.     Ms. Oliver delivered ISQ to Meow Wolf in time for HoER's opening, as contemplated by the parties' agreement. *See* Doc. 148, ¶ 103 ("In exchange for Oliver's timely installation of ISQ at HoER …."); *see also* Doc. 278, Ex. E, at 209:4–7 (Question: "My question

was just that you installed ISQ from January to March 2016 at the House of Eternal Return." Answer: "Oh, okay. I'm so sorry. Yes, sorry."); Doc. 278, Ex. D, Ans. to No. 3 ("[Plaintiff] put everything she had into the work ... to meet Defendant's deadline to finish."); Doc. 278, Ex. D, Ans. to No. 4 ("Upon completion of installation of ISQ at HoER, Plaintiff had fulfilled her obligations under the parties' contract.").

9.      Meow Wolf paid Ms. Oliver $2,000 toward the $7,000 adjusted revenue sharing amount, and tendered the remaining $5,000 which Ms. Oliver refused. *See* Doc. 278, Ex. D, Ans. to No. 1 ("Plaintiff was sent one check for $2000."); Doc. 278, Ex. E, 501:8–21 (Question: "In Exhibit 76B you see the $2,000 amount, and then $165 and $336, and the total check amount is $2502.60. Is that the $500 in consignment money that was lumped in with it?" Answer: "That's exactly right." Question: "And then Exhibit 76C is the check itself. Do you see that?" Answer: "Yes, I do." Question: "Is that your signature on the back?" Answer: "I assume it is, yes." Question: "Okay. So that's the check that you cashed; right?" Answer: "That is the check that I cashed for $2500."); Doc. 278, Ex. E, at 455:24–456:3 ("Q. . . . I thought you had said it would be inappropriate for you to sign this 2019, $5,000 Bonus Program Agreement. A. It would be.").

10.     Plaintiff has no evidence she communicated any limitations on how ISQ could be used at the time she installed it. In fact, plaintiff communicated no limitations to the use of ISQ until June 2018, when she first asked Meow Wolf to cease using her work. *See* Am. Compl., ¶ 64 ("In June 2018, Oliver directed Meow Wolf to refrain from using the Space Owl until a usage agreement had been negotiated. To the extent any implied license for promotional purposes existed prior to this communication, which is disputed by Oliver, this communication ended any such implied license.").

11.     Around the time plaintiff installed ISQ in HoER, she expressed interest in helping with marketing and promotion after finishing her work on ISQ, and specifically offered to help Meow Wolf do so. Deposition of Lauren Adele Oliver, attached as **Exhibit B**, at 70:16–25 (A. "I do recall, Ben, early on, in early 2015, telling Caity briefly about my skills in marketing and graphic design and the like, and saying, 'If you guys need anything like that, I'm absolutely on board.'" A. "So I remember e-mailing her that and letting her know that I was interested in helping out beyond just doing the Ice Station installation."); Emails between Lauren Oliver and Caity Kennedy, Feb. 10, 2015, attached as **Exhibit C** (" I have work experience in graphic design, writing, marketing -- things like that. I can send you my resume, but if you need help in any areas that draw on my professional skills, here I am, even before summer.").

12.     Plaintiff responded positively to a Facebook post that used ISQ for promotional and marketing purposes. *See* Meow Wolf Facebook Post, Aug 4, 2016, https://www.facebook.com/ meowwolf.sf/photos/903647016431411, attached as **Exhibit D** (Ms. Oliver "liked" multiple comments and commented "Love to you from Mimizuku Space Owl").

