IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

LAUREN ADELE OLIVER,

      Plaintiff,

v.                                                                         Case No. 1:20-CV-00237-KK-SCY

MEOW WOLF, INC., a Delaware
Corporation; VINCE KADLUBEK,
An individual and officer; and
DOES 1-50,

      Defendants.

**PLAINTIFF'S RESPONSE DEFENDANTS' MOTION TO EXCLUDE EXPERT OPINION TESTIMONY OF G. JAMES DAICHENDT**

Plaintiff Lauren Oliver ("Plaintiff") hereby responds to Defendants' Motion to Exclude Opinion Testimony of G. James Daichendt (Doc. 381) ("Motion"). As explained below, Defendants' Motion lacks any merit and should be denied.

**I.  INTRODUCTION**

In their characteristic defense strategy, Defendants seek to confine this case to their unsupportable contract theory (*see e.g.* Doc. 393) in an attempt to deny Plaintiff a trial of her legitimate claims. The instant Motion is one of three evidentiary motions that mispresent facts, evidence and law, and assert false premises as purported grounds to exclude each and every expert opinion to be presented by Plaintiff in this case.

Plaintiff properly designated and seeks to offer the opinion testimony of three experts, each with a distinct area of expertise for the specific scope of their respective opinions. Expert G. James Daichendt is an art critic and historian eminently qualified to opine regarding the recognized stature of Plaintiff's iconic Space Owl sculpture and Ice Station Quellette exhibit and

1

its artistic and experiential value to the House of Eternal Return ("HoER") as a whole. Of the multiple installations that comprise HoER, Daichendt evaluates Plaintiff's prominently featured work as one of the 10 most major installations contributing to "overall curation and organization" of HoER. Based on Daichendt's specialized knowledge, education, training, and experience, he ascribes a measure of artistic significance and contribution to the HoER art-entertainment experience as a percentage range of 5 to 8 percent. *Mr. Daichendt is highly-qualified to offer his methodical and well-reasoned opinions, and his testimony will assist the trier of fact in its determination of the value Defendants wrongfully acquired when they induced Plaintiff to install ISQ at HoER through fraud and unfulfilled promises.*

Marianne DeMario, a CPA and business forensic expert, calculates Plaintiff's claim of a lost share of revenue using Daichendt's percentage range as a low-high basis for apportioning a revenue share, based on Defendants' own documents outlining the portion of HoER's tens-of-millions of dollars in revenue during the first four years of operation that would be devoted to artists. *See* Doc. 366. Daichendt's non-economic analysis is used, in other words, as a basis for DeMario's economic calculations based on information generated by Defendants themselves. *See e.g.* Doc. 298-3 (revenue share interests to be converted to equity); Doc. 362-10 (revenue share percentage) at p. 4.

Plaintiff's approach of a two-step valuation approach and division of labor, in keeping with each expert's specialized knowledge, is clearly valid. Yet, Defendants misconstrue and attempt to discredit Daichendt's art/curatorial opinion by falsely asserting that Daichendt rendered what DeMario "took" as an "economic" valuation, and did so without any "financial" expertise, and "used no objective measures and rendered a purely subjective opinion." In other words, Defendants urge the Court to misread and summarily reject Daichendt's art/curatorial analysis of Plaintiff's work as if he gave it as an economic valuation, and then also reject

DeMario's economic calculation of Plaintiff's claimed financial revenue share as based on Daichendt's estimated artistic measure of the contribution of Plaintiff's work to and within HoER as a whole.

Defendants further want the Court to credit their now familiar mantra that this case involves nothing more than a contract dispute about the isolated value of a single art piece for which any recovery is based on an "undisputed" April 2, 2015 email "contract" between Plaintiff and an entity she did not know existed - VCSME Art City, LLC. In Defendants' "contract" version, Plaintiff's sole remedy is an appraisal of her ISQ art piece as a single stand-alone work. This theory is absurd under the facts of this case – ISQ was not installed with the intention or ability of it to be sold or removed from HoER – an "appraisal" of its "value" as a stand-alone work on a particular date – as though it could be bought by a collector for display in their living room – is simply irrelevant in the context of this case. *See e.g.* Doc. 393. As Defendants themselves have admitted, the millions of dollars made at HoER stem from people buying tickets to see the art, including Plaintiffs. *See e.g.* Deposition of Sean Di Ianni, Apr. 14, 2021, attached hereto as Exhibit 4; Luciano Mor Email, Doc. 241-10. Yet to further their narrative, Defendants selectively excerpt and quote misleading snippets of testimony without regard for the asserted objections, or for any later discovery obtained subsequent to Plaintiff's deposition sessions, while ignoring all claims and evidence to the contrary – including Plaintiff's own contract, fraud, conversion, and unjust enrichment claims, and alternative claim of promissory estoppel.

