IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

LAUREN ADELE OLIVER,

    Plaintiff,

v.                                                                                       Civ. No. 20-237 KK/SCY

MEOW WOLF, INC., *et al.,*

    Defendants.

### MEMORANDUM OPINION AND ORDER

THIS MATTER is before the Court on Defendant Meow Wolf, Inc.'s Motion for Referral of Registration Questions Under 17 U.S.C. § 411(b)(2) to the Register of Copyrights (Doc. 236), filed November 4, 2021. Having reviewed the parties' submissions, the record, and the relevant law, and being otherwise sufficiently advised, the Court FINDS that the motion is well-taken in part and should be GRANTED IN PART and DENIED IN PART as set forth below.

### I. Factual Background and Procedural History

In this action, Plaintiff Lauren Oliver alleges the following. From 2006 to 2015, Plaintiff created and exhibited versions of "the Space Owl," a character at the center of a project entitled "Ice Station Quellette" ("ISQ"). (Doc. 148 at 3-4.) Plaintiff holds registered copyrights relating to the Space Owl and ISQ. (*Id.* at 11.) Defendant Meow Wolf, Inc. ("MWI") is a Delaware corporation with a principal place of business in New Mexico. (*Id.* at 2.) Defendant Vince Kadlubek was at relevant times a director and/or officer of Defendant MWI. (*Id.*) Before Defendant MWI's incorporation, "Meow Wolf" was an "artists' collective" that acted through Defendant Kadlubek and other representatives. (*See id.* at 3-6.)

In early 2015, Meow Wolf representatives asked Plaintiff to install ISQ at a permanent exhibition in Santa Fe, New Mexico, called the "House of Eternal Return" ("HoER"). (*Id.* at 4.)

"In exchange for [Plaintiff's] timely installation of ISQ at [the] HoER without initial compensation," these representatives, including Defendant Kadlubek, "offered [Plaintiff] membership in the Meow Wolf artists' collective and a right to receive a share of Meow Wolf's revenue." (*Id.* at 5, 19.) Accepting this offer, Plaintiff designed and installed ISQ and the Space Owl at the HoER. (*Id.* at 5-6.) The HoER opened in March 2016 and was highly successful. (*Id.* at 6, 11, 12.) Defendant MWI grew into a multi-million-dollar enterprise, and the Space Owl became an "iconic element" of the HoER. (*Id.*)

In 2017 or 2018, Defendants began to call artists' compensation a bonus program rather than a revenue share. (*Id.* at 6.) Also, in 2018, Plaintiff discovered that Defendants were violating her intellectual property ("IP") rights by, *e.g.*, including images of the Space Owl in books sold in the HoER gift shop. (*Id.* at 6-7, 12-13.) Plaintiff tried to negotiate a formal agreement with Defendants without success, and in June 2018, she asked Defendant MWI to stop using the Space Owl until an agreement was reached. (*Id.*) Nevertheless, in December 2018, Plaintiff learned that Defendant MWI had used the Space Owl in a documentary. (*Id.* at 7.)

At a meeting in June 2019, Defendant Kadlubek demanded that Plaintiff either sell Defendant MWI all rights to the Space Owl "for a nominal sum" or remove ISQ from the HoER without additional compensation. (*Id.* at 8, 14.) "Because of the way it is constructed, removal of the installation would require its destruction." (*Id.* at 10.) Although a significant portion of Defendant MWI's value is due to ISQ and the Space Owl, to date, Plaintiff has received only $2,000 from Defendants for her work. (*Id.* at 8, 15.)

Plaintiff filed her original complaint against Defendants MWI and Kadlubek on March 16, 2020. (Doc. 1 at 1-2.) In it, Plaintiff asserted claims for copyright infringement, violation of the Visual Artists Rights Act, breach of contract and of the implied covenant of good faith and fair

2

dealing, unjust enrichment, conversion, intentional and negligent misrepresentation, and constructive trust. (*Id.* at 15-21.) Based on these claims, she sought injunctive relief, compensatory, punitive, and statutory damages, equitable relief including disgorgement of unjust enrichment and conveyance of an ownership interest in "the Meow Wolf artists' collective," and attorney's fees and costs. (*Id.* at 22-24.) On Defendants' motion, the Court dismissed Plaintiff's conversion claims on November 25, 2020. (Doc. 59.) On June 1, 2021, Plaintiff amended her complaint to add promissory estoppel claims against Defendants. (Doc. 148.)

