**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

LAUREN ADELE OLIVER,

     Plaintiff,

v.                                   Civ. No. 20-237 KK/SCY

MEOW WOLF, INC., *et al.,*

     Defendants.

**<u>MEMORANDUM OPINION AND ORDER</u>**

THIS MATTER is before the Court on Defendants' Motion for Partial Summary Judgment Dismissing Plaintiff's Claim of Copyright Infringement for Displaying Ice Station Quellette at the House of Eternal Return (Doc. 278) ("Motion for Summary Judgment"), filed January 7, 2022. Also before the Court are the following procedural motions related to the Motion for Summary Judgment: (1) Defendants' Renewed Motion to File Under Seal Exhibit F to their Motion for Partial Summary Judgment (Doc. 292) ("Motion to Seal Exhibit F"), filed February 9, 2022; (2) Plaintiff's Motion for Leave to File Under Seal Pursuant to Protective Order (Doc. 294) ("Motion to Seal Summary Judgment Response"), filed February 11, 2022; (3) Plaintiff's Request for Surreply to Defendants' Reply in Support of their Motion for Summary Judgment (Doc. 352) ("Motion for Surreply"), filed April 13, 2022; (4) Defendants' Unopposed Motion to File Exhibit and Response Under Seal (Doc. 399) ("Motion to Seal Surreply Response"), filed May 6, 2022; (5) Plaintiff's Motion for Leave to File Surreply for the Limited Purpose of Supplementing the Record on Pending Motions for Summary Judgment with Recently-Discovered Evidence (Doc. 486) ("Motion to Supplement"), filed August 11, 2022; and, (6) Plaintiff's Unopposed Motion to File Under Seal (Doc. 484) ("Motion to Seal Supplement"), filed August 10, 2022.

Having reviewed the parties' submissions, the record, and the relevant law, and being otherwise sufficiently advised, the Court FINDS that:  (1) Defendants' Motion to Seal Exhibit F should be GRANTED; (2) Plaintiff's Motion to Seal Summary Judgment Response should be GRANTED IN PART and DENIED IN PART; (3) Plaintiff's Motion for Surreply should be GRANTED; (4) Defendants' Motion to Seal Surreply Response should be GRANTED IN PART and DENIED IN PART; (5) Plaintiff's Motion to Supplement should be GRANTED; (6) Plaintiff's Motion to Seal Supplement should be GRANTED IN PART and DENIED IN PART; and, (7) Defendants' Motion for Summary Judgment should be GRANTED.

## I.  Factual Allegations and Procedural History

In her amended complaint, Plaintiff Lauren Oliver alleges the following. From 2006 to 2015, Plaintiff created and exhibited versions of "the Space Owl," a character at the center of a project entitled "Ice Station Quellette" ("ISQ").  (Doc. 148 at 3-4.) Plaintiff holds registered copyrights relating to the Space Owl and ISQ. (*Id.* at 11.) Defendant Meow Wolf, Inc. ("MWI") is a Delaware corporation with a principal place of business in New Mexico. (*Id.* at 2.) Defendant Vince Kadlubek was at relevant times a director and/or officer of Defendant MWI. (*Id.*) Before Defendant MWI's incorporation, "Meow Wolf"[1] was an "artists' collective" that acted through Defendant Kadlubek and other representatives. (*See id.* at 3-6.)

In early 2015, "Meow Wolf" representatives asked Plaintiff to install ISQ at a permanent exhibition in Santa Fe, New Mexico, called the "House of Eternal Return" ("HoER"). (*Id.* at 4.) "In exchange for [Plaintiff's] timely installation of ISQ at [the] HoER without initial

---

[1] Plaintiff in her original and amended complaints, Defendants in their second amended answer and counterclaim, and both sides in other documents filed in this matter, often refer to "Meow Wolf" without identifying the particular entity or entities to which they are actually referring. (*See generally* Docs. 1, 148, 183; *see also, e.g.*, Doc. 278-5.) In this Memorandum Opinion and Order, the Court puts such references in quotation marks because, as further discussed below, there are at least four entities to which "Meow Wolf" could refer, *i.e.*, (1) the Meow Wolf artists' collective, (2) Meow Wolf, LLC, (3) VCMSE Art City, LLC d/b/a Meow Wolf, and/or (4) Defendant Meow Wolf, Inc.

compensation," these representatives, including Defendant Kadlubek, "offered [Plaintiff] membership in the Meow Wolf artists' collective and a right to receive a share of Meow Wolf's revenue." (*Id.* at 5, 19.) Accepting this offer, Plaintiff designed and installed ISQ and the Space Owl at the HoER. (*Id.* at 5-6.) The HoER opened in March 2016 and was highly successful. (*Id.* at 6, 11, 12.) "Meow Wolf" grew into a multi-million-dollar enterprise, and the Space Owl became an iconic element of the HoER. (*Id.*)

In 2017 or 2018, Defendants began to call artists' compensation a bonus program rather than a revenue share. (*Id.* at 6.) Also, in 2018, Plaintiff discovered that Defendants were violating her intellectual property ("IP") rights by, *e.g.*, including images of the Space Owl in books sold in the HoER gift shop. (*Id.* at 6-7, 12-13.) Plaintiff tried to negotiate a formal agreement with Defendants without success, and in June 2018, she asked "Meow Wolf" to stop using the Space Owl until an agreement was reached. (*Id.*) Nevertheless, in December 2018, Plaintiff learned that "Meow Wolf" had used the Space Owl in a documentary. (*Id.* at 7.)

At a meeting in June 2019, Defendant Kadlubek demanded that Plaintiff either sell Defendants all rights to the Space Owl "for a nominal sum" or remove ISQ from the HoER without additional compensation. (*Id.* at 8, 14.) "Because of the way it is constructed, removal of the installation would require its destruction." (*Id.* at 10.) Although a significant portion of "Meow Wolf's" value is due to ISQ and the Space Owl, to date, Plaintiff has received only $2,000 from "Meow Wolf" for her work. (*Id.* at 8, 15.)

Plaintiff filed her original complaint against Defendants on March 16, 2020. (Doc. 1 at 1-2.) In it, Plaintiff asserted claims for copyright infringement, violation of the Visual Artists Rights Act, breach of contract and of the implied covenant of good faith and fair dealing, unjust enrichment, conversion, intentional and negligent misrepresentation, and constructive trust. (*Id.* at

15-21.) Based on these claims, she sought injunctive relief, compensatory, punitive, and statutory damages, equitable relief including disgorgement of unjust enrichment and conveyance of an ownership interest in the Meow Wolf artists' collective, and attorney's fees and costs. (*Id.* at 22-24.) On Defendants' motion, the Court dismissed Plaintiff's conversion claims on November 25, 2020. (Doc. 59.) On June 1, 2021, Plaintiff amended her complaint to add promissory estoppel claims against Defendants. (Doc. 148.)

On July 6, 2021, Defendant MWI filed a declaratory judgment counterclaim admitting that there was a contract between the parties but asserting different terms. (Doc. 183.) In support, Defendant MWI alleges the following. "Meow Wolf began in 2008 as a group of artists working together to build art shows, host music shows, and be a social group." (*Id.* at 18.) Plaintiff participated in the group in 2008, but not between 2009 and 2015. (*Id.*) After a financially successful show in 2011, "the first Meow Wolf company was formed." (*Id.* at 18-19.) In 2014, "Meow Wolf" began making plans to open the HoER as a permanent exhibition. (*Id.* at 19.)

"Meow Wolf" purchased the materials for artists' installations at the HoER and in some cases provided "small up-front stipends." (*Id.*) It also "created a deferred compensation program initially informally referred to as the artist revenue sharing program, and formally named [the] Artist Bonus Program (ABP)." (*Id.*) The ABP "earmarked $1 million in future profits" to pay artists who installed pieces at the HoER. (*Id.*)

> The 113 artists in the program were each given an individual cap on their share of the ABP based on the scope and amount of work they were to build. In each year that HoER rev[e]nue passed a set cost number, 11% of profits would flow into the ABP to pay artists.… Once an artist's cap was reached, that artist would drop out of the ABP pool and the remaining artists would be paid until each artist had received her set share stipend.

(*Id.* at 19-20.) "Meow Wolf told artists that … after [the] HoER was built … an artist's cap would be adjusted if he or she underperformed or overperformed." (*Id.* at 20.)

4

Having solicited and accepted Plaintiff's proposal to install ISQ at the HoER, "Meow Wolf, through its CEO [Defendant] Kadlubek," sent Plaintiff an e-mail in April 2015 proposing to pay Plaintiff $1,000 as an "up-front stipend" and $10,000 as a "revenue share stipend," in addition to buying the materials for Plaintiff's installation. (*Id.* at 21.) Defendant Kadlubek also indicated that Plaintiff would own the IP rights in ISQ but "Meow Wolf would own ISQ as tangible property." (*Id.*) Plaintiff responded, "Hey. Awesome. Good luck tonight." (*Id.*) She did not object to the terms of this e-mail or ask to change them during the time she spent installing ISQ at the HoER. (*Id.* at 21-22.)

Another artist, Cary Cluett, helped Plaintiff to install ISQ without charge. (*Id.* at 22.) Plaintiff directed that her $1,000 personal stipend be paid to Mr. Cluett; and, "[i]n recognition of [Mr.] Cluett's substantial contribution to ISQ as well as other HoER areas, Meow Wolf gave him a $10,000 participation stipend in [the] ABP and adjusted [Plaintiff's] participation stipend down to $7,000." (*Id.* at 22-23.) In March 2017, "Meow Wolf" paid Plaintiff $2,000 under the ABP. (*Id.* at 23.) Between 2016 and 2019, she also "cashed more than $20,000" in checks from "Meow Wolf" for the sale of consigned items in the HoER's gift shop. (*Id.*)

In 2018, Defendant MWI tried to pay Plaintiff an additional $2,750 under the ABP but Plaintiff asked for space to deal with family issues. (*Id.* at 24.) In 2019, "Meow Wolf" tried to pay Plaintiff "her entire remaining balance of $5,000." (*Id.*) It told her that to receive this check she would have to execute an IP assignment; however, she knew "Meow Wolf" was not trying to buy her IP rights for $5,000 because a month earlier it had offered to buy these rights for $35,000. (*Id.*) Based on these allegations, Defendant MWI seeks a declaration that Defendant "MWI and Plaintiff entered into a contract whereby Plaintiff was entitled to … $10,000[,]" rather than "an unlimited

share in [Defendant] MWI's revenue" and/or "an ownership interest in [Defendant] MWI." (*Id.* at 26-27.)

Defendants filed their Motion for Summary Judgment on January 7, 2022. (Docs. 277, 278.) In it, Defendants seek summary judgment on Plaintiff's copyright infringement claims based on Defendant MWI's display of ISQ at the HoER. (*Id.*) Plaintiff responded in opposition to the motion on February 11 and 12, 2022, and Defendants replied in support of it on March 11, 2022. (Docs. 297-99, 330.)

