**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

LAUREN ADELE OLIVER,

      Plaintiff,

      vs.                               Civ. No. 20-237 KK/SCY

MEOW WOLF, INC., a Delaware
Corporation; VINCE KADLUBEK,
an individual and officer; and
DOES 1-50,

      Defendants.

**<u>ORDER GRANTING IN PART AND DENYING IN PART
MOTION TO RECONSIDER</u>**

In May 2021, Defendants moved for sanctions against Plaintiff. They asserted that Plaintiff spoliated evidence when, in June 2018, she deleted five years' worth of emails from her email address lauren.oliver@gmail.com. Doc. 132. The Court issued an August 16, 2021 Order denying Defendants' motion for sanctions ("Order Denying Sanctions"), holding that "[a]lthough the timing of Plaintiff's deletion of these emails is suspicious, the circumstantial evidence related to Plaintiff's deletion of these emails is insufficient for the Court to conclude that Plaintiff deleted these emails with the intent to deprive Defendants from discovering them." Doc. 205 at 1. Defendants assert that they now have new evidence—Plaintiff's text messages from the day before she deleted her emails—"reflecting her intent to assert a claim against Meow Wolf at the time of her mass deletion." Doc. 501 at 1. Accordingly, Defendants filed their "Motion to Reconsider Sanctions for Spoliation in Light of New Evidence Revealing Plaintiff's Intent the Day Before her Mass Email Deletion," seeking three sanctions: (1) an order permitting them to introduce into evidence Plaintiff's deletion of emails; (2) an adverse inference instruction; and

(3) attorney's fees and costs. Doc. 501; *see also* Doc. 509 (sealed, unredacted response); Doc. 514 (unsealed, redacted response); Doc. 518 (reply).

The Court agrees with Defendants that, considering this new evidence, sanctions are appropriate. The timing of Plaintiff's email deletion has always been suspicious. The new evidence Defendants provide, when combined with the already-existing evidence, now demonstrates more than just suspicion. The evidence now before the Court demonstrates that Plaintiff acted in bad faith when she deleted emails from her lauren.oliver@gmail.com account. Contrary to Plaintiff's sworn testimony that "litigation against Meow Wolf was inconceivable" at the time of her mass deletion, Doc. 167 ¶ 13, Plaintiff engaged in a text conversation the day before her mass deletion in which she requested a reference to a "big gun" attorney that would scare Defendants into providing her a better deal and hopefully avoid litigation, Doc. 500-1. These facts demonstrate that Plaintiff performed her mass deletion of emails with the intent to deprive Defendants from discovering them.

Because Plaintiff's wrongful conduct necessitated the spoliation litigation before the Court, Defendants' request for reimbursement of attorney's fees and costs incurred in connection with this spoliation litigation is well-taken. The Court, therefore, GRANTS IN PART Defendants' motion and orders Plaintiff to reimburse Defendants for the fees and costs incurred in connection with briefing this motion to reconsider as well as the original motion for sanctions. The Court DENIES IN PART, however, Defendants' motion to the extent they request an adverse jury instruction. Rather than instructing the jury about what it must find, the Court concludes that Defendants should be allowed to present evidence related to the email deletion so that the jury may decide for itself whether an adverse inference should be drawn. Thus, the Court

GRANTS IN PART Defendants' motion to the extent they request permission to introduce into evidence Plaintiff's deletion of emails.

## 1. Legal Standard for Reconsideration

The Court has discretion, while it retains jurisdiction, to reopen "every order short of a final decree." *Price v. Philpot*, 420 F.3d 1158, 1167 n.9 (10th Cir. 2005); *see also* Federal Rule of Civil Procedure 54(b) ("[A]ny order or other decision, however designated that adjudicates fewer than all the claims or the rights and liability of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities."). The Tenth Circuit has indicated that a district court faced with a Rule 54(b) motion to reconsider may use the standards for reviewing a motion to alter or amend a judgment under Rule 59(e) to guide its analysis. *Ankeney v. Zavaras*, 524 F. App'x 454, 458 (10th Cir. 2013). Under the Rule 59(e) standard, a court may grant a motion for reconsideration in three circumstances: when there is "an intervening change in the controlling law, the availability of new evidence, or the need to correct clear error or prevent manifest injustice." *Brumark Corp. v. Samson Res. Corp.*, 57 F.3d 941, 948 (10th Cir. 1995). A motion to reconsider is not an opportunity "to revisit issues already addressed or advance arguments that could have been raised earlier." *United States v. Christy*, 739 F.3d 534, 539 (10th Cir. 2014). Using Rule 59(e) for guidance, the Court concludes that Defendants' new evidence justifies reconsideration of the Court's original decision.

## 2. Factual Background

The new evidence Defendants provide supplements, rather than contradicts, the factual findings the Court made in its original Order Denying Sanctions. Therefore, the Court's previous

factual findings remain relevant to the present analysis and are repeated below, with some supplementation.

