## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

LAUREN ADELE OLIVER,

     Plaintiff,

v.                                                                    Civ. No. 20-237 KK/SCY

MEOW WOLF, INC., *et al.,*

     Defendants.

## MEMORANDUM OPINION AND ORDER

THIS MATTER is before the Court on Defendants' Motion for Partial Summary Judgment on Contract and Related Claims (Doc. 362), filed April 19, 2022. The Court, having reviewed the parties' submissions, the record, and the relevant law, and being otherwise sufficiently advised, FINDS that the motion is well-taken in part and should be GRANTED IN PART and DENIED IN PART as set forth below.

## I. Relevant Procedural History[1]

The parties' disputes in this matter arise out of Plaintiff's installation of a work of art called "Ice Station Quellette" ("ISQ") in a permanent exhibition in Santa Fe, New Mexico, called "The House of Eternal Return" ("HoER"). (Docs. 148, 183.) Defendant Meow Wolf, Inc. ("MWI") operates the HoER, and Defendant Vince Kadlubek was formerly its CEO. (*Id.*; Doc. 348-3 at 2.) Plaintiff filed her original complaint against Defendants on March 16, 2020, asserting claims for copyright infringement, violation of the Visual Artists Rights Act, breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, conversion, intentional misrepresentation, negligent misrepresentation, and constructive trust. (Doc. 1 at 1-2, 15-21.) On

---

[1] The Court presumes that the parties are familiar with this matter's factual background, which the Court has described in prior orders and will not repeat here. (*See* Doc. 59 at 1-4, Doc. 135 at 1-4, Doc. 325 at 1-3, *and* Doc. 499 at 2-6.)

Defendants' motion, the Court dismissed Plaintiff's conversion claims with leave to amend on November 25, 2020. (Doc. 59.) On June 1, 2021, Plaintiff amended her complaint, asserting modified conversion claims and adding new factual allegations and promissory estoppel claims. (Doc. 148.) Defendant MWI, in turn, filed a declaratory judgment counterclaim on July 6, 2021, admitting that the parties entered into a contract but asserting different terms. (Doc. 183.)

On April 19, 2022, Defendants filed their Motion for Partial Summary Judgment on Contract and Related Claims, seeking summary judgment on Plaintiff's contract, quasi-contract, and tort claims against them. (Doc. 362.) Plaintiff responded in opposition to the motion on May 26, 2022, and Defendants replied in support of it on June 7, 2022. (Docs. 421, 432.) On September 12, 2022, the Court granted Plaintiff leave to file an evidentiary supplement regarding several dispositive motions, including the summary judgment motion at issue here. (Doc. 499 at 13-14; *see* Doc. 486-1.)

## II. <u>Analysis</u>

### A. Legal Standards Governing Summary Judgment

 "Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Jones v. Kodak Med. Assistance Plan*, 169 F.3d 1287, 1291 (10th Cir. 1999) (quotation marks omitted); *see also* Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."). "A dispute is genuine when the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party, and a fact is material when it might affect the outcome of the suit under the governing substantive law." *Bird v. W. Valley City*, 832

F.3d 1188, 1199 (10th Cir. 2016) (quotation marks and brackets omitted). Only material factual disputes preclude the entry of summary judgment. *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000). If the nonmovant demonstrates a genuine dispute as to material facts, the Court views the facts in the light most favorable to the nonmovant. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009). However, the Court will not draw "unreasonable inferences that are unsupported by the record." *Wellington v. Daza*, No. 21-2052, 2022 WL 3041100, at *2 (10th Cir. Aug. 2, 2022), *cert. denied*, 143 S. Ct. 788 (2023); *Est. of Redd ex rel. Redd v. Love*, 848 F.3d 899, 906 (10th Cir. 2017). Also, "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The movant bears the initial burden of demonstrating the absence of a genuine issue of material fact and its entitlement to judgment as a matter of law. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir. 1998). If the movant carries this initial burden—and if the nonmovant bears the burden of proof on the claim or defense at issue—the nonmovant must "go beyond the pleadings and set forth specific facts that would be admissible in evidence in the event of a trial from which a rational trier of fact could find for the nonmovant." *Id.* at 671 (quotation marks omitted). Alternatively, "where the moving party has the burden of proof"—as when a defendant seeks summary judgment on a counterclaim or affirmative defense—its "showing must be sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Leone v. Owsley*, 810 F.3d 1149, 1153 (10th Cir. 2015) (emphases and brackets omitted).

## B.    Material Facts

The following facts are not genuinely disputed for purposes of the present motion, except

as specifically noted. The Meow Wolf artist collective began in 2008 but, except for a "Meow Wolf" non-profit corporation organized by Defendant Kadlubek and two others in February 2008 and revoked in June 2008,[2] it was not associated with a "formed legal entity" until the organization of Meow Wolf, LLC ("MW LLC"). (Doc. 298-1 at 3; Doc. 330-3 at 3; *see also* Doc. 297 at 2.) The parties have not identified any evidence indicating how many artists were members of the collective at any given time or how they were selected. (Docs. 362, 421, 432; *see also* Doc. 278-4 at 24 ("Plaintiff's understanding is that the membership in the collective changed over time.").)

MW LLC was formed in September 2011.[3] This company was funded with the proceeds of an art show by the Meow Wolf artist collective in which Plaintiff did not participate. (Doc. 278-4 at 8, 20-21, 23-24; Doc. 298-1 at 4-5; Doc. 298-18 at 2.) An unexecuted operating agreement lists Defendant Kadlubek, Matt King, Corvas Brinkerhoff, Emily Montoya, and Caity Kennedy as the company's founding members. (Doc. 298-7 at 2, 3, 15.) However, Defendant Kadlubek testified that the collective elected him as the company's sole member. (Doc. 298-6 at 3-5.)

VCMSE Art City, LLC ("Art City") was formed in October 2014.[4] Art City did business as "Meow Wolf" and its stated purpose was "to open and operate art centers in Santa Fe, New Mexico and possibly in other locations." (Doc. 298-11 at 2.) On January 15, 2015, Art City obtained a taxpayer identification number from the New Mexico Taxation and Revenue

---

[2] The Court takes judicial notice of the founders of the Meow Wolf nonprofit corporation, and when the entity was formed and revoked; this information is listed on the New Mexico Secretary of State's ("NM SOS") website at: https://portal.sos.state.nm.us/BFS/online/CorporationBusinessSearch/CorporationBusinessInformation (last accessed Mar. 22, 2023). *See* Fed. R. Evid. 201(b) (courts may "judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned").

[3] The Court takes judicial notice of MW LLC's formation date, which is listed on the NM SOS website identified in footnote 2, *supra*.

[4] The Court takes judicial notice of Art City's formation date, which is listed on the NM SOS website identified in footnote 2, *supra*.

Department. (Doc. 412-1 at 1.) The company originally had six equity holders, *i.e.*, Defendant

Kadlubek, Mr. King, Mr. Brinkerhoff, Ms. Montoya, Ms. Kennedy, and Sean Di Ianni.[5] (Doc. 362-

8 at 2.) Its January 2015 Operating Agreement designated Defendant Kadlubek as its initial CEO.

(Doc. 298-11 at 2, 5.)

About a year before construction on the HoER began, Defendant Kadlubek presented a

slide deck at an "artists call meeting" of more than 50 people. (Doc. 330-2 at 2, 5-7; Doc. 330-3.)

The slide deck concerned "the first permanent Meow Wolf experience," *i.e.*, the HoER. (Doc. 330-

3 at 2.) It identified "Meow Wolf" as an "arts and entertainment production company," for which

it provided the following "back story":

> Originally organized as an informal art collective in 2008 by a small group of
> dedicated Santa Fe artists, Meow Wolf has created 22 fully-immersive exhibits in
> 8 different cities …. In preparation for the first permanent exhibition, Meow Wolf
> organized as an LLC in 2014 with 6 equity partners:  Vince Kadlubek, Sean Di
> Ianni, Matt King, Emily Montoya, Caity Kennedy, and Corvas Brinkerhoff.[6]

(*Id.* at 3.) On January 29, 2015, Defendant Kadlubek e-mailed a "press packet" that included the

same back story to local, regional, and national media contacts. (Doc. 330-4 at 1-2.)

Meanwhile, on January 27, 2015, Ms. Kennedy e-mailed Plaintiff from

"caity@meowwolf.com" inviting Plaintiff to "submit a proposal to this colossal project we're

working on." (Doc. 421-4 at 2.) In February and March 2015, Plaintiff and Ms. Kennedy

exchanged e-mails regarding the proposal, which Plaintiff submitted on February 11, 2015. (Doc.

---

[5] Art City subsequently added six other equity holders, *i.e.*, David Kantor, Damian Taggart, Mark Di Ianni, Kathy Di Ianni, Mat Crimmins, and Stewart Alsop. (Doc. 362-8 at 2.)

[6] As already noted, Art City was organized in 2014, while MW LLC was organized in 2011. Also, Sean Di Ianni was a founding member of Art City but not of MW LLC. (*Compare* Doc. 298-6 at 3-5 *and* Doc. 298-7 at 2, 3, 15 *with* Doc. 298-11 at 2 *and* Doc. 362-8 at 2.) It thus appears that the company to which the slide deck referred was Art City. (Doc. 330-3 at 3.)

391-3; *see also* Doc. 278-4 at 21 ("In early 2015, Caity Kennedy reached out and asked Plaintiff to submit a proposal" for the HoER, "which Plaintiff ultimately did.").)

Defendant Kadlubek signed an agreement between Comcast Business and MW LLC for internet service on March 22, 2015. (Doc. 486-1 at 16-18.)

On April 2, 2015, Defendant Kadlubek sent Plaintiff an e-mail from "vince@meowwolf.com" entitled "Meow Terms," (Doc. 278-1) ("Meow Terms e-mail"), regarding "the contractual terms for [her] involvement in the Meow Wolf project." (*Id.* at 1.) In pertinent part, the Meow Terms e-mail stated:

> We have $1000 allocated for your personal stipend to complete the project(s). You will be paid $250 twice a month from July until September, for a total of $1000. In addition, we want to offer you $10,00 [sic] of revenue share stipend, which we can go over in more depth when we meet.

> We will also be purchasing all the materials agreed upon for your project.

> I hope this amount works for you. Please let me know if you have any questions or concerns before I send over the contract. I am available to speak over the phone … or in person as well.

> It is important to note that you retain all intellectual property rights for your pieces and can sell reproductions, or images. Meow Wolf will own the actual pieces of work that you supply to the exhibit.

(*Id.*) At her deposition, Plaintiff acknowledged that this e-mail did not offer her "an open-ended or unlimited [r]evenue [s]hare." (Doc. 278-5 at 15.)

Plaintiff initially responded to the Meow Terms e-mail on April 8, 2015, with five words: "Hey. Awesome. Good luck tonight." (*Id.*) But on April 22, 2015, she e-mailed Defendant Kadlubek again, stating, among other things, "I'm not sure I actually have a contract yet – I thought you sent, and I can't find it." (Doc. 166-11 at 1.)

