**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

LAUREN ADELE OLIVER,

     Plaintiff,

v.                                     Civ. No. 20-237 KK/SCY

MEOW WOLF, INC., *et al.,*

     Defendants.

**<u>MEMORANDUM OPINION AND ORDER</u>**

THIS MATTER is before the Court on Defendants' Motion for Partial Summary Judgment Dismissing Plaintiff's Claim of Copyright Infringement for Uses of Ice Station Quellette for Marketing and Promotion (Doc. 391), filed April 29, 2022. The Court, having reviewed the parties' submissions, the record, and the relevant law, and being otherwise sufficiently advised, FINDS the motion is well-taken in part and should be GRANTED IN PART and DENIED IN PART as set forth below.

## I. <u>Relevant Procedural History</u>[1]

The parties' disputes in this matter arise out of Plaintiff's installation of a work of visual art called Ice Station Quellette ("ISQ") in a permanent exhibition in Santa Fe, New Mexico, called the House of Eternal Return ("HoER").[2] (Docs. 148, 183.) Defendant Meow Wolf, Inc. ("MWI") operates the HoER, and Defendant Vince Kadlubek was formerly the company's CEO. (*Id.*; Doc. 348-3 at 2.) Plaintiff filed her original complaint against Defendants in March 2020, asserting claims for copyright infringement and violation of the Visual Artists Rights Act, as well as several

---

[1] The parties are familiar with this matter's factual background, which the Court has described in prior orders and will not repeat here. (*See* Doc. 59 at 1-4, Doc. 135 at 1-4, Doc. 325 at 1-3, *and* Doc. 499 at 2-6.)

[2] As used herein, "ISQ" refers to the work Plaintiff installed in the HoER, and not to any of her other works that bore or bear the same name.

state law claims sounding in contract and tort. (Doc. 1.) In June 2021, Plaintiff amended her complaint, adding new factual allegations and new and modified state law claims. (Doc. 148.) Defendant MWI, in turn, filed a declaratory judgment counterclaim sounding in contract in July 2021. (Doc. 183.)

On April 29, 2022, Defendants filed the motion now before the Court, *i.e.*, Defendants' Motion for Partial Summary Judgment Dismissing Plaintiff's Claim of Copyright Infringement for Uses of Ice Station Quellette for Marketing and Promotion. (Doc. 391.) Plaintiff responded in opposition to the motion on June 23, 2022, and Defendants replied in support of it on July 7, 2022. (Docs. 457, 473.) In a Memorandum Opinion and Order filed on September 12, 2022 (Doc. 499) ("September 2022 Order"), the Court granted Plaintiff leave to file an evidentiary supplement regarding several dispositive motions, including the motion at issue here. (Doc. 486-1; Doc. 499 at 13-14, 42.) In addition, the Court granted Defendants summary judgment on Plaintiff's copyright infringement claims based on the display of ISQ in the HoER; and, as explained below, that ruling is directly relevant to the Court's analysis here. (Doc. 499 at 15-40, 42.)

## II.  <u>Analysis</u>

### A.    Legal Standards Governing Summary Judgment

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Jones v. Kodak Med. Assistance Plan*, 169 F.3d 1287, 1291 (10th Cir. 1999) (quotation marks omitted); *see also* Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."). "A dispute is genuine when the evidence is such that a reasonable

[factfinder] could return a verdict for the nonmoving party, and a fact is material when it might affect the outcome of the suit under the governing substantive law." *Bird v. W. Valley City*, 832 F.3d 1188, 1199 (10th Cir. 2016) (quotation marks and brackets omitted). Only material factual disputes preclude the entry of summary judgment. *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000). If the nonmovant demonstrates a genuine dispute as to material facts, the Court views the facts in the light most favorable to the nonmovant. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009). However, the Court will not draw "unreasonable inferences that are unsupported by the record." *Wellington v. Daza*, No. 21-2052, 2022 WL 3041100, at *2 (10th Cir. Aug. 2, 2022), *cert. denied*, 143 S. Ct. 788 (2023); *Est. of Redd ex rel. Redd v. Love*, 848 F.3d 899, 906 (10th Cir. 2017).

The movant bears the initial burden of demonstrating the absence of a genuine issue of material fact and its entitlement to a judgment as a matter of law. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir. 1998). When the nonmovant will bear the burden of proof at trial, the movant may meet its initial summary judgment burden by submitting "affirmative evidence that negates an essential element of the nonmoving party's claim" or by demonstrating "that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Tesone v. Empire Mktg. Strategies*, 942 F.3d 979, 994 (10th Cir. 2019). If the movant meets this initial burden, "the burden then shifts to the nonmovant," *id.*, who must "go beyond the pleadings and set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant … by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 671 (quotation marks omitted).

When a defendant moves for summary judgment "to test an affirmative defense," in turn, it must first "demonstrate that no disputed material fact exists regarding the affirmative defense asserted." *Helm v. Kansas*, 656 F.3d 1277, 1284 (10th Cir. 2011). If the defendant carries this initial burden, the plaintiff "must then demonstrate with specificity the existence of a disputed material fact," *id.*, but only "relative to the affirmative defense," as opposed to "each element essential to the case." *Hamric v. Wilderness Expeditions, Inc.*, 6 F.4th 1108, 1122 (10th Cir. 2021) (emphasis omitted). Ultimately, where the movant will bear the burden of proof on an issue at trial, as when a defendant relies on an affirmative defense, it "must establish beyond peradventure *all* of the essential elements of the claim or defense to warrant [summary] judgment in [its] favor." *Leone v. Owsley*, 810 F.3d 1149, 1153 (10th Cir. 2015) (emphasis in original).

