**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

LAUREN ADELE OLIVER,

    Plaintiff,

v.                                                                                    Civ. No. 20-237 KK/SCY

MEOW WOLF, INC., *et al*.,

    Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

THIS MATTER is before the Court on Defendants' Motion for Partial Summary Judgment Dismissing Plaintiff's Claim of Violation of the Visual Artist Rights Act ("Summary Judgment Motion") (Doc. 372), filed April 27, 2022, as well as the following four ancillary motions:  (1) Defendants' Unopposed Motion to File Exhibits Under Seal (Doc. 370) ("Motion to Seal Exhibit A"), filed April 27, 2022; (2) Defendants' Unopposed Motion to File Exhibit B Under Seal (Doc. 373) ("Motion to Seal Exhibit B"), filed April 27, 2022; (3) Defendants' Motion for *In Camera* Review (Doc. 375) ("Motion for Review"), filed April 27, 2022; and, (4) Defendants' Motion for Leave to Supplement the Record with New Evidence Relevant to Defendants' Motion for Summary Judgment Dismissing Plaintiff's VARA Claim (Doc. 500) ("Motion to Supplement"), filed September 21, 2022. The Court, having reviewed the parties' submissions, the record, and the relevant law, and being otherwise sufficiently advised, FINDS that all of the listed motions are well-taken and should be GRANTED, except for Defendants' Motion for Review, which is well-taken in part and should be GRANTED IN PART and DENIED IN PART.

# I. <u>Procedural History</u>[1]

The parties' disputes in this matter arise out of Plaintiff Lauren Oliver's installation of a work of visual art called Ice Station Quellette ("ISQ") in an exhibition called the House of Eternal Return ("HoER"). (Docs. 148, 183.) Defendant Meow Wolf, Inc. ("MWI") operates the HoER, and Defendant Vince Kadlubek was formerly the company's chief executive officer. (*Id.*; Doc. 348-3 at 2.) Plaintiff filed her original complaint against Defendants in March 2020, asserting claims for copyright infringement and violation of the Visual Artists Rights Act ("VARA"), 17 U.S.C. §§ 106A, 113(d), as well as several state law claims sounding in contract and tort. (Doc. 1.) In June 2021, Plaintiff amended her complaint, adding new factual allegations and new and modified state law claims. (Doc. 148.) Defendant MWI, in turn, filed a declaratory judgment counterclaim sounding in contract in July 2021. (Doc. 183.)

In her amended complaint, Plaintiff alleges that Defendants violated or threatened to violate her VARA rights in the following ways:

- Defendants used and copied ISQ without attribution "across multiple platforms," including in advertisements, promotions, social media posts, a website, publications, and a documentary and associated trailer;

- Defendants "used [Plaintiff's] name and ISQ with the 'Todos 7' collection of visual art, including Meow Wolf's 'credits' web page indicating ISQ as being part of 'Todos 7,'" even though Plaintiff specifically told them not to;

- Defendants "used ISQ elements … such that the works were distorted, mutilated, or modified in a way prejudicial to [Plaintiff's] honor and reputation"; and,

- Defendants threatened to remove ISQ from the HoER even though "ISQ … ha[s] been incorporated in and made part of [the] HoER such that removing the works of visual art, or any part thereof, from [the] HoER would cause their destruction, distortion, mutilation, or modification."

---

[1] The parties are familiar with this matter's factual background, which the Court has described in prior orders and will not repeat here. (*See* Doc. 59 at 1-4, Doc. 135 at 1-4, Doc. 325 at 1-3, *and* Doc. 499 at 2-6.)

(Doc. 148 at 12-13, 18-19.) On these grounds, Plaintiff seeks damages and an injunction barring

Defendants,

> temporarily during the pendency of this action, and permanently thereafter, from: (a) taking any action to remove, alter, deface, modify, mutilate, or destroy ISQ at [the] HoER, or any element thereof, during [Plaintiff's] lifetime; and (b) using ISQ, or any element thereof … without … attribution to [Plaintiff].

(*Id*. at 25.)

On June 8, 2021, the parties entered into a Joint Stipulation Regarding Visual Artists Rights

Act (Doc. 155), in which they stipulated that:

1. Defendant Meow Wolf provided a 90-day notice to Plaintiff Lauren Oliver under 17 USC 113(d)(2) [sic], but the parties dispute whether the artwork can be removed "without destruction, distortion, mutilation, or other modification of the work as described in section 106A(a)(3)."

2. The parties expect the issue of whether or not the artwork can be removed without destruction, distortion, mutilation, or other modification as described in section 106A(a)(3) to be decided at trial.

3. Defendant Meow Wolf agrees not to remove the artwork until after final resolution of this litigation, including appeals.

4. If Plaintiff Lauren Oliver fails to prove that removal of the artwork will destroy, distort, mutilate, or modify the artwork as described in section 106A(a)(3), Plaintiff shall have thirty (30) days after final appeal, or the time for final appeal has expired, to remove the artwork at Plaintiff's own expense and with reasonable notice to and scheduling coordination with Meow Wolf.

5. Aside from the terms outlined above, both parties reserve all rights, claims and defenses.

(*Id.* at 1-2.)

On April 27, 2022, Defendants filed the Summary Judgment Motion at issue here, seeking

summary judgment in their favor on Plaintiff's VARA claims. (Doc. 372.) Plaintiff responded in

opposition to the motion on May 26, 2022, and Defendants replied in support of it on June 9, 2022.

(Docs. 420, 437.)

Also on April 27, 2022, Defendants filed their Motion for Review, seeking a ruling that a letter from Plaintiff's counsel transmitting settlement proposals is admissible to support their Summary Judgment Motion. (Doc. 375.) Defendants filed a redacted version of this motion in the public record, (Doc. 374), and an unredacted version under seal. (Doc. 375.) Contemporaneously, Defendants filed the two unopposed Motions to Seal at issue here, seeking leave to file Exhibits A and B to the Motion for Review under seal.[2] (Docs. 370, 373.) Plaintiff responded in opposition to the Motion for Review on May 17, 2022, and Defendants replied in support of it on June 1, 2022. (Docs. 408, 424.)

Finally, Defendants filed their Motion to Supplement on September 21, 2022, seeking leave to supplement the record in support of their Summary Judgment Motion with a recently disclosed text message written by Plaintiff. (Doc. 500.) Plaintiff responded in partial opposition to this motion on September 22, 2022, and Defendants replied in support of it on October 5, 2022. (Docs. 502, 507.)

## II. Analysis

The Court will address Defendants' four ancillary motions before it turns to their Summary Judgment Motion, because the ancillary motions concern materials the Court has been asked to consider in ruling on the dispositive motion.

### A. Defendants' Ancillary Motions

#### 1. Defendants' Motion for Review

In their Motion for Review, Defendants seek *in camera* review of Plaintiff's counsel's November 22, 2019 letter ("November 2019 Letter" or "Letter") transmitting three settlement

---

[2] The Motion to Seal Exhibit A also sought leave to file exhibits to other motions under seal. (Doc. 370.) On March 28, 2023, the Court denied the portion of the Motion to Seal Exhibit A concerning these other exhibits but reserved ruling on the portion concerning Exhibit A to the Motion for Review. (Doc. 542 at 1-2 & n.1.)

proposals, and a ruling that the Letter is admissible under Federal Rule of Evidence 408 to support their Summary Judgment Motion. (Doc. 375.) Plaintiff does not oppose *in camera* review of the Letter but does contest its admissibility. (Doc. 395 at 1.)

Rule 408 bars the admission of certain types of evidence "either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction[.]" Fed. R. Evid. 408(a). Specifically, the rule bars the admission, for the listed purposes, of

> [e]vidence of … furnishing, promising, or offering—or accepting, promising to accept, or offering to accept—a valuable consideration in compromising or attempting to compromise the claim[,] and … conduct or a statement made during compromise negotiations about the claim[.]

*Id.* Courts may, however, admit such evidence "for another purpose[.]" Fed. R. Evid. 408(b).

In their Motion for Review, Defendants argue that the Court should review the November 2019 Letter *in camera*, rule that it is admissible "for the limited purpose of showing that [P]laintiff has conceded … [ISQ] is capable of being safely removed from … [the] HoER," and consider it in deciding their Summary Judgment Motion. (Doc. 375 at 1-2.) The Court will grant Defendants' request for *in camera* review of the Letter, because Plaintiff does not oppose it and because such review is necessary to determine whether the Letter is admissible for the proffered purpose. However, the Court will deny the remainder of Defendants' Motion for Review, for the following reasons.

First and foremost, Rule 408 bars admission of the Letter for the proffered purpose. According to Defendants, the settlement proposals in the Letter do not encompass Plaintiff's VARA claims, because when the Letter was sent Plaintiff's draft complaint did not include them. (Doc. 375 at 3.) Thus, Defendants reason, Plaintiff's VARA claims are not among the "disputed

claim[s]" about which her counsel was negotiating in the Letter, Fed. R. Evid. 408(a), and Rule 408 does not bar its admission to disprove them. (*Id.*)

The Court disagrees. The November 2019 Letter expressly references Plaintiff's "VARA rights" twice, and threatens that if the parties are unable to resolve their disputes, Plaintiff will file suit, "add[] claims for VARA violations" to her draft complaint, and "seek[] attorneys' fees and statutory damages for VARA violations specifically." (Doc. 375-1 at 6-8.) Thus, though merely threatened rather than actually filed, Plaintiff's VARA claims were plainly among the "disputed claim[s]" her counsel was offering to compromise in the Letter,[3] and Rule 408 bars its admission to prove or disprove the validity of these claims. Fed. R. Evid. 408(a); *see, e.g.*, *E.E.O.C. v. Gear Petroleum, Inc.*, 948 F.2d 1542, 1545 (10th Cir. 1991) (district court did not err in applying Rule 408 to defense counsel's pre-litigation communications with plaintiff "undertaken in the interest of encouraging some form of reconciliation of this matter"); *cf. Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.*, 561 F.2d 1365, 1373 (10th Cir. 1977) (district court did not err in finding Rule 408 inapplicable where the parties' "discussions had not crystallized to the point of threatened litigation"); *see generally Bradbury v. Phillips Petroleum Co.*, 815 F.2d 1356, 1363-64 (10th Cir. 1987) (noting "the strong policy interest in encouraging the settlement of disputes without resort to litigation" and stating that "when the issue is doubtful, the better practice is to exclude evidence of compromises or compromise offers").

Defendants do not dispute that they seek to use the compromise offers in the Letter to disprove the validity of some of Plaintiff's VARA claims. (*See generally* Docs. 375, 424.) But as just discussed, Rule 408 does not allow the Letter to be used for that purpose. Fed. R. Evid. 408(a).

---

[3] And as Plaintiff points out, the "mutual release of all claims" proposed in the Letter's offers would certainly have encompassed Plaintiff's VARA claims. (Doc. 408 at 7; *see* Doc. 375-1 at 5-7.)

Moreover, if the Court were to determine that these offers contradict Plaintiff's declaration "that it is impossible to remove ISQ from [the] HoER without destroying it," as Defendants contend, (Doc. 375 at 1; Doc. 437 at 3 & n.2), the Court would likely run afoul of Rule 408's prohibition against admitting settlement offers "to impeach by … a contradiction." Fed. R. Evid. 408(a). The Court therefore concludes that the November 2019 Letter is inadmissible for the proffered purpose under Rule 408.

