IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

LAUREN ADELE OLIVER,

     Plaintiff,

v.                                                            Civ. No. 20-237 KK/SCY

MEOW WOLF, INC., *et al.,*

     Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

THIS MATTER is before the Court on Plaintiff's Motion for Partial Summary Judgment (Doc. 393), filed April 29, 2022. The Court, having reviewed the parties' submissions, the record, and the relevant law, and being otherwise sufficiently advised, FINDS that the motion is not well-taken and should be DENIED.

## I.  <u>Relevant Procedural History</u>[1]

The parties' disputes in this matter arise out of Plaintiff's installation of a work of art called Ice Station Quellette ("ISQ") in a permanent exhibition in Santa Fe, New Mexico, called the House of Eternal Return ("HoER"). (Docs. 148, 183.) Defendant Meow Wolf, Inc. ("MWI") currently operates the HoER, and Defendant Vince Kadlubek was formerly its CEO. (*Id.*; Doc. 348-3 at 2.) Plaintiff filed her original complaint against Defendants on March 16, 2020, asserting claims for breach of contract as well as other federal and state law claims. (Doc. 1 at 1-2, 15-21.) On June 1, 2021, Plaintiff filed an amended complaint that includes additional state law claims and factual allegations. (Doc. 148.) Defendant MWI then filed a declaratory judgment counterclaim on July

---

[1] The parties are familiar with this matter's factual background, which the Court has described in prior orders and will not repeat here. (*See* Doc. 59 at 1-4, Doc. 135 at 1-4, Doc. 325 at 1-3, *and* Doc. 499 at 2-6.)

6, 2021, admitting that it entered into a contract with Plaintiff but asserting substantially different contractual terms. (Doc. 183.)

On April 19, 2022, Defendants filed a motion seeking summary judgment on, *inter alia*, Plaintiff's and Defendant MWI's competing contractual claims. (Doc. 362 at 1, 16-26, 31-32.) Plaintiff, in turn, filed the motion presently before the Court on April 29, 2022, seeking summary judgment on Defendant MWI's contractual counterclaim. (Doc. 393.) Both sides' motions were fully briefed by September 12, 2022. (Docs. 414, 421, 426, 432, 486-1; Doc. 499 at 13-14, 42.)

On March 28, 2023, the Court issued a Memorandum Opinion and Order ("March 2023 Order") on Defendants' motion for summary judgment on the parties' respective contractual claims. (Doc. 540.) In its March 2023 Order, the Court granted Defendants summary judgment on Plaintiff's breach of contract claims, (*id.* at 17-23, 42-43), but denied their request for summary judgment on Defendant MWI's counterclaim. (*Id.* at 23-27, 42-43.)

## II.  <u>Analysis</u>

### A.  **Legal Standards Governing Summary Judgment**

"Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Jones v. Kodak Med. Assistance Plan*, 169 F.3d 1287, 1291 (10th Cir. 1999) (quotation marks omitted); Fed. R. Civ. P. 56(a). "A dispute is genuine when the evidence is such that a reasonable [factfinder] could return a verdict for the nonmoving party, and a fact is material when it might affect the outcome of the suit under the governing substantive law." *Bird v. W. Valley City*, 832 F.3d 1188, 1199 (10th Cir. 2016) (quotation marks and brackets omitted). Only material factual disputes preclude the entry of summary judgment. *Atl. Richfield Co. v. Farm Credit Bank*

*of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000). If the nonmovant demonstrates a genuine dispute as to material facts, the Court views the facts in the light most favorable to the nonmovant. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009). However, the Court will not draw "unreasonable inferences that are unsupported by the record." *Est. of Redd ex rel. Redd v. Love*, 848 F.3d 899, 906 (10th Cir. 2017); *Wellington v. Daza*, No. 21-2052, 2022 WL 3041100, at *2 (10th Cir. Aug. 2, 2022), *cert. denied*, 143 S. Ct. 788 (2023).

A summary judgment movant bears the initial burden of demonstrating the absence of a genuine issue of material fact and its entitlement to a judgment as a matter of law. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir. 1998). When the nonmovant would bear the burden of proof at trial, the movant may meet its initial summary judgment burden by submitting "affirmative evidence that negates an essential element of the nonmoving party's claim" or by demonstrating "that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *Tesone v. Empire Mktg. Strategies*, 942 F.3d 979, 994 (10th Cir. 2019). If the movant meets this initial burden, "the burden then shifts to the nonmovant," *id.*, who must "go beyond the pleadings and set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant … by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 671 (quotation marks omitted).

**B.    Material Facts**

The following facts are not genuinely disputed for purposes of the present motion, except as specifically noted. The Meow Wolf artist collective began in 2008 but, except for a "Meow Wolf" non-profit corporation organized by Defendant Kadlubek and two others in February 2008

and revoked in June 2008,[2] it was not associated with a "formed legal entity" until the organization

of Meow Wolf, LLC ("MW LLC"). (Doc. 298-1 at 3; Doc. 330-3 at 3; *see also* Doc. 297 at 2.)

The parties have not identified any evidence indicating how many artists were members of the

collective at any given time or how they were selected. (Docs. 393, 414, 426; *see also* Doc. 278-4

at 24 ("Plaintiff's understanding is that the membership in the collective changed over time.").)

MW LLC was formed in September 2011.[3] This company was funded with the proceeds

of an art show by the Meow Wolf artist collective in which Plaintiff did not participate. (Doc. 278-

4 at 8, 20-21, 23-24; Doc. 298-1 at 4-5; Doc. 298-18 at 2.) An unexecuted operating agreement

lists Defendant Kadlubek, Matt King, Corvas Brinkerhoff, Emily Montoya, and Caity Kennedy as

the company's founding members. (Doc. 298-7 at 2, 3, 15.) However, Defendant Kadlubek

testified that the collective elected him as the company's sole member. (Doc. 298-6 at 3-5.)

VCMSE Art City, LLC ("Art City") was formed in October 2014.[4] Art City did business

as "Meow Wolf" and its stated purpose was "to open and operate art centers in Santa Fe, New

Mexico and possibly in other locations." (Doc. 298-11 at 2.) On January 15, 2015, Art City

obtained a taxpayer identification number from the New Mexico Taxation and Revenue

Department. (Doc. 412-1 at 1.) The company originally had six equity holders, *i.e.*, Defendant

---

[2] The Court takes judicial notice of the founders of the Meow Wolf nonprofit corporation, and when the entity was formed and revoked; this information is listed on the New Mexico Secretary of State's ("NM SOS") website at: https://portal.sos.state.nm.us/BFS/online/CorporationBusinessSearch/CorporationBusinessInformation (last accessed Sept. 5, 2023). *See* Fed. R. Evid. 201(b) (courts "may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned").