13.     Plaintiff was aware of Meow Wolf's other social media posts which used ISQ because she was tagged in them. *See*, *e.g.*, Ex. D; Meow Wolf Instagram Post, Apr. 6, 2016, https://www.instagram.com/p/BD4IiVzzQda/, attached as **Exhibit E**; Meow Wolf Instagram Post, Dec. 14, 2017, https://www.instagram.com/p/BctFtgSgcc5/?hl=en, attached as **Exhibit F**.[1]

14.     After HoER opened, plaintiff remained interested in participating in projects that used ISQ between February 2016 and March 2018. *See* Emails between Lauren Oliver and Caity Kennedy, Aug. 19, 2016, attached as **Exhibit G** ("I'm all the way up for anything. Let me know how I can assist."); Ex. B, at 347:4–348:22 ("I was open to participating in projects because at this

---

[1] Ms. Oliver's Instagram account has since been removed.

time I believed I was part of a collective, and that I had a share of the revenue; that I was part of this team. I was open to hearing about promotions. I was open to participating, and so I gave her the information.").

15.    Plaintiff included ISQ in HoER, intending and thinking that it was joining the Meow Wolf brand. *See* Ex. B, at 508:5–16 ("Q. You said Meow Wolf included Space Owl, I think, in its brand, but that may not have been your exact words. You put Space Owl into the House of Eternal Return; right? So in some sense, you decided to put your work in with the Meow Wolf brand. Would that be fair to say? Mr. Boyd:  Form. [A.] Well, at the time I thought that the Meow Wolf brand was a 'we,' and not a 'they.'").

16.    Plaintiff has listed the following as the marketing and promotional uses of ISQ she complains of in this case:

   i.    "Virtual reality piece for SXSW [South by Southwest], which did not include a credit or copyright information." *See* Doc. 384, Ex. 1, at 28.

   ii.   "The image of the Space Owl in a Red Bull-branded embedded video frame on the Meow Wolf website launching a Red Bull-produced video for their 'Screenland' series, also available on their TV channel." *See* Doc. 384, Ex. 1, at 29.

   iii.  "The use of the Space Owl on the soundtrack CD cover/YouTube." *See* Doc. 384, Ex. 1, at 29.

   iv.   "The deal with the Rooster Teeth marketing company in Texas to allow them to use the Space Owl character for online content, which progressed far enough for them to have developed a character voice." *See* Doc. 384, Ex. 1, at 29.

   v.    "The unauthorized footage of the Space Owl in the trailer for the film, 'Meow Wolf: Origin Story,' in all showings online, streamed, and in theatres." *See* Doc. 384, Ex. 1, at 29.

   vi.   "The unauthorized footage of the Space [Owl] in the film, 'Meow Wolf: Origin Story,' in all showings online, streamed, and in theatres." *See* Doc. 384, Ex. 1, at 29.

   vii.  "Use of Plaintiff's work by Meow Wolf on the internet and social media, sponsored posts or otherwise, tweets and retweets, which are too numerous to

catalogue here. Examples include Defendants' use of the Space Owl in their Instagram 'Todos 7' campaign, and multiple other Instagram posts (sponsored and otherwise) by Meow Wolf." *See* Doc. 384, Ex. 1, at 29.

viii.   "Any image of, or showing of, Plaintiff's work shown to investors, press, as part of business development, or to other third-parties for the benefit of Defendants, including in-person visits." *See* Doc. 384, Ex. 1, at 29.

## STANDARD ON SUMMARY JUDGMENT

Summary judgment is appropriate if, after discovery, "the pleadings, depositions, answers to interrogatories, affidavits and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)). As to materiality, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Allen v. United Servs. Auto. Ass'n*, 907 F.3d 1230, 1233 (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). Disputes are genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

Once the movant establishes the absence of a genuine issue of material fact, the nonmovant must "go beyond the pleadings and by her own affidavits or by the 'depositions, answers to interrogatories, and admissions on file' designate 'specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(c)). If there is an absence of evidence, and the plaintiff produces no evidence for a point, there is no material question of fact about it. *Id*. at 325 ("[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that

version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

## ARGUMENT

Plaintiff alleges that defendants infringed her copyright in ISQ, but her claim fails because she granted Meow Wolf a license to use the work. The creation of that license is the subject of another motion. *See* Doc. 278. There, defendants showed that plaintiff impliedly granted a license by creating and installing ISQ in HoER at Meow Wolf's request, intending it to be used by Meow Wolf. Doc. 278, at 4–9; *see also* Doc. 330, 6–11. From those facts, as well as the additional undisputed material facts set out above, it is undisputed that plaintiff did not communicate any limitations on Meow Wolf's use of ISQ at the time she installed it. She also never objected to subsequent uses of ISQ for marketing and promotion prior to 2018, and even responded approvingly to Meow Wolf's use of ISQ in a promotional Facebook post. These circumstances confirm Meow Wolf's license to use ISQ for marketing and promotion.