As shown in multiple filings with extensive briefing, Defendants' theory does not hold water. *See e.g.* Doc. 421 (Plaintiff's Response to Defendants' Motion for Summary Judgment re: Contract Related Claims) and cited evidence; Doc. 393 (Plaintiff's Motion for Summary Judgment on Counterclaim) and cited evidence; Doc. 377 (Plaintiff's Response to Kadlubek Motion for Summary Judgment). Regardless, under the clear governing law, Defendants'

assertions are not grounds for exclusion of Daichendt's opinions, and at best, go to the weight of expert opinions which is the quintessential province of the jury. Daichendt's opinions are fully appropriate to assist the jury in the two-step process of evaluating and deciding the economic issues which, together with multiple liability issues, remain subject to proof at trial.

**II.    LAW**

The law regarding expert testimony is straightforward: "As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination." *Boykin v. W. Exp., Inc.*, 2015 WL 53923, at *17 (S.D.N.Y Feb. 6, 2015), *quoting Hollman v. Taser Int'l Inc.*, 928 F. Supp.2d 657, 670 (E.D.N.Y. 2013) (internal citations omitted). Any asserted "weakness in the factual basis of an opinion bears on the weight of the evidence, not its admissibility." *Burke v. TransAm Trucking, Inc.*, 617 F. Supp.2d 327, 335 (M.D. Pa. 2009); *see also Phillips v. Raymond Corp.*, 364 F.Supp.2d 730, 743 (N.D. Ill. 2005). "Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded." *E.g. Boykin*, 2015 U.S. Dist. LEXIS 15297 at *17; *see also Willis v. Okla. Cty. Det. Ctr.*, 2022 U.S. Dist. LEXIS 69570, at *10-12 (W.D. Okla. 2022). "Challenges to the factual basis for an expert's application of an otherwise reliable methodology are quintessential jury issues." *U.S. Bank Nat'l Association v. PHL Variable Life Ins. Co.,* 122 F.Supp.3d 122, 134 (S.D.N.Y. 2015).

Moreover, in the Notes of Advisory Committee on Proposed Rule 702 the intent of the rule on questions of methodology and "sufficient facts" is clearly stated:

> Some types of expert testimony will be more objective verifiable, and subject to falsifiability, peer review, and publication, than others. Some types of expert testimony will not rely on anything like a scientific method, and so will have to be evaluated by reference to other standard principles attendant to that particular area of expertise. . . . Nothing in this amendment is intended to suggest that experience alone – or experience in

conjunction with other knowledge, skill, training or education – may not provide a sufficient foundation for expert testimony.  To the  contrary, the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience.  In certain fields, experience is the predominant, if not sole, basis for admitting a great deal of reliable testimony.                               *

*See also Kumho Tire Co. v. Carmichael*, 119 S. Ct. 1167m 1178 (stating that "not one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience.")*

When facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts.  The emphasis in the amendment on "sufficient facts or date" is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other.

In this case, there are multiple disputed facts and issues on which the court has yet to rule. Plaintiff submits that it is improper and utterly premature to rule expert testimony "inadmissible" based on her well-supported assessment of facts and documents to be presented at trial.  These facts include contemporaneous documents generated by Defendants outlining percentages and plans to provide equity to members of the Meow Wolf Collective.  *See e.g*. Doc. 298-3 (revenue share interests to be converted to equity); Doc. 362-10 (revenue share percentage) at p. 4.   Daichendt's estimate of the artistic and thematic significance and contribution of Plaintiff's creative artwork to the Meow Wolf art-entertainment show is undeniably a key component for the next step of DeMario's expert opinion what that translates to in economic terms.