On July 6, 2021, Defendant MWI filed a declaratory judgment counterclaim admitting that there was a contract between the parties but asserting different terms. (Doc. 183.) In support, Defendant MWI alleges the following. "Meow Wolf began in 2008 as a group of artists working together to build art shows, host music shows, and be a social group." (*Id.* at 18.) Plaintiff participated in the group in 2008, but not between 2009 and 2015. (*Id.*) After a financially successful show in 2011, "the first Meow Wolf company was formed." (*Id.* at 18-19.) In 2014, "Meow Wolf" began making plans to open the HoER as a permanent exhibition. (*Id.* at 19.)

"Meow Wolf" purchased the materials for artists' installations at the HoER and in some cases provided "small up-front stipends." (*Id.*) It also "created a deferred compensation program initially informally referred to as the artist revenue sharing program, and formally named [the] Artist Bonus Program (ABP)." (*Id.*) The ABP "earmarked $1 million in future profits" to pay artists who installed pieces in the HoER. (*Id.*)

> The 113 artists in the program were each given an individual cap on their share of the ABP based on the scope and amount of work they were to build. In each year that HoER rev[e]nue passed a set cost number, 11% of profits would flow into the ABP to pay artists…. Once an artist's cap was reached, that artist would drop out of the ABP pool and the remaining artists would be paid until each artist had received her set share stipend.

(*Id.* at 19-20.) "Meow Wolf told artists that … after [the] HoER was built … an artist's cap would be adjusted if he or she underperformed or overperformed." (*Id.* at 20.)

Having solicited and accepted Plaintiff's proposal to install ISQ in the HoER, "Meow Wolf, through its CEO [Defendant] Kadlubek," sent Plaintiff an e-mail in April 2015 proposing to pay Plaintiff $1,000 as an "up-front stipend" and $10,000 as a "revenue share stipend," in addition to buying the materials for Plaintiff's installation. (*Id.* at 21.) Defendant Kadlubek also indicated that Plaintiff would own the IP rights in ISQ but "Meow Wolf would own ISQ as tangible property." (*Id.*) Plaintiff responded, "Hey. Awesome. Good luck tonight." (*Id.*) She did not object to the terms of this e-mail or ask to change them during the time she spent installing ISQ in the HoER. (*Id.* at 21-22.)

Another artist, Cary Cluett, helped Plaintiff to install ISQ without charge. (*Id.* at 22.) Plaintiff directed that her $1,000 personal stipend be paid to Mr. Cluett; and, "Meow Wolf gave him a $10,000 participation stipend in [the] ABP and adjusted [Plaintiff's] participation stipend down to $7,000." (*Id.* at 22-23.) In March 2017, "Meow Wolf" paid Plaintiff $2,000 under the ABP. (*Id.* at 23.) Between 2016 and 2019, she also "cashed more than $20,000" in checks from "Meow Wolf" for the sale of consigned items in the HoER's gift shop. (*Id.*)

In 2018, Defendant MWI tried to pay Plaintiff an additional $2,750 under the ABP but Plaintiff asked for space to deal with family issues. (*Id.* at 24.) In 2019, Defendant tried to pay Plaintiff "her entire remaining balance of $5,000." (*Id.*) It told her that to receive this check she would have to sign an IP assignment; however, she knew Defendant was not trying to buy her IP rights for $5,000 because a month earlier it had proposed to buy these rights for $35,000. (*Id.*) Based on these allegations, Defendant MWI seeks a declaration that Defendant "MWI and Plaintiff entered into a contract whereby Plaintiff was entitled to … $10,000[,]" rather than "an unlimited

4

share in [Defendant] MWI's revenue" and/or "an ownership interest in [Defendant] MWI." (*Id.* at 26-27.)

On November 4, 2021, Defendant MWI filed the motion presently before the Court, requesting that the Court ask the Copyright Register whether she would have refused Plaintiff's copyright registrations relating to ISQ and the Space Owl if she had known that certain statements in Plaintiff's applications were inaccurate. (Doc. 236.) Plaintiff responded in opposition to the motion on November 18, 2021, and Defendant replied in support of it on December 22, 2021. (Docs. 250, 270.) In addition, Plaintiff filed a surreply on January 13, 2022; Defendant filed a supplemental brief on March 16, 2022; and, Plaintiff responded to Defendant's supplemental brief on March 30, 2022. (Docs. 282, 335, 346.)