The parties have also filed several procedural motions related to the Motion for Summary Judgment. First, Defendants filed their Motion to Seal Exhibit F on February 9, 2022. (Doc. 292.) Plaintiff responded to this motion on March 2, 2022, and Defendants replied in support of it on March 16, 2022. (Docs. 320, 334.) Second, Plaintiff filed her Motion to Seal Summary Judgment Response on February 11, 2022. (Doc. 294.) Defendants responded to this motion on February 25, 2022, and Plaintiff did not file a reply. (Doc. 316.) Third, Plaintiff filed her Motion for Surreply on April 13, 2022. (Doc. 352.) Defendants responded in opposition to the motion and filed their unopposed Motion to Seal Surreply Response on May 6, 2022. (Docs. 399-401.) And finally, on August 10 and 11, 2022, Plaintiff filed her Motion to Supplement and also her Motion to Seal Supplement. (Docs. 484, 486-87.) Defendants responded in opposition to the Motion to Supplement on August 22, 2022, and Plaintiff replied in support of it on September 6, 2022. (Docs. 490, 495-96.) The Court will first address the procedural motions related to the Motion for Summary Judgment and then turn to the dispositive motion.

## II.  **Procedural Motions**

**A.**      **Defendants' Motion to Seal Exhibit F**

Defendants seek to seal Exhibit F to their Motion for Summary Judgment. (Doc. 292.)
Exhibit F is a spreadsheet offered to show that 112 artists participated in the ABP. (Doc. 278 at 9;
Doc. 278-6.) The spreadsheet lists each artist's name, "Original Bonus Granted," "2017 Payment,"
"2018 Payment," and "Remaining Balance." (Doc. 278-6 at 1.) In their motion, Defendants seek
leave to file Exhibit F under seal, and to publicly file a version from which all artists' names except
Plaintiff's have been redacted. (Doc. 292 at 2-3.) According to Defendants, "[i]n this way, each
individual's privacy is respected and no names are attached to compensation numbers, and the
document can still show the total number of artists under the [ABP]." (*Id.* at 2.) In response,
Plaintiff counters that ABP participants are "free … to share their information with one another"
and that the spreadsheet "includes individuals who have testified or will testify … about the
payments they received." (Doc. 320 at 2.) According to Plaintiff, the proposed redactions would
"affect the ability of the public to understand [Defendants'] disparate and potentially fraudulent
treatment of contributing artists," and "[o]ther artists … have a right to know how fellow artists"
who contributed to the HoER have "fared." (*Id.*)

"Courts have long recognized a common-law right of access to judicial records." *Mann v.*
*Boatright*, 477 F.3d 1140, 1149 (10th Cir. 2007). "Although this right is not absolute, there is a
strong presumption in favor of public access … particularly … where the district court use[s] the
sealed documents to determine litigants' substantive legal rights." *United States v. Pickard*, 733
F.3d 1297, 1302 (10th Cir. 2013) (citations and quotation marks omitted).

> [T]he presumption in favor of access to judicial records may be overcome where
> countervailing interests heavily outweigh the public interests in access. The burden
> is on the party seeking to restrict access to show some significant interest that
> outweighs the presumption.

*Colony Ins. Co. v. Burke*, 698 F.3d 1222, 1241 (10th Cir. 2012) (citation and quotation marks omitted). Nevertheless, "where the documents play only a negligible role in the performance of Article III duties, the weight of the presumption is low and amounts to little more than a prediction of public access absent a countervailing reason." *Riker v. Fed. Bureau of Prisons*, 315 F. App'x 752, 755 (10th Cir. 2009) (quotation marks omitted).

"[T]he district court, in exercising its discretion, must weigh the interests of the public, which are presumptively paramount, against those advanced by the parties." *Pickard*, 733 F.3d at 1302 (quotation marks omitted). "Whether a trial court exercises sound discretion will be based on the facts and circumstances of the individual case and the weighing of the parties' interests." *Riker*, 315 F. App'x at 755. The district court must also "consider whether selectively redacting just the … sensitive, and previously undisclosed, information from the sealed … documents and then unsealing the rest" would adequately protect the privacy interests at stake. *Pickard*, 733 F.3d at 1304.

Defendants' proposed redactions to Exhibit F are reasonable and proper in light of the foregoing standards. Non-party ABP participants have a privacy interest in information about the bonus payments they received from Defendants. *See, e.g., Fullbright v. State Farm Mut. Auto. Ins. Co.*, No. 09-cv-297, 2010 WL 300436, at *4 (W.D. Okla. Jan. 20, 2010) (noting the "personal and sensitive" nature of personnel files and declining to order production of "information from personnel files regarding merit pay or related salary information"). Certainly, as Plaintiff argues, individual participants may choose to publicly disclose information about their bonus payments, but this does not mean Defendants should do so without their consent.

Moreover, at this juncture, the identities of ABP participants other than Plaintiff contribute nothing to the Court's resolution of Defendants' Motion for Summary Judgment or the public's

ability to understand the parties' allegations. And, as redacted, Exhibit F will still inform other ABP participants (and the public) how other artists fared without tying names to payment amounts. In these circumstances, the weight of the presumption of public access to the proposed redacted information is low and the countervailing need to preserve non-parties' privacy outweighs it. *Riker*, 315 F. App'x at 755. The Court will therefore grant Defendants' Motion to Seal Exhibit F and seal the unredacted version of Exhibit F to Defendants' Motion for Summary Judgment (Doc. 278-6). The redacted version of the exhibit (Doc. 292-1) has already been filed in the public record and need not be refiled.[2]

**B.     Plaintiff's Motion to Seal Summary Judgment Response**

In her Motion to Seal Summary Judgment Response, Plaintiff seeks leave to file her response to Defendants' Motion for Summary Judgment under seal. (Doc. 294.) Plaintiff so moves in compliance with the Court's October 22, 2020 Protective Order, (Doc. 56), because her response and attached exhibits include information and documents Defendants designated as confidential. (Doc. 294 at 1.) However, Plaintiff "does not agree that any of the evidence in and documents attached to Plaintiff's response … constitute 'Confidential' or 'Highly Sensitive Documents.'" (*Id.* (emphasis omitted).)

In their response to Plaintiff's motion, Defendants:  (a) propose limited redactions to Plaintiff's Exhibits 7 and 11 to protect the addresses, signatures, capital contributions, and percentage interests of the purported founders of Meow Wolf, LLC ("MW LLC") and actual founders of VCMSE Art City, LLC ("Art City"); (b) ask that Exhibit 23 remain sealed because it includes nonpublic financial and investment information and business strategy; and, (c) state that

---

[2] However, if in a future order the Court relies on any information that this Memorandum Opinion and Order requires or allows to be redacted, the Court may weigh the interests of the parties and the public differently and may require the information to be filed in the public record.

all other exhibits previously designated as confidential can be unsealed. (Doc. 316 at 2.) Defendants do not address the unredacted body of Plaintiff's summary judgment response (Doc. 297), which she filed under seal separately from the unredacted exhibits (Doc. 298).

Exhibit 7 is an unexecuted Operating Agreement and Operating Manual for MW LLC, (Doc. 298-7); Exhibit 11 is an executed Operating Agreement for Art City,[3] (Doc. 298-11); and, Exhibit 23 is an incomplete Business Line of Credit Application Package that Art City generated. (Doc. 298-23.) In her summary judgment response (Doc. 297), Plaintiff does not cite to the portions of Exhibits 7 and 11 that Defendants propose to redact; and, she cites to Exhibit 23 only for the proposition that a 15-member "Core Team … carr[ied] significant revenue share agreements with the intention of converting to equity upon completion of" the HoER. (Doc. 297 at 10; Doc. 298-23 at 4.)

The Court finds that Defendants' interest in keeping the proposed redacted portions of Exhibits 7 and 11 confidential outweighs the public's interest in having access to this information. The information to be redacted is nonpublic and sensitive or proprietary and plays no role in the Court's resolution of Defendants' Motion for Summary Judgment. The Court will therefore grant Plaintiff's Motion to Seal Summary Judgment Response in part and will seal Exhibits 7 and 11 to her summary judgment response and direct her to file these exhibits in the public record with Defendants' proposed redactions.

However, portions of Exhibit 23 play a role in the Court's resolution of Defendants' Motion for Summary Judgment and neither side has addressed whether redacting the nonpublic, sensitive information in this exhibit would sufficiently preserve any protection or privilege that might apply

---

[3] Defendants initially refer to Exhibit 11 as Exhibit 12 in their response to Plaintiff's Motion to Seal Summary Judgment Response. (Doc. 316 at 2.)

to its contents. In support of Defendants' designation of this document as confidential, defense counsel attested that "[t]he document contains … specific amounts of private investment into the company and capital contribution," (Doc. 316-1 at 2), but this is exactly the kind of information that could easily be redacted. The Court therefore finds that the parties have failed to justify sealing Exhibit 23 and will deny the portion of Plaintiff's Motion to Seal Summary Judgment Response seeking such relief. Rather, the Court will direct Plaintiff to file Exhibit 23 in the public record after redacting the dollar amounts in the exhibit, thus protecting the information defense counsel identified in his affidavit. These amounts are nonpublic and sensitive and play no role in the Court's resolution of Defendants' Motion for Summary Judgment.

The following procedures will be used to implement the Court's ruling. The Court will direct the Clerk to unseal the unredacted version of Plaintiff's response (Doc. 297) to Defendants' Motion for Summary Judgment. The unredacted version of Plaintiff's exhibits to her response (Doc. 298) shall remain sealed at this time, and Plaintiff shall file these exhibits in the public record with the following modifications:   (1) Exhibits 7 and 11 shall include Defendants' proposed redactions; and, (2) Exhibit 23 shall include the redactions the Court has permitted. The publicly filed exhibits shall not include any other redactions or omissions, and the Court will strike the redacted exhibits previously filed in the public record (Doc. 299) as duplicative.

C.     **Plaintiff's Motion for Surreply**

In her Motion for Surreply (Doc. 352), Plaintiff seeks leave to file a surreply to Defendants' Motion for Summary Judgment. "The filing of a surreply requires leave of the Court." D.N.M.LR-Civ. 7.4(b). However, if the Court "relies on new materials or argument in a reply brief, it may not forbid the nonmovant from responding to these new materials." *Daneshvar v. Graphic Tech., Inc.*, 237 F. App'x 309, 318 (10th Cir. 2007) (quoting *Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159,

1165 (10th Cir. 1998)). This rule applies equally to new arguments and to new materials submitted in support of legal arguments previously made. *See id.* (citing *Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1139 n.13 (10th Cir. 2003)).

Here, Defendants attached new exhibits to their summary judgment reply to rebut arguments Plaintiff made in her response. (*See* Docs. 330-1 to 330-10.) The Court does not "fault" Defendants for doing so, (Doc. 400 at 3), but because it will rely on some of these exhibits in resolving Defendants' dispositive motion, it must allow Plaintiff to respond to them. *Doebele*, 342 F.3d at 1139 n.13; *Beaird*, 145 F.3d at 1165; *Daneshvar*, 237 F. App'x at 318. Moreover, Defendants will not be unfairly prejudiced because, when they responded to Plaintiff's Motion for Surreply, they took the opportunity to address the substance of the proposed surreply as well. (*See generally* Doc. 400.) The Court will therefore grant Plaintiff's Motion for Surreply and deem the surreply attached to the motion (Doc. 352-1) filed as of the date of entry of this Memorandum Opinion and Order.