Prior to March 27, 2015, Plaintiff used the email account lauren.oliver@gmail.com. Doc. 167 ¶¶ 8-9 (Oliver Aff.); Doc. 193 at 7.[1] On February 4, 2015, Plaintiff's health insurer at the time, Anthem Blue Cross Blue Shield, disclosed that its servers had been compromised and hackers potentially stole over 37 million records that contain personally identifiable information. Doc. 166-7. Plaintiff became aware that her lauren.oliver@gmail.com account had been affected by the Anthem breach "sometime prior to March 27, 2015." Doc. 167 ¶ 8. Plaintiff asserts, "[b]etween March 27, 2015 and June 2018, I ceased checking the lauren.oliver@gmail.com account and did not send emails from that account or use it to communicate." *Id.* She set up an auto-response with the subject line, "I'm suspending this email," stating in the body of the response:

> Hello! Please remove this email address from your contact list. Thanks to hackers, I am no longer using it. If you receive an email from this address, do not open it! Please contact me through other means to get my new email contact. Thank you.

Doc. 166-9 (email auto-response dated April 2, 2015). In addition, Plaintiff alleges she conducted all email communications related to Meow Wolf through her quellette@gmail.com account, or later through her current quellettestudio@gmail.com account. Doc. 167 ¶ 10. Defendants, who would have been involved in those communications, have provided no evidence to the contrary.

Plaintiff's counsel represents, and Defendants do not dispute, that between March 27, 2015 and May 24, 2015, lauren.oliver@gmail.com generated at least eight of these auto-

---

[1] There is evidence in the record that Plaintiff was already using another email address (quellete@gmail.com) because she thought it was "better," before she ceased using lauren.oliver@gmail.com in March of 2015. Doc. 132-8 at 1 (email dated January 28, 2015).

responses to Meow Wolf personnel. Doc. 166-14; *see, e.g.*, Doc. 166-9, Doc. 166-13. According to Plaintiff's counsel, the auto-response was sent to Vince Kadlubek at least five times. Doc. 166-14. On one instance, Mr. Kadlubek sent an email to lauren.oliver@gmail.com on April 2, 2015, received the auto-response, and promptly sent the same email to quellette@gmail.com. *See* Doc. 166-8; Doc. 166-9; Doc. 166-10. The parties exchanged more emails through quellette@gmail.com on April 22, 2015. Doc. 166-14; Doc. 166-11. On April 27, 2015, Mr. Kadlubek sent another email regarding a "contracts" meeting to lauren.oliver@gmail.com, and did not follow-up by resending it to quellette@gmail.com. Doc. 166-14; Doc. 166-12. Meanwhile, the parties exchanged hundreds of communications via quellette@gmail.com and Slack from early 2015 through June 2018. Doc. 166 at 13; Doc. 166-14. For some unknown reason, however, on March 17, 2017, Mr. Kadlubek sent an email to the lauren.oliver@gmail.com address with the artist bonus contract. Doc. 132-4.

These various communications provide a timeline to Plaintiff's deteriorating relationship with Meow Wolf. The Court begins its timeline on February 12, 2018, because at this point the relationship does not appear to be strained. On that day, Brian Solomon reached out to Plaintiff via Facebook to ask about using Space Owl in a virtual reality ("VR") project Meow Wolf was developing. He wrote, "Hey I have space owl in the vr piece, I snuck in some characters we didn't have the money to animate as static characters . . . Emily told me the rights are still all yours for space owl . . . Lemme know if it's ok." Doc. 132-15 at 2. That same day, Plaintiff "had a brief communication" with her current attorney (Jesse Boyd) "regarding granting permission for the use of her work as part of a virtual reality piece."[2] Doc. 199 at 3. The next day, February

---

[2] Mr. Boyd indicates that he has known Plaintiff for more than thirty years and the February 12, 2018 conversation he had with her was consistent with his occasionally providing her *pro bono* legal advice on various topics over the years. Doc. 199. Mr. Boyd represents that he did not

13, Plaintiff responded to Mr. Solomon, "Hey Brian, from your description, it sounds like the space owl is just part of the backdrop and I'm happy to contribute. Obviously, I'll want to be more involved when/if MW plans to use ISQ elements in a more substantive way (especially if it might conflict with the ISO narrative). But this VR piece sounds great, and you have my OK to proceed." *Id*. at 3.