On April 27, 2015, Defendant Kadlubek e-mailed Plaintiff and 37 others regarding "Meow Wolf Meeting (Contracts, Please Attend)." (Doc. 132-11 at 1.) In this message, Defendant

Kadlubek wrote that he had "sent out preliminary numbers to most people, and most people should have been communicating with Caity along the way." (*Id.*) He then called a meeting for May 6, which he described as "pretty close to mandatory – as I want to go over some logistical things with everyone, hand everyone their contract, and get things clarified." (*Id.*) However, by April 2015, Plaintiff had stopped using the e-mail account to which Defendant Kadlubek sent this message, because it had been compromised.[7] (Doc. 170-14 at 1; Doc. 421-5 at 15-17.) The account sent Defendant Kadlubek an auto-response with the subject line, "I'm suspending this email," stating, "[p]lease remove this email address from your contact list. Thanks to hackers, I am no longer using it. If you receive an email from this address, do not open it! Please contact me through other means to get my new email contact." (Doc. 170-14 at 1.)

Ms. Kennedy declared under penalty of perjury that Plaintiff was in a group of artists for which Ms. Kennedy, as a "director," was responsible. (Doc. 132-12 at 1.) Ms. Kennedy further declared:

> [a]fter the [May 6, 2015] meeting, I worked very hard to deliver the remaining contracts to artists who had not been at the meeting…. [Plaintiff] was in Santa Fe in May 2015 and during the period of building [the] HoER, and although it was difficult to communicate with her – she used multiple email addresses and could be hard to come to an understanding with, I do recall looking at her contract with her. I do not recall if she signed it then or took it with her to review, but I do not recall having any contracts for artists in my group that I did not deliver to the artist.

(Doc. 132-12 at 2.) Plaintiff, in contrast, testified that she "asked for a contract and never received one." (Doc. 278-5 at 14; Doc. 298-18 at 3.) Manager Kate Lesta testified that before the HoER opened, she was "discouraged from putting agreements with artists into contracts" if the artists did not already have them, "because the terms would change."[8] (Doc. 377 at 7; Doc. 377-12 at 4-5, 9.)

---

[7] The address for the e-mail account Plaintiff had stopped using is "lauren.oliver@gmail.com." (Doc. 421-5 at 15-16.)

[8] In her reply in support of a different motion, Plaintiff contends that Ms. Kennedy's declaration is "self-serving" and "belied by the record" and therefore "not competent evidence." (Doc. 426 at 4-5.) In support, Plaintiff cites Ms. Lesta's

The record includes two complete independent contractor agreements between Art City and artists for the installation of artwork at the HoER. (Doc. 296-3; Doc. 377-16.) Drew Lenihan's agreement bears his signature but lacks the signature of an Art City representative[9]; Liberty Yablon's is unsigned. (Doc. 296-3 at 4-5; Doc. 377-16 at 5-6.) The agreements are undated; however, attached and referenced exhibits state that all artwork was to be fully installed by August 31, 2015, and that the artists were to be paid in installments from June or July to August 2015. (Doc. 296-3 at 6-7; Doc. 377-16 at 7-8.)

The agreements include a "Work for Hire" provision stating that: (a) the subject works of art were to be "work[s] made for hire" under the Copyright Act[10]; and, (b) if the works were ever found not to be works made for hire, the artists would "assign[] to Meow Wolf all right, title and interest therein, including all copyrights"; but, (c) the artists were granted non-exclusive, irrevocable, perpetual licenses to publish images of their works. (Doc. 296-3 at 2; Doc. 377-16 at 3.) The agreements also include an at-will termination provision allowing either party to terminate

---

testimony, a June 3, 2016 e-mail from Ms. Kennedy to artist Brian Hart stating, "[w]e still have several people that need contracts, that got missed in the whirlwind," (Doc. 377-11 at 2), and a 2019 spreadsheet indicating that numerous artist contracts (including Plaintiff's) could not be found, (Doc. 421 at 33; Doc. 421-17 at 2). (Doc. 426 at 4-5.) However, none of this evidence undermines Ms. Kennedy's declaration so conclusively as to make it incompetent evidence. First, Ms. Kennedy indicated that "directors" like herself (as opposed to managers like Ms. Lesta) were responsible for delivering contracts to artists in their respective groups. (Doc. 132-12 at 1.) Second, although Ms. Kennedy declared that she did not recall failing to deliver contracts to any artists in *her* group, (Doc. 132-12 at 1-2), the artists "that got missed in the whirlwind," (Doc. 377-11 at 2), could have been in another director's group. And third, the fact that numerous artist contracts could not be found in 2019 does not necessarily indicate that such contracts were not delivered. That is certainly one possibility, but there are other possibilities as well, *e.g.*, that they were later lost, or delivered but not returned.

[9] Mr. Lenihan signed the agreement on the line designated for the signature of Art City's representative. (Doc. 296-3 at 4-5.)

[10] Under the Copyright Act, a "work made for hire" includes "a work specially ordered or commissioned for use as a contribution to a collective work … if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire." 17 U.S.C. § 101. The person or entity for whom a work made for hire was prepared "is considered the author" of the work "and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright." 17 U.S.C. § 201(b).

the agreement at any time for any reason. (Doc. 296-3 at 2; Doc. 377-16 at 3.) The exhibits, in turn, provide that the artists would "be awarded an annual revenue-based bonus payment … if Meow Wolf Revenues exceed $1.2M annually," that these payments would be made from 11 per cent of annual revenues in excess of $1.2 million distributed equally among all recipients, and that each artist's aggregate payments would not exceed his or her "Cap," which was handwritten into the exhibits. (Doc. 296-3 at 8; Doc. 377-16 at 9.)

The record also includes 31 first pages of independent contractor agreements hand-labeled with other artists' names. (Doc. 414-1.) These documents identify Art City as the entity purporting to contract with artists. (*Id.*) The record includes no contracts or portions of contracts between an artist and an entity other than Art City to install artwork in the HoER. The contracts handed out at the May 6, 2015 meeting and later delivered to artists by Ms. Kennedy "were identical, with blanks for the names of the artists and their compensation numbers," which were "filled in by hand … before the meeting." (Doc. 132-12 at 1.) If Plaintiff did receive a written contract before the HoER opened, it "would have shown that [Art City] was contracting with her." (Doc. 377-4 at 6-7.) But Plaintiff declared under penalty of perjury that she did not know she was dealing with Art City and would not have participated in the HoER if she had. (Doc. 298-18 at 4.)

On June 25, 2015, Megan Roniger e-mailed Plaintiff from "admin@meowwolf.com" to ask if Plaintiff would agree to "shift artist fees from biweekly payments" to "either one payment upon completion, or half at beginning of install, half upon completion," with the single or second payment "issued within 30 days of opening the exhibition." (Doc. 421-12 at 2-3.) Plaintiff responded on July 7, 2015, stating, "don't worry about me re:  pay schedules, I'll go with whatever works best for MW." (*Id.* at 2.)

On August 11, 2015, the City of Santa Fe issued a business license to MW LLC. (Doc.

377-3 at 2.) The city has no record of issuing a business license to Art City. (Doc. 352-1 at 15-16.)

Between September 16, 2015 and November 13, 2015, the city and MW LLC executed an

agreement pursuant to which the city agreed to pay MW LLC $60,000 for developing, *inter alia*,

"an interactive, family[-]oriented attraction." (Doc. 298-2 at 4, 5, 15.) Defendant Kadlubek signed

the agreement as MW LLC's CEO. (*Id.* at 15.) On the fully executed agreement, the state taxpayer

identification number for MW LLC is partially redacted, but what is visible matches the full

number on a partially executed version of the agreement, which in turn matches Art City's taxpayer

identification number. (Doc. 288-1 at 31; Doc. 298-2 at 15; Doc. 412-1 at 1.) Before the agreement

was executed, Defendant Kadlubek e-mailed a city employee to send "CRS & EIN,"[11] and also

wrote, "[b]y the way, we are VCMSE Art City, dba Meow Wolf." (Doc. 296-4 at 1.)

In September 2015, Sean Di Ianni wrote a letter indicating that MW LLC agreed to pay a

named builder "for all bills … related to the construction of" the HoER. (Doc. 377-13 at 2.) Also,

this builder addressed a July 2015 estimate and a November 2015 statement to MW LLC. (Doc.

486-1 at 26; Doc. 495-2 at 2.)

Before November 2015, Art City generated a "Business Line of Credit Application

Package" to seek funding to complete the HoER. (Doc. 298-23 at 2-4.) Also, on January 5, 2016,

Art City generated a "Disclosure Document" for "Potential Investors" to pursue investment in the

HoER. (Doc. 362-10 at 1-2.) Among other things, the Disclosure Document explained that Art

City "intend[ed] to set aside 20% of total revenues in excess of $1.2 million annually for payments

to investors and artists. Artists will receive 11% of revenues up to a cumulative cap of $1 million."

(*Id.* at 5.)

---

[11] The Court takes judicial notice that the New Mexico Taxation and Revenue Department now refers to "CRS" numbers as Business Tax Identification Numbers. https://tap.state.nm.us/TAP/, under "FAQs," "CRS Redesign" (last accessed Mar. 22, 2023).

Meanwhile, in the summer and fall of 2015, Plaintiff designed a version of ISQ to be installed at the HoER. (Doc. 278-4 at 11, 18.) She also went to "All Shrimps" meetings. (Doc. 362-7 at 8, 11.) "All Shrimps" meetings were held "every week to every month … as needed," and were with "everyone altogether," rather than specific teams or groups. (Doc. 362-1 at 8.) Plaintiff characterized these meetings as "quite large" and "like rallies." (Doc. 362-7 at 11-12.)

At the "All Shrimps" meetings Plaintiff attended, Defendant Kadlubek promised that artists contributing to the HoER would, as members of "the collective," receive a "revenue share" in lieu of up-front payment, pursuant to which they would receive a share of the HoER's revenue "calculated on an annual basis with a relationship from year to year on how much revenue [their] work generated." (*Id.* at 8-11.) These promises were made to the whole group rather than to Plaintiff individually. (Doc. 278-5 at 21.)

Plaintiff "never heard the word capped" at these meetings, but she does not think Defendant Kadlubek was saying artists "would be sharing in the success" of the HoER "until the end of time." (Doc. 362-7 at 9, 13.) She further admitted that she "[doesn't] know what the terms were, because again, a share is generally like … stock," explaining:

> All I heard was 'share,' 'share,' 'share,' and I knew that it was calculated on an annual basis, based on the revenues of the [HoER], and that would emerge in -- it could emerge in any form. The typical one was stock. That was the one that I thought, "Well, that's the easiest thing is assign artists stock," you know, residuals, royalties, things like that.

(*Id.* at 9-10.) However, no one promised Plaintiff a specific percentage or amount of stock options, equity, or shares of stock. (Doc. 278-5 at 1-2.) Although Plaintiff "expected paperwork" to document this "deal," she did not receive it. (Doc. 278-5 at 12, 21; Doc. 362-7 at 11-12.)

In her interrogatory answers, Plaintiff attested that after she began regularly attending "Meow Wolf"[12] meetings, "it became clear" that the HoER would be "a more complex project" than she had anticipated. (Doc. 278-4 at 8-9.) Plaintiff further attested it was "clear to [her]" that "her exchange with [Defendant] Kadlubek in April [2015] was a preliminary foray, which had been replaced by a new compensation model being outlined at [sic] by [Defendant] Kadlubek's [sic] at the meetings." (*Id.* at 8.) However, at her deposition, Plaintiff testified that by the time she attended "All Shrimps" meetings, she had "dismissed" and "completely forgot[ten] about" the Meow Terms e-mail. (Doc. 421-6 at 26-27.)