## B.     Material Facts

The Court hereby incorporates the material facts set forth in Section III.B. of its September 2022 Order granting Defendants summary judgment on Plaintiff's copyright infringement claims based on the display of ISQ in the HoER. (Doc. 499 at 17-26.) In addition, the following facts are not genuinely disputed for purposes of the present motion, except as specifically noted. In early 2015, Plaintiff told Caity Kennedy that Plaintiff had "skills in marketing and graphic design and the like," and that "[i]f you guys need anything like that, I'm absolutely on board." (Doc. 391-2 at 2.) At the time, Ms. Kennedy was a member of VCMSE Art City, LLC ("Art City"), one of the entities that participated in developing and operating the HoER. (*See* Doc. 499 at 34-35.) In December 2016, Art City merged into Defendant MWI, with Defendant MWI as the sole survivor. (Doc. 298-4 at 2.)

Plaintiff "worked on-site from January 2 to the March 16[, 2016] opening" of the HoER to

install ISQ in the exhibition. (Doc. 278-4 at 11, 18; Doc. 278-5 at 9.) "Meow Wolf"[3] "bought much of the materials" Plaintiff used, though she "spent a lot of [her] own money on it," as well. (Doc. 377-7 at 11; Doc. 421-5 at 12.) Plaintiff has presented evidence that "Meow Wolf" also gave her a $1,000 "labor budget," which she directed to be paid to Carey Cluett, who spent over two months helping her to install the work. (Doc. 278-5 at 8, 10; Doc. 377-7 at 6-11.) Defendants, however, take the position that this $1,000 was the personal stipend Defendant Kadlubek offered to Plaintiff in an April 2, 2015 e-mail entitled "Meow Terms." (Doc. 362 at 13, 17.) Although Defendants present no evidence in direct support, the amount of the payment matches the amount of the personal stipend referenced in the e-mail. (Doc. 278-1 at 1; Doc. 278-5 at 8, 10; Doc. 362 at 13, 17; Doc. 377-7 at 6-11.) Also, the timing of the payment appears to be consistent with the modified "payment schedule" for "artist fees" that Megan Roniger later proposed and to which Plaintiff agreed.[4] (*See* Doc. 377-7 at 6-11; Doc. 421-12 at 2-3.)

On February 26, 2016, Peter Chapman sent Plaintiff an e-mail with a "revised layout" she had requested, writing, "I was asked by Vince to replace ICQ [sic] for 'Todos 7' to be consistent with the exhibit."[5] (Doc. 457-1 at 2.) In response, Plaintiff added Defendant Kadlubek to the thread and wrote,

---

[3] Plaintiff in her original and amended complaints, Defendants in their second amended answer and counterclaim, and both sides in other documents filed in this matter, often refer to "Meow Wolf" without identifying the particular entity or entities to which they are actually referring. (*See generally* Docs. 1, 148, 183; *see also, e.g.*, Doc. 278-5.) In this Memorandum Opinion and Order, the Court puts such references in quotation marks because, as discussed in its September 2022 Order, there are at least four entities to which "Meow Wolf" could potentially refer, *i.e.*, (1) the Meow Wolf artist collective, (2) Meow Wolf, LLC, (3) VCMSE Art City, LLC d/b/a Meow Wolf, and/or (4) Defendant Meow Wolf, Inc. (*See generally* Doc. 499.)

[4] There is no signature block for Ms. Roniger on the e-mail thread regarding this payment schedule, but the e-mail account she used was "admin@meowwolf.com on behalf of Meow Wolf Admin [megan@meowwolf.com]." (Doc. 421-12 at 2.)

[5] There is no signature block for Mr. Chapman on this e-mail thread, and the e-mail account he used does not appear to be associated with any "Meow Wolf" entity. (Doc. 457-1 at 2.)

> Looping you in, Vince, but the work I'm doing for this is an Ice Station project, so I can't have the material be under a different name – it's okay that it's Todos 7 for Portals, obviously, that's awesome, but I need to keep all my material under the Ice Station Quellette umbrella, particularly because it deals with a narrative and characters and titles, etc.[6]

(*Id.*) Defendant Kadlubek responded, "Is there a way we can tie these universes together? Totally respect it Lauren, just want to show connection between ice station and Todos 7 somehow." (*Id.*)

On or about April 6, 2016, and December 14, 2017, "meow_wolf" posted photographs of ISQ's "Space Owl" on Instagram. (Docs. 391-5, 391-6.) In the April 2016 post, "meow_wolf" wrote, "The Space Owl watches," and in the December 2017 post, "meow_wolf" wrote, "Space Owl sees you. Ice Station Room by @quellette." (*Id.*) On both of these posts, "meow_wolf" tagged "@quellette."[7] (*Id.*)

In an August 4, 2016 Facebook post, "Meow Wolf" included an image of the Space Owl and wrote, "Have you chilled with the Space Owl? Come get lost. www.meowwolf.com." (Doc. 391-4 at 1-2.) In response to a positive comment on this post, "Oliver Quellette" wrote, "Love to you from Mimizuku Space Owl."[8] (*Id.* at 2.)

---

[6] As used in this e-mail, "Portals" appears to refer to "Portals Bermuda." (*See, e.g.*, Doc. 391-3.) In a February 2015 e-mail thread, Ms. Kennedy told Plaintiff that her "ice station will be accessed via portals bermuda," which Ms. Kennedy described as "a malfunctioning time/space/dimension travel agency." (*Id.* at 1; *see also* Doc 372-13 at 7 ("The Portals Bermuda exhibit is designed as a futuristic travel agency that offers visitors 'travel' to … other, smaller exhibits within the Portals Bermuda Zone. ISQ is the smallest of 5 secondary installations that physically radiate around the main Portals Bermuda exhibit and serve as destinations in the future.").)