In addition, the settlement proposals in the Letter do not directly state what Defendants seek to offer them to prove, *i.e.*, "that ISQ can be *safely* removed from [the] HoER." (Doc. 375 at 3 (emphasis added); *see* Doc. 375-1 at 5-8.) Further, the statements on which Defendants seek to rely are similar to other statements by Plaintiff in the record, including in a text message and at her deposition. (*See, e.g.*, Doc. 372-3 at 4-5; Doc. 500-1 at 4.) Plaintiff's counsel's statements in the Letter are not more probative than or appreciably different from this other evidence and would add nothing of unique evidentiary value to the record. Hence, the Letter's probative value appears to be substantially outweighed by a danger of wasting time and needlessly presenting cumulative evidence. Fed. R. Evid. 403.

Finally, even if the at-issue statements in the Letter were read to contradict Plaintiff's subsequent sworn statements, this would not make the subsequent sworn statements an attempt to create a "sham fact issue[]," as Defendants suggest. (Doc. 437 at 3 & n.2.) In the context of a summary judgment motion, "an affidavit conflicting with the affiant's prior *sworn* statements should be disregarded when it constitutes an attempt to create a sham issue of fact." *Vivanco v. Costco Wholesale Corp.*, No. 21-cv-2110, 2022 WL 18910859, at *4 (D. Colo. Dec. 29, 2022) (emphasis in original) (citing *Franks v. Nimmo*, 796 F.2d 1230, 1237 (10th Cir. 1986)). However, that doctrine does not apply when the affidavit conflicts with prior *unsworn* statements, such as

those in the November 2019 Letter. *See Franks*, 796 F.2d at 1237 (stating that sham fact issue may arise where affiant contradicts "prior testimony"); *Vivanco*, 2022 WL 18910859, at *4 (holding that sham affidavit doctrine did not apply where affidavit conflicted with prior unsworn complaint). For all of these reasons, the Court finds that the November 2019 Letter is not admissible for the proffered purpose, and will deny the portion of Defendants' Motion for Review seeking a contrary ruling and asking the Court to consider the letter in deciding their Summary Judgment Motion.[4]

2. <u>Defendants' Unopposed Motions to Seal</u>

In their unopposed motions to seal, Defendants ask the Court to seal the two exhibits attached to their Motion for Review. (Docs. 370, 373.) Both of these exhibits are marked as "Confidential Settlement Communication[s]" between the parties.[5] (Docs. 375-1, 375-2.) And for the reasons stated in Section II.A.1., *supra*, the Court will not be considering them in deciding Defendants' Summary Judgment Motion. Accordingly, the Court finds that Defendants have shown an interest in keeping these exhibits confidential that is sufficient to overcome the public's countervailing interest in having access to them. *See Riker v. Fed. Bureau of Prisons*, 315 F. App'x 752, 755 (10th Cir. 2009) (where documents "play only a negligible role in the performance of Article III duties, the weight of the presumption [of public access to judicial records] is low and amounts to little more than a prediction of public access absent a countervailing reason");

---

[4] However, because Rule 408(b) permits the admission of compromise offers in some circumstances, and because Rule 403 requires a contextual analysis, the present ruling is without prejudice to Defendants' ability to ask the Court to admit the November 2019 Letter for a purpose other than the one proffered in their Motion for Review, if appropriate.

[5] Exhibit A to the Motion for Review is Plaintiff's counsel's November 2019 Letter to defense counsel, which Defendants asked the Court to find admissible and to consider in deciding their Summary Judgment Motion. (Doc. 375-1.) Exhibit B, in turn, is a September 2019 letter from defense counsel to Plaintiff's counsel, to which the November 2019 Letter responded. (Doc 375-2.) It appears that Defendants submitted Exhibit B to provide context to Exhibit A. (*See generally* Doc. 375.)

*Hawthorn v. Fiesta Flooring, LLC*, No. 19-cv-19, 2020 WL 3085921, at *4 (D.N.M. June 10, 2020) (stating that public had "no compelling interest" in disclosure of settlement agreements and "there would be no issue regarding sealing" them if the court did not review their merits); *cf. Colony Ins. Co. v. Burke*, 698 F.3d 1222, 1241–42 (10th Cir. 2012) (although "preserving the confidentiality of settlement agreements may encourage settlement, and … denying a motion to seal may chill future settlement discussions," court denied motions to seal documents involving settlement terms because documents were "central[]" to case). The Court will therefore grant the portion of Defendants' Motion to Seal Exhibit A seeking leave to file Exhibit A to the Motion for Review under seal, and will also grant Defendants' Motion to Seal Exhibit B. However, the Court may revisit all or part of this ruling should the balance of the parties' and the public's interests change.

    3.  <u>Defendants' Motion to Supplement</u>

    In their Motion to Supplement, Defendants seek leave to supplement the record regarding their Summary Judgment Motion with a 2018 text message written by Plaintiff stating, "I don't want to remove the art piece," *i.e.*, ISQ, "from the exhibit," *i.e.*, the HoER, "but I may have to." (Doc. 500; Doc. 500-1 at 4.) In support, Defendants assert that the message is relevant to their Summary Judgment Motion and that Plaintiff did not disclose it until August 2022, after briefing on the Summary Judgment Motion was complete. (Doc. 500 at 2-3.)

    In her response, Plaintiff indicates that she does not object to the Court considering the text message at issue. (Doc. 502 at 5.) Also, Plaintiff does not dispute that she produced the message after briefing on Defendants' Summary Judgment Motion was complete. (*Id*. at 5-6.) And although she does argue that the Motion to Supplement could be denied because Defendants did not fully comply with Local Rule 7.1, D.N.M.LR-Civ. 7.1(a), she does not ask the Court to deny the motion on that basis. (Doc. 502 at 5-6.) However, Plaintiff does contend that the message "does not

substantially add to the evidence or arguments already made" in the parties' briefing on the Summary Judgment Motion, and that Court should ignore Defendants' suggestion that Plaintiff withheld the message in bad faith. (*Id.*)

As noted in Section II.B.3.b., *infra*, the text message at issue is relevant to an issue raised in Defendants' Summary Judgment Motion; and, Defendants' justification for not submitting the message along with the motion is valid. The Court will therefore grant Defendants' Motion to Supplement and will consider the message as part of the record in deciding the Summary Judgment Motion. However, any new arguments regarding the message are unnecessary and will not be considered. *See United States v. Cmty. Health Sys., Inc*., No. 05-cv-279, 2012 WL 12546851, at *1-*2 (D.N.M. June 28, 2012) (permitting supplementation of record but not additional briefing where briefing on summary judgment motion was complete). In addition, the Court will not entertain Defendants' suggestion that Plaintiff withheld the message in bad faith, because the suggestion is not directly relevant to the issues raised in the Summary Judgment Motion and appears unsupported by the record. (*See* Doc. 480 at 9-12.)

**B. Defendants' Summary Judgment Motion**

1. <u>Legal Standards Governing Summary Judgment</u>

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Jones v. Kodak Med. Assistance Plan*, 169 F.3d 1287, 1291 (10th Cir. 1999) (quotation marks omitted); Fed. R. Civ. P. 56(a). "A dispute is genuine when the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party, and a fact is material when it might affect the outcome of the suit under the governing substantive law." *Bird v. W. Valley City*, 832 F.3d 1188, 1199 (10th Cir. 2016) (quotation marks and brackets omitted). Only material

factual disputes preclude the entry of summary judgment. *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000). If the nonmovant demonstrates a genuine dispute as to material facts, the Court views the facts in the light most favorable to the nonmovant. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009). However, the Court will not draw "unreasonable inferences that are unsupported by the record." *Est. of Redd ex rel. Redd v. Love*, 848 F.3d 899, 906 (10th Cir. 2017); *Wellington v. Daza*, No. 21-2052, 2022 WL 3041100, at *2 (10th Cir. Aug. 2, 2022), *cert. denied*, 143 S. Ct. 788 (2023).

A summary judgment movant bears the initial burden of demonstrating the absence of a genuine issue of material fact and its entitlement to a judgment as a matter of law. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir. 1998). When the nonmovant would bear the burden of proof at trial, the movant may meet its initial summary judgment burden by submitting "affirmative evidence that negates an essential element of the nonmoving party's claim" or by demonstrating "that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Tesone v. Empire Mktg. Strategies*, 942 F.3d 979, 994 (10th Cir. 2019). If the movant meets this initial burden, "the burden then shifts to the nonmovant," *id.*, who must "go beyond the pleadings and set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant … by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 671 (quotation marks omitted).

The Court "may not grant summary judgment based on its own perception that one witness is more credible than another[.]" *Helget v. City of Hays, Kansas*, 844 F.3d 1216, 1223 n.3 (10th Cir. 2017). However, "where a nonmoving party (who has the burden of persuasion at trial) fails to provide admissible evidence rebutting testimony offered by the moving party, the question is

not one of credibility, but rather the absence of evidence creating a triable issue of fact." *Id.* In other words, the nonmoving party "must do more than merely assert that the jury might disbelieve the testimony" presented by the moving party. *Id.* (quotation marks omitted). Rather, "she must present her own affirmative evidence" to contradict the testimony. *Id.* (brackets omitted); *see also Nat'l Am. Ins. Co. v. Am. Re–Ins. Co.*, 358 F.3d 736, 742 (10th Cir. 2004) ("Standing alone, attacks on the credibility of evidence offered by a summary judgment movant do not warrant denial of a summary judgment motion.").

    2.  <u>Material Facts</u>

The following facts are undisputed for purposes of Defendants' Summary Judgment Motion, except as specifically noted.

    a.  <u>ISQ and HoER Narratives</u>

The version of ISQ installed in the HoER "is the third exhibition of [ISQ], part of [Plaintiff's] climate crisis art/education/entertainment platform organized around a science fiction adventure story." (Doc. 420-1 at 1.)

> ISQ is the name of a polar outpost where a group of climate refugee scientists and adventurers were racing to prevent the climate crisis and save the Earth from the industrial forces degrading the planet for profit. The ISQ team has departed for other planets; the Space Owls have remained, the silent defenders of the Earth.

(*Id.* at 2.) Plaintiff "envisioned the ISQ at HoER installation as a life-sized diorama conveying a moment in the [ISQ] adventure story." (*Id.*)

The HoER's fictional narrative, in turn, is based on "the disappearance of the house's inhabitants who seem to have discovered portals to other worlds and dimensions." (Doc. 372-12 at 6.) The version of ISQ installed in the HoER is located in "Portals Bermuda," "a futuristic travel agency that offers visitors 'travel' to various destinations, i.e.[,] other, smaller exhibits within [the

HoER]. ISQ is the smallest of 5 secondary installations that physically radiate around the main

Portals Bermuda exhibit and serve as destinations in the future." (Doc. 372-13 at 7.)