[3] The Court takes judicial notice of MW LLC's formation date, which is listed on the NM SOS website identified in footnote 2, *supra*.

[4] The Court takes judicial notice of Art City's formation date, which is listed on the NM SOS website identified in footnote 2, *supra*.

Kadlubek, Mr. King, Mr. Brinkerhoff, Ms. Montoya, Ms. Kennedy, and Sean Di Ianni.[5] (Doc. 362-8 at 2.) Its January 2015 Operating Agreement designated Defendant Kadlubek as its initial CEO. (Doc. 298-11 at 2, 5.)

About a year before construction on the HoER began, Defendant Kadlubek presented a slide deck at an "artists call meeting" of more than 50 people. (Doc. 330-2 at 2, 5-7; Doc. 330-3.) The slide deck concerned "the first permanent Meow Wolf experience," *i.e.*, the HoER. (Doc. 330-3 at 2.) One of the slides in the slide deck identified "Meow Wolf" as an "arts and entertainment production company," for which it provided the following "back story":

> Originally organized as an informal art collective in 2008 by a small group of dedicated Santa Fe artists, Meow Wolf has created 22 fully-immersive exhibits in 8 different cities …. In preparation for the first permanent exhibition, Meow Wolf organized as an LLC in 2014 with 6 equity partners:  Vince Kadlubek, Sean Di Ianni, Matt King, Emily Montoya, Caity Kennedy, and Corvas Brinkerhoff.[6]

(*Id.* at 3.) On January 29, 2015, Defendant Kadlubek e-mailed a "press packet" that included the same back story to local, regional, and national media contacts. (Doc. 330-4 at 1-2; *see* Doc. 330 at 5.)

Meanwhile, on January 27, 2015, Ms. Kennedy e-mailed Plaintiff from "caity@meowwolf.com," inviting her to "submit a proposal to this colossal project we're working on." (Doc. 421-4 at 2.) In February and March 2015, Plaintiff and Ms. Kennedy exchanged e-mails

---

[5] Art City subsequently added six other equity holders, *i.e.*, David Kantor, Damian Taggart, Mark Di Ianni, Kathy Di Ianni, Mat Crimmins, and Stewart Alsop. (Doc. 362-8 at 2.)

[6] As already noted, Art City was organized in 2014, while MW LLC was organized in 2011. Also, Sean Di Ianni was a founding member of Art City but not of MW LLC. (*Compare* Doc. 298-6 at 3-5 *and* Doc. 298-7 at 2, 3, 15 *with* Doc. 298-11 at 2 *and* Doc. 362-8 at 2.) It thus appears that the company to which this slide referred was Art City. (Doc. 330-3 at 3.) Plaintiff argues that the witness testimony cited by Defendants "does not establish that the cited portion of the 'slide deck' was presented at the [artists call] meeting," because the witness testified that she did not believe she had "noticed" it at the meeting. (Doc. 426 at 10; *see* Doc. 330-2 at 2, 5-7; Doc. 426-3 at 3.) However, viewed in Defendants' favor, the cited testimony would allow a rational juror to conclude that the pertinent slide was presented at the meeting along with the rest of the slide deck and therefore creates a genuine issue of material fact on this point. *See Ricci*, 557 U.S. at 586.

regarding the proposal, which Plaintiff submitted on or about February 11, 2015. (Doc. 391-3; *see also* Doc. 278-4 at 21 ("In early 2015, Caity Kennedy reached out and asked Plaintiff to submit a proposal" for the HoER, "which Plaintiff ultimately did.").)

Defendant Kadlubek signed an agreement between Comcast Business and MW LLC for internet service on March 22, 2015. (Doc. 486-1 at 16-18.)

On April 2, 2015, Defendant Kadlubek sent Plaintiff an e-mail from "vince@meowwolf.com" entitled "Meow Terms," (Doc. 278-1) ("Meow Terms e-mail"), which stated:

> Hello! Writing to you today to talk about the contractual terms for your involvement in the Meow Wolf project.
>
> Your project(s) are to be completed by September 1st. We have $1000 allocated for your personal stipend to complete the project(s). You will be paid $250 twice a month from July until September, for a total of $1000. In addition, we want to offer you $10,00 [sic] of revenue share stipend, which we can go over in more depth when we meet.
>
> We will also be purchasing all the materials agreed upon for your project.
>
> I hope this amount works for you. Please let me know if you have any questions or concerns before I send over the contract. I am available to speak over the phone … or in person as well.
>
> It is important to note that you retain all intellectual property rights for your pieces and can sell reproductions, or images. Meow Wolf will own the actual pieces of work that you supply to the exhibit.
>
> Thanks! Excited to work with you!
>
> vince

(*Id.* at 1-2.)

Plaintiff responded to the Meow Terms e-mail on April 8, 2015, with five words:  "Hey. Awesome. Good luck tonight." (*Id.*) On April 22, 2015, she e-mailed Defendant Kadlubek again,

stating, among other things, "I'm not sure I actually have a contract yet – I thought you sent, and I can't find it." (Doc. 166-11 at 1.)

On April 27, 2015, Defendant Kadlubek e-mailed Plaintiff and 37 others regarding "Meow Wolf Meeting (Contracts, Please Attend)." (Doc. 132-11 at 1.) In this message, Defendant Kadlubek wrote that he had "sent out preliminary numbers to most people, and most people should have been communicating with Caity along the way." (*Id.*) He then called a meeting for May 6, which he described as "pretty close to mandatory – as I want to go over some logistical things with everyone, hand everyone their contract, and get things clarified." (*Id.*) However, by April 2015, Plaintiff had stopped using the e-mail account to which Defendant Kadlubek sent this message, because it had been compromised. (Doc. 170-14 at 1; Doc. 421-5 at 15-17.) The account sent Defendant Kadlubek an auto-response with the subject line, "I'm suspending this email," stating, "[p]lease remove this email address from your contact list. Thanks to hackers, I am no longer using it. If you receive an email from this address, do not open it! Please contact me through other means to get my new email contact." (Doc. 170-14 at 1.)