Although a party claiming a license must show the existence of the license, *Xtomic, LLC v. Active Release Techniques, LLC*, 460 F. Supp. 3d 1147, 1154 (D. Colo. 2020), "the plaintiff bears the burden of proving that the defendant's use of the copyrighted work exceeded the scope of that license." *Boatman v. U.S. Racquetball Ass'n*, 33 F. Supp. 3d 1264, 1271 (D. Colo. 2014) (citing *Bourne v. Walt Disney Co.*, 68 F.3d 621, 631 (2d Cir. 1995) ("[I]n cases where only the scope of the license is at issue, the copyright owner bears the burden of proving that the defendant's copying was unauthorized.") (collecting cases)). To the extent plaintiff's complained-of marketing uses are even actions taken by Meow Wolf, as opposed to those of third parties, plaintiff cannot show that Meow Wolf exceeded the scope of its license to market and promote, and her claim that these uses constitute copyright infringement should be dismissed with prejudice.

**I**
**PLAINTIFF CANNOT CARRY HER BURDEN OF PROVING THAT**
**ANY USES OF ISQ FOR MARKETING AND PROMOTION WERE UNLICENSED**

Courts will find an implied license "where the copyright holder engages in conduct from which [the] other [party] may properly infer that the owner consents to his use." *Parker v. Yahoo!, Inc.*, 2008 U.S. Dist. LEXIS 74512, 2008 WL 4410095, at *3 (E.D. Pa. Sept. 25, 2008) (quoting *Field v. Google, Inc.*, 412 F. Supp. 2d 1106, 1116 (D. Nev. 2006)). "Consent given in the form of mere permission or lack of objection is also equivalent to a nonexclusive license and is not required to be in writing." *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 775 (7th Cir. 1996). As stated in defendant's prior motion (Doc. 278), the undisputed facts show that plaintiff granted VCMSE Art City, LLC, now Meow Wolf, Inc., such a license.[2] *See also* Doc. 330. By granting an implied license, the copyright owner permits the use of a copyrighted work in a particular manner. *I.A.E., Inc.*, 74 F.3d at 775. Here, the circumstances surrounding plaintiff's installation of ISQ in HoER at defendants' request created a license to market as well as display.

A.     **The Scope of Meow Wolf's License**
       **Included Using ISQ for Marketing and Promotion**

"The scope of an implied license takes its form from the circumstances and conduct that created [it]. . . . [t]he core focus lies in determining what scope of the parties' conduct reasonably suggests as the range of permitted use of the licensed rights." *Teter v. Glass Onion, Inc.*, 723 F. Supp. 2d 1138, 1149 (W.D. Mo. 2010) (quoting Raymond T. Nimmer, Jeff Dodd, *Modern Licensing Law*, § 10:17 (2009)). Courts look to "objective factors to determine a party's intent, including 'deposition testimony and whether the copyrighted material was delivered without

---

[2] Courts find the following permits a party to infer that the copyright owner consents to their use: "(1) defendant requested that [plaintiff] create the work, (2) [plaintiff] created the work and delivered it to [defendants], and (3) [plaintiff] intended that the Defendants [use the work] . . . ." *Wilson v. Brennan*, 637 F. Supp. 2d 959, 976-77 (D.N.M. 2009) (citing *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 776 (7th Cir. 1996)); *accord*, *Effects Assocs., Inc. v. Cohen*, 908 F.2d 555 (9th Cir. 1990).