### III.   ARGUMENT

    **A.   Daichendt's Opinion Testimony Is Appropriate to Assist the Jury's Understanding of ISQ's Value with Regard to HoER as a Whole and Plaintiff's Claim to the Promised Share of Revenue.**

 In muddying fashion, Defendants couch their argument for exclusion in various ways, including:

> "Mr. Daichendt did not use any methodology recognized in the fields of appraisal or valuation." / "In fact, he used no methodology at all." / "Mr. Daichendt's analysis is incomplete."/ "The proffered testimony is not grounded in sufficient facts." / "Plaintiff engaged Mr. Daichendt, an art critic and historian, to supply the missing compensation term. . . ." / ". . . Mr. Daichendt is an art history professor with no qualifications or training to render economic opinions, and his opinion was of the artistic and experiential value of ISQ." / "The court should . . . exclude Mr. Daichendt's opinion that ISQ is 5-8% of [HoER], because the only use of the opinion in this case is an opinion of economic value." / "Even if Mr. Daichendt's opinions were reliable or based on sufficient facts, they . . . do not help resolve…

The actual crux of Defendants' Motion, however, is their narrative premise that the lawsuit "centers on the terms of Meow Wolf's contract with plaintiff for the installation of her work . . . and the terms of that contract were that Meow Wolf would buy her materials for the installation, pay her a $1,000 stipend, and pay her $10,000 in revenue sharing." Motion at p. 2.  Defendants self-declare on page 16 of their brief that:  "The relevant methods for determining value [of Plaintiff's ISQ installation at HoER] are those needed to appraise ISQ, compute a reasonable fee, or show plaintiff's compensation as a reasonable hourly rate and for the cost of materials at a fair price." According to Defendants' view, the sole valuation relevant to the case is an appraisal, and therefore Daichendt's non-appraisal opinions should be excluded.

The evidence now adduced in this case reflects a different scenario altogether.  Not only was there no such "contract" as described by Defendants, but a cadre six self-interested individuals, chief among them Vince Kadlubek, concealed that HoER was a for-profit enterprise when inducing Plaintiff and other artists to invest their labor, money, and most importantly their art in the HoER project.  Defendants then imposed their *own subjective criteria* of a work's

contributory value to the HoER enterprise when substituting a "bonus" program for the promised share of revenue.

As Kadlubek described it, the project leads and founders subjectively "went through and discussed everybody's performance and the quality of their work . . . you *know how valuable we felt the work turned out . . . .*" Deposition of Meow Wolf, Inc., Nov. 22, 2021, 201:13 – 202:10, attached hereto as Exhibit 1. The personal assessments they made of the quality and importance of a particular works to the HoER art-entertainment experience were then utilized in attracting venture capital investments:



MWI Dep. 195:12-18, Exhibit 1 hereto. Of course, Plaintiff vigorously disputes that she had any knowledge of, much less "agreed" to, a "contract" with such a performance evaluation setting a $10,000 "cap" on the value of her sweat equity and artistic contribution to the HoER enterprise which, in the four years after opening, generated tens of millions of revenue dollars.

Defendants' evidentiary motion – which is a veiled backup to their "contract" motions -- flies in the face of caselaw and common sense. Over a century ago in *Bleistein v. Donaldson Lithographing Co*. Justice Holmes rejected reliance on judicial aesthetic preference to resolve a then-question of whether commercial advertising art has value that may be copyrighted. See

generally 188 U.S. 239 (1903). Opinion testimony similar to Daichendt's is both common and admissible in cases involving, for example, liability and damages under the Visual Artists Right Act.  *See e.g. Castillo v. G&M Realty L.P.*, 950 F.3d 155, 166-68 (2d Cir. 2020); *see generally also Cohen v. G&M Realty,* 320 F. Supp.3d 421 (focus of whether street artists' works as curated by prominent artist were works of recognized stature centered on each party's proffered art expert and their differing approaches).

Obviously, to exclude all knowledgeable art critic/curator testimony on the artistic merit of a work in its broader context would, in effect, allow the finder of fact to simply supply their own personal view/aesthetic without any basis at all.  In addition, and far more importantly, it would leave Plaintiff unable to rebut the position of Defendants' ▮▮▮▮▮▮▮▮ that her work was not valuable in the context of HoER.  *See* MWI Dep. 195:12-18, Exhibit 1 hereto.

Here, Daichendt is an eminently qualified expert art critic and historian/curator.  Even a cursory reading of Daichendt's lengthy CV and his detailed report confirms that his opinions, based on his knowledge, training and experience, are both reasoned and appropriate to assist the jury in evaluating questions as to the recognized art stature of Plaintiff's "iconic" work and, critically, its importance to HoER as a whole.

In short, Defendants' cited "grounds" for exclusion, much like their false narrative, do not hold water.  Again, the weight to give to Daichendt's considerations and analysis are quintessentially the province of the jury.