## II. Analysis

### A. Defendant's request for referral under 17 U.S.C. § 411

In its motion, Defendant asks the Court to refer its proposed questions to the Copyright Register under 17 U.S.C. § 411. (Doc. 236.) Section 411(a) of the Copyright Act provides that copyright registration is generally a prerequisite for bringing a copyright infringement action. 17 U.S.C. § 411(a); *Unicolors, Inc. v. H&M Hennes & Mauritz, L. P.*, — U.S. —, 142 S. Ct. 941, 944 (2022). "To obtain registration, the author of a work must submit to the Register of Copyrights a copy of the work and an application." *Unicolors, Inc.*, 142 S. Ct. at 944. Importantly, some of the information to be included on the application "is purely factual, but some of it incorporates legal conclusions." *Id.* "If the Register determines that the work is copyrightable and meets other statutory requirements" based on the application, "she will issue a certificate of registration." *Id.*

Section 411(b)(1) provides a "safe harbor" for authors who inadvertently include inaccurate information on a registration application. *Id.* Specifically, under this provision,

5

> [a] certificate of registration satisfies the requirements of this section and section 412,[1] regardless of whether the certificate contains any inaccurate information, unless—(A) the inaccurate information was included on the application for copyright registration with knowledge that it was inaccurate; and (B) the inaccuracy of the information, if known, would have caused the Register of Copyrights to refuse registration.

17 U.S.C. § 411(b)(1).

In *Unicolors, Inc.*, the United States Supreme Court held that the term "knowledge" as used in Section 411(b)(1) "means actual, subjective awareness of both the facts and the law." 142 S. Ct. at 947. In other words, either a mistake of fact or a mistake of law will excuse the inclusion of inaccurate information on a registration application for purposes of Sections 411 and 412 of the Copyright Act. *Id.* at 946. Nevertheless, "courts need not automatically accept a copyright holder's claim that it was unaware of the relevant legal requirements of copyright law." *Id.* at 948. Rather, "willful blindness may support a finding of actual knowledge," as may "[c]ircumstantial evidence, including the significance of the legal error, the complexity of the relevant rule, the applicant's experience with copyright law, and other such matters." *Id.*

Section 411(b)(2), in turn, provides for referrals to the Copyright Register, stating that,

> [i]n any case in which inaccurate information described under [Section 411(b)(1)] is alleged, the court shall request the Register of Copyrights to advise the court whether the inaccurate information, if known, would have caused the Register of Copyrights to refuse registration.

17 U.S.C. § 411(b)(2).

The law is unsettled regarding the evidentiary burden a movant must meet to be entitled to relief under Section 411(b)(2). The statute provides that the movant need only "allege[]" that the copyright holder knowingly included inaccurate information on its application. 17 U.S.C. §

---

[1] Under Section 412, "a plaintiff in an infringement action normally cannot obtain an award of statutory damages or attorney's fees for infringement that occurred prior to registration." *Unicolors, Inc.*, 142 S. Ct. at 945 (citing 17 U.S.C. § 412).

6

411(b)(2); *HealtheState, LLC v. United States*, 160 Fed. Cl. 91, 95 (Fed. Cl. 2022). "But, federal courts have recognized that this procedure creates a serious potential for abuse because it allows infringers to delay proceedings by simply alleging technical violations of the underlying copyright registrations." *Energy Intel. Grp., Inc. v. CHS McPherson Refinery, Inc.*, 304 F. Supp. 3d 1051, 1055 (D. Kan. 2018). Thus, the two federal appellate courts to have considered the issue have held that trial courts may require the movant to "*demonstrate* that (1) the registration application included inaccurate information; and (2) the registrant knowingly included the inaccuracy in his submission to the Copyright Office." *DeliverMed Holdings, LLC v. Schaltenbrand*, 734 F.3d 616, 625 (7th Cir. 2013) (emphasis added); *see also Energy Intel. Grp., Inc. v. Kayne Anderson Cap. Advisors, L.P.*, 948 F.3d 261, 278 (5th Cir. 2020) (following *DeliverMed Holdings*). And "[e]ven courts that hew closely to the plain language interpretation of § 411(b)(2) review the movant's request to determine whether it has provided *some basis* for its allegation." *HealtheState, LLC*, 160 Fed. Cl. at 95-96 (emphasis added).