## D.   Defendants' Motion to Seal Surreply Response

In their unopposed Motion to Seal Surreply Response, Defendants seek leave to file their unredacted response (Doc. 400) to Plaintiff's Motion for Surreply under seal and to file a redacted response (Doc. 401) in the public record. (Doc. 399.) Defendants' sole argument in support of this request is that their response and attached exhibit quote from or consist of materials designated as confidential under the Court's Protective Order (Doc. 56). (Doc. 399 at 1.) The Court will grant Defendants' motion in part and deny it in part as set forth below.

The Protective Order "does not entitle [the parties] to seal confidential information filed with the Court." (Doc. 56 at 6.) Rather, as discussed above, "[t]he burden is on the party seeking to restrict access [to judicial records] to show some significant interest that outweighs the

12

presumption" of public access. *Colony Ins. Co.*, 698 F.3d at 1241 (quotation marks omitted). Here, Defendants have wholly failed to meet that burden. Moreover, the Court has reviewed the information Defendants propose to redact and, with one limited exception, this information pertains to substantive issues the parties have briefed extensively and is not so sensitive that Defendants' interest in keeping it private would outweigh the presumption of public access to judicial records. The Court will therefore deny Defendants' motion to seal, except that it will permit Defendants to redact the dollar amounts on page 10, lines 1 and 13, of the exhibit attached to their response. (*See* Doc. 400-1 at 10, Lines 145:1, 13.) These quantify Defendant Kadlubek's capital contributions to MW LLC and play no part in the Court's consideration of Defendants' Motion for Summary Judgment.[4] Defendants shall file their response to Plaintiff's Motion for Surreply in the public record with the permitted redactions but no other redactions or omissions. The unredacted response (Doc. 400) shall remain sealed at this time, and the Court will strike the redacted response previously filed in the public record (Doc. 401) as duplicative.

E.    **Plaintiff's Motion to Supplement**

In her Motion to Supplement, Plaintiff seeks leave to file a Surreply for the Limited Purpose of Supplementing the Record on Pending Motions for Summary Judgment with Recently-Discovered Evidence (Doc. 486-1) ("Supplement"). (Doc. 486.) In support, Plaintiff asserts that Defendants produced 4,743 pages of documents on June 16, 2022, which caused Plaintiff to realize that not all of Defendants' prior productions had been properly uploaded to her e-discovery database. (*Id.* at 3.) The June 16, 2022 production thus resulted in the need for Plaintiff to review "many thousands of documents … for the first time." (*Id.*) Pursuant to this review, Plaintiff

---

[4] Page ten of this exhibit also quantifies Defendant Kadlubek's past personal income, (Doc. 400-1 at 10, Lines 145:16, 20), but the record reflects that he has not kept this kind of information confidential, so the Court will not permit Defendants to redact it. (Doc. 298-5 at 2-3.)

identified five documents she seeks to add to the record regarding the parties' pending summary judgment motions, some of which were fully briefed before June 16, 2022. (Doc. 486-1 at 10-26.)

The Court finds that the five documents attached to Plaintiff's Supplement are relevant to issues addressed in the parties' pending dispositive motions and that Plaintiff has shown good cause and excusable neglect for failing to proffer these documents previously. The Court will therefore grant Plaintiff's Motion to Supplement and allow Plaintiff to file her Supplement as provided in Section II.F, below.

## F.    Plaintiff's Motion to Seal Supplement

In her unopposed Motion to Seal Supplement, Plaintiff seeks leave to file her Supplement (Doc. 486-1) under seal. (Doc. 484.) Plaintiff's sole argument in support of this request is that the attached exhibits include documents Defendants have designated as confidential pursuant to the Court's Protective Order. (*Id.* at 1.) Defendants have not responded in support or opposition. The Court will grant Plaintiff's motion to seal in part and deny it in part as follows.

Again, the Court's Protective Order "does not entitle [the parties] to seal confidential information filed with the Court." (Doc. 56 at 6.) Rather, "[t]he burden is on the party seeking to restrict access [to judicial records] to show some significant interest that outweighs the presumption" of public access. *Colony Ins. Co.*, 698 F.3d at 1241 (quotation marks omitted). Here, neither party has met that burden. Moreover, the Court has reviewed the exhibits attached to Plaintiff's Supplement and, with the exceptions listed below, they concern issues that the parties have briefed extensively in dispositive motions and are not so sensitive that any party's interest in keeping them private would plainly outweigh the presumption of public access to judicial records. The Court will therefore deny Plaintiff's motion to seal, except that it will permit the redaction of: (a) the portion of Exhibit B that begins after "On Wed, Jun 1, 2016 at 5:03 PM," up to but not

including Defendant Kadlubek's and Mr. Tulchin's signature blocks at the end of the exhibit, (Doc. 486-1 at 12-14); (b) the portions of Exhibit C that disclose Defendant Kadlubek's cell phone number and signature, (*id.* at 16-18); and, (c) the portions of Exhibit D that begin after "1. Caterpillar building" up to but not including "4. Your labor costs increased tremendously," (*id.* at 20), and then after "Sent:  Monday, May 22, 2017 3:45 PM" up to but not including Mr. Tulchin's and Defendant Kadlubek's signature blocks at the end of the exhibit, (*id.* at 21-24), as well as the dollar amounts in the unredacted, non-highlighted portions of this exhibit. These portions of the exhibits include confidential and sensitive or proprietary information and play no role in the Court's consideration of Defendants' Motion for Summary Judgment.

To implement this ruling, Plaintiff shall file her Supplement and attached exhibits in the public record with the permitted redactions but no other redactions or omissions. The unredacted Supplement (Doc. 486-1) will remain sealed at this time, and the Court will strike the redacted Supplement previously filed in the public record (Doc. 487-1) as duplicative.

### III.   Defendants' Motion for Summary Judgment

Finally, in their Motion for Summary Judgment, Defendants seek summary judgment on Plaintiff's copyright infringement claims based on Defendant MWI's display of ISQ at the HoER. (*See generally* Doc. 278.) In support, Defendants present two legal theories, *i.e.*, that:  (1) Plaintiff granted Defendant MWI an irrevocable implied license to display the version of ISQ installed at the HoER; and, (2) Defendant MWI owns the version of ISQ installed at the HoER and is therefore legally entitled to display it.[5] (*Id.*) For the reasons discussed herein, the Court finds that Defendant

---

[5] In their briefing on the Motion for Summary Judgment, the parties tacitly recognize that if Defendant MWI is entitled to summary judgment on Plaintiff's copyright infringement claims based on the display of ISQ at the HoER, then Defendant Kadlubek is as well, because at all relevant times he was acting on behalf of the company or companies operating the HoER and not for himself individually. (*See* Docs. 278, 297, 330, 352, 400); *see generally Diversey v. Schmidly*, 738 F.3d 1196, 1204 (10th Cir. 2013) ("[A] defendant can … be secondarily liable for another's copyright infringement under principles of vicarious and contributory liability."). The Court will therefore evaluate Plaintiff's

MWI holds an irrevocable implied nonexclusive license to display ISQ at the HoER and, as such, Defendants are entitled to summary judgment on Plaintiff's copyright infringement claims based on that display. For purposes of adjudicating Defendants' entitlement to summary judgment on Plaintiff's copyright infringement claims based on the display of ISQ at the HoER, the Court need not and does not decide whether Defendant MWI owns the version of ISQ installed at the HoER.

## A.   Legal Standards Governing Summary Judgment

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Jones v. Kodak Med. Assistance Plan*, 169 F.3d 1287, 1291 (10th Cir. 1999) (quotation marks omitted); Fed. R. Civ. P. 56(a). "A dispute is genuine when the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party, and a fact is material when it might affect the outcome of the suit under the governing substantive law." *Bird v. W. Valley City*, 832 F.3d 1188, 1199 (10th Cir. 2016) (quotation marks and brackets omitted). Only material factual disputes preclude the entry of summary judgment. *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000). If the nonmovant demonstrates a genuine dispute as to material facts, the Court views the facts in the light most favorable to the nonmovant. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009). However, the Court will not draw "unreasonable inferences that are unsupported by the record." *Wellington v. Daza*, — F. App'x —, 2022 WL 3041100, at *2 (10th Cir. Aug. 2, 2022).

The movant bears the initial burden of demonstrating the absence of a genuine issue of material fact and its entitlement to a judgment as a matter of law. *Adler v. Wal-Mart Stores, Inc.*,

---

claims against Defendant Kadlubek jointly with her claims against Defendant MWI in this Memorandum Opinion and Order.

144 F.3d 664, 670-71 (10th Cir. 1998). Where a defendant carries this burden in support of an affirmative defense, the plaintiff in response "need only identify a disputed material fact relative to the affirmative defense." *Hamric v. Wilderness Expeditions, Inc.*, 6 F.4th 1108, 1122 (10th Cir. 2021) (emphasis and citations omitted). "[W]here the moving party has the burden of proof," as when a defendant relies on an affirmative defense, "his showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Leone v. Owsley*, 810 F.3d 1149, 1153 (10th Cir. 2015) (emphases and brackets omitted).

## B.    Material Facts

The following facts are not genuinely disputed for purposes of Defendants' Motion for Summary Judgment, except as specifically noted. The Meow Wolf artists' collective began in 2008 and, with the exception of a "Meow Wolf" non-profit corporation organized by Defendant Kadlubek and two others in February 2008 and revoked in June 2008,[6] it was not associated with a "formed legal entity" until the organization of Meow Wolf, LLC ("MW LLC"). (Doc. 298-1 at 3; Doc. 330-3 at 3; *see also* Doc. 297 at 2.) The parties have not identified any evidence indicating how many artists were members of the collective or what criteria, if any, were used to select them. (Docs. 278, 297, 330, 352, 400; *see also* Doc. 278-4 at 24 ("Plaintiff's understanding is that the membership in the collective changed over time.").)

MW LLC was formed on September 16, 2011.[7] MW LLC was funded with the proceeds

---

[6] The Court takes judicial notice of the founders of the Meow Wolf nonprofit corporation, and the month and year the entity was formed and revoked; this information is listed on the New Mexico Secretary of State's ("NM SOS") website at:    https://portal.sos.state.nm.us/BFS/online/CorporationBusinessSearch/CorporationBusinessInformation    (last accessed Sept. 1, 2022). *See* Fed. R. Evid. 201(b) (courts may "judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned").