A couple of months later, on April 12, 2018, Plaintiff learned that her proposal to place another version of Space Owl in another Meow Wolf exhibition had been declined because Meow Wolf did not want to repeat anything from the House of Eternal Return. Doc. 193-1. Not long after that, on May 1, 2018, Meow Wolf asked Plaintiff for permission to use Space Owl in connection with an "escape room/scavenger hunt style web series." Doc. 193-2. Plaintiff responded the next day that it was "problematic" for anyone but her to use Space Owl, requested to talk to "whoever is handling the legal/IP stuff" for Meow Wolf, and stated "[a]ny proposals are dead in the water until we can hammer out an agreement." Doc. 193-2. Plaintiff followed up her request to speak with someone handling legal issues with a May 10, 2018 email to Meow Wolf's Drew Tulchin: "Hi Drew! Hope everything's good. I'm getting a lot of requests about using the space owl from MW folks. Who have you hired to work with artists on legal issues, and can you put me in touch? Thank you." Doc. 132-15 at 5. In response to Mr. Tulchin's request to provide information about "a specific situation" Plaintiff cited the VR piece as one example: "Brian Solomon let me know in early March that he put the space owl in his VR -- as part of the background -- without realizing I own it. I gave him the go-ahead thinking it was already done, and of course, he's a friend and a badass. I'm still waiting to see it -- it sounds like

---

formally accept Plaintiff as a client for this case until September 25, 2019 and did not execute a fee agreement with Plaintiff until July 7, 2020. Doc. 199 at 4.

he's still working on it -- I'd like to review the use to get the right copyright/permission credit

line on it." *Id*. at 4.

      Likely as a result of these May email communications, confusion developed over whether

Plaintiff was withdrawing permission to use Space Owl in the VR piece. On May 24, 2018,

Plaintiff followed up with Mr. Luchin: "Hey there. Wondering if you had any progress.

Yesterday Brian Solomon told me someone said that I wanted him to remove the owl from his

VR piece -- which is weird 'cause I did not say that to anyone. Any insights?" *Id*.

      Also at some point in May 2018, Meow Wolf proposed a contract to Plaintiff that

Plaintiff discussed with her current attorney, Mr. Boyd. Doc. 199 at 4 (noting Mr. Boyd had "a

few communications [with Plaintiff] in late-May 2018 related to a contract Ms. Oliver had been

forwarded by Meow Wolf Inc.'s attorney"). On May 29, Plaintiff rejected the contract, stating

she did not want to sell Space Owl to Meow Wolf, and added: "I'm also now curious to review

where and how my work has already been used and credited in Meow Wolf promotional

materials, publications and any other projects I'm not aware of." Doc. 193-4. On June 24, 2018,

Plaintiff filed her application to register her copyright in ISQ.[3] Doc. 132 at 2; Doc. 166 at 18. On

June 26, Plaintiff wrote to Meow Wolf (including its lawyer Talia Kosh) asking how many

copies of a coloring book containing an image of Space Owl had been printed and sold. Doc.

193-6.

---

[3] In 2014, Plaintiff began envisioning the Space Owl as a central element in a climate change-themed art project with a science fiction-style narrative, titled "Ice Station Quellette" ("ISQ"). Doc. 148 ¶ 13.

On, June 27, 2018, Plaintiff accessed her lauren.oliver@gmail.com account and deleted five years of emails, from the date of the deletion back to April 8, 2013.[4] According to Plaintiff, she did so "in an attempt to clear the account of emails [she] believed were largely spam, phishing, and otherwise malicious." Doc. 167 ¶ 9. A little more than a year later, on July 25, 2019, Plaintiff's present counsel wrote Meow Wolf a letter threatening litigation. Doc. 193 at 6. Plaintiff then filed this lawsuit on March 16, 2020. Doc. 1.

Plaintiff attached an affidavit to her original response to the motion for sanctions in which she swore, "prior to June 3, 2019, litigation against Meow Wolf was inconceivable to me."[5] Doc. 167 ¶ 13. This sworn statement, as well as Plaintiff's later clarification that, even if the idea of litigation was conceivable to Plaintiff before 2019, she considered the possibility remote, is belied by Defendants' newly submitted facts. Specifically, in response to the Court's recent order compelling Plaintiff to further search for communications from April 1, 2018 forward related to her dispute with Defendants, Doc. 480, Plaintiff has now produced to Defendants a text message string from June 26, 2018 (the day before Plaintiff's mass email deletion), in which Plaintiff made statements such as: "Now I need the expensive [lawyer]"; "Now I'm dealing with a huge conglomerate. I need a big gun now"; "They're basically stealing

---

[4] In an April 21, 2021 letter from Plaintiff's counsel to Defendants' counsel, Plaintiff represents that she deleted the emails from her lauren.oliver@gmail.com account "on, or shortly before, June 27, 2018 (the date of the first email she received after the deletion)." Doc. 132-7 at 1. Defendants, in their motion to reconsider, describe the email deletion date as "on June 27, 2018." Doc. 501 at 6. Because Plaintiff does not dispute that she deleted her emails on this date, the Court will assume that this is the date Plaintiff deleted her emails.