Before the end of 2015, managers of the HoER had an "ongoing conversation" about which artists had signed contracts and which had not. (Doc. 377-15 at 3-4.) In this context, Defendant Kadlubek testified that he recalled "having difficulty with [Plaintiff] specifically of this being in this ambiguous zone and, you know, [Plaintiff]—the question was [sic] for us was does [Plaintiff] understand what the relationship is here and is she on board with where the payments are going." (*Id.* at 4.)

Plaintiff "worked on-site from January 2 to the March 16[, 2016] opening" of the HoER to complete her installation of ISQ. (Doc. 278-4 at 11, 18; Doc. 278-5 at 9.) "Meow Wolf" "bought much of the materials" Plaintiff used, but she "spent a lot of [her] own money on it," as well. (Doc. 377-7 at 11; Doc. 421-5 at 12.) Plaintiff has presented evidence that "Meow Wolf" also gave her a $1,000 "labor budget," which she directed to be paid to Carey Cluett, who spent over two months helping her to install the work. (Doc. 278-5 at 8, 10; Doc. 377-7 at 6-11.) Defendants, however, take the position that this $1,000 was the personal stipend Defendant Kadlubek offered Plaintiff in

---

[12] Both sides often refer to "Meow Wolf" generically in documents they have filed in this matter, and when the Court discusses such references herein, it puts them in quotation marks because there are multiple entities to which "Meow Wolf" could refer.

the Meow Terms e-mail. (Doc. 362 at 13, 17.) Although they present no evidence in direct support,

the amount of the payment matches the amount of the personal stipend referenced in the Meow

Terms e-mail. (Doc. 278-1 at 1; Doc. 278-5 at 8, 10; Doc. 362 at 13, 17; Doc. 377-7 at 6-11.) Also,

the timing of it appears to be consistent with the modified "payment schedule" for "artist fees" that

Ms. Roniger proposed and to which Plaintiff agreed. (*See* Doc. 377-7 at 6-11; Doc. 421-12 at 2-

3.) At no time was Plaintiff a "Meow Wolf" employee. (Doc. 278-5 at 3.)

On April 30, 2016, shortly after the HoER opened, Drew Tulchin[13] e-mailed Defendant

Kadlubek asking for "details" about "the revenue share for … artists." (Doc. 486-1 at 10.) In

response, Defendant Kadlubek wrote, "[w]e do not have any set contracts or documentation for

artists other than a revenue share will occur. Amounts are specified to be determined within 90

days after opening the show." (*Id.*) Similarly, on June 1, 2016, Mr. Di Ianni e-mailed an

accountant, stating that

> the revenue share program [is] essentially a verbal commitment to artists to pay out
> a portion of our revenue to artists after we reach a certain revenue trigger. We have
> put this in writing for only a handful of our fabrication team as an exhibit to a letter
> of engagement. With the rest of the artists we only had verbal communications
> about it.

(*Id.* at 12.)

Pursuant to an arrangement with the HoER's gift shop, Plaintiff brought in items, the gift

shop sold them, and "Meow Wolf" sent her checks "based on what they sold … after subtracting

their cut," which shifted over time from 20 to 40 percent. (Doc. 278-4 at 5, 33; Doc. 362-7 at 2-4;

Doc. 389-2 at 2.) In April and May 2016, Plaintiff received checks from Art City for gift shop

sales. (Doc. 412-2 at 6.) In July 2016, Ms. Montoya sent Plaintiff a proposed Artist Consignment

---

[13] Mr. Tulchin's signature block around this time indicates that he was working for "UpSpring (formerly Social Enterprise Associates)." (Doc. 486-1 at 14.)

Agreement regarding such sales. (Doc. 412-2 at 1-5.) The parties to the proposed agreement were Plaintiff and Art City. (*Id.* at 2.) Ms. Montoya sent this e-mail from "emily@meowwolf.com" to Plaintiff's "correct e-mail" and Plaintiff admits she "probably" read it. (Doc. 362-7 at 2; Doc. 412-2 at 1.) Although Plaintiff "probably" did not sign the agreement, (Doc. 362-7 at 2-4), she continued to sell ISQ-themed items in the gift shop through at least June 2019. (Doc. 278-4 at 5, 33; Doc. 330-6 at 1-3; Doc. 362-11.)

Defendant MWI was organized as a Delaware public benefit corporation on November 28, 2016. (Doc. 298-4 at 2; Doc. 305-1.) On or about December 29, 2016, Art City merged into Defendant MWI, with Defendant MWI as the sole survivor. (Doc. 298-4 at 2.) MW LLC, in turn, dissolved on January 5, 2017.[14] (Doc. 298-3 at 2.)

On March 17, 2017, Defendant Kadlubek sent another message to the e-mail account Plaintiff had stopped using, stating, "we will be rewarding you with a $7,000 revenue share for your work on HOER. Please read the documents and sign." (Doc. 362-6 at 1; Doc. 421-5 at 15.) "[T]he documents" were a "Meow Wolf Artist Bonus Program Description" and "Meow Wolf Artist Bonus Program Agreement," both dated February 16, 2017. (*Id.* at 2-4.) These documents identified "Meow Wolf" as Defendant MWI, "formerly" Art City; the agreement was prepared for Plaintiff's signature and signed by Defendant Kadlubek. (*Id.*)

Among other things, the documents attached to this e-mail indicated that payments under the Artist Bonus Program ("ABP") would be made according to a specified formula based on the

---

[14] Although MW LLC indisputably dissolved in January 2017, the Court notes that in a May 2017 e-mail to a bank officer, Defendant Kadlubek wrote that an "operating company … operate[s] Meow Wolf LLC which is projected to profit $2M this year," while an unidentified "parent company … include[s] all admin, financial, marketing, and development teams," as well as "artist, fabrication, entertainment, and tech teams." (Doc. 486-1 at 20-21.) Also, a November 2017 "Expensify" report regarding an invoice for Plaintiff's gift shop sales lists MW LLC as the "Report Policy." (Doc. 426-1 at 1.)

HoER's annual "Adapted Net Income," with the aggregate amount paid to all participants capped at \$1,046,500.[15] (*Id.* at 3.) They further explained that payments would be made "on an equal basis" to each participant, up to that participant's "maximum amount possible" as stated in his or her ABP agreement. (*Id.*) The documents also indicated that "Artist Bonus Payments" would be made "in the absolute and total discretion" of Defendant MWI and that participants acknowledged they were "not entitled to any such payment." (*Id.* at 2, 4.) Plaintiff testified that she did not receive this e-mail or the documents attached to it. (Doc. 421-5 at 15-18.)

An "Artist Bonus Program Spreadsheet" presented by Defendants lists amounts allocated and paid to 112 individuals in 2017 and 2018. (Doc. 278 at 9; Doc. 278-6 at 1-3.) The spreadsheet shows that Defendants allocated \$7,000 to Plaintiff and paid her \$2,000 in 2017, leaving a remaining balance of \$5,000. (*Id.* at 3.) It also indicates that a total of \$1,048,000 was allocated for payments to all of the listed individuals. (*Id.*)

"MW Santa Fe, LLC" issued Plaintiff a check for \$2,502.60 on April 11, 2019. (Doc. 421-13 at 2.) In response to Plaintiff's inquiry, Shana Pedroncelli[16] told Plaintiff that \$2,000 of the check was "from 2017" and confirmed Plaintiff's understanding that it was for "the artist revenue thing."[17] (Doc. 330-7 at 1.) Plaintiff cashed the check, though over three years later she returned \$2,000, with interest, to "MW Santa Fe, LLC and Meow Wolf, Inc.," writing that she had "mistakenly deposited" the check. (Doc. 278-5 at 19-20; Doc. 421-13 at 2; Doc. 421-14 at 2.)

---

[15] "Adapted Net Income" was to be calculated from "all company revenues and all company expenses" as computed on annual financial statements, with "provision for upcoming debts owed and other liabilities for which cash will be required before the end of the next period." (Doc. 362-6 at 3.)

[16] Ms. Pedroncelli's signature block indicates that her title at the time was "Meow Wolf Accounts Payable Specialist." (Doc. 330-7 at 1.)

[17] The remaining \$502.60 was for items sold in the HoER's gift shop. (Doc. 278-5 at 19-20.)

On June 11, 2019, attorney Talia Kosh e-mailed Plaintiff a draft agreement providing for Defendant MWI to purchase Plaintiff's intellectual property ("IP") rights in the version of ISQ installed in the HoER, as well as "all rights to … remedies for past, current and future infringement" of these IP rights, for $35,000. (Doc. 362-16.) But on August 5, 2019, "Chris" sent Plaintiff an e-mail from invest@meowwolf.com, stating, "[o]ur records indicate that you have an outstanding balance for the Artist Bonus Payment [sic] of $5,000. Please sign and complete the attached documents and we can prepare a check for you."[18] (Doc. 362-15 at 1.) "[T]he form agreement [Plaintiff] was asked to sign to get this $5,000 included a copyright assignment." (Doc. 362 at 15; Doc. 421 at 26; *see* Doc. 278-5 at 16.)

In January 2018, Emily Montoya wrote an e-mail that referred to ISQ's "Space Owl" as an "iconic character[]." (Doc. 421-7 at 2.) Likewise, in February 2020, Han Sayles wrote an e-mail that referred to the Space Owl as "iconic."[19] (Doc. 421-8 at 2.) And, in January 2022, Brian Solomon testified that the Space Owl was "iconic" and "one of the pivotal characters that launched Meow Wolf in its early state."[20] (Doc. 421-15 at 6.)

Income statements indicate that "Meow Wolf" earned a net income of about ████ in 2016, (Doc. 389 at 13; Doc. 389-7 at 2), and that Defendant MWI earned a net income of approximately ████████ in 2017, ████████ in 2018, ████████ in 2019, and ████

---

[18] A signature line indicates that "Chris" was part of an "Investment Team" at "Meow Wolf." (Doc. 362-15 at 1.)

[19] The signature line on this e-mail indicates that Han Sayles was the Director of Artist Collaboration for "Meow Wolf." (Doc. 421-8 at 2.)

[20] Although Plaintiff does not identify Mr. Solomon's role at the HoER in her response to Defendants' motion, a Meow Wolf web page attached to the response lists him as a member of its "Exhibition Team," responsible for "Lighting and Surveillance Installation." (Doc. 421-3 at 1.) Also, he testified that he personally used the Space Owl as a reference when generating promotional materials. (Doc. 421-15 at 3.) Thus, there is evidence to support the inference that Mr. Solomon worked for Art City and/or Defendant MWI in some capacity.

 in 2021, but ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ in 2020.[21] (Doc. 389-6.)

## C.   Analysis

### 1.   Plaintiff's Breach of Contract Claims and Defendant MWI's Counterclaim

Defendants' summary judgment motion first addresses the parties' dueling contract claims. In her Amended Complaint, Plaintiff alleges that representatives of Defendant MWI, including Defendant Kadlubek, offered her "membership in the 'collective'" and an "artist revenue share'" as compensation for installing ISQ in the HoER. (Doc. 148 at 2, 5.) According to Plaintiff, Defendant Kadlubek made this offer "[r]epeatedly" during meetings she attended in 2015, representing that artists' "share of revenue would be calculated and distributed on an annual basis, based on how much revenue the venture generated each year," with no mention of a cap. (*Id.* at 15-16.) Plaintiff further alleges that she accepted this offer and installed ISQ in the HoER, but that Defendants failed to compensate her as promised, thereby breaching the parties' contract. (*Id.* at 5, 8, 16, 19-20.) In its counterclaim, in contrast, Defendant MWI seeks a declaratory judgment that Plaintiff and Defendant MWI entered into a contract governed by the Meow Terms e-mail, whereby Plaintiff is entitled to no more than $10,000 as compensation for her work. (Doc. 183 at 26-27.)