[7] The parties do not appear to dispute that the "meow_wolf" Instagram account belonged to the entity or entities operating the HoER, and the "@quellette" Instagram account belonged to Plaintiff. (*See generally* Docs. 391, 457, 473.) Plaintiff does "dispute[] Defendants' use of the name 'Meow Wolf' to identify themselves on Instagram" due to "recent findings," but she does not further explain this dispute, which in any event appears to concern the identity of the legal entity or entities operating the HoER at the relevant times, rather than whether the "meow_wolf" account belonged to that entity or those entities. (Doc. 457 at 19.)

[8] The parties do not appear to dispute that the "Meow Wolf" Facebook account belonged to the entity or entities operating the HoER, and the "Oliver Quellette" Facebook account belonged to Plaintiff. (*See generally* Docs. 391, 457, 473.) Plaintiff does "dispute[] Defendants' use of the name 'Meow Wolf' to identify themselves on Facebook" due to "recent findings," but she does not further explain this dispute, which in any event appears to concern the identity of the legal entity or entities operating the HoER at the relevant times, rather than whether the "Meow Wolf" account belonged to that entity or those entities. (Doc. 457 at 19.)

A "Meow Wolf" posting of an image of the Space Owl, and a screenshot of the Space Owl from a New York Times video about the HoER, appeared on a website located at https://isq.io.[9] (Doc. 391-1 at 1, 3.) The "Meow Wolf" posting also appeared on a website located at https://www.quellette-studio.com. (*Id*. at 2.) These two websites belong to Plaintiff. (Doc. 372-12 at 47.)

Over two years after the HoER opened, on May 1, 2018, Isabel Zermani sent Plaintiff an e-mail "on behalf of the entertainment side of Meow Wolf to inquire about filming rights and permissions for your Space Owl."[10] (Doc. 193-2 at 1.) In the e-mail, Ms. Zermani told Plaintiff that a "media company called Rooster Teeth" was "very interested in filming the Space Owl and providing a voice for it" in a "web series" to be filmed at the HoER; Ms. Zermani also attached the company's "test" to the e-mail. (*Id*.) She added, "I know your work falls under a different category for filming rights than the rest of the HoER and that adding a voice would also require additional permissions from you and I wanted to start the conversation." (*Id*.)

In response to Ms. Zermani's e-mail, Plaintiff wrote,

> Sure—let's talk. It's problematic for anyone but me to feature or develop the space owl as a character in anyway [sic]. I need to hammer out an agreement with MW/MWE about the space owl/Ice Station … and I need to talk directly to whoever is handling the legal/IP stuff on your side – can you put me in contact with that department?

(*Id*.) After Ms. Zermani responded that she would "find the right connection point," Plaintiff told her that "[a]ny proposals are dead in the water until we can hammer out an agreement." (*Id*.)

---

[9] The Court takes judicial notice that the New York Times video was posted on October 23, 2017. https://www.nytimes.com/video/us/100000005485894/santa-fe-meow-wolf.html (last accessed May 3, 2023).

[10] Ms. Zermani's signature block on this e-mail thread identifies her as "Isabel Zermani, Meow Wolf." (Doc. 193-2 at 1-2.)

On May 10, 2018, Plaintiff sent an e-mail to Drew Tulchin regarding "Space Owl stuff."[11] (Doc. 132-15 at 4-5; Doc. 457-2 at 2.) In the e-mail, she said that she was "getting a lot of requests about using the space owl from MW folks," and asked, "[w]ho have you hired to work with artists on legal issues, and can you put me in touch?" (Doc. 132-15 at 5.) After Mr. Tulchin responded that this was not "[his] area at all," Plaintiff wrote, "I want to do some of these projects but we need to work some agreement out. I have to keep saying no." (*Id.*) Mr. Tulchin then asked for "1-2 paragraphs on a specific situation" so he could "find a human being who can take action." (*Id.*) Responding to Mr. Tulchin's request, Plaintiff indicated that: (1) she would "love to participate and collaborate in interesting and fun events and publications," and thought "a quick conversation with someone handling artist legal stuff could get us on the right track"; (2) she had given "the go-ahead" to an artist using the Space Owl "in his VR"; (3) two other individuals "decided to bail on using the owl" in a "creature book" and "costume idea" after meeting with her; (4) she objected to a production company "develop[ing] the space owl character for a web-based, episodic game" and it was "problematic" for anyone other than herself to "develop" the character; and, (5) she was "curious" whether the Space Owl was in a "coffee table book at the printer," and "what text/credit goes with it." (*Id.* at 4-5.) In this e-mail, Plaintiff described the HoER as having become "a large entertainment conglomerate." (*Id.*)

At her deposition, Plaintiff testified that she initially perceived the creature book as "harmless" but at the meeting about it she "realized that it was a bad idea and … said 'No,' and they backed off." (Doc. 391-2 at 3.) More generally, she testified:

> I was open to participating in projects because at this time I believed I was part of a collective, and that I had a share of the revenue; that I was part of this team. I was open to hearing about promotions. I was open to participating[.]

---

[11] Mr. Tulchin's signature block indicates that his title at this time was "Meow Wolf VP, Capital & Investments." (Doc. 132-15 at 5.)

(*Id.*)

On May 29, 2018, Plaintiff sent an e-mail to Megan Roniger Brinkerhoff and Talia Kosh in which she stated, among other things, that she "prefer[red] to retain ownership and total creative control over the Space Owl/Ice Station," "would love to consider interesting events and publications once we get credits, guidelines and approval channels established," and was "curious to review where and how my work has already been used and credited in Meow Wolf promotional materials, publications and any other projects" of which she was unaware.[12] (Doc. 166-17 at 1.)