"Todos 7" is part of the HoER's fictional narrative. (Doc. 372-7.) On February 26, 2016,

Plaintiff e-mailed Defendant Kadlubek, writing,

> the work I'm doing for this is an Ice Station project, so I can't have the material be
> under a different name – it's okay that it's Todos 7 for Portals, obviously, that's
> awesome, but I need to keep all my material under the Ice Station Quellette
> umbrella, particularly because it deals with a narrative and characters and titles, etc.

(*Id.* at 2.)

b.   The Version of ISQ Installed in the HoER

Plaintiff designed the version of ISQ installed in the HoER in the summer and fall of 2015.

(Doc. 278-4 at 11, 18.) Plaintiff was "told two things" regarding how to design the work, *i.e.*,

"[i]t's going to be up for 10 years, because we have a 10-year lease on the building," and, "[b]uild

it for permanence," meaning, "everything had to be completely nailed down and bulletproof,

teenager-proof, you know, vandal-proof in every way." (Doc. 278-5 at 17.) Accordingly, Plaintiff

designed the version of ISQ installed in the HoER to be "indestructible," to "last 10 years, to be

teenager-proof and heavy-traffic-proof." (Doc. 372-3 at 4-5.) Plaintiff "[a]bsolutely" "inten[ded]

for ISQ to have a continued life of its own, beyond Meow Wolf, as a project of [hers] that [she is]

interested in pursuing in other venues[.]" (*Id.*; Doc. 420-2 at 2.)

Plaintiff "worked on-site from January 2 to the March 16[, 2016] opening" of the HoER to

complete the installation of ISQ. (Doc. 278-4 at 11, 18; Doc. 278-5 at 9.) Cary Cluett helped

Plaintiff build and install the work and "designed the underlying structures."[6] (Doc. 372-3 at 2-3;

---

[6] Mr. Cluett has professional experience in carpentry and electronics and as an artist, art curator, and art preparator.
(Doc. 372-2; Doc. 372-4 at 5-6.)

Doc. 372-4 at 2-4.) Plaintiff declared under penalty of perjury that the "individual art components" of the version of ISQ installed in the HoER

> consist of a 360-degree mural on the walls intended to convey the Ice Station walls inundated by polar ice, the 13-foot Space Owl and giant ventilation pipe piece, the portholes in the walls that look out on the 'polar landscapes' lit by LED lights that change color, and the sculpted sea creatures. All are a part of and critical to the art installation and its climate science adventure narrative.

(Doc. 420-1 at 2.)

The Space Owl sculpture stands on a base that Plaintiff designed and Mr. Cluett helped to plan and build. (Doc. 372-3 at 2-3; Doc. 372-4 at 2-3.) The base resembles a ventilation pipe that terminates in a round metal grate. (Doc. 372-3 at 2; Doc. 372-4 at 2-3; Doc. 420-1 at 2-4; Doc. 420-15 at 6.) Mr. Cluett built the cylindrical frame for the base using two-by-four studs and plywood or a salvaged wooden electrical spool, surrounded by metal lathe. (Doc. 372-3 at 2-3; Doc. 372-4 at 2-3; Doc. 420-1 at 3-4.) The Space Owl is wrapped around a four-by-four post that rests in the base, and the post and/or base are anchored to the concrete floor with turnbuckles, screws, and/or bolts. (Doc. 372-3 at 3; Doc. 372-4 at 2, 9; Doc. 372-6 at 5-6; Doc. 420-1 at 4.) The wires attached to the Space Owl's electrical components pass into a wall by way of a metal pipe that exits from the base. (Doc. 372-4 at 2, 9; Doc. 420-2 at 9; Doc. 420-15 at 35-36.) Plaintiff "sculpted the smooth exterior" of the base using "'Skratch,' a soft sculpting medium that hardens to a brittle state," over the metal lathe. (Doc. 372-4 at 3; Doc. 420-1 at 4; Doc. 420-15 at 39, 47.) Mr. Cluett constructed a clear, curved acrylic barrier attached to the top of the base that prevents visitors from touching the Space Owl. (Doc. 372-3 at 3; Doc. 372-4 at 3-4; Doc. 372-12 at 8; Doc. 420-15 at 40, 47.)

The walls of the ISQ room in the HoER are composed of sheetrock, joint compound for texture, and house paint. (Doc. 420-1 at 3; Doc. 420-2 at 5.) Plaintiff and Mr. Cluett shaped and

installed the wall curves and soffits in the room and framed and closed off a doorway with sheetrock.  (Doc. 372-3 at 2; Doc. 372-4 at 7; Doc. 420-15 at 11-15.) Mr. Cluett helped to smooth the walls and float the joints. (Doc. 372-4 at 7; Doc. 420-15 at 22.) Plaintiff then applied "multiple layers of joint compound … and house paint to complete[] the continuous, 360-degree mural … painted directly on to the sheetrock panels that form the walls of the room, which had been screwed into the structural studs." (Doc. 372-4 at 7; Doc. 420-1 at 3; Doc. 420-2 at 5.)

The parties dispute whether the base on which the Space Owl stands, and the walls of the ISQ room, are part of the artwork. It is undisputed that the base is constructed in part to allow the Space Owl to withstand heavy foot traffic. (Doc. 278-5 at 17; Doc. 372-3 at 4-5; Doc. 372-4 at 9; Doc. 372-13 at 4, 10.) Nevertheless, Plaintiff declared that it

> is not an interchangeable 'pedestal' in the context of conventional sculptural installations. Included in original concept drawings, ventilation pipes were integral to the narrative and design strategy of the Ice Station diorama, to convey some level of plausibility within the fantastical setting…. I ultimately settled on a single vent after a perfect round grate fit my original concept.

(Doc. 420-1 at 3-4.) Plaintiff further declared that she "intended the [wall] mural to be art and integral to the Ice Station story piece." (*Id.* at 2.) She testified that she "spent a lot of time … on [the] walls" and sees them as "one big round abstract painting." (Doc. 420-2 at 9-10.) In notes Plaintiff made while designing the version of ISQ installed in the HoER, she described the base as a "tight, sculptural barrier" that is "PART of the owl," and "the whole room" as "the station, partially inundated with ice." (Doc. 420-4 at 2 (emphasis in original); Doc. 420-5 at 2.)

Mr. Cluett, in contrast, testified that based on his professional experience, "[t]he walls are not part of [an] actual installation," even where "[t]here's been a lot done to" them. (Doc. 372-4 at 5-6.) According to Mr. Cluett, "the Space Owl was always the work of art that was going into the space, and the wall treatment was part of creating the atmosphere for the installation. I never saw

that as an integral part of the installation[.]" (*Id.* at 6.) Similarly, Sean Di Ianni testified that it is "common in museum preparation to paint a wall and to texturize the wall to the artist's specifications" and that walls so prepared are not "explicitly considered part of the art."[7] (Doc. 372-6 at 3.) Accordingly, he opined that the walls of the ISQ room at the HoER are not part of the piece but rather are "a preparation of the space that holds the artwork." (*Id.* at 3-4.) In addition, Defendants' expert witness Mary Peck opined that "the walls at [the HoER] are not part of ISQ" because "[i]t is common for artists to direct preparation of walls in an exhibition space where their work is installed" and the preparation of ISQ's walls "is not outside what is normal."[8] (Doc. 372-13 at 9-10.)

Mr. Cluett, Ms. Peck, and Mr. Di Ianni also opined that the Space Owl's base is not part of the artwork. According to Mr. Cluett, he did not see the base as "an integral part of the installation"; rather, "[t]he base was the response to the space, and the materials provided which happened to be that grate[.]" (Doc. 372-4 at 6.) Ms. Peck similarly opined that "[i]t is standard practice in art exhibitions to create custom bases … for shows. However, these display materials do not become part of the artwork and can be removed or changed as needed." (Doc. 372-13 at 4.) According to Ms. Peck, "[t]he current base for [the] *Space Owl* seems to have been designed for practical purposes related to display and the circumstances of [the HoER], and therefore does not appear to be part of the artwork itself." (*Id.* at 12 (emphasis in original).) Ms. Peck also concluded that by

---

[7] Mr. Di Ianni, a co-founder and former chief operating officer of Defendant MWI, was formally educated as a sculptor and has professional experience as a designer, model maker, and art preparator. (Doc. 372-5.) Plaintiff objects that Mr. Di Ianni "based his entire opinion solely on the report of Mary Peck." (Doc. 420 at 14-15.) However, Plaintiff has not filed a motion to exclude Mr. Di Ianni's testimony on this basis. Also, Mr. Di Ianni testified that he "went and did a visual inspection of the space" before forming his opinions; and, his opinion that the walls are not part of the piece is expressly based on his professional experience as well as Ms. Peck's expert report. (Doc. 372-6 at 2-4.) Thus, the Court will consider Mr. Di Ianni's testimony in ruling on Defendants' Summary Judgment Motion.

[8] Ms. Peck is a contemporary art appraiser with professional experience supervising art preparators. (Doc. 372-13 at 3.)

exhibiting the Space Owl in other venues without the base, Plaintiff "demonstrated that neither a base nor a Plexiglas shield [is] part of [the] *Space Owl*." (*Id.* at 10 (emphasis in original).) Relying on Ms. Peck's opinions, Mr. Di Ianni likewise assumed that the base and the curved acrylic barrier attached to it are "not a part of the work."[9] (Doc. 372-6 at 5.)

Plaintiff designed a plaque that hangs on one of the walls in the ISQ room in the HoER. (Doc. 372-3 at 2.) The plaque contains a stylized badge with the words "ICE STATION" on it, with the following text below it:

ICE STATION QUELLETTE
2051
isQ.io

(Doc. 420-12 at 2.) "isQ.io" is the address for a website that belongs to Plaintiff. (Doc. 372-12 at 47.) Asked whether the plaque is "the way [she] wanted it in the ISQ room," Plaintiff responded: "Yeah, that seems to be the most that it would be, you know, the – yes, that was fine with me. I wanted people to go to the website because there was a lot of information about climate, and a story, so yes." (Doc. 372-3 at 2.) Asked whether she has ever "demanded a different credit at the [HoER] … anywhere," Plaintiff responded, "[w]ell, I was hoping for my name in lights, but no, I have not." (*Id.*)

c.  Removal of ISQ from the HoER

Plaintiff testified that removing ISQ from the HoER would "destroy[]" it. (*See, e.g.*, Doc. 372-3 at 1, 5; Doc. 420-2 at 5-6.) More specifically, Plaintiff testified to the following damage

---

[9] In an apparent attempt to impeach Mr. Di Ianni, Plaintiff contends that he "commented, the 'whole thing is an art project,'" implying that the "whole thing" to which Mr. Di Ianni referred is the version of ISQ installed in the HoER, including the walls and base. (Doc. 420 at 8.) In fact, however, Mr. Di Ianni expressly indicated that the "whole thing" to which he was referring in the cited quotation is "the organization, the company, the business, the relationship with the union." (Doc. 420-7 at 3.)

that, in her opinion, removal would cause.[10]

- "[T]he wall work would have to be destroyed." (Doc. 372-3 at 5; Doc. 420-2 at 5-6);

- "Extracting the mural from [the] HoER would require chipping away joint compound and paint layers to expose the screws, then ripping the wall sections off the studs, panel by panel – or somehow cutting smaller pieces of it for extraction." (Doc. 420-1 at 3);

- "If … [Mr. Cluett] … can figure out how to pick up those walls without breaking them, then we can remove them, but I think we both know that you would have to tear out the Sheetrock." (Doc. 420-2 at 13);

- "[A]lthough [the portholes] could be removed from the walls, they could not be removed without damage. Also, the portholes themselves have been vandalized and would need to be replaced." (Doc. 420-1 at 3);

- "Skratch sculpted on relatively loose mesh [on the base] would likely crack and crumble during removal and transit and require extensive repair and/or modification." (Doc. 420-1 at 4);

- "Removing the base, which is bolted into the concrete, could conceivably damage the base as to make it unusable." (Doc. 420-1 at 4);

- "[T]here's the problem of taking [the base] out, but that's salvageable. The four-by-four I think is just jammed in there, and so things could be unscrewed. The fur could be removed and the wires disengaged. Obviously we wouldn't take the lighting infrastructure. But yes, the walls would have to be destroyed to be removed, and that's just how it is." (Doc. 420-2 at 7);

- "[T]he pipe that goes into the back might actually cause destruction of that base, so that base might be a loss in moving it." (Doc. 420-2 at 8);

- "I think in removing that base, I think all that scratch would crack. It's on lathe, and lathe that was nailed to the giant spool, and so I'm sure that lathe would crack. It might be repairable, but I don't know."[11]  (Doc. 420-2 at 10.)