Ms. Kennedy declared under penalty of perjury that Plaintiff was in a group of artists for which she, as a "director," was responsible. (Doc. 132-12 at 1.) Ms. Kennedy further declared:

> Many participating artists attended the May 6, 2015 meeting. We gave these artists their paper contracts for them to sign at the meeting or take home to consider. After the meeting, I worked very hard to deliver the remaining contracts to artists who had not been at the meeting…. [Plaintiff] was in Santa Fe in May 2015 and during the period of building [the] HoER, and although it was difficult to communicate with her – she used multiple email addresses and could be hard to come to an understanding with, I do recall looking at her contract with her. I do not recall if she signed it then or took it with her to review, but I do not recall having any contracts for artists in my group that I did not deliver to the artist.

(Doc. 132-12 at 2.) Plaintiff, conversely, testified that she "asked for a contract and never received one." (Doc. 278-5 at 14; Doc. 298-18 at 3.) Manager Kate Lesta testified that before the HoER

opened, she was "discouraged from putting agreements with artists into contracts" if the artists did not already have them, "because the terms would change."[7] (Doc. 377 at 7; Doc. 377-12 at 4-5, 9.)

The record includes two complete independent contractor agreements between Art City and artists for the installation of artwork in the HoER. (Doc. 296-3; Doc. 377-16.) The agreement prepared for Drew Lenihan bears his signature but lacks the signature of an Art City representative[8]; the agreement prepared for Liberty Yablon is unsigned. (Doc. 296-3 at 4-5; Doc. 377-16 at 5-6.) The agreements are undated; however, attached and referenced exhibits state that all artwork was to be fully installed by August 31, 2015, and that the artists were to be paid in installments from June or July to August 2015. (Doc. 296-3 at 6-7; Doc. 377-16 at 7-8.)

The agreements include a "Work for Hire" provision stating that: (a) the subject works of art were to be "work[s] made for hire" under the Copyright Act[9]; and, (b) if the works were ever found not to be works made for hire, the artists would "assign[] to Meow Wolf all right, title and interest therein, including all copyrights"; but, (c) the artists were granted non-exclusive,

---

[7] Plaintiff contends that Ms. Kennedy's declaration is "self-serving" and "belied by the record" and therefore "not competent evidence." (Doc. 426 at 4-5.) In support, Plaintiff cites Ms. Lesta's testimony, a June 3, 2016 e-mail from Ms. Kennedy to artist Brian Hart stating, "[w]e still have several people that need contracts, that got missed in the whirlwind," (Doc. 377-11 at 2), and a 2019 spreadsheet indicating that numerous artist contracts (including Plaintiff's) could not be found, (Doc. 421 at 33; Doc. 421-17 at 2). (Doc. 426 at 4-5.) However, as the Court has previously explained, (Doc. 540 at 7-8 n.8), none of this evidence undermines Ms. Kennedy's declaration so conclusively as to make it incompetent evidence. First, Ms. Kennedy indicated that "directors" like herself (as opposed to managers like Ms. Lesta) were responsible for delivering contracts to artists in their respective groups. (Doc. 132-12 at 1.) Second, although Ms. Kennedy declared that she did not recall failing to deliver contracts to any artists in *her* group, (*id.* at 1-2), the artists "that got missed in the whirlwind," (Doc. 377-11 at 2), could have been in another director's group. And third, the fact that numerous artist contracts could not be found in 2019 does not necessarily indicate that such contracts were not delivered in 2015. That is certainly one possibility, but there are other possibilities as well, *e.g.*, that they were later lost, or delivered but not returned.

[8] Mr. Lenihan signed the agreement on the line designated for the signature of Art City's representative. (Doc. 296-3 at 4-5.)

[9] Under the Copyright Act, a "work made for hire" includes "a work specially ordered or commissioned for use as a contribution to a collective work … if the parties expressly agree in a written instrument signed by them that the work shall be considered a work made for hire." 17 U.S.C. § 101. The person or entity for whom a work made for hire was prepared "is considered the author" of the work "and, unless the parties have expressly agreed otherwise in a written instrument signed by them, owns all of the rights comprised in the copyright." 17 U.S.C. § 201(b).

irrevocable, perpetual licenses to publish images of their works. (Doc. 296-3 at 2; Doc. 377-16 at 3.) The exhibits, in turn, provide that the artists would "be awarded an annual revenue-based bonus payment … if Meow Wolf Revenues exceed $1.2M annually," that these payments would be made from 11 per cent of annual revenues in excess of $1.2 million distributed equally among all recipients, and that each artist's aggregate payments would not exceed his or her "[c]ap," which was handwritten into the exhibits. (Doc. 296-3 at 8; Doc. 377-16 at 9.)

The record also includes 31 first pages of independent contractor agreements hand-labeled with other artists' names. (Doc. 414-1.) Like the agreements addressed to Mr. Lenihan and Ms. Yablon, these documents identify Art City as the entity purporting to contract with artists. (*Id.*) The record includes no pre-opening contracts or portions of contracts between an artist and an entity other than Art City to install artwork in the HoER.[10] The contracts handed out at the May 6, 2015 meeting and later delivered to artists by Ms. Kennedy "were identical, with blanks for the names of the artists and their compensation numbers," which were "filled in by hand … before the meeting." (Doc. 132-12 at 1.) If Plaintiff received a written contract before the HoER opened, as Ms. Kennedy declared she did, (*id.* at 2), it "would have shown that [Art City] was contracting with her." (Doc. 377-4 at 6-7.) But Plaintiff has declared under penalty of perjury that she did not receive a written contract, did not know she was dealing with Art City, and would not have participated in the HoER if she had. (Doc. 298-18 at 3-4.)