warning that its further use would constitute copyright infringement.'" *Millennium, Inc. v. Sai Denver M, Inc.*, No. 14-cv-01118-KLM, 2015 WL 1816479, 2015 U.S. Dist. LEXIS 51547, at *19 (D. Colo. Apr. 20, 2015) (quoting *Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 956 (11th Cir. 2009) (internal quotation marks omitted)). "The relevant intent is the licensor's objective intent at the time of creation and delivery of [the Work] as manifested by the parties' conduct." *Asset Marketing Systems, Inc. v. Gagnon*, 542 F.3d 748, 756 (9th Cir. 2008) (citing *Effects*, 908 F.2d at 559 n.6 (9th Cir. 1990)).

Plaintiff installed ISQ in HoER at Meow Wolf's request, intended Meow Wolf to use ISQ, and did not express any limitations on that use when she delivered it. When HoER opened in March of 2016, plaintiff still communicated no limitations on Meow Wolf's use of ISQ. HoER is a visual and interactive experience, and the only way to effectively market and promote that experience is by showing images from the exhibition. Ms. Oliver, who worked in graphic design and marketing, understood that and offered to help with marketing. *See* Ex. B, 39:9–15 ("Q. Your freelance work, has it changed in terms of the kind of work that you do? Because what I remember you saying is you were doing websites, editing books, maybe doing graphic design. Does that include logos, and branding, and marketing? A. Yes."). It was therefore reasonable based on the parties' conduct and knowledge that plaintiff intended for Meow Wolf to use ISQ in marketing and promotion.

The facts in *Latimer v. Roaring Toyz* are helpful to understanding the scope that may be properly inferred for a license in this case. In *Roaring Toyz*, one party created artwork at the request of one of the defendants and knew the artwork would be used on defendant's new "ZX-14" motorcycle. 601 F.3d 1224, 1235 (11th Cir. 2010). The artist "knew the customized motorcycles would be publicly displayed at Daytona Bike Week and photographed by the media. [The artist] also knew that [the defendants] sought as much media exposure as possible for the ZX-14

customization project." *Id*. at 1235–36. Thus, the Eleventh Circuit Court of Appeals reasoned that "it is reasonable to infer that [the artist] intended that his artwork be photographed and distributed . . . [and, a]t a minimum, [the artist] granted [the defendants] an implied license to copy and distribute his original work." *Id*. at 1236.

Next, the Court of Appeals considered whether the plaintiff had exceeded the scope of that license by photographing the motorcycle. Finding that the plaintiff had not, the Court of Appeals noted that the artist "knew that [the defendants] intended to promote the customized motorcycles as widely as possible and did not expressly restrict the scope of the license when he delivered the work." *Id*. Thus, the "implied license *at least* encompassed uses that promoted the ZX-14 motorcycle," and the plaintiff's use of the artwork "fell within the scope of what [the artist] intended when he granted the implied license." *Id*. (emphasis added) As such, the plaintiff's photographs did not infringe the party's copyright. *Id*.

At the time HoER's build was underway, plaintiff told Meow Wolf's creative director, Caity Kennedy, that she was on board for any promotional and marketing work:

> [A.] . . . I do recall, Ben, early on, in early 2015, telling Caity briefly about my skills in marketing and graphic design and the like, and saying, 'If you guys need anything like that, I'm absolutely on board.'
> Q. Okay.
> A. So I remember e-mailing her that and letting her know that I was interested in helping out beyond just doing the Ice Station installation.

Ex. B, at 70:16–25. Plaintiff has also testified that she intended to include the Space Owl in Meow Wolf's brand when she installed ISQ in HoER:

> Q. You said Meow Wolf included Space Owl, I think, in its brand, but that may not have been your exact words. You put Space Owl into the House of Eternal Return; right? So in some sense, you decided to put your work in with the Meow Wolf brand. Would that be fair to say?
> Mr. Boyd: Form.
> [A.] Well, at the time I thought that the Meow Wolf brand was a "we," and not a "they."