The jury will not be "confused" by Daichendt's art/curatorial evaluation that the artistic contribution and significance of ISQ represents an estimated 5-8% of the overall HoER experience as one of ten major installations among numerous less prominent installations and "stage craft."  Rather, the jury will be properly equipped to either accept or reject that evaluation as a basis for the calculations of revenue share separately provided by DeMario.

8

B.   **Response to Particular Assertions Made by Defendants**

1.   **Mr. Daichendt's testimony regarding art collectives is admissible to the extent the meaning of "collective" is not commonly understood.**

Mr. Daichendt's education and experience allow him to provide an expert opinion about what an "art collective" or "artist collective" is – particularly in regard to whether a for-profit company "owned" by a few people, and not run for the benefit of the collective, is consistent with a representation that an entity is a "collective." *See* Deposition of James Daichendt, March 10, 2022 ("Daichendt Dep.") at 64:16-69:13 (discussing collectives), attached hereto as Exhibit 2. Mr. Daichendt's testimony attacked by Defendants reflects what Plaintiff asserts is common knowledge – that a collective is operated for the benefit of its members, risks and rewards are shared, and it differs from typical hierarchical entities such as LLCs and corporations. *See e.g.* https://en.wikipedia.org/wiki/Artist_collective, last visited Jun. 13, 2022. To the extent the meaning of "collective" is not common knowledge, Mr. Daichendt's testimony will assist the jury in determining whether Defendants' use of the term, and their promises of membership were misrepresentations in the context of inducing participation in HoER. Evidence abounds that they were. *See e.g. See* Deposition of Blake Cahill, Feb. 4, 2022 ("Cahill Dep.") at 81:11-82:17, Doc. 377-10; Oliver Dep. Vol. I at 86:15-89-3, Doc. 421-5; Deposition of Marissa Frantz, Feb. 15, 2022, at 50:15-25, Doc. 377-6. However, if Defendants are going to argue otherwise, it will be helpful for the jury to receive expert testimony on what "artist collective" means historically and in the context of this case. *See* Fed. R. Evid., Rule 702.

2.   **Mr. Daichendt fully explained his analysis and it is based on facts and data he obtained.**

Mr. Daichendt made clear that he the analytical methods of Feldman are "engrained" in his work and opinions. *See* Daichendt Dep. at 36:4-9, Exhibit 2 hereto; *see also* Doc. 372, Ex. I

9

(report explaining analysis). Defendants' arguments that Daichendt applied no methodology is simply incorrect.

Defendants assert that Mr. Daichendt's opinions are not based on facts or data, but the contrary is true. First, his initial report was necessarily produced prior to the vast majority of discovery had occurred in the case, indeed, neither Plaintiff nor any representative of Defendants had yet been deposed. Mr. Daichendt viewed a number of videos of visitor experiences in preparing that report. *See* Daichendt Dep. at 268:4-25, Exhibit 2 hereto. In addition, after initially being unable to visit due to Covid restrictions, he personally visited HoER prior to submitting his amended report. *See* Daichendt Dep. at 32:11-32 ("As an art critic, you always want to visit."); 39:25-40:5.

> 3. **Mr. Daichendt's testimony regarding ISQ's walls being part of the work is admissible.**

Defendants recognize that the removability of ISQ without destruction or modification are issues raised in the instant lawsuit. In that regard, they designated Cary Cluett and Sean Di Ianni as experts in the possible removal of ISQ without destruction or modification. *See* Defendants' Rule 26(a)(2) Expert Witness Disclosures, Apr. 21, 2021, attached hereto as Exhibit 2. For his part, Mr. Daichendt has extensive curatorial experience, including with artworks where the walls are incorporated into the piece. Daichendt Dep. at 142:5-144:14, Exhibit 2 hereto. Including rebuttal opinions regarding damage and removability in his supplemental report and deposition (both as to the walls and otherwise) was made necessary by Defendants disclosure of two experts, Cary Cluett and MWI principal Sean Di Ianni, with regard to destruction and removability after Mr. Daichendt submitted his initial report. *See* Defendants' Rule 26(a)(2) Expert Witness Disclosures, Exhibit 3 hereto. Neither witness submitted a report as they were non-retained. Given this, and that discovery was extended significantly, it is

entirely appropriate for Plaintiff to offer Mr. Daichendt in rebuttal. It cannot have come as a surprise to Defendants that Plaintiff would utilize Mr. Daichendt to rebut these "expert's" opinions once they were known and their expected participation at trial had been confirmed. *See* Meow Wolf, Inc.'s Third Supplemental Answers to Plaintiff's Interrogatories # 22 and 23, March 4, 2022, Doc. 423-5 at p. 2 (listing Cluett and Di Ianni).