Plaintiff registered two copyrights related to ISQ and the Space Owl, *i.e.*, TXu 2-144-749 ("TXu Registration") and VA 2-170-075 ("VA Registration").[2] (Doc. 250-5 at 2; Doc. 250-6 at 2.) The TXu Registration, which Plaintiff registered on June 24, 2018, pertains to "Ice Station Quellette," an "unpublished collection" created in 2017 and consisting of "artwork, additional text[,] and photographs," with "some text and photographs from other sources." (Doc. 250-5 at 2.) The deposit[3] for the TXu Registration includes but is not limited to photographs of the ISQ and Space Owl installed at the HoER. (Doc. 236-1 at 5-26.) At her deposition, Plaintiff testified that

---

[2] The "TX" classification is for "[n]ondramatic literary works" and the "VA" classification is for "[w]orks of the visual arts." 37 C.F.R. § 202.3(b)(1)(i), (iii).

[3] The Copyright Act requires applicants to "deposit" the works to be registered with the Register. 17 U.S.C. § 408(a). The specific requirements for deposits differ depending on whether the work has been published, whether it was published outside the United States, and whether it is a contribution to a collective work. 17 U.S.C. § 408(b).

this registration "was for the whole Ice Station project, and I believe that was covering the story, because … it's a much larger project than what you just see at Meow Wolf." (Doc. 236-4 at 4.)

The VA Registration, which Plaintiff registered on September 19, 2019, pertains to "Ice Station Quellette - The Last Ice on Earth," created in 2016 and published on March 16, 2016. (Doc. 250-6 at 2.) It consists of "photograph[s], 2-D artwork, [and] sculpture" with "[p]ictorial, graphic, and sculptural features identified separately from and capable of existing independently of the utilitarian aspects of a useful article." (*Id.*) The deposit for this registration consists exclusively of photographs and drawings of the ISQ and Space Owl installed at the HoER. (Doc. 236-3 at 5-45.) Plaintiff testified that the VA Registration was for "the Ice Station piece at Meow Wolf." (Doc. 236-4 at 4.)

Defendant argues that Plaintiff knowingly included inaccurate information on her applications for these registrations in three respects. First, Defendant asserts that Plaintiff misstated the year she completed the works in the TXu Registration. (Doc. 236 at 3-5.) Second, Defendant claims that Plaintiff failed to disclose that three works in the TXu Registration had already been published. (*Id.* at 3, 6-7.) Finally, Defendant contends that in applying for the VA Registration, Plaintiff "claimed copyright in an artistic bench" she did not create. (*Id.* at 3, 8.) Defendant therefore invokes Section 411(b)(2), requesting that the Court ask the Copyright Register whether she would have refused registration had she known of the claimed inaccuracies. (*Id.* at 3-9.) The Court will consider each claimed inaccuracy in turn.

### 1. The year Plaintiff completed the works in the TXu Registration

Defendant first argues that Plaintiff misstated the year she completed the works in the TXu

Registration on her application.[4] (*Id.* at 3-5.) According to Defendant, Plaintiff stated that she completed the works in 2015, when in fact they were completed in three different years: the Space Owl painting in 2012, the Space Owl sculpture at the HoER in 2016, and the stuffed Space Owl toys, or "plushies," in 2017. (*Id.*) There are two problems with Defendant's position. First, although Plaintiff did initially state that the works at issue were completed in 2015, (Doc. 236-1 at 2), she subsequently corrected the year to 2017. (Doc. 250-5 at 2.) Second, Plaintiff made this correction on the Copyright Office's advice after providing accurate information about when she actually completed each of the works in question. (Doc. 250-3 at 2-5; Doc. 250-4 at 2.) In these circumstances, Defendant has failed to demonstrate, or even offer a sound basis to allege, that Plaintiff knowingly misstated the year she completed the works. *DeliverMed Holdings, LLC*, 734 F.3d at 625. The Court therefore declines to refer to the Register the question Defendant proposes regarding the year Plaintiff completed the TXu Registration works under Section 411(b)(2).[5]

2.  **Plaintiff's classification of the TXu Registration's works as an unpublished collection**

Defendant next claims that Plaintiff inaccurately classified the works in the TXu Registration as an unpublished collection when in fact, three of these works had already been published. (Doc. 236 at 3, 6-7.) As explained below, the Court agrees that the works in question had already been published and thus that Plaintiff should not have classified the TXu Registration works as an unpublished collection. Nevertheless, the complexity of the legal conclusions

---

[4] The parties treat the year of completion and the year of creation as synonymous in this context and the Court will therefore do the same. (*See generally* Docs. 236, 250, 270); *see also* 17 U.S.C. § 101 ("A work is 'created' when it is fixed in a copy … for the first time.").