[7] The Court takes judicial notice of MW LLC's formation date, which is listed on the NM SOS website at: https://portal.sos.state.nm.us/BFS/online/CorporationBusinessSearch/CorporationBusinessInformation (last accessed Sept. 1, 2022).

of an art show by the Meow Wolf artists' collective in which Plaintiff did not participate. (Doc. 278-4 at 8, 20-21, 23-24; Doc. 298-1 at 4-5; Doc. 298-18 at 2.) An unexecuted operating agreement lists Defendant Kadlubek, Matt King, Corvas Brinkerhoff, Emily Montoya, and Caity Kennedy as the company's founding members. (Doc. 298-7 at 2, 3, 15.) However, Defendant Kadlubek testified that the collective elected him as the company's sole member. (Doc. 298-6 at 3-5.) On August 11, 2015, the City of Santa Fe issued a business license to MW LLC. (Doc. 377-3 at 2.)

VCMSE Art City, LLC ("Art City") was formed on October 17, 2014.[8] Art City did business as "Meow Wolf" and its stated purpose was "to open and operate art centers in Santa Fe, New Mexico and possibly in other locations." (Doc. 298-11 at 2.) On January 15, 2015, Art City obtained a taxpayer identification number from the New Mexico Taxation and Revenue Department. (Doc. 412-1 at 1.) However, the City of Santa Fe has no record of issuing a business license to Art City. (Doc. 352-1 at 15-16.) The company originally had six equity holders, *i.e.*, Defendant Kadlubek, Mr. King, Mr. Brinkerhoff, Ms. Montoya, Ms. Kennedy, and Sean Di Ianni.[9] (Doc. 362-8 at 2.) Its January 2015 Operating Agreement designated Defendant Kadlubek as its initial CEO. (Doc. 298-11 at 2, 5.)

About a year before construction on the HoER began, Defendant Kadlubek presented a slide deck at an "artists call meeting" of more than 50 people at Santa Fe's Center for Contemporary Arts ("CCA"). (Doc. 330-2 at 2, 5-7; Doc. 330-3.) The slide deck concerned "the first permanent Meow Wolf experience," *i.e.*, the HoER. (Doc. 330-3 at 2.) It identified "Meow

---

[8] The Court takes judicial notice of Art City's formation date, which is listed on the NM SOS website at: https://portal.sos.state.nm.us/BFS/online/CorporationBusinessSearch/CorporationBusinessInformation (last accessed Sept. 1, 2022).

[9] Art City subsequently added six other equity holders, *i.e.*, David Kantor, Damian Taggart, Mark Di Ianni, Kathy Di Ianni, Mat Crimmins, and Stewart Alsop. (Doc. 362-8 at 2.)

Wolf' as an "arts and entertainment production company," for which it provided the following "back story":

> Originally organized as an informal art collective in 2008 by a small group of dedicated Santa Fe artists, Meow Wolf has created 22 fully-immersive exhibits in 8 different cities …. In preparation for the first permanent exhibition, Meow Wolf organized as an LLC in 2014 with 6 equity partners:  Vince Kadlubek, Sean Di Ianni, Matt King, Emily Montoya, Caity Kennedy, and Corvas Brinkerhoff.[10]

(*Id.* at 3.) On January 29, 2015, Defendant Kadlubek e-mailed a "press packet" that included the same back story to local, regional, and national media contacts. (Doc. 330-4 at 1-2.)

Meanwhile, on January 27, 2015, Ms. Kennedy e-mailed Plaintiff from "caity@meowwolf.com" inviting Plaintiff to "submit a proposal to this colossal project we're working on." (Doc. 421-4 at 2.) In February and March 2015, Plaintiff and Ms. Kennedy exchanged e-mails regarding the proposal, which Plaintiff submitted on February 11, 2015. (Doc. 391-3; *see also* Doc. 278-4 at 21 ("In early 2015, Caity Kennedy reached out and asked Plaintiff to submit a proposal" for the HoER, which "Plaintiff ultimately did.").)

Defendant Kadlubek signed an agreement between Comcast Business and MW LLC for internet service on March 22, 2015. (Doc. 486-1 at 16-18.)

On April 2, 2015, Defendant Kadlubek sent Plaintiff an e-mail from "vince@meowwolf.com" entitled "Meow Terms," addressing "the contractual terms for [her] involvement in the Meow Wolf project." (Doc. 278-1 at 1.) In pertinent part, the e-mail stated:

> We have $1000 allocated for your personal stipend to complete the project(s). You will be paid $250 twice a month from July until September, for a total of $1000. In addition, we want to offer you $10,00 [sic] of revenue share stipend, which we can go over in more depth when we meet. We will also be purchasing all the materials agreed upon for your project. I hope this amount works for you. Please let me know if you have any questions or concerns before I send over the contract…. It is

---

[10] As already noted, Art City was organized in 2014, while MW LLC was organized in 2011. Also, Mr. Di Ianni was a founding member of Art City but not of MW LLC. (*Compare* Doc. 298-6 at 3-5 *and* Doc. 298-7 at 2, 3, 15 *with* Doc. 298-11 at 2 *and* Doc. 362-8 at 2.) It thus appears that the company to which the slide deck referred was Art City. (Doc. 330-3 at 3.)

> important to note that you retain all intellectual property rights for your pieces and can sell reproductions, or images. Meow Wolf will own the actual pieces of work that you supply to the exhibit.

(*Id.*) Plaintiff initially responded to this message on April 8, 2015 with five words: "Hey. Awesome. Good luck tonight." (*Id.*) On April 22, 2015, however, she e-mailed Defendant Kadlubek again, stating, "I'm not sure I actually have a contract yet – I thought you sent, and I can't find it." (Doc. 166-11 at 1.)

On April 27, 2015, Defendant Kadlubek e-mailed Plaintiff and 37 others regarding "Meow Wolf Meeting (Contracts, Please Attend)." (Doc. 132-11 at 1.) In this message, Defendant Kadlubek wrote that he had "sent out preliminary numbers to most people, and most people should have been communicating with Caity along the way." (*Id.*) He then called a meeting for May 6, which was "pretty close to mandatory – as I want to go over some logistical things with everyone, hand everyone their contract, and get things clarified." (*Id.*) However, Plaintiff had stopped using the e-mail account to which Defendant Kadlubek sent this message because "[i]t had been used in the Anthem breach."[11] (Doc. 170-14 at 1; Doc. 421-5 at 15-17.) Plaintiff's account sent Defendant Kadlubek an auto-response with the subject line, "I'm suspending this email," stating, "[p]lease remove this email address from your contact list. Thanks to hackers, I am no longer using it. If you receive an email from this address, do not open it! Please contact me through other means to get my new email contact." (Doc. 170-14 at 1.)

Ms. Kennedy attested that she recalls "looking at [Plaintiff's] contract with her" in person "during the period of building [the] HoER," but she does not remember whether Plaintiff signed the contract or merely took it with her to review. (Doc. 132-12 at 2.) In contrast, Plaintiff testified that she "asked for a contract and never received one." (Doc. 278-5 at 14; Doc. 298-18 at 3.)

---

[11] The address for the e-mail account in question is "lauren.oliver@gmail.com." (Doc. 421-5 at 15-16.)

The record includes a complete independent contractor agreement between Art City and Drew Lenihan for Mr. Lenihan to install artwork at the HoER. (Doc. 296-3.) The agreement bears Mr. Lenihan's signature but lacks the signature of an Art City representative.[12] (*Id.* at 4-5.) The record also includes 32 first pages of independent contractor agreements hand-labeled with other artists' names. (Doc. 414-1.) These undated documents identify Art City as the entity purporting to contract with artists. (*Id.*) The record includes no contracts or portions of contracts between an artist and an entity other than Art City to install artwork at the HoER. If Plaintiff received a written contract, it "would have shown that [Art City] was contracting with her." (Doc. 377-4 at 6-7.)

On June 25, 2015, Megan Roniger e-mailed Plaintiff from "admin@meowwolf.com" to ask if Plaintiff would agree to "shift artist fees from biweekly payments" to "either one payment upon completion, or half at beginning of install, half upon completion." (Doc. 421-12 at 2-3.) Plaintiff responded on July 7, 2015, stating, "don't worry about me re:  pay schedules, I'll go with whatever works best for MW." (*Id.* at 2.)

Between September 16, 2015 and November 13, 2015, the City of Santa Fe and MW LLC executed an agreement pursuant to which the city agreed to pay MW LLC $60,000 for developing, *inter alia*, "an interactive, family[-]oriented attraction." (Doc. 298-2 at 4, 5, 15.) Defendant Kadlubek signed the agreement as MW LLC's CEO. (*Id.* at 15.) On the fully executed agreement, the state taxpayer identification number for MW LLC is partially redacted, but what is visible matches the full number on a partially executed version of the agreement, which in turn matches Art City's taxpayer identification number. (Doc. 288-1 at 31; Doc. 298-2 at 15; Doc. 412-1 at 1.) Before the agreement was executed, Defendant Kadlubek e-mailed a city employee to send "CRS

---

[12] Mr. Lenihan signed the agreement on the line designated for the signature of Art City's representative. (Doc. 296-3 at 4-5.)

& EIN,"[13] and also wrote, "[b]y the way, we are VCMSE Art City, dba Meow Wolf." (Doc. 296-4 at 1.)

In September 2015, Sean Di Ianni wrote a letter indicating that MW LLC "agreed to pay Ragano and Careccio Inc. for all bills from ProBuild related to the construction of" the HoER.[14] (Doc. 377-13 at 2.) Also, Ragano & Careccio Inc. addressed a July 2015 estimate and a November 2015 statement to MW LLC. (Doc. 486-1 at 26; Doc. 495-2 at 2.)

Before November 2015, Art City generated a "Business Line of Credit Application Package" to seek funding to complete the HoER. (Doc. 298-23 at 2-4.) Also, on January 5, 2016, Art City generated a "Disclosure Document" for "Potential Investors in Loan Participation Units" to pursue investment in the HoER. (Doc. 362-10 at 1-2.)

In the summer and fall of 2015, Plaintiff designed a version of ISQ to be installed at the HoER. (Doc. 278-4 at 11, 18.) Plaintiff was "told two things" regarding how to design the work, *i.e.*, "[i]t's going to be up for 10 years, because we have a 10-year lease on the building," and, "[b]uild it for permanence," meaning, "everything had to be completely nailed down and bulletproof, teenager-proof, you know, vandal-proof in every way." (Doc. 278-5 at 17.) Defendant Kadlubek portrayed the HoER to Plaintiff and other artists as a "legacy arts complex … with a grand exhibit generating ticket sales along the lines of Santa Fe's Children's Museum." (Doc. 278-4 at 9.)

Plaintiff "worked on-site from January 2 to the March 16[, 2016] opening" of the HoER to

---

[13] The Court takes judicial notice that the New Mexico Taxation and Revenue Department now refers to "CRS" numbers as Business Tax Identification Numbers. https://tap.state.nm.us/TAP/_/#3 (last accessed Sept. 1, 2022).