[5] In her surreply to the original motion, Plaintiff backstepped some, explaining that "Plaintiff did understand in late spring 2018 that litigation with Defendants was theoretically possible, and any categorical statements in Plaintiff's response brief that she had 'no' or 'zero' 'thought' or 'idea' that litigation might be possible are incorrect and withdrawn. This does not change the fact that Plaintiff considered the possibility of litigation to be remote. . . ." Doc. 199 at 5.

my project as of today, and I need to take a more forceful stance"; "what I really need to do is (1) scare these people into compliance, which is why I was looking for the letterhead as well as the lawyer. Then, (2) negotiate money for me for the past two years of copyright infringement as well as their brand enrichment off my IP"; "I'm not interested in working with them any further"; "But I'm trying to figure out how to capitalize on the relationship because they're blowing up pretty fast." Doc. 500-1. She also states in the text messages that she's "trying to prevent litigation," and just needs "a better contract." Doc. 500-1 at 2.

### 3.  Legal Standard for Spoliation Sanctions

Federal Rule of Civil Procedure 37(e)(2) permits a court, "only upon finding that the party acted with the intent to deprive another party of the information's use in the litigation," to "presume that the lost information was unfavorable to the party; to instruct the jury that it may or must presume the information was unfavorable to the party; or to dismiss the action." Additionally, "[f]ederal courts possess inherent powers necessary 'to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.' Among those inherent powers is 'the ability to fashion an appropriate sanction.'" *Jordan F. Miller Corp. v. Mid-Continent Aircraft Serv., Inc.*, 139 F.3d 912 (10th Cir. 1998) (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991)). Court-fashioned spoliation sanctions may include an award of attorney's fees. *See Browder v. City of Albuquerque*, 187 F. Supp. 3d 1288, 1295 (D.N.M. 2016).

The Tenth Circuit has stated: "A spoliation sanction is proper where (1) a party has a duty to preserve evidence because it knew, or should have known, that litigation was imminent, and (2) the adverse party was prejudiced by the destruction of the evidence." *Burlington N. & Santa Fe Ry. Co. v. Grant*, 505 F.3d 1013, 1032 (10th Cir. 2007) (citing *103 Investors I, L.P. v. Square D Co.*, 470 F.3d 985, 989 (10th Cir. 2006)). A question exists, however, as to whether the Tenth

Circuit offered "imminent litigation" as only one example of when spoliation sanctions are appropriate, rather than *the only* circumstance under which a court may award spoliation sanctions. *United States ex rel. Baker v. Cmty. Health Sys., Inc*., No. 05cv279 WJ/ACT, 2012 WL 12294413, at *2-3 (D.N.M. Aug. 31, 2012) (Torgerson, J.), *recommendation adopted*, 2012 WL 5387069 (D.N.M. Oct. 3, 2012).

> In *Baker*, Magistrate Judge Torgerson concluded,
>
> *Burlington Northern* cited to *103 Investors I, L.P. v. Square D Co*., 470 F.3d 985 (10th Cir. 2006). In *103 Investors,* litigation was imminent when the product was destroyed and the Court believes the Tenth Circuit's choice of the word "imminent" reflected that fact, rather than stating a different standard from the virtually universal standard of "reasonably foreseeable." As stated by the court in *Micron Tech., Inc. v. Rambus, Inc.*, "*Burlington* merely noted that imminent litigation was sufficient, not that it was necessary for spoliation . . . ." 645 F .3d at 1320. Having reviewed all of the foregoing cases, the Court agrees with that analysis.

2012 WL 12294413, at *3 n.2. Like Judge Torgerson, this Court also agrees with that analysis. A plaintiff cannot decide to sue, delete adverse relevant evidence, wait some period of time, file suit, and then successfully avoid liability for spoliation by claiming that, although foreseeable, the lawsuit was not "imminent" at the time of the deletion. Counting the number of months or number of years in between the deletion and the filing of the lawsuit is not always the best litmus test to determine reasonable foreseeability.

    **4.  Spoliation Analysis**

        a.  <u>At the time Plaintiff deleted her emails, litigation was reasonably foreseeable and imminent.</u>

In its August 16, 2022 Order, because the Court did not find intentional spoliation, the Court had no reason to "decide whether foreseeable, but not imminent litigation gives rise to a duty to preserve." Doc. 205 at 16. Having now addressed this question and concluded that a prospective party to a lawsuit has a duty to preserve evidence when litigation is reasonably

foreseeable, the Court also easily concludes that, when Plaintiff deleted her emails on June 27, 2018, litigation was reasonably foreseeable. At that time, Plaintiff's relationship with Defendants had broken down, Plaintiff had rejected Defendants' contract offer, Plaintiff had consulted her present attorney about that offer, Plaintiff had expressed concerns about whether Defendants had used her intellectual property without authorization, and Plaintiff had expressed the need to hire "a big gun now" that would scare Defendants into "compliance," and who could negotiate payment for copyright infringement and brand enrichment off her intellectual property.

Even if reasonably foreseeable *and* imminent litigation were both needed to create a duty to preserve evidence in the Tenth Circuit, however, Plaintiff's text messages demonstrate that the litigation she could reasonably foresee was also imminent. Her text messages evince a sense of urgency. She texted, "I need a big gun *now*." Doc. 500-1 at 2 (emphasis added); *see also id.* at 3 (Plaintiff stating that she "need[s] to take a more forceful stance" as "[t]hey're basically stealing [her] project as of today").[6] Thus, even under this more stringent standard, the Court would conclude that, on the day Plaintiff deleted her emails, she had a duty to preserve evidence related to the present litigation.