In their motion, Defendants seek a summary judgment "[d]eclaring that the parties entered into a contract for installation of ISQ in the [HoER] on the terms set forth in [the] Meow Terms e[-]mail," and limiting Plaintiff's damages for her breach of contract claims to $3,000. (Doc. 362 at 32.) In support, Defendants argue that both sides agree they entered into a contract and that the Meow Terms e-mail is the only evidence of its terms. (*Id.* at 16-17.) Defendants further argue that

---

[21] It is unclear whether the amounts listed on Defendant MWI's income statements relate only to the HoER. Though they do show a "filter" of "02-SF LLC," the parties' briefing on the present motion does not explain what this filter means. (Doc. 389-6.)

Plaintiff's contractual damages should be limited to $3,000 because "Meow Wolf fulfilled $7,000 of the $10,000 revenue share stipend" promised in the e-mail. (*Id.* at 26.)

In general, "to be legally enforceable" under New Mexico law,[22] "a contract must be factually supported by an offer, an acceptance, consideration, and mutual assent." *Garcia v. Middle Rio Grande Conservancy Dist.*, 1996-NMSC-029, ¶ 9, 121 N.M. 728, 731, 918 P.2d 7, 10; *Hartbarger v. Frank Paxton Co.*, 1993-NMSC-029, ¶ 7, 115 N.M. 665, 669, 857 P.2d 776, 780; *see also* N.M. U.J.I. 13-801 ("[F]or a promise … to be legally enforceable, there must be an offer, an acceptance, consideration, and mutual assent."). "An offer is a communication of a willingness to enter into a contract," N.M. U.J.I. 13-805, and "[a]n acceptance is a statement or conduct" by the offeree showing the offeree's agreement to the offer's terms. N.M. U.J.I. 13-807. Consideration is any "benefit or advantage" to the offeror, or "any loss or detriment" to the offeree, "which was a reason for [the offeror] to enter into the contract." N.M. U.J.I. 13-814. "Mutual assent requires a showing of agreement by the parties to the material terms of the contract." N.M. U.J.I. 13-816.

"[W]hen the existence of a contract is at issue and the evidence is conflicting or admits of more than one inference, it is for the jury to determine whether the contract did in fact exist." *Atl. Specialty Ins. Co. v. Deans, Inc.*, No. 13-cv-945, 2015 WL 10819158, at *6 (D.N.M. Nov. 3, 2015).

---

[22] The parties have stipulated that the substantive law of New Mexico governs Plaintiff's state law claims in this case. (Doc. 23 at 2); *see also Barnett v. Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C.*, 956 F.3d 1228, 1237 n.2 (10th Cir. 2020) ("[A] federal court applies the substantive law of the forum state . . . when [it] exercises supplemental jurisdiction over state law claims in a federal question lawsuit.") (quotation marks and ellipses omitted).

> When the federal courts are called upon to interpret state law, the federal court must look to rulings of the highest state court, and, if no such rulings exist, must endeavor to predict how that high court would rule. Where a state's highest court has not addressed an issue of law, a starting point … is the decisions of the state's intermediate court of appeals and those decisions are not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.

*Amparan v. Lake Powell Car Rental Cos.*, 882 F.3d 943, 947–48 (10th Cir. 2018) (citation and quotation marks omitted).  The Court will consider Defendants' motion in light of these principles.

> A jury may find any of the four requirements, even if not expressly stated, in the surrounding circumstances, including the parties' words and actions, what they wanted to accomplish, the way they dealt with each other, and how others in the same circumstances customarily deal with each other.

*Id.* (citing N.M. U.J.I. 13-801).

As the Court has previously noted, (Doc. 59 at 11), "indefiniteness can defeat a contract claim in two ways. First, indefiniteness can indicate that the parties failed to reach an agreement." *Am. Nat. Prop. & Cas. Co. v. United Specialty Ins. Co.*, 592 F. App'x 730, 739 (10th Cir. 2014) (quoting *Padilla v. RRA, Inc.*, 1997-NMCA-104, ¶ 6, 124 N.M. 111, 114, 946 P.2d 1122, 1125). And second, indefiniteness can render an agreement unenforceable because its terms are not reasonably certain. *Id.*

Indefiniteness does not conclusively establish the absence of a bargain in every case. *Padilla*, 1997-NMCA-104 at ¶ 7, 124 N.M. at 114, 946 P.2d at 1125. But "[e]nforceability of a contract requires more than just the parties' intent to be bound." *Id.* at ¶ 8, 124 N.M. at 114, 946 P.2d at 1125. Even if it is intended as such, an offer "cannot be accepted so as to form a contract unless the terms of the contract are reasonably certain." *Id.* The terms of a contract are "reasonably certain" when they provide a basis for (1) "determining the existence of a breach," and (2) providing "an appropriate remedy." *Id.*; *Las Cruces Urban Renewal Agency v. El Paso Elec. Co.*, 1974-NMSC-004, ¶ 14, 86 N.M. 305, 309, 523 P.2d 549, 553 (same); *see also Am. Nat. Prop. & Cas. Co.*, 592 F. App'x at 739 ("The question … is whether there is a sufficient basis for ascertaining a breach and remedying it.").

In this case, both sides have alleged that Plaintiff and Defendant MWI entered into a contract pursuant to which Defendant MWI agreed to compensate Plaintiff in exchange for her installation of ISQ in the HoER. (*See generally* Docs. 148, 183.) But they dispute the terms governing how Plaintiff was to be compensated for her work. Plaintiff claims that Defendants are

bound by Defendant Kadlubek's oral promises to pay her an uncapped proportion of Defendant MWI's annual revenue, (Doc. 148 at 19-20), while Defendants counter that Plaintiff is bound by the compensation terms described in the Meow Terms e-mail. (Doc. 183 at 26-27.) Broadly, Defendants' motion seeks a declaration that, as a matter of law:  (1) Defendants are *not* contractually bound by Defendant Kadlubek's alleged oral promises; and, (2) Plaintiff *is* contractually bound by the Meow Terms e-mail. (Doc. 362 at 16-28.)

As to the first point, the Court agrees with Defendants that, as a matter of law, the oral promises on which Plaintiff relies are too indefinite to constitute enforceable contract terms. Construed in Plaintiff's favor for purposes of Defendants' motion, the evidence shows the following. Defendant Kadlubek made the promises on which Plaintiff relies to "the whole group of artists" at "All Shrimps" meetings, which were large meetings "like rallies." (Doc. 278-4 at 10; Doc. 278-5 at 21; Doc. 362-7 at 8, 11-12.) These promises included that:  (1) as members of "the collective," artists contributing to the HoER would receive a "revenue share" in lieu of up-front payment, pursuant to which they would receive a share of the HoER's revenue; (2) the revenue shares would be calculated on an annual basis; and, (3) "from year to year," the revenue shares would bear a "relationship" to "how much revenue [their] work generated." (Doc. 362-7 at 8-11; *see also* Doc. 278-4 at 10 (promised revenue share "would be based on an annual calculation, proportional to how much income [the] HoER generated each year").)

Plaintiff "never heard the word capped" at the meetings she attended. (Doc. 362-7 at 9.) But she does not think Defendant Kadlubek was saying artists "would be sharing in the success" of the HoER "until the end of time." (*Id.*) Further, she admitted that she "[does not] know what the terms were," that the promised revenue share "could emerge in any form," and that no one ever promised her a specific percentage or amount of stock options, equity, or shares of stock. (Doc.

20

278-5 at 1-2; Doc. 362-7 at 9-10.) And, although she "expected paperwork" to document this "deal," she did not receive it. (Doc. 278-5 at 12, 21; Doc. 362-7 at 11-12.)

As a matter of law, the promises just described do not establish the compensation terms on which Plaintiff relies with enough certainty for the Court to enforce them as part of a legally binding contract. Specifically, these promises are not "reasonably certain" because they do not provide an adequate basis for determining the existence of a breach or providing an appropriate remedy. *Padilla*, 1997-NMCA-104 at ¶ 8, 124 N.M. at 114, 946 P.2d at 1125; *Las Cruces Urban Renewal Agency*, 1974-NMSC-004 at ¶ 14, 86 N.M. at 309, 523 P.2d at 553. Among the most pressing questions a factfinder would need to be able to answer to find a breach or fashion a remedy based on these promises are:  (1) what form the revenue shares would take; (2) how long artists would be entitled to receive them; and, (3) to what proportion of the HoER's annual revenue each artist would be entitled. Plaintiff has failed to present evidence that Defendant Kadlubek's alleged oral promises ever addressed any of these questions, and indeed has effectively admitted that they did not.

Plaintiff does suggest some *post hoc* methods for finding a breach and fashioning a remedy based on these promises. Regarding the promised revenue share's form, she testified that "the easiest thing is assign artists stock." (Doc. 362-7 at 10.) Regarding her percentage, she points to Art City's January 2016 Disclosure Document, which indicated that contributing artists would collectively receive 11 per cent of the HoER's annual revenues over $1.2 million. (Doc. 362-10 at 5; Doc. 421 at 32.) And she argues that she will present "competent expert testimony that [her] work represented 5-8% of the artistic and experiential value of [the] HoER," thus suggesting that her share of the 11 per cent of the HoER's annual revenues over $1.2 million should be five to eight per cent. (Doc. 421 at 32-33.)

The Court notes that Plaintiff's suggestions appear to be inherently problematic in various ways. For example, the Disclosure Document indicated that the total amount to be paid to artists collectively would be capped at $1 million, (Doc. 362-10 at 5); yet, Plaintiff fails to proffer any authority or persuasive argument to justify binding Defendants to the percentage but disregarding the cap, when both terms are integral to the payment structure described. And the expert testimony to which Plaintiff alludes as a basis for her entitlement to a particular percentage is the subject of a pending motion to exclude. (*See* Doc. 381.) The Court therefore hesitates to conclude that Plaintiff's suggested methods for finding a breach and fashioning a remedy are "perfectly appropriate," as she claims. (Doc. 421 at 33.)