Plaintiff e-mailed Ms. Roniger Brinkerhoff and Ms. Kosh again on June 26, 2018, this time asking them to "immediately remove the space owl" from an "artwork/promotional campaign." (Doc. 166-2 at 1.) The next day, Ms. Roniger Brinkerhoff told Plaintiff that the Space Owl image had been removed from the social media and promotional poster in question. (*Id.*) Plaintiff responded that she "really hated having to make the request, but until we hammer out a good agreement, it's best to avoid any use of the space owl." (*Id.*) On June 28, 2018, Ms. Roniger Brinkerhoff sent Plaintiff an e-mail addressing, among other things, Plaintiff's objection to "the image of the Space Owl that showed up on promotional materials this week." (Doc. 166-5 at 3.) In this e-mail, Ms. Roniger Brinkerhoff wrote that she understood Plaintiff "to be comfortable with Meow Wolf using the Space Owl within the context of [HoER] documentation and promotional materials." (*Id.*) In response, Plaintiff wrote that she was "[s]orry for the confusion" and explained, "it's that the Space Owl was identified as part of Todos 7 … in conflict with my desire to keep a solid boundary between narratives[.]" (*Id.*)

---

[12] Ms. Roniger Brinkerhoff's signature block at this time identifies her as "Chief People Officer, Meow Wolf Creative Studios." (Doc. 166-17 at 1.) Ms. Kosh is an attorney who represented Defendant MWI during events forming the basis of this lawsuit. (*See, e.g.*, Doc. 278-4 at 27.)

On December 23, 2018, Plaintiff e-mailed Ms. Roniger Brinkerhoff and Ms. Kosh yet again, indicating that she had seen "the trailer for the MW documentary" and noting that it included "footage of the space owl." (Doc. 166-2 at 1.) In this e-mail, Plaintiff wrote:

> Since the three of us were clear about MW not using (developing, etc.) the space owl until I had an agreement in place with MW, I wonder if you might make certain that all the MW divisions are 100% aware of that? Meanwhile, I'm really looking forward to seeing the movie – do you think you could get me access to a copy?

(*Id.*)

On March 5, 2021, almost a year after this lawsuit was filed, Plaintiff's counsel sent defense counsel a cease-and-desist letter, demanding that Defendants "preclude[]" HoER patrons from "viewing" ISQ "until the rights and obligations of the parties are determined, whether by litigation or settlement." (Doc. 298-26 at 2.)

## C.    Analysis

In the motion now before the Court, Defendants seek summary judgment on Plaintiff's copyright infringement claims based on Defendants' alleged use of images of ISQ to market and promote the HoER. (Doc. 391; Doc. 473 at 3.) According to Defendants, the undisputed facts show that Plaintiff granted Defendant MWI an implied license to use images of ISQ for these purposes as a matter of law. (*Id.*) In response, Plaintiff argues that there are at least genuine issues of material fact regarding:  (1) whether Defendant MWI is a holder of any implied license Plaintiff granted, (Doc. 457 at 2-6); (2) whether Plaintiff objectively intended to grant anyone an implied license to use images of ISQ to market and promote the HoER, (*id.* at 6-10); and, (3) whether Plaintiff revoked any such license, if granted.[13] (*Id.* at 10-11.)

---

[13] Plaintiff also argues that Defendants claim the implied license addressed in their motion "include[s] marketing and promoting the Meow Wolf brand to get investments and interests in new projects in Denver, Austin, Las Vegas, etc." (Doc. 457 at 2.) However, in their reply, Defendants clarify that their motion addresses only the use of images of ISQ to market and promote the HoER. (Doc. 473 at 3.)

For the reasons discussed herein, the Court finds that as a matter of law, Defendant MWI holds an implied, irrevocable, nonexclusive license to use images of ISQ to market and promote the HoER for the first ten years of its operation.[14] However, the Court further finds that there is a genuine issue of material fact regarding whether the license allows such uses under narrative titles other than "Ice Station Quellette." As such, Defendants are entitled to summary judgment on Plaintiff's copyright infringement claims based on their actual or alleged uses of images of ISQ to market or promote the HoER, but only to the extent such uses were not under a different narrative title.[15] In so holding, the Court assumes without deciding that Plaintiff holds a valid copyright registration that satisfies the statutory prerequisite for her copyright infringement claims. *See* 17 U.S.C. § 411(a). Nevertheless, the Court recognizes that Defendants have filed a motion to invalidate Plaintiff's copyright registration numbered VA 2-170-075 pursuant to 17 U.S.C. § 411(b), on which the Court has not yet ruled, and that this motion, if granted, would lead to the dismissal of any copyright infringement claims dependent on the VA 2-170-075 registration for satisfaction of the statutory prerequisite. (Doc. 538.)

1. Defendant MWI holds a nonexclusive implied license to use images of ISQ to market and promote the HoER.

The Copyright Act provides that a "transfer of copyright ownership" must be executed "in writing." 17 U.S.C. § 204(a). However, the Act also provides that the granting of a "nonexclusive

---

[14] As with Defendant MWI's implied license to display ISQ at the HoER, and for the reasons stated in the Court's September 2022 Order, the undisputed temporal scope of Defendant MWI's implied license to use images of ISQ to market and promote the HoER is for the first ten years of the HoER's operation. (*See generally* Doc. 499.) The Court does not decide here whether the license extends beyond that time frame, because the parties have not briefed this issue, and also because the HoER has not yet been in operation for ten years.

[15] As the Court noted in its September 2022 Order, if Defendant MWI is entitled to summary judgment on Plaintiff's copyright infringement claims, then Defendant Kadlubek is as well, because it is undisputed that he was acting on behalf of this company or a prior HoER operator at the relevant times. (Doc. 499 at 15 n.5); *see generally Diversey v. Schmidly*, 738 F.3d 1196, 1204 (10th Cir. 2013) ("[A] defendant can … be secondarily liable for another's copyright infringement under principles of vicarious and contributory liability.").

license" is not a transfer of copyright ownership. 17 U.S.C. § 101. Rather, a nonexclusive license

"permits the use of a copyrighted work in a particular way and precludes a finding of infringement"

based on the licensed use. *Wilson v. Brennan*, 666 F. Supp. 2d 1242, 1260–61 (D.N.M. 2009),

*aff'd*, 390 F. App'x 780 (10th Cir. 2010). As such, "[a] nonexclusive license may be granted orally,

or may even be implied from conduct." *Effects Assocs., Inc. v. Cohen*, 908 F.2d 555, 558 (9th Cir.