---

[10] Defendants object to Plaintiff's "conclusions regarding removability of aspects of ISQ" on the ground that they "lack a basis in her personal knowledge." (Doc. 437 at 6.) However, Defendants have not filed a motion to exclude the testimony at issue. In addition, Plaintiff testified that "everything that went in there" was her design and she "know[s] what's behind the curtain" because she "was there every day working on this." (Doc. 420-2 at 11.) Thus, the Court will consider the testimony at issue in ruling on Defendants' Summary Judgment Motion.

[11] Plaintiff has conceded that other individual art components of ISQ, including the Space Owl sculpture, could be removed and reassembled. (*See, e.g.*, Doc. 420-1 at 4-5 (lighting, octopus, sea slugs); Doc. 420-2 at 7-8 (Space Owl, wiring, octopus, sea slugs).) Plaintiff does in her response cite to Mr. Cluett's testimony that if one "reassemble[d] the Space Owl after disassembling it," "[i]t wouldn't be the same way that it was built[.]" (Doc. 372-4 at 8; Doc. 420 at 19.) But Plaintiff fails to quote Mr. Cluett's complete statement, *i.e.*, "[i]t wouldn't be the same way that it was built, *but it would have the same effect.*" (Doc. 372-4 at 8 (emphasis added); *see generally* Doc. 420).) Also, although Plaintiff

Plaintiff's expert witness G. James Daichendt testified that:  (1) he has "a pretty good idea on how to remove a wall"; (2) he "do[esn't] know of any wall that can be removed without damaging it"; (3) the walls in the ISQ room at the HoER "would be damaged … [b]ecause you would be portioning it up or cutting it up"; (4) "Banksys removed from walls" are "never the same"; and, (5) consequently, ISQ would "[t]heoretically" be "destroyed" if it were removed from the HoER.[12] (Doc. 372-8 at 3; *see also* Doc. 381-3 at 24.) Professor Daichendt also opined that removing ISQ from the HoER would be prejudicial to Plaintiff because "the art would be removed from its established place of significance" and Plaintiff's "reputation … would suffer … if the [HoER] continued its exhibition run without the intentional placement of *Space Owl* and *Ice Station Quellette* in this particular space." (Doc. 420-10 at 5 (emphases in original).)

At his deposition, Mr. Di Ianni described a plan for removing ISQ from the HoER. (Doc. 372-6 at 5-8.) With respect to the elements Plaintiff and Professor Daichendt testified would be damaged or destroyed during removal—*i.e.*, the walls and the base—Mr. Di Ianni testified as follows. To remove the walls, Mr. Di Ianni explained that one would first "use a … non-invasive tool" to "locat[e] all of the screws that are attaching the sheetrock to the studs behind" and the seams between each sheetrock panel. (Doc. 372-6 at 7-8.) Next, he testified that "with a straight edge … protecting the surface of the walls you would just … cut each one of those seams," "drill out the surface of the plaster, remove each one of those screws while stabilizing the panel, [and] remove the sheetrock panel." (*Id.*) He added that one could go behind the

---

claims she testified that "the lighting infrastructure … could not be removed," (Doc. 420 at 7), in fact, she merely testified that, "[o]bviously we wouldn't take the lighting infrastructure," without addressing the feasibility of removing it. (Doc. 420-2 at 7.)

[12] Professor Daichendt is a Vice-Provost, Dean, and Professor of Art History, and has professional experience as an art preparator and art curator. (Doc. 381-2 at 11; Doc. 447-2 at 27.)

curved area of the room which is built out of an independent unit …[,] locate the screws that are attaching that curved framing on the back corner of the back wall and probably with just a sawzall or a hacksaw you would cut those screws. If you could remove them mechanically you could do that as well, but you detach that sort of curved framing with that curved panel attached.

(*Id.* at 8.) At that point, Mr. Di Ianni testified, "what you would be left with is a number of sheetrock panels cut into sections" that could be "put … back together and re-seam[ed] … with joint compound and match[ed] color or ... display[ed] … separately as independent works."[13] (*Id.*)

With respect to the base, Mr. Di Ianni testified that one could "cut underneath the two-by-fours," cut the metal pipe attached to the wall, and "take the whole base out." (*Id.*) Mr. Di Ianni noted that the "bottom … metal trim pieces," which "just screw on and off," would need to be reattached afterward, as well as "the hardware on top of the base that the plexiglass went into." (*Id.*) Also, he testified that "[y]ou would have to do some patching and repairing to the base probably," but that such work is "very easy to do and happens all the time on both wooden pedestals and also in this case it's like a plaster lathe scenario, so anybody who is familiar with mud and plaster could patch the base." (*Id.*)

Mr. Cluett likewise testified that one could "release the pedestal from the cement floor and provide that to be reinstalled somewhere else." (Doc. 372-4 at 6.) He added that "[i]f you want to keep the base, there's a way to cut the base into sections, then to reattach together later and patch the scratch, much like you would tape and float a joint and a piece of drywall." (*Id.*) Alternatively, he said, one could "move the base intact." (*Id.* at 8.)

In a text message dated June 26, 2018, Plaintiff wrote, "I don't want to remove the art piece from the exhibit, but I may have to." (Doc. 500-1 at 4.) Plaintiff does not dispute that "the art

---

[13] Mr. Di Ianni added that "you could also cut any section out of the sheetrock in the same way if you wanted to remove pieces of the sheetrock rather than the entire wall." (Doc. 372-6 at 8.)

piece" to which she referred in this message is ISQ, and that "the exhibit" is the HoER. (*See generally* Doc. 502.)

3.   Analysis

VARA, which is part of the Copyright Act, addresses visual artists' "moral rights" of "attribution" and "integrity." *Kelley v. Chicago Park Dist.*, 635 F.3d 290, 298 (7th Cir. 2011); 17 U.S.C. § 106A. Generally speaking, rights of "attribution" refer to an artist's right to claim authorship of her work and to prevent works that she did not create, or that have been prejudicially altered, from being attributed to her, while rights of "integrity" refer to an artist's right to prevent the destruction, mutilation, modification, or distortion of her work. *Kelley*, 635 F.3d at 296, 298. As discussed below, VARA provides legal protection for these moral rights, *id.*, but with pertinent limitations and exceptions. *See generally* 17 U.S.C. §§ 106A, 113(d).

a.   Defendants have not violated Plaintiff's rights of attribution under VARA.

With respect to rights of attribution, VARA grants the author of a work of visual art the right "to claim authorship of that work" and "to prevent the use of his or her name as the author of any work of visual art which he or she did not create." 17 U.S.C. § 106A(a)(1). VARA also grants the author of a work of visual art the right "to prevent the use of his or her name as the author of the work … in the event of a distortion, mutilation, or other modification of the work which would be prejudicial to his or her honor or reputation." 17 U.S.C. § 106A(a)(2).

In her amended complaint, Plaintiff alleges that Defendants used and copied ISQ "across multiple platforms … without attribution" to Plaintiff in violation of her VARA rights, including on the "Themed Entertainment Association … Awards" website, and in advertising and social media posts, "an influential publication[]," a coloring book, a coffee table book, "cross-branding promotions," and a "documentary and associated trailer." (Doc. 148 at 12-13, 18-19; Doc. 148-5 at 1.) Plaintiff further alleges that Defendants violated her VARA rights of attribution by using her

"name and ISQ with the 'Todos 7' collection of visual art ... including [on] Meow Wolf's 'credits' web page indicating ISQ as being part of 'Todos 7,'" even though Plaintiff told them not to. (Doc. 148 at 13, 18.)

Defendants raise several challenges to Plaintiff's claims based on her VARA rights of attribution. First, they argue that Plaintiff cannot prevail on any claim that they failed to properly attribute the version of ISQ at the HoER to her, because she testified that "she was credited there to her satisfaction." (Doc. 372 at 20; Doc. 437 at 7.) In support, they cite to Plaintiff's testimony that she designed the plaque in the ISQ room and it "was fine with [her]," because it has "[her] website on it" and she "wanted people to go to the website because there [is] a lot of information about climate, and a story." (Doc. 372 at 8; Doc. 372-3 at 2; *see* Doc. 420-12 at 2.) Plaintiff also testified that she has not "ever demanded a different credit at the [HoER] ... anywhere." (Doc. 372-3 at 2.) In her response to Defendants' motion, Plaintiff points to no evidence to contradict this testimony. (*See* Doc. 420 at 19.)

In light of the foregoing, Plaintiff has not shown a genuine factual dispute regarding whether Defendants violated her VARA attribution rights with respect to the version of ISQ installed in the HoER. As noted above, VARA grants the author of a protected work the right "to claim authorship of that work." 17 U.S.C. § 106A(a)(1)(A). This "right of attribution generally consists of the right of an artist to be recognized by name as the author of his work *or to publish anonymously or pseudonymously*[.]" *Phillips v. Pembroke Real Est., Inc.*, 459 F.3d 128, 133 (1st Cir. 2006) (emphasis added); *Carter v. Helmsley-Spear, Inc.*, 71 F.3d 77, 81 (2d Cir. 1995) (same) (emphasis added); *see also Kelley*, 635 F.3d at 296 ("'Rights of attribution' generally include the artist's right ... to publish anonymously and pseudonymously[.]"). In other words, VARA gives

the author of a protected work the right to choose whether the work will be publicly credited to her and if so, by what name.[14]

Here, undisputed evidence shows that Plaintiff chose to claim authorship of the version of ISQ at the HoER anonymously or pseudonymously, *i.e.*, by referring to her website rather than her name. (Doc. 372-12 at 47; Doc. 420-12 at 2.) Critically, she concedes that she designed the plaque displaying this attribution, it was "fine with [her]," and she never sought to exercise her right to claim authorship of the work in some other way. (Doc. 372-3 at 2.) In these circumstances, Plaintiff cannot show that Defendants have violated her right to claim authorship of the version of ISQ installed in the HoER.[15] The Court will therefore grant Defendants' Summary Judgment Motion as to her VARA claims based on that right.