On June 25, 2015, Megan Roniger e-mailed Plaintiff from "admin@meowwolf.com" to

---

[10] In her motion, Plaintiff cites to Jared Nicholson's testimony that, "in negotiating or confirming [his] contractual relations with Meow Wolf, the only [LLC] that [Defendant Kadlubek] would use or mention would be [MW LLC]." (Doc. 298-17 at 3; Doc. 393 at 4.) However, Plaintiff fails to present any evidence or argument that Mr. Nicholson was negotiating with Defendant Kadlubek as an artist to install artwork in the HoER. (Doc. 393 at 4.) And there is other record evidence that Mr. Nicholson was negotiating with Defendant Kadlubek as an inventor to sell a sculpting medium called "Skratch." (*See, e.g.*, Doc. 298-13 to Doc. 298-16.) As such, on the present record, Mr. Nicholson's testimony does not tend to show the existence of a pre-opening contract between an artist and an entity other than Art City to install artwork in the HoER.

ask if Plaintiff would agree to "shift artist fees from biweekly payments" to "either one payment upon completion, or half at beginning of install, half upon completion," with the single or second payment "issued within 30 days of opening the exhibition." (Doc. 421-12 at 2-3.) Plaintiff responded on July 7, 2015, stating, "don't worry about me re: pay schedules, I'll go with whatever works best for MW." (*Id.* at 2.)

On August 11, 2015, the City of Santa Fe issued a business license to MW LLC. (Doc. 377-3 at 2.) The city has no record of issuing a business license to Art City. (Doc. 352-1 at 15-16.) Between September 16, 2015 and November 13, 2015, the city and MW LLC executed an agreement pursuant to which the city agreed to pay MW LLC $60,000 for developing, *inter alia*, "an interactive, family[-]oriented attraction." (Doc. 298-2 at 4, 5, 15.) Defendant Kadlubek signed the agreement as MW LLC's CEO. (*Id.* at 15.) On the fully executed agreement, the state taxpayer identification number for MW LLC is partially redacted, but what is visible matches the full number on a partially executed version of the agreement, which in turn matches Art City's taxpayer identification number. (Doc. 288-1 at 31; Doc. 298-2 at 15; Doc. 412-1 at 1.) Before the agreement was executed, Defendant Kadlubek e-mailed a city employee to send "CRS & EIN,"[11] and also wrote, "[b]y the way, we are VCMSE Art City, dba Meow Wolf." (Doc. 296-4 at 1.)

In September 2015, Sean Di Ianni wrote a letter indicating that MW LLC agreed to pay a named builder "for all bills … related to the construction of" the HoER. (Doc. 377-13 at 2.) Also, this builder addressed a July 2015 estimate and a November 2015 statement to MW LLC. (Doc. 486-1 at 26; Doc. 495-2 at 2.)

---

[11] The Court takes judicial notice that the New Mexico Taxation and Revenue Department now refers to "CRS" numbers as Business Tax Identification Numbers. https://tap.state.nm.us/TAP/, under "FAQs," "CRS Redesign" (last accessed Sept. 5, 2023).

Before November 2015, Art City generated a "Business Line of Credit Application Package" to seek funding for the HoER. (Doc. 298-23 at 2-4.) Also, on January 5, 2016, Art City generated a "Disclosure Document" for "Potential Investors" to pursue investment in the HoER. (Doc. 362-10 at 1-2.) Among other things, the Disclosure Document explained that Art City "intend[ed] to set aside 20% of total revenues in excess of $1.2 million annually for payments to investors and artists. Artists will receive 11% of revenues up to a cumulative cap of $1 million." (*Id.* at 5.)

Meanwhile, in the summer and fall of 2015, Plaintiff designed a version of ISQ to be installed in the HoER. (Doc. 278-4 at 11, 18.) She also went to "All Shrimps" meetings. (Doc. 362-7 at 8, 11.) "All Shrimps" meetings were held "every week to every month … as needed," and were with "everyone altogether," rather than specific teams or groups. (Doc. 362-1 at 8.) In her interrogatory answers, Plaintiff attested that after she began regularly attending "Meow Wolf"[12] meetings, "it became clear" that the HoER would be "a more complex project" than she had anticipated. (Doc. 278-4 at 8-9.) Plaintiff further attested it was "clear to [her]" that "her exchange with [Defendant] Kadlubek in April [2015] was a preliminary foray, which had been replaced by a new compensation model being outlined at [sic] by [Defendant] Kadlubek's [sic] at the meetings." (*Id.* at 8.) However, at her deposition, Plaintiff testified that by the time she attended "All Shrimps" meetings, she had "dismissed" and "completely forgot[ten] about" the Meow Terms e-mail. (Doc. 421-6 at 26-27.)

Before the end of 2015, managers of the HoER had an "ongoing conversation" about which artists had signed contracts and which had not. (Doc. 377-15 at 3-4.) In this context, Defendant

---

[12] Both sides often refer to "Meow Wolf" generically in documents they have filed in this matter, and when the Court discusses such references herein, it puts them in quotation marks because there are multiple entities to which "Meow Wolf" could refer.

Kadlubek testified that he recalled "having difficulty with [Plaintiff] specifically of this being in this ambiguous zone and, you know, [Plaintiff]—the question was [sic] for us was does [Plaintiff] understand what the relationship is here and is she on board with where the payments are going." (*Id.* at 4.)

Plaintiff "worked on-site from January 2 to the March 16[, 2016] opening" of the HoER to complete her installation of ISQ. (Doc. 278-4 at 11, 18; Doc. 278-5 at 9.) "Meow Wolf" "bought much of the materials" Plaintiff used, but she "spent a lot of [her] own money on it," as well. (Doc. 377-7 at 11; Doc. 421-5 at 12.) Reimbursements for materials were "written out with a[n Art City] checking account."[13] (Doc. 414-2 at 2.)

Plaintiff has presented evidence that "Meow Wolf" gave her a $1,000 "labor budget." (Doc. 278-5 at 8, 10; Doc. 377-7 at 6-11.) Defendants, however, take the position that this $1,000 was the personal stipend Defendant Kadlubek offered Plaintiff in the Meow Terms e-mail. (Doc. 362 at 13, 17.) Although they present no evidence in direct support, the amount of the payment matches the amount of the personal stipend referenced in the Meow Terms e-mail. (Doc. 278-1 at 1; Doc. 278-5 at 8, 10; Doc. 362 at 13, 17; Doc. 377-7 at 6-11.) Also, the timing of it appears to be consistent with the modified "payment schedule" for "artist fees" that Ms. Roniger proposed and to which Plaintiff agreed. (*See* Doc. 377-7 at 6-11; Doc. 421-12 at 2-3.) Plaintiff directed the $1,000 in question to be paid to Carey Cluett, who spent over two months helping her to install ISQ. (Doc. 278-5 at 8, 10; Doc. 377-7 at 6-11.) At no time was Plaintiff a "Meow Wolf" employee. (Doc. 278-5 at 3.)