14

Ex. B, at 508:5–16. Plaintiff cannot claim that subjective, unexpressed intentions diminish the meaning of her objective conduct in this case.

The facts in *Martin v. Pure Spectrum CBD, LLC*, Civil Action No. 20-cv-00910-MEH, 2022 WL 19418 (D. Colo. Jan. 3, 2022), are instructive. In finding an implied license, the *Martin* court noted at summary judgment that "there [was] contradictory evidence on what Plaintiff intended for her creative works." *Id*. at *13. But, "what is not in dispute, though, is that objective facts demonstrate an intent for Defendants to use Plaintiff's works." *Id*. at *14. Specifically,

> Plaintiff created multiple new product packaging designs, developed and designed multiple media campaigns for email, print, and online distribution, generated copious amounts of social media content, and developed and directed short animations for Defendants' products.

*Id*. Therefore, the court explained, "[i]t is reasonable that Defendants would use and distribute such products for its business." *Id*. (citing *Latimer*, 601 F.3d at 1235–36 (finding an implied license because, in part, "it is reasonable to infer that" licensor created content that was meant for distribution); *Millennium, Inc. v. SAI Denver M, Inc.*, Civil Action No. 14-cv-01118-KLM, 2015 WL 1816479, 2015 U.S. Dist. LEXIS 51547, at *7 (D. Colo. Apr. 20, 2015) (finding intent when the content creator "clearly hoped that Defendant would use his Ad and create a good working relationship"). In sum, the *Pure Spectrum* Court found that "Plaintiff created her works specifically for Defendant, and such works were meant to be used and distributed as part of Defendants' business and marketing, . . . an implied license existed." 2022 WL 19418, at *14 (citing *Latimer*, 601 F.3d at 1236).

Here, as in *Pure Spectrum*, plaintiff created ISQ specifically for installation at HoER. The work was meant to be displayed as part of the exhibition, which Ms. Oliver understood would include marketing and promotion. When that marketing occurred in the form of numerous social

media posts, Ms. Oliver knew about them, did not object, and even affirmatively approved. The implied license therefore covered such uses of ISQ.

## B.   The License to Use ISQ for Marketing and Promotion Is Irrevocable

Similarities between *Pure Spectrum* and this case do not stop there and the remainder of that court's analysis is relevant here, as well as to defendants' prior motion seeking summary judgment on the issue of ISQ's display in HoER. Like Ms. Oliver, the plaintiff in *Pure Spectrum* also argued that "even if an implied license existed, she revoked that license . . . ." *Id*. The court noted that a license unsupported by consideration is revocable, but "there is no dispute in this case that Defendants paid consideration." *Id*. at *14–15. Likewise, plaintiff does not dispute here that plaintiff received consideration for installing ISQ at HoER. Instead, Ms. Oliver has simply argued that she was not paid enough, Doc. 297, at 16, yet in *Pure Spectrum*, the plaintiff similarly argued "that she [was] owed more than the money she received." *Id*. at *15. But "that is a breach of contract question, not a question of implied license." *Id*. (collecting cases).

Certainly, while consideration is not required to support an implied nonexclusive license, it does render that license irrevocable. *See Avtec Sys. v. Peiffer*, 21 F.3d 568, 574 n.12 (4th Cir. 1994) ("[A]n implied license is necessarily nonexclusive and revocable absent consideration.") (citations omitted). Ms. Oliver says she did not receive "any consideration for her work," Doc. 297, at 3, but Ms. Oliver does not dispute that the parties exchanged promises—Meow Wolf promised Ms. Oliver payment, and Ms. Oliver promised to install ISQ in HoER. Doc. 148, at 5; *Heye v. American Golf Corp., Inc.*, 2003-NMCA-138, ¶ 12, 134 N.M. 558. In fact, her own alleged contract with MWI necessarily concedes that she received consideration for the installation. Doc. 148, at 19 ("In exchange for Oliver's timely installation of ISQ at HoER without initial

compensation, Defendants offered Oliver membership in the Meow Wolf artists' collective and a right to receive a share of Meow Wolf's revenue.").