### 4. Mr. Daichendt's testimony is admissible under Rules 403 and 702.

Defendants' arguments under Rules 403 and 702 again improperly limit the issues in this case to those germane to their own (flawed) contract theory. But as explained above, Mr. Daichendt's opinions as an art critic and historian are straight forward, and will assist the jury in determining the value Defendants realized when they wrongfully induced Plaintiff to invest her labor, money and art in HoER. His testimony should not, and cannot, be viewed exclusively through the lens of Defendants' theory of the case.

As Plaintiff will prove at trial, Defendants presented "Meow Wolf" as a collective in which Plaintiff was a member, and promised a corresponding share of revenue that would go up and down with the success of the venture. Defendants rely heavily on the Court's initial ruling on their 12(b)(6) motion to dismiss Plaintiff's contract claim. *See e.g.* Motion at pp. 3-4, *citing* Order, Doc. 59. However, they ignore the Court's later ruling on Plaintiff's motion for leave to file her Amended Complaint, which clearly recognizes Plaintiff's claim for promissory estoppel alleges an uncapped and proportional share of revenue. *See* Memorandum Opinion and Order, Doc. 135, at pp. 11-13 (citing allegations of uncapped, proportional share underlying promissory estoppel claim). Moreover, both the initial and amended complaints were drafted before the vast majority of discovery had been conducted in this matter. Thus, the "crux" of Plaintiff's case is entirely unrelated to the non-existent "contract" Defendants allege. Rather, it centers on Defendants' inducement of her investment of labor, money, and art through fraud and unfulfilled

11

promises.  In order to determine the value to Defendants of that misappropriated investment – e.g., how much Defendants were unjustly enriched by their wrongful actions – it is important and helpful for the jury to understand the value of ISQ in relation to HoER as a whole.  This is precisely Mr. Daichendt's role in this case, and Defendants should not be allowed to avoid liability with assertions that an art history professor and critic with decades of academic and curatorial experience is not qualified or justified in presenting his opinions.

> **5. Mr. Daichendt's supplemented his report and provided opinions at deposition in compliance with Plaintiff's duties, his reports were sufficient, and assuming *arguendo* they were not strictly procedurally compliant, the timing of disclosures was justified and harmless.**

As noted above, Mr. Daichendt's initial report was served on Defendants prior to any of their representatives having been deposed in this matter and prior to the bulk of discovery having been conducted, much less completed.  Pursuant to Rule 26(e)(2), "For an expert whose report must be disclosed under Rule 26(a)(2)(B), the party's duty to supplement extends both to information included in the report and to information given during the expert's deposition. Any additions or changes to this information must be disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due."  FED. R. CIV. P., Rule 26(e)(2).  Under Rule 26(a)(3), pretrial disclosures are due 30 days before trial.  FED. R. CIV. P., Rule 26(a)(3).

Plaintiff provided Defendants Mr. Daichendt's supplemental report, and he was deposed regarding it.  As to the additional opinions Mr. Daichendt expressed at deposition regarding removability, they were in rebuttal to the opinions offered by Mr. Cluett and Mr. Di Ianni, who were both disclosed after Mr. Daichendt's initial report.  Mr. Daichendt was provided relevant portions of the transcript of Mr. Cluett's deposition prior to his own as soon as those transcripts were available, and so as to allow Defendants to fully explore Mr. Daichendt's opinions in that regard.

None of this came as a surprise to Defendants, and to the extent there was any departure from the Rules regarding disclosure of expert opinions it was justified and harmless. For example, Defendants argue that Mr. Daichendt's reports were deficient because they did not include his compensation. However, while this may be a technical departure from the rules, Mr. Daichendt freely gave the information at his deposition. *See* Daichendt Dep. at 15:2-9, Exhibit 2 hereto. Defendants also claim they were forced to take Mr. Daichendt's deposition to determine the basis of his opinions. This claim is ludicrous. Given the intensity of litigation in this case, and the amount of briefing and discovery exchanges conducted prior to Mr. Daichendt's deposition, Defendants' argument that they were somehow surprised by his positions or testimony is not colorable. Likewise, Defendants' implication that they would not have deposed Mr. Daichendt if his reports were somehow different flies in the face of how Defendants have conducted this litigation to this point. *See* Doc. 392 at p. 2 (noting Defendants had scheduled or taken 14 depositions (including Mr. Daichendt's)).[1]

Plaintiff provided Defendants supplemental information regarding Mr. Daichendt's opinions and their bases well before the close of discovery. This did not come as surprise to Defendants, it was justified given the timing of Daichendt's initial report (before litigation and discovery had significantly progressed) and the state of litigation near the close of discovery, and ultimately it was harmless.