[5] The specific wording Defendant proposes is "[w]hether the Register of Copyrights would have refused Registration No. TXu 2-144-749 had she been made aware … that the statement that the work was completed in 2015 was not true, and the three different works in the deposit materials were completed in 2012, 2016, and 2017." (Doc. 236 at 9.) This wording is problematic because Plaintiff ultimately indicated that the TXu Registration works were completed in 2017, (Doc. 250-5 at 2), and because the works are registered as an unpublished collection of works rather than a singular collective "work" as discussed in Section II.A.2, *infra*.

incorporated in the classification, together with the relevant evidence, show that Plaintiff did not knowingly misclassify the works.

The Copyright Act authorizes the Copyright Register to issue regulations that "require or permit, for particular classes, … a single registration for a group of related works." 17 U.S.C. § 408(c)(1). Under the regulations issued pursuant to this authority, a group of unpublished works may be registered with one application if, *inter alia*, "[a]ll the works in the group" are unpublished. 37 C.F.R. § 202.4(c)(1). A copyright holder may also register a group of published works with one application, but generally only if "all copyrightable elements that are otherwise recognizable as self-contained works" are "included in the same unit of publication." 37 C.F.R. § 202.3(b)(4). In other words, all of the works must have been published at the same time. *Fam. Dollar Stores, Inc. v. United Fabrics Int'l, Inc.*, 896 F. Supp. 2d 223, 229 (S.D.N.Y. 2012). "For unpublished works," of course, "there is no such requirement." *Id.*

A "collective work," however, is distinct from a "group" or "collection" of works. *Compare* 17 U.S.C. § 101 *with* 17 U.S.C. § 408(c). A "collective work" is "a work … in which a number of contributions, constituting separate and independent works in themselves, are assembled into a collective whole," and is a type of "compilation," *i.e.*, "a work formed by the collection and assembling of preexisting materials … that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship." 17 U.S.C. § 101. As a singular work of authorship in its own right, a compilation can be registered as unpublished even if some of its component works have previously been published.[6] *See, e.g.,*

---

[6] But, a registration for a compilation "does not cover any preexisting material … that is included in the compilation." U.S. Copyright Office, Compendium of U.S. Copyright Office Practices § 710 (3d ed. 2021), https://www.copyright.gov/comp3/ (last accessed Aug. 19, 2022). Also, though "[a]n applicant may register a collective work together with the separate and independent works contained therein," she may do so only "(i) if the copyright in the contributions and the collective work are owned by the same claimant, and (ii) if the component works have not been previously published or registered." *Id.* § 711.

10

*Energy Intel. Grp., Inc.*, 304 F. Supp. 3d at 1061 (to be registered together, each issue in a group of newsletters must be an "all new collective work[ ] … that ha[s] not been published before," but this requirement does not apply to "the individual components within" each issue).[7]

Here, Plaintiff classified the works in the TXu Registration as an "unpublished collection." (Doc. 250-5 at 2.) The Court agrees with Defendant that this classification is incorrect. (Doc. 236 at 6-7; Doc. 270 at 3.) The Copyright Act defines the act of "[p]ublication" as "the distribution of copies … of a work to the public by sale … [,] rental, lease, or lending," or "[t]he offering to distribute copies … to a group of persons for purposes of further distribution, public performance, or public display," although "[a] public performance or display of a work does not of itself constitute publication." 17 U.S.C. § 101. Plaintiff does not dispute that she distributed the 2012 Space Owl painting and the 2016 Space Owl sculpture to others for sale or display, and offered the 2017 Space Owl plushies for sale, before she applied for the TXu Registration in 2018. (Doc. 250 at 4-6.) Thus, these works had already been published by the time of registration contrary to the regulatory requirement that all of the works in an unpublished group must be unpublished. 37 C.F.R. § 202.4(c)(1).

In her response to Defendant's motion, Plaintiff argues that she was "truthful … when she stated that the collection had not been published" because "when [she] filed the TXu application, the collection—as a whole—had not been published." (Doc. 250 at 5-6.) In so arguing, Plaintiff appears to confuse an unpublished group or collection of works—all of which must be unpublished, 37 C.F.R. § 202.4(c)(1)—with an unpublished collective work or other compilation. If, as it appears, the distinction confuses Plaintiff now that counsel represents her, it is likely that

---

[7] Adding another layer of complexity, certain types of collective works, such as newsletters, can be registered in a group or collection even if they were not published concurrently. 37 C.F.R. § 202.4(f). However, each issue must be published within a specified window of time and "must be an all-new issue or an all-new collective work that has not been previously published." *Id.*

11

it also confused Plaintiff when she applied for the TXu Registration without counsel's assistance. (Doc. 250 at 3.) And certainly, this area of copyright law is esoteric enough that a layperson could plausibly misunderstand it. *See Unicolors, Inc.*, 142 S. Ct. at 948 (citing "the complexity of the relevant rule" as circumstantial evidence relevant to whether an applicant knowingly included legally inaccurate information on a registration application).