[14] The Court takes judicial notice that the Santa Fe Area Home Builders Association's website lists Ragano & Careccio, Inc. as a "Builder Member." https://sfahba.com/ragano-careccio-inc/ (last accessed Sept. 1, 2022).

complete her installation of ISQ. (Doc. 278-4 at 11, 18; Doc. 278-5 at 9.) "Meow Wolf"[15] "bought much of the materials" Plaintiff used, though she "spent a lot of [her] own money on it," as well. (Doc. 377-7 at 11; Doc. 421-5 at 12.) According to Plaintiff, "Meow Wolf" also gave her a $1,000 "labor budget," which she directed to be paid to Carey Cluett, who spent about two and a half months helping her to install the work. (Doc. 278-5 at 8, 10; Doc. 377-7 at 7-9, 11.) Plaintiff did not personally pay Mr. Cluett anything except to buy him "lunch and dinner … a few times." (Doc. 278-5 at 8; *see also* Doc. 421-5 at 10 ("It was not money that came from my bank account, they paid Carey.").) At no time was Plaintiff a "Meow Wolf" employee. (Doc. 278-5 at 3.)

On April 30, 2016, shortly after the HoER opened, Drew Tulchin[16] asked Defendant Kadlubek for "details" about "the revenue share for … artists." (Doc. 486-1 at 10.) In response, Defendant Kadlubek wrote, "[w]e do not have any set contracts or documentation for artists other than a revenue share will occur. Amounts are specified to be determined within 90 days after opening the show." (*Id.*) Similarly, on June 1, 2016, Mr. Di Ianni told an accountant that

> the revenue share program [is] essentially a verbal commitment to artists to pay out a portion of our revenue to artists after we reach a certain revenue trigger. We have put this in writing for only a handful of our fabrication team as an exhibit to a letter of engagement. With the rest of the artists we only had verbal communications about it.

(Doc. 486-1 at 12.)

Pursuant to her arrangement with the HoER's gift shop, Plaintiff brought in items, the gift shop sold them, and "Meow Wolf" sent her checks "based on what they sold … after subtracting

---

[15] As previously noted, both sides often refer to "Meow Wolf" generically in documents they have filed in this matter, and when the Court discusses such references herein, it puts them in quotation marks because there are multiple entities to which "Meow Wolf" could refer.

[16] Mr. Tulchin's signature block around this time indicates that he was working for "UpSpring (formerly Social Enterprise Associates)." (Doc. 486-1 at 14.)

their cut," which shifted over time from 20 to 40 percent. (Doc. 278-4 at 5, 33; Doc. 362-7 at 3; Doc. 389-2 at 2.) In April and May of 2016, Plaintiff received checks from Art City for gift shop sales. (Doc. 412-2 at 6.) In July 2016, Ms. Montoya sent Plaintiff a proposed Artist Consignment Agreement regarding such sales. (Doc. 412-2 at 1-5.) The parties to the proposed agreement were Plaintiff and Art City. (*Id.* at 2.) Ms. Montoya sent this e-mail from "emily@meowwolf.com" to Plaintiff's "correct e-mail" and Plaintiff admits she "probably" read it. (Doc. 362-7 at 2; Doc. 412-2 at 1.) Although Plaintiff "probably" did not sign the agreement, (Doc. 362-7 at 2), she continued to sell ISQ-themed items in the gift shop through at least June 2019. (Doc. 278-4 at 5, 33; Doc. 278-5 at 20; Doc. 330-6 at 1-4; Doc. 362-11; Doc. 421-13.)

Defendant MWI was organized as a Delaware public benefit corporation on November 28, 2016. (Doc. 298-4 at 2; Doc. 305-1.) On December 29, 2016, Art City merged into Defendant MWI, with Defendant MWI as the sole survivor. (Doc. 298-4 at 2.) MW LLC, in turn, dissolved on January 5, 2017.[17] (Doc. 298-3 at 2.)

On March 17, 2017, Defendant Kadlubek sent another message to the e-mail account Plaintiff had stopped using, stating, "we will be rewarding you with a $7,000 revenue share for your work on HOER. Please read the documents and sign." (Doc. 362-6 at 1.) "[T]he documents" were a "Meow Wolf Artist Bonus Program Description" and "Meow Wolf Artist Bonus Program Agreement," both dated February 16, 2017. (*Id.* at 2-4.) These documents identified "Meow Wolf" as Defendant MWI, "formerly" Art City; the agreement was directed to Plaintiff and signed by Defendant Kadlubek. (*Id.*) Plaintiff testified that she did not receive this message. (Doc. 421-5 at

---

[17] Although MW LLC indisputably dissolved in January 2017, the Court notes that in May 2017, Defendant Kadlubek informed a Century Bank officer that an "operating company … operate[s] Meow Wolf LLC which is projected to profit $2M this year," while an unidentified "parent company … include[s] all admin, financial, marketing, and development teams," as well as "artist, fabrication, entertainment, and tech teams." (Doc. 486-1 at 21.) Also, a November 2017 "Expensify" report regarding an invoice for Plaintiff's gift shop sales lists MW LLC as the "Report Policy." (Doc. 426-1 at 1.)

15-18.)

Over two years after the HoER opened, on May 10, 2018, Plaintiff sent an e-mail to Mr. Tulchin[18] in which she objected to actual or potential uses of the Space Owl in various "events and publications" but did not object to the display of ISQ at the HoER. (Doc. 132-15 at 4-5; Doc. 457-2 at 2.) In this e-mail, Plaintiff referred to the HoER as "a large entertainment conglomerate." (*Id.*) Plaintiff likewise sent e-mails to Ms. Roniger Brinkerhoff and Talia Kosh[19] in May, June, and December of 2018 objecting to use of the Space Owl in events and publications including a coloring book, a promotional poster, and a documentary, but not to the display of ISQ at the HoER. (Doc. 166-2 at 1-2; Doc. 166-17 at 1.)

"MW Santa Fe, LLC" issued Plaintiff a check for $2,502.60 on April 11, 2019. (Doc. 421-13.) In response to Plaintiff's inquiry, Shana Pedroncelli[20] told Plaintiff that $2,000 of the check was "from 2017" and confirmed Plaintiff's understanding that it was for "the artist revenue thing."[21] (Doc. 330-7 at 1.) Plaintiff cashed the check.[22] (Doc. 278-5 at 19-20; Doc. 421-13 at 2.)

On March 5, 2021, Plaintiff's counsel sent defense counsel a letter demanding that "Meow Wolf" stop displaying ISQ at the HoER. (Doc. 298-26 at 2.) According to Plaintiff, removing ISQ from the HoER would destroy it. (Doc. 298-26 at 2; Doc. 372-3 at 1, 5; Doc. 372-8 at 5; Doc. 420-

---

[18] Mr. Tulchin's signature block at this time indicates that his title had changed to "Meow Wolf VP, Capital & Investments." (Doc. 132-15 at 5.)

[19] Ms. Roniger Brinkerhoff's signature block at this time indicates that her title was "Chief People Officer, Meow Wolf Creative Studios." (Doc. 166-2 at 2.) Ms. Kosh is an attorney who represented Defendant MWI during events forming the basis of this lawsuit. (*See, e.g.*, Doc. 278-4 at 27.)

[20] Ms. Pedroncelli's signature block indicates that her title at the time was "Meow Wolf Accounts Payable Specialist." (Doc. 330-7 at 1.)

[21] The remaining $502 was for items sold in the HoER's gift shop. (Doc. 278-5 at 20.)

[22] Over three years later, on May 19, 2022, Plaintiff returned the $2,000 to "MW Santa Fe, LLC and Meow Wolf, Inc." with interest, writing that she had "mistakenly deposited" the check. (Doc. 421-14 at 2.)

2 at 5-14.)

## C.   Analysis

The Copyright Act provides that "[a] transfer of copyright ownership" must be executed "in writing." 17 U.S.C. § 204(a). However, the Act also provides that the granting of a "nonexclusive license" is not a transfer of copyright ownership. 17 U.S.C. § 101. Rather, a nonexclusive license "permits the use of a copyrighted work in a particular way and precludes a finding of infringement" based on the licensed use. *Wilson v. Brennan*, 666 F. Supp. 2d 1242, 1260–61 (D.N.M. 2009), *aff'd*, 390 F. App'x 780 (10th Cir. 2010). As such, "[a] nonexclusive license may be granted orally, or may even be implied from conduct." *Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 558 (9th Cir. 1990) ("*Effects Associates*"). A nonexclusive implied license is an affirmative defense to a claim of copyright infringement and the alleged licensee bears the burden of proving its existence. *I.A.E., Inc. v. Shaver*, 74 F.3d 768, 775 (7th Cir. 1996); *Karlson v. Red Door Homes, LLC*, 611 F. App'x 566, 569 (11th Cir. 2015); *Martin v. Pure Spectrum CBD, LLC*, No. 20-cv-910, 2022 WL 19418, at *4 (D. Colo. Jan. 3, 2022), *reconsideration denied,* No. 20-cv-910, 2022 WL 1521766 (D. Colo. May 13, 2022).

In *Effects Associates*, the Ninth Circuit found that the plaintiff granted the defendants an implied license to use and distribute copies of special effects footage that the plaintiff created at the defendants' request for a specific movie the defendants produced and distributed. 908 F.2d at 555-56, 558. Other federal appellate courts have applied a three-part test derived from *Effects Associates*, pursuant to which the licensee must show that: (1) the licensee asked the licensor to create the work; (2) the licensor created the work and delivered it to the licensee; and, (3) the licensor intended that the licensee copy and distribute the work. *See, e.g.*, *Bitmanagement Software GmBH v. United States*, 989 F.3d 938, 947 (Fed. Cir. 2021); *Asset Mktg. Sys., Inc. v. Gagnon*, 542

F.3d 748, 754–55 (9th Cir. 2008); *Nelson-Salabes, Inc. v. Morningside Dev., LLC*, 284 F.3d 505, 514 (4th Cir. 2002); *Lulirama Ltd., Inc. v. Axcess Broad. Servs., Inc.*, 128 F.3d 872, 879 (5th Cir. 1997); *I.A.E., Inc.*, 74 F.3d at 776; *Karlson, LLC*, 611 F. App'x at 569; *Nat'l Ass'n for Stock Car Auto Racing, Inc. v. Scharle*, 184 F. App'x 270, 275 (3d Cir. 2006) ("*NASCAR*"); *but cf. Baisden v. I'm Ready Prods., Inc.*, 693 F.3d 491, 501 (5th Cir. 2012) ("To be sure, we applied [the *Effects Associates* test] in *Lulirama*. But we have never held that an implied license could not arise in other circumstances where the totality of the parties' conduct supported such an outcome."). Though the Tenth Circuit has not yet addressed the question, district courts in this circuit have likewise applied the *Effects Associates* test. *Wilson*, 666 F. Supp. 2d at 1261; *Martin*, 2022 WL 19418 at *4; *Millennium, Inc. v. Sai Denver M, Inc.*, No. 14-cv-1118, 2015 WL 1816479, at *4 (D. Colo. Apr. 20, 2015); *Harner v. Wong Corp.*, No. 12-cv-820, 2014 WL 12573383, at *1 (D.N.M. Nov. 14, 2014).