>  b.  The possibility of impending litigation motivated Plaintiff to delete her emails.

The Court further concludes that it was the prospect of impending litigation that motivated Plaintiff to delete her lauren.oliver@gmail.com emails. Plaintiff initially vigorously denied being motivated by the thought of impending litigation when she deleted her lauren.oliver@gmail.com account on June 27, 2018. *See* Doc. 167 ¶ 13 (Plaintiff's affidavit stating that "prior to June 3, 2019, litigation against Meow Wolf was inconceivable" to her);

---

[6] Plaintiff points out that she also stated in the text messages that she was "trying to prevent litigation." Doc. 500-1 at 3. But by stating that she needed a better contract to prevent litigation, she also made clear that litigation would ensue if her demands were not met.

Doc. 501-1 (Plaintiff's counsel threatening a motion for Rule 11 sanctions unless Defendants withdraw their "baseless and improper spoliation motions for sanctions"); Doc. 166 at 1 (Plaintiff's response to the original motion for sanctions, arguing that "Defendants cannot establish the most fundamental elements of their motion: that Plaintiff had any thought of litigation in 2018"); Doc. 199 at 5 (Plaintiff acknowledging that, at time of deletion, she understood that litigation with Defendants was theoretically possible, but asserting that she considered the possibility to be remote). Instead, Plaintiff asserted that the Anthem data breach served as the catalyst for her deletions. Doc. 166 at 9-10; *see also* Doc. 167 ¶ 12 (Plaintiff's affidavit stating that she bulk-deleted emails she "believed were largely spam, phishing, and otherwise malicious" given the Anthem data breach). The Court was skeptical of Plaintiff's denial, noting that, "In comparing each side's asserted catalyst [for the mass deletion], Defendants' aligns much more neatly with the undisputed timeline." Doc. 205 at 7. The reasons the Court found the timing of the deletion to be suspicious are worth repeating.

Plaintiff's email deletions occurred amid growing tension over Defendants' use of Space Owl and payment for that use. On May 1, 2018, in response to a Meow Wolf inquiry about obtaining filming rights and permissions for the Space Owl, Plaintiff responded that she needed to "hammer out an agreement" with Meow Wolf about the Space Owl/Ice Station and asked to be put in touch with "whoever is handling the legal/IP stuff on your side . . . ." Doc. 193-2. Plaintiff followed up her request to speak with someone handling legal issues with a May 10, 2018 email asking, "Who have you hired to work with artists on legal issues, and can you put me in touch?" Doc. 132-15 at 5. On May 29, 2018, Plaintiff wrote an email "Re: Space Owl Licensing" to a Meow Wolf representative stating,

> This contract came as a surprise—my request to talk to your legal department
> isn't about selling the Space Owl to Meow Wolf, but to set some guidelines on the

use of the likeness and appropriately credit the work, given the flurry of requests
to use it this spring.

. . . . I prefer to retain ownership and total creative control over the Space Owl/Ice
Station.

. . . .

I'm also now curious to review where and how my work has already been used
and credited in Meow Wolf promotional materials, publications and any other
projects I'm not aware of.

Doc. 193-4. Likewise, Plaintiff communicated with her current counsel in late May 2018 to

discuss a contract forwarded by a Meow Wolf attorney. Doc. 199 at 4. Plaintiff acknowledges

that she understood at this point that litigation with Defendants was theoretically possible, but

asserts that she considered the possibility to be remote. Doc. 199 at 3-4.

In late June (close in time to the June 2018 email deletions), Plaintiff reached out to

Meow Wolf to ask how many coloring books, which included a picture of the Space Owl, Meow

Wolf sold. Doc. 133-3.[7] On June 24, 2018, Plaintiff filed an application to register the copyright

for her artwork. Doc. 132 at 2; Doc. 166 at 18. Beginning sometime before June 13, 2018

through at least June 27, 2018, Plaintiff was also negotiating with Meow Wolf over the use of

Space Owl in a Meow Wolf virtual reality piece and was considering a contract Meow Wolf had

provided in connection with the virtual reality piece. Doc. 166 at 18; Doc. 132-2. On June 26,

Plaintiff wrote to Meow Wolf (including its lawyer Talia Kosh) asking how many copies of a

coloring book containing an image of Space Owl had been printed and sold. Doc. 193-6. Around

this same time, on June 27, 2018, Plaintiff deleted emails from her account going back to April

---

[7] Defendants assert Plaintiff asked about the coloring books on June 24, 2018. Doc. 132 at 2. The
document Defendants cite, however, is a June 26, 2018 email between Meow Wolf employees
that references an undated earlier communication with Plaintiff. Thus, rather than attributing a
specific date to Plaintiff's question about the coloring books, the Court infers that Plaintiff's
inquiry came sometime in late June, near the time Plaintiff deleted her emails.