But there is a more fundamental problem with all of these methods, which is Plaintiff's failure to present evidence that Defendants promised her it would use any of them. The legal question before the Court is not whether Defendants' alleged promises can be used as a springboard to invent an adequate basis for determining the existence of a breach or providing an appropriate remedy. The question is whether the promises themselves provide such a basis and are therefore reasonably certain. *Padilla*, 1997-NMCA-104 at ¶ 8, 124 N.M. at 114, 946 P.2d at 1125; *Las Cruces Urban Renewal Agency*, 1974-NMSC-004 at ¶ 14, 86 N.M. at 309, 523 P.2d at 553. And as explained above, Plaintiff has failed to demonstrate a genuine, material factual dispute on this point.[23]

---

[23] Earlier in this litigation, in ruling on a motion to dismiss, the Court pointed out "two ways in which the Court could determine that the parties entered into an enforceable contract despite their failure to agree on the amount of or method of calculating Plaintiff's compensation." (Doc. 59 at 14.) Specifically, the Court noted that Plaintiff could argue for "a reasonable price at the time for delivery," such as "compensation for her labor at a reasonable hourly rate and for the cost of her materials at a fair market price," or "the appraised value of ISQ"; or, she could "demonstrate that … the parties … agree[d] on a range of alternatives." (*Id.* at 12, 14.) But manifestly, the methods Plaintiff has suggested would not produce a reasonable price at the time of delivery; rather, they are all contingent on the amount of the HoER's revenues in the years that followed. And Plaintiff has neither argued nor presented evidence that Defendant Kadlubek's alleged oral promises included a specified range of alternatives. Thus, Plaintiff has failed to demonstrate a genuine issue of material fact regarding the existence of an enforceable contract in either of the two ways the Court highlighted.

Likewise unenforceable are Defendants' alleged promises of "membership" in the Meow Wolf artist collective, to the extent Plaintiff claims that these promises entitled her to something other than a revenue share. In her response to Defendants' motion, Plaintiff has pointed to no competent evidence that such promises had any independent meaning.[24] (*See* Doc. 421.) These promises therefore provide virtually *no* basis for determining the existence of a breach or providing an appropriate remedy and cannot be enforced as part of a legally binding contract. *Padilla*, 1997-NMCA-104 at ¶ 8, 124 N.M. at 114, 946 P.2d at 1125; *Las Cruces Urban Renewal Agency*, 1974-NMSC-004 at ¶ 14, 86 N.M. at 309, 523 P.2d at 553. For all of the foregoing reasons, Defendants are entitled to summary judgment on Plaintiff's breach of contract claims based on Defendants' alleged promises of compensation in the form of an uncapped revenue share and membership in the Meow Wolf artist collective.

However, the Court finds that there *are* genuine factual disputes as to the second point on which Defendants seek summary judgment regarding the parties' contract claims, *i.e.*, whether Plaintiff is bound by the compensation terms in the Meow Terms e-mail. As the parties seeking to enforce these terms, Defendants bear the burden of proving that they control. *See Farmington Police Officers Ass'n Commc'n Workers of Am. Loc. 7911 v. City of Farmington*, 2006-NMCA-077, ¶ 16, 139 N.M. 750, 756, 137 P.3d 1204, 1210 ("A party seeking judicial enforcement of a contract bears the burden of persuasion."), *cited with approval in Strausberg v. Laurel Healthcare Providers, LLC*, 2013-NMSC-032, ¶ 42, 304 P.3d 409, 419. And as noted in Section II.A, *supra*,

---

[24] In this regard, the Court denies Plaintiff's request for it to take judicial notice of the prerogatives of membership in an artist collective as defined by Wikipedia, (Doc. 421 at 18), because the contents of the cited article do not satisfy judicial notice requirements. Fed. R. Evid. 201(b). And though Plaintiff did attest that Ms. Kennedy told her to "just ask for help" moving house because she was "part of a collective now," (Doc. 278-4 at 9), she does not base any of her claims on the theory that, by promising her membership in the collective, Defendants promised to help her with personal tasks but then failed to do so. (*See* Doc. 148.) More generally, the Court notes that New Mexico law does not recognize an artist collective as a legal entity and it would therefore be wholly improper for this Court, sitting in diversity, to do so.

where the moving party bears the burden of proof, its showing on summary judgment must be sufficient for the Court to hold that a reasonable trier of fact could find only for the moving party. *Leone*, 810 F.3d at 1153.

Defendants fail to satisfy this standard, because a rational juror could find that the parties did *not* enter into a legally binding contract governed by the Meow Terms e-mail. Evidence that could support such a finding includes evidence that: (1) the Meow Terms e-mail offered Plaintiff a revenue share stipend in the potentially ambiguous amount of "$10,00," (Doc. 278-1 at 1); (2) in this e-mail, Defendant Kadlubek expressed his "hope" that the proposed amount would work for Plaintiff and told her to let him know if she had any questions or concerns "before [he sent] over the contract," (*id.*); (3) shortly after Defendant Kadlubek sent the Meow Terms e-mail, Plaintiff sent him an e-mail stating, "I'm not sure I actually have a contract yet – I thought you sent, and I can't find it," (Doc. 166-11 at 1); (4) Plaintiff "expected paperwork" to document the parties' bargain but never received it, (Doc. 278-5 at 12, 14, 21; Doc. 362-7 at 11-12); (5) in April 2016, Defendant Kadlubek wrote, "[w]e do not have any set contracts or documentation for artists other than a revenue share will occur. Amounts are to be determined within 90 days after opening the show," (Doc. 486-1 at 10); (6) in June 2016, Mr. Di Ianni wrote, "the revenue share program" was "essentially a verbal commitment" that had been put in writing "for only a handful of our fabrication team as an exhibit to a letter of engagement," (*id.* at 12); and, (7) in March 2017, Defendant Kadlubek tried to send Plaintiff an e-mail awarding her a revenue share of $7,000, and asking her to sign paperwork acknowledging that this amount would be paid at Defendant MWI's discretion and that she was not entitled to it. (Doc. 362-6 at 1-4.) This evidence could certainly support findings that Defendants did not intend the Meow Terms e-mail to be an offer, that if it

24

was intended to be an offer Plaintiff did not accept it, and/or that the parties did not mutually agree to be bound by its terms. N.M. U.J.I. 13-805, 13-807, 13-816.

Of course, a rational juror could also find the converse, *i.e.*, that the parties did enter into a legally enforceable contract governed by the Meow Terms e-mail, in light of the e-mail, Plaintiff's affirmative response to it, and the parties' subsequent conduct. For example, a rational juror could credit evidence that Plaintiff installed ISQ in the HoER after receiving the Meow Terms e-mail and responding with "[a]wesome," (Doc. 278-1 at 1), that she agreed to a modification of the payment schedule it described, and that Defendants made and she accepted one or more partial payments according to its terms. *See Atl. Specialty Ins. Co.*, 2015 WL 10819158 at *6 (jury may find offer, acceptance, consideration, and/or mutual assent in "the parties' words and actions, what they wanted to accomplish, the way they dealt with each other, and how others in the same circumstances customarily deal with each other"). But the evidence Defendants have presented falls far short of conclusively establishing such a contract.

Defendants' more specific request for the Court to limit Plaintiff's contract damages to $3,000 is unfounded for other reasons as well. (*See* Doc. 362 at 25-26.) As noted above, Defendants contend that Plaintiff's contract damages should be so limited because "Meow Wolf fulfilled $7,000 of the $10,000 revenue share stipend" promised in the Meow Terms e-mail. (*Id.* at 26.) But there are at least three problems with this position.

First, even assuming the e-mail's reference to a "$10,00 … revenue share stipend" is a typographical error and should have been $10,000, the e-mail additionally offered Plaintiff a $1,000 "personal stipend," for a total proposed payment of $11,000. (Doc. 278-1 at 1.) Second, although Defendants contend that they offered to pay Plaintiff the $1,000 personal stipend and she told them to pay it to Mr. Cluett instead, (Doc. 362 at 13), Plaintiff has presented evidence that

this payment was presented as a "labor budget" to which she was never entitled. (Doc. 278-5 at 8, 10; Doc. 377-7 at 6-11.) And third, although Defendants contend that Plaintiff's contract damages should be reduced by the "$5,000 Meow Wolf tendered and [Plaintiff] refused," (Doc. 362 at 5), Defendants admit that they conditioned this $5,000 tender on Plaintiff's acceptance of terms materially different from those proposed in the Meow Terms e-mail, including the assignment of her IP rights to Defendant MWI.

If all of the foregoing were not enough to defeat Defendants' motion with respect to Defendant MWI's counterclaim, a rational juror could also conclude that Defendant MWI is not legally entitled to enforce any contract arising out of the Meow Terms e-mail. Specifically, although Defendants have submitted evidence that the entity on whose behalf Defendant Kadlubek sent the e-mail was Defendant MWI's predecessor, Art City, Plaintiff has submitted evidence that this entity may have been MW LLC. For example, there is evidence that Defendant Kadlubek was MW LLC's sole member as well as Art City's CEO, and that MW LLC obtained a business license and funding from the City of Santa Fe to operate the HoER, and also agreed to pay bills related to its construction. And Defendants have presented no evidence to show that Defendant MWI ever legally acquired MW LLC's contractual rights and privileges. (Doc. 414 at 4); *see Bank of New York v. Romero*, 2014-NMSC-007, ¶ 17, 320 P.3d 1, 6 ("One who is not a party to a contract cannot maintain a suit upon it. If the entity was a successor in interest to a party on the contract, it was incumbent upon it to prove this to the court.") (brackets omitted), *abrogated on other grounds by Deutsche Bank Nat. Tr. Co. v. Johnston*, 2016-NMSC-013, 369 P.3d 1046.

Moreover, although Defendants have presented evidence that Plaintiff knew the entity offering her a contract was Art City, Plaintiff has presented evidence that she did not know this

and would not have installed ISQ in the HoER if she had.[25] And Defendants have failed to refute Plaintiff's argument that her unilateral "mistake[] about the identity of the party she was dealing with," if credited, would make the alleged contract on which Defendants rely "rescindable," (Doc. 352-1 at 8), because she has also presented evidence from which one could infer that Defendants knew or should have known of the mistake. *See Potucek v. Cordeleria Lourdes*, 310 F.2d 527, 532 (10th Cir. 1962) (holding that a contracting party's unilateral mistake as to the identity of the other party "is ground for rescission" where the other party knew or should have known of the mistake); (Doc. 377-15 at 3-4 (HoER's managers questioned whether Plaintiff understood "what the relationship is here"). For all of the above reasons, the Court concludes that Defendants have failed to show their entitlement to a summary judgment declaring that the parties entered into a contract for the installation of ISQ in the HoER according to the terms in the Meow Terms e-mail.

2.    Claims for Breach of Implied Covenant of Good Faith and Fair Dealing

Defendants next move for summary judgment on Plaintiff's claims based on the implied covenant of good faith and fair dealing. "New Mexico courts have held that every contract imposes a duty of good faith and fair dealing on the parties with respect to the performance and enforcement of the terms of the contract." *Sanders v. FedEx Ground Package Sys., Inc.*, 2008-NMSC-040, ¶ 7, 144 N.M. 449, 452, 188 P.3d 1200, 1203. This "implied covenant of good faith and fair dealing requires that neither party do anything that will injure the rights of the other to receive the benefit of their agreement." *Id.* (quotation marks omitted). A party breaches the implied covenant when it "wrongfully and intentionally use[s] the contract to the detriment of the other party." *Cont'l*

---

[25] Although Plaintiff claims that she thought the entity offering her a contract was the Meow Wolf artist collective, (Doc. 352-1 at 8), as the Court explained in a previous order, "no rational factfinder could conclude that the Meow Wolf artist[] collective—a group consisting of a fluid number of people selected according to unknown criteria and lacking its own identified organizational structure—was nevertheless acting as a partner entity in developing the HoER." (Doc. 499 at 31.)