1990) ("*Effects Associates*"). A nonexclusive implied license is an affirmative defense to a claim

of copyright infringement and the alleged licensee bears the burden of proving its existence. *I.A.E.,*

*Inc. v. Shaver*, 74 F.3d 768, 775 (7th Cir. 1996); *Karlson v. Red Door Homes, LLC*, 611 F. App'x

566, 569 (11th Cir. 2015); *Martin v. Pure Spectrum CBD, LLC*, No. 20-cv-910, 2022 WL 19418,

at *4 (D. Colo. Jan. 3, 2022), *reconsideration denied,* No. 20-cv-910, 2022 WL 1521766 (D. Colo.

May 13, 2022).

In its September 2022 Order, the Court granted Defendants summary judgment on

Plaintiff's copyright infringement claims based on the display of ISQ in the HoER. (Doc. 499 at

15-40, 42.) The Court first explained that this case presents a "textbook example of an implied

license" to display ISQ because it is undisputed that Ms. Kennedy asked Plaintiff to create an art

installation for the HoER, Plaintiff created a version of ISQ and installed it in the HoER in response

to Ms. Kennedy's request, and Plaintiff intended for the work to be used in the way Defendant

MWI claimed to be licensed to use it, *i.e.*, to be publicly displayed at the HoER. (*Id.* at 29-30.)

Then, as to the question of who held the implied license, the Court found that as a matter of law,

Plaintiff granted it "to the entity or entities operating the HoER for the first ten years," including

Art City, Meow Wolf, LLC ("MW LLC"), and Defendant MWI. (*Id.* at 30-38.)

In the present motion, Defendants argue that "the circumstances surrounding [P]laintiff's

installation of ISQ in [the] HoER at [D]efendants' request created a license to market as well as

display." (Doc. 391 at 12.) In support, Defendants reason that "[n]o artist puts her work on display in an exhibition with the intention that no one come to see it." (Doc. 473 at 1.) Thus, Defendants continue, "when an artist puts her work in a show, she grants an implied license to market the show," and "[t]his includes highlighting and previewing the experience to the public through photos and videos on traditional and social media." (Doc. 391 at 2.) In addition, Defendants claim there is undisputed evidence confirming that Plaintiff knew they would use images of ISQ to market and promote the HoER, and intended for them to do so, when she installed ISQ in the HoER. (*Id.* at 11, 13-15.)

In response, Plaintiff first contends that there is at least a genuine issue of material fact regarding whether Defendant MWI is a holder of any implied license Plaintiff might have granted. (Doc. 457 at 2-8.) But to support this contention, Plaintiff relies on arguments and authorities the Court rejected in its September 2022 Order, and those arguments and authorities are equally unpersuasive here. (*Id.*; Doc. 499 at 29-38.) Rather, for the reasons stated in its prior Order, the Court finds that any implied license Plaintiff granted to use images of ISQ to market and promote the HoER was granted "to the entity or entities operating the HoER for the first ten years," including Art City, MW LLC, and Defendant MWI. (*See* Doc. 499 at 29-38.)

Plaintiff also suggests that she did not objectively intend to grant anyone an implied license to use images of ISQ to market and promote the HoER. (Doc. 457 at 8-10.) And as explained below, the Court agrees that Plaintiff's objective intent is the operative question here. However, in the Court's view, Defendants have carried their burden to show beyond peradventure that Plaintiff objectively intended for the HoER's operators to use images of ISQ to market and promote the exhibition, and therefore granted these operators an implied license for such use. *Leone*, 810 F.3d at 1153.

In *Effects Associates*, the Ninth Circuit found that the plaintiff granted the defendants an implied license to use and distribute copies of special effects footage the plaintiff created at the defendants' request for a movie the defendants produced and distributed. 908 F.2d at 555-56, 558. Other federal appellate courts have derived a three-part test from *Effects Associates*, pursuant to which the purported owner of an implied license must show that: (1) the licensee asked the licensor to create the work; (2) the licensor created the work and delivered it to the licensee; and, (3) the licensor intended that the licensee copy and distribute the work. *See, e.g., Bitmanagement Software GmBH v. United States*, 989 F.3d 938, 947 (Fed. Cir. 2021) ("*Bitmanagement*"); *Asset Mktg. Sys., Inc. v. Gagnon*, 542 F.3d 748, 754–55 (9th Cir. 2008); *Nelson-Salabes, Inc. v. Morningside Dev., LLC*, 284 F.3d 505, 514 (4th Cir. 2002); *Lulirama Ltd., Inc. v. Axcess Broad. Servs., Inc.*, 128 F.3d 872, 879 (5th Cir. 1997); *I.A.E., Inc.*, 74 F.3d at 776; *Karlson, LLC*, 611 F. App'x at 569; *Nat'l Ass'n for Stock Car Auto Racing, Inc. v. Scharle*, 184 F. App'x 270, 275 (3d Cir. 2006) ("*NASCAR*"); *but cf. MidlevelU, Inc. v. ACI Info. Grp.*, 989 F.3d 1205, 1215 (11th Cir.), *cert. denied,* 141 S. Ct. 2863 (2021) (three-factor test derived from *Effects Associates* is not "exclusive"); *Baisden v. I'm Ready Prods., Inc.*, 693 F.3d 491, 501 (5th Cir. 2012) ("[W]e have never held that an implied license could not arise in other circumstances where the totality of the parties' conduct supported such an outcome."). Though the Tenth Circuit has not yet addressed the question, district courts in this circuit have likewise applied the *Effects Associates* test. *Wilson*, 666 F. Supp. 2d at 1261; *Martin*, 2022 WL 19418 at *4; *Millennium, Inc. v. Sai Denver M, Inc.*, No. 14-cv-1118, 2015 WL 1816479, at *4 (D. Colo. Apr. 20, 2015); *Harner v. Wong Corp.*, No. 12-cv-820, 2014 WL 12573383, at *1 (D.N.M. Nov. 14, 2014).