Next, Defendants argue that they are entitled to summary judgment on Plaintiff's claims that they violated her VARA rights of attribution by failing to credit her in advertisements, promotions, social media posts, a website, publications, and a documentary and associated trailer that include images of the version of ISQ installed in the HoER, because VARA rights of attribution do not apply to these alleged uses. (Doc. 372 at 18-19; Doc. 437 at 6-7; *see* Doc. 148 at 12-13, 18-19; Doc. 148-5 at 1.) Plaintiff does not address this argument in her response to Defendants' Summary Judgment Motion. (*See generally* Doc. 420.)

---

[14] On its face, VARA does not grant the author of a protected work the right to dictate the materials or format used to credit the work. 17 U.S.C. §106A(a)(1). For example, although it does grant an author the right to claim authorship by her name, it does not grant her the right to insist that her name be "in lights." (Doc. 372-3 at 2.) Nevertheless, here, it is undisputed that Plaintiff designed the plaque used to credit the version of ISQ installed in the HoER within the room itself.

[15] The Court is aware that Plaintiff's right to claim authorship of her protected works endures for her lifetime, 17 U.S.C. § 106A(d)(1), and that this right can be waived only if she expressly agrees to such waiver in a written instrument that satisfies statutory requirements. 17 U.S.C. § 106A(e). This Memorandum Opinion and Order does not address Plaintiff's VARA rights, if any, to ask Defendants to credit her for the version of ISQ installed in the HoER differently in the future. Rather, the Court's analysis is necessarily confined to Defendants' past and ongoing conduct as challenged in Plaintiff's amended complaint. (*See generally* Doc. 148.)

Local Civil Rule 7.1 provides that "[t]he failure of a party to file and serve a response in opposition to a motion within the time prescribed for doing so constitutes consent to grant the motion." D.N.M.LR-Civ. 7.1(b). "Implicit in that rule is that the failure to respond to an argument raised in a motion constitutes consent to grant the motion to the extent associated with that particular argument." *Lewis v. XL Catlin*, 542 F. Supp. 3d 1159, 1168 n.6 (D.N.M. 2021), *appeal dismissed*, 2021 WL 6197126 (10th Cir. Sept. 27, 2021); s*ee also Hinsdale v. City of Liberal, Kan*., 19 F. App'x 749, 768-69 (10th Cir. Aug. 28, 2001) (holding that plaintiff abandoned claim by failing to respond to summary judgment arguments about it); *Coffey v. Healthtrust, Inc*., 955 F.2d 1388, 1393 (10th Cir. 1992) (holding that plaintiff's failure to challenge defendants' summary judgment arguments was "fatal"). Thus, Plaintiff's failure to respond to Defendants' argument that VARA rights of attribution do not apply to their alleged use of images of ISQ in various media constitutes consent to grant Defendants' motion as to that argument.

Moreover, VARA rights of attribution do not in fact apply to the alleged reproductions at issue. VARA only protects "work[s] of visual art." 17 U.S.C. § 106A. Section 101 of the Copyright Act defines a work of visual art as

> (1) a painting, drawing, print, or sculpture, existing in a single copy, in a limited edition of 200 copies or fewer that are signed and consecutively numbered by the author, or, in the case of a sculpture, in multiple cast, carved, or fabricated sculptures of 200 or fewer that are consecutively numbered by the author and bear the signature or other identifying mark of the author; or (2) a still photographic image produced for exhibition purposes only, existing in a single copy that is signed by the author, or in a limited edition of 200 copies or fewer that are signed and consecutively numbered by the author.

17 U.S.C. § 101. Under subparagraph (A) of Section 101,

> [a] work of visual art does not include … any poster, … motion picture or other audiovisual work, book, magazine, newspaper, periodical, … electronic publication, or similar publication[, or] any merchandising item or advertising, promotional, descriptive, covering, or packaging material or container[.]

*Id.* Further, VARA expressly provides that the statute's rights of attribution do not apply to "any reproduction, depiction, portrayal, or other use of a work in, upon, or in any connection with any item" excluded from the definition of a work of visual art under subparagraph (A). 17 U.S.C. § 106A(c)(3).

The foregoing makes plain that VARA rights of attribution do not apply to the alleged reproductions at issue here—*i.e.*, images of the version of ISQ installed in the HoER on a website and in advertising and social media posts, "an influential publication[]," books, "cross-branding promotions," and a "documentary and associated trailer." (Doc. 148 at 12-13, 18-19; Doc. 148-5 at 1); 17 U.S.C. §§ 101, 106A(c)(3); *see also, e.g., Kleinman v. City of San Marcos*, 597 F.3d 323, 329 (5th Cir. 2010) (holding that VARA did not apply to "promotional" piece); *Pollara v. Seymour*, 344 F.3d 265, 270 (2d Cir. 2003) (holding that promotional banner was not work of visual art protected by VARA); *Teter v. Glass Onion, Inc.*, 723 F. Supp. 2d 1138, 1158 (W.D. Mo. 2010) (holding that VARA did not apply to images of artwork on website used for marketing purposes); *Berrios Nogueras v. Home Depot*, 330 F. Supp. 2d 48, 51 (D.P.R. 2004) ("VARA does not afford a right of action to plaintiff for the unauthorized reproduction of his work upon … advertising or promotional material[.]") (quotation marks omitted); *Martin v. Walt Disney Internet Grp.*, No. 09-cv-1601, 2010 WL 2634695, at *5 (S.D. Cal. June 30, 2010) (dismissing plaintiff's VARA attribution claims based on reproduction of photograph in magazine because "[i]t is the original or limited edition [work] … that garners the rights VARA bestows"); *Silberman v. Innovation Luggage, Inc.*, No. 01-cv-7109, 2003 WL 1787123, at *5 (S.D.N.Y. Apr. 3, 2003) (holding that VARA did not apply to computer scan of "a picture in a marketing catalogue of a mass-produced poster"); *see generally Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 34–35 (2003) ("[VARA's] … express right of attribution is carefully limited and focused:

It attaches only to specified works of visual art.") (quotation marks and brackets omitted). For these reasons, Plaintiff's claims that Defendants violated her VARA rights by failing to properly attribute the alleged reproductions listed in her amended complaint fail as a matter of law, and the Court will grant Defendants summary judgment on those claims.

Finally, Defendants challenge Plaintiff's claims based on her VARA right not to be identified as the author of works she did not create. (Doc. 372 at 19.) As noted above, VARA grants the author of a work of visual art the right "to prevent the use of his or her name as the author of any work of visual art which he or she did not create." 17 U.S.C. § 106A(a)(1)(B). Plaintiff alleges that Defendants violated this right by using her name "with the 'Todos 7' collection of visual art" and "as the author for 'Todos 7,'" including on a "'credits' web page indicating ISQ as being part of 'Todos 7.'" (Doc. 148 at 13, 18.)

To challenge these claims, Defendants present evidence that "Todos 7 refers to a fictional world that is part of the narrative of [the] HoER." (Doc. 372 at 8, 19; Doc. 372-7 at 1-2.) Thus, they argue, "Todos 7" is not a "work of visual art which [Plaintiff] did not create," 17 U.S.C. § 106A(a)(1)(B), and they did not violate Plaintiff's VARA right of non-attribution by "us[ing her] name and ISQ" in connection with it. (Doc. 372 at 19.) In her response to Defendants' Summary Judgment Motion, Plaintiff fails to address this argument. (*See generally* Doc. 420.)

Plaintiff's failure to respond to Defendants' argument regarding her claims based on her VARA rights of non-attribution constitutes consent to grant Defendants' motion as to that argument. D.N.M.LR-Civ. 7.1(b); *Lewis*, 542 F. Supp. 3d at 1168 n.6. Furthermore, undisputed record evidence indicates that, as Defendants observe, "Todos 7" is a fictional narrative rather than a work of visual art. (Doc. 372-7 at 1-2; *see also, e.g.*, Doc. 166-5 at 3.) And critically, Plaintiff has pointed to no evidence to show that Defendants ever used her name as the author of either the

entire "'Todos 7' collection of visual art," (Doc. 148 at 13, 18), or of any particular work associated with the "Todos 7" narrative that she did not create. (*See generally* Doc. 420.)

Even in her amended complaint, the only misconduct Plaintiff alleges with specificity in this regard is that Defendants identified *ISQ* as part of the "'Todos 7' collection of visual art." (Doc. 148 at 13, 18.) But, even if this allegation were accepted as true, it would not show that Defendants identified Plaintiff as the author of a work she did not create. Rather, at most, it would show that Defendants included ISQ—a work Plaintiff *did* create—in an art collection to which she objected. As a matter of law, VARA does not prohibit such conduct. *See generally* 17 U.S.C. §§ 106A, 113(d). The Court will therefore grant Defendants' Summary Judgment Motion as to Plaintiff's claims based on her VARA rights of non-attribution.

To summarize the above rulings regarding Plaintiff's claims based on her VARA attribution rights, the Court will grant Defendants' Summary Judgment Motion on Plaintiff's claims that Defendants violated her right to claim authorship of the version of ISQ installed in the HoER, because Plaintiff concedes that the work is credited according to her own design and that she never asked Defendants to credit it differently. The Court will also grant Defendants' motion on Plaintiff's claims that Defendants violated her VARA rights of attribution as to alleged reproductions of ISQ in various media, because these rights do not apply to the types of reproductions at issue. Finally, the Court will grant Defendants' motion on Plaintiff's claims that Defendants violated her VARA rights of non-attribution, because she has failed to point to any evidence that Defendants identified her as the author of any work of visual art she did not create. The Court will therefore grant Defendants' motion as it pertains to all of Plaintiff's claims based on her VARA rights of attribution.

   b.  Removing ISQ from the HoER would not violate Plaintiff's VARA rights
       of integrity.

In addition to rights of attribution, VARA grants authors of protected works certain rights

of "integrity." 17 U.S.C. § 106A(a)(3). Plaintiff seeks to enforce these rights by way of an

injunction prohibiting Defendants from "taking any action to remove, alter, deface, modify,

mutilate, or destroy ISQ at [the] HoER, or any element thereof, during [Plaintiff's] lifetime." (Doc.

148 at 25.) In support, Plaintiff alleges that the version of ISQ installed in the HoER is a work of

recognized stature, that Defendants have threatened to remove ISQ from the HoER, and that the

threatened removal would destroy or modify the work in violation of her VARA integrity rights.[16]

(*Id.* at 10-11, 14, 18-19, 25.)