---

[13] Relatedly, a Rule 30(b)(6) representative for Defendant MWI testified that "[w]hen we went and bought materials, it was with a[n Art City] debit card." (Doc. 414-2 at 2.) However, the excerpted testimony does not indicate to whom the pronoun "we" was meant to refer. (*See id.*) Further, Plaintiff testified that although Ms. Lesta "offered to send [her] to Home Depot with a card," she "did not have time to go through the head office." (Doc. 278-5 at 10.)

On April 30, 2016, shortly after the HoER opened, Drew Tulchin[14] e-mailed Defendant Kadlubek asking for "details" about "the revenue share for … artists." (Doc. 486-1 at 10.) In response, Defendant Kadlubek wrote, "[w]e do not have any set contracts or documentation for artists other than a revenue share will occur. Amounts are specified to be determined within 90 days after opening the show." (*Id.*) Similarly, on June 1, 2016, Mr. Di Ianni e-mailed an accountant, stating that

> the revenue share program [is] essentially a verbal commitment to artists to pay out a portion of our revenue to artists after we reach a certain revenue trigger. We have put this in writing for only a handful of our fabrication team as an exhibit to a letter of engagement. With the rest of the artists we only had verbal communications about it.

(*Id.* at 12.)

Pursuant to an arrangement with the HoER's gift shop, Plaintiff brought in items, the gift shop sold them, and "Meow Wolf" sent her checks "based on what they sold … after subtracting their cut," which shifted over time from 20 to 40 percent. (Doc. 278-4 at 5, 33; Doc. 362-7 at 2-4; Doc. 389-2 at 2.) In April and May 2016, Art City issued checks to Plaintiff for gift shop sales, which checks were subsequently cashed. (Doc. 412-2 at 6.) Although Plaintiff argues that she "is unaware of having received checks from [Art City] in 2016," she cites to no evidence to support this argument, nor does she present any evidence that the checks were cashed by someone else, or that she either objected to receiving checks from Art City or requested clarification about the entity at that time. (Doc. 426 at 7.)

In July 2016, Ms. Montoya sent Plaintiff a proposed Artist Consignment Agreement regarding gift shop sales. (Doc. 412-2 at 1-5.) The parties to the proposed agreement were Plaintiff and Art City. (*Id.* at 2.) Ms. Montoya sent this e-mail from "emily@meowwolf.com" to Plaintiff's

---

[14] Mr. Tulchin's signature block around this time indicates that he was working for "UpSpring (formerly Social Enterprise Associates)." (Doc. 486-1 at 14.)

13

"correct e-mail" and Plaintiff admits she "probably" read it. (Doc. 362-7 at 2; Doc. 412-2 at 1.) Although Plaintiff "probably" did not sign the agreement, (Doc. 362-7 at 2-4), she continued to sell ISQ-themed items in the gift shop through at least June 2019. (Doc. 278-4 at 5, 33; Doc. 330-6 at 1-3; Doc. 362-11.)

Defendant MWI was organized as a Delaware public benefit corporation on November 28, 2016. (Doc. 298-4 at 2; Doc. 305-1.) On or about December 29, 2016, Art City merged into Defendant MWI, with Defendant MWI as the sole survivor. (Doc. 298-4 at 2.) MW LLC, in turn, dissolved on January 5, 2017.[15] (Doc. 298-3 at 2.)

On March 17, 2017, Defendant Kadlubek sent another message to the e-mail account Plaintiff had stopped using, stating, "we will be rewarding you with a $7,000 revenue share for your work on HOER. Please read the documents and sign." (Doc. 362-6 at 1; Doc. 421-5 at 15.) "[T]he documents" were a "Meow Wolf Artist Bonus Program Description" and "Meow Wolf Artist Bonus Program Agreement," both dated February 16, 2017. (Doc. 362-6 at 2-4.) These documents identified "Meow Wolf" as Defendant MWI, "formerly" Art City. (*Id.*) The agreement was prepared for Plaintiff's signature and signed by Defendant Kadlubek. (*Id.*)

Among other things, the documents attached to this e-mail indicated that payments under the Artist Bonus Program ("ABP") would be made according to a specified formula based on the HoER's annual "Adapted Net Income," with the aggregate amount paid to all participants capped at $1,046,500. (*Id.* at 3.) They further explained that payments would be made "on an equal basis"

---

[15] Although MW LLC indisputably dissolved in January 2017, the Court notes that in a May 2017 e-mail to a bank officer, Defendant Kadlubek wrote that an "operating company … operate[s] Meow Wolf LLC which is projected to profit $2M this year," while an unidentified "parent company … include[s] all admin, financial, marketing, and development teams," as well as "artist, fabrication, entertainment, and tech teams." (Doc. 486-1 at 20-21.) Also, a November 2017 "Expensify" report regarding an invoice for Plaintiff's gift shop sales lists MW LLC as the "Report Policy." (Doc. 426-1 at 1.)

to each participant, up to that participant's "maximum amount possible" as stated in the participant's ABP agreement. (*Id.*) The documents also indicated that "Artist Bonus Payments" would be made "in the absolute and total discretion" of Defendant MWI and that participants acknowledged they were "not entitled to any such payment." (*Id.* at 2, 4.) Plaintiff testified that she did not receive this e-mail or the documents attached to it. (Doc. 421-5 at 15-18.)

An "Artist Bonus Program Spreadsheet" presented by Defendants lists amounts allocated and paid to 112 individuals in 2017 and 2018. (Doc. 278 at 9; Doc. 278-6 at 1-3.) The spreadsheet shows that Defendants allocated $7,000 to Plaintiff and paid her $2,000 in 2017, leaving a remaining balance of $5,000. (*Id.* at 3.)

"MW Santa Fe, LLC" issued Plaintiff a check for $2,502.60 on April 11, 2019. (Doc. 421-13 at 2.) In response to Plaintiff's inquiry, Shana Pedroncelli[16] told Plaintiff that $2,000 of the check was "from 2017" and confirmed Plaintiff's understanding that it was for "the artist revenue thing."[17] (Doc. 330-7 at 1.) Plaintiff cashed the check, though over three years later she returned $2,000, with interest, to "MW Santa Fe, LLC and Meow Wolf, Inc.," writing that she had deposited the check "mistakenly." (Doc. 278-5 at 19-20; Doc. 421-13 at 2; Doc. 421-14 at 2.)