This Court recently found sufficient undisputed facts for the existence of an irrevocable implied license, entering summary judgment against the plaintiff's claim of copyright infringement when the defendant had requested plaintiff to create yellow pages advertisements, and plaintiff had created them and provided them to defendant for printing in the yellow pages. *Harner v. Wong Corp.*, Civ. No. 12-820 KG/KK, 2016 U.S. Dist. LEXIS 163082 (D.N.M. Nov. 14, 2016). There:

> (1) Defendant requested the creation of the advertisement at issue; (2) Plaintiff created the advertisement and delivered it to Defendant; (3) Plaintiff intended that Defendant publish and use the advertisement; (4) Plaintiff did not limit Defendant's use of the advertisement when he delivered it to Defendant; and (5) Defendant paid Plaintiff for creating the advertisement.

*Id.* at *1. Under the facts in *Harner*, "Defendant had, as a matter of law, an irrevocable implied license to use the advertisement at issue." *Id.* (citing *Asset Mktg. Sys.*, 542 F.3d at 754–55, 757; *I.A.E.*, 74 F.3d at 776). Here, there is no dispute the parties exchanged consideration. *See* Doc. 278, at 18–19. Therefore, defendants' license to use ISQ for marketing is irrevocable. *See I.A.E., Inc.* 74 F.3d at 776 ("when, as here, consideration is paid for a license, it is irrevocable.").

### C. After Installing ISQ, Plaintiff Supported and Benefited from Meow Wolf's Use of ISQ for Marketing and Promotion

Meow Wolf did not exceed the scope of the license Ms. Oliver gave it for marketing and promotion. When Meow Wolf displayed a promotional image of ISQ on Facebook, she commented approvingly on the post. She had notice of other similar posts and did not object. This confirms her express support for Meow Wolf's use of ISQ in promotional and marketing materials. Additionally, when plaintiff learned of new and other uses of ISQ for marketing and promotion, there is no evidence that she objected to those uses. It is undisputed that plaintiff only

17

communicated limitations on defendants' use of ISQ in 2018, after engaging counsel to represent her.

In fact, even as late as March 30, 2018, plaintiff indicated she remained interested in continuing to collaborate with Meow Wolf on promotional uses of ISQ:

> I was open to participating in projects because at this time I believed I was part of a collective, and that I had a share of the revenue; that I was part of this team. I was open to hearing about promotions. I was open to participating, and so I gave her the information.

Ex. B, 348:17–22. The facts establish plaintiff knew Meow Wolf had used ISQ for marketing and promotion, and that she did not object to Meow Wolf's uses for that purpose. Meow Wolf therefore used ISQ within the scope of its license, and such uses do not constitute copyright infringement.

## CONCLUSION

For the foregoing reasons, summary judgment should be granted dismissing with prejudice plaintiff's claim for copyright infringement based on uses of ISQ for marketing and promotion, including those uses of ISQ identified above on pages 9–10.

Dated: April 29, 2022.

Respectfully submitted,

BARDACKE ALLISON LLP

By: */s/ Cole Wilson*
    Benjamin Allison
    Maureen Dolan
    Rose Bryan
    Cole Wilson
    Michael Woods
    P.O. Box 1808
    141 E. Palace Avenue
    Santa Fe, NM  87504-1808
    505-995-8000
    ben@bardackeallison.com
    maureen@bardackeallison.com
    rose@bardackeallison.com
    cole@bardackeallison.com

michael@bardackeallison.com

*Counsel for Defendants Meow Wolf, Inc.*
*and Vince Kadlubek*

## CERTIFICATE OF SERVICE

I certify that I caused a true and correct copy of the foregoing to be filed through the Court's CM/ECF system which caused all parties and counsel entitled to receive notice to be served electronically as more fully described on the Notice of Electronic Filing.

BARDACKE ALLISON LLP

By:    */s/ Cole Wilson*