Defendants' arguments and authority to the contrary are unavailing. For example, the Perea case cited by Defendants involved Plaintiff's attempted use of an expert report only served on the defendants in that case after a motion for summary judgment had been filed. *See Perea v. City of Albuquerque*, 2014 U.S. Dist. LEXIS 194484, at *2-3 (D.N.M. 2014). Here, quite the

---

[1] Plaintiff also notes Defendants filed ten (10) motions, including 4 motions for summary judgment (and the instant motion), in the final 10 days leading up to the motions deadline.

opposite is true.  Defendants were provided Mr. Daichendt's supplemental report in January 2022 – almost two months before the close of discovery.  It disclosed additional opinions on a small subset of issues that had been raised by Defendants after Mr. Daichendt had produced his initial report.  Defendants had an opportunity to depose Mr. Daichendt on those opinions and his assessment of their own' expert's opinions on removability, which were only revealed at that expert's deposition days before and had not been earlier disclosed to Plaintiff in the form of a report.  In addition, Defendants had the benefit of Mr. Daichendt's deposition well before they filed four (4) additional motions for summary judgment in addition to the two that had been filed before his deposition.  Any implication that Defendants might have allowed discovery to close without deposing Mr. Daichendt is not justified in the context of this litigation.

Meanwhile, to the extent Plaintiff's disclosure of any of Mr. Daichendt's opinions were somehow untimely, their admission is appropriately analyzed under the standard set forth in *Woodworker's Supply, Inc. v. Principal Mut. Life. Ins. Co.*, 170 F.3d 985 (10th Cir. 1999).  *See e.g. Pueblo of Isleta v. Grisham*, 2019 U.S. Dist. LEXIS 55047, at *10-13 (D.N.M. Mar. 30, 2019).

> "Without a finding of bad faith or gamesmanship courts are loathe to invoke the strong medicine of precluding expert testimony." *Harvey v. THI of N.M. at Albuquerque Care Ctr.*, Civ. No. 12-727 MCA/LAM, 2015 U.S. Dist. LEXIS 182700, 2015 WL 13667111, at *6 (D.N.M. Mar. 31, 2015) (ellipses omitted); *see also Summers v. Mo. Pac. R.R. Sys.*, 132 F.3d 599, 604 (10th Cir. 1997) ("The decision to exclude evidence is a drastic sanction.").

*Id* at *12.

> A district court need not make explicit findings concerning the existence of a substantial justification or the harmlessness of a failure to disclose. Nevertheless, the following factors should guide its discretion: (1) the prejudice or surprise to the party against whom the testimony is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the moving party's bad faith or willfulness."

*Id.* at *11-12.

Here there was no prejudice or surprise to Defendants regarding Daichendt's testimony. Even if there were, Defendants were able to cure it by taking Mr. Daichendt's deposition prior to the close of discovery. Trial is still months away, and Defendants have not identified any bad faith on the part of Plaintiff. As such, Defendants' motion to exclude Mr. Daichendt's testimony, and their baseless request for monetary sanction should be denied.

## IV. CONCLUSION

For the reasons stated above, Plaintiff respectfully requests that Defendants' Motion be denied.

Date: June 13, 2022　　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　　　ERICKSEN ARBUTHNOT

　　　　　　　　　　　　　　　　　　　　By: /s/ Jesse A. Boyd
　　　　　　　　　　　　　　　　　　　　　　JESSE A. BOYD
　　　　　　　　　　　　　　　　　　　　　　2300 Clayton Road, Suite 350
　　　　　　　　　　　　　　　　　　　　　　Concord, CA 94520
　　　　　　　　　　　　　　　　　　　　　　(510) 832-7770
　　　　　　　　　　　　　　　　　　　　　　(510) 832-0102 facsimile
　　　　　　　　　　　　　　　　　　　　　　jboyd@ericksenarbuthnot.com

## Certificate of Service

      I hereby certify that on June 13, 2022 a true and correct copy of the foregoing document and all referenced exhibits was served via CM/ECF on all interested parties. I further certify that I mailed the foregoing document and the notice of electronic filing by first-class mail to the following non-CM/ECF participants: N/A.

                                                */s/ Jesse A. Boyd*
                                                Jesse A. Boyd