Other evidence confirms that Plaintiff did not act knowingly when she misclassified the TXu Registration works as an unpublished collection. First, Plaintiff's deposition testimony describing the works is more consistent with a singular collective work or other compilation than with a group or collection of works. (*See* Doc. 236-4 at 4 (describing TXu Registration works as "the whole Ice Station project," which she analogized to a "children's book … with the story and images that were integrated").)

Second, Plaintiff provided accurate information about the works' publication status in an e-mail exchange with Ashley Emmett, a Copyright Office examiner, from September to December 2018. (Doc. 250-3 at 2-5.) Ms. Emmett initiated this exchange by asking about the year of the works' completion, explaining that "[t]he completion date should be the year in which the author … completed the version of the work submitted for registration." (*Id.* at 4.) In the ensuing thread, Plaintiff provided the following information, "with attached images," (*id.* at 2):

- "Fall 2012:  The space owl character debuts at a group art show[.]" (*Id.* at 2.)

- "The 'Ice Station' first appeared in two shows in 2015. Both shows included the original 'space owl' in two and three dimensions." (*Id.* at 4.) "Summer 2015:  The Ice Station makes its debut as a comprehensive art project at a gallery in Santa Fe. Fall 2015:  The Ice Station has a second show in Santa Fe; space owl appears as small sculptures and in printed material." (*Id.* at 2.)

- "March 2016:  The Ice Station room, featuring the tall furry space owl sculpture and the art in the portholes, is completed for the opening of the Meow Wolf exhibit in Santa Fe." (*Id.* at 2.) "The sculptural space owl that was completed in early 2016 for the Meow Wolf exhibit in Santa Fe is still on display." (*Id.* at 4.)

- "The space owl toys were designed in 2016, and produced in 2017." (*Id.* at 4.)

The point of Plaintiff's exchange with Ms. Emmett was to clarify the correct year of completion for the works to be registered. (*See generally id.* at 2-4.) However, in the exchange, Plaintiff made no attempt to hide the fact that some of the works had already been published. On the contrary, by informing Ms. Emmett that versions of ISQ and the Space Owl in the deposit had been displayed in 2012, 2015, and 2016, including at an art gallery and at "the Meow Wolf exhibit in Santa Fe," (*id.* at 2, 4), Plaintiff clearly conveyed that these works had already been distributed to others for sale or display. Also, Plaintiff's reference to the production of Space Owl "toys" in 2017 certainly suggests that these items had likely been sold to the public by 2018. (*Id.* at 4.) In short, a rational factfinder could not read Plaintiff's exchange with Ms. Emmett and conclude that Plaintiff knew she had misclassified the works at issue as unpublished.

In light of the foregoing, Defendant has failed to proffer a sound basis to allege, and certainly has not demonstrated, that Plaintiff knowingly misclassified the TXu Registration works as an unpublished collection on her application. *DeliverMed Holdings, LLC*, 734 F.3d at 625. The distinction between a wholly unpublished collection of works on the one hand, and an unpublished collective work that includes previously published component works on the other, is esoteric and potentially confusing to a layperson; and, the record shows that Plaintiff was in fact confused about these two categories. As such, the Court declines to refer the question Defendant proposes regarding the publication status of the works in the TXu Registration to the Copyright Register under Section 411(b)(2).[8]

---

[8] The specific wording Defendant proposes is "[w]hether the Register of Copyrights would have refused Registration No. TXu 2-144-749 had she been made aware … that the statement in the application that the work sought to be registered was unpublished was not true, and in fact there were three works sought to be registered, and all of them were published on different dates." (Doc. 236 at 9.) Again, this wording is problematic because the TXu Registration works are registered as an unpublished collection of works rather than a singular collective "work."