The last prong of the *Effects Associates* test "is not limited to copying and distribution; instead [courts] look at the protected right at issue." *Asset Mktg. Sys., Inc.*, 542 F.3d at 755. Moreover, as used in the last prong, "[t]he relevant intent is the licensor's objective intent at the time of the creation and delivery of the [work] as manifested by the parties' conduct." *Id.* at 756; *Millennium, Inc.*, 2015 WL 1816479 at *6. "[T]he private hopes of the creator are not relevant." *NASCAR*, 184 F. App'x at 275. Rather, "[c]ourts examine the totality of the parties' conduct to evaluate intent." *Karlson*, 611 F. App'x at 569; *see also Bitmanagement Software*, 989 F.3d 938 at 947 (emphasizing "the relevance of [the] parties' entire course of conduct to the determination of whether an implied-in-fact license exists"); *Marino v. Usher*, 22 F. Supp. 3d 437, 440-41, 444–45 (E.D. Pa. 2014), *aff'd*, 673 F. App'x 125 (3d Cir. 2016) (finding that the plaintiff's "words and conduct confirm that he granted an implied license to [the d]efendants," including his words and

conduct after creation and delivery).

Notably, "because the parties' conduct … create[s] the implied license," any contractual obligation to pay for a work "is separate from the existence of the implied license allowing [the licensee] to distribute [it]." *Millennium, Inc.*, 2015 WL 1816479 at \*9. Whether a licensor "is owed more than the money she received … is a breach of contract question, not a question of implied license." *Martin*, 2022 WL 19418 at \*5. As such, courts have declined to treat payment in full as a condition precedent to the granting of an implied license in the absence of "plain, unambiguous language" to that effect. *I.A.E., Inc.*, 74 F.3d at 778; *Effects Assocs., Inc.*, 908 F.2d at 559 n.7. Relatedly, "there is no privity requirement for an implied license." *NASCAR*, 184 F. App'x at 275. In other words, the existence of an implied license is not dependent on the existence of an underlying transactional contract between the licensor and licensee. *See id.*

An implied license becomes irrevocable if it is supported by consideration. *Asset Mktg. Sys., Inc.*, 542 F.3d at 757; *Lulirama Ltd., Inc.*, 128 F.3d at 882; *Kid Stuff Mktg., Inc. v. Creative Consumer Concepts, Inc.*, 223 F. Supp. 3d 1168, 1183 (D. Kan. 2016); *Martin*, 2022 WL 19418 at \*4; *Fryberger v. Strimbu*, No. 15-cv-363, 2021 WL 6118674, at \*4 (D. Colo. Sept. 27, 2021). In general, "[c]onsideration consists of a promise to do something that a party is under no legal obligation to do or to forbear from doing something he has a legal right to do."[23] *Luginbuhl v. City of Gallup*, 2013-NMCA-053, ¶ 15, 302 P.3d 751, 755. However, some federal courts discussing consideration in the context of implied licenses have stated that a license becomes irrevocable if

---

[23] Courts "rely on state law to provide the canons of contractual construction, but only to the extent such rules do not interfere with federal copyright law or policy." *S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1088 (9th Cir. 1989). The parties have not addressed choice of law in their briefing. (*See generally* Docs. 278, 297, 330, 352, 400.) However, on the present record, MW LCC and Art City were organized in New Mexico; the HoER is located in New Mexico; and, the incidents giving rise to the parties' disputes occurred in New Mexico. Thus, the Court will apply New Mexico law where state law supplies the rule of decision.

consideration has been "paid," as opposed to merely promised. *Asset Mktg. Sys., Inc.*, 542 F.3d at 757; *Harner*, 2014 WL 12573383 at *1; *Fryberger*, 2021 WL 6118674 at *4.

The parties' primary dispute regarding Defendants' Motion for Summary Judgment concerns who received the implied license to display ISQ at the HoER. Plaintiff contends that Defendants are not entitled to summary judgment because, on the present record, the recipient could have been the Meow Wolf artists' collective, MW LLC, or Defendant Kadlubek, instead of Art City, the entity that later merged with Defendant MWI. (Doc. 297 at 19-24.) Defendants, in contrast, insist that Art City is the only possible recipient. (Doc. 330 at 3-6, 15-16.) The parties also dispute whether Plaintiff received consideration for the implied license, thereby rendering it irrevocable. (Doc. 278 at 19-21; Doc. 297 at 24.) For the following reasons, the Court finds that Defendants are entitled to summary judgment on Plaintiff's copyright infringement claims based on Defendant MWI's display of the version of ISQ installed at the HoER, because Defendant MWI holds an irrevocable implied license to display the work there.

Except as to the question of who received the implied license, Plaintiff does not dispute the pertinent facts showing that the *Effects Associates* elements have been satisfied. Specifically, it is undisputed that: (1) Ms. Kennedy asked Plaintiff to create an art installation for the HoER, (Doc. 278-4 at 21; Doc. 421-4 at 2); (2) Plaintiff created a version of ISQ and installed it at the HoER in response to Ms. Kennedy's request, (Doc. 278-4 at 11, 18, 21); and, (3) Plaintiff intended for the work to be used in the way Defendants claim Defendant MWI is licensed to use it, *i.e.*, to be publicly displayed at the HoER. (*See* Doc. 278-4 at 9; Doc. 278-5 at 17); *Bitmanagement Software*, 989 F.3d at 947; *Asset Mktg. Sys., Inc.*, 542 F.3d at 754–55; *Nelson-Salabes, Inc.*, 284 F.3d at 514; *Lulirama Ltd., Inc.*, 128 F.3d at 879; *I.A.E., Inc.*, 74 F.3d at 776; *Karlson, LLC*, 611 F. App'x at 569; *NASCAR*, 184 F. App'x at 275. Indeed, up to this point, the case presents an undisputed,

textbook example of an implied license.[24]

Turning, then, to the question of who received the license, the Court finds that there is no genuine issue of material fact and the license vested in Defendant MWI as a matter of law when it began to participate in operating the HoER and thus in displaying the work. As a preliminary matter, the Court finds that Plaintiff did not grant the implied license to the Meow Wolf artists' collective. The New Mexico Uniform Partnership Act provides that if two or more persons associate to operate a for-profit business as co-owners, they will be considered a partnership *unless* they are organized under a different statute. N.M. Stat. Ann. § 54-1A-202(a), (b); *see Leon v. Kelly*, 618 F. Supp. 2d 1334, 1340 (D.N.M. 2008) ("In New Mexico, partnerships are governed by the Uniform Partnership Act.").

Here, by the time Ms. Kennedy e-mailed Plaintiff to solicit a proposal, the record shows that there were two entities—MW LLC and Art City—participating in the development of the HoER, and both were organized under a different statute, *i.e.*, the New Mexico Limited Liability Company Act, N.M. Stat. Ann. §§ 53-19-1, *et seq.* MW LLC obtained the city license to operate the business, (Doc. 377-3 at 2); Art City obtained its state tax identification number, (Doc. 412-1 at 1); and, each company assumed responsibilities associated with building and operating the business.[25] For example, MW LLC contracted for internet services, agreed to pay a builder's bills,

---

[24] In her summary judgment response, Plaintiff repeatedly uses the term "fraud" to characterize Defendants' dealings with her. (*See* Doc. 297 at 2-4, 10, 23-24.) However, she cites to no authority for the proposition that the alleged "fraud" would invalidate the implied license at issue. (*Id.*) On the contrary, in essence, her "fraud" argument appears to be that the license is invalid because Defendants failed to compensate her as promised; and, this argument is plainly unfounded because full compensation cannot have been a condition precedent to the license where Plaintiff admits such compensation was contingent and not due until after the HoER opened. (Doc. 278-4 at 17-18; Doc. 297 at 9); *I.A.E., Inc.*, 74 F.3d at 778; *Effects Assocs., Inc.*, 908 F.2d at 559 n.7.

[25] There is no evidence regarding whether MW LLC and Art City intended to operate the HoER "as co-owners" and therefore formed a general partnership of their own. N.M. Stat. Ann. § 54-1A-202(a). However, this question is immaterial because even if they had, the license would still have vested in Defendant MWI when it began to participate in the HoER's operation, as further explained below.

and entered into an agreement with the City of Santa Fe—albeit using what appears to be Art City's tax identification number. (Doc. 288-1 at 31; Doc. 298-2 at 15; Doc. 377-13 at 2; Doc. 412-1 at 1; Doc. 486-1 at 16-18.) And Art City negotiated or contracted with Mr. Lenihan to install artwork, prepared a line of credit application package and an investor disclosure document, and presented Plaintiff with checks and a consignment agreement for gift shop sales. (Doc. 296-3; Doc. 298-23; Doc. 362-10; Doc. 412-2 at 2-6; Doc. 414-1.)

In light of these facts, which are not genuinely disputed, no rational factfinder could conclude that the Meow Wolf artists' collective—a group consisting of a fluid number of people selected according to unknown criteria and lacking its own identified organizational structure—was nevertheless acting as a partner entity in developing the HoER. (Doc. 278-4 at 24; Doc. 298-1 at 3.) In short, as a matter of law, Plaintiff did not grant an implied license to the Meow Wolf artists' collective because it was not one of the legal entities building and operating the HoER.

Nor did Plaintiff grant the implied license to Defendant Kadlubek individually, to the exclusion of the entity or entities on behalf of which he was acting. First, it is undisputed that Ms. Kennedy, rather than Defendant Kadlubek, was the person who asked Plaintiff to submit a proposal for the HoER. (Doc. 278-4 at 21; Doc. 421-4 at 2.) Second, like Ms. Kennedy, Defendant Kadlubek was clearly acting on behalf of a principal when he followed up on her request by sending Plaintiff the "Meow Terms" e-mail. (Doc. 278-1 at 1.) For example, both Ms. Kennedy and Defendant Kadlubek e-mailed Plaintiff from "meowwolf.com" accounts; Ms. Kennedy referred to "this colossal project *we're* working on"; and, Defendant Kadlubek stated that "*Meow Wolf* will own the actual pieces of work that you supply to the exhibit."[26] (Doc. 278-1 at 1 (emphasis added);

---

[26] Likewise, Ms. Roniger e-mailed Plaintiff from a "meowwolf.com" account when proposing a revised payment schedule, and Ms. Montoya e-mailed Plaintiff from a "meowwolf.com" account when forwarding a proposed Artist Consignment Agreement for HoER gift shop sales. (Doc. 412-2 at 1-2; Doc. 421-12 at 3.)

Doc. 421-4 at 2 (emphasis added).) And even if the principal in question was unidentified[27]—a fact the parties dispute—it would still be a party to any contract Defendant Kadlubek made with Plaintiff as the principal's agent, including an implied license, which is a "form of contract." *Lulirama Ltd., Inc.*, 128 F.3d at 882; *see* Restatement (Third) of Agency § 6.02 (2006) ("When an agent acting with actual or apparent authority makes a contract on behalf of an unidentified principal, … the principal and the third party are parties to the contract.").[28]

According to Plaintiff, this leaves a choice between two entities that could have received the implied license, *i.e.*, either Art City *or* MW LLC. (Doc. 297 at 19-24.) But Plaintiff's dichotomy is a false one. In fact, as further explained below, the record shows that Plaintiff granted an implied license to the entity or entities operating the HoER for the first ten years, and those entities include MW LLC, Art City, *and* Defendant MWI. "The touchstone for finding an implied license, according to [the *Effects Associates*] framework, is intent." *John G. Danielson, Inc. v. Winchester-Conant Properties, Inc.*, 322 F.3d 26, 40 (1st Cir. 2003); *see also Nelson-Salabes, Inc.*, 284 F.3d at 515 (intent is the "determinative question"); *Johnson v. Jones*, 149 F.3d 494, 502 (6th Cir. 1998) ("Without intent, there can be no implied license."). As previously noted, the relevant intent is the licensor's objective intent at the time of the creation and delivery of the work as manifested by the parties' entire course of conduct, including conduct after delivery.