8, 2013. Doc. 132-7 at 1. Thus, Plaintiff's mass deletion of her email account occurred in the midst of a rising dispute over Defendants' use of Plaintiff's Space Owl. Compare this with the timing of the Anthem breach.

Plaintiff learned of the Anthem breach sometime between February 4, 2015 and March 27, 2015. Doc. 166-7 (Anthem's announcement of the breach); Doc. 167 ¶ 8 (Plaintiff's affidavit stating she learned of the breach "sometime prior to March 27"). Yet, she did not delete emails from her lauren.oliver@gmail.com account until three years later, on or shortly before June 27, 2018. In that three-year period, Plaintiff asserts she was not using her lauren.oliver@gmail.com account. And, she alleges no specific event related to the hack (such as a notification that a password or other account data connected to her lauren.oliver@gmail.com account had been compromised) that would serve as a more temporally connected catalyst to her deletion. Thus, although the timing of the Anthem data breach does generally coincide with Plaintiff's decision to cease using her lauren.oliver@gmail.com account, Plaintiff's deletion of emails in that account does not.[8]

Now, added to the above analysis (taken from the Court's August 16, 2021 Order), are Plaintiff's recently disclosed text messages. In this text string, Plaintiff reminds her friend that her friend had previously asked whether Plaintiff needed the "cheap" lawyer or the expensive "lawyer." Doc. 500-1 at 1. After reminding her friend about their previous communication, Plaintiff states, "*Now* I need the expensive one." *Id*. (emphasis added). Later in the string, Plaintiff again emphasizes "I need a big gun now." *Id*. at 2. When her friend warns her about

---

[8] It appears Plaintiff had already begun to shift to a "better" email account even before she learned of the Anthem data breach. *Compare* Doc. 132-8 (1/28/2015 email to Meow Wolf employee Caity Kennedy stating, "here's my better email quellette@gmail.com"), *with* Doc. 167 at 2 ¶ 8 (Plaintiff's affidavit indicating that she "came to understand" in March 2015 that her lauren.oliver@gmail.com account was part of the Anthem breach).

how much a big gun would cost, Plaintiff responds, "I understand the cost. But I'm trying to prevent litigation. So I need someone sharp. In theory, all I need is a better contract. They won't write one." *Id*. at 3. After discussing options for new attorneys, Plaintiff writes, "They're basically stealing my project as of today, and I need to take a more forceful stance." *Id*. Plaintiff then explains, "what I really need to do is (1) scare these people into compliance, which is why I was looking for the letterhead as well as the lawyer. Then (2) negotiate money for me for the last two years of copyright infringement as well as their brand enrichment off of my IP." *Id*. at 4.

*The day after* Plaintiff sent these text messages, she deleted the emails in her lauren.oliver@gmail.com account. That Plaintiff was motivated to do so by a data breach that occurred three years earlier rather than in connection with the legal battle that was about to begin is unfathomable. It is simply not plausible that three years after the data breach, and the day after the above text exchange, Plaintiff's email deletion had everything to do with the Anthem data breach and nothing to do with her potential lawsuit.

Stuck with her June 26, 2018 text messages, Plaintiff appears to now assert that, at the time she filed her affidavit swearing that litigation was "inconceivable" to her prior to June 3, 2019, she had simply forgotten what her motive was for deleting her emails. She points out that

> [T]wo days after the text was sent, on June 28, 2018, Kosh and Brinkerhoff presented Plaintiff with a revised agreement addressing many of the concerns Plaintiff had raised. While the new agreement still contained provisions absolving Defendants from all past uses, it provided protections from ongoing use of Plaintiff's work without her permission. This would have given Plaintiff comfort that the relationship was back on the right track, and given the series of personal events that were fully briefed in relation to Defendants['] Original Motion, it is reasonable that Plaintiff would have forgotten about the text exchange she had with a friend before negotiations appeared to be moving toward a reasonable usage agreement.

Doc. 509 at 4 (internal citations omitted). Plaintiff, however, did not aver in her affidavit that she could not remember what motivated her to delete her emails. Instead, she specifically denied that

the prospect of litigation served as a motivation and affirmatively swore that a different motive—concerns about the Anthem breach—motivated her. Doc. 167.