*Potash, Inc. v. Freeport-McMoran, Inc.*, 1993-NMSC-039, ¶ 64, 115 N.M. 690, 706, 858 P.2d 66, 82, *holding limited on other grounds by Davis v. Devon Energy Corp.*, 2009-NMSC-048, ¶¶ 34-35, 147 N.M. 157, 167-68, 218 P.3d 75, 85-86.

As a preliminary matter, a cause of action for breach of the implied covenant of good faith and fair dealing generally sounds in contract. *Anderson Living Tr. v. ConocoPhillips Co., LLC*, 952 F. Supp. 2d 979, 1032 (D.N.M. 2013). Tort recovery for breach of the implied covenant is "permissible only where a special relationship existed" between the parties, such as between insurer and insured, which Plaintiff has not alleged here. *Id.*; (*see* Doc. 148 at 20.) Thus, and in light of the discussion in Section II.C.1, *supra*, Plaintiff can prevail on any claims for breach of the implied covenant only if the jury finds that the parties entered into a legally binding contract pursuant to the Meow Terms e-mail, as Defendants allege. The Court will analyze Plaintiff's implied covenant claims accordingly.

Turning to the parties' arguments, Defendants contend they are entitled to summary judgment on Plaintiff's implied covenant claims because the undisputed facts show that they exercised good faith in delivering the benefit of the parties' agreement to Plaintiff. (Doc. 362 at 27-28.) Plaintiff disagrees, contending that Defendants breached the implied covenant in the following ways: (1) the pre-opening formal contract that Defendants claim Ms. Kennedy provided to Plaintiff included a "Work for Hire" provision, contrary to the Meow Terms e-mail's promise that Plaintiff would retain the IP rights in her work; (2) Plaintiff asked Defendant Kadlubek for a contract in April 2015, but never received one; (3) after Plaintiff installed ISQ in the HoER, Defendants conditioned payment of a portion of her revenue share on her acceptance of terms contrary to the Meow Terms e-mail, *i.e.*, an acknowledgment that she was not entitled to a revenue share and the assignment of her IP rights to Defendant MWI; and, (4) after Plaintiff installed ISQ

in the HoER, Defendants unilaterally reduced Plaintiff's revenue share from $10,000 to $7,000.[26] (Doc. 421 at 35-36.) The Court will address each of these theories in turn.

As a matter of law, Plaintiff has not shown a genuine issue of material fact regarding whether Defendants breached the implied covenant of good faith and fair dealing by allegedly offering her a pre-opening formal contract that included a "Work for Hire" provision. As just noted, a party breaches the implied covenant when it wrongfully and intentionally injures the other party's rights to receive the benefit of the parties' agreement. *Sanders*, 2008-NMSC-040 at ¶ 7, 144 N.M. at 452, 188 P.3d at 1203; *Cont'l Potash, Inc.*, 1993-NMSC-039 at ¶ 64, 115 N.M. at 706, 858 P.2d at 82. But Plaintiff has presented no evidence that Defendants ever tried to enforce or rely on the "Work for Hire" provision at issue in any way, and thus no evidence that Defendants' alleged proffer of this provision ever injured her rights to receive the benefit of the parties' agreement. In the absence of any proof concerning this essential element, Defendants are entitled to summary judgment on Plaintiff's implied covenant claims based on the "Work for Hire" provision in the pre-opening formal contract Defendants claim to have given her.

However, Plaintiff *has* shown genuine issues of material fact regarding whether Defendants breached the implied covenant by failing to provide her with a formal contract in response to her April 2015 request. First, although Ms. Kennedy declared that she *did* give Plaintiff a pre-opening formal contract, Plaintiff denied that she ever got one, creating a genuine factual dispute. Then, a rational juror could conclude that Defendants' alleged failure to provide Plaintiff with a pre-opening formal contract injured her rights to receive the benefit of the parties'

---

[26] Plaintiff also asserts that Defendants' "bad-faith will be made crystal clear at trial." (Doc. 421 at 36.) To the extent Plaintiff intends this to be an argument that the Court should deny Defendants summary judgment on her implied covenant claims based on her "hope that something will turn up at trial," the Court rejects it. *See Conaway v. Smith*, 853 F.2d 789, 794 (10th Cir. 1988) ("In a response to a motion for summary judgment, a party cannot rest on ignorance of facts, on speculation, or on suspicion and may not escape summary judgment in the mere hope that something will turn up at trial.").

agreement. In particular, the Court notes that the Meow Terms e-mail promised Plaintiff a "$10,00" revenue share, (Doc. 278-1 at 1), whereas one could reasonably infer that a pre-opening formal contract would have unambiguously entitled her to a $10,000 revenue share and would therefore have prevented or invalidated Defendants' subsequent reduction of this amount more effectively than the Meow Terms e-mail.[27]

Further, there is evidence on which a rational juror could rely to infer that Defendants' failure to provide Plaintiff with a pre-opening formal contract was wrongful and intentional. First, although Defendants have presented evidence that Defendant Kadlubek invited Plaintiff to a meeting to get her contract, Plaintiff has presented evidence that he sent the invitation to an e-mail account he knew she was no longer using. And second, Ms. Lesta testified that she was "discouraged from putting agreements with artists into contracts" before the HoER opened, "because the terms would change." (Doc. 377-12 at 4, 9.)

Plaintiff has also shown genuine issues of material fact regarding whether Defendants breached the implied covenant by conditioning payment of a portion of her revenue share on her acceptance of terms contrary to the Meow Terms e-mail, namely, an acknowledgment that she was not entitled to a revenue share and the assignment of her IP rights to Defendant MWI. Defendants admit that a "form agreement [Plaintiff] was asked to sign to get … $5,000" of her revenue share "included a copyright assignment," contrary to the Meow Terms e-mail. (Doc. 362 at 15.) And the form ABP agreement in the record includes an acknowledgment that the recipient has no right to

---

[27] Of course, if Plaintiff's pre-opening formal contract had included the same terms as the two pre-opening formal contracts in the record, it would have included a "Work for Hire" provision less favorable to her than the Meow Terms e-mail. But it would also have included an at-will termination provision that would have allowed Plaintiff to terminate the parties' agreement before she began installing ISQ in the HoER, to the extent any of the contract's terms were unacceptable to her. Thus, Defendants' alleged failure to provide Plaintiff with a pre-opening formal contract may have been injurious even if some of its terms would have been less favorable to her than the Meow Terms e-mail.

receive payment. Moreover, there is no evidence that Defendants ever gave Plaintiff the $5,000 in question, despite their contention that she did not actually need to assign her IP rights to Defendant MWI to get it.[28] (*Id.*) In light of these circumstances, a rational juror could find that Defendants injured Plaintiff's rights to receive the benefit of any contract arising out of the Meow Terms e-mail. Further, Defendants' conduct in this regard could be construed as wrongful and intentional on its face; and, in the briefing on their motion, Defendants fail to demonstrate the absence of a genuine issue of material fact on this point. (Docs. 362, 432.)

Likewise, Plaintiff has shown genuine issues of material fact regarding whether Defendants breached the implied covenant by unilaterally reducing her revenue share from $10,000 to $7,000 after she installed ISQ in the HoER. In its counterclaim, Defendant MWI alleges that Defendants told artists their revenue shares would be "adjusted" if they "underperformed," and that Defendants reduced Plaintiff's revenue share accordingly. (Doc. 183 at 20, 22-23.) But the Meow Terms e-mail does not indicate that Plaintiff's compensation might be reduced for underperformance, (Doc. 278-1 at 1), and Defendants point to no evidence that they otherwise informed Plaintiff of this possibility, and that she agreed to it, before she installed ISQ in the HoER. (*See* Docs. 362, 432.) Nor is there any evidence that Defendants ever actually offered Plaintiff more than $7,000 as a revenue share. A rational juror could therefore find that, by unilaterally reducing Plaintiff's revenue share, Defendants wrongfully and intentionally injured her rights to receive the benefit of any contract arising out of the Meow Terms e-mail.[29]

---

[28] Defendants' roughly contemporaneous offer to purchase Plaintiff's IP rights for $35,000 might arguably support the inference that Plaintiff could have successfully challenged Defendants' demand for an assignment of rights in exchange for the $5,000 payment. (*See* Doc. 362 at 15.) But it does not show the absence of a genuine factual dispute in this regard.

[29] Defendants argue that their unilateral reduction of Plaintiff's revenue share is "irrelevant" because their motion does not seek to limit Plaintiff's contractual damages to the reduced amount. (Doc. 432 at 24.) But Defendants do not dispute that, before Plaintiff filed this lawsuit, they only tried to pay her the reduced amount; and, they claim that they expect to prove the reduction "as part of [Defendant MWI's] contract with [P]laintiff" at trial. (Doc. 362 at 26.) Thus,

For all of the foregoing reasons, the Court will grant Defendants' request for summary judgment on Plaintiff's claims for breach of the implied covenant of good faith and fair dealing based on evidence that Defendants offered Plaintiff a pre-opening formal contract that included a "Work for Hire" provision. However, the Court will deny Defendants' request for summary judgment on Plaintiff's implied covenant claims based on evidence that Defendants: (1) failed to provide Plaintiff with a pre-opening formal contract in response to her April 2015 request; (2) conditioned payment of $5,000 of her revenue share on her acceptance of terms contrary to the Meow Terms e-mail; and, (3) unilaterally reduced her revenue share to $7,000.

3.     Promissory Estoppel Claims

In their motion, Defendants next seek summary judgment on Plaintiff's promissory estoppel claims. Plaintiff bases these claims on Defendants' alleged "promises … of membership in the [Meow Wolf artist collective] and a revenue share, representing a proportionate share in the success of Meow Wolf." (Doc. 148 at 21.) Defendants argue that they are entitled to summary judgment on these claims because, as a matter of law, the promises on which Plaintiff relies are too indefinite to be enforceable. (Doc. 362 at 29.) For the following reasons, the Court agrees.[30]

According to the New Mexico Supreme Court,

the essential elements of promissory estoppel are: (1) An actual promise must have been made which in fact induced the promisee's action or forbearance; (2) The promisee's reliance on the promise must have been reasonable; (3) The promisee's action or forbearance must have amounted to a substantial change in position; (4) The promisee's action or forbearance must have been actually foreseen or

---

the reduction is relevant to whether Plaintiff has demonstrated a genuine issue of material fact regarding her implied covenant claims.

[30] Because the Court concludes that Defendants are entitled to summary judgment on Plaintiff's promissory estoppel claims on this basis, it will not consider Defendants' other argument in opposition to these claims, *i.e.*, that "[t]he existence of the parties' contract" precludes them. (Doc. 362 at 28-29.) However, the Court notes that, as discussed in Section II.C.1, *supra*, there are genuine issues of material fact regarding whether the parties entered into a legally binding contract governed by the Meow Terms e-mail, and if the jury finds that they did not, then there would be no contractual bar to Plaintiff's promissory estoppel claims.

reasonably foreseeable to the promisor when making the promise; and (5) enforcement of the promise is required to prevent injustice.

*Strata Prod. Co. v. Mercury Expl. Co.*, 1996-NMSC-016, ¶ 20, 121 N.M. 622, 628, 916 P.2d 822, 828.