The last prong of the *Effects Associates* test "is not limited to copying and distribution; instead [courts] look at the protected right at issue." *Asset Mktg. Sys., Inc.*, 542 F.3d at 755.

Moreover, as used in the last prong, "[t]he relevant intent is the licensor's objective intent at the time of the creation and delivery of the [work] as manifested by the parties' conduct." *Id.* at 756; *Millennium, Inc.*, 2015 WL 1816479 at \*6. "[T]he private hopes of the creator are not relevant." *NASCAR*, 184 F. App'x at 275. Rather, "[c]ourts examine the totality of the parties' conduct to evaluate intent." *Karlson*, 611 F. App'x at 569; *see also Bitmanagement*, 989 F.3d at 947 (emphasizing "the relevance of [the] parties' entire course of conduct to the determination of whether an implied-in-fact license exists"); *Marino v. Usher*, 22 F. Supp. 3d 437, 440-41, 444–45 (E.D. Pa. 2014), *aff'd*, 673 F. App'x 125 (3d Cir. 2016) (finding that the plaintiff's "words and conduct," including his words and conduct after creation and delivery, "confirm[ed] that he granted an implied license to [the d]efendants").

As the Court has already found in its September 2022 Order addressing Defendant MWI's implied license to display ISQ in the HoER, it is not genuinely disputed that Defendants have satisfied the first two prongs of the *Effects Associates* test, which are the same regardless of the type of activity an implied license allegedly authorizes. (Doc. 499 at 29-30); *see generally Bitmanagement*, 989 F.3d at 947; *Asset Mktg. Sys., Inc.*, 542 F.3d at 754–55; *Nelson-Salabes, Inc.*, 284 F.3d at 514; *Lulirama Ltd., Inc.*, 128 F.3d at 879; *I.A.E., Inc.*, 74 F.3d at 776; *Karlson, LLC*, 611 F. App'x at 569; *NASCAR*, 184 F. App'x at 275. Specifically, as the Court explained in its prior Order, it is undisputed that Ms. Kennedy—a member of Defendant MWI's predecessor, Art City—asked Plaintiff to create an art installation for the HoER, and that Plaintiff created a version of ISQ and installed it in the HoER in response to Ms. Kennedy's request. (Doc. 499 at 29-30.)

However, the Court must conduct a distinct analysis regarding the third prong of the *Effects Associates* test in the context of the present motion, because the allegedly licensed activities at issue here are different. Specifically, the Court must determine whether it is undisputed that

Plaintiff objectively intended for Defendant MWI not only to display ISQ in the HoER, but also to use images of ISQ to market and promote the exhibition. *Bitmanagement*, 989 F.3d at 947; *Asset Mktg. Sys., Inc.*, 542 F.3d at 754–55; *Nelson-Salabes, Inc.*, 284 F.3d at 514; *Lulirama Ltd., Inc.*, 128 F.3d at 879; *I.A.E., Inc.*, 74 F.3d at 776; *Karlson, LLC*, 611 F. App'x at 569; *NASCAR*, 184 F. App'x at 275. In this context, the Court generally understands "[m]arketing" to refer to "the process or technique of promoting, selling, and distributing a product or service," and "promotion" to refer to "the act of furthering the growth or development of something[,] *especially*[] the furtherance of the acceptance and sale of merchandise through advertising, publicity, or discounting." https://www.merriam-webster.com/dictionary/marketing (last accessed June 15, 2023); https://www.merriam-webster.com/dictionary/promotion (last accessed June 15, 2023) (emphasis in original). Accordingly, as Defendants suggest and Plaintiff does not dispute, the terms "marketing" and "promotion" with respect to the HoER refer to activities designed to get people to visit the exhibition, including "highlighting and previewing the experience to the public through photos and videos on traditional and social media." (Doc. 391 at 2; Doc. 473 at 1; *see generally* Doc. 457.)

Here, undisputed evidence shows that when Plaintiff created ISQ and installed it in the HoER, she knew its operators would market and promote the exhibition and intended for them to do so. Initially, this inference arises inexorably from Plaintiff's allegations and admissions that she installed ISQ in the HoER because she believed she would receive a share of the revenue it generated. (*See, e.g.,* Doc. 148 at 5, 15-16, 19-20; Doc. 278-4 at 8-11; Doc. 278-5 at 6.) It is self-evident that the exhibition would have attracted far fewer visitors, and therefore generated far less revenue, if its operators had done nothing to market and promote it. Further, Plaintiff admits that in early 2015 she told Ms. Kennedy about her "skills in marketing and graphic design and the

like," and offered, "If you guys need anything like that, I'm absolutely on board." (Doc. 391-2 at 2.)

In addition, undisputed evidence confirms the logical corollary that when Plaintiff created and delivered ISQ, she intended for the HoER's operators to use images of the work to help carry out such marketing and promotion. Specifically:

- In or about April 2016 and December 2017, "Meow Wolf" posted images of the Space Owl on Instagram and though Plaintiff was tagged on these posts, she did not object to them, (Docs. 391-5, 391-6);

- In August 2016, "Meow Wolf" posted an image of the Space Owl on Facebook, and not only did Plaintiff fail to object to this post, but also she wrote, "Love to you from Mimizuku Space Owl" in response to a positive comment about it, (Doc. 391-4 at 1-2); and,

- Plaintiff included images of ISQ used to market and promote the HoER on her websites, (Doc. 391-1 at 1-3).