In their Summary Judgment Motion, Defendants argue that they are entitled to summary

judgment on Plaintiff's VARA claims seeking to bar them from removing ISQ from the HoER,

because under VARA's "public presentation" and "building" exceptions, a protected work can be

removed as long as it is not destroyed or prejudicially modified in the process, and "only harm

caused by gross negligence in moving a work is actionable." (Doc. 372 at 2-3, 11-18.) And here,

Defendants continue, it is undisputed that ISQ can be removed from the HoER without destroying

or prejudicially modifying it. (*Id.*) As explained below, the Court agrees that, in light of VARA's

---

[16] In her amended complaint, Plaintiff seeks to prevent Defendants from removing ISQ from the HoER "temporarily
during the pendency of this action, and permanently thereafter[.]" (Doc. 148 at 25.) But her request for a temporary
injunction has been mooted by Defendants' stipulation to the requested relief, *i.e.*, that Defendants will not remove
ISQ from the HoER, if at all, until this litigation is fully resolved. (Doc. 155.) Thus, not only are Defendants
substantively entitled to summary judgment on Plaintiff's request for a temporary injunction for the reasons explained
in this section, but also these claims are moot and should be denied as such. *See generally Utah Animal Rts. Coal. v.
Salt Lake City Corp.*, 371 F.3d 1248, 1257 (10th Cir. 2004) (finding request for injunctive relief moot where
controversy at issue was "over" and would "not recur").

public presentation and building exceptions, Defendants are entitled to summary judgment on Plaintiff's VARA claims seeking to prevent them from removing ISQ from the HoER.[17]

VARA grants the author of a work of visual art the right "to prevent any intentional distortion, mutilation, or other modification of that work which would be prejudicial to his or her honor or reputation," as well as the right "to prevent any destruction of a work of recognized stature."[18, 19] 17 U.S.C. § 106A(a)(3)(A), (B). However, VARA's public presentation exception provides that

> [t]he modification of a work of visual art which is the result … of the public presentation, including lighting and placement, of the work is not a destruction, distortion, mutilation, or other modification described in [17 U.S.C. § 106A(a)(3)] unless the modification is caused by gross negligence.

17 U.S.C. § 106A(c)(2). This exception

> provides a safe harbor for ordinary changes in the public presentation of VARA-qualifying artworks; the artist has no cause of action unless through gross

---

[17] Alternatively, Defendants argue that they are entitled to summary judgment on Plaintiff's VARA claims seeking to prevent them from removing ISQ from the HoER because ISQ is a "site specific" work to which VARA does not apply, citing *Phillips v. Pembroke Real Estate, Inc.*, 459 F.3d 128 (1st Cir. 2006). (Doc. 372 at 2-3, 9-11.) However, because the Court will grant Defendants summary judgment on these claims based on the public presentation and building exceptions, it need not decide whether the Tenth Circuit would adopt *Phillips'* holding that VARA does not apply to "site specific" works. *See Phillips*, 459 F.3d at 143.

[18] VARA also provides that "any intentional distortion, mutilation, or other modification" of a work of visual art "is a violation" of an author's right to prevent such actions, making Copyright Act damages available for the violation. 17 U.S.C. §§ 106A(a)(3)(A), 504; *Castillo v. G&M Realty L.P.*, 950 F.3d 155, 164 (2d Cir. 2020), *as amended* (Feb. 21, 2020); *Canilao v. City Com. Invs., LLC*, 613 F. Supp. 3d 1236, 1245 (N.D. Cal. 2022). Although this provision does not restate the requirement that an intentional modification of a protected work must be prejudicial to the author's honor or reputation to be actionable, "Congress intended the prejudice requirement to apply to the right of integrity whether the remedy sought is injunctive relief or damages." *Massachusetts Museum of Contemp. Art Found., Inc. v. Buchel*, 593 F.3d 38, 53–54 (1st Cir. 2010).

[19] The Second Circuit explained the difference in the way VARA treats protected works of recognized stature, which cannot be destroyed, and the way it treats other protected works, which can, by noting that prohibiting the destruction of works of recognized stature "stress[es] the public interest in preserving a nation's culture"; otherwise, "destruction is seen as less harmful than the continued display of deformed or mutilated work that misrepresents the artist and destruction may proceed." *Carter*, 71 F.3d at 81–83. In their Summary Judgment Motion, Defendants have not disputed that the version of ISQ installed in the HoER is a work of recognized stature and that VARA grants Plaintiff the right to prevent its destruction as well as its prejudicial modification. (*See generally* Doc. 372.) The Court will therefore assume without deciding that the piece is a work of recognized stature in ruling on Defendants' Summary Judgment Motion.

negligence the work is modified, distorted, or destroyed in the process of changing its public presentation.

*Kelley*, 635 F.3d at 306–07.

VARA also includes an exception applicable to works of visual art that are "incorporated in or made part of a building." 17 U.S.C. § 113(d). This 'building exception' has two sections. The first section provides that VARA integrity rights do not apply when

> a work of visual art has been incorporated in or made part of a building in such a way that removing the work from the building will cause the destruction, distortion, mutilation, or other modification of the work as described in [17 U.S.C. §] 106A(a)(3), and … the author consented to the installation of the work in the building either before [VARA's effective date of June 1, 1991],[20] or in a written instrument executed on or after such effective date that is signed by the owner of the building and the author and that specifies that installation of the work may subject the work to destruction, distortion, mutilation, or other modification, by reason of its removal.

17 U.S.C. § 113(d)(1).

The second section of the building exception provides that

> [i]f the owner of a building wishes to remove a work of visual art which is a part of such building and which can be removed from the building without the destruction, distortion, mutilation, or other modification of the work as described in [17 U.S.C. §] 106A(a)(3), the author's rights [of integrity under VARA] shall apply unless— (A) the owner has made a diligent, good faith attempt without success to notify the author of the owner's intended action affecting the work of visual art, or (B) the owner did provide such notice in writing and the person so notified failed, within 90 days after receiving such notice, either to remove the work or to pay for its removal.[21]

17 U.S.C. § 113(d)(2). In their briefing, both sides assume without discussion that the version of ISQ installed in the HoER has been incorporated into or made part of the building within the

---

[20] VARA's effective date was set at six months after its December 1, 1990 date of enactment. Jud. Improvements Act of 1990, PL §§ 603, 604, 610(a), 104 Stat 5089 (Dec. 1, 1990); *Guzman v. New Mexico State Dep't of Cultural Affs.*, 534 F. Supp. 3d 1375, 1382 (D.N.M. 2021).

[21] The parties have stipulated that Defendant MWI "provided a 90-day notice to Plaintiff … under 17 [U.S.C.] § 113(d)(2)," but that, if Plaintiff "fails to prove that removal of the artwork will destroy, distort, mutilate, or modify [ISQ] as described in [17 U.S.C. §] 106A(a)(3)," she will have 30 days after final resolution of this litigation to remove ISQ from the HoER at her expense. (Doc. 155 at 1-2.)

meaning of the statute. (*See* Doc. 372 at 3, 16-18; Doc. 420 at 6, 12-13.) The Court will therefore assume without deciding that this is so in ruling on Defendants' Summary Judgment Motion.

Read as a coherent whole, the foregoing provisions indicate that, in assessing an author's right to prevent the removal of a protected work that is part of a building, the pivotal question is whether the removal will either destroy the work or modify it in a way that is prejudicial to the author's honor or reputation. 17 U.S.C. §§ 106A, 113(d); *see generally W. Virginia v. Env't Prot. Agency*, — U.S. —, 142 S. Ct. 2587, 2607 (2022) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."); *King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991) ("[A] statute is to be read as a whole[.]"). If so, the author's integrity rights apply unless she consented to the installation of the work in the manner the statute requires. But if removal will not destroy or prejudicially modify the work, the author's integrity rights do not apply, provided the building owner has given or diligently tried to give the requisite 90-day notice.

In assessing how removal from the HoER would impact ISQ, the Court must initially address whether the walls and the Space Owl's base are elements of the work that must be considered in its analysis. The Court finds there is a genuine factual dispute on this point. As noted in Section II.B.2., *supra*, Mr. Di Ianni, Ms. Peck, and Mr. Cluett opined that these elements are not part of the work. But other cognizable evidence supports the opposite conclusion. In particular, Plaintiff declared that she "envisioned the ISQ at [the] HoER installation as a life-sized diorama," that its components include "a 360-degree mural on the walls intended to convey the Ice Station walls inundated by polar ice" and a "giant ventilation pipe piece," and that these components "are a part of and critical to the art installation and its climate science adventure narrative." (Doc. 420-1 at 2.) Plaintiff testified that she "spent a lot of time … on [the] walls" and sees them as "one big

round abstract painting." (Doc. 420-2 at 9-10.) And she elaborated that the "Giant Vent is not an interchangeable 'pedestal' in the context of conventional sculptural installations"; rather, she included ventilation pipes "in original concept drawings … to convey some level of plausibility within the fantastical setting," and "ultimately settled on the single vent after a perfect round grate fit [her] original concept." (Doc. 420-1 at 3-4.) Based on Plaintiff's evidence, a rational factfinder could conclude that the walls and base are part of the artwork that is the version of ISQ installed in the HoER.[22] The Court will therefore consider how removal would affect these elements in determining whether Defendants are entitled to summary judgment on Plaintiff's VARA claims seeking to prevent removal of ISQ from the HoER.

In their Summary Judgment Motion, Defendants argue that ISQ—including the walls and base, if necessary—can be removed from the HoER without destroying the work or prejudicially modifying it. In particular, they argue that although removal will damage the work, it is undisputed that such damage can be repaired without harm to Plaintiff's honor or reputation. (Docs. 372 at 17; Doc. 437 at 9 n.6.) In her response, Plaintiff counters that:  (1) the parties have stipulated this issue will be decided at trial; (2) removal would destroy the work; and, (3) the "issue at the very least represents a genuine dispute of material fact that is not suitable for determination at the summary judgment stage." (Doc. 420 at 1, 11-13.)

VARA does not define the term "destruction." 17 U.S.C. §§ 106A, 113(d). Consistent with the term's ordinary meaning, Black's Law Dictionary defines the term "destroy" to mean "[t]o damage … so thoroughly as to make unusable, unrepairable, or nonexistent." Black's Law

---

[22] Professor Daichendt also opined that the walls and base are "part of [Plaintiff's] exhibit," based on "the discretion of the artist." (Doc. 381-3 at 3, 30.) Defendants have moved to exclude this testimony by separate motion. (Doc. 381 at 5-6, 14.) The Court need not decide whether to exclude this testimony before ruling on Defendants' Summary Judgment Motion because even without it, Plaintiff has presented sufficient evidence to show a genuine factual dispute regarding whether the walls and base are part of the version of ISQ installed in the HoER.

Dictionary (11th ed. 2019); *see generally Perrin v. United States*, 444 U.S. 37, 42 (1979) ("A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning."). Accordingly, courts have defined the term "destruction" as used in VARA to mean, "at minimum, *irreparable* damage." *Robar v. Vill. of Potsdam Bd. of Trustees*, 490 F. Supp. 3d 546, 573 (N.D.N.Y. 2020) (emphasis added); *see also, e.g.*, *Flack v. Friends of Queen Catherine Inc.*, 139 F. Supp. 2d 526, 534–35 (S.D.N.Y. 2001) (dismissing VARA claim based on destruction where complaint alleged that work was "capable of being repaired"); *Tobin v. The Rector*, No. 17-cv-2622, 2017 WL 5466705, at *6 (S.D.N.Y. Nov. 14, 2017), *aff'd on other grounds sub nom. Tobin v. Rector, Church-Wardens, & Vestrymen of Trinity Church,* 735 F. App'x 32 (2d Cir. 2018) (dismissing VARA claim based on destruction where complaint alleged that defendant "merely damaged" the work) (quotation marks omitted). As used in VARA, the term stands in contradistinction to the term "modification," which simply means "[a] change to something; an alteration or amendment." Black's Law Dictionary (11th ed. 2019).