On June 11, 2019, attorney Talia Kosh e-mailed Plaintiff a draft agreement for Defendant MWI to purchase Plaintiff's intellectual property ("IP") rights in the version of ISQ installed in the HoER, as well as "all rights to … remedies for past, current and future infringement" of these IP rights, for $35,000. (Doc. 362-16.) But on August 5, 2019, "Chris" sent Plaintiff an e-mail from invest@meowwolf.com, stating, "[o]ur records indicate that you have an outstanding balance for

---

[16] Ms. Pedroncelli's signature block indicates that her title at the time was "Meow Wolf Accounts Payable Specialist." (Doc. 330-7 at 1.)

[17] The remaining $502.60 was for items sold in the HoER's gift shop. (Doc. 278-5 at 19-20.)

the Artist Bonus Payment of $5,000. Please sign and complete the attached documents and we can prepare a check for you."[18] (Doc. 362-15 at 1.) "[T]he form agreement [Plaintiff] was asked to sign to get this $5,000 included a copyright assignment." (Doc. 362 at 15; Doc. 421 at 26; *see* Doc. 278-5 at 16.)

## C.    Analysis

In the present motion, Plaintiff asks the Court to enter summary judgment in her favor on Defendant MWI's counterclaim, which seeks a judgment declaring that Plaintiff and Defendant MWI entered into a contract governed by the Meow Terms e-mail. (Doc. 183 at 26-27; Doc. 393.) In support, she argues that "the claimed 'contract' … cannot be established as a matter of law" because there is insufficient evidence to show she knew of and assented to form a contract with Defendant MWI's predecessor Art City, and there is no evidence that Defendant MWI has the right to enforce a contract formed with some other entity, such as MW LLC. (Doc. 393 at 1, 8-11; Doc. 426 at 8-12.) In response, Defendant points to evidence that, in its view, objectively shows Plaintiff's knowledge of and assent to form a contract with Art City. (Doc. 414 at 7-17.)

As the Court has previously observed, in general, "to be legally enforceable" under New Mexico law,[19] "a contract must be factually supported by an offer, an acceptance, consideration,

---

[18] A signature line indicates that "Chris" was part of an "Investment Team" at "Meow Wolf." (Doc. 362-15 at 1.)

[19] The parties have stipulated that the substantive law of New Mexico governs the state law claims in this case.  (Doc. 23 at 2); *see also Barnett v. Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C.*, 956 F.3d 1228, 1237 n.2 (10th Cir. 2020) ("[A] federal court applies the substantive law of the forum state . . . when [it] exercises supplemental jurisdiction over state law claims in a federal question lawsuit.") (quotation marks and ellipses omitted).

> When the federal courts are called upon to interpret state law, the federal court must look to rulings of the highest state court, and, if no such rulings exist, must endeavor to predict how that high court would rule. Where a state's highest court has not addressed an issue of law, a starting point … is the decisions of the state's intermediate court of appeals and those decisions are not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise.

*Amparan v. Lake Powell Car Rental Cos.*, 882 F.3d 943, 947–48 (10th Cir. 2018) (citation and quotation marks omitted).  The Court considers Plaintiff's motion in light of these principles.

and mutual assent." *Garcia v. Middle Rio Grande Conservancy Dist.*, 1996-NMSC-029, ¶ 9, 121 N.M. 728, 731, 918 P.2d 7, 10; *Hartbarger v. Frank Paxton Co.*, 1993-NMSC-029, ¶ 7, 115 N.M. 665, 669, 857 P.2d 776, 780; *see also* N.M. U.J.I. 13-801 ("[F]or a promise … to be legally enforceable, there must be an offer, an acceptance, consideration, and mutual assent."). "An offer is a communication of a willingness to enter into a contract," N.M. U.J.I. 13-805, and "[a]n acceptance is a statement or conduct" by the offeree showing the offeree's agreement to the offer's terms. N.M. U.J.I. 13-807. Consideration is any "benefit or advantage" to the offeror, or "any loss or detriment" to the offeree, "which was a reason for [the offeror] to enter into the contract." N.M. U.J.I. 13-814. "Mutual assent requires a showing of agreement by the parties to the material terms of the contract." N.M. U.J.I. 13-816.

"[W]hen the existence of a contract is at issue and the evidence is conflicting or admits of more than one inference, it is for the jury to determine whether the contract did in fact exist." *Atl. Specialty Ins. Co. v. Deans, Inc.*, No. 13-cv-945, 2015 WL 10819158, at *6 (D.N.M. Nov. 3, 2015).

> A jury may find any of the four requirements, even if not expressly stated, in the surrounding circumstances, including the parties' words and actions, what they wanted to accomplish, the way they dealt with each other, and how others in the same circumstances customarily deal with each other.

*Id.* (citing N.M. U.J.I. 13-801).

Plaintiff's motion does not develop any arguments addressing whether a rational juror could find that the Meow Terms e-mail, Plaintiff's affirmative response, and the parties' subsequent conduct evidence a binding contract between Plaintiff and some "Meow Wolf" entity. Plaintiff does make perfunctory remarks to the effect that the e-mail "of course did not" constitute an offer or a contract. (Doc. 393 at 8, 10.) But her motion includes neither argument nor evidence

to support these remarks.[20] (*See generally id.*) Further, in the portion of its March 2023 Order addressing Defendants' motion for summary judgment on the parties' competing contractual claims, the Court specifically noted that a rational juror could find that Plaintiff entered into a legally binding contract governed by the Meow Terms e-mail in light of

> evidence that Plaintiff installed ISQ in the HoER after receiving the Meow Terms e-mail and responding with "[a]wesome," (Doc. 278-1 at 1), that she agreed to a modification of the payment schedule it described, and that Defendants made and she accepted one or more partial payments according to its terms.

(Doc. 540 at 25.) Nothing in Plaintiff's motion persuades the Court to revisit this determination.[21]

The Court turns, then, to Plaintiff's arguments regarding the identity of the entity with which she allegedly contracted. The Court's March 2023 Order also includes discussion relevant to this issue. Specifically, the Court found that "a rational juror could … conclude that Defendant MWI is not legally entitled to enforce any contract arising out of the Meow Terms e-mail" because,

> although Defendants have submitted evidence that the entity on whose behalf Defendant Kadlubek sent the e-mail was Defendant MWI's predecessor, Art City, Plaintiff has submitted evidence that this entity may have been MW LLC…. And Defendants have presented no evidence to show that Defendant MWI ever legally acquired MW LLC's contractual rights and privileges.