### 3. The bench in the VA Registration deposit

Defendant next points out that Plaintiff included an "artistic bench" designed by someone else in her deposit for the VA Registration. (Doc. 236 at 3, 8; *see* Doc. 236-3 at 6, 13; Doc. 236-4 at 2.) The bench is white, sits in a corner of ISQ, and has irregularly cut ends resembling cracked sheets of ice and supports with stylized cut-outs. (Doc. 236-3 at 6, 13.) It is the sole object in the first photograph in the deposit and is also shown from above in another photograph.[9] (*Id.*) At her deposition, Plaintiff testified that "Katherine Lee designed the bench." (Doc. 236-4 at 2.) Nevertheless, on her application for the VA Registration, Plaintiff listed herself as the sole author of the work to be registered. (Doc. 236-3 at 2-3.) When asked why she included the bench in the deposit even though she was not its author, Plaintiff stated, "I didn't realize I did that, and I think that was probably a slip…. [Ms. Lee] definitely owns the copyright for that design." (Doc. 236-4 at 3-4.)

Notwithstanding this undisputed and very basic error, Plaintiff posits three reasons why the Court should not ask the Copyright Register whether she would have refused the VA Registration had she known Plaintiff did not author the bench. First, Plaintiff contends that the bench is not copyrightable because it is a useful article. (Doc. 250 at 6.) The Copyright Act defines a "useful article" as "an article having an intrinsic utilitarian function that is not merely to portray the appearance of the article or to convey information." 17 U.S.C. § 101. "The statute does not protect useful articles as such." *Star Athletica, L.L.C. v. Varsity Brands, Inc.*, 580 U.S. 405, 137 S. Ct. 1002, 1008 (2017). Rather, "the design of a useful article" is copyrightable only to the extent that it "incorporates pictorial, graphic, or sculptural features that can be identified separately from,

---

[9] One edge of the bench can also be seen in a third photograph in the deposit. (Doc. 236-3 at 30.)

and are capable of existing independently of, the utilitarian aspects of the article." 17 U.S.C. § 101. Thus, the Supreme Court has held that

> an artistic feature of the design of a useful article is eligible for copyright protection if the feature (1) can be perceived as a two- or three-dimensional work of art separate from the useful article and (2) would qualify as a protectable pictorial, graphic, or sculptural work either on its own or in some other medium if imagined separately from the useful article.

*Star Athletica, L.L.C.*, 137 S. Ct. at 1016.

The bench at issue here satisfies the two-part *Star Athletica* test. Its sculpted edges and stylized supports: (1) can be perceived as works of art separate from the bench; and, (2) would qualify as protectable pictorial, graphic, or sculptural works on their own or in some other medium if imagined separately from the bench. *Id.* Plaintiff recognized as much at her deposition, testifying that Ms. Lee "designed" the bench and "owns the copyright for that design." (Doc. 236-4 at 2-4.) Also, the VA Registration lists the basis for the registration as "[p]ictorial, graphic, and sculptural features identified separately from and capable of existing independently of the utilitarian aspects of a useful article." (Doc. 250-6 at 2.) Granted, the bench is not the only useful article in the deposit—the textured and painted walls, for example, would also fall into that category, (Doc. 236-3 at 43-45)—but it is certainly one such article. The Court rejects Plaintiff's argument that the bench is not copyrightable.

Plaintiff next suggests that the Court should not refer Defendant's proposed question regarding the bench to the Register because the bench was not included in the VA Registration. (Doc. 250 at 6-7.) This suggestion is wholly implausible in light of the photographs in the VA Registration deposit, particularly the first photograph, in which the bench is the only object. (Doc. 236-3 at 6, 13.)

Finally, Plaintiff contends that the Court should not refer Defendant's proposed question regarding the bench because she did not know she was required to identify Ms. Lee as the bench's author. (Doc. 346 at 4.) However, this contention is also wholly implausible, and not only because authorship is the basis of copyright. 17 U.S.C. §§ 102(a), 201(a). Additionally, when Plaintiff applied for the TXu Registration, Ms. Emmett told her that her application should identify material "from other sources."[10] (Doc. 250-4 at 2.) Ms. Emmett informed Plaintiff of this requirement on May 13, 2019, and Plaintiff applied for the VA Registration on September 19, 2019. (Doc. 236-3 at 3; Doc. 250-4 at 2.) In short, Plaintiff was at best willfully blind to the need to identify Ms. Lee as the bench's author when she applied for the VA Registration. *See Unicolors, Inc.*, 142 S. Ct. at 948 ("willful blindness may support a finding of actual knowledge" that a statement on a registration application is inaccurate).

Where a movant shows that a copyright holder has knowingly included inaccurate information on a registration application, "the court *shall* request the Register of Copyrights to advise the court whether the inaccurate information, if known, would have caused the Register of Copyrights to refuse registration." 17 U.S.C. § 411(b)(2) (emphasis added). Here, Defendant has shown that Plaintiff knowingly and inaccurately indicated that she authored the bench Ms. Lee designed on her application for the VA Registration. *Unicolors, Inc.*, 142 S. Ct. at 948. The Court will therefore grant Defendant's motion in part and ask the Copyright Register to advise the Court whether the inaccurate information, if known, would have caused her to refuse the registration.