---

[27] "A principal is unidentified if, when an agent and a third party interact, the third party has notice that the agent is acting for a principal but does not have notice of the principal's identity." Restatement (Third) Of Agency § 1.04 (2006); *see Alfaro-Huitron v. Cervantes Agribusiness*, 982 F.3d 1242, 1250 (10th Cir. 2020) ("New Mexico courts have treated … the Restatement (Third) of Agency (2006), as authoritative on various aspects of agency law.").

[28] Moreover, as the parties tacitly acknowledge, to the extent Plaintiff granted Defendant Kadlubek's principal an implied license to display ISQ at the HoER, Defendant Kadlubek could not be secondarily liable for infringement based on such display. *Diversey*, 738 F.3d at 1204. However, he would be personally bound by any contract he entered into with Plaintiff as an unidentified principal's agent, unless he and Plaintiff agreed otherwise. Restatement (Third) of Agency § 6.02 (2006).

*Bitmanagement Software*, 989 F.3d at 947; *Asset Mktg. Sys., Inc.*, 542 F.3d at 756; *Marino*, 22 F. Supp. 3d at 444–45.

Here, even viewed in the light most favorable to Plaintiff, the parties' entire course of conduct shows that Plaintiff's objective intent was to grant an implied license to display ISQ to the entity or entities operating the HoER for the first ten years. Plaintiff installed ISQ at the HoER in response to Ms. Kennedy's and Defendant Kadlubek's request on behalf of an unidentified principal developing the HoER, knowing that the work would be publicly displayed there.[29] (Doc. 278-1 at 1; Doc. 278-4 at 7-9, 21; Doc. 421-4 at 2.) She designed the work to be displayed for ten years or more and testified that removing it from the HoER would destroy it. (Doc. 278-5 at 17; Doc. 420-2 at 2-14.) In these circumstances, there was only ever one use she could have intended for the work, *i.e.*, to be displayed at the HoER for at least ten years. Thus, regardless of Plaintiff's "private hopes," *NASCAR*, 184 F. App'x at 275, the parties' conduct at the time of creation and delivery indisputably manifested an objective intent on Plaintiff's part to grant the HoER's operators over the ten-year period an implied license to display ISQ at the HoER, without regard to those operators' initial or successive identities.

In addition, Plaintiff's conduct after delivery confirms her intent to grant an implied license to the entity or entities operating the HoER, including Defendant MWI when it began to participate in such operation. Although Plaintiff informed Defendants of her objections to many other actual or potential uses of her IP in 2018, (Doc. 132-15 at 4-5; Doc. 166-2 at 1-2; Doc. 166-17 at 1; Doc. 457-2 at 2), she did not object to the display of ISQ at the HoER until 2021, long after Defendant

---

[29] Plaintiff suggests that Ms. Kennedy and Defendant Kadlubek should have identified their principal as an LLC rather than the Meow Wolf artists' collective. (*See, e.g.*, Doc. 297 at 11.) However, it is undisputed that Defendant Kadlubek disclosed this fact to artists in 2014 and to the press in early 2015. (Doc. 330-2 at 2, 5-7; Doc. 330-3 at 3; Doc. 330-4 at 1-2.) And, Plaintiff has failed to point to any evidence that Ms. Kennedy and Defendant Kadlubek nevertheless knew or should have known Plaintiff was unaware she was dealing with an LLC.

MWI was formed, Art City merged into it, MW LLC dissolved, and this lawsuit was filed. (Doc. 297 at 24; Doc. 298-26 at 2.) And even if Plaintiff did not know Defendant MWI's precise identity when she objected to these other uses—which again, the parties dispute—she undisputedly knew a "large entertainment conglomerate" was operating the HoER. (Doc. 132-15 at 4-5; Doc. 457-2 at 2.) Indeed, far from objecting to the "conglomerate's" display of ISQ, she actively sought to profit from it both before and after Defendant MWI's formation by producing ISQ-themed items to be sold on consignment in the HoER's gift shop. (Doc. 278-4 at 5, 33; Doc. 278-5 at 20; Doc. 330-6 at 1-3; Doc. 362-11; Doc. 421-13.) As such, Plaintiff's conduct after creation and delivery confirms her intent for the license to vest in the HoER's operators for the first ten years of the exhibit's operation.[30] *See Baisden*, 693 F.3d at 500 ("Consent for an implied license may take the form of … lack of objection.").

And, even viewed in the light most favorable to Plaintiff, the record shows that the HoER's operators during the ten-year period include MW LLC, Art City, and Defendant MWI. For example, as previously discussed, MW LLC obtained a business license and funding from the City of Santa Fe, contracted for internet services, and agreed to pay a builder's bills. (Doc. 288-1 at 31; Doc. 298-2 at 15; Doc. 377-3 at 2; Doc. 377-13 at 2; Doc. 412-1 at 1; Doc. 486-1 at 16-18.) Art City obtained a state tax identification number, negotiated or contracted with Mr. Lenihan to install artwork, prepared a line of credit application package and an investor disclosure document, and

---

[30] This line of evidence also refutes Plaintiff's argument that she only intended to grant an implied license to the Meow Wolf artists' collective and not to a for-profit entity. (Doc. 297 at 23-24.) Again, "[t]he relevant intent is the licensor's *objective* intent at the time of the creation and delivery of the [work] *as manifested by the parties' conduct*." *Asset Mktg. Sys., Inc.*, 542 F.3d at 756 (emphases added). And again, regardless of her private hopes, Plaintiff's conduct manifested no intent to limit her grant of an implied license to a not-for-profit entity or indeed to any particular entity at all. On the contrary, very shortly after the HoER opened, if not before, Plaintiff indisputably knew or had reason to know that at least one for-profit entity was operating the HoER; yet, not only did she fail to object to the display of ISQ until nearly five years later, but also she actively sought and received tangible benefits from that display. (Doc. 298-26; Doc. 330-6 at 1-3; Doc. 362-7 at 2; Doc. 412-2 at 2-6.)

presented Plaintiff with checks and a consignment agreement for gift shop sales.[31] (Doc. 296-3; Doc. 298-23; Doc. 362-10; Doc. 412-1 at 1; Doc. 412-2 at 2-6; Doc. 414-1.) And, not only did Defendant MWI assume Art City's rights, duties, and purposes by merger, N.M. Stat. Ann. § 53-19-62.2(A)(2), (3), (5), but also it prepared an ABP description and agreement and proffered them to Plaintiff. (Doc. 362-6 at 1-4.) In sum, as a matter of law, the implied license to display ISQ at the HoER vested in MW LLC, Art City, *and* Defendant MWI because (1) Plaintiff granted the license to the HoER's operators for the first ten years, and (2) MW LLC, Art City, and Defendant MWI each participated in the HoER's operation during that time.

Plaintiff argues that vesting the license in Defendant MWI "changes the scope of the … license and thus precludes a finding of summary judgment," citing to *Crispin v. Christian Audigier, Inc.*, 839 F. Supp. 2d 1086 (C.D. Cal. 2011). (Doc. 297 at 22.) The Court disagrees. In *Crispin*, the court found genuine issues of material fact regarding whether a licensee had the right to sublicense the licensor's artwork. *Id.* at 1096-97. In so holding, the *Crispin* court reviewed several cases addressing whether a licensee has the right to transfer an implied license. *Id.* Synthesizing these cases, the court concluded that "[i]n those cases in which the court would not imply a right, the licensee was attempting to assign its license in a way that harmed the owner's retained interest in the property," whereas "[i]n those cases in which the [c]ourt did find an implied right," the transfer was "necessary to effectuate the purpose of [the] license." *Id.* at 1096.

*Crispin* is distinguishable in that it concerns a licensee's attempt to grant a sublicense, thus

---

[31] Plaintiff intimates that Art City may not have participated in the HoER's operation at all, based on the company's lack of a city business license. (Doc. 352-1 at 3-5.) However, this position is patently untenable in light of the considerable record evidence that Art City did participate in the HoER's construction and early operation. (*See, e.g.*, Doc. 298-23 (credit application); Doc. 362-10 (investor disclosure document); Doc. 412-1 at 1 (tax identification number); Doc. 412-2 at 6 (checks for gift shop sales).) Whether Art City should have obtained a city business license to do what it so plainly did is a question best left to the municipal authorities and is immaterial to the Court's resolution of Defendants' Motion for Summary Judgment.

making the licensee the licensor's "competitor in the market for licenses" and "undermin[ing]" the licensor's "retained rights to control the use of his [a]rtwork." *Id.* at 1097. In contrast, this case involves the initial grant of an implied license to two licensees and the subsequent merger of one of these licensees into a survivor, with the predecessor's rights vesting in the survivor by operation of law. N.M. Stat. Ann. § 53-19-62.2(A)(2), (3), (5). Moreover, because the survivor—Defendant MWI—has continued to display ISQ in the same way the prior licensees did, and because Defendant MWI falls within the original scope of the license as an entity operating the HoER, vesting the license in it has not changed the scope of the license or harmed Plaintiff's retained IP rights in any way. *Crispin*, 839 F. Supp. 2d at 1096. On the contrary, such vesting is "necessary to effectuate the purpose of [the] license," *i.e.*, the public display of ISQ at the HoER for at least ten years. *Id.* Thus, far from helping Plaintiff, *Crispin* actually supports Defendants' position that the implied license vested in Defendant MWI when it began to participate in the HoER's operation.

Plaintiff also relies heavily on *Xtomic, LLC v. Active Release Techniques, LLC*, 340 F. Supp. 3d 1092 (D. Colo. 2018), to support her argument that factual disputes regarding the licensee's identity should prevent the entry of summary judgment in this case. (Doc. 297 at 1-2, 18-22.) But the facts here are plainly distinguishable from the facts in *Xtomic*. In that case, a software developer sued three related healthcare companies for copyright infringement due to the companies' use of four computer programs the plaintiff developed. *Id.* at 1095. With respect to two of these programs, the court "stop[ped] short of granting summary judgment in favor of 'the [d]efendants'" on their implied license defense because it could not "decipher … to which … of the three named defendants [the p]laintiff has granted the implied license." *Id.* at 1103.

To put this decision in context, it is helpful to refer to the *Xtomic* court's subsequent findings of fact and conclusions of law. *Xtomic, LLC v. Active Release Techniques, LLC*, 460 F.