Moreover, for purposes of deciding whether spoliation sanctions are appropriate, what Plaintiff may have, or may not have, forgotten after she deleted her emails is less important than her state of mind at the time she deleted her emails. Even if believed, Plaintiff's justification for the statements in her June 15, 2021 affidavit cannot justify Plaintiff's act of deleting her emails in 2018. An event that occurred the day after Plaintiff deleted her emails that allayed her concerns about litigation does not speak to the relevant spoliation question: What was Plaintiff's state of mind *at the time she deleted her emails*? The Court concludes that on June 27, 2018, Plaintiff was preparing for an upcoming legal battle with Meow Wolf and, on that date, Plaintiff deleted her lauren.oliver@gmail.com emails because she did not want emails in that account to be disclosed.

   c.  <u>Although Plaintiff violated her duty to preserve evidence when she deleted her emails, whether to infer that Plaintiff deleted information adverse to her is an issue for the jury.</u>

Plaintiff argues that, regardless of whether she deleted her emails to hide them from litigation, "Defendants cannot show relevant emails ever existed in the unused account, much less that any were destroyed." Doc. 509 at 11; *see also* Doc. 509 at 12 ("Here, Defendants do nothing more than speculate that the emails in Plaintiff's unused account 'could have included' conjured categories of 'evidence,' which 'may have been part of' the cleared emails."). But having deleted, and thereby prevented Defendants from seeing, the emails in her possession, Plaintiff is not well-positioned to argue that she cannot be sanctioned unless Defendants can prove that the deleted emails are relevant. As a sister district court has observed, a party's "intentional destruction of the evidence would be rewarded were the court to hold [the aggrieved

party] to a strict standard of proving the destroyed files' content and whether its destruction prejudiced [its] case." *Philips Elecs. N. Am. Corp. v. BC Tech.*, 773 F. Supp. 2d 1149, 1202 (D. Utah 2011).

Nonetheless, the particular facts of this case make the Court reluctant to instruct a jury that it should draw an adverse inference from Plaintiff's email deletion rather than allow it to decide the issue for itself. Reasons exist to doubt that the emails Plaintiff deleted contained information adverse to her case. First, to the extent the account did contain relevant emails with Meow Wolf employees, Defendants or Defendants' employees likely independently possessed those same emails. For instance, on January 28, 2015, after the Meow Wolf employee in charge of getting Plaintiff her contract, Doc. 132-12, sent Plaintiff an email at her lauren.oliver@gmail.com account, Plaintiff informed her, "here's my better email quellette@gmail.com," Doc. 132-8. Thereafter, Plaintiff included an auto-response to her lauren.oliver@gmail.com account that informed the sender that she was no longer using that account because it had been hacked and that the sender should no longer use this account. Doc. 166 at 1. Defendants do not dispute Plaintiff's contention that at least eight of these auto-responses were sent to Meow Wolf representatives, including five of which were sent to Mr. Kadlubek *before* Mr. Kadlubek sent to lauren.oliver@gmail.com the March 17, 2017 contract email Defendants would like to be able to prove that Plaintiff opened. *See* Doc. 518 at 2.

Defendants have asserted that the most natural explanation for the timing of Plaintiff's email deletion is that Plaintiff had something to hide. Doc. 134 at 13-4; Doc. 193 at 7-9. This may be true, but it is debatable as to whether that something had to do with this case. Plaintiff requested Defendants, as well as all others, to use a different email address at the inception of her relationship with Meow Wolf (long before even Defendants allege litigation was foreseeable to

17

Plaintiff). Yet, she did not try to delete emails from the accounts most likely to contain emails related to this case (the quellette@gmail.com and quellettestudio@gmail.com accounts she and Meow Wolf most often used to communicate with each other). And, to the extent Defendants disregarded her instructions and sent emails to her old address, it would have been illogical for Plaintiff to assume that deleting emails from her old account would prevent Defendants from having access to emails already in their possession.

Beyond her communications with Meow Wolf employees, Defendants also argue in their current motion that Plaintiff may have deleted communications with third-party friends and associates regarding the terms of her relationship with Meow Wolf that would hurt her copyright claim. Doc. 501 at 3-4. However, as the Court noted in its previous order, Plaintiff's submission of Space Owl for use in Defendants' project did not occur until *after* she began shifting away from her lauren.oliver@gmail.com account. Plaintiff's First Amended Complaint alleges that she created digital versions of the Space Owl in 2010 and created a seven-foot painting of the Space Owl for a Santa Fe art gallery in 2012. Doc. 148 at ¶ 12. On November 13, 2013, Meow Wolf employee Caity Kennedy sent out (using a meowwolf.com domain) what appears to be a mass email soliciting funding for Meow Wolf. Doc. 132-9. Indeed, Plaintiff does not allege that she even discussed her art project with Meow Wolf until the fall of 2014. Doc. 148 at ¶ 14. On January 27, 2015, Caity Kennedy sent Plaintiff another email. Here, Ms. Kennedy wrote, "You know, we were thinking about it, and we weren't sure if anyone ever invited you to submit a proposal to this colossal project we're working on (if you're even interested). If you are interested, let me know, I'll tell you all the things!" Doc. 132-8. This email indicates that, although Plaintiff was not yet associated with Meow Wolf, she was being invited to submit a proposal. And, although Plaintiff alleges that she did then submit a proposal, as of June 2015,

Plaintiff's first ISQ show opened somewhere else—at an art gallery in Santa Fe. Doc. 148 at ¶ 17. Based on Plaintiff's January 28, 2015 reply to Ms. Kennedy, we know that as of January 28, 2015, Plaintiff was asking her correspondents to use quellete@gmail.com because it was "better" than lauren.oliver@gmail.com account. We also know from the automatic reply she associated with this account that, by April 2, 2015, she had informed anyone who tried to send her an email at this account that she was no longer using it.