Promissory estoppel is "a theory of contract formation" that "treats reliance as an alternative form of consideration when all other contractual elements are present." *Salazar v. Quikrete Companies, LLC*, No. 18-cv-765, 2019 WL 4860915, at *2 (D.N.M. Oct. 2, 2019), *aff'd sub nom. Salazar v. Quickrete Companies, LLC*, 817 F. App'x 565 (10th Cir. 2020). Thus, "though promissory estoppel replaces consideration in the contractual framework, it still requires an actual promise" rather than an "illusory" one, *i.e.*, one that is too vague and indefinite to be legally enforceable. *Id.* at *2-*3; *see also Mendoza v. Honeywell Tech. Sols., Inc.*, No. 07-cv-124, 2008 WL 11322912, at *12 (D.N.M. Apr. 23, 2008) (holding that statements of defendant's human resources specialist "were too vague to be viewed as an explicit promise"). Relatedly, a party's reliance on an illusory promise is necessarily unreasonable. *Salazar*, 2019 WL 4860915 at *5; *see also, e.g.*, *Mendoza*, 2008 WL 11322912 at *11 (holding that a "non-definitive, unspecific, and vague statement … cannot create a reasonable expectation of contractual rights"); *cf. Magnolia Mountain Ltd., P'ship v. Ski Rio Partners, Ltd.*, 2006-NMCA-027, ¶ 27, 139 N.M. 288, 296, 131 P.3d 675, 683 (holding that defendant's reliance on alleged promise at issue "would likely have been unreasonable due to the equivocal and ambiguous nature of most of the statements" defendant relied on to support its promissory estoppel defense).

As explained in Section II.C.1, *supra*, the promises on which Plaintiff relies are too vague and indefinite to be enforceable. "Promises are illusory when they fail to establish price, quantity, or other material terms." *Salazar*, 2019 WL 4860915 at *3. And, as already noted, Plaintiff admits that the promises on which she relies never addressed such material terms as what form the

33

promised revenue shares would take, how long contributing artists would be entitled to receive them, and to what proportion or percentage of the HoER's annual revenues each artist would be entitled. As a matter of law, then, these promises are insufficient not only to form a binding contract, but also to constitute actual promises on which Plaintiff could reasonably rely, and Defendants are therefore entitled to summary judgment on Plaintiff's promissory estoppel claims. *Salazar*, 2019 WL 4860915 at *2-*5; *Mendoza*, 2008 WL 11322912 at *11-*12.

### 4.   Unjust Enrichment Claims

Defendants' motion next addresses Plaintiff's unjust enrichment claims.

> One who has been unjustly enriched at the expense of another may be required by law to make restitution. This quasi-contractual obligation is created by the courts for reasons of justice and equity, notwithstanding the lack of any contractual relationship between the parties. New Mexico law recognizes such a cause of action.

*Hydro Conduit Corp. v. Kemble*, 1990-NMSC-061, ¶ 8, 110 N.M. 173, 175, 793 P.2d 855, 857 (quoting *U. S., for & on Behalf of Sunworks Div. of Sun Collector Corp. v. Ins. Co. of N. Am.*, 695 F.2d 455, 458 (10th Cir. 1982)) (citation omitted). To prevail on a claim for unjust enrichment, a plaintiff must show that: "(1) another has been knowingly benefitted at one's expense (2) in a manner such that allowance of the other to retain the benefit would be unjust." *Fiore Indus., Inc. v. Ericsson*, No. 18-cv-1218, 2021 WL 24569, at *6 (D.N.M. Jan. 4, 2021) (quoting *Ontiveros Insulation Co. v. Sanchez*, 2000-NMCA-051, ¶ 11, 129 N.M. 200, 203, 3 P.3d 695, 698).

Defendants make two arguments in support of their request for summary judgment on Plaintiff's unjust enrichment claims. First, Defendants assert that these claims are barred by the existence of an enforceable contract, *i.e.*, the contract they claim arose out of the Meow Terms e-mail. (Doc. 362 at 28 (citing *Elliott Indus. Ltd. P'ship v. BP Am. Prod. Co.*, 407 F.3d 1091, 1117 (10th Cir. 2005).) However, as discussed in Section II.C.1, *supra*, there are genuine issues of

material fact regarding whether such a contract was formed, and if the jury finds that it was not, then there will be no contractual bar to Plaintiff's unjust enrichment claims. Thus, Defendants' argument on this point is unavailing.

Second, Defendants argue that they are entitled to summary judgment on Plaintiff's unjust enrichment claims because they either paid her or tendered payment to her in an amount greater than the value of ISQ, and so were not unjustly enriched. (Doc. 362 at 30-31.) However, as explained below, the Court finds that there are genuine issues of material fact regarding whether Defendants either paid Plaintiff or tendered payment to her in excess of ISQ's value.

Initially, although Defendants assert that the value of ISQ is undisputedly $5,000, they base this assertion on their expert's appraisal of the work's value *at the time of installation*, without citing any law to support the necessary corollary that this is the only correct way to value it for purposes of an unjust enrichment claim. (*See* Doc. 362 at 15, 31; Doc. 362-17 at 2; Doc. 432 at 25-26.) And at least one court has implied that this is *not* the only correct way, by analyzing value in terms of whether a good or service "*ultimately* conferred an unjust benefit" on the defendant. *Fiore Indus., Inc.*, 2021 WL 24569 at *6-*7 (emphasis added). Not for the first time in this litigation, the Court reminds Defendants that "[a] litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority or in the face of contrary authority, forfeits the point. The [C]ourt will not do his research for him." *Phillips v. Hillcrest Med. Ctr.*, 244 F.3d 790, 800 n.10 (10th Cir. 2001) (brackets omitted).

Moreover, a rational factfinder could conclude that, by installing ISQ in the HoER, Plaintiff conferred on Defendants a benefit worth more than the amount they claim to have paid or tried to pay her, *i.e.*, $8,000.[31] For example, the Meow Terms e-mail could be read to assign the work a

---

[31] The Court arrives at this figure by adding the $1,000 Defendants paid to Mr. Cluett at Plaintiff's direction, the $2,000 Plaintiff admits she was paid as a revenue share, and the $5,000 Defendants proffered to her conditionally but

value of $11,000. And the admissions of MWI personnel that ISQ's "Space Owl" was "iconic" and "one of the pivotal characters that launched Meow Wolf in its early state" could permit a rational factfinder to assign the work a value greater than $11,000, particularly when these admissions are considered in light of evidence of the HoER's financial success. (Doc. 421-7 at 2; Doc. 421-8 at 2; Doc. 421-15 at 6.) For all of these reasons, the Court finds that Defendants have failed to demonstrate their entitlement to judgment as a matter of law on Plaintiff's unjust enrichment claims.

5.   Misrepresentation Claims

Defendants next assert that they are entitled to summary judgment on Plaintiff's intentional and negligent misrepresentation claims. The elements of intentional misrepresentation are that a party:  "(1) made a misrepresentation of fact intentionally or with reckless disregard for the truth, (2) with the intent to deceive and to induce the injured party to act upon it, (3) and upon which the injured party actually and detrimentally relie[d]." *Bull v. BGK Holdings, LLC*, 859 F. Supp. 2d 1238, 1247 (D.N.M. 2012); *Saylor v. Valles*, 2003-NMCA-037, ¶ 21, 133 N.M. 432, 438, 63 P.3d 1152, 1158. "[T]he promise to pay money in the future with the present intent to *not* keep the promise" is "actionable fraud."[32] *Telman v. Galles*, 1936-NMSC-073, ¶¶ 16-17, 41 N.M. 56, 63 P.2d 1049, 1052 (emphasis in original); *see also, e.g., Solomon v. Pendaries Properties, Inc.*, 623 F.2d 602, 605 (10th Cir. 1980) (under New Mexico law, "a representation of future events" is actionable fraud "when there is a misstatement of present intent"); *Primus v. Clark*, 1944-NMSC-

---

did not ultimately pay. Plaintiff admits that Defendants also paid for some of the materials she used to install ISQ in the HoER; however, in their motion, Defendants do not say how much they paid for these materials, (*see generally* Doc. 362), so the Court does not include that amount in its calculation.

[32] Cases applying New Mexico law use the terms "intentional misrepresentation" and "fraudulent misrepresentation" or "fraud" interchangeably. *See, e.g., Bull*, 859 F. Supp. 2d at 1246-47.

030, ¶ 45, 48 N.M. 240, 149 P.2d 535, 542 ("If the defendant had the present fraudulent intent to

not keep his agreements at the time he made them, then such agreements were fraudulent[.]").

> The elements of negligent misrepresentation, in turn, are that:
>
> (1) the defendant made a statement that, though perhaps literally true, is misleading;
> (2) the defendant failed to exercise ordinary care in obtaining or communicating
> the statement; (3) the defendant[] intended that the plaintiff receive and be
> influenced by the statement; and (4) it was reasonably foreseeable that the plaintiff
> would be harmed if the information was incorrect or misleading.

*Bull*, 859 F. Supp. 2d at 1247.

> Though related, the two types of misrepresentation claims are distinct in several ways:
>
> (1) fraudulent misrepresentation requires an untrue statement, while negligent
> misrepresentation may involve a statement that is "literally true" but misleading;
> (2) fraudulent misrepresentation requires the defendant to make the statement
> recklessly or with knowledge that it is false, while negligent misrepresentation only
> requires a failure to exercise ordinary care in obtaining or communicating the
> statement; [and,] (3) fraudulent misrepresentation requires an intent to deceive,
> while negligent misrepresentation only requires an intent that the plaintiff receive
> and be influenced by the statement where it is reasonably foreseeable that the
> plaintiff would be harmed if the information conveyed was incorrect or misleading.

*Eckhardt v. Charter Hosp. of Albuquerque, Inc.,* 1998-NMCA-017, ¶ 55, 124 N.M. 549, 562, 953

P.2d 722, 735. Also, "while negligent misrepresentation may be proven by a preponderance of the

evidence, common-law fraud must be proven by clear and convincing evidence." *Id.* at ¶ 56, 124

N.M. at 562, 953 P.2d at 735; *Cantrall v. Applera Corp.*, No. 02-cv-747, 2003 WL 27385262, at

*4 (D.N.M. Apr. 10, 2003).

 In her Amended Complaint, Plaintiff alleges intentional and negligent misrepresentation

on the basis that Defendants falsely told her "she would be compensated proportionally with the

ISQ's contribution to Meow Wolf's brand, enterprise, and revenue."[33] (Doc. 148 at 23.)

---

[33] Plaintiff elaborates that, among other things, "[t]hese representations included statements that [Plaintiff] was part
of the Meow Wolf 'collective[.]'" (Doc. 148 at 23.) But as discussed in Section II.C.1, *supra*, Plaintiff has pointed to
no competent evidence to show that membership in the collective would have entitled her to any particular right or
benefit. Moreover, although Plaintiff accuses Defendant Kadlubek of "hid[ing]" the fact that an LLC rather than the

Defendants request summary judgment on these claims, arguing, among other things, that Plaintiff has failed to demonstrate a genuine issue of material fact regarding whether the representations on which she relies were untrue. (*Id.*; Doc. 348 at 16-17.) Though the issue is somewhat more nuanced than Defendants contend, ultimately the Court agrees that, as a matter of law, the alleged representations on which Plaintiff relies do not adequately support her claims for intentional and negligent misrepresentation.[34]

Initially, Plaintiff has failed to demonstrate a genuine issue of material fact regarding whether the representations on which she relies were fraudulent or untrue. Construed in Plaintiff's favor for purposes of the present motion, the evidence shows that Defendant Kadlubek promised contributing artists a "revenue share" in lieu of up-front payment, pursuant to which they would receive a share of the HoER's revenue "calculated on an annual basis with a relationship from year to year on how much revenue [their] work generated." (Doc. 362-7 at 8-11.) These promises were made at large meetings "like rallies," to the whole group rather than Plaintiff individually. (Doc. 278-5 at 21; Doc. 362-7 at 11-12.) Plaintiff "never heard the word capped" at these meetings but does not think Defendant Kadlubek was saying artists "would be sharing in the success" of the HoER "until the end of time." (Doc. 362-7 at 9, 13.) In fact, she "[doesn't] know what the terms were," she knew the promised revenue share "could emerge in any form," and no one promised

---

collective "would claim all the equity in [the] HoER," she points to no competent evidence to support this allegation. (Doc. 377 at 18-20.) On the contrary, Defendant Kadlubek undisputedly and widely disclosed that the "arts and entertainment production company" developing the HoER was an LLC with six equity partners, even going so far as to include the six partners' biographies in promotional material. (Doc. 330-2 at 2, 5-7; Doc. 330-3 at 2-3; Doc. 330-4 at 1-2.)