See *Baisden*, 693 F.3d at 500 ("Consent for an implied license may take the form of … lack of objection."); *I.A.E., Inc.*, 74 F.3d at 775 ("[C]onsent given in the form of … lack of objection is … equivalent to a nonexclusive license[.]"); *Bitmanagement*, 989 F.3d at 947 ("parties' entire course of conduct" is relevant to whether implied license exists); *see also generally NASCAR*, 184 F. App'x at 272, 275-76 (affirming summary judgment based on implied license where NASCAR used designer's trophy designs "in its marketing and promotional efforts," among other uses).

The Court is aware of Plaintiff's evidence that, construed in her favor, shows she began to tell Defendant MWI not to use images of ISQ for any reason in May 2018. (*See, e.g.,* Doc. 132-15 at 4-5; Doc. 166-2 at 1.) However, by this time, over two years had passed since the HoER's operators first used images of ISQ to market and promote the exhibition, with Plaintiff's knowledge and approval. In these circumstances, no reasonable factfinder could conclude that Plaintiff's extremely belated protests evidence her objective intent regarding such uses at the time

she created and delivered the work.[16] *Asset Mktg. Sys., Inc.*, 542 F.3d at 756; *Millennium, Inc.*, 2015 WL 1816479 at *6. In sum, Defendants have carried their summary judgment burden as to the third prong of the *Effects Associates* test and have shown that Plaintiff objectively and undisputedly intended for the HoER's operators to use images of ISQ to market and promote the exhibition when she created and delivered the work. For all of these reasons, the Court concludes that as a matter of law, Plaintiff granted Defendant MWI an implied license to use images of ISQ to market and promote the HoER for the first ten years of the HoER's operation.[17]

    2.  <u>There are genuine factual disputes regarding whether Plaintiff limited the scope of the implied license at issue</u>.

Nevertheless, implied licenses may be limited, and a licensee that exceeds the scope of an implied license commits copyright infringement. *Latimer v. Roaring Toyz, Inc.*, 601 F.3d 1224, 1235 (11th Cir. 2010). Importantly, the parties' conduct reveals not only whether the copyright owner intended to grant an implied license, but also the owner's intent regarding the scope of the license. *See, e.g., id.* ("Courts focus on objective evidence revealing the intent of the parties to determine if an implied license exists, and this inquiry also reveals the scope of that license."); *Geophysical Serv., Inc. v. TGS-NOPEC Geophysical Co.*, 784 F. App'x 253, 257 n.5 (5th Cir.

---

[16] Rather, at most, these objections could show an intent to revoke the implied license she had previously granted, as discussed in Section II.C.3., below.

[17] In its counterclaim, Defendant MWI alleges that Plaintiff installed ISQ in the HoER pursuant to a contract governed by Defendant Kadlubek's April 2015 "Meow Terms" e-mail to her. (Doc. 183.) Nevertheless, Plaintiff does not oppose Defendants' motion by arguing that this contract, if it exists, would supplant the implied license at issue here. (*See generally* Doc. 457.) Moreover, the "Meow Terms" e-mail does not appear to address the topic of the implied license at issue, *i.e.*, the non-exclusive right to use of images of ISQ to market and promote the HoER. Although the e-mail does state that "Meow Wolf" would own the work itself and Plaintiff would retain her intellectual property ("IP") rights in it, (Doc. 278-1 at 1), the non-exclusive implied license at issue does not transfer any of Plaintiff's IP rights to Defendant MWI. 17 U.S.C. § 101. And if the alleged contract does not address the same subject matter as the implied license at issue, then it does not supplant that license. *See, e.g., Bitmanagement*, 989 F.3d at 949 (although "the existence of an express contract precludes the existence of an implied-in-fact contract dealing with the same subject matter," the express agreements in that case did not preclude an implied license where, *inter alia*, the agreements did not cover "the topic of the implied-in-fact license").

2019) ("[T]he parties' conduct reveals the scope of the license."); *McElroy v. Courtney Ajinça Events LLC*, 512 F. Supp. 3d 1328, 1337 (N.D. Ga. 2021) ("[T]he objective evidence revealing the intent to grant an implied license also reveals the scope of the license.") (quotation marks omitted). "[A] copyright owner must express the intent to restrict the scope of a license when they deliver the copyright[ed] work." *Latimer*, 601 F.3d at 1235; *see also Asset Mktg. Sys., Inc.*, 542 F.3d at 756-57 (copyright owner "had to express an intent to … limit [the licensee's] license" at time of delivery "if he intended to do so").

Here, it is undisputed that before Plaintiff finished installing ISQ in the HoER, she sent Defendant Kadlubek an e-mail in which she wrote that her installation should be kept "under the Ice Station Quellette umbrella" and could not be "under a different name," *i.e.*, "Todos 7," except "for Portals."[18] (Doc. 457-1 at 2.) Construed in the light most favorable to Plaintiff, this e-mail creates a genuine issue of material fact regarding whether Plaintiff timely expressed an intent to limit the scope of the implied license at issue to exclude the use of images of ISQ under narrative titles other than "Ice Station Quellette." Thus, to the extent Defendants take the position that Defendant MWI's implied license to use images of ISQ to market and promote the HoER undisputedly allows it to use these images "under a different name," (*id.*), they are mistaken, and, in this respect, their motion is denied.

3.  <u>Defendant MWI's implied license to use images of ISQ to market and promote the HoER is irrevocable.</u>

An implied license is revocable unless it is supported by consideration. *Asset Mktg. Sys., Inc.*, 542 F.3d at 757; *Lulirama Ltd., Inc.*, 128 F.3d at 882; *Kid Stuff Mktg., Inc. v. Creative*

---

[18] Additionally, the Court notes that in June 2018, Ms. Roniger Brinkerhoff sent Plaintiff an e-mail regarding Plaintiff's objection to a particular promotional use of ISQ, and Plaintiff explained, "it's that the Space Owl was identified as part of Todos 7 … in conflict with my desire to keep a solid boundary between narratives[.]" (Doc. 166-5 at 3.)