As previously noted, VARA prohibits the modification of a protected work only where the modification "would be prejudicial to [the author's] honor or reputation." 17 U.S.C. § 106A(a)(3). Again, because VARA does not define the terms "prejudice," "honor," and "reputation," the Court applies their ordinary meaning. *Perrin*, 444 U.S. at 42. In this context, "honor" is defined as "good name or public esteem"; "reputation" refers to one's "overall quality or character as seen or judged by people in general" or "recognition by other people of some characteristic or ability"; and, "prejudicial" means "tending to injure or impair." https://www.merriam-webster.com/dictionary (last accessed Aug. 3, 2023). Thus, in determining whether modification of a protected work would be prejudicial to an author's honor or reputation, courts "consider whether the proposed alteration

would cause injury or damage to [the author's] good name, public esteem, or reputation in the artistic community." *Massachusetts Museum of Contemp. Art Found., Inc. v. Buchel*, 593 F.3d 38, 54 (1st Cir. 2010) ("*Buchel*") (brackets omitted). In applying these terms, the Court is mindful that under the public presentation exception, moving a VARA-protected work to a different location or even removing it from public display does not, standing alone, constitute a modification prejudicial to an author's honor or reputation. 17 U.S.C. § 106A(c)(2); *Kerson v. Vermont L. Sch., Inc.*, No. 20-cv-202, 2021 WL 4142268, at *5 (D. Vt. Mar. 10, 2021) ("Modify means to alter or change an object. It does not mean to conceal it from view."); *Tobin*, 2017 WL 5466705 at *5 ("[S]imply relocating [a VARA-protected work] does not by itself constitute distortion, mutilation or modification under VARA.").

As noted in Section II.B.2.c., *supra*, Plaintiff takes the position that removal of ISQ from the HoER would destroy the work because it would physically damage the walls and the Space Owl's sculptural base. However, in their motion, Defendants argue that, even though the walls and base will be damaged in the process of removal, the work will not be destroyed because these elements can undisputedly be repaired. (Doc. 372 at 16-18.) Defendants also point to the absence of any evidence that the resulting modifications to the walls and the base would be prejudicial to Plaintiff's honor or reputation. (*Id.*)

In support of Defendants' arguments as to the walls, Mr. Di Ianni testified to a process by which the screws attaching the sheetrock panels to the studs could be removed and the seams between the panels cut, such that the panels could be "put … back together and re-seam[ed] … with joint compound and match[ed] color or ... display[ed] … separately as independent works." (Doc. 372-6 at 7-8.) And critically, although Plaintiff presents her declaration and testimony describing other, more destructive ways to remove the walls, (Doc. 420-1 at 3; Doc. 420-2 at 13),

she submits no cognizable evidence rebutting Mr. Di Ianni's testimony that the walls could also be removed and repaired in the way he described, or showing that any resulting modifications would prejudice her honor or reputation.[23] (*See generally* Doc. 420.)

Plaintiff did declare and testify that the walls would "have to" be removed in the destructive ways she described. (Doc. 420-1 at 3; Doc. 420-2 at 13.) But again, she fails to present any particularized evidence to show that the walls could not be removed and repaired in the more painstaking way Mr. Di Ianni described, and her testimony is thus too vague and conclusory to preclude the entry of summary judgment. *See, e.g., Forney Indus., Inc. v. Daco of Missouri, Inc.*, 835 F.3d 1238, 1254 (10th Cir. 2016) (holding that "conclusory" testimony was insufficient to prevent summary judgment); *Ford v. West*, 222 F.3d 767, 777 (10th Cir. 2000) ("Vague, conclusory statements do not suffice to create a genuine issue of material fact."); *Adler*, 144 F.3d at 675 (holding that "conclusory statements in [the plaintiff's] verified complaint and brief … [did] not help her to carry her burden on summary judgment"); *see also Helget*, 844 F.3d at 1223 n.3 (nonmoving party who would bear burden of proof at trial must present affirmative evidence to contradict testimony offered by moving party supporting entry of summary judgment).

Plaintiff also relies on Professor Daichendt's testimony regarding the walls to argue that "removal of the Space Owl would not preserve it as it is." (Doc. 420 at 10.) But this argument misses the point. VARA does not grant an author the right to preserve a protected work exactly as it is; rather, it grants an author the right to prevent the *destruction* or *prejudicial modification* of

---

[23] As noted in Section II.B.2.c., *supra*, Plaintiff also declared that removing the portholes from the walls would damage ISQ. (Doc. 420-1 at 3.) However, Plaintiff fails to explain not only how such damage would occur, but also why the portholes would have to be removed at all to relocate the work, given Mr. Di Ianni's unrebutted testimony that the wall panels can be removed intact. (*Id.*) Furthermore, Plaintiff concedes that the portholes have been vandalized and need to be replaced regardless. (*Id.*) Thus, Plaintiff's declaration regarding the portholes fails to demonstrate a genuine factual dispute regarding whether ISQ can be removed from the HoER without destroying or prejudicially modifying the work.

the work. 17 U.S.C. §106A(a)(3). And in his testimony, Professor Daichendt merely (and unremarkably) confirmed that ISQ's walls will not be exactly the same after removal and repair, without addressing whether the resulting modifications would be prejudicial to Plaintiff's honor or reputation.[24] (*See, e.g.*, Doc. 372-8 at 3; Doc. 381-3 at 25-26.) Plaintiff has therefore failed to meet her burden to demonstrate a genuine factual dispute as to whether removal of ISQ from the HoER would either destroy the walls or damage them in a way that "would cause injury or damage to [her] good name, public esteem, or reputation in the artistic community." *Buchel*, 593 F.3d at 54 (brackets omitted); *see Tesone*, 942 F.3d at 994; *Adler*, 144 F.3d at 670-71.

In support of Defendants' arguments as to the base, in turn, Mr. Di Ianni testified to a process by which one could "take the whole base out." (Doc. 372-6 at 8.) And although he conceded that "some patching and repairing" would "probably" have to be done as a result, he also testified that "anybody who is familiar with mud and plaster" would find the patching and repairing "very easy to do." (*Id.*) Similarly, Mr. Cluett testified that the base could be "released" from "the cement floor … to be reinstalled somewhere else" or "cut … into sections" that could be reattached and patched with Skratch, "much like you would tape and float a joint and a piece of drywall." (Doc. 372-4 at 6.)

In response, Plaintiff relies on her declaration and testimony to the effect that the Skratch on the base "would likely crack and crumble during removal and transit." (Doc. 420-1 at 4; Doc. 420-2 at 10.) In her declaration, she stated that such damage would "require extensive repair and/or modification," and at her deposition, she testified that it "might be repairable." (Doc. 420-1 at 3; Doc. 420-2 at 10.) This equivocal evidence falls well short of rebutting Mr. Di Ianni's and Mr.

---

[24] The Court need not decide whether Professor Daichendt's testimony on this point should be excluded pursuant to Defendants' Motion to Exclude Expert Opinion Testimony of G. James Daichendt (Doc. 381), because even if the Court were to find the testimony admissible, it would not change the Court's ruling on Defendants' Summary Judgment Motion.

Cluett's affirmative testimony that such damage could be repaired. And again, Plaintiff offers no evidence to show that any resulting modifications would be prejudicial to her honor or reputation. (*See generally* Doc. 420.)

Plaintiff also relies on her testimony that removal "could conceivably damage the base as to make it unusable" because it is "bolted into the concrete," and that "the pipe that goes into the back might actually cause destruction of [the] base." (Doc. 420-1 at 4; Doc. 420-2 at 8.) But she does not explain how such destruction "might" "conceivably" occur, and "[t]o defeat a motion for summary judgment, evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise." *Hasan v. AIG Prop. Cas. Co.*, 935 F.3d 1092, 1098 (10th Cir. 2019). Moreover, Mr. Di Ianni and Mr. Cluett both testified about the pipe and the way the base is attached to the floor and accounted for these elements in describing how the base could be removed and repaired. (Doc. 372-4 at 2, 6, 8-9; Doc. 372-6 at 6, 8.) And again, Plaintiff offers no cognizable evidence rebutting their testimony on these points. (*See generally* Doc. 420.) As with the walls, Plaintiff has therefore failed to meet her burden to demonstrate a genuine factual dispute as to whether removal of ISQ from the HoER would destroy the base or damage it in a way that "would cause injury or damage to [her] good name, public esteem, or reputation in the artistic community." *Buchel*, 593 F.3d at 54 (brackets omitted); *see Tesone*, 942 F.3d at 994; *Helget*, 844 F.3d at 1223 n.3; *Adler*, 144 F.3d at 670-71.

Plaintiff also makes three more general arguments to support her VARA claims seeking to prevent Defendants from removing ISQ from the HoER. First, Plaintiff relies on her sworn statements that removing ISQ from the HoER would "destroy[]" the work. (Doc. 372-3 at 1, 5; Doc. 420-2 at 5-6.) However, these statements are too vague and conclusory to create a genuine issue of material fact for summary judgment purposes. *Forney Indus., Inc.*, 835 F.3d at 1254; *Ford*,

222 F.3d at 777; *Adler*, 144 F.3d at 675. In this regard, Plaintiff did declare that another artist's work at the HoER was "destroyed" in the process of removal. (Doc. 420-1 at 2.) However, she fails to offer any evidence that this other work was structurally similar to ISQ and was removed using a process similar to the one Mr. Di Ianni and Mr. Cluett described, and her declaration on this point is therefore irrelevant.

Second, taking another tack, Plaintiff relies on Professor Daichendt's opinions that removal of ISQ from the HoER would be prejudicial to her, not because of any resulting physical damage, but because "the art would be removed from its established place of significance" and her "reputation … would suffer … if the [HoER] continued its exhibition run without the intentional placement of *Space Owl* and *Ice Station Quellette* in this particular space." (Doc. 420-10 at 5 (emphases in original).) But these opinions do not create a material factual dispute, either. As to Professor Daichendt's first opinion, Plaintiff has unequivocally taken the position that ISQ "is not site-specific. The ISQ story and this installation have no relationship with [the] HoER … and no element of ISQ is dependent on [the] HoER."[25] (Doc. 420 at 6.) Thus, she has waived any argument that removing ISQ from the HoER would destroy or prejudicially modify the work by taking it out of a context "integral" to its meaning. *Phillips*, 459 F.3d at 134.