---

[20] In her reply, Plaintiff argues that Defendant MWI "has presented no evidence that Plaintiff's installation of [ISQ in the] HoER had anything to do with the 'Meow Terms' email, which she had disregarded and long forgotten." (Doc. 426 at 9.) However, on its face, the Meow Terms e-mail addresses "the contractual terms for [Plaintiff's] involvement in the Meow Wolf project" and, together with Plaintiff's affirmative response and subsequent actions, would allow a rational juror to conclude that Plaintiff installed ISQ in the HoER in reliance on those terms. (Doc. 278-1 at 1-2.) Thus, even if the Court were to consider this argument raised for the first time in Plaintiff's reply, the argument would not support the entry of summary judgment in Plaintiff's favor. *See Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1139 n.13 (10th Cir. 2003) (courts generally do not consider new arguments or evidence presented for the first time in a reply and must either permit a surreply or refrain from relying on the new material).

[21] Of course, as the Court observed in its March 2023 Order, although a rational juror could find that Plaintiff *did* enter into a legally binding contract governed by the Meow Terms e-mail, a rational juror could also find the converse. (Doc. 540 at 24-25.) The evidence described in that Order and in Section II.B., *supra*, "could certainly support findings that Defendants did not intend the Meow Terms e-mail to be an offer, that if it was intended to be an offer Plaintiff did not accept it, and/or that the parties did not mutually agree to be bound by its terms." (*Id.*) But Plaintiff has failed to present evidence that would mandate any of these findings as a matter of law in light of the Meow Terms e-mail, Plaintiff's affirmative response thereto, and the parties' subsequent conduct, at least some of which tracked the e-mail's terms.

(*Id.* at 26.) The Court further noted that,

> although Defendants have presented evidence that Plaintiff knew the entity offering her a contract was Art City, Plaintiff has presented evidence that she did not know this and would not have installed ISQ in the HoER if she had. And Defendants have failed to refute Plaintiff's argument that her unilateral mistake about the identity of the party she was dealing with, if credited, would make the alleged contract on which Defendants rely rescindable, because she has also presented evidence from which one could infer that Defendants knew or should have known of the mistake.

(*Id.* at 26-27 (footnote, quotation marks, bracket, and citation omitted).)

The Court made these findings in the context of Defendant MWI's motion for summary judgment on its counterclaim. (*See generally id.*) As such, the Court viewed the genuinely disputed facts in the light most favorable to Plaintiff, who was then the nonmovant. (*Id.* at 23-27, 43); *Ricci*, 557 U.S. at 586. Here, though, Defendant MWI is the nonmovant, and the Court must view the genuinely disputed facts in the light most favorable to it. Viewed in this light, and for the reasons discussed below, Defendant MWI has presented evidence from which a rational juror could conclude that it is entitled to enforce a contract with Plaintiff arising out of the Meow Terms e-mail, as alleged in its declaratory judgment counterclaim.

First, Defendants have submitted evidence that would allow a rational juror to conclude that Defendant Kadlubek made the alleged offer in the Meow Terms e-mail on behalf of Defendant MWI's predecessor, Art City. For example, there is record evidence that: (1) Ms. Kennedy, one of Art City's founding members, was the individual who originally asked Plaintiff to create an art installation for "this colossal project we're working on," via an e-mail from an "@meowwolf.com" account, (Doc. 421-4 at 2); (2) Defendant Kadlubek, another Art City founding member and its initial CEO, sent the Meow Terms e-mail from an "@meowwolf.com" account; (3) the Meow Terms e-mail referred to "the Meow Wolf project," and used the terms "[w]e" and "Meow Wolf" to identify the party making the proposals therein, (Doc. 278-1 at 1); (4) Art City did business as

"Meow Wolf"; (5) a slide deck and press packet disseminated by Defendant Kadlubek stated that an LLC matching Art City's characteristics was organized in 2014 in preparation for the HoER; (6) Art City obtained a state tax identification number for the HoER and prepared a line of credit application package and investor disclosure document to finance the business; (7) Art City negotiated or contracted with Mr. Lenihan and Ms. Yablon in 2015 to install artwork in the HoER; and, (8) there is no record evidence that any entity other than Art City negotiated or contracted with artists to install artwork in the HoER before it opened.

Defendants have also presented evidence that would allow a rational juror to conclude that, before Plaintiff finished installing ISQ in the HoER in March 2016, she knew the entity offering her a contract was Art City and assented to contract with this entity by completing the installation. Specifically, in addition to the evidence just listed, there is record evidence that before the HoER opened:  (1) Ms. Kennedy gave Plaintiff a paper contract and looked at it with her; (2) Plaintiff either signed the contract or took it with her to review; (3) the paper contracts delivered to artists around this time were identical, with blanks for the artists' names and compensation; and, (4) like the contracts prepared for Mr. Lenihan and Ms. Yablon, the paper contract Plaintiff received "would have shown that [Art City] was contracting with her."[22] (Doc. 377-4 at 6-7.)

In her motion, Plaintiff makes several arguments in opposition to Defendant MWI's counterclaim. First, Plaintiff argues that Ms. Kennedy's declaration does not show Plaintiff was "aware … that she was contracting with [Art City]." (Doc. 426 at 10.) However, a rational juror

---

[22] The parties' subsequent course of dealing also shows that there are genuine, material factual disputes regarding whether Defendant Kadlubek sent the Meow Terms e-mail on behalf of Art City, and whether Plaintiff knew of and agreed to contract with this entity by March 2016. For example, there is evidence tending to show that in April and May 2016, Plaintiff received checks from Art City for HoER gift shop sales yet made no objection to or request for clarification about the entity, which evidence could provide additional support for the inferences that Art City was the entity with which Plaintiff had been dealing, and she knew it was.

could certainly infer from Ms. Kennedy's sworn statements, in combination with the other record evidence just described, that Plaintiff received and read a paper contract identifying Art City as the entity with which she was dealing. Plaintiff also argues that the artist contracts in the record "could not be the 'contract' Plaintiff purportedly entered [into], as it contained a 'work-for-hire' provision Defendants have admitted does not apply to her." (Doc. 426 at 8.) But this argument misses the point. Defendants rely on the artist contracts in the record not to show that Plaintiff signed an identical paper contract, but rather to show a means by which Plaintiff was informed that Art City was the entity contracting with her to install artwork in the HoER.