**B.   Defendant's request for referral under the primary jurisdiction doctrine**

As a last argument in support of its motion, Defendant relies in its reply on the primary

---

[10] Ms. Emmett provided this information after Plaintiff told Ms. Emmett that her deposit for the TXu Registration included a photograph from the Themed Entertainment Association's website. (Doc. 250-3 at 2; Doc. 250-4 at 2.)

16

jurisdiction doctrine. (Doc. 270 at 13-16.) Because the Court will refer Defendant's proposed question regarding the VA Registration to the Copyright Register under Section 411(b)(2), it need not consider Defendant's primary jurisdiction argument with respect to that question. Rather, the Court will consider this argument only as applied to Defendant's proposed questions regarding the TXu Registration, which the Court has declined to refer under Section 411(b)(2).

Pursuant to the doctrine of primary jurisdiction, "[e]ven where a court has subject matter jurisdiction over a claim, courts have discretion to refer an issue or issues to an administrative agency." *TON Servs., Inc. v. Qwest Corp.*, 493 F.3d 1225, 1238 (10th Cir. 2007). In deciding whether to invoke the doctrine, courts in the Tenth Circuit should "consider whether the issues of fact in the case: (1) are not within the conventional experience of judges; (2) require the exercise of administrative discretion; or (3) require uniformity and consistency in the regulation of the business entrusted to the particular agency." *Id.* at 1239. However, there is

> no fixed formula for applying the doctrine. Courts should consider case-by-case whether the reasons for the existence of the doctrine are present and whether the purposes it serves [i.e., uniformity and resort to administrative expertise] will be aided by its application in the particular litigation.

*Id.* (quotation marks, ellipses, and citation omitted).

Applying the three *TON Services* factors, the Court finds that it would be inappropriate to refer Defendant's proposed questions regarding the TXu Registration to the Copyright Register under the primary jurisdiction doctrine. As to the first and second factors, the pertinent issues in the case are well within the conventional experience of judges and do not call for the exercise of administrative discretion. *Id.* Section 411(b)(2) specifically delineates the circumstances in which the Register's input regarding application inaccuracies is warranted, and as discussed in Section II.A., *supra*, Defendant has not shown that the TXu Registration presents such circumstances. Nor are the pertinent issues exceptional in that they demand technical expertise. For example, the issues

the Court has analyzed regarding the works' year of completion and publication status stand in sharp contrast to the issue referred to the Register in *Syntek Semiconductor Co. v. Microchip Technology Inc.*, 307 F.3d 775 (9th Cir. 2002), *i.e.*, "whether decompiled object code qualifies for registration as source code under the Copyright Act and regulations." *Id.* at 781.

As to the third *TON Services* factor, although the Copyright Act plainly envisions that copyright law should be uniform and consistent, the issues regarding the TXu Registration do not raise regulatory questions of broad significance or first impression. Rather, resolving these issues has simply required the application of established law to the case's particular facts. In sum, referring Defendant's proposed questions regarding the TXu Registration to the Copyright Register would not further the purposes of the primary jurisdiction doctrine and the Court therefore declines to refer them on that basis.[11]

### III. Conclusion

For the reasons set forth above, IT IS HEREBY ORDERED as follows:

1. Defendant Meow Wolf, Inc.'s Motion for Referral of Registration Questions Under 17 U.S.C. § 411(b)(2) to the Register of Copyrights (Doc. 236) is GRANTED IN PART and DENIED IN PART.

2. The Motion is GRANTED in that the Court refers the following question to the Register of Copyrights:

> Whether the Register of Copyrights would have refused Registration No. VA 2-170-075 had she been made aware that the applicant did not create or own the copyright in the artistic bench pictured [in] the deposit material.

(Doc. 236 at 9.)

---

[11] The Court also rejects the request in Defendant's reply for a stay pending the Copyright Register's response to any questions referred to her, (Doc. 270 at 5, 18), because the only question to be referred is not of such sweeping importance to the litigation that the entire proceeding should be halted until it is answered.

3.  In all other respects, the motion is DENIED.

IT IS SO ORDERED.

*Kirtan Khalsa*
KIRTAN KHALSA
UNITED STATES MAGISTRATE JUDGE
Presiding by Consent