Supp. 3d 1147 (D. Colo. 2020). There, the court explained that one of the defendants ran "the seminars side" of the business while another provided healthcare services in places of employment.[32] *Id.* at 1149. The court further found that one of the two programs at issue was created for the first defendant, while the other was created for the second, and "each [p]rogram was specific to one unique side of the business, run by a specific … defendant." *Id.* at 1153 (quotation marks omitted). As such, the court ultimately concluded that each defendant had an implied license to use the program created for its side of the business, but not the program created for the other side. *Id.*

Unlike the *Xtomic* case, here, only one entity (Defendant MWI) now claims to hold an implied license to display one work (ISQ) at one business (the HoER).[33] And even though the license was initially granted to distinct legal entities, it is undisputed that these entities were displaying precisely the same work at precisely the same business. Thus, this case does not involve multiple companies running substantially different "sides" of a business and using different works for different purposes and in different ways. Rather, even viewing the facts in the light most favorable to Plaintiff, it involves multiple companies running a single business that has continuously used Plaintiff's single work as she intended it to be used. Thus, the Court declines to rely on the *Xtomic* decision to guide it here.

This case is more analogous to the *NASCAR* case, in which the court found that the plaintiff designer of a NASCAR event trophy granted NASCAR an implied license to use the trophy even though another party actually requested the designs and received them from the plaintiff. 184 F.

---

[32] The third defendant was "no longer functioning." 460 F. Supp. 3d at 1149.

[33] There is evidence that Defendant MWI has developed other businesses in addition to the HoER. (*See, e.g.*, Doc. 486-1 at 21.) However, there is no evidence that the version of ISQ installed at the HoER has ever been displayed anywhere else.

App'x at 274-76. The *NASCAR* court found the facts in that case "very similar to *Effects Associates*," and stated that the plaintiff could not "seriously argue that he did not intend for NASCAR to cast and use the trophy," given its dedicated purpose. *Id.* at 275-76. This case, too, is very similar to *Effects Associates*. And, given the dedicated purpose of Plaintiff's artwork, which by her own admission could only ever be used where and how the HoER's operators have used it, she cannot plausibly argue that she did not intend that use. In sum, "every objective fact concerning the transaction at issue supports a finding that an implied license existed," *Effects Assocs., Inc.*, 908 F.2d at 558 n.6; and, the Court finds that the license vested in Defendant MWI as a matter of law when it became an operator of the HoER.

Plaintiff next argues that Defendants are not entitled to summary judgment because, for her to have granted an implied license to display ISQ at the HoER, she must also have entered into a transactional contract with the licensee to install ISQ there, and she disputes the existence of such a contract. (*See, e.g.*, Doc. 352-1 at 8-9.) Again, the Court disagrees. An implied license *is* a form of contract "in the sense that it is … an agreement not to sue the licensee for infringement." *Lulirama Ltd., Inc.*, 128 F.3d at 882 (quotation marks omitted). However, Plaintiff has pointed to no authority for the proposition that a licensee must prove an underlying transactional contract to establish an implied license, and in *NASCAR*, the Third Circuit held otherwise. 184 F. App'x at 275 ("[T]here is no privity requirement for an implied license."). The Court declines to adopt Plaintiff's unsupported position on this point.

Finally, Plaintiff argues that even if Defendant MWI did hold an implied license to display ISQ at the HoER, she revoked that license on March 5, 2021. (Doc. 297 at 24; Doc. 352-1 at 10.) As a preliminary matter, the Court notes that this argument would only preserve Plaintiff's copyright infringement claims based on Defendant MWI's display of ISQ at the HoER *after* the

alleged revocation. However, the argument also suffers from a more fundamental flaw that invalidates it entirely.

As noted above, an implied license becomes irrevocable if it is supported by consideration. *Asset Mktg. Sys., Inc.*, 542 F.3d at 757; *Lulirama Ltd., Inc.*, 128 F.3d at 882; *Kid Stuff Mktg., Inc.*, 223 F. Supp. 3d at 1183; *Martin*, 2022 WL 19418 at *4; *Fryberger*, 2021 WL 6118674 at *4. And, notwithstanding Plaintiff's insistence that she never received any "compensation" for installing ISQ at the HoER, (Doc. 297 at 24), she admits that she received valuable *consideration* in exchange for the installation. Specifically, she testified that "Meow Wolf"[34] "bought much of the materials" she used to create the work and supplied the funds to pay Mr. Cluett for his labor helping her to install it. (Doc. 278-5 at 8, 10; Doc. 377-7 at 7-9, 11; Doc. 421-5 at 10, 12.) Plaintiff was never a "Meow Wolf" employee, (Doc. 278-5 at 3), and there is no evidence to suggest that any Meow Wolf entity was otherwise legally obligated to provide her with materials or labor except as consideration for the installation.[35] Thus, the implied license at issue here was supported by consideration and was irrevocable as a matter of law.[36] *Asset Mktg. Sys., Inc.*, 542 F.3d at 757; *Lulirama Ltd., Inc.*, 128 F.3d at 882; *Kid Stuff Mktg., Inc.*, 223 F. Supp. 3d at 1183; *Martin*, 2022 WL 19418 at *4; *Fryberger*, 2021 WL 6118674 at *4.

---

[34] Again, both sides often refer to "Meow Wolf" generically in documents they have filed in this matter, and when the Court discusses such references herein, it puts them in quotation marks because there are multiple entities to which "Meow Wolf" could refer.

[35] Nor was "Meow Wolf" otherwise obligated to pay Mr. Cluett for helping Plaintiff. Rather, according to Plaintiff, "Meow Wolf" gave her the $1,000 labor budget and she was the one who directed "Meow Wolf" to use it to pay him. (Doc. 278-5 at 8, 10; Doc. 377-7 at 7-9, 11.)

[36] In addition, Plaintiff received $2,000 from "MW Santa Fe, LLC" on April 11, 2019, for "the artist revenue thing." (Doc. 278-5 at 19-20; Doc. 330-7 at 1; Doc. 421-13 at 2.) Although this payment appears to have been made on Defendant MWI's behalf, the Court does not rely on it because the check was issued from the account of a different entity, about which there is no other evidence in the record.

There is one last matter the Court must address in resolving Defendants' Motion for Summary Judgment, and that is Defendants' argument that Defendant MWI also has the right to display ISQ at the HoER because Defendant Kadlubek's "Meow Terms" e-mail and Plaintiff's response formed a binding contract pursuant to which Plaintiff sold the version of ISQ installed at the HoER to Art City. (Doc. 278 at 21-24.) And, if so, then ownership of the piece vested in Defendant MWI by operation of law after Art City merged into it. N.M. Stat. Ann. § 53-19-62.2(A)(2), (3), (5).

Because the alleged contract expressly addresses the parties' respective IP rights in Plaintiff's work, it would, if found to exist, supplant the implied-in-fact license at issue. *Cf. Bitmanagement Software*, 989 F.3d at 949 (although "the existence of an express contract precludes the existence of an implied-in-fact contract dealing with the same subject matter," the express agreements in that case did not preclude an implied license where, *inter alia*, the agreements did not cover "the topic of the implied-in-fact license"). Nevertheless, ownership of an original piece of artwork gives the owner the right to display the piece. 17 U.S.C. § 109(c) ("[T]he owner of a particular copy" of a work "is entitled, without the authority of the copyright owner, to display that copy publicly … to viewers present at the place where the copy is located."); *see also* 17 U.S.C. § 101 ("The term 'copies' includes the material object … in which the work is first fixed."). As such, the Court need not and does not decide here whether the "Meow Terms" e-mail exchange formed a binding contract between Plaintiff and Art City, because even if it did, this would not change the Court's ruling. Defendant MWI would still have the right to display the version of ISQ installed at the HoER, and Defendants would still be entitled to summary judgment on Plaintiff's copyright infringement claims based on that display.

### IV.  Conclusion

For the reasons set forth above, IT IS HEREBY ORDERED as follows:

1.      Defendants' Renewed Motion to File Under Seal Exhibit F to their Motion for Partial Summary Judgment (Doc. 292) is GRANTED. The unredacted version of Exhibit F to Defendants' Motion for Summary Judgment (Doc. 278-6) shall remain sealed at this time. The redacted version of Exhibit F attached to Defendants' Motion to Seal (Doc. 292-1) has already been filed in the public record and need not be refiled.

2.      Plaintiff's Motion for Leave to File Under Seal Pursuant to Protective Order (Doc. 294) is GRANTED IN PART and DENIED IN PART. The Clerk is directed to unseal the unredacted version of Plaintiff's response (Doc. 297) to Defendants' Motion for Summary Judgment. By Thursday, September 22, 2022, Plaintiff shall file the exhibits to her response in the public record, with the following modifications:  (1) Exhibits 7 and 11 shall include Defendants' proposed redactions (*see* Doc. 316-2); and, (2) Exhibit 23 shall include the redactions the Court has permitted. The publicly filed exhibits shall not include any other redactions or omissions. The unredacted version of the exhibits (Doc. 298) shall remain sealed at this time and the redacted version of the response and exhibits previously filed in the public record (Doc. 299) is STRICKEN as duplicative.

3.      Plaintiff's Request for Surreply to Defendants' Reply in Support of their Motion for Summary Judgment (Doc. 352) is GRANTED. The Court deems the surreply attached to the motion (Doc. 352-1) to be filed as of the date of entry of this Memorandum Opinion and Order.

4.      Defendants' Unopposed Motion to File Exhibit and Response Under Seal (Doc. 399) is GRANTED IN PART and DENIED IN PART. By Thursday, September 22, 2022, Defendants shall file their response to Plaintiff's Motion for Surreply in the public record with the

redactions permitted herein but no other redactions or omissions. The unredacted version of the response (Doc. 400) shall remain sealed at this time, and the redacted version of the response previously filed in the public record (Doc. 401) is STRICKEN as duplicative.

5.      Plaintiff's Motion for Leave to File Surreply for the Limited Purpose of Supplementing the Record on Pending Motions for Summary Judgment with Recently-Discovered Evidence (Doc. 486) is GRANTED.

6.      Plaintiff's Unopposed Motion to File Under Seal (Doc. 484) is GRANTED IN PART and DENIED IN PART. By Thursday, September 22, 2022, Plaintiff shall file her Surreply for the Limited Purpose of Supplementing the Record on Pending Motions for Summary Judgment with Recently-Discovered Evidence and attached exhibits in the public record with the redactions permitted herein but no other redactions or omissions. The unredacted version of this document (Doc. 486-1) shall remain sealed at this time, and the redacted version previously filed in the public record (Doc. 487-1) is STRICKEN as duplicative.

7.      Defendants' Motion for Partial Summary Judgment Dismissing Plaintiff's Claim of Copyright Infringement for Displaying Ice Station Quellette at the House of Eternal Return (Doc. 278) is GRANTED. Plaintiff's claims against Defendants for copyright infringement based on the display of Ice Station Quellette, including the Space Owl, at the House of Eternal Return are DISMISSED WITH PREJUDICE.

        IT IS SO ORDERED.


_____
KIRTAN KHALSA
UNITED STATES MAGISTRATE JUDGE
Presiding by Consent