Thus, for almost all of the time Plaintiff was using her lauren.oliver@gmail.com account, she was not involved with Meow Wolf. And, for almost all of the time she was involved in Meow Wolf, she was not actively using her lauren.oliver@gmail.com account (as evidenced by the automatic reply Meow Wolf and all others received when they tried to send an email to this account beginning no later than April 2, 2015). Given this, the relevance of this account's emails, whether sent to Meow Wolf employees or to third-parties, is questionable.

Moreover, after the Court denied Defendants' motions for sanctions in August 2021, Defendants conducted a forensic examination of Plaintiff's devices that could be used to retrieve the deleted emails.[9] Unquestionably, had this examination revealed any additional emails of relevance to this case, Defendants would have identified them in support of their motion to reconsider. That Defendants were able to conduct a forensic examination of Plaintiff's devices and that this examination presumably yielded no additional information, dissuades the Court from instructing a jury that it must conclude something about which the Court is unconvinced:

---

[9] In the Order Denying Sanctions, the Court held that while the lauren.oliver@gmail.com account likely did not contain a trove of emails, the account could contain some relevant emails. Doc. 205 at 18. Thus, the Court allowed Defendants to bear the cost of a forensic expert to recover deleted emails. *Id.* Defendants elected to bear that cost. *See* Doc. 359.

that the emails Plaintiff deleted contained information that, if discovered, would have harmed her case.

Nonetheless, the Court acknowledges that Plaintiff has never adequately explained why she did not want her lauren.oliver@gmail.com emails to be disclosed to her legal opponents. For the reasons already articulated, the explanation she provides—that she had security concerns related to a data breach that occurred three years before she deleted these emails—is not credible. A reasonable jury could conclude that Plaintiff deleted these emails because she feared their discovery would harm her litigation position. The Court determines that, upon hearing of Plaintiff's email deletion, the jury should be allowed to decide for itself whether an adverse inference should be drawn.[10]

### 5. Appropriate Sanctions

In short, the Court concludes that the prospect of impending litigation with Meow Wolf, combined with Plaintiff's desire to prevent Meow Wolf from obtaining emails in her lauren.oliver@gmail.com, motivated Plaintiff to delete her emails in this account. The Court further concludes that, in a sworn affidavit, Plaintiff provided an untrue ulterior motive for deleting these emails. Nonetheless, what Plaintiff wanted to prevent Defendants from seeing is unclear. Because reasonable factfinders could draw different conclusions from the email deletion, the Court rejects Defendants' request to instruct the jury that it must draw an adverse inference. Instead, the Court will allow Defendants to introduce into evidence Plaintiff's deletion of emails from her lauren.oliver@gmail.com address.

---

[10] One adverse inference Defendants argue should be drawn from Plaintiff's email deletion is that Plaintiff saw a contract proposal Defendant Kadlubek attached to a March 17, 2017 email he sent to Plaintiff. *See* Doc. 518 at 7-8 (arguing that, even though Defendants possessed the emails sent to Plaintiff, Plaintiff's email deletion deprived them of metadata that would provide additional information about what Plaintiff did upon receiving an email).

Finally, Defendants request that the Court order Plaintiff to pay the attorney's fees and costs associated with the present motion and the original motion for sanctions. Doc. 501 at 12. Plaintiff's wrongful conduct—deleting her emails once she anticipated litigation, with the purpose of preventing Defendants from seeing them—necessitated Defendants' original motion for sanctions. Plaintiff's untrue affidavit and recently disclosed text messages necessitated the present motion to reconsider. Defendants should not have to finance the cost of briefing a legal issue that only needed to be briefed because Plaintiff engaged in wrongful conduct in connection with this litigation. As such, the Court grants Defendants' request for attorney's fees and costs associated with the present motion as well as the original motion for sanctions.

**IT IS THEREFORE ORDERED THAT** Defendants' Motion to Reconsider Sanctions for Spoliation in Light of New Evidence Revealing Plaintiff's Intent the Day Before her Mass Email Deletion (Doc. 501) **is GRANTED IN PART AND DENIED IN PART**. Specifically, Defendants' request for: (1) an order permitting them to introduce into evidence Plaintiff's deletion of emails is **GRANTED**; (2) an adverse inference instruction is **DENIED**; and (3) attorney's fees and costs is **GRANTED**.

**IT IS FURTHER ORDERED THAT** within 14 days of the entry of this Order, Defendants shall file an affidavit listing and explaining their attorney's fees and costs associated with the present motion and the original motion for sanctions. Within 14 days of the filing of the affidavit, Plaintiff may, but is not required to, file a response to the amount of fees and costs requested.

**STEVEN C. YARBROUGH**
**United States Magistrate Judge**