[34] Because the Court finds that Defendants are entitled to summary judgment on Plaintiff's misrepresentation claims on this basis, it does not address Defendants' other arguments in opposition to these claims. (*See* Doc. 362 at 31; Doc. 348 at 16-18.)

her a specific percentage or amount of stock options, equity, or shares of stock. (Doc. 278-5 at 1-2; Doc. 362-7 at 9-10.)

Then, Plaintiff has failed to show a genuine issue of material fact regarding whether Defendants paid or intended to pay contributing artists, including Plaintiff, inconsistently with the oral promises she has described. In other words, she has failed to point to any competent evidence that Defendants did *not* pay or intend to pay artists "a share of the HoER's revenue calculated on an annual basis," which bore a "relationship" to "how much revenue" their work generated. (Doc. 362-7 at 8-11.) Moreover, there is undisputed evidence to the contrary, including evidence that:

- The pre-opening formal contract Mr. Lenihan received from Art City provided that he would be awarded annual revenue-based bonus payments from 11 per cent of annual revenues in excess of $1.2 million, distributed equally among all contributing artists, up to his cap, (Doc. 296-3 at 8);

- Documents prepared for Plaintiff's signature in 2017 indicated that, pursuant to the ABP, Defendant MWI would—albeit at its discretion and on an assignment of rights—pay Plaintiff up to $7,000 according to a formula based on the HoER's annual "Adapted Net Income," which was in turn derived from the exhibition's annual revenues and expenses, (Doc. 362-6);

- An "Artist Bonus Program Spreadsheet" shows that, by 2018, $365,000 had been paid, and an additional $683,000 allocated, to artists, including $2,000 paid and an additional $5,000 allocated to Plaintiff, (Doc. 278-6 at 1-3);

- In April 2019, Plaintiff was paid $2,000 "from 2017" for "the artist revenue thing,"[35] (Doc. 278-5 at 19-20; Doc. 330-7 at 1; Doc. 421-13 at 2); and,

- In August 2019, Defendants offered to pay Plaintiff $5,000 under the ABP, albeit, again, at its discretion and on an assignment of rights. (Doc. 362-15.)

Plaintiff appears to base her claims of falsity on her position that artists' revenue shares were to be uncapped, (*see, e.g.*, Doc. 148 at 15-16), whereas the revenue shares Defendants paid

---

[35] The Court notes that Plaintiff received the $2,000 in question from "MW Santa Fe, LLC." (Doc. 421-13 at 2.) However, on the present record, there appears to be no genuine factual dispute that the payment was made on behalf of Defendant MWI as the entity responsible for paying artists' revenue shares from 2017 forward. (*See, e.g.*, Doc. 362-6.)

and intended to pay were unquestionably capped. But Plaintiff admits that, at the meetings she attended, she did not hear Defendant Kadlubek say whether the revenue shares would be capped or not. As such, Plaintiff has failed to show a genuine factual dispute regarding whether the representations on which she relies were fraudulent or untrue.

Of course, Defendant Kadlubek's alleged failure to say whether artists' revenue shares would be capped does raise the question of whether his promises, as Plaintiff has described them, were literally true but misleading, which would support her claims for negligent though not intentional misrepresentation. *Eckhardt,* 1998-NMCA-017 at ¶ 55, 124 N.M. at 562, 953 P.2d at 735. However, even construed in Plaintiff's favor, a rational juror could not find this alleged omission misleading when considered in combination with the Meow Terms e-mail, which Plaintiff admittedly received before she began attending All Shrimps meetings. In this e-mail, Defendant Kadlubek offered Plaintiff "$10,00 of revenue share stipend[.]" (Doc. 278-1 at 1.) And the offer of a "revenue share stipend" in a specific dollar amount plainly indicates a capped share, notwithstanding any potential ambiguity regarding the exact amount of the cap. (*See also* Doc. 278-5 at 15 ("Q. And this e-mail does not offer you an open-ended or unlimited Revenue Share, does it? A. It does not.").)

Plaintiff did testify that she "dismissed" and "completely forgot about" the Meow Terms e-mail. (Doc. 421-6 at 26-27.) But Defendants cannot be held responsible for her undisclosed selective reliance and imperfect memory. Plaintiff also attested that after she began regularly attending "Meow Wolf" meetings, "it became clear" that the HoER would be "a more complex project" than she had anticipated, and it was "clear *to [her]*" that "her exchange with [Defendant] Kadlubek in April [2015] was a preliminary foray, which had been replaced by a new compensation model being outlined at [sic] by [Defendant] Kadlubek's [sic] at the meetings."

(Doc. 278-4 at 8-9 (emphasis added).) But she has presented no evidence that Defendant Kadlubek ever said the cap he previously gave her had been rescinded, or that she ever tried to renegotiate that cap once she realized she had underestimated how much work she would have to do. Plaintiff has therefore failed to show a genuine factual dispute regarding whether Defendant Kadlubek misled her in the way she alleges.[36] In sum, Defendants are entitled to summary judgment on Plaintiff's misrepresentation claims because there is a complete failure of proof on an essential element of these claims, *i.e.*, that the representations on which Plaintiff relies were misleading, fraudulent, or untrue.

### 6.   Conversion Claims

Finally, in their motion, Defendants request summary judgment on Plaintiff's conversion claims. "Conversion is the unlawful exercise of dominion and control over property belonging to another in defiance of the owner's rights, or acts constituting an unauthorized and injurious use of another's property, or a wrongful detention after demand has been made." *Hollow Spirits, LLC v. Corson Distilling Sys., Inc.*, No. 18-cv-257, 2020 WL 1963188, at *13 (D.N.M. Mar. 9, 2020), *report and recommendation adopted,* No. 18-cv-257, 2020 WL 1954152 (D.N.M. Apr. 23, 2020); *Sec. Pac. Fin. Servs., a Div. of Bank of Am., FSB v. Signfilled Corp.*, 1998-NMCA-046, ¶ 15, 125 N.M. 38, 43, 956 P.2d 837, 842.

As modified by her Amended Complaint, Plaintiff alleges that Defendants are liable on her conversion claims because, "[t]o the extent it is determined that [Plaintiff] held and holds title to

---

[36] In neither her Amended Complaint nor her response to Defendants' motion has Plaintiff claimed that Defendants committed misrepresentation in the Meow Terms e-mail by (1) promising her a $10,000 revenue share but later reducing it to $7,000 and/or (2) conditioning her receipt of $5,000 of it on her acceptance of terms contrary to the e-mail. (*See generally* Docs. 148, 377, 421.) Consequently, the Court will not address the viability of such claims here. However, it appears that Plaintiff would have some difficulty proving actual and detrimental reliance on any of the promises in the Meow Terms e-mail in light of her testimony that she dismissed and completely forgot about it. *Bull*, 859 F. Supp. 2d at 1247.

her work at [the] HoER, Defendants have wrongfully possessed and exercised dominion and control over ISQ[.]" (Doc. 148 at 22.) Defendants argue that they are entitled to summary judgment on these claims because Plaintiff bases them on Defendant Kadlubek "misrepresenting an uncapped share of Meow Wolf's revenue to artists for their work on HoER," but there is no genuine issue of material fact that he did so. (Doc. 348 at 3; Doc. 362 at 31.)

Plaintiff has not disputed Defendants' contention that she bases her conversion claims on Defendant Kadlubek's alleged misrepresentations that she would receive an uncapped share of the HoER's revenue; and, a review of her Amended Complaint reveals no other basis for these claims. (Docs. 148, 377, 421.) However, as discussed in Section II.C.5, *supra*, Plaintiff has failed to show a genuine issue of material fact regarding whether Defendant Kadlubek made the misrepresentations she claims. Moreover, the undisputed evidence shows that Plaintiff personally installed ISQ in the HoER and, far from demanding its return, has actually asked the Court to enjoin Defendants from removing it during her lifetime. (Doc. 148 at 25.) Thus, even assuming Plaintiff retained ownership of the work, she has failed to show a genuine issue of material fact regarding whether Defendants unlawfully exercised dominion and control over ISQ, used it in an unauthorized or injurious way, or wrongfully detained it after demand was made. *Hollow Spirits, LLC*, 2020 WL 1963188 at *13. Defendants are therefore entitled to summary judgment on Plaintiff's conversion claims.

## III.  Conclusion

For the reasons set forth above, Defendants' Motion for Partial Summary Judgment on Contract and Related Claims (Doc. 362) is hereby GRANTED IN PART and DENIED IN PART.

1.    The Motion is GRANTED in the following respects:

    a.      Summary judgment in Defendants' favor is granted on Plaintiff's claims for breach of contract based on the compensation terms alleged in her Amended Complaint, (Doc. 148);

    b.      Summary judgment in Defendants' favor is granted on Plaintiff's claims for breach of the implied covenant of good faith and fair dealing based on evidence that, before the HoER opened, Defendants provided Plaintiff with a formal contract that included a "Work for Hire" provision; and,

    c.      Summary judgment in Defendants' favor is granted on Plaintiff's claims for promissory estoppel, intentional misrepresentation, negligent misrepresentation, and conversion.

The foregoing claims are DISMISSED WITH PREJUDICE; and,

2.      The Motion is DENIED in the following respects:

    a.      Summary judgment in Defendants' favor is denied on Defendant MWI's counterclaim seeking a declaration that the parties entered into a contract for Plaintiff to install ISQ in the HoER according to the compensation terms in the Meow Terms e-mail;

    b.      Summary judgment in Defendants' favor is denied on Defendants' request that the Court limit Plaintiff's contractual damages to $3,000;

    c.      Summary judgment in Defendants' favor is denied on Plaintiff's claims for breach of the implied covenant of good faith and fair dealing based on evidence that: (1) Defendants failed to provide Plaintiff with a formal contract in response to her April 2015 request; (2) Defendants unilaterally reduced her revenue share after she installed ISQ in the HoER; and, (3) Defendants conditioned payment of a portion

of her revenue share on her acceptance of terms contrary to the Meow Terms e-mail; and,

d.    Summary judgment in Defendants' favor is denied on Plaintiff's claims for unjust enrichment.

IT IS SO ORDERED.

_____
KIRTAN KHALSA
UNITED STATES MAGISTRATE JUDGE
Presiding by Consent