*Consumer Concepts, Inc.*, 223 F. Supp. 3d 1168, 1183 (D. Kan. 2016); *Martin*, 2022 WL 19418 at *4; *Fryberger v. Strimbu*, No. 15-cv-363, 2021 WL 6118674, at *4 (D. Colo. Sept. 27, 2021). In general, "[c]onsideration consists of a promise to do something that a party is under no legal obligation to do or to forbear from doing something he has a legal right to do."[19] *Luginbuhl v. City of Gallup*, 2013-NMCA-053, ¶ 15, 302 P.3d 751, 755. However, some federal courts discussing consideration in the context of implied licenses have stated that a license becomes irrevocable if consideration has been "paid," as opposed to merely promised. *Asset Mktg. Sys., Inc.*, 542 F.3d at 757; *Harner*, 2014 WL 12573383 at *1; *Fryberger*, 2021 WL 6118674 at *4.

Plaintiff argues that even if she granted Defendant MWI an implied license to use images of ISQ to market and promote the HoER, which she denies, she revoked that license by filing this lawsuit in March 2020, and by her counsel's March 2021 cease-and-desist letter to defense counsel. (Doc. 457 at 10-11); *see Carson v. Dynegy, Inc.*, 344 F.3d 446, 452–53 (5th Cir. 2003) (holding that a licensor can revoke an implied license not supported by consideration by filing suit). In addition, Plaintiff has presented evidence that, construed in her favor, shows an intent to revoke this license beginning in May 2018, when she told Defendants not to use images of ISQ for any reason. (*See, e.g.*, Do. 132-15 at 4-5; Doc. 166-2 at 1.)

However, as the Court discussed in its September 2022 Order, and notwithstanding Plaintiff's insistence that she never received any "compensation" for installing ISQ at the HoER, (Doc. 297 at 24), she admits that she received consideration of monetary value in exchange for the

---

[19] Courts "rely on state law to provide the canons of contractual construction, but only to the extent such rules do not interfere with federal copyright law or policy." *S.O.S., Inc. v. Payday, Inc.*, 886 F.2d 1081, 1088 (9th Cir. 1989). The parties have not addressed choice of law in their briefing. (*See generally* Docs. 391, 457, 473.) However, on the present record, MW LLC and Art City were organized in New Mexico; the HoER is located in New Mexico; and, the incidents giving rise to the parties' disputes occurred in New Mexico. (Doc. 499 at 28 n.23.) Thus, the Court will apply New Mexico law where state law supplies the rule of decision.

installation. (Doc. 499 at 39.) Specifically, she testified that "Meow Wolf" "bought much of the materials" she used to create the work, and that it supplied the funds to pay Mr. Cluett for helping her to install it. (*Id.* (citing Doc. 278-5 at 8, 10; Doc. 377-7 at 7-9, 11; Doc. 421-5 at 10, 12).) Plaintiff was never a "Meow Wolf" employee, and there is no evidence to suggest that any Meow Wolf entity was otherwise legally obligated to provide her with materials or labor except as consideration for the installation.[20] (*Id.* (citing Doc. 278-5 at 3).) Thus, like the implied license to display ISQ in the HoER, the implied license to use images of ISQ to market and promote the exhibition was supported by consideration and was irrevocable as a matter of law.[21] *Asset Mktg. Sys., Inc.*, 542 F.3d at 757; *Lulirama Ltd., Inc.*, 128 F.3d at 882; *Kid Stuff Mktg., Inc.*, 223 F. Supp. 3d at 1183; *Martin*, 2022 WL 19418 at *4; *Fryberger*, 2021 WL 6118674 at *4.

4. Defendants have failed to carry their initial summary judgment burden as to any specific allegedly infringing uses.

Finally, in their motion, Defendants list certain specific allegedly infringing uses of ISQ that they claim were or are to market or promote the HoER, on which they claim they are therefore entitled to summary judgment. (Doc. 391 at 9-10, 18.) However, the motion fails to include any evidence or argument to show that the listed uses actually were or are to market or promote the HoER. (*See generally id.*) As such, Defendants have failed to carry their initial summary judgment burden as to these items, *Adler*, 144 F.3d at 670-71; *Tesone*, 942 F.3d at 994, and the Court will deny their motion with respect to any specific allegedly infringing uses at this time.

---

[20] Nor was "Meow Wolf" otherwise obligated to pay Mr. Cluett for helping Plaintiff. Rather, according to Plaintiff, "Meow Wolf" gave her the $1,000 labor budget and she was the one who directed "Meow Wolf" to use it to pay him. (Doc. 499 at 39 n.35 (citing Doc. 278-5 at 8, 10; Doc. 377-7 at 7-9, 11).)

[21] In addition, Plaintiff received a $2,000 payment from "MW Santa Fe, LLC" in April 2019 for "the artist revenue thing." (Doc. 499 at 39 n. 36 (citing Doc. 278-5 at 19-20; Doc. 330-7 at 1; Doc. 421-13 at 2).) Although this payment appears to have been made on Defendant MWI's behalf, the Court does not rely on it because it was made after May 2018, when Plaintiff may have begun to attempt to revoke the implied license at issue.

### III.  <u>Conclusion</u>

For the reasons set forth above, IT IS HEREBY ORDERED that Defendants' Motion for Partial Summary Judgment Dismissing Plaintiff's Claim of Copyright Infringement for Uses of Ice Station Quellette for Marketing and Promotion (Doc. 391) is GRANTED IN PART and DENIED IN PART as set forth herein.

IT IS SO ORDERED.

_____
KIRTAN KHALSA
UNITED STATES MAGISTRATE JUDGE
Presiding by Consent