As to Professor Daichendt's second opinion, in turn, even accepting as true that the mere fact of ceasing to display ISQ in its present location would harm Plaintiff's honor or reputation, as a matter of law such harm is not actionable under VARA. Rather, relocating a VARA-protected work or removing it from public display does not, standing alone, constitute a modification prejudicial to an author's honor or reputation. 17 U.S.C. § 106A(c)(2); *Kerson*, 2021 WL 4142268

---

[25] Moreover, Plaintiff's position on this point is consistent with the evidence discussed in Section II.B.2.a., *supra*, indicating that the respective narratives of ISQ and the HoER are distinct and do not depend on one another for their meaning.

at *5; *Tobin*, 2017 WL 5466705 at *5. Thus, Professor Daichendt's opinions are inadequate to create a genuine factual dispute regarding whether removing ISQ from the HoER would destroy or prejudicially modify the work.[26]

Finally, Plaintiff argues that the parties have stipulated that "the issue of whether or not [ISQ] can be removed without destruction, distortion, mutilation, or other modification as described in section 106A(a)(3)" will be decided at trial. (Doc. 155 at 1; Doc. 420 at 12-13.) But a careful reading of the parties' stipulation reveals that Plaintiff is mistaken. The parties did stipulate that they "expect" this issue "to be decided at trial." (Doc. 155 at 1.) But an *expectation* that something will happen is different from an *agreement* that it will. The latter is a promise, but the former is just a prediction. And a prediction that an issue will be decided at trial cannot reasonably be construed as definite or binding, particularly where, as here, much of the discovery relevant to the issue had yet to be taken when the prediction was made.[27]

Indeed, the stipulation itself shows that the parties appreciated the difference between an expectation and an affirmative agreement. Specifically, although the stipulation states that the parties "expect" the at-issue question to be decided at trial, it also states that Defendant MWI "agrees" not to remove ISQ until after this litigation is finally resolved, and that if the question is decided against Plaintiff, she "shall" have thirty days after final resolution to remove the work at

---

[26] Again, the Court need not decide whether Professor Daichendt's opinions on these points should be excluded pursuant to Defendants' Motion to Exclude Expert Opinion Testimony of G. James Daichendt (Doc. 381), because even if the Court were to find them admissible, they would not change the Court's ruling on Defendants' Summary Judgment Motion.

[27] The parties filed the stipulation at issue on June 8, 2021. (Doc. 155.) The following evidence attached to the parties' briefing on Defendants' Summary Judgment Motion was produced after that date: (1) Professor Daichendt's preliminary report, which is dated January 14, 2022, (Doc. 372-9 at 1, 7; Doc. 420-10 at 2, 8); (2) Mary Peck's supplemental rebuttal report, which is dated February 25, 2022, (Doc. 372-13 at 1); (3) Mr. Cluett's deposition, which was taken on March 7, 2022, (Doc. 372-4 at 1; Doc. 420-15 at 2); (4) Professor Daichendt's deposition, which was taken on March 10, 2022, (Doc. 372-8 at 1); (5) one of Mr. Di Ianni's depositions, which was taken on March 18, 2022, (Doc. 372-6 at 1; Doc. 437-1 at 1); and, (6) Plaintiff's declaration, which is dated May 26, 2022. (Doc. 420-1 at 5.)

her expense. (*Id.* at 1-2.) Further, the stipulation includes a broad reservation of rights, providing that "[a]side from the terms outlined" therein, "both parties reserve all rights, claims and defenses," including, presumably, the right to move for summary judgment on any issues not affirmatively conceded. (*Id.* at 2.) For these reasons, the Court is not persuaded that the provision on which Plaintiff relies is a binding agreement.

To summarize the Court's ruling regarding Plaintiff's claims for injunctive relief based on her VARA integrity rights, Defendants have shown that there is no genuine factual dispute as to whether ISQ can be removed from the HoER without destroying it, because the damage such removal will cause can undisputedly be repaired. Further, Defendants have pointed out the absence of any evidence in the record that the resulting modifications would be prejudicial to Plaintiff's honor or reputation; and, Plaintiff has failed to come forward with any such evidence in response to Defendants' motion. *Tesone*, 942 F.3d at 994; *Adler*, 144 F.3d at 670-71. The Court therefore finds as a matter of law that ISQ can be removed from the HoER without intentional destruction, distortion, mutilation, or other modification prejudicial to Plaintiff's honor or reputation. In these circumstances—and Defendants having undisputedly given Plaintiff the requisite 90-day notice, (Doc. 155 at 1; Doc. 420 at 12)—VARA's building exception provides that Plaintiff's rights of integrity do not apply to the intended removal. 17 U.S.C. § 113(d)(2). Accordingly, the Court will grant Defendants summary judgment on Plaintiff's claims for injunctive relief barring the removal of ISQ from the HoER based on her VARA integrity rights.[28]

---

[28] The Court is aware that, in a text message, Plaintiff stated that she "may have to" remove ISQ from the HoER. (Doc. 500-1 at 4.) Likewise, the Court is aware of Plaintiff's testimony that she "absolutely" "intend[ed] for ISQ to have a life of its own … in other venues[.]" (Doc. 372-3 at 4-5; Doc. 420-2 at 2.) One could certainly argue, as Defendants do, that this evidence shows that Plaintiff believes ISQ can be safely removed from the HoER. (Doc. 372 at 13-14; Doc. 500.) However, this evidence does not conclusively establish the point, because the text message does not expressly address the effects removal would have, and the testimony does not clearly indicate whether "ISQ," in this context, refers to the version of ISQ installed in the HoER or rather to the overall "art/education/entertainment platform" of the same name. (Doc. 420-1 at 1.) The Court therefore does not rely on this evidence in granting Defendants' Summary Judgment Motion.

In light of the Court's ruling, it appears that Defendant MWI would ordinarily be entitled to remove ISQ without further delay. *Id*. However, pursuant to the parties' stipulation, Defendant has agreed not to remove the work until after this litigation is resolved, and to give Plaintiff until 30 days after such resolution to remove it at her own expense. (Doc. 155.)

    c.   Plaintiff's claims for damages based on her VARA integrity rights are not ripe.

In reliance on her VARA integrity rights, Plaintiff seeks not only injunctive relief barring Defendants from removing ISQ from the HoER, but also damages arising from Defendants' alleged "distortion, mutilation, or other modification of her works in a way prejudicial to her honor and reputation." (Doc. 148 at 25.) Defendants argue that they are entitled to summary judgment on these claims because "ISQ has not been moved or harmed in any way," and therefore, Plaintiff's request for damages is not ripe for adjudication. (Doc. 372 at 20; Doc. 437 at 15–16.) Plaintiff counters that her claims are ripe because "[o]ne does not have to await the consummation of threatened injury to obtain preventive relief. If the injury is certainly impending, that is enough." (Doc. 420 at 13-14.) Notably, Plaintiff does *not* argue or present any evidence to show that, to date, Defendants have moved the version of ISQ installed in the HoER or harmed it in any way. (*See generally id.*)

"The ripeness doctrine stems from the 'cases and controversies' requirement in Article III" of the United States Constitution and "reflects important prudential limitations on a court's exercise of jurisdiction." *Salt Lake Trib. Publ'g Co., LLC v. Mgmt. Plan., Inc.*, 454 F.3d 1128, 1140 (10th Cir. 2006) (quotation marks omitted) ("*Salt Lake*"). "[R]ipeness is a justiciability doctrine designed to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements." *Morgan v. McCotter*, 365 F.3d 882, 890 (10th Cir. 2004). In determining whether a particular claim is ripe for review, courts in this circuit must

"evaluate both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Salt Lake*, 454 F.3d at 1140. The fitness inquiry asks "whether the case involves uncertain or contingent future events that may not occur as anticipated, or indeed may not occur at all," while the hardship inquiry asks "whether the challenged action creates a direct and immediate dilemma for the parties." *Id.*

Here, both of the *Salt Lake* inquiries indicate that Plaintiff's damages claims based on her VARA integrity rights are not ripe. As to the fitness inquiry, it is undisputed that the claims "involve[] uncertain or contingent future events that may not occur as anticipated, or indeed may not occur at all." *Id.* It is of course possible that Defendants could one day prejudicially modify or destroy ISQ in a way that violates Plaintiff's integrity rights under VARA, *e.g.*, by prejudicially damaging the work through gross negligence while it remains on the premises. 17 U.S.C. § 106A(c). But any such harm is wholly contingent on events that may or may not occur, which renders Plaintiff's claims for damages based on the harm unripe—and, not incidentally, wholly unsupported—at this juncture. *See Baird v. Town of Normal*, No. 19-cv-1141, 2020 WL 234622, at *3 (C.D. Ill. Jan. 15, 2020) (holding that request for damages was "clearly unripe" where damages were contingent on anticipated destruction or improper redisplay of VARA-protected work).

As to the hardship inquiry, in turn, "the challenged action," *Salt Lake*, 454 F.3d at 1140, which appears to be Defendants' past threats to remove ISQ from the HoER, no longer creates any dilemma for the parties, because they have since stipulated that Defendants will not follow through with these threats until after this litigation, including any appeals, is over. (Doc. 155.) Thus, the fitness and hardship inquiries both indicate that Plaintiff's claims for damages based on her VARA integrity rights are not ripe for review.

The authority Plaintiff cites in her response to Defendants' motion is not to the contrary. That authority holds that the ripeness doctrine does not bar a party from seeking "preventive relief" for "[i]mpending injury." (Doc. 420 at 13-14 (citing *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 201 (1983)).) But to state the obvious, damages are not preventive, *i.e.*, they do not *prevent* an impending wrong; rather, they serve to remedy a wrong that has already occurred.[29] The Court will therefore grant Defendants summary judgment on Plaintiff's claims for damages based her VARA integrity rights.

### III. <u>Conclusion</u>

For the reasons set forth above, IT IS HEREBY ORDERED as follows:

1.  Defendants' Motion for *In Camera* Review (Doc. 375) is GRANTED IN PART and DENIED IN PART. Defendants' request for *in camera* review of Plaintiff's counsel's November 2019 Letter is granted, but Defendants' request for a ruling that the Letter is admissible for the proffered purpose is denied, as is their request for the Court to consider the Letter in ruling on their Summary Judgment Motion;

2.  The portion of Defendants' Unopposed Motion to File Exhibits Under Seal (Doc. 370) seeking leave to file Exhibit A to their Motion for Review under seal is GRANTED, as is Defendants' Unopposed Motion to File Exhibit B Under Seal (Doc. 373). Exhibits A and B to Defendants' Motion for *In Camera* Review (Docs. 375-1, 375-2) shall remain permanently under seal unless otherwise ordered by the Court;

3.   Defendants' Motion for Leave to Supplement the Record with New Evidence Relevant to Defendants' Motion for Summary Judgment Dismissing Plaintiff's VARA Claim (Doc. 500)

---

[29] Also, in light of the Court's ruling in Section II.B.3.b., *supra*, the threatened removal of ISQ from the HoER is not a legally cognizable injury, provided Defendant MWI abides by the conditions of removal to which the parties have stipulated.

is GRANTED, and the record is hereby supplemented in accordance with this Memorandum Opinion and Order; and,

4. Defendants' Motion for Partial Summary Judgment Dismissing Plaintiff's Claim of Violation of the Visual Artist Rights Act (Doc. 372) is GRANTED, and the VARA claims in Plaintiff's amended complaint (Doc. 148) are hereby DISMISSED WITH PREJUDICE.

IT IS SO ORDERED.

_____
KIRTAN KHALSA
UNITED STATES MAGISTRATE JUDGE
Presiding by Consent