Plaintiff next argues that she cannot be bound by the contract Defendant MWI alleges because Art City was an "undisclosed principal." (Doc. 426 at 11.) The Court disagrees, for two reasons. First, as just noted, there are genuine factual disputes regarding whether Art City was disclosed to her as the principal for which Defendant Kadlubek was acting. Second, on its face, the Meow Terms e-mail disclosed that Defendant Kadlubek was acting on behalf of "Meow Wolf," which means that his principal was not undisclosed but rather, at most, unidentified.[23] Restatement (Third) Of Agency § 1.04(2)(b), (c) (2006) (principal is "undisclosed" when "third party has no notice that the agent is acting for a principal" but "unidentified" when "third party has notice that the agent is acting for a principal but does not have notice of the principal's identity"); *see Alfaro-Huitron v. Cervantes Agribusiness*, 982 F.3d 1242, 1250 (10th Cir. 2020) ("New Mexico courts have treated … the Restatement (Third) of Agency (2006), as authoritative on various aspects of agency law."). And the mere fact that Art City was unidentified would not deprive it of the right to enforce the contract Defendant Kadlubek allegedly made with Plaintiff while acting as its agent.

---

[23] Defendants do not argue that Defendant Kadlubek's principal was fully disclosed by virtue of having been identified as "Meow Wolf." (*See generally* Doc. 414.) As such, for purposes of the present motion, the Court assumes without deciding that it was not.

*See* Restatement (Third) of Agency § 6.02 & Comment (2006) ("When an agent acting with actual or apparent authority makes a contract on behalf of an unidentified principal, … the principal and the third party are parties to the contract" and generally "have the same rights, liabilities, and defenses against each other as if the principal had made the contract directly[.]").

Of course, as the Court noted in its March 2023 Order, Plaintiff's alleged "unilateral mistake about the identity of the party she was dealing with, *if credited*," could make the alleged contract on which Defendants rely rescindable, "because she has also presented evidence from which one could infer that Defendants knew or should have known of the mistake." (Doc. 540 at 27 (emphasis added) (quotation marks and brackets omitted)); *see Potucek v. Cordeleria Lourdes*, 310 F.2d 527, 532 (10th Cir. 1962) (holding that a contracting party's unilateral mistake as to the identity of the other party "is ground for rescission" where the other party knew or should have known of the mistake); (Doc. 377-15 at 4 (HoER's managers questioned whether Plaintiff understood "what the relationship is here").) But again, there are genuine factual disputes regarding whether Plaintiff actually knew Art City was the entity with which she was dealing, and a rational factfinder could choose to disbelieve the evidence Plaintiff has offered to support rescission or could construe it differently than she does.

Plaintiff also suggests that Defendant Kadlubek cannot have sent the Meow Terms e-mail on Art City's behalf, that she cannot have known he was acting on its behalf, and that it lacked "the legal ability to enter [into] contracts," because it lacked a city business license. (Doc. 393 at 5-6, 10-11; Doc. 426 at 2, 12.) However, Plaintiff offers no authority for the proposition that an entity must have a city business license to be able to make an offer or enter into a legally binding contract. (*See generally* Docs. 393, 426.) In fact, she candidly admits that while "she may have been able to develop an argument that [Art City]'s failure to obtain a business license … was

22

dispositive as to [Defendant's] contract counterclaim," the "volume of briefing Plaintiff has had to address in this case" prevented her from doing so. (Doc. 426 at 12.) And "[a] litigant who fails to press a point by supporting it with pertinent authority, or by showing why it is sound despite a lack of supporting authority or in the face of contrary authority, forfeits the point. The [C]ourt will not do his research for him." *Phillips v. Hillcrest Med. Ctr.*, 244 F.3d 790, 800 n.10 (10th Cir. 2001) (brackets omitted).

Moreover, Plaintiff neither asserts nor offers any evidence to show that, before the HoER opened, she knew Art City lacked a city business license and therefore had reason to believe it was not the entity with which she was dealing. (*See generally* Docs. 393, 426.) Rather, in other briefing, she admits that she only discovered this fact well after she brought this lawsuit. (Doc. 352 at 1; Doc. 352-1.) The Court therefore rejects Plaintiff's position that she is entitled to summary judgment on Defendant MWI's counterclaim based on Art City's lack of a city business license.

Finally, Plaintiff argues that she is entitled to summary judgment on Defendant MWI's counterclaim because Defendant MWI cannot prove that it acquired the right to enforce the alleged contract at issue from MW LLC. (Doc. 393 at 10-11.) However, as discussed at length above, there are genuine factual disputes about whether Plaintiff formed the alleged contract with Art City rather than MW LLC. And the Court has already pointed out that, when Art City merged into Defendant MWI, as it undisputedly did,

> "all debts, liabilities and other obligations" of Art City "bec[a]me the obligations" of Defendant MWI; and, "except as prohibited by other law, all the rights, privileges, immunities, powers and purposes" of Art City "bec[a]me vested in" Defendant MWI. N.M. Stat. Ann. § 53-19-62.2(A)(3), (5)[.][24]

---

[24] Moreover, Plaintiff has not argued that this vesting of rights, privileges, immunities, powers, and purposes, was "prohibited by other law" within the meaning of N.M. Stat. Ann. § 53-19-62.2. (*See generally* Docs. 393, 426.)

(Doc. 325 at 17.) Thus, by operation of law, Defendant MWI acquired the rights and obligations of any contract governed by the Meow Terms e-mail that Art City entered into with Plaintiff, including any rights of enforcement.

### III.  Conclusion

For all of the above reasons, the Court concludes that there are genuine issues of material fact regarding whether Plaintiff and Art City entered into a legally binding contract for the installation of ISQ in the HoER governed by the terms set forth in the Meow Terms e-mail, which contract Defendant MWI is entitled to enforce. Plaintiff has therefore failed to show her entitlement to summary judgment on Defendant MWI's counterclaim seeking a declaratory judgment to that effect. Plaintiff's Motion for Partial Summary Judgment (Doc. 393) is DENIED.

IT IS SO ORDERED.

KIRTAN KHALSA
UNITED STATES MAGISTRATE JUDGE
Presiding by Consent